In The

# United States Court of Appeals

### For The Federal Circuit

## SMARTSKY NETWORKS, LLC,

*Plaintiff – Appellant,*

v.

## GOGO BUSINESS AVIATION, LLC, GOGO INC.,

*Defendants – Appellees.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
IN NO. 1:22-cv-00266-GBW, JUDGE GREGORY BRIAN WILLIAMS.**

––––––––––––––

## NON-CONFIDENTIAL BRIEF OF APPELLANT

––––––––––––––

Lance A. Lawson
BURR & FORMAN, LLP
101 South Tyron Street, Suite 2610
Charlotte, North Carolina 28280
(704) 347-1170
llawson@burr.com

Ryan M. Corbett
BURR & FORMAN, LLP
201 North Franklin Street, Suite 3200
Tampa, Florida 33602
(813) 221-2626
rcorbett@burr.com

Jack B. Blumenfeld
Rodger D. Smith II
MORRIS, NICHOLS,
    ARSCHT & TUNNELL LLP
1201 North Market Street
Post Office Box 1347
Wilmington, Delaware 19899
(302) 658-9200
blumenfeld@morrisnichols.com
rsmith@morrisnichols.com

*Counsel for Appellant*          *Counsel for Appellant*          *Counsel for Appellant*

**Claims of U.S. Patent No. 9,312,947**

1. A network base station within a network including at least one in-flight communication node, the network base station comprising:

a radio configured via software defined radio to utilize beamforming to generate a plurality of steerable beams, to enable multiple reuses of a same frequency to communicate with respective different in-flight communication nodes via respective different communication links,

wherein the respective different communication links are high speed data communications links that are enabled to be maintained continuous and uninterrupted in time while one of the respective different in-flight communication nodes transitions between a first steerable beam associated with a first coverage area defined by the network base station and a second steerable beam associated with a second coverage area defined by another network base station, the first and second coverage areas at least partially overlapping.

11. A network comprising a plurality of network base stations configured to communicate with at least one in-flight node, the network base stations including at least two base stations having coverage areas that at least partially overlap with each other, each of the at least two base stations including:

a radio configured via software defined radio to utilize beamforming to generate a plurality of steerable beams, to enable multiple reuses of a same frequency to communicate with respective different in-flight communication nodes via respective different communication links,

wherein the respective different communication links are high speed data communications links that are enabled to be maintained continuous and uninterrupted in time while one of the respective different in-flight communication nodes transitions between corresponding steerable beams associated with respective ones of the coverage areas defined by the at least two base stations.

**Claims of U.S. Patent No. 11,223,417**

1. A ground station among a network of ground stations configured to provide a wirelessly transmitted high speed data communication link to a receiver station on an in-flight aircraft, the ground station comprising:

an antenna; and

a software defined radio operably coupled to the antenna, the software defined radio configuring the ground station to conduct a handover of the in-flight aircraft to another ground station within the network of ground stations to maintain the high speed data communication link continuous and uninterrupted in time;

wherein the software defined radio is configured to employ a wireless radio access network protocol operating in a communication band from about 2 GHz to about 6 GHz,

wherein the ground station is configured to utilize beamforming to generate one or more steerable beams used to form the high speed data communication link; and

wherein the ground station is configured to reuse a same frequency to communicate with the receiver station and another receiver station on another in-flight aircraft.

11. A wireless communication network configured to provide high speed wirelessly transmitted data communication to an in-flight aircraft, the network comprising:

a plurality of ground stations, the ground stations being located such that at least some of the ground stations are within overlapping communication range of respective other ones of the ground stations, the ground stations being configured via software defined radio to:

communicate with a receiver station located onboard the in-flight aircraft to provide a high speed data communication link continuous and uninterrupted in time with the receiver station employing a wireless radio access network protocol operating in a communication band from about 2 GHz to about 6 GHz, and

utilize beamforming to generate a plurality of steerable beams used to form the high speed data communication link, and reuse a same frequency to communicate with the receiver station and another receiver station on another in-flight aircraft,

wherein the high speed data communication link is maintained continuous and uninterrupted in time while the in-flight aircraft moves from a coverage area provided by one of the plurality of ground stations to a coverage area provided by another of the plurality of ground stations.

**Claims of U.S. Patent No. 10,257,717**

1. A network for providing air-to-ground (ATG) wireless communication in various cells, comprising:

a first base station including a first antenna array defining a first directional radiation pattern that is oriented toward a horizon; and

a second base station including second antenna array defining a second directional radiation pattern that at least partially overlaps with the first base station,

wherein the first base station employs unlicensed spectrum,

wherein the second base station employs licensed spectrum,

wherein the first and second base stations are each configured to wirelessly communicate with a radio disposed on an aircraft flying through respective cell coverage areas of the first and second base stations, and

wherein the first and second base stations are each configured to handover communication with the radio as the aircraft moves between the respective cell coverage areas of the first and second base stations.

12. A network for providing air-to-ground (ATG) wireless communication in various cells, comprising:

a first base station including a first antenna array defining a first directional radiation pattern that is oriented toward a horizon; and

a second base station including second antenna array defining a second directional radiation pattern that at least partially overlaps with the first base station,

wherein one of the first base station or the second base station employs unlicensed spectrum, and the other of the first base station and the second base station employs licensed spectrum,

wherein the first and second base stations are each configured to wirelessly communicate with a radio disposed on an aircraft flying through respective cell coverage areas of the first and second base stations, and

wherein the first and second base stations are each configured to handover communication with the radio as the aircraft moves between the respective cell coverage areas of the first and second base stations.

**Claims of U.S. Patent No. 9,730,077**

1. An air-to-ground (ATG) network providing wireless communication to an in-flight aircraft capable of passing through various cells of the ATG network, the ATG network comprising:

a first ATG base station defining a first radiation pattern focusing energy toward the horizon;

a second ATG base station defining a second radiation pattern focusing energy toward the horizon; and

a plurality of additional ATG base stations, each of which defines a corresponding radiation pattern focusing energy toward the horizon,

wherein the first, second and additional ATG base stations are spaced apart from each other to define at least partially overlapping coverage areas to communicate with an antenna assembly on the in-flight aircraft in an ATG communication layer defined between a first altitude and a second altitude via the ATG network,

wherein a plurality of terrestrial base stations are configured to communicate primarily in a ground communication layer below the first altitude via a terrestrial communication network, and

wherein the first, second and additional ATG base stations are each configured to communicate in the ATG communication layer using the same radio frequency (RF) spectrum used by the terrestrial base stations in the ground communication layer.

2. The ATG network of claim 1, wherein a serving ATG base station from among the first, second and additional ATG base stations is in communication with the in-flight aircraft while being geographically located outside a coverage area of each of the terrestrial base stations in a portion of the ground communication layer above which the in-flight aircraft is located.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 23-1058 |
| **Short Case Caption** | SmartSky Networks, LLC v. Gogo Business Aviation, LLC |
| **Filing Party/Entity** | SmartSky Networks, LLC |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/28/2022

Signature:  /s/ Lance A. Lawson

Name:  Lance A. Lawson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| SmartSky Networks, LLC | | SmartSky Networks, LLC is wholly owned by SmartSky MidCo, LLC |
| | | SmartSky MidCo, LLC is wholly owned by SmartSky New HoldCo, LLC |
| | | No publicly held company owns 10% or more stock in SmartSky Networks, LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable                    ☐   Additional pages attached

| Jack B. Blumenfeld Morris, Nichols, Arsht & Tunnell LLP | Rodger Dallery Smith, II Morris, Nichols, Arsht & Tunnell LLP | Sarah Elizabeth Simonetti Morris, Nichols, Arsht & Tunnell LLP |
|---|---|---|
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑   None/Not Applicable                    ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable                    ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

FORM 30. Certificate of Service                                    Form 30
                                                                   July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 23-1058

**Short Case Caption** SmartSky Networks, LLC v. Gogo Business Aviation, LLC

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 10/28/2022

by  ☐ U.S. Mail  ☐ Hand Delivery  ☑ Email  ☐ Facsimile
    ☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
| --- | --- |
| Thomas D. Rein, Stephanie P. Koh, Nathaniel C. Love, Julia G. Tabat | Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Tel: (312) 853-7000; Email: trein@sidley.com, skoh@sidley.com, nlove@sidley.com, jtabat@sidley.com |
| Kelly E. Farnan, Tyler E. Cragg, Griffin A. Schoenbaum | Richards, Layton, & Finger, P.A.<br>One Rodney Square, 920 North King Street<br>Wilmington, DE 19801<br>Tel: (302) 651-7700; Email: farnan@rlf.com, cragg@rlf.com, schoenbaum@rlf.com |
|  |  |
|  |  |
|  |  |

☐  Additional pages attached.

Date: 10/28/2022

Signature: /s/ Ryan M. Corbett

Name: Ryan M. Corbett

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF RELATED CASES .............................................. viii

STATEMENT OF JURISDICTION................................................... 1

STATEMENT OF ISSUES ON APPEAL ....................................... 2

I.     INTRODUCTION ................................................. 4

II.    STATEMENT OF THE CASE...................................... 4

    A.    The Asserted Patents .............................................. 8

    B.    The Accused Product............................................ 11

    C.    Preliminary Injunction Motion and Order............................ 12

III.    SUMMARY OF THE ARGUMENT ........................... 15

IV.    ARGUMENT.................................................... 17

    A.    Standard of Review ............................................. 17

    B.    The District Court's Construction of "High Speed Data Communications Links that are Enabled to be Maintained Continuous and Uninterrupted in Time" is Erroneous........................ 18

        1.    *The District Court's Construction Contradicts the Intrinsic Evidence* ................................................ 19

        2.    *Gogo's Own Documents and Personnel Contradict the District Court's Construction* ................................ 27

    C.    The District Court Erred in Construing the '717 Patent Claims......... 28

    D.    The District Court Erred by Finding No Likelihood of Success on the Merits Regarding the '077 Patent.............................. 31

i

1.      *The '077 Patent Claims Do Not Require a Terrestrial Network* ..................................................................31

2.      *Gogo's Conclusory Obviousness Argument Lacks Substantial Merit* ...............................................37

E.      The District Court Erred By Finding No Likelihood of Irreparable Harm, and Not Crediting SmartSky's Undisputed, Hallmark Evidence of Such Harm ......................................42

1.      *The District Court Correctly Found That SmartSky and Gogo Are Direct Competitors* ..................................46

2.      *The District Court Acknowledged that Gogo's Customers Are "Sticky" – After Gogo Equipment Is Installed, They Remain Gogo Customers  For At Least Seventeen Years* ........48

3.      *The District Court Erred In Finding That Gogo's Accused 5G Network Was "Yet-To-Be Released" And SmartSky Is Not Likely To Show Irreparable Harm From Lost Sales and Lost Market Share* ...........................49

4.      *The District Court Erred By Finding That SmartSky Was Not Likely to Show Irreparable Harm From Price Erosion* ....................................................................55

5.      *The District Court Erred By Finding That SmartSky Is Not Likely to Show Irreparable Harm From Lost R&D and Investments* ..........................................................57

6.      *The District Court Erred By Finding That SmartSky Did Not Suffer Irreparable Harm To Its Reputation As An Innovator And To Its Goodwill With Customers* .....................58

7.      *Gogo's Infringement Is Causing The Irreparable Harm To SmartSky* ...............................................................61

V.      CONCLUSION AND PRAYER FOR RELIEF............................................62

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIAL OMITTED

Confidential Material Subject to The Protective Order Entered by The District Court in This Matter Has Been Omitted from The Memorandum Opinion Included At Page Appx20 Of The Addendum, And From Appellant's Brief At Pages 12, 27, 45, 57, and 60. The Material Omitted Contains Confidential Business Information And Confidential Deposition Testimony. The Confidential Version of The Memorandum Order Is Included at Pages Appx2-21 Of The Addendum.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ...................................................................29

*Advanced Software Design Corp. v. Fiserv, Inc.*,
    641 F.3d 1368 (Fed. Cir. 2011) ...................................................................37

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015) ............................................................... 47, 59

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
    726 F.3d 1296 (Fed. Cir. 2013) ............................................................ 29, 30

*Avid Tech., Inc. v. Harmonic, Inc.*,
    812 F.3d 1040 (Fed. Cir. 2016) ...................................................................24

*Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*,
    967 F.3d 1353 (Fed. Cir. 2020) ............................................................ *passim*

*BlephEx, LLC v. Myco Industries, Inc.*,
    24 F.4th 1391 (Fed. Cir. 2022) ........................................................ 18, 47, 56

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013) ............................................................ 52, 53

*Butamax Advanced Biofuels LLC v. Gevo, Inc.*,
    746 F.3d 1302 (Fed. Cir. 2014) ...................................................................28

*C.R. Bard, Inc. v. M3 Sys.*,
    157 F.3d 1340 (Fed. Cir. 1998) ............................................................ 34, 37

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) .....................................................................59

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*,
    838 F. App'x 555 (Fed. Cir. 2021) ..............................................................39

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ............................................................ *passim*

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
    885 F.3d 1367 (Fed. Cir. 2018) .......................................................39

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
    946 F.3d 1367 (Fed. Cir. 2020) ....................................... 33, 34, 35

*Hypertherm, Inc. v. American Torch Tip Co.*,
    2008 WL 268589 (D.N.H. 2008)....................................................35

*i4i Ltd. Partnership v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ................................................ 51, 59

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) .....................................................39

*INVT SPE LLC v. Int'l Trade Comm'n*,
    46 F.4th 1361 (Fed. Cir. 2022) ......................................................36

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
    790 F.3d 1298 (Fed. Cir. 2015) .....................................................21

*Kaufman v. Microsoft Corp.*,
    34 F.4th 1360 (Fed. Cir. 2022) ......................................................19

*Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*,
    39 F.4th 1377 (Fed. Cir. 2022) ......................................................18

*Liqwd, Inc. v. L'Oréal USA, Inc.*,
    720 F. Appx. 623 (Fed. Cir. 2018) ...............................................48

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
    29 F.4th 1376 (Fed. Cir. 2022) ......................................................23

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017) ............................................. 39, 49

*M-I LLC v. FPUSA, LLC*,
    626 F. App'x 995 (Fed. Cir. 2015) ...............................................53

*Mylan Institutional LLC v. Aurobindo Pharma Ltd.*,
    857 F.3d 858 (Fed. Cir. 2017) ....................................... 42, 43, 47

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014) ....................................................... 16, 33, 37

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
  981 F.3d 1015 (Fed. Cir. 2020) ...................................................................21

*Nevro Corp. v. Stimwave Techs., Inc.*,
  2019 WL 3322368 (D. Del. Jul. 24, 2019) ........................................... 57, 59

*Nippon Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc.*,
  25 F. 4th 998 (Fed. Cir. 2022) ............................................................. 17, 18

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................ 24, 26

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...................................................................19

*Power Probe Grp., Inc. v. Innova Elecs. Corp.*,
  2022 WL 1089910 (Fed. Cir. Apr. 12, 2022)................................................18

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ....................................................... 47, 48, 56

*S.-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*,
  748 F. App'x 1003 (Fed. Cir. 2018) ............................................................40

*TecSec, Inc. v. Adobe Sys. Inc.*,
  658 F. App'x 570 (Fed. Cir. 2016)...............................................................21

*TEK Glob. S.R.A. v. Sealant Sys. Int'l, Inc.*,
  920 F.3d 777 (Fed. Cir. 2019) ............................................................. 51, 58

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
  846 F.3d 1190 (Fed. Cir. 2017) ........................................................... 58, 59

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) ................................................. 48, 49, 51, 54

*Trustees of Columbia U. in City of New York v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) ....................................................... 15, 21, 23

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ........................................................28

*Woods v. DeAngelo Marine Exhaust, Inc.*,
    692 F.3d 1272 (Fed. Cir. 2012) ........................................................29

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
    122 F.3d 1440 (Fed. Cir. 1997) ........................................................23

**Statutes**

28 U.S.C. § 1292(a)(1) ........................................................................1

28 U.S.C. § 1292(c)(1) ........................................................................1

28 U.S.C. § 1295(a)(1) ........................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 2107(a) .............................................................................1

35 U.S.C. § 271 ...................................................................................1

**Rule**

Fed. R. App. P. 4(a)(1)(A) ...................................................................1

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this civil action alleges patent infringement under the patent statute, 35 U.S.C. § 271.

This Court has jurisdiction under 28 U.S.C. § 1292(c)(1) to hear this appeal of an order denying an injunction in a civil action arising under an Act of Congress relating to patents.  28 U.S.C. § 1292(a)(1); 28 U.S.C. § 1295(a)(1).

The district court entered an order denying a preliminary injunction on September 26, 2022.  A timely notice of appeal was filed on October 14, 2022.  28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES ON APPEAL

1.     Whether the district court erred by denying a preliminary injunction regarding the '947 and '417 Patents based on an erroneous preliminary claim construction that the claim term "high speed data communications links that are enabled to be maintained continuous and uninterrupted in time" requires a "make-before-break" handoff, and does not include "break-before-make" handoffs.

2.     Whether the district court erred by denying a preliminary injunction regarding the '717 Patent based on an erroneous preliminary claim construction that the claim terms "first base station employs unlicensed spectrum" and "second base station employs licensed spectrum" mean "first base station employs *solely* unlicensed spectrum" and "second base station employs *solely* licensed spectrum."

3.     Whether the district court erred by denying a preliminary injunction regarding the '077 Patent by declining to decide whether the asserted claims require Gogo to provide a terrestrial network in order to infringe, and by finding that Gogo's conclusory obviousness argument raised a substantial question of validity.

4.    Whether the district court erred by finding no irreparable harm while misapplying Federal Circuit precedent and not crediting SmartSky's undisputed record evidence of irreparable harm.

## I.    INTRODUCTION

The district court's order denying SmartSky's motion for preliminary injunction (Appx1-21; "Preliminary Injunction Order") rests on multiple fundamental claim construction errors, and ignores numerous hallmark examples of irreparable harm that this Court has found require preliminary injunctive relief. SmartSky's air-to-ground (ATG) network provides *10 times* the performance of Gogo's legacy network, and only by copying SmartSky's patented technology is Gogo's 5G network able to compete with SmartSky. Gogo's ongoing infringement is actively and irreparably harming SmartSky, and should be preliminarily enjoined.

## II.    STATEMENT OF THE CASE

This case is an interlocutory appeal from the district court's order (Appx1-21) denying a preliminary injunction sought by SmartSky to enjoin Gogo's sale of its "Gogo 5G" network for providing in-flight connectivity (IFC) to business aircraft. For well over a decade, Gogo has enjoyed an effective monopoly in the business aviation market for IFC with an ATG network using 3 MHz of licensed spectrum for its exclusive use without interference from others. (Appx182, Appx189-190, Appx280, Appx1202, Appx2762, Appx9603-9604). Skyrocketing consumer demand for better performance and data consumption quickly rendered Gogo's limited bandwidth insufficient. (Appx1199, Appx995, Appx2762, Appx2961-2962). While Gogo spent years trying to purchase more licensed spectrum to keep

up with consumer demand (Appx284, Appx600-603, Appx621-622, Appx640-641, Appx2969-2970, Appx3165, Appx3330, Appx3349-3350), SmartSky charted a different course—developing a breakthrough ATG network that uses beamforming and 60 MHz of unlicensed spectrum to achieve roughly *10 times* the average effective performance of Gogo's legacy 3G/4G ATG network. (Appx182-188, Appx198-199, Appx235-240). Unlike Gogo's exclusively licensed spectrum, SmartSky's network uses the unlicensed spectrum used by thousands of other networks, such as Wi-Fi. But to do so, SmartSky developed a number of innovations to avoid interference with other networks using unlicensed spectrum.

SmartSky's ATG network incorporates innovative features that are protected by a robust patent portfolio of more than 100 U.S. patents. (Appx182). For example, U.S. Patent No. 9,312,947 ("the '947 Patent") and U.S. Patent No. 11,233,417 ("the '417 Patent") describe and claim phased array beamforming antennas and software-defined radios that generate multiple beams and direct them to a small area, which increases range as compared to an omnidirectional signal. (Appx184, Appx233-234). Because the beams are directed to a small area, multiple spatially-separated beams can be generated at the same frequency with a range greater than 100 miles, without creating harmful interference with each other or other unlicensed band transmissions on the ground, such as Wi-Fi networks. (*Id*). The '947 and '417 Patents also claim seamless handoffs of communication links between beams

originating from different ATG base stations as an aircraft moves. (Appx219-221, Appx234-235). By conducting seamless handoffs, the communication link is maintained "continuous and uninterrupted in time," which enables real-time communications such as videoconferencing. *Id*. U.S. Patent No. 10,257,717 ("the '717 Patent") and U.S. Patent No. 9,730,077 (the '077 Patent") describe and claim a ground antenna system that generates respective radiation patterns that are oriented toward the horizon, and overlap to create a "wedge" architecture. (Appx222, Appx225-226). By directing radiation patterns toward the horizon, interference from and with ground-based Wi-Fi in the unlicensed spectrum is substantially reduced. (Appx232).

SmartSky has spent more than ten years and hundreds of millions of dollars developing and building its nationwide ATG network. Throughout the development of SmartSky's network, the aviation industry, and especially Gogo, expressed deep skepticism that an unlicensed ATG network would ever be commercially viable. (Appx663, Appx669-670, Appx681, Appx691-692, Appx1426, Appx4317). Yet, in 2016, after more than eight years attempting to acquire additional licensed spectrum and criticizing SmartSky's approach, Gogo abruptly changed course and copied SmartSky's patented technology that enables use of unlicensed spectrum. (Appx1189). On the same day SmartSky received FCC certification for its ATG network using 60 MHz of unlicensed spectrum, Gogo announced it also intended to

use the same unlicensed spectrum for its "Gogo 5G" network that is accused of infringement in this case.  (Appx186, Appx4399).

Apparently realizing that its 5G network would infringe SmartSky's patents, in 2020—almost two years before Gogo made its first sale of its 5G Network—Gogo launched a preemptive strike by filing a Petition for *Inter Partes* Review challenging the validity of SmartSky's '947 Patent. (Appx769-845).  Notably, however, the Patent Trial and Appeal Board denied Gogo's Petition at the institution stage. (Appx404-416).

SmartSky commercially launched its ATG network in late 2021 to strong reviews.    (Appx186).    During demo flights, passengers remarked about the "seamless" web surfing, "flawless and consistent" live-streaming, and simultaneous FaceTime® video calls that "never buffered, not even once."   (Appx186-187, Appx725-729, Appx737-740, Appx746-747).  The same month SmartSky launched its ATG network, Gogo announced that it made its first sale of its 5G system to a customer for installation on 50 aircraft.  (Appx190-191, Appx757-760).

The drastically improved performance of SmartSky's network compared to Gogo's legacy network has positioned SmartSky to capture a substantial portion of the nearly 70% of the business aviation market that has yet to install broadband connectivity, as well as customers looking to upgrade from their outdated legacy systems.  (Appx196, Appx284, Appx996, Appx1419). But Gogo's infringing 5G

network has forced SmartSky to compete against a much larger incumbent who has enjoyed a near monopoly in the market for decades, and to compete against SmartSky's own far superior technology.  (Appx195-200, Appx9610, Appx9616-9617).  SmartSky therefore filed the instant action in the district court and immediately requested a preliminary injunction.

### A.    The Asserted Patents

The '947 and '417 Patents are from the same patent family, and share the same specification[1] relating to a broadband data communications system for in-flight aircraft.  (Appx32, Appx48-49).  The '947 Patent explains that range and throughput limitations make cellular wireless data links impractical for in-flight use, and that satellite links require costly antennas and also suffer from throughput limitations. (Appx41).  To address these problems, the '947 Patent discloses a system having a series of ground transmitters, each having a coverage area in which a respective ground transmitter can establish a communications link with the aircraft.  (Appx42). As the aircraft moves across coverage areas, the aircraft transitions between ground transmitters so the link is maintained without a loss of communications.  *Id*.  The ground transmitters use a software-defined radio (SDR) to control and configure the antenna to "beam form" the signal to such a narrow beam that interference with

---

[1] References herein to the common specification of the '947 and '417 Patents are to the '947 Patent, but apply equally to the '417 Patent.

nearby signals on the same or very close frequencies is minimized. (Appx43). By using beamforming, the same frequency can be re-used for different communications links, and the range is greatly increased, allowing the aircraft to communicate with ground transmitters further away. *Id.* The '947 Patent specification states that embodiments may use present and future versions of the IEEE 802.16 Air Interface Standard, such as the IEEE 802.16e (or 802.16-2005) standard that addresses mobile (rather than just fixed) components or other communication protocols such as the UTRAN Long Term Evolution (LTE) Terrestrial Radio Access Network protocol. (Appx44).

The '717 and '077 Patent relate to another aspect of SmartSky's ATG network that enables increased performance and reduced interference while using unlicensed spectrum. The '717 Patent explains that antennas at a base station can transmit "signals having a radiation pattern defined between two elevation angles resulting in an increasing vertical beam width…to form a wedge-shaped sector." (Appx71). As shown below in Fig. 2 of the '717 Patent, the wedge-shaped sectors overlap to progressively build in altitude. (Appx67).



**FIG. 2**

The '717 Patent explains that the network can implement "frequency reuse" so that adjacent base stations can use alternating channels between adjacent cell coverage areas. (Appx73). For example, the base stations may include radios that can communicate using licensed spectrum or unlicensed spectrum. (Appx75).

The '077 Patent uses some of the same figures as the '717 Patent (such as Fig. 2 above) to describe an ATG network using a similar architecture, in which base stations define radiation patterns focusing energy toward the horizon to create overlapping wedge-shaped cells. (Appx82, Appx92). The in-flight aircraft may use antennas that focus toward the horizon or just below the horizon so that the aircraft can communicate with distant base stations instead of the base stations immediately below. (Appx92). Therefore, the aircraft is essentially unaffected by communications on the ground below the aircraft, which allows the aircraft to use the same RF spectrum to communicate with a distantly located base station as the RF spectrum used by terrestrial networks (e.g., Wi-Fi) directly below the aircraft.

*Id.* For example, Fig. 3 of the '077 Patent (below), shows an ATG network having ATG base stations 350, 355 enabling communication in an ATG communication layer 335, using the same RF spectrum used by a separate terrestrial network having terrestrial base stations 310 enabling communications in a ground communication layer 320. (Appx83).



**FIG. 3**

As explained below, Gogo has incorporated these same claimed features into its 5G network, which allows Gogo to unfairly compete with, and irreparably harm, SmartSky using SmartSky's own technology.

B.    **The Accused Product**

The accused Gogo 5G system includes a network of base stations that use a combination of Gogo's 3 MHz of licensed spectrum in the 850 MHz band, and 60 MHz of unlicensed spectrum in the 2.4 GHz band. (Appx6396, Appx6417).

CONFIDENTIAL MATERIAL REDACTED

The Gogo 5G base stations include software defined radios to implement beamforming.  (Appx8081-8083, Appx9260, Appx9305, Appx9322-9323, Appx9343).  Gogo has touted that its use of beamforming enables communication with six different aircraft in the same sector using the same frequency, and delivers a stronger signal with less interference.  (Appx895, Appx902, Appx243, Appx918-919).  Gogo's confidential technical documents explain that during a handover procedure from one base station to another base station, confidential details confidential details  (Appx4868) (emphasis added):

As SmartSky's technical expert, Dr. Steven Goldberg, explained, the 2.4 GHz antennas on the Gogo 5G base stations have a radiation pattern oriented toward the horizon.  (Appx8092-8095 (citing Appx6421); *see also* Appx9346-9347).  By orienting the radiation pattern of the ATG base stations toward the horizon, Gogo's 5G network is able to use the same 2.4 GHz spectrum as terrestrial networks, such as Wi-Fi networks, on the ground.  (Appx8100-8101).

## C.     Preliminary Injunction Motion and Order

SmartSky's motion for preliminary injunction, supported by multiple technical expert declarations and economic expert declarations, explained how Gogo's 5G network infringes each of the Asserted Patents, and how that infringement is irreparably harming SmartSky.  Without holding a hearing, the district court denied the motion, finding that SmartSky's irreparable harm arguments

are speculative, and that SmartSky failed to establish a likelihood of success on the merits. Regarding the '947 and '417 Patents, the district court found that maintaining a data communications link "continuous and uninterrupted in time" during a handover "is encompassed by" a make-before-break handover "rather than a 'continuous and interrupted in time' connectivity link between the aircraft and *the user.*" (Appx11-12) (emphasis added).[2] The district court cited arguments SmartSky made during prosecution distinguishing prior art that terminates the link during handovers, as the basis for excluding "break-before-make" handoffs. *See id.*

Regarding the '717 Patent, SmartSky argued that the Gogo 5G base stations use both licensed and unlicensed spectrum, and therefore meet the claim limitation requiring a handoff between base stations that employ licensed and unlicensed spectrum. (Appx13). The district court narrowly construed the claims to require a first base station that "employs *solely* licensed spectrum" and a second base station that "employs *solely* unlicensed spectrum," and on that basis found that SmartSky failed to show a likelihood of success on infringement. (Appx15).

Regarding the '077 Patent, the parties disagree about whether claim 1 requires Gogo to provide a terrestrial network to infringe, or whether the terrestrial network

---

[2] The district court apparently misunderstood SmartSky's argument, as SmartSky never argued that the "continuous and uninterrupted in time" link is between the aircraft and the user.

is merely a reference point for describing the claimed ATG network. The district court declined to decide the issue, and found that SmartSky failed to meet its burden regarding infringement. (Appx17). The district court further found that Gogo raised a substantial question of invalidity by arguing that the asserted '077 Patent claims are obvious in view of U.S. Patent App. Publ. No. 2006/0040660 to Cruz ("Cruz"), which was considered by the Examiner during prosecution, and U.S. Patent No. 5,444, 762 to Frey ("Frey"), even though the district court acknowledged the suggested motivation for combining the references was conclusory. (Appx17-18, Appx7213-7248).

Regarding irreparable harm, the district court further found that although the parties are direct competitors, and that although lost market share due to customer "stickiness" has the potential to harm SmartSky, that harm is not imminent because Gogo's 5G network is "yet-to-be released." (Appx20-21). The district court further found that SmartSky's price erosion argument is speculative, and rests on conclusory assertions. The district court also noted that SmartSky has not been harmed because SmartSky has been able to secure some customers and investments despite Gogo's entry into the market. *Id.* But as explained below, the district court failed to consider substantial evidence that Gogo's infringement is actively, and irreparably, harming SmartSky.

## III.    SUMMARY OF THE ARGUMENT

The Preliminary Injunction Order relies on multiple claim construction legal errors, and ignores concrete evidence of ongoing irreparable harm.  Regarding the '947 and '417 Patents, the district court's construction of "continuous and uninterrupted" is inconsistent with the dependent claims, specification, prosecution history, Gogo's own technical documents, and the testimony of Gogo's own expert. The district court's distinction between "make-before-break" and "break-before-make" handoffs is unsupported in the record, and contrary to central canons of claim construction, including claim differentiation.  *See, e.g.*, *Trustees of Columbia U. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) (construction of independent claim is erroneous when inconsistent with claims depending therefrom).  The district court also misinterpreted arguments made during prosecution of the '947 Patent, which fall well short of the clear and unmistakable standard required for prosecution disclaimer.

Regarding the '717 Patent, the district court improperly re-wrote the claims to require handoffs between a base station that employs "solely" licensed spectrum and a base station that employs "solely" unlicensed spectrum.  The district court erred as a matter of law because nothing in the intrinsic evidence supports such a narrow reading of the claims, which the district court based on a misreading of SmartSky's expert's testimony.

The district court further erred by refusing to determine whether claim 1 of the '077 Patent requires Gogo to provide terrestrial base stations to infringe, and finding that SmartSky therefore failed to meet its burden regarding infringement. This Court has "repeatedly distinguished a description of the environment in which a claimed invention operates from a limitation on the claimed invention itself." *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345 (Fed. Cir. 2014). Claim 1 of the '077 Patent claims an air-to-ground (ATG) network that uses the same RF spectrum as separate terrestrial base stations, which are merely referenced to describe the RF spectrum used by the claimed ATG network, and are not part of the claimed ATG network itself. Regarding obviousness, Gogo's proposed motivation to combine Cruz and Frey merely notes that both references identify the same need to avoid interference, but fails to explain how the alleged common frequency use of Frey would avoid interference if implemented in the system disclosed in Cruz. Such conclusory arguments do not raise a substantial question of validity needed to avoid a preliminary injunction.

Regarding irreparable harm, the district court erred in finding that Gogo's infringement is not harming SmartSky because Gogo's 5G network has not yet launched, and because SmartSky has been able to secure a handful of customers and some investment. Gogo and SmartSky are direct competitors in a two-competitor market. Gogo has been the only supplier of an ATG network in the U.S. for more

than 15 years and currently has more than an 85% market share of all U.S. business aviation aircraft with any form of in-flight connectivity, while SmartSky is attempting to break into the ATG market with its groundbreaking technology that provides *10 times* the performance of Gogo's legacy ATG network. Gogo's sale of its 5G system, components, and subscriptions are locking in customers that will keep Gogo's ATG system on each Gogo customer aircraft for at least 17 years on average. There is no question that SmartSky would be able to secure significantly more customers and greater investment on significantly better terms were it not for Gogo copying SmartSky's technology and infringing SmartSky's patents. SmartSky's price erosion and loss of goodwill and reputation as an innovator are supported by testimony from SmartSky's President, which Gogo has not rebutted.

## IV.   ARGUMENT

The district court committed legal error by improperly construing multiple terms of the asserted claims, and abused its discretion by making clearly erroneous factual findings regarding irreparable harm.

### A.   Standard of Review

The Federal Circuit generally reviews a denial of a preliminary injunction according to the law of the regional circuit (here, the Third Circuit), but "give[s] dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues," such as likelihood of success on the merits. *Nippon*

*Shinyaku Co., Ltd. v. Sarepta Therapeutics, Inc*., 25 F. 4th 998, 1004 (Fed. Cir. 2022); *BlephEx, LLC v. Myco Industries, Inc*., 24 F.4th 1391, 1398 (Fed. Cir. 2022). "Both the Federal Circuit and the Third Circuit review a denial of a preliminary injunction for abuse of discretion," which may be established by showing a clear error of judgment, an erroneous legal conclusion, or clearly erroneous factual findings. *Nippon*, 25 F. 4th at 1004; *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377, 1379 (Fed. Cir. 2022). Factual findings are reviewed for clear error, while legal conclusions, such as claim construction, are reviewed *de novo*. *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1369 (Fed. Cir. 2020); *Power Probe Grp., Inc. v. Innova Elecs. Corp*., 2022 WL 1089910, at *2 (Fed. Cir. Apr. 12, 2022).

## B.    The District Court's Construction of "High Speed Data Communications Links that are Enabled to be Maintained Continuous and Uninterrupted in Time" is Erroneous

The district court erred by interpreting "high speed data communications links that are enabled to be maintained continuous and uninterrupted in time" as limited to "make-before-break" handoffs, and excluding "break-before-make" handoffs. While both types of handoffs maintain the communication link continuously and uninterrupted in time (which in this case does not cause a break in the overall data link), "break-before-make" handoffs include a short break at the physical layer of the link, while a "make-before-break" handoff does not. (Appx8056-8059). The

district court's construction is wrong because it is inconsistent with the dependent claims, specification, and prosecution history, as well as Gogo's own documents and expert testimony.

### 1. The District Court's Construction Contradicts the Intrinsic Evidence

The specification is "the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005). "A claim construction that would exclude the preferred embodiment is rarely, if ever, correct." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022). The '947 Patent specification provides multiple examples of protocols that require "break-before-make" handoffs, and yet still maintain the high-speed data communication link "continuous and uninterrupted" during a handoff.

The "Summary of the Invention" section explains that "a continuous and uninterrupted high speed data communications link" is provided "according to the IEEE 802.16 Air Interface Standard." (Appx41). The specification further explains that this approach allows passengers to "have uninterrupted high speed data communications while in the air" as the aircraft passes between ground transmitters. *Id*. The '947 Patent specifically references the IEEE 802.16e standard, which Dr. Goldberg explained requires "break-before-make" or "hard" handoffs. (Appx44, Appx8069-8070, Appx8209). Dr. Goldberg cited to a textbook entitled "Current Technology Developments of WiMax Systems," which explains:

As defined in [an] IEEE 802.16e standard, three basic handover modes are supported ***to enable continuous data transmission and services*** when a MS [mobile station] moves across the cell boundaries of BSs [base stations], and they are Hard Handover (HHO), a Macro Diversity Handover (MDHO) and Fast Base Station Switching (FBSS). Among these handover modes, ***HHO is mandatory*** in [an] IEEE 802.16e system, while MDHO and FBSS are option. ***HHO adopts a break-before-make approach***…

(Appx8070-8071 (citing Appx9136)); *see also* (Appx9091 (Hard Handoff (HHO) is "one of three handoff methods supported within the 802.16e standard…Of these, the HHO[3] is mandatory")).  Thus, the '947 Patent specification references an IEEE standard, which acknowledges that "break-before-make" handoffs support ***continuous data transmission and services***.

The '947 Patent specification further explains that the UTRAN Long Term Evolution (LTE) Terrestrial Radio Access Network protocol can be used, which Dr. Goldberg explained also requires break-before-make handoffs.   (Appx44, Appx8070-8071).   In particular, Dr. Goldberg cited a conference paper from Ericsson Research entitled "Handover within 3GPP LTE: Design Principles and Performance," which confirms that "[i]n LTE only hard handover is supported." (Appx8071, Appx9127).  The district court's claim construction limiting the claims to only make-before-break handoffs is incorrect because it excludes multiple

---

[3] Gogo's expert, Dr. Michalson, acknowledged that the hard handoff referenced in the article cited by Dr. Goldberg corresponds to "break-before-make" handoffs.  (Appx8152-8153).

preferred embodiments that require break-before-make handoffs.  *See Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1024 (Fed. Cir. 2020) (reversing claim construction that excluded preferred embodiment); *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (same).

In addition to contradicting the '947 Patent specification, the district court's claim construction also renders multiple dependent claims inconsistent with the independent claim from which they depend.  The doctrine of claim differentiation requires that "[a] limitation in the parent [claim] be at least broad enough to encompass the limitation in the dependent claim." *TecSec, Inc. v. Adobe Sys. Inc.*, 658 F. App'x 570, 577 (Fed. Cir. 2016) (*citing Tr. of Columbia Univ.*, 811 F.3d at 1370).

Claim 1 of the '947 Patent recites, *inter alia*,

…high speed data communications links that are enabled to be ***maintained continuous and uninterrupted in time*** while one of the respective different in-flight communication nodes transitions between a first steerable beam… and a second steerable beam…

(Appx45) (emphasis added).  Though the district court narrowly interpreted this claim term as limited to "make-before-break" handoffs, claims 4 and 5 depend from claim 1, and recite (emphasis added):

4.    The network base station of claim 1, wherein the high speed data communications link is provided ***continuous and uninterrupted in time*** with the receiver station ***according to Long Term Evolution (LTE) terrestrial radio access network protocols***.

21

> 5.  The network base station of claim 1, wherein the high speed data communications link is provided ***continuous and uninterrupted in time*** with the receiver station ***according to IEEE 802.16 Air Interface Standard***.

*Id*.  As explained above, both the LTE terrestrial radio access network protocols and the IEEE 802.16 Air Interface Standard require "break-before-make" or "hard" handoffs.  *See, e.g.*, Appx9091 ("HHO [hard handoff] is mandatory"); Appx9136 ("HHO is mandatory in IEEE 802.16e system . . . HHO adopts a break-before-make approach"); Appx9127 ("In LTE only hard handover is supported").  Because the district court's construction of "continuous and uninterrupted in time" in independent claim 1 requires only "make-before-break" handoffs, dependent claims 4 and 5, which require "break-before-make" handoffs, are not encompassed within the district court's construction of claim 1.  Hence, the district court's construction violates the doctrine of claim differentiation.

Gogo's expert, Dr. Michalson, agreed at his deposition that if the "continuous and uninterrupted" claim term is interpreted as requiring "make-before-break" handoffs, then claim 4 is "*claiming something that's impossible* . . . because if LTE has to use hard handovers, then it can't, as a matter of technology, provide a link that's continuous and uninterrupted in time."  (Appx8155 (emphasis added); *see also* Appx8156-8157 ("[I]f 802.16 requires hard handovers, then it would be the same problem as claim 4 . . . [I]f 802.16 requires hard handovers, then claim 5 is, on its face, impossible."); Appx8157-8159 (acknowledging same inconsistency regarding

dependent claim 2 of the '417 Patent)).  The district court's construction is erroneous because courts "must not interpret an independent claim in a way that is inconsistent with a claim which depends from it."  *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997); *see also Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1379–82 (Fed. Cir. 2022) (reversing construction of a fuse end cap that excluded single piece end caps where dependent claim specified that end cap be "a single, contiguous piece of conductive material"); *Tr. of Columbia,* 811 F.3d at 1370 (reversing construction of independent claim term that was inconsistent with dependent claims).

The district court's construction also contradicts the prosecution history, which the district court misinterpreted as disclaiming break-before-make handoffs. The district court found that because "SmartSky distinguished prior art that contemplated termination of the communication link between the ground—the ATG base station—and the aircraft," the "continuous and uninterrupted in time" limitation is limited to a "make-before-break" handover.  (Appx11-12).  Although SmartSky distinguished prior art in which the communication link was completely terminated, SmartSky did not disclaim "break-before-make" handoffs that maintain the link continuous and uninterrupted despite short breaks at the physical layer.

While the prosecution history "plays various roles in resolving uncertainties about claim scope," the standard for applying prosecution disclaimer is very high,

and "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003). "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (internal quotation marks and citation omitted).

The arguments SmartSky made during prosecution of the '947 Patent fall far short of constituting a "clear and unmistakable" disclaimer of "break-before-make" handoffs. Claim 1 of the '947 Patent was rejected as allegedly being obvious in view of, *inter alia*, U.S. Patent App. Publ. No. 2002/0160773 to Gresham ("Gresham"), which the Examiner alleged discloses a communication link that is maintained continuous and uninterrupted in time while the in-flight communication node transitions between coverage areas. (Appx447-451).

In response, SmartSky explained that in Gresham, a server 20 on the aircraft connects with a base station on the ground at 15-minute intervals to periodically upload and download data to and from a cache memory of the server 20 to form a virtual world wide web. (Appx430-431). The server 20 "masquerades" as the passenger's usual domain name server to produce a "locally generated" worldwide web page, but the original websites themselves are not accessed in flight by the server 20. (Appx430-431, Appx1492). SmartSky argued that Gresham explicitly

24

states that "there is no possibility for a passenger browsing the pages within the cache on board the aircraft to visit Internet sites which have not been stored in the cache." (Appx431, Appx1496-1497). Importantly, SmartSky noted that the server 20 of Gresham connects to the base station at 15-minute intervals and "terminates communication sessions" with the base stations in between connections. (Appx431, Appx1496-1497). Any messages the user attempts to transmit while the communication session is terminated are stored in the cache until the next connection. (Appx431, Appx1496-1497).

When the aircraft reaches an overlap region of two coverage cells, the first station (90) commands the server 20 to contact second station (120) for the next connection. (Appx430-431, Appx1502). At the next 15-minute interval, the server 20 contacts the second station (120) to update the cache. (Appx431, Appx1502). Because of these 15-minute intervals, SmartSky argued that Gresham does not disclose a continuous and uninterrupted communication link with one base station, much less a continuous and uninterrupted communication link during a handover between base stations. (Appx432).

Importantly, SmartSky never argued that every layer (e.g., particularly the physical layer that is briefly broken during a break-before-make handoff) of the communication link must be maintained continuous and uninterrupted during the entire handover procedure. As Dr. Goldberg explained, Gresham teaches the

termination of the entire connection *at all layers* of the OSI stack.  (Appx8062-8063).  In particular, Gresham's termination of "communication sessions" indicates termination of the communication link at higher layers, such that SmartSky's argument did not disclaim short breaks at the physical layer that would not interrupt the higher layer connection.  (*Id*).  Moreover, SmartSky differentiated the claimed "continuous and uninterrupted" communication links from the intermittent links of Gresham based on the inability of "a passenger browsing the pages within the cache on board the aircraft to visit Internet sites which have not been stored in the cache." (Appx431, Appx1496).  Dr. Goldberg explained that one skilled in the art would understand that this argument focuses on the higher layer connection with the base station, as a short break in the physical layer during a "break-before-make" handoff would not prevent the passenger from visiting Internet sites that have not been stored in the cache, because such a short break in the physical layer does not interrupt higher layer connections.  (Appx8062-8063).

The district court incorrectly interpreted the '947 Patent prosecution history as disclaiming any break at any layer of the communication link.  Because SmartSky's prosecution arguments fall far short of a "clear and unmistakable" disavowal of "break-before-make" handoffs, the district court's construction requiring "make-before-break" handoffs must be vacated.  *Omega Eng'g*, 334 F.3d at 1325–26.

26

CONFIDENTIAL MATERIAL REDACTED

2. *Gogo's Own Documents and Personnel Contradict the District Court's Construction*

The district court's claim construction is also undermined by Gogo's own documents and testimony. For example, U.S. Patent No. 10,200,111, assigned to Gogo, LLC and issued in February 2019, explains that "Aircraft networks hand over the Point-to-Point communication links between Radio Access Networks (RAN) in different locations (different Ground Subsystems 1), in order to *maintain continuity of service* . . . [and such] [h]andovers may be *hard or soft*." (Appx9152). U.S. Patent No. 11,153,005 ("the '005 Patent"), assigned to Gogo Business Aviation, LLC and issued in October 2021, explains that "if the execution of the hard handoff fails, the communication link between the end user(s) and the network 110 may be disrupted or terminated" (Appx9170), which indicates that successful hard handoffs, used during normal operation, would *not* disrupt the communication link.

Perhaps most tellingly, Gogo's own technical documents explaining the "break-before-make" handover procedures performed by the Gogo Accused 5G System explain that confidential details ▮▮▮▮▮ (Appx4868 (emphasis added); *see also* Appx8084-8087).

A Gogo engineer, Mr. Yong Liu, testified that this portion of Gogo's technical document means that during Gogo's "break-before-make" handover procedure, confidential details ▮▮▮▮▮ (Appx9546-9547 (emphasis added); *see also* Appx9533, Appx9540, Appx9546-9555).

Therefore, the district court's construction is also inconsistent with Gogo's own documents and the testimony of its engineer, which confirm that Gogo's "break-before-make" handoff maintains a continuous and uninterrupted communications link. *See Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1309-12 (Fed. Cir. 2014) (relying in part on accused infringer's description of its patented technology to reject contention that patentee implicitly narrowly defined disputed term); *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1348 (Fed. Cir. 2009) (relying in part on how accused infringer used disputed claim term to support broader construction).  Because Gogo's sole non-infringement defense for the '947 and '417 Patents relied on the district court's erroneous construction of the "continuous and uninterrupted" limitation, and Gogo's documents and its engineer unambiguously state that its handover procedures "maintain the continuity of the connection," this Court should find that SmartSky has established a likelihood of success on the merits with respect to the '947 and '417 Patents.

## C.    The District Court Erred in Construing the '717 Patent Claims

The district court's finding regarding the likelihood of success on the merits for the '717 Patent hinges on another erroneous claim construction.  Claim 1 of the '717 Patent recites, in relevant part:

…wherein the first base station ***employs unlicensed spectrum***,

wherein the second base station ***employs licensed spectrum***,…

wherein ***the first and second base stations are each configured to handover communication with the radio as the aircraft moves between the respective cell coverage areas of the first and second base stations***.

(Appx76).  The district court erred by re-writing the claim language to require that the first base station "***solely*** employs unlicensed spectrum" and that the second base station "***solely*** employs licensed spectrum." (Appx15).  The district court summarily concluded that the "plain and ordinary meaning" of the claim language supports Gogo's proposed construction of inserting the word "solely" into the claim terms. *Id*.  But this Court has repeatedly refused to assign claim terms "a more particularized meaning unless a narrower construction is required by the specification or prosecution history."  *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013) (refusing to limit "preferential activation zone" to one that is "predetermined" or "identifiable"); *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1285 (Fed. Cir. 2012) (declining to limit "angularly disposed" to any specific angle).

For example, in *Aria Diagnostics, Inc. v. Sequenom, Inc.*, this Court vacated an order denying a preliminary injunction motion based on the district court's overly narrow claim construction.  726 F.3d 1296, 1303 (Fed. Cir. 2013).  In *Aria Diagnostics*, the district court improperly construed the term "amplifying a

paternally inherited nucleic acid" to mean that *only* the paternally inherited nucleic acid is increased, but that other types of nucleic acid could not be amplified. *See id*. This Court explained that "the claim language requires 'amplifying' paternally inherited nucleic acid, without any mention of an effect on the quantity of other nucleic acid. Thus, the claim as written stands infringed without regard to whether, or not, other nucleic acid is amplified . . . The claim does not state that paternally inherited nucleic acid is 'selectively' or 'only' amplified." *Id.* Like the claim term in *Aria Diagnostics*, claim 1 of the '717 Patent recites the first base station "employs unlicensed spectrum," but does not state that "only" unlicensed spectrum is employed. Nor does claim 1 specify that the second base station employs "only" licensed spectrum. The district court did not identify any portion of the claims, specification, or prosecution history that would indicate the claim language should be limited to a first base station employing "only" unlicensed spectrum, and a second base station employing "only" licensed spectrum.

The only alleged support for the district court's narrow construction are two statements from Dr. Goldberg's first declaration. (Appx15). But in those two statements, Dr. Goldberg merely mirrored the claim language, stating that "The first base station employs unlicensed spectrum, and the second base station employs licensed spectrum," and "[T]he asserted '717 patent claims further specify that one base station employs unlicensed spectrum while another base station employs

licensed spectrum." (Appx223, Appx233). Neither of these statements provide any indication whatsoever that Dr. Goldberg believed the claims should be limited to two base stations that respectively employ "only" unlicensed and "only" licensed spectrum. The district court's construction of the '717 Patent claims is wholly unsupported by the claim language, specification, prosecution history, and extrinsic evidence, and therefore should be vacated. Because the district court's erroneous construction was the sole basis for finding that SmartSky failed to show a likelihood of success on the merits regarding the '717 Patent, this Court should reverse the district court's finding regarding likelihood of success on the merits.

**D.     The District Court Erred by Finding No Likelihood of Success on the Merits Regarding the '077 Patent**

The district court made two errors in finding that SmartSky failed to show a likelihood of success on the merits with respect to the '077 Patent: (1) failing to construe the '077 Patent claims as not requiring Gogo to provide "terrestrial base stations" to infringe; and (2) failing to consider the evidence and arguments submitted by SmartSky and its technical expert, Dr. Goldberg, refuting Gogo's arguments that the asserted '077 Patent claims are obvious.

*1.     The '077 Patent Claims Do Not Require a Terrestrial Network*

Gogo's only non-infringement argument regarding the '077 Patent is that the asserted claims require providing a terrestrial network having terrestrial base stations, and Gogo does not provide a terrestrial network or terrestrial base stations.

31

(Appx4613).  But claim 1 of the '077 Patent merely mentions the terrestrial network as a reference point for describing the radio frequency (RF) spectrum used by the claimed ATG network, which Gogo does provide.  (Appx101).  The district court declined to decide this claim construction issue, and therefore found that SmartSky failed to meet its burden of showing a likelihood of success on infringement.  (Appx17).  The district court erred by refusing to address a claim construction issue that is readily resolved by this Court's precedent.

Claim 1 of the '077 Patent recites:

> 1. ***An air-to-ground (ATG)*** *network* providing wireless communication to an in-flight aircraft capable of passing through various cells of the ATG network; ***the ATG network comprising***:
>
> a first ATG base station defining a first radiation pattern focusing energy toward the horizon;
>
> a second ATG base station defining a second radiation pattern focusing energy toward the horizon; and
>
> a plurality of additional ATG base stations, each of which defines a corresponding radiation pattern focusing energy toward the horizon,
>
> wherein the first, second and additional ATG base stations are spaced apart from each other to define at least partially overlapping coverage areas to communicate with an antenna assembly on the in-flight aircraft in an ATG communication layer defined between a first altitude and a second altitude via the ATG network;
>
> ***wherein a plurality of terrestrial base stations are configured to communicate primarily in a ground***

32

> **communication layer below the first altitude via a terrestrial communication network**; and
>
> **wherein the first, second and additional ATG base stations are each configured to communicate in the ATG communication layer using the same radio frequency (RF) spectrum used by the terrestrial base stations in the ground communication layer**.

(Appx101) (emphasis added).

This Court has "repeatedly distinguished a description of the environment in which a claimed invention operates from a limitation on the claimed invention itself." *Nazomi Commc'ns*, 739 F.3d at 1345. For example, in *Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*, the claim at issue recited, in part, "A beverage brewing device *for use with a single serve beverage brewer* having a brewing holster." 946 F.3d 1367, 1377 (Fed. Cir. 2020) (emphasis added). The body of the claim recited the elements of the beverage brewing device, several of which reference the single serve beverage brewer, such as "a body removably receivable with a brewing holster of a single serve beverage brewer," "at least one outlet probe . . . configured to receive an outlet probe of the single serve beverage brewer when the body is received within the brewing holster," and "an inlet probe opening . . . configured to receive an inlet probe of the single serve beverage brewer in a brewing position." *Id*. at 1377 n.3. The accused infringer argued that it did not infringe the claim because it sold only the brewing device and not the single serve beverage brewer. *Id*. at 1377. This Court held that "on its face [the claim] does not require a

beverage brewer." *Id*. More specifically, despite three different elements in the body of the claim referencing the beverage brewer, the beverage brewer is merely "a 'reference point' to define the purpose and structure of the brewing device." *Id.* (quoting *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998)). This Court affirmed the district court's ruling that the claim does not require a beverage brewer. *Id*.

Just as the "face" of the claim in *Eko Brands* did not require a "beverage brewer," claim 1 of the '077 Patent on its face is directed to "An air-to-ground (ATG) network providing wireless communication to an in-flight aircraft capable of passing through various cells of the ATG network," and does not require any terrestrial network components. (Appx101). The body of claim 1 recites that the ATG network comprises three elements: a first ATG base station, a second ATG base station, and a plurality of additional ATG base stations. *Id*. The remaining limitations of claim 1 merely further describe the recited ATG base stations. As relevant here, "wherein a plurality of terrestrial base stations are configured to communicate primarily in a ground communication layer below the first altitude via a terrestrial communication network" describes the multi-layer environment in which the ATG network operates, and provides a "reference point" to clarify that the ATG network operates in altitudes above the terrestrial base stations (*e.g.*, Wi-Fi) of the ground communication layer below. *Eko Brands*, 946 F.3d at 1377. The limitation "using the same radio

34

frequency (RF) spectrum used by the terrestrial base stations in the ground communication layer" defines the RF spectrum used by the ATG network by referencing the spectrum of the terrestrial network. (Appx101). Like the beverage brewer was used as a reference point to further "define the purpose and structure of the brewing device" in *Eko Brands*, the terrestrial network and terrestrial base stations in claim 1 of the '077 Patent are used as reference points to further define the operation of the claimed ATG network. *Eko Brands*, 946 F.3d at 1377.

The remaining claims of the '077 Patent confirm that terrestrial base stations are not a required element of claim 1. In contrast to claim 1, which recites "An ATG network," claim 12 recites "***A system*** for supporting air-to-ground (ATG) wireless communication in various cells" that positively recites both "a plurality of ATG base stations" and "a plurality of terrestrial base stations." *Compare* Appx101 *with* Appx102 (emphasis added). Claim 12, which claims the combination of the ATG and terrestrial networks, demonstrates that claim 1 covers only the ATG network. *See Hypertherm, Inc. v. American Torch Tip Co.*, 2008 WL 268589, at *4 (D.N.H. 2008) (claims directed to combination of electrode and coolant tube indicate claims directed only to electrode do not require coolant tube, even where electrode claims reference coolant tube to describe electrode).

The specification further supports the separate nature of the ATG and terrestrial networks. As discussed above, Figs. 1 and 2 of the '077 Patent illustrate

35

an ATG network having a series of base stations having overlapping radiation patterns oriented toward the horizon to create a "wedge" architecture. (Appx81-82, Appx92-94). The radiation pattern of the aircraft antenna is also oriented toward the horizon, which enables communication with distant ATG base stations (rather than the one right below the aircraft), so the in-flight aircraft can use the same spectrum as terrestrial networks below without interference. (Appx92).

In contrast to Figs. 1 and 2, which do not reference a terrestrial network even once, Fig. 3 illustrates a "network architecture" that includes both the ATG network described in Figs. 1 and 2, and "a terrestrial network component of the architecture." (Appx94-95). By explaining that the ATG network and the terrestrial network are separate "components" of a larger "network architecture," the specification confirms that the two networks are distinct. (Appx95).

Nothing in the prosecution history indicates that claim 1 should be interpreted as requiring Gogo to provide both an ATG network and a terrestrial network to infringe. The '077 Patent claims were allowed in response to an amendment specifying that the ATG network and terrestrial network use the same RF spectrum. (Appx556-558). But specifying the nature of the RF spectrum used by the ATG network in no way indicates that the terrestrial network is part of the claim. *See INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1375 (Fed. Cir. 2022) ("the recited base station is not 'a limitation on the claimed invention itself,' in the sense

that an infringer would not need to, for instance, use, make, or sell the base station"

(quoting *Nazomi Commcn's*, 739 F.3d at 1345); *Advanced Software Design Corp. v.*

*Fiserv, Inc.*, 641 F.3d 1368, 1373-74 (Fed. Cir. 2011) (distinguishing claim language

"defin[ing] the financial instrument that the claimed system validates" from steps

the accused system must perform to infringe); *C.R. Bard*, 157 F.3d at 1350 (in claims

to needle for biopsy gun, "reference points in the gun that aid in defining the needles"

are not part of claim).  Because Gogo's only non-infringement argument regarding

the '077 Patent relies on a flawed construction that reads the terrestrial network into

the claims, SmartSky has shown a likelihood of success under the correct

construction on the merits regarding infringement.

### 2. *Gogo's Conclusory Obviousness Argument Lacks Substantial Merit*

The district court erred by finding that Gogo's conclusory obviousness

arguments meet Gogo's burden of showing a substantial question of validity.

Gogo's lone obviousness argument relies on Cruz, which was considered by the

Examiner during prosecution, as allegedly disclosing every element of claim 1

except for the ATG and terrestrial networks using the same RF spectrum, which

Gogo alleges is disclosed by Frey.  (Appx564-565, Appx4616).  Though the district

court noted that Gogo's motivation for combining Cruz and Frey was conclusory,

the district court found that SmartSky did not "meaningfully address" Gogo's

alleged motivation to combine.  (Appx17-18).  The district court abused its

discretion because Gogo's conclusory motivation to combine fails to meet its burden, and the district court failed to properly consider SmartSky's arguments explaining why Cruz does not disclose certain features of the '077 Patent claims, why there is no motivation to combine Cruz and Frey, and how secondary indicia of nonobviousness indicate that the '077 Patent claims are not obvious.

First, in alleging that Cruz discloses first and second ATG base stations defining first and second radiation patterns "focusing energy toward the horizon," Dr. Michalson merely parroted the portions of Cruz cited by the Examiner during prosecution. (Appx4667). Dr. Goldberg pointed out that the cited portions of Cruz (paragraphs 3, 4, 7-8, and Figs. 1, 3, 15) vaguely reference "specialized antenna patterns well known in the art, but fail to disclose radiation patterns focusing energy toward the horizon." (Appx8101-8102). In fact, Dr. Goldberg noted that Cruz teaches that one should "limit transmit power towards the horizon," and that "limiting the transmit power toward the horizon . . . is desirable." (Appx8102, Appx7234, Appx7231). Neither the district court nor Dr. Michalson addressed this disclosure of Cruz, which teaches *the opposite* of "focusing energy toward the horizon."

Second, Dr. Michalson fails to provide the required motivation for combining Cruz and Frey. Dr. Michalson merely noted:

> [s]ince Cruz and Frey are both directed to enabling communications between devices in airplanes and ground based

38

cellular networks . . . use of the additional method of Frey in Cruz to use the same frequency spectrum for both types of communication would have been well within the level of ordinary skill in the art, would not have resulted in any unpredictable results, and could have been readily accomplished without undue experimentation and with a reasonable expectation of success.

(Appx4671). But simply stating that two references are directed to the same general goal of enabling ATG communication fails to explain why one skilled in the art would have made the specific proposed combination. *See e.g.*, *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374–77 (Fed. Cir. 2018) (motivation to modify operation of one base station to match operation of mobile station not established based on mobile station and base station sharing same physical structure).

Dr. Michalson further noted that because both Cruz and Frey disclose the need for avoiding interference between cellular base stations, one skilled in the art would have been motivated "to implement the common frequency use of Frey in the setting of Cruz." (Appx4671). "However, 'knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references.'" *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) (quoting *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008)). Just because Cruz and Frey allegedly describe the same need (i.e., avoiding interference) this does not establish why one skilled in the art would have been motivated to combine the references as proposed. *See Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, 838 F. App'x 555, 557 (Fed. Cir. 2021), *cert. denied*,

39

141 S. Ct. 2721 (2021) (affirming finding of no motivation to combine based on mere allegation that "the references came from the same field of study and address the same problem."). For example, Dr. Michalson does not explain how the common frequency use of Frey addresses the interference problem of Cruz, and has therefore not met the burden of raising a substantial question of invalidity.

Moreover, Cruz explains that it "solves the problems of inter-network interference" "by trifurcating the air-to-ground cellular network spatial coverage regions." (Appx8102, Appx7229). To that end, Dr. Goldberg explained (Appx8102-8103) that because Cruz already addresses the problem of inter-network interference, there would be no need to consult Frey for interference avoidance techniques. *See S.-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*, 748 F. App'x 1003, 1007 (Fed. Cir. 2018) (no motivation to combine where primary reference already solves problem allegedly providing motivation).

Dr. Goldberg also explained that using a common frequency between terrestrial and ATG networks does not avoid interference (as Dr. Michalson apparently contends), but rather creates interference. (Appx8103). For example, Gogo's executives have made this precise point in criticizing SmartSky's network, arguing that Gogo's use of licensed spectrum avoids the interference problems associated with using the same unlicensed spectrum that is used by Wi-Fi networks on the ground. (Appx8103, Appx691-692, Appx863 ("[SmartSky] will rely on an

unlicensed spectrum which faces significant interference from ground-based usage like Wi-Fi, Bluetooth, et cetera.")).  Dr. Goldberg also noted that Frey itself teaches that interference between the terrestrial network and the ATG network can be overcome by "shifting the frequency channels used by the aircraft to channels *not* being used by the ground system."  (Appx8103, Appx7246).  In other words, Dr. Goldberg explained that Frey actually teaches *not* using the same frequency in order to avoid interference.  In contrast to Dr. Michalson's vague reference to the allegedly common problem faced by Cruz and Frey, Dr. Goldberg identified specific reasons why one skilled in the art would not combine Cruz and Frey.  The district court therefore abused its discretion by finding that Gogo's conclusory obviousness arguments raise a substantial question of validity.

Lastly, the district court did not properly weigh the secondary considerations of nonobviousness identified by SmartSky.  As Dr. Goldberg noted, Gogo's first ATG network relied on Gogo's 3 MHz of licensed spectrum, which quickly became insufficient to meet the growing need for more bandwidth.  (Appx8104, Appx572-573, Appx582, Appx602).  Despite the availability of unlicensed spectrum, Gogo tried for years to obtain additional licensed spectrum to satisfy customer's unmet need for more spectrum, while at the same time expressing skepticism that SmartSky's unlicensed spectrum-based network would work.  (Appx8104, Appx582, Appx602-603, Appx690-692, Appx863).  But the performance of

SmartSky's network, which relies on unlicensed spectrum, has received repeated praise from the industry. *See* (Appx186-187, Appx725-729, Appx737-740, Appx746-747, Appx4428-4438). Dr. Goldberg explained that the dramatic, ten-fold performance improvement of SmartSky's network is based on several features claimed in the asserted patents, such as radiation patterns focusing energy toward the horizon, and using 60 MHz of the same unlicensed spectrum used by terrestrial networks without substantial interference. (Appx8104-8105, Appx232-240). SmartSky's unrebutted evidence of nonobviousness, coupled with Gogo's failure to provide the required motivation to combine Cruz and Frey, shows that Gogo has not met its burden of establishing a substantial question of validity regarding the '077 Patent. *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 871 (Fed. Cir. 2017) (affirming district court's finding that accused infringer failed to establish substantial question of validity based on patentee's evidence of long-felt but unmet need and praise of others).

### E. The District Court Erred By Finding No Likelihood of Irreparable Harm, and Not Crediting SmartSky's Undisputed, Hallmark Evidence of Such Harm

The district court abused its discretion in finding that SmartSky did not show a likelihood of irreparable harm because SmartSky's "losses are not imminent" and are "speculative." (Appx21).

This case includes facts that this Court has ruled time and again are hallmark examples of irreparable harm: direct competition—here in a two-player market—where the patentee has developed breakthrough technology that is transforming an entire industry, and the incumbent has copied the patentee's new technology and the infringement is causing lost sales, lost market share, price erosion, lost R&D, loss of reputation as an innovator, and lost goodwill. *See Mylan*, 857 F.3d at 872-73 (affirming ruling that lost sales, lost R&D, price erosion, and that the patentee must directly compete with an infringer are "hallmark examples" of irreparable harm). Here, each relevant factor weighs strongly in favor of ruling that SmartSky is likely to show that Gogo has been irreparably harming SmartSky at least since Gogo made its first sale of its infringing 5G Network and component parts more than a year ago (October 2021). The record evidence shows that SmartSky presented *unrebutted evidence* of such harm. These facts include:

- SmartSky and Gogo are direct competitors (Appx21) and the only two competitors providing ATG networks for in-flight communications in business aviation aircraft. (Appx189-190, Appx198, Appx281-282, Appx286, Appx9584-9585, Appx9597-9598, Appx9602-9604).

- SmartSky's patented ATG technology is game-changing, as Gogo admits the technology provides at least a "ten-fold" increase in in-flight communication data speeds over Gogo's 3G/4G legacy network and

allows for "office in the air" performance. (Appx183-184, Appx193-194, Appx286, Appx291-292, Appx294-295, Appx1186).

- Gogo has stated publicly that there is an "insatiable appetite" for more data streaming and bi-directional communication for business aviation customers, and data consumed by Gogo customers on aircraft has more than doubled since 2019. (Appx1419, Appx9810 ("Our results demonstrate that demand for BA travel and connectivity continues to accelerate."))

- Gogo publicly touts that its business aviation customers are extremely "sticky" because once Gogo's IFC equipment is installed on an aircraft, Gogo keeps that customer for an average of *seventeen years*. (Appx1366, Appx195-196).

- For more than 14 years, Gogo has provided the only air-to-ground network in the U.S.; Gogo has its IFC equipment on more than 6,500 business aviation aircraft in the U.S., which accounts for more than 85% of all U.S. business aviation aircraft that currently have broadband IFC equipment. (Appx9803, Appx9604, Appx992, Appx1366-1370, Appx1418-1421).

- SmartSky is new to the business aviation market and its patented ATG network is its flagship product—nearly all of SmartSky's revenues and

44

CONFIDENTIAL MATERIAL REDACTED

marketing efforts are directly related to its patented ATG network. (Appx182, Appx188-189).

Further, over the past 10 years, SmartSky has spent over [$ amount] in researching and developing its patented ATG network technology and more than [$ amount] building out its operational, nationwide ATG network. (Appx198-199). SmartSky has never offered to license its technology for its ATG Network. Instead, SmartSky is differentiating itself from Gogo by focusing on its patented, game-changing technology and nationwide ATG network. (Appx201). But Gogo's infringement has given customers another option with comparable performance, greatly diminished SmartSky's return on its R&D, and inhibited its ability to fund future R&D. (Apx9623, Appx198-199, Appx304, Appx8128).

Gogo's launch of its infringing 5G Network in October 2021 has caused SmartSky to lose significant sales and market share to Gogo. (Appx9609-9612, Appx9616-9619). Gogo is actively selling its "AVANCE L5" system, which includes hardware required for upgrading to the Gogo 5G network. (Appx1368 ("A key selling point for the AVANCE L5 platform is that the upgrade path to our Gogo 5G network is much simpler"), Appx191-194, Appx196-197, Appx291-293, Appx299-301, Appx1383-1384, Appx1388-1389, Appx8121-8123, Appx9594-9596, Appx9598, Appx9622). Gogo has sold approximately 123 AVANCE L5 units in the first quarter of 2022 alone, and sold a total of about 1,900 of these units.

(Appx9815, Appx9821).    Because customers crave the increased performance provided by SmartSky's technology, and given the stickiness of ATG customers, it is exceptionally important to be the first mover with the new technology and capture the market.  (Appx9615-9616, Appx200, Appx306).

In addition, Gogo's sales of its infringing 5G Network has caused SmartSky to lower its prices to attract customers.  (Appx9584-9585, Appx9591, Appx9594-9603, Appx9614, Appx8125).  Further, SmartSky's reputation as an innovator and its goodwill with its customers have been significantly harmed because it must compete against its own technology in Gogo's infringing 5G Network.  (Appx9577, Appx9582-9596, Appx9616-9620, Appx9622-9623, Appx187-188, Appx196-199, Appx304-305, Appx8125-8127).    Gogo's infringing 5G Network has made it significantly more difficult and expensive for SmartSky to attract new and additional investors and investments.    (Appx9568-9569, Appx9610-9612, Appx9618, Appx198-199, Appx304).

### 1.    *The District Court Correctly Found That SmartSky and Gogo Are Direct Competitors*

The district court correctly found that SmartSky and Gogo are direct competitors.  (Appx21, Appx167, Appx8040-8041).  Despite that finding, the district court ruled that SmartSky was not likely to show irreparable harm.  But this Court has ruled time and again that forcing a patentee to compete against its own

technology deployed by an infringing competitor is nearly always irreparable harm and significantly impacts the irreparable harm analysis.

> Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.

*Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1345 (Fed. Cir. 2013) (reversing trial court and finding irreparable harm where parties were direct competitors); *Bio-Rad Labs.*, 967 F.3d at 1378 (affirming irreparable harm where parties were direct competitors); *BlephEx*, 24 F.4th at 1406 (affirming preliminary injunction and irreparable harm where parties were direct competitors); *Mylan*, 857 F.3d at 872 (affirming preliminary injunction and irreparable harm because "[patentee was] having to directly compete with an infringer"). Moreover, irreparable harm is inferred where it is only a two-competitor market. *See Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 646 (Fed. Cir. 2015) (reversing district court and granting injunction because of "substantial hardship" to the patentee "especially where it is undisputed that it is essentially a two-horse race"); *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1151 (Fed. Cir. 2011) ("[The existence of a two-player market] creates an inference that an infringing sale amounts to a lost sale for the patentee."). SmartSky and Gogo are in a two-competitor market as the only players offering ATG network for broadband in-flight communications to business aviation aircraft, with SmartSky attempting to break-in with its game-changing

technology.   (Appx198, Appx9577-9578, Appx286).   As discussed below, the district court abused its discretion by ruling that SmartSky was not likely to show irreparable harm in this two-competitor market.  *See Robert Bosch*, 659 F.3d at 1151; *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170-71 (Fed. Cir. 2014) (reversing district court and finding irreparable harm in a "small, niche market" with only three players); *Liqwd, Inc. v. L'Oréal USA, Inc.*, 720 F. Appx. 623, 632-33 (Fed. Cir. 2018) (nonprecedential) (affirming irreparable harm because it was a two-player, national market and was the patentee's primary market).

### 2.    *The District Court Acknowledged that Gogo's Customers Are "Sticky" – After Gogo Equipment Is Installed, They Remain Gogo Customers  For At Least Seventeen Years*

The district court acknowledged the record evidence that once Gogo equipment is installed on a new customer aircraft, Gogo keeps that customer for *at least 17 years*.  (Appx19).  In fact, Gogo's CEO confirmed the 17-year customer retention, and that, after installation, Gogo customers almost never remove Gogo's equipment:

> From the time we started computing churn in 2017 until now, we've averaged a 0.5% monthly churn rate, which implies a 17-year equivalent life on an aircraft that's driven by high customer satisfaction combined with the fact that it's very expensive and time consuming to install a new system.

(Appx1366, Appx195-197).

This Court has consistently ruled that customer stickiness supports a finding of irreparable harm. *See Bio-Rad Labs.*, F.3d at 1378 ("It is undeniable that [the patentee] has suffered harm from [the infringer's] first mover advantage and "sticky" customer relationships."); *Metalcraft of Mayville*, 848 F.3d at 1368-69 (affirming preliminary injunction and irreparable harm where patentee could lose a potentially lifelong customer to infringer;); *Trebro*, 748 F.3d at 1170 (reversing denial of preliminary injunction, and finding irreparable harm: "Once a [customer] buys a [infringing product], they're not going to replace it for many years."); *Apple*, 809 F.3d at 645 (finding irreparable harm because lost sales are "difficult to quantify" because of "far-reaching effect" now and in the future). Indeed, one is hard-pressed to find more irreparable harm from the sale of an infringing product by a direct competitor than where, as here, the patentee has, in effect, no opportunity to compete for that customer for nearly two full decades.

3. ***The District Court Erred In Finding That Gogo's Accused 5G Network Was "Yet-To-Be Released" And SmartSky Is Not Likely To Show Irreparable Harm From Lost Sales and Lost Market Share***

The district court erred in ruling that SmartSky had not demonstrated that its loss of sales or market share "are imminent as a result of Gogo's yet-to-be released 5G Network or that its losses are non-compensable." (Appx21). The district court noted that SmartSky has not been irreparably harmed because it has been able to secure at least some investment and customers. *Id*. But SmartSky's sales and

49

number of customers pales in comparison to Gogo's sales and customers. (Appx9797-9798, Appx9604, Appx182, Appx199, Appx281-290, Appx1003, Appx1366-1367, Appx1419).  And since Gogo announced that it is offering its 5G product for sale, SmartSky has experienced significantly more challenges raising new investor capital.  (Appx9568-9569, Appx9610-9612, Appx198-199).  The district court erred by implicitly requiring SmartSky to show that it has been unable to secure any investments or customers. *See Douglas Dynamics*, 717 F.3d at 1344.

The district court also abused its discretion by ignoring undisputed evidence that Gogo, in fact, has been selling its "yet-to-be-released" 5G Network since at least October 13, 2021, when it announced its first sale of its 5G Network to Jet Edge for installation on 50 business aviation aircraft.  (Appx757-759).  Gogo has sold and continues to sell hundreds of its AVANCE L5 systems and 5G antennas that are required components of Gogo's infringing 5G system.  (Appx9797-9798, Appx9812, Appx8122, Appx9594-9596, Appx9598-9615).  In fact, Gogo's CEO has explained that "[a] key selling point for the AVANCE L5 platform is that the upgrade path to our Gogo 5G network is much simpler." (Appx1368; *see also* Appx299-301, Appx8121-8123, Appx9594-9596, Appx9599, Appx9615).  So even though the Gogo 5G network may not be operational yet, Gogo's sales of the 5G network and the AVANCE L5 system, which has exceeded Gogo's own expectations, are actively harming SmartSky.  (Appx9810-9811, Appx9797-9798,

Appx9615).  Because SmartSky and Gogo are the only two players in the relevant
IFC ATG Network market, every sale Gogo makes is a lost sale and lost market
share for SmartSky for at least seventeen years.  Indeed, SmartSky's President
testified that SmartSky will continue to lose market share and sales to Gogo if Gogo
is not enjoined.  (Appx9616-9617, Appx195-198).

This Court has ruled that losing market share to a head-to-head competitor
regarding one's flagship product strongly supports a finding of irreparable harm.
*See TEK Glob. S.R.A. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019)
(affirming permanent injunction where parties were direct competitors, infringing
sales caused lost sales and market share, patentee's patented product was its central
product, focus of marketing was on patented product, and quantifying loss of market
share, brand recognition, and customer goodwill were inherently difficult); *Trebro*,
748 F.3d at 1170-71 (reversing district court and finding irreparable harm due to
competition in small, niche market with few competitors, and because of insufficient
weight given to patentee's evidence of likely loss of market share and customers
where customers were "sticky" and patentee may not have opportunity at lost
customers for "many years"); *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831,
862 (Fed. Cir. 2010) (affirming irreparable harm where parties were direct
competitors, product was patentee's central product).

51

Case: 23-1058    Document: 12    Page: 69    Filed: 12/19/2022

The district court also overlooked the first mover advantage Gogo has achieved via its infringement.  Gogo has acknowledged that the ten-fold performance increase provided by SmartSky's patented technology (and incorporated in Gogo 5G) will "enable rapid growth in passenger adoption." (Appx1186).  Thus, being the first to satisfy customers' "insatiable appetite" for bandwidth is critically important for SmartSky, who is attempting to break into the ATG market that Gogo has dominated for years with its inferior legacy 3G product. (Appx1419, Appx1366, Appx195-198).  Being the first to capture customers looking to upgrade their ATG system is particularly important in this case, where customers are very "sticky," and on average stay with their equipment provider for seventeen years after installation on an aircraft.  *See id*.  By virtue of its infringement, Gogo has seized the first mover advantage and is irreparably harming SmartSky.  *See Bio-Rad Labs.*, 967 F.3d at 1378 (patentee suffered irreparable harm due to infringer's "first mover advantage and 'sticky' customer relationships").

Moreover, Gogo has the advantage of being the incumbent in the market and SmartSky is the new entrant: since 2008, Gogo has operated the only ATG network in the United States, and deployed its ATG network equipment on more than 6,500 business aviation aircraft, which is more than 85% of the business aviation aircraft using IFC in the U.S.  *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1337 (Fed. Cir. 2013) (incumbency effect in small, niche market with few competitors and

limited number of customers/OEMs); *M-I LLC v. FPUSA, LLC*, 626 F. App'x 995, 998-99 (Fed. Cir. 2015) (nonprecedential) (affirming irreparable harm where patentee was a new entrant in a two-player market).

Gogo's monopoly position in the business aviation market contributes to SmartSky's lost sales and lost market share from Gogo's infringement. The market for providing IFC services on private and regional jets is a relatively small, niche market. (Appx200, Appx306). There are a small number of OEMs, MROs/dealers, value-added resellers, airlines, management companies, fractional fleets, and corporate fleets that either directly or indirectly make or strongly influence the IFC purchase decisions on the majority of business aviation and regional jet aircraft in North America (Appx200, Appx9570-9571, Appx9620-9621, Appx306). Because of Gogo' relationships with many of these entities, Gogo's sale of Gogo 5G is preventing or significantly delaying these entities from adopting SmartSky's ATG network and/or working on FAA certifications for SmartSky's equipment required to operate its ATG network. (*Id*). Thus, the more time Gogo has to promote and sell its infringing product before being enjoined, the more SmartSky will lose in market penetration and market share. *Broadcom Corp.*, 732 F.3d at 1337.

The district court also erred by finding that SmartSky's lost sales and lost market share are compensable or speculative. Lost market share reflects lost future sales and profits potentially in perpetuity. It is not possible to quantify damages

under these circumstances over an at least seventeen-year period. *See Trebro*, 748 F.3d at 1170-71 (reversing trial court and ruling it was error to rule irreparable harm was "speculative" where parties were direct competitors in a small, niche market). Moreover, the district court erred by not crediting the testimony of SmartSky's economic expert who explained that the harm caused to SmartSky by Gogo's 5G and AVANCE L5 is not readily quantifiable. While it may be possible to calculate the number of customers who have purchased Gogo 5G and AVANCE L5 at trial, even with a permanent injunction, it will not be possible to determine if those customers, after being burned by Gogo 5G, will be willing (or even have the financial capacity) to switch over to SmartSky's network, or when that switchover would occur. (Appx8115-8116).

The district court stated that SmartSky's expert allegedly "concedes that the loss of equipment sales and service revenue associated with consumers choosing Gogo through the date of the trial can be determined and quantified as damages." (Appx19). But this overlooks Mr. Cook's explanation that the amount of revenue may not be determined at trial due to, for example, holdout customers who would have installed SmartSky's system but for Gogo's 5G and AVANCE L5 products. (Appx8115-8116). Importantly, SmartSky's expert also explained that the lost revenue after trial is difficult to determine because there no way to reasonably estimate the number of customers who would switch from Gogo to SmartSky after

trial, when that switch might occur, and what the associated revenue would be over the long life of the product.  (Appx295-298).

### 4.    *The District Court Erred By Finding That SmartSky Was Not Likely to Show Irreparable Harm From Price Erosion*

The district court ruled that SmartSky did not present evidence of price erosion, but instead simply made conclusory statements, concluding that "without such evidence, it is speculation to assert that competing with a disputed infringing product will drive down SmartSky's prices."  Appx20.

But SmartSky *did* present uncontroverted evidence of price erosion. SmartSky's President, Ryan Stone, testified that SmartSky would be able to charge significantly higher prices for its ATG service than it is now if SmartSky did not have to compete against its own technology in Gogo's infringing 5G Network. (Appx195, Appx302-303).  At his deposition, Mr. Stone testified as follows:

> Q.    Have any SmartSky customers or potential customers come back in price negotiations and specifically cited Gogo's pricing as a reason for seeking a price reduction from SmartSky?

> A.    Yes.

> * * *

> Q.  Did any of these customers specifically use Gogo pricing as a basis for seeking a price reduction from SmartSky below SmartSky's listed prices as shown in table 2 of Mr. Cook's declaration?

> A.  Yes, they asked for discounts and extra discounts and things like that. . . . [W]hat makes it painful, is that in the case of Gogo 5G, I really feel like I'm competing with myself and our patented technology,

and it's – I'm having to negotiate against myself.  If that didn't exist, then I wouldn't be having that conversation.  So yes.

* * *

A.    What the customer would say is I'm looking at your numbers here, and what I'm paying at Gogo, you're not showing me something that's really compelling, I need you to do better, you really need to sharpen your pencil.  What I'm paying Gogo and what you are offering here, glad for the performance benefits you bring, but I need to see the economic side too.  We've got options, right?  It's a two competitor market, so they can go to Gogo.

(Appx9594, Appx9597, Appx9599, Appx9602-9603).

Contrary to the district court's finding, Mr. Stone's uncontroverted testimony and Declaration establish that SmartSky has suffered price erosion due to Gogo's infringement.  *See Robert Bosch*, 659 F.3d at 1155-56 (reversing district court and finding irreparable harm where testimony of price erosion was unrebutted); *BlephEx*, 24 F.4th at 1405-06 (affirming finding of price erosion due to competition from direct competitor).

The relative positions of the parties further support a finding of price erosion.  SmartSky is the new market entrant, while Gogo has had an effective monopoly in the ATG market for the past 14 years.  (Appx9603-9604, Appx9620).  For SmartSky to compete against such an established incumbent (in addition to competing against its own technology), it is forced to lower its prices more than it would otherwise to attract customers.  (Appx9598-9599).

56

CONFIDENTIAL MATERIAL REDACTED

**5.  *The District Court Erred By Finding That SmartSky Is Not Likely to Show Irreparable Harm From Lost R&D and Investments***

In a one sentence, the district court ruled that SmartSky's assertions of lost R&D and investments (past and future) were "speculative" and therefore "could not be grounds for finding irreparable harm without additional evidence."  (Appx21). The district court erred by ignoring SmartSky's concrete, unrebutted evidence of harm in the hundreds of millions of dollars.  SmartSky presented unrebutted factual evidence that it has spent more than [$ amount] researching and developing its proprietary ATG network technology.  (Appx198-199).  At the time of briefing in May 2022, SmartSky had also spent about [$ amount] building out its nationwide ATG network with equipment on approximately 330 towers in order to enter the IFC market.  (*Id*).  To recoup this investment will require many years of profits, of which only a relatively small portion may be quantified at trial.

As a startup attempting to break into the market and recoup its investments, SmartSky's nearly [$ amount] in investments to invent and develop the technology, and build out its nationwide network establishes irreparable harm.  *See Douglas Dynamics*, 717 F.3d at 1344-45; *Nevro Corp. v. Stimwave Techs., Inc.*, 2019 WL 3322368, *14 (D. Del. Jul. 24, 2019) (finding irreparable harm where patentee "spent hundreds of millions of dollars to bring its [patented product] to market" and "all of [its] research and development is directed towards" its patented product).

SmartSky's only competitor has stolen SmartSky's groundbreaking technology and thereby greatly reduced SmartSky's ability to get a necessary and significant foothold in the market that SmartSky created. The harm is particularly irreparable because the infringement relates to SmartSky's flagship product that is the focus of its marketing. *See TEK*, 920 F.3d at 792 (finding irreparable harm where patented product was patentee's central product and focus of marketing).

Also, by taking SmartSky's market share and eroding prices, Gogo has significantly impaired SmartSky's ability to obtain investors for current and future operations of its network and invest in future R&D. (Appx9568-9569, Appx9610-9612, Appx9618).

### 6. *The District Court Erred By Finding That SmartSky Did Not Suffer Irreparable Harm To Its Reputation As An Innovator And To Its Goodwill With Customers*

The district court erred by not crediting undisputed evidence that Gogo's infringing 5G system has caused irreparable harm to SmartSky's reputation as an innovator. Instead, the district court ruled that any harm to SmartSky's reputation was "speculative." (Appx21).

This Court has often ruled that a patentee's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products]." *Douglas Dynamics,* 717 F.3d at 1344-45; *see also Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1208 (Fed. Cir. 2017)

("persisting harm to [patentee]'s reputation and tarnishes its status as the innovator in the market") (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)).  This irreparable harm is particularly acute because of the head-to-head competition, because this is SmartSky's flagship product and its marketing campaign is focused on its transformative technology with a ten-fold improvement in performance covered by its patents, and because Gogo's infringement is in the market that SmartSky created. *See Douglas Dynamics*, 717 F.3d at 1345; *Tinnus*, 846 F.3d at 1208 (tarnished reputation as innovator is irreparable harm); *i4i*, 598 F.3d at 862; *Nevro*, 2019 WL 3322368 at *14; *Apple*, 809 F.3d at 648 (Reyna, J. (concurring) ("toe-to-toe competition between Apple and Samsung, Apple's reputation as an innovator, and the importance of the patents-in-suit to that reputation—establishes that Apple will likely suffer irreparable harm to its reputation").

SmartSky presented unrebutted evidence through deposition testimony and declarations that Gogo and SmartSky are direct competitors and Gogo has caused harm to SmartSky's reputation.  SmartSky spent ten years as a startup building its reputation as an innovator and inventor of its patented, breakthrough technology. (Appx198-199).  SmartSky's breakthrough technology has garnered positive attention from investors and the aviation industry who long awaited an IFC service that offers broadband connectivity similar to that found on the ground.  (Appx186-

CONFIDENTIAL MATERIAL REDACTED

187, Appx725-729, Appx736-740, Appx746-747, Appx4486, Appx304). Because of these technologies and the publicity surrounding them, SmartSky had been able to raise more than [$ amount] in capital—most of which occurred before Gogo began selling its 5G system—from investors who expect SmartSky to make significant gains in the IFC business aviation market. (Appx187-188. Appx196-197, Appx304). But Gogo's infringing 5G system, which uses SmartSky's patented technology to provide similarly improved performance, has made those gains less certain, and hindered SmartSky's ability to obtain further investment. (Appx9568-9569, Appx9610-9611, Appx9618). The importance of SmartSky's patented technology cannot be overstated, and is why SmartSky makes its patented technology the overwhelming focus of all its marketing efforts. SmartSky also has not offered to license its patents as it wants to be the exclusive provider of its game-changing technology. (Appx201). It is only through these patented technologies that SmartSky has an ATG network with which to enter the IFC business aviation market. (Appx188-199, Appx304). SmartSky's earned reputation as an innovator, ability to secure new investors on favorable terms, and goodwill, will continue to suffer permanent and irreparable damage from Gogo's infringement. (Appx9611-9613, Appx189, Appx198-199, Appx304-305, Appx9616).

### 7. *Gogo's Infringement Is Causing The Irreparable Harm To SmartSky*

Gogo has not disputed that a nexus exists between the alleged patent infringement and SmartSky's irreparable harm. SmartSky's patented features relating to beamforming, reusing spectrum, seamless handoffs, increased speed and capacity of the air-to-ground network from using unlicensed spectrum, and horizon-oriented antenna patterns drive consumer demand for SmartSky's ATG network and Gogo's infringing 5G network. (Appx232-240, Appx290-295, Appx8130). Gogo acknowledges that consumers are demanding the increased speed with the ability to use high-bandwidth applications such as videoconferencing, which requires not just additional bandwidth, but increased speed in both upload and download directions, as well as reduced latency and interference. (Appx282-283, Appx289-291). And industry experts agree. (Appx294, Appx2671-2675, Appx4428-4439). The ability to meet these consumer demands is made possible by SmartSky's patented features. Use of beamforming, which is recited in the asserted '947 and '417 Patent Claims, allows base stations to allocate a single beam to a single aircraft, which allows users on the aircraft to enjoy data rates that can accommodate high-bandwidth applications without having to share signal with users on other planes. (Appx233-234.) In addition, the base stations can generate multiple beams that reuse the same spectrum without interfering with each other. (*Id*.) And the unlicensed spectrum opens up 60 MHz of bandwidth, which is 20 times larger than Gogo's legacy operating

bandwidth, as Gogo's own marketing documents explain.  (Appx285, Appx291-292).  Moreover, the use of seamless handoffs between beams of different base stations allows consumers to maintain their videoconference regardless of which beam or base station is enabling the communication link.  (Appx233).  Gogo again cites the "uninterrupted connectivity" of its 5G network in its marketing materials (Appx291, Appx247-248) and publicly states that its 5G product greatly enhances performance and provides "a quality home or office like connectivity experience in-flight."  (Appx9812).  Thus, as confirmed by its own statements, Gogo's infringing use of SmartSky's technology is irreparably harming SmartSky.

## V.    CONCLUSION AND PRAYER FOR RELIEF

This Court should reverse the district court's Preliminary Injunction Order.  Alternatively, at a minimum, this Court should reverse the Preliminary Injunction Order with respect to irreparable harm, and vacate and remand with respect to likelihood of success on the merits, so the district court can assess this factor under the correct constructions of the claim terms discussed herein.

Date: <u>December 19th, 2022</u>              Respectfully submitted

<u>/s/ Lance A. Lawson</u>
Lance A. Lawson
BURR & FORMAN, LLP
101 South Tyron Street, Suite 2610
Charlotte, NC 28280
(704) 347-1170
llawson@burr.com

Ryan M. Corbett
BURR & FORMAN, LLP
201 N. Franklin St, Suite 3200
Tampa, Florida 33602
(813) 221-2626
rcorbett@burr.com

Jack B. Blumenfeld
Rodger D. Smith II
1201 North Market Street
P.O. Box 1347
Wilmington DE 19899
(302) 658-9200
blumenfeld@morrisnichols.com
rsmith@morrisnichols.com

*Attorneys for Plaintiff-Appellant
SmartSky Networks LLC*

# ADDENDUM

# TABLE OF CONTENTS

**Appendix Page**

**Order of**
**The United States District Court for the District of Delaware**
      **filed September 26, 2022** ................................................................... **Appx1**

**Memorandum Opinion of**
**The United States District Court for the District of Delaware,**
      **filed September 26, 2022** ................................................................... **Appx2**

**U.S. Patent No. 9,312,947 B2**
      **dated April 12, 2016**........................................................................ **Appx31**

**U.S. Patent No. 11,223,417 B2**
      **dated January 11, 2022** ................................................................... **Appx47**

**U.S. Patent No. 10,257,717 B2**
      **filed April 9, 2019**.......................................................................... **Appx63**

**U.S. Patent No. 9,730,077 B2**
      **filed August 8, 2017**....................................................................... **Appx78**

## CONFIDENTIAL MATERIAL OMITTED

Confidential Material Subject to The Protective Order Entered by The District Court in This Matter Has Been Omitted from The Memorandum Opinion Included At Page Appx20 Of The Addendum, And From Appellant's Brief At Pages 12, 27, 45, 57, and 60. The Material Omitted Contains Confidential Business Information And Confidential Deposition Testimony. The Confidential Version of The Memorandum Order Is Included at Pages Appx2-21 Of The Addendum.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SMARTSKY NETWORKS, LLC,

          Plaintiff,

      v.

GOGO BUSINESS AVIATION, LLC and
GOGO INC.,

          Defendants.

Civil Action No. 22-266-GBW

---

**ORDER**

At Wilmington this 26th day of September 2022:

For the reasons set forth in the Memorandum Opinion issued this day, IT IS HEREBY
ORDERED that Defendants Gogo Business Aviation, LLC, and Gogo Inc.'s Motion to Strike
Improper Reply Arguments from D.I. 85 and D.I. 86 (D.I. 97) is DENIED. Plaintiff SmartSky
Networks, LLC's Motion for Preliminary Injunction (D.I. 6) also is DENIED.

Because the Memorandum Opinion is filed under seal, the parties shall meet and confer
and, no later than October 3, 2022, submit a joint proposed redacted version, accompanied by a
supporting memorandum, detailing how, under applicable law, the Court may approve any
requested redactions. In the absence of a timely, compliant request, the Court will unseal the entire
opinion.

                                        GREGORY B. WILLIAMS
                                        U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SMARTSKY NETWORKS, LLC,

Plaintiff,

v.

GOGO BUSINESS AVIATION, LLC and
GOGO INC.,

Defendants.

Civil Action No. 22-266-GBW

REDACTED PUBLIC VERSION
DATED OCTOBER 4, 2022

---

Jack B. Blumenfeld, Rodger D. Smith II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Lance A. Lawson, BURR & FORMAN LLP, Charlotte, North Carolina; Ryan M. Corbett, BURR & FORMAN LLP, Tampa, Florida; Erik R. Puknys, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Palo Alto, California

*Counsel for Plaintiff*

Kelly E. Farnan, Tyler E. Cragg, Griffin A. Schoenbaum, RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware; Thomas D. Rein, Stephanie P. Koh, Nathaniel C. Love, Julia G. Tabat, SIDLEY AUSTIN LLP, Chicago, Illinois

*Counsel for Defendants*

## MEMORANDUM OPINION

September 26, 2022
Wilmington, Delaware

GREGORY B. WILLIAMS
U.S. DISTRICT JUDGE

Pending before this Court is Defendants Gogo Business Aviation, LLC, and Gogo Inc.'s ("Gogo") Motion to Strike sections from Plaintiff SmartSky Networks, LLC's ("SmartSky") reply brief in support of SmartSky's Motion for a Preliminary Injunction and from the accompanying supplemental declaration of Dr. Steven Goldberg, SmartSky's technical expert (D.I. 97), and SmartSky's Motion for Preliminary Injunction (D.I. 6). For the reasons set forth below, the Court will deny Gogo's Motion to Strike and SmartSky's Motion for Preliminary Injunction.

## I.    BACKGROUND

On February 28, 2022, SmartSky brought this lawsuit against Gogo alleging infringement of United States Patent Nos. 9,312,947 (the "'947 patent"), 11,223,417 (the "'417 patent"), 10,257,717 (the "'717 patent"), and 9,730,077 (the "'077 patent"). D.I. 1. On the same day, SmartSky moved for a preliminary injunction seeking to enjoin Gogo from making, using, offering to sell, or selling its 5G Network. D.I. 6. The parties stipulated to a limited discovery schedule, permitting the parties to serve limited document requests and interrogatories and take the depositions of each parties' declarants. D.I. 40. The stipulation was entered by this Court on March 23, 2022. D.I. 41. Gogo filed its answering brief in opposition to SmartSky's Motion for Preliminary Injunction on May 5, 2022 (D.I. 76), and SmartSky filed its reply brief on June 3, 2022 (D.I. 93). On June 17, 2022, Gogo filed a Motion to Strike Sections II.A.1 and II.A.2 from SmartSky's reply brief and ¶¶ 20-45, 47-57, 65-66, and 70-119 from Dr. Goldberg's rebuttal declaration filed with SmartSky's reply brief. D.I. 97. SmartSky filed its answering brief in opposition to Gogo's Motion to Strike on July 1, 2022 (D.I. 106), and Gogo filed its reply brief on July 15, 2022 (D.I. 110).

Appx3

## II.    LEGAL STANDARD

Delaware Local Rule 7.1.3(c)(2) provides, in relevant part, that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." D. Del. LR 7.1.3(c)(2). "This provision exists, in part, to prevent litigants from engaging in impermissible 'sandbagging,' reserving crucial arguments for a reply brief to which an opponent cannot respond." *Fifth Mkt., Inc. v. CME Grp., Inc.*, C.A. No. 08-520-GMS, 2013 WL 3063461, at *1 n.2 (D. Del. June 19, 2013) (citing *Rockwell Techs., LLC v. Spectra-Physics Lasers, Inc.*, C.A. No. 00-589-GMS, 2002 WL 531555, at *3 (D. Del. Mar. 26, 2002)). Arguments and evidence submitted in violation of this rule may be excluded. *See Bos. Sci. Scimed, Inc. v. Cordis Corp.*, 434 F. Supp. 2d 308, 314 (D. Del. June 15, 2006), *rev'd in part on other grounds*, 554 F.3d 982 (Fed. Cir. 2009). But, a party does not violate this provision when the new material in its reply brief responds to arguments raised in the answering brief. *Id.*; *see also Cornell Univ. v. Illumina, Inc.*, C.A. No. 10-433-LPS-MPT, 2018 WL 11427960, at *4 n.48 (D. Del. Feb. 23, 2018) ("[E]verything in plaintiffs' reply memorandum is either in the original brief or in response to defendants' arguments . . . Therefore, defendants' motion is denied.") (citing *In re Fleming Co., Inc.*, 316 B.R. 809, 815 n.3 (D. Del. 2004)).

Preliminary injunctive relief is an "extraordinary" remedy appropriate only in "limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted); *see also Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) ("[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted.") (citations omitted); *accord Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 996 (Fed. Cir. 1985) ("Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined.") (internal quotation marks and

citations omitted). However, the Patent Act expressly provides that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.

A movant for a preliminary injunction pursuant to 35 U.S.C. § 283 must establish: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted). No one of these factors is dispositive; "rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Id.* (quoting *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988)). However, "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Id.* (emphasis in original) (citations omitted). Moreover, "[w]hile granting a preliminary injunction requires analysis of all four factors, [] a trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors—especially either of the first two—without analyzing the others[.]" *Jack Guttman, Inc. v. KopyKake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002) (citations omitted); *see also Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990) ("If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.").

## III.  DISCUSSION

SmartSky's reply brief in support of its Motion for Preliminary Injunction and the accompanying rebuttal declaration by Dr. Goldberg are responsive to Gogo's arguments raised in its answering brief.  Thus, the Court will deny Gogo's Motion to Strike portions of SmartSky's reply brief in support of SmartSky's Motion for Preliminary Injunction and from the accompanying rebuttal declaration of Dr. Goldberg.  With respect to SmartSky's Motion for Preliminary Injunction, SmartSky failed to carry its burden of demonstrating a likelihood of success on the merits and that it will be irreparably harmed if an injunction is not granted.  Thus, the Court will deny SmartSky's Motion for Preliminary Injunction.

### A.  Motion to Strike

Gogo contends SmartSky's reply brief in support of its preliminary injunction "abandons SmartSky's original interpretations of its claims, and advances new infringement theories under new, and much broader, interpretations of its claims, none of which were mentioned in SmartSky's motion."  D.I. 98 at 1.  Gogo asserts two arguments.  First, Gogo alleges portions of SmartSky's reply brief and Dr. Goldberg's rebuttal declaration present a new interpretation of the "continuous and uninterrupted" limitation in the '947 patent and the '417 patent.  *Id.* at 8-13.  Second, Gogo alleges portions of SmartSky's and Dr. Goldberg's rebuttal declaration present an improper new theory of infringement for the '717 patent regarding the number of radios required by the claims and handovers between base stations.  *Id.* at 13-16.

The infringement arguments contained in SmartSky's reply brief in support of its preliminary injunction and Dr. Goldberg's rebuttal declaration are consistent with SmartSky's opening brief and respond to arguments raised in Gogo's answering brief.  In SmartSky's opening brief, it asserted that Gogo's 5G Network infringes claims 1 and 11 of the '947 patent because

4

Appx6

> [t]he different communication links provided by Gogo's 5G network are high speed links that are "maintained continuous and uninterrupted" while the aircraft transitions between steerable beams of different base stations having overlapping coverage areas. For example, Gogo's 5G system conducts "make before break" handoffs, which allow for uninterrupted connectivity to passengers.

D.I. 24 at 8.

In support of SmartSky's opening brief, Dr. Goldberg stated:

> Gogo's "make before break" handoffs are one example of a communication link that is "maintained continuous and uninterrupted in time." Additionally, Gogo marketing literature states that the system provides "uninterrupted connectivity" to passengers.

D.I. 26 at ¶ 102.

Gogo responded in its answering brief that "Gogo's 5G Network will use a 'break-then-make' handover" and "[s]uch handovers are discontinuous and contain an interruption in time." D.I. 76 at 6. Gogo concludes that, because its 5G Network uses a "break-then-make" handover, it does not infringe SmartSky's asserted patents. *Id.* In response, SmartSky states that, even if Gogo's 5G Network uses a "break-then-make" handover, "Gogo's technical documents confirm that 5G network handovers are conducted to maintain the continuity of the connection between the base stations and the aircraft." D.I. 93 at 1. SmartSky also filed a rebuttal report by Dr. Goldberg providing details about how a "break-then-make" handover meets the claim requirement "continuous and uninterrupted in time." *See* D.I. 94.

In support of its Motion to Strike, Gogo contends that SmartSky is asserting a new infringement theory and deviating from SmartSky's original argument that "continuous and uninterrupted in time" requires a "make before break" handoff. D.I. 98 at 8. SmartSky and Dr. Goldberg never argued that the "continuous and uninterrupted in time" claim limitation *requires* a "make before break" handoff. Dr. Goldberg stated that "make before break" handoffs "are *one*

*example* of a communication link that is 'maintained continuous and uninterrupted in time,'" and SmartSky noted that Gogo's 5G Network meets the claim elements of 1 and 11 of the '917 patent, "*for example,*" by conducting make before break handoffs. *See* D.I. 24 at 8; D.I. 26 at ¶ 102 (emphases added). SmartSky's reply brief and Dr. Goldberg's rebuttal declaration are responsive to Gogo's argument that Gogo's 5G Network does not infringe SmartSky's patents because Gogo's 5G Network uses a "break then make" handover.

With respect to the '717 patent, SmartSky argued in its opening brief in support of its preliminary injunction that Gogo's 5G Network meets claims 1 and 12 of the '717 patent because Gogo's 5G Network has "a base station that employs unlicensed spectrum in the 2.4 GHz band, and another base station that employs licensed spectrum in the 850 MHz band." D.I. 24 at 9. Dr. Goldberg submitted a declaration stating the same. *See* D.I. 26. In response, Gogo refutes SmartSky's infringement argument by asserting that the claim language in the '717 patent only requires the use of a single radio and contending the aircraft equipment used for Gogo's 5G Network "will consist of two radios, one communicating on unlicensed spectrum and other communicating on licensed spectrum." D.I. 76 at 8. Gogo also states that there are "no handovers in the Gogo 5G Network between a first base station employing unlicensed spectrum and a second base station employing licensed spectrum, or vice versa[.]" D.I. 76 at 8. Again, SmartSky's reply brief merely responds to Gogo's non-infringement arguments. Specifically, in SmartSky's reply brief, it refutes Gogo's argument that the claims in the '717 patent require a single radio and Gogo's handover argument. D.I. 93 at 3-4.

Thus, because SmartSky and Dr. Goldberg's rebuttal declaration is responsive to Gogo's arguments made in its answering brief, SmartSky's reply brief does not violate Local Rule 7.1.3(c)(2). Accordingly, Gogo's Motion to Strike is denied.

### B. Preliminary Injunction

#### i. Likelihood of Success on the Merits

When seeking a preliminary injunction in an infringement suit, the patentee "must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). With respect to infringement, the court adheres to the same two-step analysis used at other stages of the case. *See Waters Corp. v. Agilent Techs, Inc.*, 410 F. Supp. 3d 702, 708 (D. Del. 2019). First, the court determines the asserted claim scope. *Amazon.com, Inc.*, 239 F.3d at 1351. Second, "the properly construed claim is compared with the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent." *Id.* When examining invalidity, the court will compare the asserted claims, as construed, to the prior art. *Waters Corp.*, 410 F. Supp. 3d at 708.

A defendant may succeed in defeating a patentee's motion for a preliminary injunction if it raises a "substantial question" as to infringement or invalidity of the patent-in-suit. *Amazon.com, Inc.*, 239 F.3d at 1350. A "substantial question" means that the defendant "asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit.'" *Id.* at 1350-51 (quoting *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

SmartSky argues that Gogo's 5G Network literally infringes claims 1 and 11 of the '947 patent and the '417 patent, as well as literally infringing claims 1 and 12 of the '717 patent and claims 1 and 2 of the '077 patent. D.I. 24 at 7-10. However, rather than offering a substantive analysis of Gogo's accused 5G Network on a claim-by-claim basis, SmartSky's motion is littered with conclusory assertions and numerous citations to hundreds of pages of expert declarations.

In response, Gogo asserts three noninfringement arguments. D.I. 76 at 5-8. First, Gogo's 5G Network does not infringe claims 1 and 11 of the '947 patent and '417 patent because it does not maintain "continuous and uninterrupted in time" communication links between the aircraft and the air-to-ground ("ATG") base stations. *Id.* at 5-7. Second, and closely related to the first argument, Gogo's 5G Network cannot infringe claims 1 and 12 of the '717 patent because it utilizes two aircraft radios communicating with the ATG base stations that employ *both* licensed and unlicensed spectrum. *Id.* at 7-8 (emphasis added). Third, Gogo's 5G Network does not infringe claims 1 and 2 of the '077 patent because it lacks the "plurality of terrestrial base stations" limitation. *Id.* at 8. In addition to its noninfringement positions, Gogo argues that the '717 patent and the '077 patent are invalid for indefiniteness pursuant to 35 U.S.C. § 112, while the '077 patent is further invalid as obvious in view of Gogo's own prior art.

### 1. The '947 and the '417 Patents

The parties' respective briefing offers little argument as to the scope of the asserted claims of the '947 patent and the '417 patent. Nevertheless, the crux of the dispute on infringement is whether claims 1 and 11 of the '947 patent and the '417 patent encompass communication link handovers between an aircraft's radio and ATG base stations that are continuous and uninterrupted in time. SmartSky argues that Gogo's 5G Network infringes claim 1 and 11 because it uses "high speed links that are 'maintained continuous and uninterrupted' while the aircraft transitions between steerable beams of different base stations having overlapping coverages." D.I. 24 at 8. In response, Gogo argues that claims 1 and 11 require the aircraft's radio to make a communication link with a subsequent ATG base station before breaking the link with the current ATG base station—a "break-then-make" handoff—to meet the continuous and uninterrupted in time limitation. D.I. 76 at 5-6. SmartSky responds that short physical layer breaks with the aircraft's

8

radio and ATG base stations are continuous and uninterrupted in time because the higher layer communications links between the aircraft and the user is maintained.   D.I. 93 at 1-3.

On this record, there is no reason to depart from the plain and ordinary meaning of the claim language.   *See Aventis Pharm. Inc. v. Amino Chem. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").   Claim 1 recites, in relevant part:

> wherein the respective different communication links are high speed data communications links that are enabled to be maintained continuous and uninterrupted in time while one of the respective different in-flight communication nodes transitions between a first steerable beam associated with a first coverage area defined by the network base station and a second steerable beam associated with a second coverage area defined by another network base station.

'947 patent at claim 1; '417 patent at claim 1.

Claim 11 recites, in relevant part:

> wherein the respective different communication links are high speed data communications links that are enabled to be maintained continuous and uninterrupted in time while one of the respective different in-flight communication nodes transitions between corresponding steerable beams associate with respective ones of the coverage areas defined by the at least two base stations.

'947 patent at claim 11; '417 patent at claim 11.

A "high speed data communications links" that is maintained "continuous and uninterrupted in time" is one that is continuously maintained between the aircraft and the ground—the ATG base stations.   *See, e.g.*, '947 patent at 4:67-5:2 ("The system may be accessed directly by an individual aboard an aircraft via a direct communication link that is continuous and uninterrupted in time with the ground.").   This preliminary construction is consistent with the portions of the prosecution history cited by SmartSky.   Specifically, during the prosecution of the '947 patent, SmartSky distinguished prior art that

contemplated termination of the communication link between the ground—the ATG base station—and the aircraft. *See* D.I. 94 at ¶ 35; *see also* D.I. 77 at ¶¶ 57-80. Thus, considering the record before the Court, the "continuous and uninterrupted in time" limitation is encompassed by a continuous communication link between the aircraft and the ATG base station—a "make-before-break" handover—rather than a "continuous and uninterrupted in time" connectivity link between the aircraft and the user.

Next, the parties offer differing analyses of how Gogo's 5G Network works. SmartSky's experts assert that Gogo's 5G Network employs a "make-before-break" handover between the aircraft and the first and second base stations, allowing for "continuous and uninterrupted" connectivity between the aircraft and the base stations. D.I. 24 at 8; D.I. 26 at ¶¶ 102-103. Gogo argues that these conclusions rely on misinterpretations of non-technical panel discussions and third-party misstatements rather than Gogo's technical documents. D.I. 76 at 6-7. Instead, Gogo's own experts aver that its 5G Network implements "break-before-make" handovers that require a physical disconnection between the aircraft and the first base station prior to connecting to the second base station. *Id.*; *see also* D.I. 79 at ¶¶ 12-24; D.I. 77 at ¶¶ 143-156. Although Gogo contends that this short disconnection is imperceivable to a network user and maintains the appearance of continuity, the short disconnection means that handovers are not "continuous and uninterrupted in time." *Id.* In reply, SmarkSky's expert concedes that Gogo's 5G Networks utilizes "break-before-make" handoffs between the aircraft and the base station (D.I. 94 at ¶ 73) but argues that Gogo still meets the "continuous and uninterrupted in time" limitation because the connection between the user and the aircraft is continuous and uninterrupted. D.I. 93 at 1-3; D.I. 94 at ¶¶ 51-56.

In light of SmartSky's cursory showing on infringement, SmartSky has failed to carry its burden of demonstrating a likelihood of success on the merits as to infringement of the '947 patent and the '417 patent. Gogo has raised substantial questions as to whether its accused 5G Network meets the "continuous and uninterrupted in time" limitation between the ATG base stations and the aircraft even though there is a short disconnection between the aircraft and the base station.

### 2. The '717 Patent

The parties once again offer little argument as to the scope of the asserted claims. However, the dispute centers around whether claims 1 and 12 of the '717 patent encompass multiple radios on the aircraft, and whether the claims encompass handovers between a first base station employing *only* unlicensed spectrum and a second base station employing *only* licensed spectrum. SmartSky argues that the claims contemplate multiple radios on the aircraft (D.I. 24 at 9; *see also* D.I. 93 at 3), while Gogo asserts that a plain reading of the claim language requires a single radio (D.I. 76 at 7). Further, SmartSky argues that claims 1 and 12 do not require one base station solely employing the unlicensed spectrum and a second base station solely employing the licensed spectrum (D.I. 93 at 3-4), while Gogo asserts that a plain reading of the claims demonstrates that the first base station only employs unlicensed spectrum and the second base station only employs licensed spectrum. D.I. 76 at 7-8. Claim 1 recites, in relevant part:

> a first base station including a first antenna array defining a first
> directional radiation pattern that is oriented toward a horizon; and
> a second base station including second antenna array defining a
> second directional radiation pattern that at least partially overlaps
> with the first base station,
> wherein the first base station employs unlicensed spectrum,
> wherein the second base station employs licensed spectrum,
> wherein the first and second base stations are each configured to
> wirelessly communicate with a radio disposed on an aircraft flying

> through respective cell coverage areas of the first and second base stations, and
>
> wherein the first and second base stations are each configured to handover communication with the radio as the aircraft moves between the respective cell coverage areas of the first and second base stations.

'717 patent at claim 1.

Claim 12 recites, in relevant part:

> a first base station including a first antenna array defining a first directional radiation pattern that is oriented toward a horizon; and
>
> a second base station including second antenna array defining a second directional radiation pattern that at least partially overlaps with the first base station,
>
> wherein one of the first base station or the second base station employs unlicensed spectrum, and the other of the first base station and the second base station employs licensed spectrum,
>
> wherein the first and second base stations are each configured to wirelessly communicate with a radio disposed on an aircraft flying through respective cell coverage areas of the first and second base stations, and
>
> wherein the first and second base stations are each configured to handover communication with the radio as the aircraft moves between the respective cell coverage areas of the first and second base stations.

'717 patent at claim 12.

Again, based on the record before the Court at this time, there is no reason to depart from the plain and ordinary meaning of the claim language. *Aventis Pharm. Inc.*, 715 F.3d at 1373. Although the claim language recites "a radio," such a construction requiring "radio" to be limited to "a single radio disposed on the aircraft" is contrary to the general rule that the "words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'" *See, e.g.*, *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (quoting *TiVo, Inc. v. Echostar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008)). This construction is supported by the claims' later recitation of "the radio," which reinvokes its non-singular meaning. *01 Communique*, 687 F.3d at

12

1297 (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d at 1338, 1342 (Fed. Cir. 2008)). Additionally, the '717 patent's specification contemplates multiple radios, further supporting SmartSky's construction that "a radio" can mean "one or more" radios. *See* '717 patent at 9:40-46 ("Moreover, it is to be appreciated that the radio(s) 416 can communicate using substantially any air interface in a licensed spectrum (e.g., third generation partnership project (3GPP) long term evolution (LTE), Wideband Code Division Multiple Access (WCDMA), and/or the like), unlicensed spectrum (e.g., 2.4 gigahertz (GHz), 5.8 GHz, and/or the like), etc."); *see also id.* at 6:25-28; 9:27-33.

However, the '717 patent's plain and ordinary meaning of the first base station which employs "unlicensed" spectrum and a second base station which employs "licensed" spectrum supports Gogo's proposed construction that the first base station solely employs unlicensed spectrum while the second base station solely employs licensed spectrum. SmartSky's own expert's declaration supports this construction. *See* D.I. 26 at ¶ 56 ("The first base station employs unlicensed spectrum, and the second base station employs licensed spectrum."); *id.* at ¶ 83 ("[T]he asserted '717 patent claims further specify that one base station employs unlicensed spectrum while another base station employs licensed spectrum.").

Next, in considering Gogo's accused 5G Network, the parties provide competing analyses of how Gogo's aircraft radios and base stations operate. As Gogo concedes, its aircraft equipment consists of multiple radios (D.I. 76 at 8; D.I. 79 at ¶¶ 26-29; D.I. 77 at ¶¶ 165-171), thus meeting the "one or more radios" limitation based on this preliminary construction. Further, SmartSky argues that because Gogo's base stations have antennas supporting both the unlicensed spectrum and the licensed spectrum, Gogo's handoffs necessarily require a handoff between a first base station employing licensed spectrum and a second base station employing unlicensed spectrum,

13

even if the base stations support both spectrums. *See* D.I. 93 at 3-4; D.I. 94 at ¶¶ 110-113. Gogo refutes SmartSky's characterization, arguing that there are no handoffs between a first base station employing solely unlicensed spectrum and a second base station solely employing licensed spectrum. D.I. 76 at 8; D.I. 77 at ¶¶ 172-175, D.I. 79 at ¶ 12. Further, Gogo contends that, although its base station antennas support both unlicensed and licensed spectrum, each of its two aircraft radios are solely dedicated to either the unlicensed or licensed spectrum. *See* D.I. 76 at 8; D.I. 79 at ¶ 9. Thus, Gogo asserts that the handoffs must be between licensed-licensed or unlicensed-unlicensed, rather than cross-network handoffs, i.e., unlicensed to licensed, as required by the claims 1 and 12 of the '717 patent. *Id.*

Based on the preliminary claim construction and factual disputes regarding how Gogo's 5G Network operates its handoffs, SmartSky has failed to meet its burden of demonstrating a likelihood of success on the merits as to infringement of the '717 patent. Additionally, Gogo contends that the '717 patent is invalid pursuant to 35 U.S.C. § 112. The Court acknowledges the parties' arguments concerning the validity of the '717 patent but concludes that it is unnecessary to evaluate its validity in light of SmartSky's failure to meet its burden of demonstrating a likelihood of success as to infringement. *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017) (the patentee must show both that it will likely prove infringement and that the claims will likely withstand the alleged infringer's invalidity challenge).

### 3. The '077 Patent

The parties offer differing constructions of claims 1 and 2 of the '077 patent. SmartSky argues that the claims require a system comprised of ATG base stations functioning in an ATG network. D.I. 24 at 9-10; D.I. 93 at 4. SmartSky also contends that the asserted claims on its face do not require separately providing a terrestrial network comprised of terrestrial base stations. D.I.

93 at 4. Gogo asserts that the plain language of the asserted claims require providing terrestrial base stations within the 5G system. D.I. 76 at 8; *see also* Gogo's Motion to Dismiss SmartSky's Complaint, D.I. 54, at 7-10.[1]

At this stage and based on the present record, the Court cannot conclude that SmartSky has carried its burden of demonstrating a likelihood of success as to its alleged infringement of the '077 patent in order to obtain the extraordinary relief of a preliminary injunction. The parties clearly contest the scope of claims 1 and 2 of the '077 patent, particularly whether the claims require providing terrestrial base stations. But, without the benefits of comprehensive claim construction briefing or a *Markman* hearing—especially considering the parties' scant briefing related to the scope of claims 1 and 2 of the '077 patent—the Court cannot conclude that SmartSky has met its burden.

Moreover, Gogo raises, at a minimum, substantial questions of validity related to the '077 patent. Gogo asserts that claims 1 and 2 of the '077 patent are likely obvious under 35 U.S.C. § 103 and, thus invalid, over a combination of two prior art references, U.S. Patent Application No. 2006/0040660 ("Cruz") and U.S. Patent No. 5,444,762 ("Frey"). D.I. 76 at 11; D.I. 77 at ¶¶ 103-108. Cruz purportedly discloses operating an ATG network containing networks of WiFi base stations (e.g., terrestrial base stations) near airports (D.I. 77 at ¶¶ 108-110), while Frey allegedly teaches that ATG networks may use the same spectrum (e.g., WiFi) employed by terrestrial base stations (D.I. 77 at ¶¶ 111-112). Gogo contends, albeit in a conclusory fashion, that a skilled person would be motivated to combine Cruz and Frey, which supplies each limitation required by the '077 patent. D.I. 76 at 11; D.I. 77 at ¶¶ 113-116. In response, SmartSky argues that Gogo's

---

[1] For purposes of deciding Smarksky's Motion for Preliminary Injunction, the Court has not evaluated any arguments for, or against, granting Gogo's Motion to Dismiss SmartSky's Complaint.

alleged motivation to combine Cruz and Frey is "nonsensical" because Cruz already solves the problem of using common frequencies to avoid interference, and thus there is no reason to consult Frey. D.I. 93 at 5. Having reviewed the record, the Court concludes that SmartSky has not demonstrated that Gogo's invalidity contention related to the '077 patent "lacks substantial merit." *See Amazon.com, Inc.*, 239 F.3d at 1350. Particularly, the Court finds that SmartSky has failed to meaningfully address, beyond mere conclusory assertions, whether Cruz discloses a solution to the interference problem that would obviate the motivation for a person skilled in the art to combine the teachings of Frey to Cruz.

### ii. Irreparable Harm

The movant seeking the preliminary injunction must demonstrate "that it is likely to suffer irreparable harm if the preliminary injunction is not granted and there is a causal nexus between the alleged infringement and the alleged harm." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017). The alleged harm must not be compensable via monetary damages. *Id.* (stating that, where no monetary damage is calculable, "the harm cannot be adequately compensated and is irreparable.").

SmartSky asserts three grounds of irreparable harm as a result of Gogo's alleged infringement: (1) SmartSky will lose sales, market share, and its goodwill and reputation in the business aviation industry; (2) Gogo competing for consumers would erode the price SmartSky could charge without Gogo's competition; and (3) Gogo's competition will reduce SmartSky's ability to recoup its research and development ("R&D") costs and impair its ability to invest in future R&D. D.I. 24 at 11-18; D.I. 93 at 6-10.

SmartSky alleges that Gogo is the only other provider of comparable business aviation network services, and that allowing Gogo to compete with its allegedly infringing 5G Network

would greatly reduce SmartSky's sales and profits. D.I. 24 at 12; D.I. 93 at 7-8. SmartSky further asserts that due to the nature of the consumer-provider relationship and the costs associated with switching network providers, known as "stickiness," lost sales and profits are incalculable. *Id.* Gogo estimates that its consumer-relationships will last 17 years. *Id.*; *see also* D.I. 95 at ¶¶ 5-20. Further, as a result of SmartSky and Gogo's head-to-head competition and SmartSky's identity as a "disruptor" in a small market, SmartSky claims it stands to lose a large share of the market. *See* D.I. 24 at 14-15; D.I. 93 at 8-9; D.I. 27 at ¶¶ 34, 57. Due to SmartSky's loss of market exclusivity, it claims it will lose its earned reputation and goodwill as an "innovator" that arose from its years of developing a superior business aviation network. D.I. 24 at 15-16; D.I. 93 at 9.

In response, Gogo argues that SmartSky has produced no evidence of lost sales, and, if sales are indeed lost, they are calculable. D.I. 76 at 12-15; D.I. 78 at ¶¶ 22-23. Notably, Gogo cites to SmartSky's own expert, who concedes that the loss of equipment sales and service revenue associated with consumers choosing Gogo through the date of trial can be determined and quantified as damages. D.I. 76 at 12 (citing D.I. 27 at ¶¶ 40-42); *see Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. Appx. 297, 300-01 (Fed. Cir. 2009) (without more, lost sales are "presumed to be compensable through damages."). Gogo further contends that any harm that may occur after trial, such as consumers remaining with Gogo even if SmartSky prevails, is purely speculative and cannot support a preliminary injunction. D.I. 76 at 12-13; D.I. 78 at ¶¶ 23-34; *see IGT v. Aristocrat Techs., Inc.*, 646 F. Appx. 1015, 1018-19 (Fed. Cir. 2016) (multiple contingencies existing prior to a patentee experiencing alleged harm militates a finding of irreparable harm).

Furthermore, Gogo asserts that SmartSky's claim that it is a "disruptor" in the market and stands to lose a large share of the market are purely hypothetical claims about future market shares rather than supporting evidence of lost market share. D.I. 76 at 14-15; *Abbott Cardiovascular Sys.,*

*Inc. v. Edwards Lifesciences Corp.*, 2019 WL 2521305, at *19 (D. Del. June 6, 2019) ("[S]peculative loss of market share cannot support issuance of a preliminary injunction."). Also, any potential loss of market share "correspond[s] to the same lost sales that were quantifiable as damages," and cannot be counted twice. D.I. 76 at 14 (citing D.I. 27 at ¶¶ 56-57). Similarly, Gogo refutes SmartSky's claims that it will lose its earned goodwill and reputation in the industry by pointing to evidence demonstrating SmartSky's ability to secure investments and customers subsequent to Gogo's announcement of its competing network. D.I. 76 at 16; *see also* D.I. 78 at ¶¶ 17, 26.

Next, SmartSky advances a price erosion argument. D.I. 24 at 13; D.I. 93 at 6-7. Following the announcement of Gogo's competing network, SmartSky asserts that it must charge "less than Gogo and hence suffer[] price erosion on any sales that it makes while Gogo is in the market promoting and selling its infringing 5G service." D.I. 24 at 13; D.I. 27 at ¶ 55. However, SmartSky offers no economic analysis, other than conclusory assertions, to support its price erosion theory, and, without such evidence, it is speculation to assert that competing with a disputed infringing product will drive down SmartSky's prices. *Waters Corp.*, 410 F. Supp. 3d at 715-16 (price erosion argument without "concrete pricing evidence" was "too speculative").

Lastly, SmartSky argues that, because it will lose market exclusivity, it will not be able to recover its nearly ▉$ amount▉ R&D investment, further hindering its ability to invest in future R&D, such as its complementary product "Skytelligence." D.I. 24 at 15; D.I. 93 at 9-10. Notably, SmartSky concedes that quantifying its lost R&D is not possible. *See* D.I. 95 at ¶ 35. Gogo asserts that SmartSky's allegations concerning a return on R&D costs are purely speculative and duplicative of the alleged lost sales, which account for any proposed return-on-investment. D.I. 76 at 16. Generally, courts give little weight, if any, to claims of lost opportunity to conduct future

research and development because such claims are highly speculative. *See Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) ("If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparable harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive relief.").

On this record, SmartSky has established that it competes directly with Gogo as a business aviation network provider, and that a loss of market share, and thus sales, to Gogo has the potential to be damaging due to the "stickiness" of the consumer. However, SmartSky has not demonstrated that such losses are imminent as a result of Gogo's yet-to-be-released 5G Network or that its losses are non-compensable. In fact, Gogo has provided evidence demonstrating that regardless of Gogo's promotion of its 5G Network, SmartSky has still secured investments and customers. *See* D.I. 76 at 16. SmartSky's assertions that it stands to lose its reputation in the industry and its ability to recoup its R&D investments to fund its complementary product, Skytelligence, (D.I. 24 at 15-16; D.I. 93 at 9-10) is speculative and cannot serve as the grounds for finding irreparable harm without additional evidence. *See Eli Lilly & Co.*, 82 F.3d at 1578.

Given the above conclusions on the likelihood of success on the merits and on irreparable harm, the Court need not make any findings concerning the third and fourth factors. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973-74 (Fed. Cir. 1996) ("[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors."). Thus, because SmartSky failed to establish the first two factors, i.e., likelihood of success on the merits and irreparable harm, the court denies SmartSky's Motion for Preliminary Injunction.

The Court will issue an Order consistent with this Memorandum Opinion.

# EXHIBIT 1

US009312947B2

(12) **United States Patent**
Alcorn

(10) **Patent No.:** US 9,312,947 B2
(45) **Date of Patent:** *Apr. 12, 2016

(54) **TERRESTRIAL BASED HIGH SPEED DATA COMMUNICATIONS MESH NETWORK**

(71) Applicant: **Smartsky Networks LLC**, Charlotte, NC (US)

(72) Inventor: **Donald L. Alcorn**, Montgomery, AL (US)

(73) Assignee: **SMARTSKY NETWORKS, LLC**, Charlotte, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 151 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/862,508**

(22) Filed: **Apr. 15, 2013**

(65) **Prior Publication Data**

US 2014/0328421 A1     Nov. 6, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/601,452, filed on Aug. 31, 2012, now Pat. No. 8,442,520, and a continuation of application No. 13/601,413, filed on Aug. 31, 2012, now Pat. No. 8,792,880, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *H04W 4/00* | (2009.01) |
| *H04B 7/185* | (2006.01) |
| *H04L 27/26* | (2006.01) |
| *H04W 84/00* | (2009.01) |
| *H04W 84/06* | (2009.01) |

(52) **U.S. Cl.**
CPC .......... *H04B 7/18506* (2013.01); *H04B 7/1851*

(2013.01); *H04B 7/18508* (2013.01); *H04L 27/2601* (2013.01); *H04W 84/005* (2013.01); *H04W 84/06* (2013.01)

(58) **Field of Classification Search**
CPC ............. H04B 7/1851; H04B 7/18506; H04B 7/18508; H04W 84/005; H04W 84/06; H04L 27/2601
USPC ........... 455/431, 432.1, 436, 441, 405, 404.2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,418,961 A | 4/1947 | Wehner |
| 5,681,300 A | 10/1997 | Ahr et al. |
| 6,201,797 B1 | 3/2001 | Leuca et al. |
| 6,285,878 B1 | 9/2001 | Lai |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          1341327 A1     3/2003

OTHER PUBLICATIONS

Office Action issued Nov. 29, 2013 in co-pending U.S. Appl. No. 13/601,515, filed Aug. 31, 2012, all enclosed pages cited.

(Continued)

*Primary Examiner* — Khai M Nguyen
(74) *Attorney, Agent, or Firm* — Nelson Mullins Riley & Scarborough LLP

(57) **ABSTRACT**

A network for providing high speed data communications may include multiple terrestrial transmission stations that are located within overlapping communications range and a mobile receiver station. The terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station employing a wireless radio access network protocol.

**20 Claims, 7 Drawing Sheets**



US 9,312,947 B2

Page 2

### Related U.S. Application Data

continuation of application No. 13/552,896, filed on Jul. 19, 2012, now Pat. No. 8,311,533, said application No. 13/552,896, filed on Jul. 19, 2012, now Pat. No. 8,311, 533, which is a continuation of application No. 12/355, 341, filed on Jan. 16, 2009, now Pat. No. 8,254,913, which is a continuation-in-part of application No. 11/622,811, filed on Jan. 12, 2007, now abandoned, which is a continuation-in-part of application No. 11/206,695, filed on Aug. 18, 2005, now abandoned.

(56)                    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,377,802 | B1 | 4/2002 | McKenna et al. |
| 6,487,426 | B1 | 11/2002 | Haber |
| 6,512,921 | B1 | 1/2003 | Hadinger |
| 6,694,143 | B1 | 2/2004 | Beamish et al. |
| 6,757,712 | B1 | 6/2004 | Bastian et al. |
| 6,816,728 | B2 | 11/2004 | Igloi et al. |
| 7,043,225 | B1 | 5/2006 | Patel et al. |
| 7,603,137 | B1 | 10/2009 | Elliott |
| 7,751,815 | B2 | 7/2010 | McKenna et al. |
| 7,933,599 | B2 | 4/2011 | Fernandez-Corbaton et al. |
| 8,249,586 | B2 | 8/2012 | Bosenbecker |
| 8,254,913 | B2 | 8/2012 | Alcorn |
| 2001/0036822 | A1 | 11/2001 | Mead et al. |
| 2001/0039189 | A1 | 11/2001 | Cox |
| 2002/0072332 | A1 | 6/2002 | Chang et al. |
| 2002/0160773 | A1* | 10/2002 | Gresham ............ H04B 7/18506 |
| | | | 455/431 |
| 2003/0046338 | A1 | 3/2003 | Runkis |
| 2003/0055975 | A1 | 3/2003 | Nelson et al. |
| 2003/0093798 | A1 | 5/2003 | Rogerson |
| 2003/0128681 | A1 | 7/2003 | Rauschmayer |
| 2003/0203736 | A1 | 10/2003 | Chi et al. |
| 2004/0203706 | A1 | 10/2004 | Dietz et al. |
| 2004/0253949 | A1 | 12/2004 | Swensen et al. |
| 2004/0253951 | A1 | 12/2004 | Chang et al. |
| 2005/0028214 | A1 | 2/2005 | Hall |
| 2005/0053026 | A1 | 3/2005 | Mullan et al. |
| 2005/0059396 | A1 | 3/2005 | Chuah et al. |
| 2005/0074019 | A1 | 4/2005 | Handforth et al. |
| 2005/0085249 | A1 | 4/2005 | Goldstein et al. |
| 2005/0108374 | A1* | 5/2005 | Pierzga ............ H04B 7/18506 |
| | | | 709/223 |
| 2005/0164664 | A1* | 7/2005 | DiFonzo ............ H04L 45/00 |
| | | | 455/277.1 |
| 2005/0255845 | A1 | 11/2005 | Leuca et al. |
| 2005/0256616 | A1* | 11/2005 | Rhoads ................ H04L 67/06 |
| | | | 701/1 |

| | | | |
|---|---|---|---|
| 2005/0286451 | A1 | 12/2005 | Kim et al. |
| 2006/0007952 | A1 | 1/2006 | Oishi et al. |
| 2006/0140572 | A1 | 6/2006 | Ruiz |
| 2006/0219776 | A1* | 10/2006 | Finn ..................... B60R 25/25 |
| | | | 235/380 |
| 2006/0229070 | A1 | 10/2006 | de La Chapelle et al. |
| 2006/0229077 | A1 | 10/2006 | Monk |
| 2006/0264210 | A1 | 11/2006 | Lovberg et al. |
| 2008/0090567 | A1 | 4/2008 | Gilbert |
| 2008/0233974 | A1* | 9/2008 | Xu ..................... H04W 76/002 |
| | | | 455/458 |
| 2008/0274734 | A1 | 11/2008 | Kostanic et al. |
| 2010/0073197 | A1 | 3/2010 | Eagleton et al. |

#### OTHER PUBLICATIONS

Office Action issued Nov. 29, 2013 in co-pending U.S. Appl. No. 13/601,413, filed Aug. 31, 2012, all enclosed pages cited.

Office Action issued Jan. 2, 2014 in co-pending U.S. Appl. No. 13/601,413, filed Aug. 31, 2012, all enclosed pages cited.

Office Action from co-pending U.S. Appl. No. 13/601,515 mailed Apr. 3, 2014, all enclosed pages cited.

Leabman, Michael A., "Adaptive Band-Partioning of Interference Cancellation in Communications Systems," M. Eng. Thesis, MIT EECS, 1997, pp. 1-70.

Mecham, Michael et al., "Meeting Expectations," Aviation Week and Space Technology (New York Feb. 28, 2005), vol. 162.

Taverna, Michael A., "From Seatback to Laptop," Aviation Week and Space Technology (New York Jul. 19, 2004), vol. 161, No. 3.

Martin, J.N., et al., "High-Speed Internet Access Via Stratospheric HALO Aircraft," Raytheon Syst. Co., Plano, TX (Piscataway, NJ, Apr. 10, 2000), from the 2000 EEEE Emerging Technologies Symposium on Broadband, Wireless Internet Access, Digest of Papers, Richardson, TX.

UTRA-UTRAN Long Term Evolution (LTE) and 3GPP System Architecture Evolution (SAE), Nov. 2-3, 2004.

Office Action issued Sep. 5, 2012 in co-pending (now patented) U.S. Appl. No. 13/552,896, filed Jul. 19, 2012 (U.S. Pat. No. 8,311,533).

Office Action issued Oct. 2, 2012 in co-pending (now patented) U.S. Appl. No. 13/601,381, filed Aug. 31, 2012 (U.S. Pat. No. 8,509,765).

Office Action issued Oct. 31, 2012 in co-pending (now patented) U.S. Appl. No. 13/601,452, filed Aug. 31, 2012 (U.S. Pat. No. 8,442,520).

Office Action issued Oct. 10, 2012 in co-pending (now allowed) U.S. Appl. No. 13/601,486, filed Aug. 31, 2012.

Office Action issued Oct. 15, 2012 in co-pending U.S. Appl. No. 13/601,515, filed Aug. 31, 2012.

Office Action issued Oct. 10, 2012 in co-pending U.S. Appl. No. 13/601,413, filed Aug. 31, 2012.

Office Action issued Dec. 28, 2012 in co-pending (now patented) U.S. Appl. No. 13/601,381, filed Aug. 31, 2012 (U.S. Pat. No. 8,509,765).

* cited by examiner



Figure 1



FIG. 2



FIG. 3



FIG. 4a



FIG. 4b



FIG. 5



FIG. 6

US 9,312,947 B2

1

# TERRESTRIAL BASED HIGH SPEED DATA COMMUNICATIONS MESH NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. patent application Ser. No. 13/601,452 filed on Aug. 31, 2012 and a Continuation of U.S. patent application Ser. No. 13/601,413 filed on Aug. 31, 2012, each of which is a Continuation of U.S. Pat. No. 8,311,533 which issued on Nov. 13, 2012, which is a Continuation of U.S. Pat. No. 8,254,913 which issued on Aug. 28, 2012, which is a Continuation-in-Part of U.S. patent application Ser. No. 11/622,811 filed on Jan. 12, 2007, which is a Continuation-in-Part of U.S. patent application Ser. No. 11/206,695 filed on Aug. 18, 2005, the contents of each of which are incorporated herein in their entireties.

## FIELD OF THE INVENTION

The invention relates generally to wireless telecommunications. More specifically, the present invention relates to a broadband data communications system for in-flight aircraft.

## BACKGROUND ART

High speed data communications are becoming more and more desirable and important to society. Most high speed data connections are available through telephone lines, cable modems or other such devices that have a physical wired connection. Since such a wired connection has limited mobility, wireless techniques for data communications are very attractive for airline passengers. However, cellular high speed wireless data links have a range which in not practical for in-flight use due to throughput limitations. Alternatively, high speed links are available from satellites for in-flight aircraft. This option is costly since it requires a satellite link as well as specialized antennae and other equipment for the aircraft and also consists of throughput limitations which impact usefulness. Consequently, there is a need for a system that provides high speed data communications link to an in-flight aircraft at a reasonable cost.

## SUMMARY OF THE INVENTION

In some aspects, the invention relates to a network for providing high speed data communications, comprising: a plurality of terrestrial transmission stations that are located within overlapping communications range; and a mobile receiver station, where the plurality of terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station according to the IEEE 802.16 Air Interface Standard terrestrial radio access network protocol in a mesh network configuration.

In other aspects, the invention relates to a network for providing high speed data communications, comprising: a plurality of terrestrial transmission stations that are located within overlapping communications range; and an airborne receiver station, where the plurality of terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station according to the IEEE 802.16 Air Interface Standard.

In other aspects, the invention relates to a network for providing high speed data communications, comprising: a plurality of terrestrial transmission stations that are located within overlapping communications range; and a seaborne

2

receiver station, where the plurality of terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station according to the IEEE 802.16 Air Interface Standard.

Other aspects and advantages of the invention will be apparent from the following description and the appended claims.

## BRIEF DESCRIPTION OF DRAWINGS

It should be noted that identical features in different drawings are shown with the same reference numeral.

FIG. 1 shows a schematic view of a broadband communication system for in-flight aircraft in accordance with one embodiment of the present invention.

FIG. 2 shows an example of a broadband communication system for the continental United States in accordance with one embodiment of the present invention.

FIG. 3 shows a schematic view of a broadband communication network over the ocean for in-flight aircraft and shipping in accordance with one embodiment of the present invention.

FIGS. 4a and 4b show views of the results of computer simulations of the performance of the network in accordance with one embodiment of the present invention.

FIG. 5 shows a diagram of the actual test network that was simulated in FIGS. 4a and 4b in accordance with one embodiment of the present invention.

FIG. 6 shows a diagram of the internal network configurations for the target craft shown in FIG. 5 in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION

The present invention is a system of providing high speed data communications for in-flight airliners utilizing a series of ground based transmitters along established common flight paths for multiple aircraft called "air corridors" that provides an IEEE 802.16 Air Interface Standard or OFDM "WiMax" connection. The ground transmitters are located in a pattern to provide overlapping coverage as an aircraft passes from one transmitter to the other. This allows passengers on the aircraft to have uninterrupted high speed data communications while in the air. The high speed data communications link between the passenger and the ground allows for a direct link that is continuous and uninterrupted in time. The direct link may be between the passenger and the ground station. Alternatively, the direct link may be between the aircraft and the ground station where the passenger accesses an on board network. The network would typically be run by an on-board server that would be in communication with the ground station and the passenger and also be continuous and uninterrupted in time.

The IEEE 802.16 Air Interface Standard, often called "WiMax" and built upon OFDM protocols as part of the next generation wireless (4G), is a specification for fixed broadband wireless access systems employing a point-to-multipoint (PMP) architecture. The IEEE 802.16 Air Interface Specification is a very capable, while complex, specification with current data transfer rates as high as 75 megabits per second (Mbps), and sometimes higher. There are allowances for a number of physical layers for different frequency bands and region-by-region frequency regulatory rules. There are features that allow an IP centric system or an ATM centric system depending upon the needs of customers. The specification is designed to cover application to diverse markets from very high bandwidth businesses to SOHO and residen-

US 9,312,947 B2

3

tial users. The initial version was developed with the goal of meeting the requirements of a vast array of deployment scenarios for broadband wireless access (BWA) systems operating between 10-66 GHz. Revisions to the base IEEE 802.16 standard targeting the sub 11 GHz are envisioned and intended to be captured for use within the scope of the present invention. The present invention envisions inclusion of the technology and performance requirements of IEEE 802.16, i.e. OFDM, but may include other technology adaptations to achieve connectivity with an aircraft in flight. OFDM is considered to be a distinguishing feature of the next generation wireless radio technology, also known as "4G".

System Profiles, Protocol Implementation Conformance Statement Proforma, Test Suite Structure & Test Purposes, and Abstract Test Suite specifications for 10 to 66 GHz and sub 11 GHz, have been developed all according to the ISO/IEC 9464 series (equivalent to ITU-T x.290 series) of conformance testing standards. The 802.16 standard covers both the Media Access Control (MAC) and the physical (PHY) layers access standard for systems in the frequency ranges 10-66 GHz and sub 11 GHz.

A number of PHY considerations were taken into account for the target environment. At higher frequencies, line-of-sight is a must. This requirement eases the effect of multipath, allowing for wide channels, typically greater than 10 MHz in bandwidth. This gives IEEE 802.16 the ability to provide very high capacity links on both the uplink and the downlink. For sub 11 GHz non line-of-sight capability is a requirement. The standard is designed to accommodate either Time Division Duplexing (TDD) or Frequency Division Duplexing (FDD) deployments, allowing for both full and half-duplex terminals in the FDD case. The current invention envisions utilizing multiple custom adaptations of the PHY layer of software.

The MAC is designed specifically for the PMP wireless access environment. It supports higher layer or transport protocols such as ATM, Ethernet or Internet Protocol (IP), and is designed to easily accommodate future protocols that have not yet been developed. The MAC is designed for very high bit rates of the truly broadband physical layer, while delivering ATM compatible Quality of Service (QoS); UGS, rtPS, nrtPS, and Best Effort. The present invention envisions multiple unique configurations of the MAC layer of the radio system.

The frame structure allows terminals to be dynamically assigned uplink and downlink burst profiles according to their link conditions. This allows a tradeoff between capacity and robustness in real-time, and provides roughly a two times increase in capacity on average when compared to non-adaptive systems, while maintaining appropriate link availability.

The 802.16 MAC uses a variable length Protocol Data Unit (PDU) along with a number of other concepts that greatly increase the efficiency of the standard. Multiple MAC PDUs may be linked into a single burst to save PRY overhead. Additionally, multiple Service Data Units (SDU) for the same service may be linked into a single MAC PDU, saving on MAC header overhead. Fragmentation allows very large SDUs to be sent across frame boundaries to guarantee the QoS of competing services. And, payload header suppression can be used to reduce the overhead caused by the redundant portions of SDU headers.

The MAC uses a self-correcting bandwidth request/grant scheme that eliminates the overhead and delay of acknowledgements, while simultaneously allowing better QoS handling than traditional acknowledged schemes. Terminals have a variety of options available to them for requesting bandwidth depending upon the QoS and traffic parameters of their

4

services. They can be polled individually or in groups. They can recycle bandwidth already allocated to make requests for more. They can signal the need to be polled, and they can piggyback requests for bandwidth. This is made possible with "beam forming" of the signal down to a 4 degree wide "pencil beam". Beam forming also enables the signal to be electronically adapted (null steering) to connect with a fast-moving aircraft.

FIG. 1 shows an example of a broadband communication system 10 for in-flight aircraft in accordance with one embodiment of the present invention. The system 10 includes a series of ground located transmitters 16 located along an air corridor 12. As an airliner passes along its flight path 18, it moves along different coverage areas 14 provided by the transmitters 16 without a loss of communications. It should be understood that a single transmitter 16 may cover all aircraft within range in the air corridor 12. Through the unique properties of 4G OFDM technology envisioned in the present invention, one base station is able to reuse the same frequency to communication with multiple aircraft simultaneously. Also, an aircraft may be simultaneously within the overlapping range of multiple transmitters 16 as it travels along its flight path 18. When an aircraft is in the coverage area, as well as when the aircraft is moving from one coverage area to the next, the passenger is able to remain in contact with the ground station through a direct link, continuous and without interruption in time.

FIG. 2 shows an example of a WiMax broadband communication system 20 for the continental United States. It should be noted that the drawing is not to scale and the actual number of transmitters will be greater than shown. Transmission of WiMax signals typically requires a line-of-sight (LOS) link between the transmitter and receiver. While conventional WiMax performance standards typically have a maximum range of 34 miles, it is important to note that this range is from ground point to ground point. WiMax has a range of well over 100 miles for a ground point to aircraft link due to the increased distance of a LOS link and other modifications to an OFDM-based radio.

A great majority of passenger aircraft in the United States travel in "air corridors" that function similar to highways. Air corridors typically exist along major east/west and north/south routes between high population areas (e.g., California, the northeastern corridor of the United States, etc.). Aircraft are routed along these corridors in order to more efficiently move air traffic to and from their final destinations. Since most air traffic passes through these paths, a system for providing 4G WiMax access to in-flight aircraft could cover only the air corridors in lieu of trying to provide coverage for all airspace in the country. This has the advantage of providing a significant cost advantage by reducing the number of transmitters while still covering the majority of flights. However, as the OFDM signal flows outward from the typical air corridors, the signal becomes weaker but nonetheless perceptible by random-flying aircraft.

The system provides high speed broadband communications to an in-flight aircraft while the aircraft is within the air corridor. Technology to manage the user's transition from one transmitter to another is well known to those of ordinary skill in the art. The communications link may provide the user with such data communications as internet access, streaming video, voice-over IP, etc. Additionally, the system may provide data on the aircraft to parties on the ground such as an air traffic controller. Examples of aircraft data include air traffic control information, aircraft status and performance information, video security surveillance of the aircraft interior, etc. The system may be accessed directly by an individual aboard

US 9,312,947 B2

5

an aircraft via a direct communication link that is continuous and uninterrupted in time with the ground. In an alternative embodiment, the system may be accessed by the aircraft that it in turn provides individual with direct access that is continuous and uninterrupted in time via an onboard network such as a LAN or in-cabin wireless network via a server relayed to the ground using the modified OFDM or WiMAX connection.

FIG. **3** shows an alternate embodiment of the present invention. Specifically, it shows a schematic view of a broadband communication network over the ocean for in-flight aircraft and surface shipping. In this embodiment, the network utilizes "terrestrial" based stations that include land based stations **30**, ocean shipping **32** and in-flight aircraft **34**. Under this definition, any surface node (land or sea) or in-flight node is considered terrestrial. These nodes interlink to form a network "mesh" that may include: an air mesh; a sea mesh; or a combined air-sea mesh. Under this definition, the nodes share interconnectivity where the individual nodes of the mesh network serve as repeaters in and among each other to provide redundancy of communication links. Additionally, it should be understood in this application that the use of the terms "aircraft" and "airliner" are interchangeable and should include all types of aviation including: commercial aviation, military aviation, and general aviation of all types and purposes.

In order to understand and typify the expected radio coverage of the present invention, as well as prepare for the FCC STA authorization process, a comprehensive Frequency Plot Map was created. FIG. **4***a* shows a schematic view of the results of one Frequency Plot Map created by a computer simulation of the performance of the network in accordance with one embodiment of the present invention. The diagram shows a simulated network in a section of Puget Sound between the coast of Washington and British Columbia. A land based station **40** is making a communications link to a helicopter **42** and a boat **44**. The smaller operating area **46** shows the range of communications links at an operating frequency of 5.8 MHz. The larger operating area **48** shows the range of communications links at an operating frequency of 3.5 MHz

FIG. **4***b* shows a second frequency plot map created by the same computer simulation. The map shows a base station **41** on land and a target helicopter **43**. The simulated system utilizes the Proxim Networks Tsunami MP.16 Model 3500 and Model 3338-AOO-060 antenna operating at a frequency of 3.5 GHz. The broader area **47** represents horizontal coverage for antenna mounted at 407 foot elevation confined to 60 degree Azimuth Beamwidth. The more narrow area **45** represents vertical coverage area of 10 degree Elevation Beamwidth at target height of 10,800 feet.

Both frequency plot maps were generated with Radio Mobile Version 7.1.1 software utilizing the plot transmission characteristics of the raw RF signal. Radio Mobile is a Radio Propagation and Virtual Mapping computer simulation software that is listed as Freeware. The software uses digital terrain elevation data for automatic extraction of a path profile between a transmitter and a receiver. The path data is added to radio system specific attributes, environmental and statistical parameters to feed into an Irregular Terrain Model radio propagation calculation. The software utilizes USGS Earth Resource Observation and Science (EROS) data provided by the United States Geological Survey. The data sets are in BIL format at ⅓ arc second resolution (3 meter).

The use of Radio Mobile software, customized for the 3.5 GHz frequency band as well as for the particular lobe characteristics of the flat panel antenna, demonstrated a 20+ mile

6

Line of Site (LOS) transmission distance. The resultant plots were then incorporated in the STA application process and submitted to the FCC for approval of a Temporary authority to utilize licensed frequencies in and around the subject test area.

In the present invention, reuse of frequencies made possible with "beam forming" of the signal down to a 4 degree wide "pencilbeam" by a "software definable radio (SDR)". In these embodiments, the signal is transmitted down such a narrow beam that interference with nearby signals on the same or very close frequencies is minimized. By using a buffer range between beams of the signals, the same frequencies may be recycled or re-used for different communications links between nodes. In optimum conditions, it is possible to achieve 288 reuses of the same frequency. This has the great advantage of minimized the necessary frequency spectrum required to operate the network.

Another advantage of the use of SDR involves a more stable and manageable system of transitioning between communications links among moving nodes. With a narrow beam, a high quality communication link may be established with a more distant node rather than the closest node. This link will conceivably last longer as the distant node moves through the transmission range towards the base station.

FIG. **5** shows a schematic diagram of the actual test network that was simulated in FIG. **4** in accordance with one embodiment of the present invention. An internet access link **50** is provided through a land based computer network. The link is connected to a base station antenna **52** that focuses the RF energy to the intended receiver. In this embodiment, the antenna is a Proxim Wireless Flat Panel Model 3338-AOO-060 external antenna. The antenna is part of Proxim's Wireless's Tsunami MP.16 Model 3500 products. These products include a Model M3500-BSR-EU base station and a Model 3500-SSR-EU subscriber unit. The antenna **52** is vertically polarized with a 17 dBi gain. It has an azimuth beamwidth of 60°+/−4° and an elevation beamwidth of 10°.

The test network comprised several discreet elements. At the core of the network, the Tsunami MP.16 Model 3500 base station was mounted on top of a roof structure at a height of 407 feet above sea level, as measured by GPS receivers. The base station was connected via 100BaseT to an Ethernet switch that hosted several data servers; a file server for large file transfer, a network management/Data capture station, and a video server utilizing VLC's server side software to multicast a movie file through the WiMAX link. The network core was also attached to the internet via a DSL router that had a 1.5 Mb downlink and 768 uplink connection.

FIG. **6** shows a diagram of the internal network configurations for the target craft shown in FIG. **5** in accordance with one embodiment of the present invention. In each target vehicle **54** and **58**, a Tsunami MP.16 Model 3500 subscriber unit was installed as well as a 17 dBi external Patch antenna **62**. An onboard switched network **64** was created to connect 3 laptops **66**, each running specific applications for the test suite including: a video client/skype VOIP unit; a data collection/network monitoring unit; and a video conferencing unit utilizing a Logitech 1.3 Megapixel QuickCam supporting both Yahoo and Microsoft messaging clients. Variations were undertaken in some vehicles due to variations in onboard-power options and restrictions to mounting options and location of equipment.

Wind-load survival for the Proxim Model 333S-AOO-060 antenna is calculated at 220 Km/h, and is operationally rated at 160 Km/h, as such it was not possible to mount the antenna to the exterior of the aircraft as the aircraft's top speed is 230 Km/h. Instead the antenna was mounted inside the canopy in

US 9,312,947 B2

7

the copilot's seat position which did have some effect on antenna aiming/signal reception due to large nearby metal objects such as the avionics instrument cluster, etc. This issue was partially mitigated by manual manipulation of the helicopter orientation in flight by the pilot after signal degradation was noted, or manual movement of the antenna if flight path reorientation was not practical.

The demonstration testing of WiMAX capable equipment in the 3.5 GHz and 5.8 GHz spectrum ranges successfully established communications with both airborne and water based vehicles. The initial test is targeted at the range of 20 miles, with later portions of the test at 50 miles. Both vehicles were initially stationary in position (PtP), but the airborne target also tested altitude targets up to two vertical miles. In the final stages of testing, the airborne vehicle traveled at higher speeds (PtMP). The tests were conducted utilizing the IEEE 802.15-2004 Standard for mobile applications. The tests comprised multiple phases with increasing difficulty. These phases were: (1.) 20 mile LOS, PTP shot to boat; (2.) 20 mile LOS, PTP shot to helicopter, 200' above boat; (3.) 21 mile LOS, PTP shot to helicopter, 10,572' (2 mi) above boat; (4.) 20-mile radius speed tests to helicopter at 10,000; and (5.) LOS, PTP distance test at 10,000'.

The Proxim equipment, though locked to QPSK-3/4 Modulation/FEC and below modulation types, was able to reliably operate at 30.52 statutory miles from the base station, and was able to reliably operate at 140 MPH. Combined transmit/receive data rates above 2 Mbps were realized in many portions of the test areas. Video conferencing via MSN messenger, VOIP calls via Skype, remote streaming of movie files, and large file transfers were simultaneously executed at distances of 20+ miles, and during vehicle movement—even at high speeds. Multi-megabit data transmission speeds were achieved during multiple samples, as well as testing of VOIP applications, high-speed file transfers, video conferencing to various locations in the United States, and multi-media video streaming of large movie files.

Doppler shift and signal reflectivity from water were observed during testing. To rectify these factors, the subscriber antenna elevation was modified upward to reduce or eliminate water reflectivity causing signal interference. Doppler shift, though observed only at speed in excess of approximately 100 mph, did not cause signal failure but marginally impacted the rate of throughput. This variance is to be expected with the version of gear employed in the test, which was designed and configured for point to point (PTP) transmission. The impact of Doppler shift is anticipated to be further minimized in newer versions of WiMAX gear, with the 802.16-2005 standard, which is designed with forward error correction capability.

It is intended that embodiments of the present invention include present and future versions of IEEE 802.16 Air Interface Standard that are consistent with the present disclosure. For example, the IEEE Standard 802.16-2004 (approved in June 2004) renders the previous (and 1st) version 802.16-2001 obsolete, along with its amendments 802.16a and 802.16c. However, IEEE Standard 802.16-2004 addresses only fixed systems such as Local area networks (LANs) and metropolitan area networks (MANs).

IEEE Standard 802.16-2005 (approved December, 2005 and formerly named 802.16e) adds mobility components to the WiMax standard. This WiMAX mobility standard is an improvement on the modulation schemes stipulated in the original WiMAX standard. It allows for fixed wireless and mobile Non Line of Sight (NLOS) applications primarily by enhancing the Orthogonal Frequency Division Multiplexing Access (OFDMA). It is possible that by stipulating a new

8

modulation method called Scalable OFDMA (SOFDMA), the 802.16-2005 standard will make the older 802.16-2004 standard which uses OFDM-256 outdated. However, there are plans for a migration path from the older version of the standard to the more robust, mobile modulation scheme. In any case, compatibility between similar system profiles is a distinct possibility. SOFDMA and OFDMA256 are typically not compatible so most equipment may have to be replaced. However, attempts are being made to provide a migration path for older equipment to OFDMA256 compatibility which would ease the transition for those networks which have already made the switch to SOFDMA.

SOFDMA will improve upon OFDM256 for NLOS applications by improving NLOS coverage by utilizing advanced antenna diversity schemes, and hybrid-Automatic Retransmission Request (hARQ). Also, system gain is increased by use of denser sub-channelization, thereby improving indoor penetration. The newer standard introduces high-performance coding techniques such as Turbo Coding and Low-Density Parity Check (LDPC), enhancing security and NLOS performance and introduces downlink sub-channelization, allowing network administrators to trade coverage for capacity or vice versa. It also improves coverage by introducing Adaptive Antenna Systems (AAS) and Multiple Input-Multiple Output (MIMO) technology. It eliminates channel bandwidth dependencies on sub-carrier spacing, allowing for equal performance under any RF channel spacing (1.25-14 MHz). Finally, SOFDMA's enhanced Fast Fourier Transform (FFT) algorithm can tolerate larger delay spreads and there by increasing resistance to multi path interference.

WiMAX's equivalent in Europe is HIPERMAN. Efforts are underway to make 802.16 and HIPERMAN interoperate seamlessly. Additionally, Korea's telecom industry has developed its own standard, WiBro which is expected to be fully interoperable with WiMAX. Consequently, it is fully intended that the definition of "WiMax" and IEEE Standard 802.16 cover any and all versions, modifications and equivalents of this wireless communication standard, inclusive of OFDM technology, also known as next generation wireless or 4G.

In other embodiments of the present invention, alternative communications protocols could be used. For example, one embodiment of the invention could use the UTRAN Long Term Evolution (LTE) Terrestrial Radio Access Network protocol which is based on or utilizes OFDM technology. Versions of LTE may utilize radio air interface technology known as Orthogonal Frequency Division Multiple Access (OFDMA) to provide several key benefits including significantly increased peak data rates, increased cell edge performance, reduced latency, scalable bandwidth, co-existence with GSM/EDGE/UMTS systems, reduced CAPEX and OPEX. LTE is scalable to allow operation in a wide range of spectrum bandwidths, from 1.4-20 MHz, using both Frequency Division Duplex (FDD) and Time Division Duplex (TDD) modes of operation, thus providing flexibility to suit any user's existing or future frequency allocation.

The performance characteristics for LTE versions of next generation of 4G technology include: peak download rates of 326.4 Mbit/s for 4×4 antennas and 172.8 Mbit/s for 2×2 antennas for every 20 MHz of spectrum; peak upload rates of 86.4 Mbit/s for every 20 MHz of spectrum; at least 200 active users in every 5 MHz cell. (i.e., 200 active data clients); sub-5 ms latency for small IP packets; spectrum flexibility for spectrum slices as small as 1.4 MHz (and as large as 20 MHz); optimal ground to ground cell size of 5 km, 30 km sizes with reasonable performance, and up to 100 km cell sizes supported with acceptable performance (this will be increased

US 9,312,947 B2

9

for air to ground cells; co-existence with legacy standards (users can transparently start a transfer of data in an area using an LTE standard, and, should coverage be unavailable, continue the operation without any action on their part using GSM/GPRS or W-CDMA-based UMTS or even 3GPP2 networks such as CDMA or EV-DO; and support for a MBSFN (Multicast Broadcast Single Frequency Network) which can deliver services such as Mobile TV using the LTE infrastructure.

Another alternative communications protocol that could be used is the IEEE Standard 802.20 which is known as "The Standard Air Interface for Mobile Broadband Wireless Access Systems Supporting Vehicular Mobility—Physical and Media Access Control Layer Specification" (hereafter "802.20"). 802.20 is a variation of next generation wireless or 4G technology, a mobility enhancement of 802.16. 802.20 is defined as a protocol for boosting IP-based data-transmission rates for mobile users in wireless metropolitan area networks (WMANs). It would be capable of supporting people and devices sitting in trains, subways and automobiles traveling at up to 150 miles per hour. 802.20 would support transmission speeds of up to 1M bit/sec in the 3-GHz spectrum band. 802.20 is also based on OFDM. The 802.20 standard seeks to boost real-time data transmission rates in wireless metropolitan area networks connections based on cell ranges of up to 15 kilometers or more for ground to ground stations. This range will be greater for ground to air connections.

802.20 shares some similarities with IEEE Standard 802.16e. The 802.16e and 802.20 standards both specify mobile air interfaces for wireless broadband. On the surface the two standards are similar, but there are some important differences between them. Specifically, 802.16e will add mobility in the 2 to 6 GHz licensed bands while 802.20 aims for operation in licensed bands below 3.5 GHz. Typically, 802.16e will be used by the mobile user walking around with a PDA or laptop, while 802.20 will address high-speed mobility issues. Another key difference will be the manner in which the two are deployed with users deploying 802.20 as an overlay to their existing networks including existing 802.16 networks.

While the invention has been described based on fundamental embodiments of the forms of next generation wireless or 4G technology, it also should be understood that all described embodiments may utilize hybrid or modified versions of the next generation wireless technology, 4G or 802.16 (WiMAX) based on or utilizing OFDM as applicable. It is recognized that these embodiments describe only portions of the foundation components necessary in the construction of a radio to communicate with an aircraft at true broadband data rates over extreme distances. Such a transceiver, modified to the magnitude necessary to maintain an effective communication continuous and uninterrupted in time with aircraft at jet speed and extreme distances from the terrestrial station, will include protocols and code which are not presently included within the definitions or standards of 802.16 or WiMAX or LTE. Despite the modification of the 4G transceivers, both terrestrial and airborne units, inclusion of the component elements described in 802.16 or WiMAX or LTE, specifically to include OFDM, make such a radio subject to the claims of this invention.

While the invention has been described with respect to a limited number of embodiments, those skilled in the art, having benefit of this disclosure, will appreciate that other embodiments can be devised which do not depart from the scope of the invention as disclosed here. Accordingly, the scope of the invention should be limited only by the attached claims.

10

What is claimed is:

1. A network base station within a network including at least one in-flight communication node, the network base station comprising:
   a radio configured via software defined radio to utilize beamforming to generate a plurality of steerable beams, to enable multiple reuses of a same frequency to communicate with respective different in-flight communication nodes via respective different communication links, wherein the respective different communication links are high speed data communications links that are enabled to be maintained continuous and uninterrupted in time while one of the respective different in-flight communication nodes transitions between a first steerable beam associated with a first coverage area defined by the network base station and a second steerable beam associated with a second coverage area defined by another network base station, the first and second coverage areas at least partially overlapping.

2. The network base station of claim 1, wherein the high speed data communications link is provided continuous and uninterrupted in time with the receiver station employing Orthogonal Frequency Division Multiplexing (OFDM).

3. The network base station of claim 2, wherein the network base station employs communication bands in about a 2 GHz to about a 6 GHz range utilizing OFDM.

4. The network base station of claim 1, wherein the high speed data communications link is provided continuous and uninterrupted in time with the receiver station according to Long Term Evolution (LTE) terrestrial radio access network protocols.

5. The network base station of claim 1, wherein the high speed data communications link is provided continuous and uninterrupted in time with the receiver station according to IEEE 802.16 Air Interface Standard.

6. The network base station of claim 1, wherein the radio is further configured to generate the plurality of beams such that at least one of the beams has a beamwidth of less than about 4 degrees.

7. The network base station of claim 1, wherein the network base station is one of a plurality of base stations in a land based mesh network serving in-flight nodes.

8. The network base station of claim 1, wherein the network base station is one of a plurality of base stations in an air mesh network of in-flight nodes serving at least one surface node.

9. The network base station of claim 1, wherein the network base station is one of a plurality of base stations in an air mesh network of in-flight nodes serving at least one other in-flight node on another aircraft.

10. The network base station of claim 1, wherein the network base station is one of a plurality of base stations in an air and sea mesh network of in-flight nodes and sea based nodes serving at least one surface node or at least one air node.

11. A network comprising a plurality of network base stations configured to communicate with at least one in-flight node, the network base stations including at least two base stations having coverage areas that at least partially overlap with each other, each of the at least two base stations including:
   a radio configured via software defined radio to utilize beamforming to generate a plurality of steerable beams, to enable multiple reuses of a same frequency to communicate with respective different in-flight communication nodes via respective different communication links, wherein the respective different communication links are high speed data communications links that are enabled

US 9,312,947 B2

11                                                          12

to be maintained continuous and uninterrupted in time while one of the respective different in-flight communication nodes transitions between corresponding steerable beams associated with respective ones of the coverage areas defined by the at least two base stations.

**12**. The network of claim **11**, wherein the high speed data communications link is provided continuous and uninterrupted in time with the receiver station employing Orthogonal Frequency Division Multiplexing (OFDM).

**13**. The network of claim **12**, wherein the radio employs communication bands in about a 2 GHz to about a 6 GHz range utilizing OFDM.

**14**. The network of claim **11**, wherein the high speed data communications link is provided continuous and uninterrupted in time with the receiver station according to Long Term Evolution (LTE) terrestrial radio access network protocols.

**15**. The network of claim **11**, wherein the high speed data communications link is provided continuous and uninter-

rupted in time with the receiver station according to IEEE 802.16 Air Interface Standard.

**16**. The network of claim **11**, wherein the radio is further configured to generate the plurality of beams such that at least one of the beams has a beamwidth of less than about 4 degrees.

**17**. The network of claim **11**, wherein mesh network is a land based mesh network serving in-flight nodes.

**18**. The network of claim **11**, wherein the mesh network is an air mesh network of in-flight nodes serving at least one surface node.

**19**. The network of claim **11**, wherein the mesh network is an air mesh network of in-flight nodes serving at least one other in-flight node on another aircraft.

**20**. The network of claim **11**, wherein the mesh network is an air and sea mesh network of in-flight nodes and sea based nodes serving at least one surface node or at least one air node.

* * * * *

# EXHIBIT 2

(12) **United States Patent**
Alcorn

(10) Patent No.: **US 11,223,417 B2**
(45) Date of Patent: **Jan. 11, 2022**

(54) **TERRESTRIAL BASED HIGH SPEED DATA COMMUNICATIONS MESH NETWORK**

(71) Applicant: **SMARTSKY NETWORKS LLC**, Morrisville, NC (US)

(72) Inventor: **Donald Alcorn**, Montgomery, AL (US)

(73) Assignee: **SmartSky Networks, LLC**, Morrisville, NC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/337,715**

(22) Filed: **Jun. 3, 2021**

(65) **Prior Publication Data**
US 2021/0297146 A1 Sep. 23, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 16/951,493, filed on Nov. 18, 2020, which is a continuation of application No. 16/599,519, filed on Oct. 11, 2019, now Pat. No. 10,855,364, which is a continuation of application No. 15/964,694, filed on Apr. 27, 2018, now Pat. No. 10,484,079, which is a continuation of application No. 15/068,783, filed on Mar. 14, 2016, now Pat. No. 9,985,717, which is a continuation of application No.
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 7/185* | (2006.01) |
| *H04W 84/00* | (2009.01) |
| *H04W 84/06* | (2009.01) |
| *H04L 27/26* | (2006.01) |

(52) **U.S. Cl.**
CPC ....... *H04B 7/18506* (2013.01); *H04B 7/1851* (2013.01); *H04B 7/18508* (2013.01); *H04L 27/2601* (2013.01); *H04W 84/005* (2013.01); *H04W 84/06* (2013.01)

(58) **Field of Classification Search**
CPC .............. H04B 7/18506; H04B 7/1851; H04L 27/2601; H04W 84/06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 614,879 | A | 11/1898 | Miller |
| 2,418,961 | A | 4/1947 | Wehner |
(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1341327 A1 | 3/2003 |
| JP | 2005159448 A | 6/2005 |
| WO | 2013089731 A1 | 6/2013 |

OTHER PUBLICATIONS

Leabman, Michael A., "Adaptive Band-Partioning of Interference Cancellation in Communications System," M. Eng. Thesis, MIT EECS, 1997, all enclosed pages cited.
(Continued)

*Primary Examiner* — Faruk Hamza
*Assistant Examiner* — Abusayeed M Haque
(74) *Attorney, Agent, or Firm* — Burr & Forman, LLP

(57) **ABSTRACT**

A network for providing high speed data communications may include multiple terrestrial transmission stations that are located within overlapping communications range and a mobile receiver station. The terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station employing a wireless radio access network protocol.

**20 Claims, 7 Drawing Sheets**



## US 11,223,417 B2
Page 2

### Related U.S. Application Data

13/862,508, filed on Apr. 15, 2013, now Pat. No. 9,312,947, which is a continuation of application No. 13/601,452, filed on Aug. 31, 2012, now Pat. No. 8,442,520, which is a continuation of application No. 13/601,413, filed on Aug. 31, 2012, now Pat. No. 8,792,880, which is a continuation of application No. 13/552,896, filed on Jul. 19, 2012, now Pat. No. 8,311,533, said application No. 13/601,452 is a continuation of application No. 13/552,896, filed on Jul. 19, 2012, now Pat. No. 8,311,533, which is a continuation of application No. 12/355,341, filed on Jan. 16, 2009, now Pat. No. 8,254,913, which is a continuation-in-part of application No. 11/622,811, filed on Jan. 12, 2007, now abandoned, which is a continuation-in-part of application No. 11/206,695, filed on Aug. 18, 2005, now abandoned.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,681,300 A | 10/1997 | Ahr et al. | |
| 5,819,000 A | 10/1998 | Oshima | |
| 6,047,165 A * | 4/2000 | Wright | G05D 1/0055 340/945 |
| 6,108,539 A * | 8/2000 | Ray | H04B 7/18506 455/427 |
| 6,201,797 B1 * | 3/2001 | Leuca | H04B 7/18508 370/316 |
| 6,285,878 B1 | 9/2001 | Lai | |
| 6,345,186 B1 * | 2/2002 | Schultz | H04W 36/24 455/436 |
| 6,377,802 B1 | 4/2002 | McKenna et al. | |
| 6,487,426 B1 | 11/2002 | Haber | |
| 6,507,739 B1 * | 1/2003 | Gross | H04B 7/18504 455/11.1 |
| 6,512,921 B1 | 1/2003 | Hadinger | |
| 6,675,013 B1 | 1/2004 | Gross et al. | |
| 6,694,143 B1 | 2/2004 | Beamish et al. | |
| 6,757,712 B1 | 6/2004 | Bastian et al. | |
| 6,779,476 B1 | 8/2004 | Sowell et al. | |
| 6,781,513 B1 | 8/2004 | Korkosz et al. | |
| 6,816,728 B2 | 11/2004 | Igloi et al. | |
| 6,940,426 B1 | 9/2005 | Vaida | |
| 7,043,225 B1 | 5/2006 | Patel et al. | |
| 7,088,288 B1 | 8/2006 | Margolese | |
| 7,356,389 B2 | 4/2008 | Holst | |
| 7,460,830 B2 | 12/2008 | Moore | |
| 7,603,137 B1 | 10/2009 | Elliott | |
| 7,715,853 B1 | 5/2010 | Frerking et al. | |
| 7,751,815 B2 | 7/2010 | McKenna et al. | |
| 7,933,599 B2 | 4/2011 | Fernandez-Corbaton et al. | |
| 7,984,190 B2 | 7/2011 | Rhoads | |
| 8,023,936 B2 | 9/2011 | Hudson | |
| 8,032,135 B1 | 10/2011 | Redford et al. | |
| 8,249,586 B2 | 8/2012 | Bosenbecker | |
| 8,254,913 B2 | 8/2012 | Alcorn | |
| 8,311,533 B1 | 11/2012 | Alcorn | |
| 8,700,032 B2 | 4/2014 | Redford et al. | |
| 8,744,360 B2 | 6/2014 | Zheng | |
| 2001/0036822 A1 | 11/2001 | Mead et al. | |
| 2001/0039189 A1 | 11/2001 | Cox | |
| 2002/0004393 A1 * | 1/2002 | Heppe | H04B 7/18508 455/431 |
| 2002/0072332 A1 | 6/2002 | Chang et al. | |
| 2002/0101632 A1 | 8/2002 | Meckler | |
| 2002/0160773 A1 | 10/2002 | Gresham et al. | |
| 2003/0046338 A1 | 3/2003 | Runkis | |
| 2003/0052798 A1 | 3/2003 | Hanson | |
| 2003/0055975 A1 | 3/2003 | Nelson et al. | |
| 2003/0093187 A1 | 5/2003 | Walker | |
| 2003/0093798 A1 | 5/2003 | Rogerson | |
| 2003/0128681 A1 | 7/2003 | Rauschmayer | |
| 2003/0203736 A1 | 10/2003 | Chi et al. | |
| 2004/0008253 A1 | 1/2004 | Monroe | |
| 2004/0095907 A1 | 5/2004 | Agee | |
| 2004/0132495 A1 * | 7/2004 | Horton, Jr. | G08G 5/065 455/562.1 |
| 2004/0203706 A1 | 10/2004 | Dietz et al. | |
| 2004/0240590 A1 | 12/2004 | Cameron | |
| 2004/0253949 A1 | 12/2004 | Swensen et al. | |
| 2004/0253951 A1 | 12/2004 | Chang et al. | |
| 2005/0028214 A1 | 2/2005 | Hall | |
| 2005/0053026 A1 | 3/2005 | Mullan et al. | |
| 2005/0059396 A1 | 3/2005 | Chuah et al. | |
| 2005/0074019 A1 | 4/2005 | Handforth et al. | |
| 2005/0085249 A1 | 4/2005 | Goldstein et al. | |
| 2005/0088980 A1 | 4/2005 | Olkkonen et al. | |
| 2005/0108374 A1 | 5/2005 | Pierzga et al. | |
| 2005/0164664 A1 | 7/2005 | DiFonzo et al. | |
| 2005/0197748 A1 | 9/2005 | Holst | |
| 2005/0232579 A1 | 10/2005 | Monroe | |
| 2005/0255845 A1 | 11/2005 | Leuca et al. | |
| 2005/0256616 A1 | 11/2005 | Rhoades | |
| 2005/0286451 A1 | 12/2005 | Kim et al. | |
| 2006/0007952 A1 | 1/2006 | Oishi et al. | |
| 2006/0035588 A1 | 2/2006 | Chapelle | |
| 2006/0040612 A1 | 2/2006 | Min | |
| 2006/0102798 A1 | 5/2006 | Cox | |
| 2006/0140572 A1 | 6/2006 | Ruiz | |
| 2006/0167598 A1 | 7/2006 | Pennarola | |
| 2006/0219776 A1 | 10/2006 | Finn | |
| 2006/0229070 A1 | 10/2006 | de La Chapelle et al. | |
| 2006/0229077 A1 | 10/2006 | Monk | |
| 2006/0239537 A1 | 10/2006 | Shragai | |
| 2006/0251507 A1 | 11/2006 | Braswell | |
| 2006/0264210 A1 | 11/2006 | Lovberg et al. | |
| 2006/0265183 A1 | 11/2006 | Jacques | |
| 2007/0130389 A1 | 6/2007 | Petersson et al. | |
| 2007/0184846 A1 * | 8/2007 | Horton, Jr. | G08G 5/065 455/456.1 |
| 2007/0226407 A1 | 9/2007 | Radulescu et al. | |
| 2008/0090567 A1 | 4/2008 | Gilbert | |
| 2008/0233974 A1 | 9/2008 | Xu | |
| 2008/0274734 A1 | 11/2008 | Kostanic et al. | |
| 2010/0073197 A1 | 3/2010 | Eagleton et al. | |
| 2010/0124210 A1 | 5/2010 | Lo | |
| 2011/0309979 A1 | 12/2011 | Redford et al. | |
| 2018/0124671 A1 * | 5/2018 | Zhang | H04B 7/18506 |

### OTHER PUBLICATIONS

Martin, J.N., et al., "High-Speed Internet Access via Stratospheric HALO Aircraft," Raytheon Syst. Co., Plano, TX (Piscataway, NJ, Apr. 10, 2000), from the 2000 EEEE Emerging Technologies Symposium on Broadband, Wireless Internet Access, Digest of Papers, Richardson, TX, all enclosed pages cited.

Taverna, Michael A., "From Seatback to Laptop," Aviation Week and Space Technology (New York Jul. 19, 2004), vol. 161, No. 3, all enclosed pages cited.

UTRA-UTRAN Long Term Evolution (LTE) and 3GPP System Architecture Evolution (SAE), Nov. 2-3, 2004, all enclosed pages cited.

Mecham, Michael, et al., "Meeting Expectations," Aviation Week and Space Technology (New York Feb. 28, 2005), vol. 162, all enclosed pages cited.

IPR from related U.S. Pat. No. 9,312,947, dated Mar. 12, 2020, all pages cited in its entirety.

IEEE Standard for Local and Metropolitan Area Networks, Part 16: Air Interface for Fixed Broadband Wireless Access Systems.

Patent Owner's Preliminary Response from related U.S. Pat. No. 9,312,947, dated Jun. 22, 2020, all pages cited in its entirety.

IPR Decision Denying Institution of Inter Partes Review, dated Sep. 16, 2020.

Office Action from U.S. Appl. No. 17/067,120 dated Aug. 23, 2021, all pages cited in its entirety.

* cited by examiner



Figure 1



FIG. 2



FIG. 3



FIG. 4a

U.S. Patent     Jan. 11, 2022     Sheet 5 of 7     US 11,223,417 B2



FIG. 4b



FIG. 5



FIG. 6

US 11,223,417 B2

1

# TERRESTRIAL BASED HIGH SPEED DATA COMMUNICATIONS MESH NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/951,493 filed on Nov. 18, 2020, which is a continuation of U.S. patent application Ser. No. 16/599,519 filed on Oct. 11, 2019, which is a continuation of U.S. patent application Ser. No. 15/964,694 filed Apr. 27, 2018, which is a continuation of U.S. patent application Ser. No. 15/068,783 filed Mar. 14, 2016 (now U.S. Pat. No. 9,985,717 which issued on May 5, 2018), which is a continuation of Ser. No. 13/862,508 filed Apr. 15, 2013 (now U.S. Pat. No. 9,312,947 which issued on Apr. 12, 2016), which is a continuation of U.S. patent application Ser. No. 13/601,452 filed on Aug. 31, 2012 (now U.S. Pat. No. 8,442,520 which issued on May 14, 2013) and a continuation of U.S. patent application Ser. No. 13/601,413 filed on Aug. 31, 2012 (now U.S. Pat. No. 8,792,880 which issued on Jul. 29, 2014), each of which is a continuation of U.S. patent application Ser. No. 13/552,896 filed Jul. 19, 2012 (now U.S. Pat. No. 8,311,533 which issued on Nov. 13, 2012), which is a continuation of U.S. patent application Ser. No. 12/355,341 filed Jan. 16, 2009 (now U.S. Pat. No. 8,254,913 which issued on Aug. 28, 2012), which is a continuation-in-part of U.S. patent application Ser. No. 11/622,811 filed on Jan. 12, 2007, which is a continuation-in-part of U.S. patent application Ser. No. 11/206,695 filed on Aug. 18, 2005, the contents of each of which are incorporated herein in their entireties.

## FIELD OF THE INVENTION

The invention relates generally to wireless telecommunications. More specifically, the present invention relates to a broadband data communications system for in-flight aircraft.

## BACKGROUND ART

High speed data communications are becoming more and more desirable and important to society. Most high speed data connections are available through telephone lines, cable modems or other such devices that have a physical wired connection. Since such a wired connection has limited mobility, wireless techniques for data communications are very attractive for airline passengers. However, cellular high speed wireless data links have a range which in not practical for in-flight use due to throughput limitations. Alternatively, high speed links are available from satellites for in-flight aircraft. This option is costly since it requires a satellite link as well as specialized antennae and other equipment for the aircraft and also consists of throughput limitations which impact usefulness. Consequently, there is a need for a system that provides high speed data communications link to an in-flight aircraft at a reasonable cost.

## SUMMARY OF THE INVENTION

In some aspects, the invention relates to a network for providing high speed data communications, comprising: a plurality of terrestrial transmission stations that are located within overlapping communications range; and a mobile receiver station, where the plurality of terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver

2

station according to the IEEE 802.16 Air Interface Standard terrestrial radio access network protocol in a mesh network configuration.

In other aspects, the invention relates to a network for providing high speed data communications, comprising: a plurality of terrestrial transmission stations that are located within overlapping communications range; and an airborne receiver station, where the plurality of terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station according to the IEEE 802.16 Air Interface Standard.

In other aspects, the invention relates to a network for providing high speed data communications, comprising: a plurality of terrestrial transmission stations that are located within overlapping communications range; and a seaborne receiver station, where the plurality of terrestrial transmission stations provide a continuous and uninterrupted high speed data communications link with the mobile receiver station according to the IEEE 802.16 Air Interface Standard.

Other aspects and advantages of the invention will be apparent from the following description and the appended claims.

## BRIEF DESCRIPTION OF DRAWINGS

It should be noted that identical features in different drawings are shown with the same reference numeral.

FIG. 1 shows a schematic view of a broadband communication system for in-flight aircraft in accordance with one embodiment of the present invention.

FIG. 2 shows an example of a broadband communication system for the continental United States in accordance with one embodiment of the present invention.

FIG. 3 shows a schematic view of a broadband communication network over the ocean for in-flight aircraft and shipping in accordance with one embodiment of the present invention.

FIGS. 4a and 4b show views of the results of computer simulations of the performance of the network in accordance with one embodiment of the present invention.

FIG. 5 shows a diagram of the actual test network that was simulated in FIGS. 4a and 4b in accordance with one embodiment of the present invention.

FIG. 6 shows a diagram of the internal network configurations for the target craft shown in FIG. 5 in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION

The present invention is a system of providing high speed data communications for in-flight airliners utilizing a series of ground based transmitters along established common flight paths for multiple aircraft called "air corridors" that provides an IEEE 802.16 Air Interface Standard or OFDM "WiMax" connection. The ground transmitters are located in a pattern to provide overlapping coverage as an aircraft passes from one transmitter to the other. This allows passengers on the aircraft to have uninterrupted high speed data communications while in the air. The high speed data communications link between the passenger and the ground allows for a direct link that is continuous and uninterrupted in time. The direct link may be between the passenger and the ground station. Alternatively, the direct link may be between the aircraft and the ground station where the passenger accesses an on board network. The network would typically be run by an on-board server that would be in

US 11,223,417 B2

3

communication with the ground station and the passenger and also be continuous and uninterrupted in time.

The IEEE 802.16 Air Interface Standard, often called "WiMax" and built upon OFDM protocols as part of the next generation wireless (4G), is a specification for fixed broadband wireless access systems employing a point-to-multipoint (PMP) architecture. The IEEE 802.16 Air Interface Specification is a very capable, while complex, specification with current data transfer rates as high as 75 megabits per second (Mbps), and sometimes higher. There are allowances for a number of physical layers for different frequency bands and region-by-region frequency regulatory rules. There are features that allow an IP centric system or an ATM centric system depending upon the needs of customers. The specification is designed to cover application to diverse markets from very high bandwidth businesses to SOHO and residential users. The initial version was developed with the goal of meeting the requirements of a vast array of deployment scenarios for broadband wireless access (BW A) systems operating between 10-66 GHz. Revisions to the base IEEE 802.16 standard targeting the sub 11 GHz are envisioned and intended to be captured for use within the scope of the present invention. The present invention envisions inclusion of the technology and performance requirements of IEEE 802.16, i.e. OFDM, but may include other technology adaptations to achieve connectivity with an aircraft in flight. OFDM is considered to be a distinguishing feature of the next generation wireless radio technology, also known as "4G."

System Profiles, Protocol Implementation Conformance Statement Proforma, Test Suite Structure & Test Purposes, and Abstract Test Suite specifications for 10 to 66 GHz and sub 11 GHz, have been developed all according to the ISO/IEC 9464 series (equivalent to ITU-T x.290 series) of conformance testing standards. The 802.16 standard covers both the Media Access Control (MAC) and the physical (PHY) layers access standard for systems in the frequency ranges 10-66 GHz and sub 11 GHz.

A number of PHY considerations were taken into account for the target environment. At higher frequencies, line-of-sight is a must. This requirement eases the effect of multipath, allowing for wide channels, typically greater than 10 MHz in bandwidth. This gives IEEE 802.16 the ability to provide very high capacity links on both the uplink and the downlink. For sub 11 GHz non line-of-sight capability is a requirement. The standard is designed to accommodate either Time Division Duplexing (TDD) or Frequency Division Duplexing (FDD) deployments, allowing for both full and half-duplex terminals in the FDD case. The current invention envisions utilizing multiple custom adaptations of the PHY layer of software.

The MAC is designed specifically for the PMP wireless access environment. It supports higher layer or transport protocols such as ATM, Ethernet or Internet Protocol (IP), and is designed to easily accommodate future protocols that have not yet been developed. The MAC is designed for very high bit rates of the truly broadband physical layer, while delivering ATM compatible Quality of Service (QoS); UGS, rtPS, nrtPS, and Best Effort. The present invention envisions multiple unique configurations of the MAC layer of the radio system.

The frame structure allows terminals to be dynamically assigned uplink and downlink burst profiles according to their link conditions. This allows a tradeoff between capacity and robustness in real-time, and provides roughly a two

4

times increase in capacity on average when compared to non-adaptive systems, while maintaining appropriate link availability.

The 802.16 MAC uses a variable length Protocol Data Unit (PDU) along with a number of other concepts that greatly increase the efficiency of the standard. Multiple MAC PDUs may be linked into a single burst to save PRY overhead. Additionally, multiple Service Data Units (SDU) for the same service may be linked into a single MAC PDU, saving on MAC header overhead. Fragmentation allows very large SDUs to be sent across frame boundaries to guarantee the QoS of competing services. And, payload header suppression can be used to reduce the overhead caused by the redundant portions of SDU headers.

The MAC uses a self-correcting bandwidth request/grant scheme that eliminates the overhead and delay of acknowledgements, while simultaneously allowing better QoS handling than traditional acknowledged schemes. Terminals have a variety of options available to them for requesting bandwidth depending upon the QoS and traffic parameters of their services. They can be polled individually or in groups. They can recycle bandwidth already allocated to make requests for more. They can signal the need to be polled, and they can piggyback requests for bandwidth. This is made possible with "beam forming" of the signal down to a 4 degree wide "pencil beam". Beam forming also enables the signal to be electronically adapted (null steering) to connect with a fast-moving aircraft.

FIG. 1 shows an example of a broadband communication system 10 for in-flight aircraft in accordance with one embodiment of the present invention. The system 10 includes a series of ground located transmitters 16 located along an air corridor 12. As an airliner passes along its flight path 18, it moves along different coverage areas 14 provided by the transmitters 16 without a loss of communications. It should be understood that a single transmitter 16 may cover all aircraft within range in the air corridor 12. Through the unique properties of 4G OFDM technology envisioned in the present invention, one base station is able to reuse the same frequency to communication with multiple aircraft simultaneously. Also, an aircraft may be simultaneously within the overlapping range of multiple transmitters 16 as it travels along its flight path 18. When an aircraft is in the coverage area, as well as when the aircraft is moving from one coverage area to the next, the passenger is able to remain in contact with the ground station through a direct link, continuous and without interruption in time.

FIG. 2 shows an example of a WiMax broadband communication system 20 for the continental United States. It should be noted that the drawing is not to scale and the actual number of transmitters will be greater than shown. Transmission of WiMax signals typically requires a line-of-sight (LOS) link between the transmitter and receiver. While conventional WiMax performance standards typically have a maximum range of 34 miles, it is important to note that this range is from ground point to ground point. WiMax has a range of well over 100 miles for a ground point to aircraft link due to the increased distance of a LOS link and other modifications to an OFDM-based radio.

A great majority of passenger aircraft in the United States travel in "air corridors" that function similar to highways. Air corridors typically exist along major east/west and north/south routes between high population areas (e.g., California, the northeastern corridor of the United States, etc.). Aircraft are routed along these corridors in order to more efficiently move air traffic to and from their final destinations. Since most air traffic passes through these

US 11,223,417 B2

5

paths, a system for providing 4G WiMax access to in-flight aircraft could cover only the air corridors in lieu of trying to provide coverage for all airspace in the country. This has the advantage of providing a significant cost advantage by reducing the number of transmitters while still covering the majority of flights. However, as the OFDM signal flows outward from the typical air corridors, the signal becomes weaker but nonetheless perceptible by random-flying aircraft.

The system provides high speed broadband communications to an in-flight aircraft while the aircraft is within the air corridor. Technology to manage the user's transition from one transmitter to another is well known to those of ordinary skill in the art. The communications link may provide the user with such data communications as internet access, streaming video, voice-over IP, etc. Additionally, the system may provide data on the aircraft to parties on the ground such as an air traffic controller. Examples of aircraft data include air traffic control information, aircraft status and performance information, video security surveillance of the aircraft interior, etc. The system may be accessed directly by an individual aboard an aircraft via a direct communication link that is continuous and uninterrupted in time with the ground. In an alternative embodiment, the system may be accessed by the aircraft that it in turn provides individual with direct access that is continuous and uninterrupted in time via an onboard network such as a LAN or in-cabin wireless network via a server relayed to the ground using the modified OFDM or WiMAX connection.

FIG. 3 shows an alternate embodiment of the present invention. Specifically, it shows a schematic view of a broadband communication network over the ocean for in-flight aircraft and surface shipping. In this embodiment, the network utilizes "terrestrial" based stations that include land based stations 30, ocean shipping 32 and in-flight aircraft 34. Under this definition, any surface node (land or sea) or in-flight node is considered terrestrial. These nodes interlink to form a network "mesh" that may include: an air mesh; a sea mesh; or a combined air-sea mesh. Under this definition, the nodes share interconnectivity where the individual nodes of the mesh network serve as repeaters in and among each other to provide redundancy of communication links. Additionally, it should be understood in this application that the use of the terms "aircraft" and "airliner" are interchangeable and should include all types of aviation including: commercial aviation, military aviation, and general aviation of all types and purposes.

In order to understand and typify the expected radio coverage of the present invention, as well as prepare for the FCC STA authorization process, a comprehensive Frequency Plot Map was created. FIG. 4a shows a schematic view of the results of one Frequency Plot Map created by a computer simulation of the performance of the network in accordance with one embodiment of the present invention. The diagram shows a simulated network in a section of Puget Sound between the coast of Washington and British Columbia. A land based station 40 is making a communications link to a helicopter 42 and a boat 44. The smaller operating area 46 shows the range of communications links at an operating frequency of 5.8 MHz. The larger operating area 48 shows the range of communications links at an operating frequency of 3.5 MHz

FIG. 4b shows a second frequency plot map created by the same computer simulation. The map shows a base station 41 on land and a target helicopter 43. The simulated system utilizes the Proxim Networks Tsunami MP.16 Model 3500 and Model 3338-A00-060 antenna operating at a frequency

6

of 3.5 GHz. The broader area 47 represents horizontal coverage for antenna mounted at 407 foot elevation confined to 60 degree Azimuth Beamwidth. The more narrow area 45 represents vertical coverage area of 10 degree Elevation Beamwidth at target height of 10,800 feet.

Both frequency plot maps were generated with Radio Mobile Version 7.1.1 software utilizing the plot transmission characteristics of the raw RF signal. Radio Mobile is a Radio Propagation and Virtual Mapping computer simulation software that is listed as Freeware. The software uses digital terrain elevation data for automatic extraction of a path profile between a transmitter and a receiver. The path data is added to radio system specific attributes, environmental and statistical parameters to feed into an Irregular Terrain Model radio propagation calculation. The software utilizes USGS Earth Resource Observation and Science (EROS) data provided by the United States Geological Survey. The data sets are in BIL format at ⅓ arc second resolution (3 meter).

The use of Radio Mobile software, customized for the 3.5 GHz frequency band as well as for the particular lobe characteristics of the flat panel antenna, demonstrated a 20+ mile Line of Site (LOS) transmission distance. The resultant plots were then incorporated in the STA application process and submitted to the FCC for approval of a Temporary authority to utilize licensed frequencies in and around the subject test area.

In the present invention, reuse of frequencies made possible with "beam forming" of the signal down to a 4 degree wide "pencilbeam" by a "software definable radio (SDR)". In these embodiments, the signal is transmitted down such a narrow beam that interference with nearby signals on the same or very close frequencies is minimized. By using a buffer range between beams of the signals, the same frequencies may be recycled or re-used for different communications links between nodes. In optimum conditions, it is possible to achieve 288 reuses of the same frequency. This has the great advantage of minimized the necessary frequency spectrum required to operate the network.

Another advantage of the use of SDR involves a more stable and manageable system of transitioning between communications links among moving nodes. With a narrow beam, a high quality communication link may be established with a more distant node rather than the closest node. This link will conceivably last longer as the distant node moves through the transmission range towards the base station.

FIG. 5 shows a schematic diagram of the actual test network that was simulated in FIG. 4 in accordance with one embodiment of the present invention. An internet access link 50 is provided through a land based computer network. The link is connected to a base station antenna 52 that focuses the RF energy to the intended receiver. In this embodiment, the antenna is a Proxim Wireless Flat Panel Model 3338-A00-060 external antenna. The antenna is part of Proxim's Wireless's Tsunami MP.16 Model 3500 products. These products include a Model M3500-BSR-EU base station and a Model 3500-SSR-EU subscriber unit. The antenna 52 is vertically polarized with a 17 dBi gain. It has an azimuth beamwidth of 60°+/−4° and an elevation beamwidth of 10°.

The test network comprised several discreet elements. At the core of the network, the Tsunami MP.16 Model 3500 base station was mounted on top of a roof structure at a height of 407 feet above sea level, as measured by GPS receivers. The base station was connected via 100BaseT to an Ethernet switch that hosted several data servers; a file server for large file transfer, a network management/Data capture station, and a video server utilizing VLC's server side software to multicast a movie file through the WiMAX

US 11,223,417 B2

7

link. The network core was also attached to the internet via a DSL router that had a 1.5 Mb downlink and 768 uplink connection.

FIG. 6 shows a diagram of the internal network configurations for the target craft shown in FIG. 5 in accordance with one embodiment of the present invention. In each target vehicle 54 and 58, a Tsunami MP.16 Model 3500 subscriber unit was installed as well as a 17 dBi external Patch antenna 62. An onboard switched network 64 was created to connect 3 laptops 66, each running specific applications for the test suite including; a video client/skype VOIP unit; a data collection/network monitoring unit; and a video conferencing unit utilizing a Logitech 1.3 Megapixel QuickCam supporting both Yahoo and Microsoft messaging clients. Variations were undertaken in some vehicles due to variations in onboard-power options and restrictions to mounting options and location of equipment.

Wind-load survival for the Proxim Model 333S-AOO-060 antenna is calculated at 220 Km/h, and is operationally rated at 160 Km/h, as such it was not possible to mount the antenna to the exterior of the aircraft as the aircraft's top speed is 230 Km/h. Instead the antenna was mounted inside the canopy in the copilot's seat position which did have some effect on antenna aiming/signal reception due to large nearby metal objects such as the avionics instrument cluster, etc. This issue was partially mitigated by manual manipulation of the helicopter orientation in flight by the pilot after signal degradation was noted, or manual movement of the antenna if flight path reorientation was not practical.

The demonstration testing of WiMAX capable equipment in the 3.5 GHz and 5.8 GHz spectrum ranges successfully established communications with both airborne and water based vehicles. The initial test is targeted at the range of 20 miles, with later portions of the test at 50 miles. Both vehicles were initially stationary in position (PtP), but the airborne target also tested altitude targets up to two vertical miles. In the final stages of testing, the airborne vehicle traveled at higher speeds (PtMP). The tests were conducted utilizing the IEEE 802.15-2004 Standard for mobile applications. The tests comprised multiple phases with increasing difficulty. These phases were: (1.) 20 mile LOS, PTP shot to boat; (2.) 20 mile LOS, PTP shot to helicopter, 200' above boat; (3.) 21 mile LOS, PTP shot to helicopter, 10.572' (2 mi) above boat; (4.) 20-mile radius speed tests to helicopter at 10,000; and (5.) LOS, PTP distance test at 10,000'.

The Proxim equipment, though locked to QPSK-3/4 Modulation/FEC and below modulation types, was able to reliably operate at 30.52 statutory miles from the base station, and was able to reliably operate at 140 MPH. Combined transmit/receive data rates above 2 Mbps were realized in many portions of the test areas. Video conferencing via MSN messenger, VOIP calls via Skype, remote streaming of movie files, and large file transfers were simultaneously executed at distances of 20+ miles, and during vehicle movement—even at high speeds. Multi-megabit data transmission speeds were achieved during multiple samples, as well as testing of VOW applications, high-speed file transfers, video conferencing to various locations in the United States, and multi-media video streaming of large movie files.

Doppler shift and signal reflectivity from water were observed during testing. To rectify these factors, the subscriber antenna elevation was modified upward to reduce or eliminate water reflectivity causing signal interference. Doppler shift, though observed only at speed in excess of approximately 100 mph, did not cause signal failure but marginally impacted the rate of throughput. This variance is

8

to be expected with the version of gear employed in the test, which was designed and configured for point to point (PTP) transmission. The impact of Doppler shift is anticipated to be further minimized in newer versions of WiMAX gear, with the 802.16-2005 standard, which is designed with forward error correction capability.

It is intended that embodiments of the present invention include present and future versions of IEEE 802.16 Air Interface Standard that are consistent with the present disclosure. For example, the IEEE Standard 802.16-2004 (approved in June 2004) renders the previous (and 1st) version 802.16-2001 obsolete, along with its amendments 802.16a and 802.16c. However, IEEE Standard 802.16-2004 addresses only fixed systems such as Local area networks (LANs) and metropolitan area networks (MANs).

IEEE Standard 802.16-2005 (approved December, 2005 and formerly named 802.16e) adds mobility components to the WiMax standard. This WiMax mobility standard is an improvement on the modulation schemes stipulated in the original WiMAX standard. It allows for fixed wireless and mobile Non Line of Sight (NLOS) applications primarily by enhancing the Orthogonal Frequency Division Multiplexing Access (OFDMA). It is possible that by stipulating a new modulation method called Scalable OFDMA (SOFDMA), the 802.16-2005 standard will make the older 802.16-2004 standard which uses OFDM-256 outdated. However, there are plans for a migration path from the older version of the standard to the more robust, mobile modulation scheme. In any case, compatibility between similar system profiles is a distinct possibility. SOFDMA and OFDMA256 are typically not compatible so most equipment may have to be replaced. However, attempts are being made to provide a migration path for older equipment to OFDMA256 compatibility which would ease the transition for those networks which have already made the switch to SOFDMA.

SOFDMA will improve upon OFDM256 for NLOS applications by improving NLOS coverage by utilizing advanced antenna diversity schemes, and hybrid-Automatic Retransmission Request (hARQ). Also, system gain is increased by use of denser sub-channelization, thereby improving indoor penetration. The newer standard introduces high-performance coding techniques such as Turbo Coding and Low-Density Parity Check (LDPC), enhancing security and NLOS performance and introduces downlink sub-channelization, allowing network administrators to trade coverage for capacity or vice versa. It also improves coverage by introducing Adaptive Antenna Systems (AAS) and Multiple Input-Multiple Output (MIMO) technology. It eliminates channel bandwidth dependencies on sub-carrier spacing, allowing for equal performance under any RF channel spacing (1.25-14 MHz). Finally, SOFDMA's enhanced Fast Fourier Transform (FFT) algorithm can tolerate larger delay spreads and there by increasing resistance to multi path interference.

WiMAX's equivalent in Europe is HIPERMAN. Efforts are underway to make 802.16 and HIPERMAN interoperate seamlessly. Additionally, Korea's telecom industry has developed its own standard, WiBro which is expected to be fully interoperable with WiMAX. Consequently, it is fully intended that the definition of "WiMax" and IEEE Standard 802.16 cover any and all versions, modifications and equivalents of this wireless communication standard, inclusive of OFDM technology, also known as next generation wireless or 4G.

In other embodiments of the present invention, alternative communications protocols could be used. For example, one embodiment of the invention could use the UTRAN Long

US 11,223,417 B2

9

Term Evolution (LTE) Terrestrial Radio Access Network protocol which is based on or utilizes OFDM technology. Versions of LTE may utilize radio air interface technology known as Orthogonal Frequency Division Multiple Access (OFDMA) to provide several key benefits including significantly increased peak data rates, increased cell edge performance, reduced latency, scalable bandwidth, co-existence with GSM/EDGE/UMTS systems, reduced CAPEX and OPEX. LTE is scalable to allow operation in a wide range of spectrum bandwidths, from 1.4-20 MHz, using both Frequency Division Duplex (FDD) and Time Division Duplex (TDD) modes of operation, thus providing flexibility to suit any user's existing or future frequency allocation.

The performance characteristics for LTE versions of next generation of 4G technology include: peak download rates of 326.4 Mbit/s for 4×4 antennas and 172.8 Mbit/s for 2×2 antennas for every 20 MHz of spectrum; peak upload rates of 86.4 Mbit/s for every 20 MHz of spectrum; at least 200 active users in every 5 MHz cell. (i.e., 200 active data clients); sub-5 ms latency for small IP packets; spectrum flexibility for spectrum slices as small as 1.4 MHz (and as large as 20 MHz); optimal ground to ground cell size of 5 km, 30 km with reasonable performance, and up to 100 km cell sizes supported with acceptable performance (this will be increased for air to ground cells); co-existence with legacy standards (users can transparently start a transfer of data in an area using an LTE standard, and, should coverage be unavailable, continue the operation without any action on their part using GSM/GPRS or W-CDMA-based UMTS or even 3GPP2 networks such as CDMA or EV-DO; and support for a MBSFN (Multicast Broadcast Single Frequency Network) which can deliver services such as Mobile TV using the LTE infrastructure.

Another alternative communications protocol that could be used is the IEEE Standard 802.20 which is known as "The Standard Air Interface for Mobile Broadband Wireless Access Systems Supporting Vehicular Mobility—Physical and Media Access Control Layer Specification" (hereafter "802.20"). 802.20 is a variation of next generation wireless or 4G technology, a mobility enhancement of 802.16. 802.20 is defined as a protocol for boosting IP-based data-transmission rates for mobile users in wireless metropolitan area networks (WMANs). It would be capable of supporting people and devices sitting in trains, subways and automobiles traveling at up to 150 miles per hour. 802.20 would support transmission speeds of up to 1 M bit/sec in the 3-GHz spectrum band. 802.20 is also based on OFDM. The 802.20 standard seeks to boost real-time data transmission rates in wireless metropolitan area networks connections based on cell ranges of up to 15 kilometers or more for ground to ground stations. This range will be greater for ground to air connections.

802.20 shares some similarities with IEEE Standard 802.16e. The 802.16e and 802.20 standards both specify mobile air interfaces for wireless broadband. On the surface the two standards are similar, but there are some important differences between them. Specifically, 802.16e will add mobility in the 2 to 6 GHz licensed bands while 802.20 aims for operation in licensed bands below 3.5 GHz. Typically, 802.16e will be used by the mobile user walking around with a PDA or laptop, while 802.20 will address high-speed mobility issues. Another key difference will be the manner in which the two are deployed with users deploying 802.20 as an overlay to their existing networks including existing 802.16 networks.

While the invention has been described based on fundamental embodiments of the forms of next generation wire-

10

less or 4G technology, it also should be understood that all described embodiments may utilize hybrid or modified versions of the next generation wireless technology, 4G or 802.16 (WiMAX) based on or utilizing OFDM as applicable. It is recognized that these embodiments describe only portions of the foundation components necessary in the construction of a radio to communicate with an aircraft at true broadband data rates over extreme distances. Such a transceiver, modified to the magnitude necessary to maintain an effective communication continuous and uninterrupted in time with aircraft at jet speed and extreme distances from the terrestrial station, will include protocols and code which are not presently included within the definitions or standards of 802.16 or WiMAX or LTE. Despite the modification of 4G transceivers, both terrestrial and airborne units, inclusion of the component elements described in 802.16 or WiMAX or LTE, specifically to include OFDM, make such a radio subject to the claims of this invention.

While the invention has been described with respect to a limited number of embodiments, those skilled in the art, having benefit of this disclosure, will appreciate that other embodiments can be devised which do not depart from the scope of the invention as disclosed here. Accordingly, the scope of the invention should be limited only by the attached claims.

What is claimed is:

1. A ground station among a network of ground stations configured to provide a wirelessly transmitted high speed data communication link to a receiver station on an in-flight aircraft, the ground station comprising:
   an antenna; and
   a software defined radio operably coupled to the antenna, the software defined radio configuring the ground station to conduct a handover of the in-flight aircraft to another ground station within the network of ground stations to maintain the high speed data communication link continuous and uninterrupted in time;
   wherein the software defined radio is configured to employ a wireless radio access network protocol operating in a communication band from about 2 GHz to about 6 GHz;
   wherein the ground station is configured to utilize beamforming to generate one or more steerable beams used to form the high speed data communication link; and
   wherein the ground station is configured to reuse a same frequency to communicate with the receiver station and another receiver station on another in-flight aircraft.

2. The ground station of claim 1, wherein the wireless radio access network protocol includes Long Term Evolution (LTE) terrestrial radio access network protocols.

3. The ground station of claim 1, wherein a frame structure utilized for the high speed data communication link provides dynamically assignable uplink and downlink burst profiles based on link conditions.

4. The ground station of claim 3, wherein multiple media access control protocol data units are linkable to a single burst.

5. The ground station of claim 1, wherein the high speed data communication link is configured to provide internet access, streaming video, or voice-over IP to the receiver station.

6. The ground station of claim 1, wherein the high speed data communication link is configured to transfer security data communications comprising video surveillance from the in-flight aircraft to a ground station within the network of ground stations.

US 11,223,417 B2

11

7. The ground station of claim **1**, wherein at least one of said one or more steerable beams has an azimuth beamwidth less than about 10 degrees, and an elevation beamwidth less than about 10 degrees.

8. The ground station of claim **1**, wherein the high speed data communication link employs Orthogonal Frequency Division Multiplexing (OFDM).

9. The ground station of claim **1**, wherein the ground station is further configured to provide the high speed data communication link with a range of greater than 20 miles and forward error correction.

10. The ground station of claim **9**, wherein the forward error correction is configured to maintain the high speed data communication link to the receiver station while the receiver station travels at speeds greater than 100 miles per hour.

11. A wireless communication network configured to provide high speed wirelessly transmitted data communication to an in-flight aircraft, the network comprising:

a plurality of ground stations, the ground stations being located such that at least some of the ground stations are within overlapping communication range of respective other ones of the ground stations, the ground stations being configured via software defined radio to:

communicate with a receiver station located onboard the in-flight aircraft to provide a high speed data communication link continuous and uninterrupted in time with the receiver station employing a wireless radio access network protocol operating in a communication band from about 2 GHz to about 6 GHz, and

utilize beamforming to generate a plurality of steerable beams used to form the high speed data communication link, and reuse a same frequency to communicate with the receiver station and another receiver station on another in-flight aircraft,

wherein the high speed data communication link is maintained continuous and uninterrupted in time while the

12

in-flight aircraft moves from a coverage area provided by one of the plurality of ground stations to a coverage area provided by another of the plurality of ground stations.

12. The network of claim **11**, wherein the wireless radio access network protocol includes Long Term Evolution (LTE) terrestrial radio access network protocols.

13. The network of claim **11**, wherein a frame structure utilized for the high speed data communication link provides dynamically assignable uplink and downlink burst profiles based on link conditions.

14. The network of claim **13**, wherein multiple media access control protocol data units are linkable to a single burst.

15. The network of claim **11**, wherein the high speed data communication link is configured to provide internet access, streaming video, or voice-over IP to the receiver station.

16. The network of claim **11**, wherein the high speed data communication link is configured to transfer security data communications comprising video surveillance from the in-flight aircraft to one of the plurality of ground stations.

17. The network of claim **11**, wherein at least one of said one or more steerable beams has an azimuth beamwidth less than about 10 degrees, and an elevation beamwidth less than about 10 degrees.

18. The network of claim **11**, wherein the high speed data communication link employs Orthogonal Frequency Division Multiplexing (OFDM).

19. The network of claim **11**, wherein the plurality of ground stations are further configured to provide the high speed data communication link with a range of greater than 20 miles and forward error correction.

20. The network of claim **19**, wherein the forward error correction is configured to maintain the high speed data communication link to the receiver station while the receiver station travels at speeds greater than 100 miles per hour.

* * * * *

# EXHIBIT 3

US010257717B2

(12) **United States Patent**
Hyslop

(10) Patent No.: **US 10,257,717 B2**
(45) Date of Patent: *Apr. 9, 2019

(54) **WEDGE SHAPED CELLS IN A WIRELESS COMMUNICATION SYSTEM**

(71) Applicant: **SMARTSKY NETWORKS LLC**, Charlotte, NC (US)

(72) Inventor: **Douglas Hyslop**, Vienna, VA (US)

(73) Assignee: **SMARTSKY NETWORKS LLC**, Morrisville, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/877,625**

(22) Filed: **Jan. 23, 2018**

(65) **Prior Publication Data**

US 2018/0160318 A1  Jun. 7, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/345,527, filed on Nov. 8, 2016, now Pat. No. 9,913,149, which is a
(Continued)

(51) **Int. Cl.**
*H04W 40/00* (2009.01)
*H04W 16/30* (2009.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *H04W 16/30* (2013.01); *H04B 7/18506* (2013.01); *H04W 16/12* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... H04W 16/00; H04W 16/02; H04W 16/12; H04W 16/18; H04W 16/24; H04W 16/30;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,365,516 A  11/1994  Jandrell
5,740,166 A  4/1998  Ekemark et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN  101176367 A  5/2008
CN  101536566 A  9/2009
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion of corresponding application PCT/US2014/017273 dated Jun. 6, 2014, all enclosed pages cited.

(Continued)

*Primary Examiner* — Amancio Gonzalez
(74) *Attorney, Agent, or Firm* — Burr Forman McNair

(57) **ABSTRACT**

Aspects described herein relate to a network for providing air-to-ground wireless communication in various cells. The network includes a first base station array, each base station of which includes a respective first antenna array defining a directional radiation pattern that is oriented in a first direction, wherein each base station of the first base station array is disposed spaced apart from another base station of the first base station array along the first direction by a first distance. The network also includes a similar second base station array where the second base station array extends substantially parallel to the first base station array and is spaced apart from the first base station array by a second distance to form continuous and at least partially overlapping cell coverage areas between respective base stations of the first and second base station arrays.

**20 Claims, 5 Drawing Sheets**



**US 10,257,717 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 15/017,794, filed on Feb. 8, 2016, now Pat. No. 9,503,912, which is a continuation of application No. 14/681,429, filed on Apr. 8, 2015, now Pat. No. 9,294,933, which is a continuation of application No. 13/832,385, filed on Mar. 15, 2013, now Pat. No. 9,008,669.

(51) **Int. Cl.**

| | |
|---|---|
| *H04W 16/24* | (2009.01) |
| *H04W 16/12* | (2009.01) |
| *H04B 7/185* | (2006.01) |
| *H04W 36/32* | (2009.01) |
| *H04W 88/08* | (2009.01) |

(52) **U.S. Cl.**
CPC ........... *H04W 16/24* (2013.01); *H04W 36/32* (2013.01); *H04W 88/08* (2013.01)

(58) **Field of Classification Search**
CPC ..... H04W 24/02; H04W 36/32; H04W 88/08; H04B 7/18506
USPC .................................. 455/446; 370/328, 338
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,878,345 | A | 3/1999 | Ray et al. |
| 6,330,459 | B1 | 12/2001 | Crichton et al. |
| 6,336,034 | B1 | 1/2002 | Yamura et al. |
| 6,618,016 | B1 | 9/2003 | Hannan et al. |
| 7,933,598 | B1 * | 4/2011 | Agrawal ........... H04W 36/0022 370/310 |
| 8,447,292 | B2 | 5/2013 | Chari et al. |
| 8,666,451 | B2 | 3/2014 | Engstrom et al. |
| 8,848,605 | B2 | 9/2014 | Ohm et al. |
| 8,914,022 | B2 | 12/2014 | Kostanic et al. |
| 9,008,669 | B2 | 4/2015 | Hyslop et al. |
| 9,294,933 | B2 | 3/2016 | Hyslop et al. |
| 9,913,149 | B2 * | 3/2018 | Hyslop ................ H04W 16/24 |
| 2003/0160719 | A1 | 8/2003 | Hancock |
| 2006/0019710 | A1 | 1/2006 | Ylitalo |
| 2006/0084474 | A1 | 4/2006 | Iacono et al. |
| 2008/0102813 | A1 | 5/2008 | Chari et al. |
| 2008/0234930 | A1 | 9/2008 | Cheok et al. |
| 2012/0200458 | A1 | 8/2012 | Jalali et al. |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 2278732 A2 * | 1/2011 | ........ H04B 7/18506 |
| WO | 2011017576 A2 | 2/2011 | |
| WO | 2011071470 A1 | 6/2011 | |

#### OTHER PUBLICATIONS

Extended Search Report and Written Opinion of corresponding European application No. 14768874.1 dated Sep. 21, 2016, all enclosed pages cited.
Examination report from corresponding European application No. 14768874.1 dated Jul. 12, 2017, all enclosed pages cited.
Office Action from corresponding Chinese application No. 201480027629.3 dated Feb. 6, 2018, all enclosed pages cited.

\* cited by examiner



FIG. 1



FIG. 2



FIG. 3



**FIG. 4**



**FIG. 5**

US 10,257,717 B2

1

# WEDGE SHAPED CELLS IN A WIRELESS COMMUNICATION SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/345,527 filed Nov. 8, 2016, which is a continuation of U.S. application Ser. No. 15/017,794 filed Feb. 8, 2016, (now patented as U.S. Pat. No. 9,503,912 which issued on Nov. 22, 2016), which is a continuation of U.S. application Ser. No. 14/681,429 filed Apr. 8, 2015, (now patented as U.S. Pat. No. 9,294,933 which issued on Mar. 22, 2016), which is a continuation of U.S. application Ser. No. 13/832, 385 filed Mar. 15, 2013 (now patented as U.S. Pat. No. 9,008,669 which issued on Apr. 14, 2015), the entire contents of which are hereby incorporated herein by reference.

## TECHNICAL FIELD

Example embodiments generally relate to wireless communications and, more particularly, relate to employing wedge shaped cells to provide continuous wireless communication at various distances and altitudes.

## BACKGROUND

High speed data communications and the devices that enable such communications have become ubiquitous in modern society. These devices make many users capable of maintaining nearly continuous connectivity to the Internet and other communication networks. Although these high speed data connections are available through telephone lines, cable modems or other such devices that have a physical wired connection, wireless connections have revolutionized our ability to stay connected without sacrificing mobility.

However, in spite of the familiarity that people have with remaining continuously connected to networks while on the ground, people generally understand that easy and/or cheap connectivity will tend to stop once an aircraft is boarded. Aviation platforms have still not become easily and cheaply connected to communication networks, at least for the passengers onboard. Attempts to stay connected in the air are typically costly and have bandwidth limitations or high latency problems. Moreover, passengers willing to deal with the expense and issues presented by aircraft communication capabilities are often limited to very specific communication modes that are supported by the rigid communication architecture provided on the aircraft.

Conventional ground based wireless communications systems use vertical antennas to provide coverage for device connectivity. Antennas used in terrestrial systems typically provide coverage in the azimuthal, or horizontal, plane with a width of 65 to 90 degrees. The elevation, or vertical, pattern is typically more narrow in order to maximize the antenna performance in the horizontal plane, which can result in a larger coverage area, increased signal strength or clarity in the coverage area, etc. With focus on the horizontal plane, however, these existing antennas may be unable to support connectivity for aircraft traveling above an elevation of the coverage area.

## BRIEF SUMMARY OF SOME EXAMPLES

The continuous advancement of wireless technologies offers new opportunities to provide wireless coverage for

2

aircraft at varying elevations using multiple antennas installed at certain sites. A plurality of antennas at a base station can each transmit signals having a radiation pattern defined between two elevation angles resulting in an increasing vertical beam width and smaller azimuth to form a wedge shaped sector. These wedge shaped sectors may then be overlapped with each other to progressively build in altitude for providing communications with continuous coverage at high altitudes. In one example, the plurality of antennas are configured at the base station such that corresponding wedge shaped sectors are adjacent in a horizontal plane to form a substantially semicircular coverage area in the horizontal plane that achieves at least a predetermined altitude within a predetermined distance from the base station. In addition, multiple deployed base stations can be substantially aligned in a first direction while substantially offset in a second direction. Moreover, a distance between the deployed base stations in the first direction can be less than the distance between the base stations in the second direction to facilitate providing continuous coverage up to the predetermined altitude based on the wedge shaped sectors.

In the first direction, the base stations can be aligned and deployed at a distance such that the wedge shaped sectors of a first base station are overlapped by the wedge shaped sectors of a second base station behind the first base station along the first direction. This allows the sectors of the second base station to cover altitudes up to the predetermined altitude at the location of the first base station and extending therebeyond in the first direction for a predetermined distance from the first base station until the sectors of the first base station reach the predetermined altitude. In the second direction, the base stations can be offset and deployed at a distance such to allow continuous coverage based on a horizontal plane coverage area of the sectors, as the coverage area is compensated for altitude deficiencies in the first direction, and thus may not need to be compensated by adjacent coverage areas in the second direction.

In one example embodiment, a network for providing air-to-ground (ATG) wireless communication in various cells is provided. The network includes a first base station array, each base station of which includes a respective first antenna array defining a directional radiation pattern that is oriented in a first direction, wherein each base station of the first base station array is disposed spaced apart from another base station of the first base station array along the first direction by a first distance. The network also includes a second base station array, each base station of which includes a respective second antenna array defining a directional radiation pattern that is oriented in the first direction, wherein each base station of the second base station array is disposed spaced apart from another base station of the second base station array along the first direction by the first distance, and wherein the second base station array extends substantially parallel to the first base station array and is spaced apart from the first base station array by a second distance to form continuous and at least partially overlapping cell coverage areas between respective base stations of the first and second base station arrays. Base stations of the first base station array and the second base station array are disposed to be located offset from each other along the first direction by a third distance, and wherein the first distance is less than the second distance.

In another example embodiment, a network for providing ATG wireless communication in various cells is provided. The network includes a first base station having a first antenna array providing a directional radiation pattern ori-

US 10,257,717 B2

3

ented along a first direction, the directional radiation pattern extending over a predetermined range in azimuth centered on the first direction, and extending between a first elevation angle and a second elevation angle over at least a predetermined distance to define a substantially wedge shaped radiation pattern. The network also includes a second base station deployed spaced apart from the first base station by a first distance in the first direction, the second base station having a second antenna array having the same directional radiation pattern as the first antenna array such that coverage areas of the first and second antenna arrays overlap at different altitude ranges moving along the first direction from the second base station. The network further includes a third base station deployed spaced apart from the second base station by the first distance along the first direction, the third base station having a third antenna array having the same directional radiation pattern as the first and second antenna arrays such that coverage areas of the first, second and third antenna arrays overlap at different altitude ranges moving along the first direction from the third base station to achieve continuous coverage to a predetermined altitude.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING(S)

Having thus described the invention in general terms, reference will now be made to the accompanying drawings, which are not necessarily drawn to scale, and wherein:

FIG. 1 illustrates a top view of an example network deployment providing air-to-ground (ATG) wireless communication coverage areas;

FIG. 2 illustrates an aspect of an example network deployment of base stations providing overlapping cell coverage areas to achieve coverage up to a predetermined altitude;

FIG. 3 illustrates an aspect of an example network deployment of base stations providing overlapping cell coverage areas and/or additional coverage areas;

FIG. 4 illustrates a functional block diagram of a base station of an example embodiment; and

FIG. 5 illustrates an example methodology for deploying base stations to provide ATG wireless communications at a predetermined altitude.

## DETAILED DESCRIPTION

Some example embodiments now will be described more fully hereinafter with reference to the accompanying drawings, in which some, but not all example embodiments are shown. Indeed, the examples described and pictured herein should not be construed as being limiting as to the scope, applicability or configuration of the present disclosure. Rather, these example embodiments are provided so that this disclosure will satisfy applicable legal requirements. Like reference numerals may be used to refer to like elements throughout. Furthermore, as used herein, the term "or" is to be interpreted as a logical operator that results in true whenever one or more of its operands are true.

Some example embodiments described herein provide architectures for improved air-to-ground (ATG) wireless communication performance. In this regard, some example embodiments may provide for base stations having antenna structures that facilitate providing wireless communication coverage in vertical and horizontal planes with sufficient elevation to communicate with aircraft at high elevations. A base station can provide a wedge shaped cell coverage area in a vertical plane that achieves coverage at a predetermined altitude within a predetermined distance from the base

4

station to facilitate ATG wireless communications. The cell coverage area can be substantially semicircular in the horizontal plane, and can be provided by multiple antennas each providing a wedge shaped sector over a portion of the semicircular azimuth. The base stations can be deployed as substantially aligned in a first direction while offset in a second direction. For example, the base stations can also be deployed in the first direction at a first distance to provide coverage overlapping in elevation to achieve coverage over the predetermined altitude, and within a second distance in the second direction based on an achievable coverage area distance of the sectors.

FIG. 1 illustrates a top view of a network 100 of deployed base stations for providing ATG wireless communication coverage. Network 100 includes various base stations providing substantially semicircular cell coverage areas. The cell coverage areas are each depicted in two portions. For example, the cell coverage area for a first base station is shown as similarly patterned portions 102 and 104. The portions 102 and 104 represent a single continuous cell coverage area over a horizontal plane; however, FIG. 1 depicts intervening portion 108 of another cell coverage area as providing overlapping coverage to achieve continuous coverage up to a predetermined altitude, as described further herein. Portion 102 is shown to represent the initial cell coverage area from the location of the corresponding base station out to an arbitrary distance for illustrative purposes; it is to be appreciated that this portion 102 also includes the overlapping coverage of portion 108 of another cell coverage area to achieve coverage at the predetermined altitude. Moreover, the coverage area represented by portions 106 and 108 may extend beyond boundary 130 of coverage area portion 104; the coverage areas are limited in the depiction to illustrate at least one point where the bordering coverage areas are able to provide ATG wireless communication coverage at the predetermined altitude. Further, the base stations are not depicted for ease of explanation, but it is to be appreciated that the base stations can be located such to provide the cell coverage area indicated by portions 102 and 104, portions 106 and 108, portions 110 and 112, etc.

The cell coverage areas 102/104 and 106/108 can be provided by respective base stations in a first base station array, where the base stations of one or more base station arrays are substantially aligned in a first direction 120 (as depicted by the representative cell coverage areas). As shown, cell coverage areas 102/104 and 106/108 project a directional radiation pattern that is oriented in the first direction, and are aligned front to back along the first direction. Such alignment can be achieved by substantially aligning base stations in the base station array to provide the substantially aligned cell coverage areas, antenna rotation to achieve alignment in the cell coverage areas in the first direction 120, and/or the like. As described, in this regard, a first base station that provides cell coverage area 102/104 can be overlapped by at least a cell coverage area 106/108 of a second base station in front of the first base station in the first direction 120. For example, a base station, or antennas thereof, can provide wedge shaped cell coverage areas defined by multiple elevation angles employed by antennas transmitting signals to achieve a predetermined altitude by a certain distance from the base station. Thus, overlapping the cell coverage areas in the first direction 120 allows cell coverage area 106/108 to achieve the predetermined altitude for at least the certain distance between the base station providing cell coverage area 102/104 and a point along line 130 where the cell coverage area 102/104 achieves the predetermined altitude.

US 10,257,717 B2

5

In addition, base stations in the first base station array providing cell coverage areas **102/104** and **106/108** can be spaced apart in a second direction **122** from base stations of a second base station array, which can provide additional cell coverage areas **110/112, 114/116**, etc., aligned in the first direction **120**. The first and second base station arrays can extend substantially parallel to each other in the first direction **120**. In addition, base stations of the second base station array can be offset from base stations of the first base station array in the first direction **120** (as depicted by the representative cell coverage areas). The second direction **122** can be substantially perpendicular to the first direction **120** in one example. In this example, the first and second base station arrays can be offset to provide the offsetting of respective cell coverage areas (e.g., the offset shown between cell coverage areas **102/104** and **110/112**), and any other coverage areas of the base station arrays aligned in the first direction **120**.

The first and second base station arrays can be spaced apart at a greater distance in the second direction **122** than base stations within the respective arrays spaced apart in the first direction **120**. For example, the base stations can be spaced in the second direction **122** according to an achievable coverage distance of the base station providing the cell coverage areas. Because the base stations providing cell coverage areas **102/104** and **106/108** in the first base station array are aligned in the first direction **120** such that cell coverage area **106/108** provides overlapping coverage to cell coverage area **102/104** to achieve the predetermined altitude, the base station arrays themselves can be separated based on the achievable distance of the respective cell coverage areas **102/104** and **110/112**. In this regard, no substantial overlapping is needed between the boundaries of cell coverage areas **102/104** and **110/112** provided by base stations of adjacent base station arrays to reach the predetermined altitude since the altitude deficiencies near the respective base stations are covered by cell coverage areas of base stations in the base station array aligned in the first direction **120**.

Moreover, offsetting the base stations providing the various cell coverage areas over the second direction **122** can allow for further spacing in the first direction **120** and/or second direction **122** as the end portions of one cell coverage area in the horizontal plane can abut to a middle portion of another cell coverage area from a base station in an adjacent base station array to maximize the distance allowed between the cell coverage areas while maintaining continuous coverage, which can lower the number of base stations necessary to provide coverage over a given area. In one example, the spacing in the second direction **122** can be more than twice the spacing in the first direction **120**, depending on the coverage distance of the cell coverage areas and the distance over which it takes a cell coverage area to reach the predetermined altitude.

As depicted, the spacing of a first distance between base stations in a given base station array can be indicated as distance **140** in the first direction **120**. The spacing of a second distance between base station arrays in the second direction **122** can be indicated as distance **142**. Moreover, the offset between the base station arrays can be indicated as a third distance **144**. In one specific example, the distance **140** can be near 150 kilometers (km), where distance **142** between the base stations providing cell coverage area **102/104** can be 400 km or more. In this example, the achievable cell coverage areas can be at least 200 km from the corresponding base station in the direction of the trans-

6

mitted signals that form the coverage areas or related sectors thereof. Moreover, in this example, the distance **144** can be around 75 km.

In an example, the base stations providing cell coverage areas **102/104, 106/108, 110/112**, etc. can each include respective antenna arrays defining a directional radiation pattern oriented in the first direction. The respective antenna arrays can include multiple antennas providing a sector portion of the radiation pattern resulting in a coverage area that is wedge shaped in the vertical plane. For example, the cell coverage area provided by each antenna can have first and second elevation angles that exhibit an increasing vertical beam width in the vertical plane, and fills a portion of an azimuth in the horizontal plane. Using more concentrated signals that provide smaller portions of the azimuth can allow for achieving further distance and/or increased elevation angles without increasing transmission power. In the depicted example, the antenna arrays include six substantially 30 degree azimuth sectors that are substantially adjacent to form a directional radiation pattern extending substantially 180 degrees in azimuth centered on the first direction to define the semicircular coverage area. Each sector can be provided by an antenna at the corresponding base station, for example. Moreover, in one example, the base station can have a radio per antenna, a less number of radios with one or more switches to switch between the antennas to conserve radio resources, and/or the like, as described further herein. It is to be appreciated that additional or a less number of sectors can be provided. In addition, the sectors can have an azimuth more or less than 30 degrees and/or can form a larger or smaller total cell coverage area azimuth than the depicted semicircular cell coverage area.

In yet other examples, the network **100** can implement frequency reuse of two such that adjacent base stations can use alternating channels in providing the cell coverage areas. For example, a base station providing cell coverage areas **102/104** can use a first channel, and a base station providing cell coverage area **106/108** in the same base station array can use a second channel. Similarly, the base station providing cell coverage area **110/112** in a different base station array can use the second channel, etc. It is to be appreciated that other frequency reuse patterns and/or number of reuse factors can be utilized in this scheme to provide frequency diversity between adjacent cell coverage areas.

Furthermore, in an example deployment of network **100**, the first direction **120** and/or second direction **122** can be, or be near, a cardinal direction (e.g., north, south, east, or west), an intermediate direction (e.g., northeast, northwest, southeast, southwest, north-northeast, east-northeast, etc.), and/or the like on a horizontal plane. In addition, the network **100** can be deployed within boundaries of a country, boundaries of an air corridor across one or more countries, and/or the like. In one example, cell coverage area **106/108** can be provided by an initial base station at a border of a country or air corridor. In this example, a base station providing cell coverage area **106/108, 110/112**, and/or additional cell coverage areas at the border, can include one or more patch antennas to provide coverage at the predetermined altitude from the distance between the base station to the point where the respective cell coverage area **106/108, 110/112**, etc. reaches the predetermined altitude. For example, the one or more patch antennas can be present behind the cell coverage areas **106/108, 110/112**, etc., and/or on the base stations thereof (e.g., as one or more antennas angled at an uptilt and/or parallel to the horizon) to provide cell coverage up to the predetermined altitude.

US 10,257,717 B2

7

FIG. 2 illustrates an example network 200 for providing overlapping cells to facilitate ATG wireless communication coverage at least at a predetermined altitude. Network 200 includes base stations 202, 204, and 206 that transmit signals for providing the ATG wireless communications. Base stations 202, 204, and 206 can each transmit signals that exhibit a radiation pattern defined by a first and second elevation angle such to achieve a predetermined altitude. In this example, base stations 202, 204, and 206 provide respective wedge shaped cell coverage areas 212, 214, and 216. The base stations 202, 204, and 206 can be deployed as substantially aligned in a first direction 120 as part of the same base station array, as described above, or to otherwise allow for aligning the cell coverage areas 212, 214, and 216 in the first direction, such that cell coverage area 212 can overlap cell coverage area 214 (and/or 216 at a different altitude range in the vertical plane), cell coverage area 214 can overlap cell coverage area 216, and so on. This can allow the cell coverage areas 212, 214, and 216 to achieve at least a predetermined altitude (e.g., 45,000 feet (ft)) for a distance defined by the various aligned base stations 202, 204, 206, etc.

As depicted, base station 202 can provide cell coverage area 212 that overlaps cell coverage area 214 of base station 204 to facilitate providing cell coverage up to 45,000 ft near base station 204 for a distance until signals transmitted by base station 204 reach the predetermined altitude of 45,000 ft (e.g., near point 130), in this example. In this example, base station 204 can be deployed at a position corresponding to the distance between which it takes cell coverage area 214 of base station 204 to reach the predetermined altitude subtracted from the achievable distance of cell coverage area 212 of base station 202. In this regard, there can be substantially any number of overlapping cell coverage areas of different base stations to reach the predetermined altitude based on the elevation angles, the distance it takes to achieve a vertical beam width at the predetermined altitude based on the elevation angles, the distance between the base stations, etc.

In one specific example, the base stations 202, 204, and 206 can be spaced apart by a first distance 140, as described. The first distance 140 can be substantially 150 km along the first direction 120, such that base station 204 is around 150 km from base station 202, and base station 206 is around 300 km from base station 202. Further, in an example, an aircraft flying between base station 206 and 204 may be covered by base station 202 depending on its altitude, and in one example, altitude can be used in determining whether and/or when to handover a device on the aircraft to another base station or cell provided by the base station.

Moreover, as described in some examples, base stations 202, 204 and 206 can include an antenna array providing a directional radiation pattern oriented along the first direction 120, as shown in FIG. 1, where the directional radiation pattern extends over a predetermined range in azimuth centered on the first direction 120, and extends between the first elevation angle and the second elevation angle of the respective coverage areas 212, 214, and 216 over at least a predetermined distance to define the substantially wedge shaped radiation pattern. In this regard, FIG. 2 depicts a side view of a vertical plane of the base stations 202, 204, and 206, and associated coverage areas 212, 214, and 216. Thus, in one example, base station 202 can provide a cell coverage area 212 that is similar to cell coverage area 106/108 in FIG. 1 in a horizontal plane, and base station 204 can provide a cell coverage area 214 similar to cell coverage area 102/104 in FIG. 1. Moreover, as described, direction 120 can corre-

8

late to a cardinal direction, intermediate direction, and/or the like. In addition, in a deployment of network 200, additional base stations can be provided in front of base station 206 along direction 120 until a desired coverage area is provided (e.g., until an edge of a border or air corridor is reached).

FIG. 3 illustrates an example network 300 for providing overlapping cells to facilitate ATG wireless communication coverage at least at a predetermined altitude, as in FIG. 2. Network 300, thus, includes base stations 202, 204, and 206 that transmit signals for providing the ATG wireless communications. Base stations 202, 204, and 206 can each transmit signals that exhibit a radiation pattern defined by a first and second elevation angle such to achieve a predetermined altitude. This results in providing respective wedge shaped cell coverage areas 212, 214, and 216. The base stations 202, 204, and 206 can be deployed as substantially aligned in a first direction as part of the same base station array, as described above, or to otherwise allow for aligning the cell coverage areas 212, 214, and 216 in the first direction, such that cell coverage area 212 can overlap cell coverage area 214 (and/or 216), cell coverage area 214 can overlap cell coverage area 216, and so on. This can allow the cell coverage areas 212, 214, and 216 to achieve at least a predetermined altitude (e.g., 45,000 ft) for a distance defined by the various aligned base stations 202, 204, 206, etc., as described.

In addition, however, base station 202 can be deployed at an edge of a desired coverage area, and can include one or more patch antennas to provide additional ATG wireless communication coverage. In an example, the edge of the desired coverage area can include a border of a country, an edge of an air corridor, etc. For example, the one or more patch antennas can be provided at an uptilt angle and/or with additional elevation as compared to antenna(s) providing cell coverage area 202. In one example, at least one patch antenna can provide additional coverage areas 302 and/or 304 up to the target altitude to fill coverage gaps near the border or edge in the network deployment configuration described herein, for example.

FIG. 4 illustrates a functional block diagram of a base station 400 in an example embodiment. In this regard, for example, the base station 400 may include processing circuitry 402 that may be configurable to perform control functions in accordance with example embodiments. The processing circuitry 402 may provide electronic control inputs to one or more functional units of an aircraft for providing ATG wireless communications thereto. The processing circuitry 402 may be configured to perform data processing, control function execution and/or other processing and management services according to an example embodiment.

In some examples, the processing circuitry 402 may be embodied as a chip or chip set. In other words, the processing circuitry 402 may comprise one or more physical packages (e.g., chips) including materials, components and/or wires on a structural assembly (e.g., a baseboard). The structural assembly may provide physical strength, conservation of size, and/or limitation of electrical interaction for component circuitry included thereon. The processing circuitry 402 may therefore, in some cases, be configured to implement an embodiment of the disclosed subject matter on a single chip or as a single "system on a chip." As such, in some cases, a chip or chipset may constitute means for performing one or more operations for providing the functionalities described herein.

In an example embodiment, the processing circuitry 402 may include one or more instances of a processor 404 and

US 10,257,717 B2

9                                                                    10

memory **406** that may be in communication with or otherwise control a transceiver **408**. The processing circuitry **402** may be embodied as a circuit chip (e.g., an integrated circuit chip) configured (e.g., with hardware, software or a combination of hardware and software) to perform operations described herein. However, in some embodiments, the processing circuitry **402** may be embodied as a portion of an on-board computer. The transceiver **408** may include one or more mechanisms for enabling communication with various devices. In some cases, the transceiver **408** can include device or circuitry embodied in either hardware, or a combination of hardware and software that is configured to receive and/or transmit data from/to aircraft or other devices in communication with the processing circuitry **402**. Thus, for example, the transceiver **408** may allow for communication via different antennas, such as antenna **1 410**, antenna **2 412**, antenna N **414**, where N is a positive integer, etc.

In an example embodiment, the processing circuitry **402** may be configured to control configuration or operation of one or more instances of the transceiver **408** to facilitate operation of one or more antennas, such as antenna **1 410**, antenna **2 412**, antenna N **414**, etc. In one example, as depicted, the antennas **410, 412, 414**, etc. can be operated by a single radio **416**, and the radio **416** can include a switch **418** to alternate between transmitting signals over the various antennas **410, 412, 414**, etc. In another example, though not depicted, the antennas **410, 412, 414**, etc. can use independent radios, and/or can transmit signals concurrently. In any case, processing circuitry **402** can use transceiver **408** to provide cell coverage via communications using the antennas **410, 412, 414**, etc. to provide wedge shaped cells, as described. In addition, the wedge shaped cells provided by the antennas can be substantially adjacent in a direction to provide multiple aligned sectors that form semicircular coverage areas, as described. In some examples, transceiver **408** can employ additional patch antennas (not shown) to provide additional coverage areas to provide border coverage at the predetermined altitude.

Moreover, it is to be appreciated that the radio(s) **416** can communicate using substantially any air interface in a licensed spectrum (e.g., third generation partnership project (3GPP) long term evolution (LTE), Wideband Code Division Multiple Access (WCDMA), and/or the like), unlicensed spectrum (e.g., 2.4 gigahertz (GHz), 5.8 GHz, and/or the like), etc.

The processor **404** may be embodied in a number of different ways. For example, the processor **404** may be embodied as various processors, such as one or more of a microprocessor or other processing element, a coprocessor, a controller or various other computing or processing devices including integrated circuits such as, for example, an application specific integrated circuit (ASIC), a field programmable gate array (FPGA), or the like. In an example embodiment, the processor **402** may be configured to execute instructions stored in the memory **406** or otherwise accessible to the processor **404**. As such, whether configured by hardware or by a combination of hardware and software, the processor **404** may represent an entity (e.g., physically embodied in circuitry—in the form of processing circuitry **402**) capable of performing operations according to embodiments of the present invention while configured accordingly. Thus, for example, when the processor **404** is embodied as an ASIC, FPGA or the like, the processor **404** may be specifically configured hardware for conducting the operations described herein. Alternatively, as another example, when the processor **404** is embodied as an executor of software instructions, the instructions may specifically configure the processor **404** to perform the operations described herein.

In an example embodiment, the processor **404** (or the processing circuitry **402**) may be embodied as, include or otherwise control the operation of the base station **400**, as described herein. As such, in some embodiments, the processor **404** (or the processing circuitry **402**) may be said to cause each of the operations described in connection with the base station **400** in relation to operation of the base station **400** by directing components of the transceiver **408** to undertake the corresponding functionalities responsive to execution of instructions or algorithms configuring the processor **404** (or processing circuitry **402**) accordingly.

In an exemplary embodiment, the memory **406** may include one or more non-transitory memory devices such as, for example, volatile and/or non-volatile memory that may be either fixed or removable. The memory **406** may be configured to store information, data, applications, instructions or the like for enabling the processing circuitry **402** to carry out various functions in accordance with exemplary embodiments described herein. For example, the memory **406** could be configured to buffer input data for processing by the processor **404**. Additionally or alternatively, the memory **406** could be configured to store instructions for execution by the processor **404**. As yet another alternative, the memory **406** may include one or more databases that may store a variety of data sets related to functions described herein. Among the contents of the memory **406**, applications may be stored for execution by the processor **404** in order to carry out the functionality associated with each respective application. In some cases, the applications may include instructions for recognition of various input signals related to component status or operational parameters and, if necessary, applying timing control, encryption, channel control and/or the like associated with handling the reception of such signals. The applications may further include instructions for operational control of the base station **400**, as described above.

Referring to FIG. **5**, a methodology that can be utilized in accordance with various aspects described herein is illustrated. While, for purposes of simplicity of explanation, the methodology is shown and described as a series of acts, it is to be understood and appreciated that the methodology is not limited by the order of acts, as some acts can, in accordance with one or more aspects, occur in different orders and/or concurrently with other acts from that shown and described herein. For example, those skilled in the art will understand and appreciate that a methodology could alternatively be represented as a series of interrelated states or events, such as in a state diagram. Moreover, not all illustrated acts may be required to implement a methodology in accordance with one or more aspects.

FIG. **5** illustrates an example methodology **500** for providing deploying a plurality of base stations to provide ATG wireless communication coverage areas. At **502**, a first base station is deployed providing a wedge shaped coverage area in a vertical plane over a semicircular shaped coverage area in a horizontal plane. As described, an increasing vertical beam width over a distance, as effectuated by multiple elevation angles of signal transmissions by the base station, can result in the wedge shape of the coverage area. In addition, the semicircular shape in the horizontal plane can be effectuated by an azimuth of transmission by one or more antennas. As described, in an example, transmissions from a

US 10,257,717 B2

11

plurality of antennas can form substantially adjacent sectors that together form the semicircular shaped cell coverage area.

At **504**, a second base station can be deployed aligned with the first base station in a first direction to facilitate providing overlapping coverage with the first base station in the first direction to achieve a predetermined altitude. In this regard, as described, a second cell coverage area of the second base station can be similarly shaped in the vertical and horizontal planes as the cell coverage area of the first base station, such that the second cell coverage area can fill coverage gaps in the cell coverage area near the first base station up to a predetermined altitude in a semicircular coverage area shape in the horizontal plane. In this example, the second base station can be deployed at a distance that allows the second base station to cover the cell coverage area of the first base station at least at the predetermined altitude and at least to a point where the cell coverage area of the first base station reaches the predetermined altitude. Moreover, as described, the first and second base stations can be deployed in the same base station array.

At **506**, a third base station can be deployed in a second direction from the first base station, and offset in the first direction, to facilitate providing continuous coverage at the predetermined altitude in the second direction. The second direction can be substantially perpendicular to the first direction such that the third base station is deployed based on an achievable cell coverage area distance by the first base station and the third base station. As described, since the cell coverage area of the first base station is compensated for altitude deficiency in the first direction (e.g., by the over-lapping cells of the second base station aligned in the first direction), no such compensation is needed in the second direction, and thus the base stations in the second direction can be further spaced apart based on the achievable coverage area distance of each base station. Moreover, as described, the third base station can be deployed in a base station array adjacent to the base station array to which the first and second base stations are associated.

Many modifications and other embodiments of the inventions set forth herein will come to mind to one skilled in the art to which these inventions pertain having the benefit of the teachings presented in the foregoing descriptions and the associated drawings. Therefore, it is to be understood that the inventions are not to be limited to the specific embodiments disclosed and that modifications and other embodiments are intended to be included within the scope of the appended claims. Moreover, although the foregoing descriptions and the associated drawings describe exemplary embodiments in the context of certain exemplary combinations of elements and/or functions, it should be appreciated that different combinations of elements and/or functions may be provided by alternative embodiments without departing from the scope of the appended claims. In this regard, for example, different combinations of elements and/or functions than those explicitly described above are also contemplated as may be set forth in some of the appended claims. In cases where advantages, benefits or solutions to problems are described herein, it should be appreciated that such advantages, benefits and/or solutions may be applicable to some example embodiments, but not necessarily all example embodiments. Thus, any advantages, benefits or solutions described herein should not be thought of as being critical, required or essential to all embodiments or to that which is claimed herein. Although

12

specific terms are employed herein, they are used in a generic and descriptive sense only and not for purposes of limitation.

What is claimed is:

1. A network for providing air-to-ground (ATG) wireless communication in various cells, comprising:
  a first base station including a first antenna array defining a first directional radiation pattern that is oriented toward a horizon; and
  a second base station including second antenna array defining a second directional radiation pattern that at least partially overlaps with the first base station,
  wherein the first base station employs unlicensed spectrum,
  wherein the second base station employs licensed spectrum,
  wherein the first and second base stations are each configured to wirelessly communicate with a radio disposed on an aircraft flying through respective cell coverage areas of the first and second base stations, and
  wherein the first and second base stations are each configured to handover communication with the radio as the aircraft moves between the respective cell coverage areas of the first and second base stations.

2. The network of claim **1**, wherein at least one of the first directional radiation pattern or the second direction radiation pattern defines a substantially wedge shaped radiation pattern.

3. The network of claim **2**, wherein the first and second directional radiation patterns overlap each other to provide continuous coverage up to a predetermined altitude.

4. The network of claim **3**, wherein coverage up to the predetermined altitude immediately above the first base station is provided by the second base station.

5. The network of claim **4**, wherein the predetermined altitude is about 45,000 feet.

6. The network of claim **1**, wherein one of the first antenna array or the second antenna array forms a semicircular radiation pattern.

7. The network of claim **1**, wherein the first antenna array and the second antenna array each form semicircular radiation patterns.

8. The network of claim **7**, wherein the first antenna array and the second antenna array each include six sectors of about thirty degrees.

9. The network of claim **1**, wherein each of the first directional radiation pattern and the second direction radiation pattern define a substantially wedge shaped radiation pattern.

10. The network of claim **9**, wherein each of the first directional radiation pattern and the second direction radiation pattern form semicircular radiation patterns.

11. The network of claim **1**, wherein the first directional radiation pattern is differently shaped than the second direction radiation pattern.

12. A network for providing air-to-ground (ATG) wireless communication in various cells, comprising:
  a first base station including a first antenna array defining a first directional radiation pattern that is oriented toward a horizon; and
  a second base station including second antenna array defining a second directional radiation pattern that at least partially overlaps with the first base station,
  wherein one of the first base station or the second base station employs unlicensed spectrum, and the other of the first base station and the second base station employs licensed spectrum,

US 10,257,717 B2

13

wherein the first and second base stations are each con-
figured to wirelessly communicate with a radio dis-
posed on an aircraft flying through respective cell
coverage areas of the first and second base stations, and

wherein the first and second base stations are each con-
figured to handover communication with the radio as
the aircraft moves between the respective cell coverage
areas of the first and second base stations.

**13**. The network of claim **12**, wherein at least one of the
first directional radiation pattern or the second direction
radiation pattern defines a substantially wedge shaped radia-
tion pattern.

**14**. The network of claim **13**, wherein the first and second
directional radiation patterns overlap each other to provide
continuous coverage up to a predetermined altitude.

**15**. The network of claim **14**, wherein coverage up to the
predetermined altitude immediately above the first base
station is provided by the second base station

14

**16**. The network of claim **15**, wherein the predetermined
altitude is about 45,000 feet.

**17**. The network of claim **12**, wherein one of the first
antenna array or the second antenna array forms a semicir-
cular radiation pattern.

**18**. The network of claim **12**, wherein each of the first
directional radiation pattern and the second direction radia-
tion pattern define a substantially wedge shaped radiation
pattern.

**19**. The network of claim **18**, wherein each of the first
directional radiation pattern and the second direction radia-
tion pattern form semicircular radiation patterns.

**20**. The network of claim **12**, wherein the first directional
radiation pattern is differently shaped than the second direc-
tion radiation pattern.

\* \* \* \* \*

# EXHIBIT 4

(12) **United States Patent**  
Stone et al.

(10) Patent No.: **US 9,730,077 B2**  
(45) Date of Patent: **Aug. 8, 2017**

(54) **ARCHITECTURE FOR SIMULTANEOUS SPECTRUM USAGE BY AIR-TO-GROUND AND TERRESTRIAL NETWORKS**

(71) Applicant: **SMARTSKY NETWORKS LLC**, Charlotte, NC (US)

(72) Inventors: **Ryan M. Stone**, Charlotte, NC (US); **Douglas Hyslop**, Vienna, VA (US)

(73) Assignee: **SMARTSKY NETWORKS LLC**, Charlotte, NC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/287,914**

(22) Filed: **Oct. 7, 2016**

(65) **Prior Publication Data**

US 2017/0026849 A1    Jan. 26, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/595,512, filed on Jan. 13, 2015, now Pat. No. 9,491,635.

(51) **Int. Cl.**  
*H04W 16/14* (2009.01)  
*H04B 7/185* (2006.01)  
(Continued)

(52) **U.S. Cl.**  
CPC ........ *H04W 16/14* (2013.01); *H04B 7/18504* (2013.01); *H04B 7/18506* (2013.01); (Continued)

(58) **Field of Classification Search**  
CPC ..... H04W 16/14; H04W 16/28; H04W 24/02; H04B 88/08; H04B 7/18504 (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,410,975 B1    4/2013 Bell et al.  
8,477,062 B1    7/2013 Kanellis  
(Continued)

OTHER PUBLICATIONS

ETSI Technical Committee Electromagnetic Compatibility and Radio Spectrum Matters (ERM), "Electromagnetic Compatibility and Radio Spectrum Matters (ERM); System Reference Document (SRdoc); Broadband Direct-Air-To-Ground Communications System Employing Beamforming Antennas, Operating in the 2, 4 GHz and 5.8 GHz Bands," European Telecommunications Standards Institute, Jul. 2012, ETSI TR 101 599 V1.1.1.

*Primary Examiner* — Cong Tran  
(74) *Attorney, Agent, or Firm* — McNair Law Firm, P.A.

(57) **ABSTRACT**

A network for providing air-to-ground (ATG) wireless communication in various cells may include an in-flight aircraft including an antenna assembly, a plurality of ATG base stations, a plurality of terrestrial base stations. Each of the ATG base stations defines a corresponding radiation pattern, and the ATG base stations are spaced apart from each other to define at least partially overlapping coverage areas to communicate with the antenna assembly in an ATG communication layer defined between a first altitude and a second altitude. The terrestrial base stations are configured to communicate primarily in a ground communication layer below the first altitude. The terrestrial base stations and the ATG base stations are each configured to communicate using the same radio frequency (RF) spectrum in the ground communication layer and ATG communication layer, respectively.

**19 Claims, 10 Drawing Sheets**



**US 9,730,077 B2**

Page 2

(51) **Int. Cl.**
| | |
|---|---|
| *H04W 16/28* | (2009.01) |
| *H04W 24/02* | (2009.01) |
| *H04W 88/08* | (2009.01) |
| *H04W 84/06* | (2009.01) |

(52) **U.S. Cl.**
CPC ........... *H04W 16/28* (2013.01); *H04W 24/02* (2013.01); *H04B 7/18508* (2013.01); *H04W 84/06* (2013.01); *H04W 88/08* (2013.01)

(58) **Field of Classification Search**
USPC ... 455/453, 454, 442, 12.1, 13.1, 431, 456.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,681,021 | B1 | 3/2014 | Carrico | |
| 9,014,704 | B2 | 4/2015 | Hyslop | |
| 9,143,807 | B2 * | 9/2015 | Keen | |
| 2006/0040660 | A1 * | 2/2006 | Cruz | H04B 7/18506 |
| | | | | 455/431 |
| 2006/0229076 | A1 | 10/2006 | Monk | |
| 2010/0066616 | A1 | 3/2010 | Brady, Jr. | |
| 2010/0189089 | A1 | 7/2010 | Lynch et al. | |
| 2013/0182790 | A1 * | 7/2013 | Jalali | H01Q 3/24 |
| | | | | 375/285 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3

Case 1:22-cv-01058 Document 12 Filed 12/19/2022 Page 157 PageID #: 102



FIG. 4

FIG. 5





FIG. 6



FIG. 7



**FIG. 8**



FIG. 9



FIG. 10



**FIG. 11**

US 9,730,077 B2

**1**

# ARCHITECTURE FOR SIMULTANEOUS SPECTRUM USAGE BY AIR-TO-GROUND AND TERRESTRIAL NETWORKS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/595,512 filed Jan. 13, 2015, the entire contents of which are hereby incorporated herein by reference.

## TECHNICAL FIELD

Example embodiments generally relate to wireless communications and, more particularly, relate to techniques for enabling dual usage of spectrum by wireless air-to-ground (ATG) networks and terrestrial networks in the same geographic area.

## BACKGROUND

High speed data communications and the devices that enable such communications have become ubiquitous in modern society. These devices make many users capable of maintaining nearly continuous connectivity to the Internet and other communication networks. Although these high speed data connections are available through telephone lines, cable modems or other such devices that have a physical wired connection, wireless connections have revolutionized our ability to stay connected without sacrificing mobility.

However, in spite of the familiarity that people have with remaining continuously connected to networks while on the ground, people generally understand that easy and/or cheap connectivity will tend to stop once an aircraft is boarded. Aviation platforms have still not become easily and cheaply connected to communication networks, at least for the passengers onboard. Attempts to stay connected in the air are typically costly and have bandwidth limitations or high latency problems. Moreover, passengers willing to deal with the expense and issues presented by aircraft communication capabilities are often limited to very specific communication modes that are supported by the rigid communication architecture provided on the aircraft.

As improvements are made to network infrastructures to enable better communications with in-flight receiving devices of various kinds, one prospect that may be considered is the dedication of some amount of radio frequency (RF) spectrum to in-flight communication. However, RF spectrum is extremely expensive due to the massive demands on this relatively limited resource. Accordingly, alternatives to the exclusive designation of a portion of RF spectrum to in-flight communication may be of interest.

## BRIEF SUMMARY OF SOME EXAMPLES

The continuous advancement of wireless technologies offers new opportunities to provide wireless coverage for aircraft in-flight without dedicating RF spectrum to such coverage. In this regard, for example, by employing various interference mitigation strategies, spectrum reuse may be employed. Some example embodiments may provide interference mitigation techniques that may allow spectrum reuse within a given area so that both terrestrial networks and air-to-ground (ATG) networks can coexist in the same geographical area and employ the same spectrum.

**2**

In one example embodiment, a network for providing air-to-ground (ATG) wireless communication in various communication volumes or cells is provided. The network may include an in-flight aircraft including an antenna assembly, a plurality of ATG base stations, and a plurality of terrestrial base stations. Each of the ATG base stations defines a corresponding radiation pattern, and the ATG base stations are spaced apart from each other to define at least partially overlapping coverage areas to communicate with the antenna assembly in an ATG communication layer defined between a first altitude and a second altitude. The terrestrial base stations are configured to communicate primarily in a ground communication layer below the first altitude to provide services independently of or in cooperation with the ATG base stations. The terrestrial base stations and the ATG base stations are each configured to communicate using the same radio frequency (RF) spectrum in the ground communication layer and ATG communication layer, respectively.

In another example embodiment, a method of selecting antenna elements of an antenna assembly for communicating in an ATG network and compensating for aircraft movement (e.g., pitch and roll) is provided. The method may include determining an expected relative position of an ATG base station relative to an in-flight aircraft, selecting an antenna element to employ for communication with the ATG base station based on the expected relative position, receiving an indication of a change to the dynamic position information (e.g., where the change is indicative of at least a change in the pitch or roll of the aircraft), and adjusting the selected antenna element to compensate for the change to the dynamic position information.

In another example embodiment, an antenna assembly for an aircraft is provided. The antenna assembly may be capable of communicating with ATG base stations of an ATG wireless communication network. The antenna assembly may include a plurality of antenna elements, at least one of which is tiltable to maintain the antenna assembly oriented toward a focus region responsive to in-flight maneuvering of the aircraft.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING(S)

Having thus described the invention in general terms, reference will now be made to the accompanying drawings, which are not necessarily drawn to scale, and wherein:

FIG. **1** illustrates a top view of an example network deployment providing air-to-ground (ATG) wireless communication coverage areas in accordance with an example embodiment;

FIG. **2** illustrates an aspect of an example network deployment of base stations providing overlapping cell coverage areas to achieve coverage up to a predetermined altitude in accordance with an example embodiment;

FIG. **3** illustrates a side view of a layered approach to providing wireless communication to in-flight aircraft while minimizing interference between the layers in accordance with an example embodiment;

FIG. **4** illustrates a side panel element disposed on an in-flight aircraft in accordance with an example embodiment;

FIG. **5** illustrates a functional block diagram of antenna elements of an example embodiment;

FIG. **6** illustrates a panel antenna vertical pattern in accordance with an example embodiment;

US 9,730,077 B2

3

FIG. **7** illustrates a functional block diagram of a controller for selecting antenna elements and compensating for aircraft movement to keep antenna elements oriented toward a focus region in accordance with an example embodiment;

FIG. **8** illustrates a block diagram of a method of communicating in an ATG network in accordance with an example embodiment;

FIG. **9** illustrates a side view of a layered approach to providing wireless communication to in-flight aircraft including a high altitude service layer in accordance with an example embodiment;

FIG. **10** illustrates a full duplex radio architecture in accordance with a first example; and

FIG. **11** illustrates a full duplex radio architecture in accordance with a second option.

DETAILED DESCRIPTION

Some example embodiments now will be described more fully hereinafter with reference to the accompanying drawings, in which some, but not all example embodiments are shown. Indeed, the examples described and pictured herein should not be construed as being limiting as to the scope, applicability or configuration of the present disclosure. Rather, these example embodiments are provided so that this disclosure will satisfy applicable legal requirements. Like reference numerals may be used to refer to like elements throughout. Furthermore, as used herein, the term "or" is to be interpreted as a logical operator that results in true whenever one or more of its operands are true.

Some example embodiments described herein provide architectures for improved air-to-ground (ATG) wireless communication performance. In this regard, some example embodiments may provide for the use of base stations on the ground having antenna structures configured to generate a wedge-shaped cell inside which directional beams may be focused. The wedge shaped cells may be spaced apart from each other and arranged to overlap each other in altitude bands to provide coverage over a wide area and up to the cruising altitudes of in-flight aircraft. The wedge shaped cells may therefore form overlapping wedges that extend out toward and just above the horizon. Thus, the size of the wedge shaped cells is characterized by increasing altitude band width (or increasing vertical span in altitude) as distance from the base station increases. Meanwhile, the in-flight aircraft may employ antennas that are capable of focusing toward the horizon and just below the horizon such that the aircraft generally communicate with distant base stations instead of base stations that may be immediately below or otherwise proximal (e.g., nearest) the aircraft. In fact, for example, an aircraft directly above a base station would instead be served by a more distant base station as the aircraft antennas focus near the horizon, and the base station antennas focus above the horizon. This leaves the aircraft essentially unaffected by the communication transmitters that may be immediately below the aircraft. Thus, for example, the same RF spectrum, and even the same specific frequencies the aircraft is using to communicate with a distally located base station may be reused by terrestrial networks immediately below the aircraft. As a result, spectrum reuse can be practiced relative to terrestrial wireless communication networks and ATG wireless communication networks in the same geographic area.

A plurality of base stations may be distributed to provide a corresponding plurality of adjacent wedge shaped cell coverage areas. Each wedge shaped cell may define a coverage area that extends between an upper and lower

4

altitude limit and the upper and lower altitude limits may increase (substantially linearly) as distance from the transmitters forming the wedge shaped cell increases. Thus, the coverage areas may be defined between altitude bands that increase in size and altitude as they proceed away from the transmission site. A plurality of sectors within each wedge shaped cell may combine to form the wedge shaped cell. In some cases, six sectors may be employed to cover about 30 degrees each for a total of 180 degrees of azimuth coverage provided by each wedge shaped cell. The cell coverage area may therefore be substantially semicircular in the horizontal plane, and can be provided by multiple antennas each providing a wedge shaped sector over corresponding portions of the semicircular azimuth. The base stations can be deployed as substantially aligned in a first direction while offset in a second direction. For example, the base stations can also be deployed in the first direction at a first distance to provide coverage overlapping in elevation to achieve coverage over the predetermined altitude, and within a second distance in the second direction based on an achievable coverage area distance of the sectors. In some embodiments, any number of sectors may be employed for as much as 360 degrees of coverage.

FIG. **1** illustrates a top view of a network **100** of deployed base stations for providing ATG wireless communication coverage as described above. Network **100** includes various base stations providing substantially semicircular cell coverage areas. The cell coverage areas are each depicted in two portions. For example, the cell coverage area for a first base station is shown as similarly patterned portions **102** and **104**. The portions **102** and **104** represent a single continuous cell coverage area over a horizontal plane; however, FIG. **1** depicts intervening portion **108** of another cell coverage area as providing overlapping coverage to achieve continuous coverage up to a predetermined altitude, as described further herein. Portion **102** is shown to represent the initial cell coverage area from the location of the corresponding base station out to an arbitrary distance for illustrative purposes; it is to be appreciated that this portion **102** also includes the overlapping coverage of portion **108** of another cell coverage area to achieve coverage at the predetermined altitude. Moreover, the coverage area represented by portions **106** and **108** may extend beyond boundary **130** of coverage area portion **104**; the coverage areas are limited in the depiction to illustrate at least one point where the bordering coverage areas are able to provide ATG wireless communication coverage at the predetermined altitude. Further, the base stations are not depicted for ease of explanation, but it is to be appreciated that the base stations can be located such to provide the cell coverage area indicated by portions **102** and **104**, portions **106** and **108**, portions **110** and **112**, etc.

The cell coverage areas **102/104** and **106/108** can be provided by respective base stations in a first base station array, where the base stations of one or more base station arrays are substantially aligned in a first direction **120** (as depicted by the representative cell coverage areas). As shown, cell coverage areas **102/104** and **106/108** project a directional radiation pattern that is oriented in the first direction, and are aligned front to back along the first direction. Such alignment can be achieved by substantially aligning base stations in the base station array to provide the substantially aligned cell coverage areas, antenna rotation to achieve alignment in the cell coverage areas in the first direction **120**, and/or the like. As described, in this regard, a first base station that provides the cell coverage area **102/104** can be overlapped by at least a cell coverage area **106/108** of a second base station in front of the first base station in

US 9,730,077 B2

5

the first direction 120. For example, a base station, or antennas thereof, can provide wedge shaped cell coverage areas defined by multiple elevation angles employed by antennas transmitting signals to achieve a predetermined altitude by a certain distance from the base station. Thus, overlapping the cell coverage areas in the first direction 120 allows cell coverage area 106/108 to achieve the predetermined altitude for at least the certain distance between the base station providing cell coverage area 102/104 and a point along line 130 where the cell coverage area 102/104 achieves the predetermined altitude.

In addition, base stations in the first base station array providing cell coverage areas 102/104 and 106/108 can be spaced apart (i.e., located at random, fixed or predetermined intervals) in a second direction 122 from base stations of a second base station array, which can provide additional cell coverage areas 110/112, 114/116, etc., aligned in the first direction 120. The first and second base station arrays can extend substantially parallel to each other in the first direction 120. In addition, base stations of the second base station array can be offset from base stations of the first base station array in the first direction 120 (as depicted by the representative cell coverage areas). The second direction 122 can be substantially perpendicular to the first direction 120 in one example. In this example, the first and second base station arrays can be offset to provide the offsetting of respective cell coverage areas (e.g., the offset shown between cell coverage areas 102/104 and 110/112), and any other coverage areas of the base station arrays aligned in the first direction 120.

The first and second base station arrays can be spaced apart at a greater distance in the second direction 122 than base stations within the respective arrays spaced apart in the first direction 120. For example, the base stations can be spaced in the second direction 122 according to an achievable coverage distance of the base station providing the cell coverage areas. Because the base stations providing cell coverage areas 102/104 and 106/108 in the first base station array are aligned in the first direction 120 such that cell coverage area 106/108 provides overlapping coverage to cell coverage area 102/104 to achieve the predetermined altitude, the base station arrays themselves can be separated based on the achievable distance of the respective cell coverage areas 102/104 and 110/112. In this regard, no substantial overlapping is needed between the boundaries of cell coverage areas 102/104 and 110/112 provided by base stations of adjacent base station arrays to reach the predetermined altitude since the altitude deficiencies near the respective base stations are covered by cell coverage areas of base stations in the base station array aligned in the first direction 120.

Moreover, offsetting the base stations providing the various cell coverage areas over the second direction 122 can allow for further spacing in the first direction 120 and/or second direction 122 as the end portions of one cell coverage area in the horizontal plane can abut to a middle portion of another cell coverage area from a base station in an adjacent base station array to maximize the distance allowed between the cell coverage areas while maintaining continuous coverage, which can lower the number of base stations necessary to provide coverage over a given area. In one example, the spacing in the second direction 122 can be more than twice the spacing in the first direction 120, depending on the coverage distance of the cell coverage areas and the distance over which it takes a cell coverage area to reach the predetermined altitude.

6

As depicted, the spacing of a first distance between base stations in a given base station array can be indicated as distance 140 in the first direction 120. The spacing of a second distance between base station arrays in the second direction 122 can be indicated as distance 142. Moreover, the offset between the base station arrays can be indicated as a third distance 144. In one specific example, the distance 140 can be near 100 kilometers (km), where distance 142 between the base stations providing cell coverage area 102/104 can be 300 km or more. In this example, the achievable cell coverage areas can be at least 200 km from the corresponding base station in the direction of the transmitted signals that form the coverage areas or related sectors thereof, as a slant distance from a base station within one array to the intersecting coverage from a base station in the second array. Moreover, in this example, the distance 144 can be around 75 km.

In an example, the base stations providing cell coverage areas 102/104, 106/108, 110/112, etc. can each include respective antenna arrays defining a directional radiation pattern oriented in the first direction. The respective antenna arrays can include multiple antennas providing a sector portion of the radiation pattern resulting in a coverage area that is wedge shaped in the vertical plane. For example, the cell coverage area provided by each antenna can have first and second elevation angles that exhibit an increasing vertical beam width, or span, in the vertical plane, and fills a portion of an azimuth in the horizontal plane. Using more concentrated signals that provide smaller portions of the azimuth can allow for achieving further distance and/or increased elevation angles without increasing transmission power. In the depicted example, the cell coverage areas defined by the antenna arrays include six substantially 30 degree azimuth sectors that are substantially adjacent to form a directional radiation pattern extending substantially 180 degrees in azimuth centered on the first direction to define the semicircular coverage area. Each sector can be provided by an antenna at the corresponding base station, for example. Moreover, in one example, the base station can have a radio per antenna, a less number of radios with one or more switches to switch between the antennas to conserve radio resources, and/or the like, as described further herein. It is to be appreciated that additional or a less number of sectors can be provided. In addition, the sectors can have an azimuth more or less than 30 degrees and/or can form a larger or smaller total cell coverage area azimuth than the depicted semicircular cell coverage area.

In yet other examples, the network 100 can implement frequency reuse of one, three, four, seven, or other suitable configurations (e.g., using formula $N=i^2+j^2+ij$ where $i=\#$ cells over from the original cell and $j=\#$ cells down from the original cell) such that nearby base stations can use the same channels in providing the cell coverage areas. For example, a base station providing cell coverage areas 102/104 can use a first channel, a base station providing cell coverage area 106/108 in the same base station array can use a second channel, and a base station providing cell coverage area 114/116 can use a third channel. Similarly, an adjacent group of three base stations providing cell coverage areas in a different base station array can use the same channels, etc. It is to be appreciated that other frequency reuse patterns and/or number of reuse factors can be utilized in this scheme to provide frequency diversity between adjacent cell coverage areas.

In a further example, a non-traditional frequency reuse scheme of two may be employed by the system. The wedge shape of the base station coverage areas in combination with

US 9,730,077 B2

7

the directional aircraft antennas effectively achieve a reuse of four with only two channel sets. In this example, an array of base stations alternate channel assignment between two channels in the array, with Channel A on a first base station, Channel B on a second base station, Channel A on a third, etc. The second array similarly alternates between the two channels, with Channel A offset from the similar Channel A base station in the first array. The overlap area between the two arrays will occasionally present the same co-channel frequency within the overlap area, but the angular directions of arrival from the two co-channel base stations are sufficiently distinct such that the aircraft antenna will focus on the closer base station, resulting in an aircraft antenna null in the direction of the second, weaker base station. Thus, a non-traditional frequency reuse is achieved through the design of the wedge-shaped base station coverage and the design of the directional aircraft antennas.

Furthermore, in an example deployment of network 100, the first direction 120 and/or second direction 122 can be, or be near, a cardinal direction (e.g., north, south, east, or west), an intermediate direction (e.g., northeast, northwest, southeast, southwest, north-northeast, east-northeast, etc.), and/or the like on a horizontal plane. In addition, the network 100 can be deployed within boundaries of a country, boundaries of an air corridor across one or more countries, and/or the like. In one example, cell coverage area 106/108 can be provided by an initial base station at a border of a country or air corridor. In this example, a base station providing cell coverage area 106/108, 110/112, and/or additional cell coverage areas at the border, can include one or more patch antennas to provide coverage at the predetermined altitude from the distance between the base station to the point where the respective cell coverage area 106/108, 110/112, etc. reaches the predetermined altitude. For example, the one or more patch antennas can be present behind the cell coverage areas 106/108, 110/112, etc., and/or on the base stations thereof (e.g., as one or more antennas angled at an uptilt and/or parallel to the horizon) to provide cell coverage up to the predetermined altitude.

FIG. 2 illustrates an example network 200 for providing overlapping cells (e.g., in the vertical direction) to facilitate ATG wireless communication coverage at least at a predetermined altitude. Network 200 includes base stations 202, 204, and 206 that transmit signals for providing the ATG wireless communications. Base stations 202, 204, and 206 can each transmit signals that exhibit a radiation pattern defined by a first and second elevation angle such to achieve a predetermined altitude. In this example, base stations 202, 204, and 206 provide respective wedge shaped cell coverage areas 212, 214, and 216 that are offset in origin and overlap in the vertical direction. The base stations 202, 204, and 206 can be deployed as substantially aligned in a first direction 120 as part of the same base station array, as described above, or to otherwise allow for aligning the cell coverage areas 212, 214, and 216 in the first direction, such that cell coverage area 212 can overlap cell coverage area 214 (and/or 216 at a different altitude range in the vertical plane), cell coverage area 214 can overlap cell coverage area 216, and so on. This can allow the cell coverage areas 212, 214, and 216 to achieve at least a predetermined altitude (e.g., 45,000 feet (ft)) for a distance defined by the various aligned base stations 202, 204, 206, etc.

As depicted, base station 202 can provide cell coverage area 212 that overlaps cell coverage area 214 of base station 204 to facilitate providing cell coverage up to 45,000 ft near base station 204 for a distance until signals transmitted by base station 204 reach the predetermined altitude of 45,000

8

ft (e.g., near point 130), in this example. In this example, base station 204 can be deployed at a position corresponding to the distance between which it takes cell coverage area 214 of base station 204 to reach the predetermined altitude subtracted from the achievable distance of cell coverage area 212 of base station 202. In this regard, there can be substantially any number of overlapping cell coverage areas of different base stations to reach the predetermined altitude based on the elevation angles, the distance it takes to achieve a vertical beam width at the predetermined altitude based on the elevation angles, the distance between the base stations, etc.

In one specific example, the base stations 202, 204, and 206 can be spaced apart by a first distance 140, as described. The first distance 140 can be substantially 100 km along the first direction 120, such that base station 204 is around 100 km from base station 202, and base station 206 is around 200 km from base station 202. Further, in an example, an aircraft flying between base station 206 and 204 may be covered by base station 202 depending on its altitude, and in one example, altitude can be used in determining whether and/or when to handover a device on the aircraft to another base station or cell provided by the base station to provide for uninterrupted handover of receivers on an aircraft.

Moreover, as described in some examples, base stations 202, 204 and 206 can include an antenna array providing a directional radiation pattern oriented along the first direction 120, as shown in FIG. 1, where the directional radiation pattern extends over a predetermined range in azimuth centered on the first direction 120, and extends between the first elevation angle and the second elevation angle of the respective coverage areas 212, 214, and 216 over at least a predetermined distance to define the substantially wedge shaped radiation pattern. In this regard, FIG. 2 depicts a side view of a vertical plane of the base stations 202, 204, and 206, and associated coverage areas 212, 214, and 216. Thus, in one example, base station 202 can provide a cell coverage area 212 that is similar to cell coverage area 106/108 in FIG. 1 in a horizontal plane, and base station 204 can provide a cell coverage area 214 similar to cell coverage area 102/104 in FIG. 1. Moreover, as described, direction 120 can correlate to a cardinal direction, intermediate direction, and/or the like. In addition, in a deployment of network 200, additional base stations can be provided in front of base station 206 along direction 120 until a desired coverage area is provided (e.g., until an edge of a border or air corridor is reached).

As mentioned above, the establishment of an ATG network with base stations deployed and configured in the manner described in FIGS. 1 and 2 provides the ability to create a layered approach to covering a given area, in which the layers define altitude bands in which distally located base stations provide coverage for aircraft with fore/aft and side looking antenna arrays that are essentially shielded from potentially interfering transmitters directly below them. Accordingly, for example, a bottom layer (i.e., closest to the ground) may reuse radio spectrum already employed in the altitude bands defined in the layer or layers above. Frequency reuse can therefore be employed for a given region in distinct altitude bands.

FIG. 3 illustrates an example network architecture for providing overlapping cells with layered altitude bands to facilitate ATG wireless communication coverage with RF spectrum that can be reused by a terrestrial network. FIG. 3 shows only two dimensions (e.g., an X direction in the horizontal plane and a Z direction in the vertical plane), however it should be appreciated that the wedge architecture of the ATG network may be structured to extend coverage

US 9,730,077 B2

9

also in directions into and out of the page (i.e., in the Y direction). Although FIG. 3 is not drawn to scale, it should be appreciated that the wedge shaped cells generated by the base stations for the ATG portion of the network architecture are configured to have a much longer horizontal component than vertical component. In this regard, the wedge shaped cells may have a horizontal range on the order of dozens to nearly or more than 100 miles. Meanwhile, the vertical component expands with distance from the base stations, but is in any case typically less than about 8 miles (e.g., about 45,000 ft).

As shown in FIG. 3, a terrestrial network component of the architecture may include one or more terrestrial base stations 300. The terrestrial base stations 300 may generally transmit terrestrial network emissions 310 to serve various fixed or mobile communication nodes (e.g., UEs) and other wireless communication devices dispersed on the ground. The terrestrial base stations 300 may be operably coupled to terrestrial backhaul and network control components 315, which may coordinate and/or control operation of the terrestrial network. The terrestrial backhaul and network control components 315 may generally control allocation of RF spectrum and system resources, and provide routing and control services to enable the UEs and other wireless communication devices of the terrestrial network to communicate with each other and/or with a wide area network (WAN) such as the Internet.

The UEs of the terrestrial network may also transmit their own terrestrial network emissions, which may create the possibility for generation of a substantial amount of communication traffic in a ground communication layer 320 extending from the ground to a predetermined minimum altitude 325 above which only receivers on in-flight aircraft 330 are present. The in-flight aircraft 330 may operate in an ATG communication layer 335 that may extend from one or two miles in altitude up (e.g., the predetermined minimum altitude 325) to as far as about 8 miles in altitude (e.g., a predetermined maximum altitude 340). While, the predetermined minimum altitude 325 and predetermined maximum altitude 340 may bound a single ATG communication layer or, in the case where multiple ATG wedge shaped cells overlap, multiple ATG communication layers.

The architecture may also employ a first ATG base station 350 and a second ATG base station 355, which are examples of base stations employed as described in the examples of FIGS. 1 and 2. Thus, for example, the first ATG base station 350 may be deployed substantially in-line with the second ATG base station 355 along the X axis and may generate a first wedge shaped cell 360 that may be layered on top of a second wedge shaped cell 365 generated by the second ATG base station 355. When the in-flight aircraft 330 is exclusively in the first wedge shaped cell 360, the in-flight aircraft 330 may communicate with the first ATG base station 350 using assigned RF spectrum and when the in-flight aircraft 330 is exclusively in the second wedge shaped cell 365, the in-flight aircraft 330 may communicate with the second ATG base station 355 using assigned RF spectrum. An area of overlap between the first wedge shaped cell 360 and the second wedge shaped cell 365 may provide the opportunity for handover of the in-flight aircraft 330 between the first ATG base station 350 and the second ATG base station 355, respectively. Accordingly, uninterrupted handover of receivers on the in-flight aircraft 330 may be provided while passing between coverage areas of base stations having overlapping coverage areas as described herein.

In an example embodiment, ATG backhaul and network control components 370 may be operably coupled to the first

10

and second ATG base stations 350 and 355. The ATG backhaul and network control components 370 may generally control allocation of RF spectrum and system resources, and provide routing and control services to enable the in-flight aircraft and any UEs and other wireless communication devices thereon to communicate with each other and/or with a wide area network (WAN) such as the Internet.

Given the curvature of the earth and the distances between base stations of the ATG network, the layering of the wedge shaped cells can be enhanced. Additionally, the first ATG base station 350 and the second ATG base station 355 may be configured to communicate with the in-flight aircraft 330 using relatively small, directed beams that are generated using beamforming techniques. The beamforming techniques employed may include the generation of relatively narrow and focused beams. Thus, the generation of side lobes (e.g., radiation emissions in directions other than in the direction of the main beam) that may cause interference with communications in the ground communication layer 320 may be reduced. In some cases, the terrestrial base stations 300, which are generally only required to transmit in a relatively narrow layer close to the ground, may also be configured to employ antennas and/or arrays that employ side lobe suppression techniques aimed at reducing the amount of potential interference transmitted out of the ground communication layer 320 and into the ATG communication layer 335.

Accordingly, the network architecture itself may help to reduce the amount of cross-layer interference. In this regard, the wedge shaped cell structure focuses energy just above the horizon and leaves a layer on the ground that is usable for terrestrial network operations without significant interference from the ATG base stations, and create a separate higher altitude layer for ATG network communications. Additionally, the use of directional antennas with beamsteering by the ATG base stations, and antennas with side lobe suppression, reduces the amount of interference across these layers. However, as will be described in greater detail below, since all of the equipment in the ATG communication layer 335 with which communication is desired will be on the in-flight aircraft 330, some embodiments may employ further interference mitigation techniques associated with the antenna assembly 375 provided on the in-flight aircraft 330. Accordingly, for example, the UEs or other wireless communication devices on or associated with the in-flight aircraft 330 may be communicatively coupled with the first ATG base station 350 or the second ATG base station 355 via the antenna assembly 375 of the in-flight aircraft 330. In this regard, for example, the antenna assembly 375 may be strategically mounted on the in-flight aircraft 330 and/or the antenna assembly 375 may be operated or controlled in a manner that facilitates interference mitigation as described in greater detail below.

By generally minimizing cross-layer interference, the same RF spectrum can be reused in both the ground communication layer 320 and the ATG communication layer 335. As such, the network architecture of an example embodiment may effectively act as a frequency spectrum doubler in that spectrum that is used in the terrestrial network may be reused by the ATG network with minimal interference therebetween. The base stations serving each respective layer may be distally located relative to each other such that, for example, a serving ATG base station in communication with the in-flight aircraft 330 is geographically located outside a coverage area of each of the terrestrial base stations in a portion of the ground communication layer 320 above which the in-flight aircraft 330 is located. The

US 9,730,077 B2

11

substantially horizontally focused nature of the ATG base stations (350 and 355) enables them to be positioned far outside of the region below which the in-flight aircraft 330 is located. The antenna assembly 375 can therefore "look" or otherwise focus its communication efforts away from potentially interfering sources directly below the in-flight aircraft 330.

As mentioned above, cross-layer interference mitigation may be accomplished on the in-flight aircraft 330 by strategic positioning of the antenna assembly 375. For example, when the antenna assembly 375 is positioned on a vertical stabilizer of the in-flight aircraft 330, the antenna assembly 375 may generally have a narrow aspect relative to the ground and any transmissions directed from the ground, while providing excellent control of the vertical antenna pattern. Additionally, for certain side mountings of the antenna assembly on the body of the in-flight aircraft 330, part of the airframe may shield the antenna assembly 375 from terrestrial network emissions 310 generated by terrestrial base stations 300 below the in-flight aircraft 330. Such shielding may be even more pronounced if, for example, the antenna assembly 375 is positioned on the top or roof of the in-flight aircraft 330. In these examples, the metal airframe of the in-flight aircraft 330 may act as an extended ground-plane. The antenna assembly 375 in either (or both) of these locations may therefore have limited ability to receive transmissions that are not directed from locations with a substantially greater vertical component of distance from the in-flight aircraft 330 than the horizontal component of such distance. In other words, the antenna assembly 375 is shielded from transmitters that are not near the horizon. These locations (e.g., on sides or tops of aircraft) are therefore advantageous for further mitigating cross-layer interference. However, such locations may generally be better for communication with transmitters off to the side of the in-flight aircraft 330, rather than in front of or behind the in-flight aircraft 330. For better coverage in front of and behind the in-flight aircraft 330, positioning of the antenna assembly 375 (or portions or components of the antenna assembly 375) on the bottom of the in-flight aircraft 330 may be employed. Thus, fewer antenna elements (e.g., only those on the bottom of the in-flight aircraft 330) may need to have sophisticated side lobe suppression techniques employed thereon to facilitate reduction of cross-layer interference.

In accordance with the general strategic positioning of the antenna assembly 375 described above, the antenna assembly 375 can be shielded (at least partially) from cross-layer interference by avoiding exposure to transmitters below the in-flight aircraft 330. However, such strategy implies that the antenna assembly 375 should instead look to transmitters closer to the horizon. This horizon-focused paradigm actually fits quite well with the corresponding layered network architecture described above since the ATG base stations are generally configured to form wedge shaped cells that are focused just above the horizon. Thus, both the ground transmitters and the antenna assembly 375 of an example embodiment are mutually optimized for focusing substantially more energy in the horizontal plane than in the vertical plane. This enhances the ability to maximize spacing between ATG base stations (thereby reducing ATG base station count and network build cost), and simplifies the architecture of the antenna assembly 375 (since natural shielding of the airframe can be employed in some cases). As a result, corresponding ATG base stations focusing energy above the horizon and airborne antenna assemblies focusing energy just below the horizon are mutually optimized to communicate with each other with substantially

12

less interference to worry about from terrestrial network base stations directly (or nearly directly) below the in-flight aircraft 330 even when the same spectrum used by the terrestrial network is reused by the ATG network.

In an example embodiment, the antenna assembly 375 may be configured to focus energy in an area from the horizon to about 10 or 15 degrees below the horizon (from the perspective of the in-flight aircraft 330). FIG. 4 illustrates an example of the in-flight aircraft 330 having a side panel element 400 as a portion of the antenna assembly 375. The side panel element 400 is positioned on the vertical stabilizer, but could alternatively be positioned on a side, top, bottom or other portion of the aircraft. Of note, the side panel element 400 may, in some cases, be embodied in a form other than as a flat array (e.g., as a blade antenna element, a conformal array and/or the like). As can be appreciated from the example of FIG. 4, by focusing mainly on areas between the horizon and 10 or 15 degrees below the horizon, the subset of ATG base stations with which communication can be established is somewhat limited. Accordingly, the side panel element 400 may need to be stabilized for ensuring that it remains oriented toward the horizon and just below the horizon even when the aircraft pitches (i.e., moves its head up and down as shown by arrow 410) or rolls (i.e., turns side to side as shown by arrow 420).

In some cases, the amount of pitch and roll that the in-flight aircraft 330 may encounter may be limited based on certain restrictions that are dependent upon altitude, speed and passenger comfort. For example, pitch (i.e., the angle of ascent or descent) may be limited to about 7 degrees above 10,000 ft in altitude. Meanwhile, for example, roll (i.e., the angle of bank right or left during a turn) may be limited to less than 20 degrees above 10,000 ft in altitude and to less than 15 degrees above 20,000 ft in altitude. Accordingly, not only may it be desirable to provide compensation and/or stabilization of the antenna assembly 375 (e.g., the side panel element 400), but such compensation and/or stabilization may be dependent upon altitude or other environmental factors.

In embodiments in which the antenna assembly 375 is embodied as or includes a panel antenna (e.g., side panel element 400), which may include a plurality of sector antennas. In some cases, the panel antenna may be mechanically and/or electrically steered or tilted to provide the compensation and/or stabilization described above. As such, the panel antenna may also be referred to as a steerable matrix antenna. FIG. 5 shows a block diagram of system components that may be employed in connection with controlling an antenna assembly of an example embodiment. As shown in FIG. 5, the antenna assembly 375 may include a left side panel element 402 and a right side panel element 404. The antenna assembly may also include one or more blade, monopole or other antenna elements such as antenna elements 406 and 408. In an example embodiment, element 408 may be a blade antenna configured for fore/aft reception. Meanwhile, the right and left side panel elements 404 and 402 may be receive elements for respective sides of the airplane. Antenna element 406 may be a blade antenna with four or more transmission elements, and may have selectable directivity. In some embodiments, such as for large airframes, the receive elements may optionally each be coupled to a remote radio head 430 via one or multiple cables. However, if no remote radio head is employed, the radio itself could perform functions described herein in association with the remote radio head. In some cases, the remote radio head 430 may be distributed in more than one physical location (as shown by distributed elements (DEs)

US 9,730,077 B2

13

432 and 434. The remote radio head 430 may then be coupled (e.g., via fiber optic or other cables) to a base radio 440 at which typical modulation, demodulation and other radio functions are conducted. The transmit element 406 may also be coupled to the base radio 440.

In an example embodiment, the remote radio head 430 may provide for switching among the receive antennas. In examples in which vertical beam steering of the array panels is conducted, four or more cables may be used to connect each of the left side panel element 402 and the right side panel element 404 to the remote radio head 430. The remote radio head 430 may include one or more cavity filters corresponding to the number of antenna outputs provided to the remote radio head 430. In cases in which vertical beam steering is conducted with a mechanical device adjusting the electrical tilt of the arrays, only one cable and cavity filter, bulk acoustic wave (BAW) filter, surface acoustic wave (SAW) filter, circulator or any other suitable filter may be employed for each array. In some cases, the remote radio head 430 could be eliminated and filters, low noise amplifier (LNA) and switching components may be integrated into antenna housings or in other housings proximate to the antennas. Switching components (whether part of or external to the remote radio head 430) would be used to select the best antenna for receipt or transmission of any given signal based on location of the target or source, the signal strength of the ATG base stations, and the level of interference from surrounding base stations or terrestrial stations. The antenna selection, then, has multiple triggers designed to maximize the signal to interference plus noise ratio.

FIG. 6 illustrates a panel antenna vertical pattern. When mounted on an aircraft such that the panel is focused generally perpendicular to the direction of travel, compensation for aircraft rolling maneuvers may be needed. As can be appreciated from FIG. 6, when the in-flight aircraft 330 (which is generally communicating with ATG base stations at and slightly below the horizon) is rolling toward a ground station, the upper portion of the antenna pattern rolls toward the ground station. Meanwhile, when rolling away from the ground station, the antenna pattern provides less gain toward the ground station. Thus, beam steering may be needed (or at least helpful) to focus the antenna gain on the ground station by tilting the antenna assembly to compensate for the aircraft roll. For the panel elements, mechanical or electrical steering may be employed.

Accordingly, in some embodiments, the antenna assembly 375 may further be in communication with a control element that may be configured to interface with various aircraft sensors to determine the amount of compensation to apply to compensate for aircraft maneuvering. FIG. 7 illustrates a block diagram of components that may be employed for control of antenna assembly components (e.g., the side panels). As shown in FIG. 7, side panel element 400 may be operably coupled to a steering assembly 500. The steering assembly 500 may be configured to mechanically or electrically tilt at least a portion of the antenna assembly 375 (e.g., the side panels (individually or collectively) of the side panel element 400) to maintain the side panels oriented to communicate with ATG base stations proximate to the horizon (e.g., within about 15 degrees below the horizon). A controller 505 may be provided in communication with the steering assembly 500 to provide control over the steering assembly 500. The controller 505 may include processing circuitry 510 configured to provide control outputs for steering of the side panel element 400 based on, for example, knowledge of base station location and the relative position and orientation of the in-flight aircraft 330. The processing

14

circuitry 510 may be configured to perform data processing, control function execution and/or other processing and management services according to an example embodiment of the present invention. In some embodiments, the processing circuitry 510 may be embodied as a chip or chip set. In other words, the processing circuitry 510 may comprise one or more physical packages (e.g., chips) including materials, components and/or wires on a structural assembly (e.g., a baseboard). The structural assembly may provide physical strength, conservation of size, and/or limitation of electrical interaction for component circuitry included thereon. The processing circuitry 510 may therefore, in some cases, be configured to implement an embodiment of the present invention on a single chip or as a single "system on a chip." As such, in some cases, a chip or chipset may constitute means for performing one or more operations for providing the functionalities described herein.

In an example embodiment, the processing circuitry 510 may include one or more instances of a processor 512 and memory 514 that may be in communication with or otherwise control a device interface 520 and, in some cases, a user interface 530. As such, the processing circuitry 510 may be embodied as a circuit chip (e.g., an integrated circuit chip) configured (e.g., with hardware, software or a combination of hardware and software) to perform operations described herein. However, in some embodiments, the processing circuitry 510 may be embodied as a portion of an on-board computer. In some embodiments, the processing circuitry 510 may communicate with various components, entities and/or sensors of the in-flight aircraft 330. Thus, for example, the processing circuitry 510 may communicate with a sensor network 518 of the in-flight aircraft 330 to receive altitude information, location information (e.g., GPS coordinates, latitude/longitude, etc.), pitch and roll information, and/or the like.

The device interface 520 may include one or more interface mechanisms for enabling communication with other devices (e.g., modules, entities, sensors and/or other components of the in-flight aircraft 330). In some cases, the device interface 520 may be any means such as a device or circuitry embodied in either hardware, or a combination of hardware and software that is configured to receive and/or transmit data from/to modules, entities, sensors and/or other components of the in-flight aircraft 330 that are in communication with the processing circuitry 510.

The processor 512 may be embodied in a number of different ways. For example, the processor 512 may be embodied as various processing means such as one or more of a microprocessor or other processing element, a coprocessor, a controller or various other computing or processing devices including integrated circuits such as, for example, an ASIC (application specific integrated circuit), an FPGA (field programmable gate array), or the like. In an example embodiment, the processor 512 may be configured to execute instructions stored in the memory 514 or otherwise accessible to the processor 512. As such, whether configured by hardware or by a combination of hardware and software, the processor 512 may represent an entity (e.g., physically embodied in circuitry—in the form of processing circuitry 510) capable of performing operations according to embodiments of the present invention while configured accordingly. Thus, for example, when the processor 512 is embodied as an ASIC, FPGA or the like, the processor 512 may be specifically configured hardware for conducting the operations described herein. Alternatively, as another example, when the processor 512 is embodied as an executor of

US 9,730,077 B2

15

software instructions, the instructions may specifically configure the processor **512** to perform the operations described herein.

In an example embodiment, the processor **512** (or the processing circuitry **510**) may be embodied as, include or otherwise control the operation of the steering assembly **500** based on inputs received by the processing circuitry **510** indicative of ATG base station location and/or aircraft maneuvering or position information. As such, in some embodiments, the processor **512** (or the processing circuitry **510**) may be said to cause each of the operations described in connection with the steering assembly **500** in relation to adjustments to be made to antenna arrays to undertake the corresponding functionalities relating to array compensation/stabilization based on execution of instructions or algorithms configuring the processor **512** (or processing circuitry **510**) accordingly. In particular, the instructions may include instructions for processing 3D position information the in-flight aircraft **330** (including orientation) along with position information of fixed transmission sites in order to instruct an antenna array to tilt or otherwise orient in a direction that will facilitate establishing a communication link between the antenna array and one of the fixed transmission stations.

In an exemplary embodiment, the memory **514** may include one or more non-transitory memory devices such as, for example, volatile and/or non-volatile memory that may be either fixed or removable. The memory **514** may be configured to store information, data, applications, instructions or the like for enabling the processing circuitry **510** to carry out various functions in accordance with exemplary embodiments of the present invention. For example, the memory **514** could be configured to buffer input data for processing by the processor **512**. Additionally or alternatively, the memory **514** could be configured to store instructions for execution by the processor **512**. As yet another alternative, the memory **514** may include one or more databases that may store a variety of data sets responsive to input sensors and components. Among the contents of the memory **514**, applications and/or instructions may be stored for execution by the processor **512** in order to carry out the functionality associated with each respective application/instruction. In some cases, the applications may include instructions for providing inputs to control operation of the steering assembly **500** as described herein. In an example embodiment, the memory **514** may store fixed position information indicative of a fixed geographic location of ATG base stations.

The processing circuitry **510** may also be configured to receive dynamic position information indicative of a three dimensional position and orientation of the in-flight aircraft **330** to compute an adjustment to be applied (if needed) to the orientation of the side panel element **400** based on in-flight aircraft **330** dynamic position. The antenna assembly **375** may therefore be positioned optimally for engaging in continued communication with the corresponding ATG base station currently being used. The antenna assembly **375** can also be optimally positioned to anticipate handover to a next ATG base station based on a predicted future in-flight aircraft **330** location and the known locations of the ATG base stations.

A further embodiment of the aircraft antenna may be as a long blade mounted on the aircraft, with multiple antenna elements within the blade. The multiple elements are employed for beamforming that generally provides a horizon focused beam pattern. However, by using the long blade design, the horizon focused beam pattern can be achieved

16

with a more narrow horizontal (azimuth) pattern (relative to that of the panel antenna) to focus gain toward the desired base station and reduce gain in other interfering directions. The blade results in a wider vertical antenna pattern (relative to the panel antenna), which obviates the need for beam steering in the vertical direction to account for pitch or roll. The more narrow horizontal pattern in combination with the wider vertical pattern delivers a smaller interference profile than the panel antenna, because less interference "surface area" is captured by the antenna pattern. However, the general horizon focus is maintained, and interference from the ground communication layer **320** below the aircraft is substantially avoided.

The network **100** and its corresponding ATG base stations employing the wedge shaped cell architecture described above in reference to FIGS. **1** and **2** may be employed to provide coverage for communication with receivers on aircraft over a very large geographical area, or even an entire country. Moreover, using such architecture may substantially reduce or even minimize the number of ATG base stations that are needed to construct the network **100** since relatively large distances may be provided between ATG base stations. Beamforming techniques (which may also be referred to as beam steering techniques) and frequency reuse may be employed to further improve the ability of the network **100** to provide quality service to multiple targets without interference. Moreover, by providing a movable or steerable antenna array (e.g., antenna array **375**) on the in-flight aircraft **330**, particularly for an array that is shielded relative to transmissions directly (or nearly directly) below the in-flight aircraft **330** or is otherwise configurable to have less gain anywhere other than near the horizon, both the ATG base stations and the antenna array **375** may be configured to avoid interference below the in-flight aircraft **330**. This may permit spectrum reuse of, for example, ISM band frequencies (e.g., 2.4 GHz and/or 5.8 GHz) that may be unlicensed, or even licensed band frequencies at any desirable frequency range.

If airborne interference from ground transmitters such as, for example, ground based WiFi transmitters were relatively low over the entirety of the geographic area to be covered, it could be expected that the wedge architecture of the network **100** of FIGS. **1-2** could provide robust and cost effective coverage without any further modification even though ground transmitters (e.g., terrestrial base stations **300**) may use omni-directional antennas that are at least partially oriented to transmit upward using the same frequency.

As mentioned above, the ATG base stations (**350** and **355**) may employ beamforming (e.g., via a beamforming control module that may employ both 2D knowledge of fixed base station location and 3D knowledge of position information regarding the in-flight aircraft **330** to assist in application of beamforming techniques). Likewise, beamforming and/or beamsteering may be employed on the antenna array **375** of the in-flight aircraft **330** to use knowledge of ATG base station location and aircraft maneuvering (e.g., turns or pitch and roll) to maintain the antenna array **375** in an advantageous orientation to communicate with the ATG base stations when the in-flight aircraft **330** maneuvers. The antenna array **375** may therefore be adjusted in a compensatory manner responsive to maneuvering of the in-flight aircraft **330**. The compensation employed may involve switching between antenna elements that are best positioned for the orientation of the aircraft relative to the location of a serving

US 9,730,077 B2

17

ATG base station and/or tilting of the antenna array **375** to maintain the array in an advantageous position relative to the focus region of the array.

Although not every element of every possible embodiment of the ATG network **100** is shown and described herein, it should be appreciated that the communication equipment on the aircraft **330** may be coupled to one or more of any of a number of different networks through the ATG network **100**. In this regard, the network(s) can be capable of supporting communication in accordance with any one or more of a number of first-generation (1G), second-generation (2G), third-generation (3G), fourth-generation (4G) and/or future mobile communication protocols or the like. In some cases, the communication supported may employ communication links defined using unlicensed band frequencies such as 2.4 GHz or 5.8 GHz. Example embodiments may employ time division duplex (TDD), frequency division duplex (FDD), or any other suitable mechanisms for enabling two way communication within the system.

As indicated above, a beamforming control module may be employed on wireless communication equipment at either or both of the network side or the aircraft side in example embodiments. Moreover, in some embodiments, the communications received at the aircraft side may be distributed to equipment on the aircraft (e.g., such as telephone handsets or UEs via a WiFi router or other wireless access point, or aircraft communication equipment). In some embodiments, information distributed from the wireless access point may be provided to passenger devices or other aircraft communications equipment with or without intermediate storage.

In an example embodiment, the processing circuitry **510** may be configured to conduct switching to select an antenna element among the antenna assembly for communication with an optimal or otherwise selected one of the ATG base stations. This switching may be performed to select a particular antenna element (or sector) in a panel element or to select between panel elements and/or other antenna elements (e.g., the blade antenna) based on the location of the selected one of the ATG base stations relative to the in-flight aircraft **330**. As mentioned above, the switching may be performed using switch devices within the remote radio head **430** or at another location. In some embodiments, the particular antenna element that is selected may additionally or alternatively be tilted electrically or otherwise positionally adjusted to compensate or stabilize the particular antenna element responsive to maneuvering of the in-flight aircraft. Thus, for example, the processing circuitry **510** may initially receive information indicative of dynamic position information of the in-flight aircraft **330**, which may include a 3D position and/or orientation information (e.g., pitch and roll) and/or an estimated future position. The processing circuitry **510** may determine an expected relative position of a first network node (e.g., one of the ATG base stations) relative to the aircraft (e.g., based on the fixed position information indicating ATG base station location and the dynamic position information). Tracking algorithms may be employed to track dynamic position changes and/or calculate future positions (relative or geographic) based on current location and rate and direction of movement. After an expected relative position is determined, the processing circuitry **510** may be configured to provide instructions to select an antenna element to communicate with the first network node in the focus region based on the expected relative position. Thereafter, any changes in dynamic position information, particularly related to pitch and roll, may be compensated for by steering of the antenna element (e.g., mechanically or electrically).

18

FIG. **8** illustrates a block diagram of one method that may be associated with an example embodiment as described above. From a technical perspective, the processing circuitry **510** described above may be used to support some or all of the operations described in FIG. **8**. As such, the platform described in FIG. **7** may be used to facilitate the implementation of several computer program and/or network communication based interactions. As an example, FIG. **8** is a flowchart of a method and program product according to an example embodiment of the invention. It will be understood that each block of the flowchart, and combinations of blocks in the flowchart, may be implemented by various means, such as hardware, firmware, processor, circuitry and/or other device associated with execution of software including one or more computer program instructions. For example, one or more of the procedures described above may be embodied by computer program instructions. In this regard, the computer program instructions which embody the procedures described above may be stored by a memory device of a device (e.g., the controller **505**, and/or the like) and executed by a processor in the device. As will be appreciated, any such computer program instructions may be loaded onto a computer or other programmable apparatus (e.g., hardware) to produce a machine, such that the instructions which execute on the computer or other programmable apparatus create means for implementing the functions specified in the flowchart block(s). These computer program instructions may also be stored in a computer-readable memory that may direct a computer or other programmable apparatus to function in a particular manner, such that the instructions stored in the computer-readable memory produce an article of manufacture which implements the functions specified in the flowchart block(s). The computer program instructions may also be loaded onto a computer or other programmable apparatus to cause a series of operations to be performed on the computer or other programmable apparatus to produce a computer-implemented process such that the instructions which execute on the computer or other programmable apparatus implement the functions specified in the flowchart block(s).

Accordingly, blocks of the flowchart support combinations of means for performing the specified functions and combinations of operations for performing the specified functions. It will also be understood that one or more blocks of the flowchart, and combinations of blocks in the flowchart, can be implemented by special purpose hardware-based computer systems which perform the specified functions, or combinations of special purpose hardware and computer instructions.

In this regard, a method according to one embodiment of the invention, as shown in FIG. **8**, may include determining an expected relative position of an ATG base station relative to an in-flight aircraft at operation **800**. The expected relative position may be determined based on information indicative of aircraft location and information indicative of the known fixed positions of ATG base stations. However, in some cases, the ATG base station location may be discovered based on detection of a pilot signal or other transmissions from the ATG base station. The method may further include selecting an antenna element to employ for communication with the ATG base station based on the expected relative position at operation **810**. The selected antenna element may be an element of an antenna assembly on the aircraft. The antenna assembly may include transmission and receive components, and may include blade antennas, panel antennas and/or the like. Thus, a selected antenna element could be a particular panel antenna or blade antenna, or could be

US 9,730,077 B2

19

a particular sector of a panel antenna. The selected antenna element could be chosen based on signal strength measured or estimated, or other factors for base stations within a focus region (e.g., horizon to about 15 degrees below the horizon) relative to the aircraft. At operation **820**, an indication of a change to the dynamic position information may be received, and the change may be indicative of at least a change in the pitch or roll of the aircraft. The selected antenna element may then be adjusted (e.g., by mechanical or electrical tilting) to compensate for the change to the dynamic position information at operation **830** (e.g., to keep the selected antenna element substantially oriented toward the focus region based on the change to the dynamic position information).

In an example embodiment, the layered approach described above could be augmented to include an additional layer above the ATG communication layer. The layer above the ATG communication layer may be a high altitude service layer. The high altitude service layer may be populated with high altitude service craft such as drones or other devices capable of flying (or orbiting) at high altitude. The high altitude service craft may be in communication with ground stations receiving communication signal from ATG base stations (or satellites) and relaying such communications on to the in-flight aircraft. However, the high altitude service craft with which the in-flight aircraft communicate may be located proximate to the horizon. The communication with high altitude service craft proximate to the horizon allows the same vertical beam steering antennas described above to be employed except the vertical beam steering antennas are steered to maintain the focus area just above the horizon to locate distant high altitude service craft instead of being steered to maintain the focus area just below the horizon. The additional altitude may extend the spacing between service stations (e.g., drones and/or ATG stations) that can be provided to give continuous coverage. Coverage can therefore be provided over sparsely populated areas and/or oceans.

As shown in FIG. **9**, the network of FIG. **3** may be provided with one or more high altitude service craft **900** in a high altitude service layer **910**. The high altitude service layer **910** may extend above the ATG communication layer **335** (e.g., above the predetermined maximum altitude **340**) to high altitudes including low earth orbit and beyond. In some examples, drones or balloons acting as high altitude service craft **900** may loiter or otherwise operate as high as (or higher than) 50,000 ft to 75,000 ft. However, it should be noted that the specific example altitudes described herein may change over time as aircraft capabilities change. The high altitude service craft **900** may communicate with the ATG base stations (**350** and **355**) via an ATG link **920**, with the in-flight aircraft **330** via an aircraft link **930** and/or with a satellite via a satellite link **940**. Accordingly, the high altitude service craft **900** may be enabled to service the in-flight aircraft **330** over vast distances and in different communication environments.

Accordingly, uninterrupted handover of receivers on the in-flight aircraft **330** may be provided while passing between coverage areas of ATG base stations and high altitude service craft having overlapping coverage areas as described herein. When employed in a network that includes a high altitude service layer **910**, the antenna assembly **375** may be configured to focus energy in an area from the horizon to about 10 or 15 degrees above the horizon (from the perspective of the in-flight aircraft **330**) to communicate with the high altitude service craft **900**. Moreover, the antenna assembly **375** can be vertically steered to shift between

20

being serviced by ATG base stations or high altitude service craft based on signal strength or other such factors in association with a handover managed between the ATG base stations and high altitude service craft (or vice versa). The high altitude service craft **900** may also include antennas focused toward the horizon (e.g., focusing energy in an area from the horizon to about 10 or 15 degrees below the horizon (from the perspective of the high altitude service craft **900**) and the service craft antenna assembly may also be vertically steerable to account for turning or banking of the high altitude service craft **900** in similar fashion to the way the antenna assembly **375** of the in-flight aircraft **330** is steerable (as described above). Thus, the high altitude service craft **900** may also use horizon-focused antenna assemblies for communication with aircraft, other drones and/or with the ground. Moreover, the same frequencies can be used for each of these links, and it may also be the same frequency used in the ground communication layer **320** given that the beams for such communication are steerable (e.g., employing spatial filtering and vertical beamsteering) to extend substantially parallel to the surface of the earth and avoid interference with communications in the ground communication layer **320**. In some cases, however, the high altitude service craft **900** may use a first frequency to communicate to aircraft and ground stations, and the aircraft (where it does not use high altitude service craft **900** for connectivity) may use a second frequency to communicate from the aircraft to ground and ground to ground.

The employment of the high altitude service layer **910** may effectively create a sandwich mesh architecture. High altitude service craft **900** may link to other high altitude service craft to provide a GB/s wireless backhaul network that may only selectively touch or access ground stations or satellites in a handful of places. The high altitude service craft **900** may therefore generally be above the weather and connections to the ground may be selectively made in areas that have good weather to minimize negative impacts of weather on communications at higher frequencies, whether RF or optical. Furthermore, at high altitudes, physics may enable ready use of free space optics or high frequency RF to further enhance network performance. Meanwhile, the antenna assembly **375** of the in-flight aircraft **330** is steerable+/−10 to 15 degrees from the horizon to selectively communicate with the ATG base stations (**350** and **355**), with other in-flight aircraft **330** and/or with the high altitude service craft **900**.

As an alternative to the architecture of FIG. **5**, in which separate receive and transmit elements are provided, some embodiments may employ a single steerable antenna element (or panel) that handles both transmit and receive functions by employing duplexing. By employing an antenna element that can handle both transmit and receive functions, the size, weight, number and cost of antenna elements employed may be reduced. Maximal ratio combining may also be employed. With employment of full duplexing, receiver filtering becomes important to allow signals to be differentiated. BAW filters, in-line cavity filters or a BAW duplexer may therefore be employed. A BAW duplexer may be a relatively straightforward option for such a full duplex solution.

FIG. **10** illustrates a full duplex radio architecture in accordance with a first option. In this regard, FIG. **10** shows an architecture for a relatively long blade antenna **1000** that may be provided in some embodiments. The antenna **1000** may include one or more elements **1010** (e.g., 10 in some cases) that may provide signals to a Butler combiner **1020**, which may be operably coupled to a multi-pole throw switch

US 9,730,077 B2

21

1030 (e.g., a ten pole switch). The switch 1030 may be operably coupled to a circulator 1040. The circulator 1040 may isolate signals among ports so that signals on port 1 go to port 2, signals on port 2 go to port 3, etc. The circulator 1040 may provide as much as 18 dB of isolation port-to-port with a relatively low insertion loss of 0.6 dB. The circulator 1040 may be operably coupled to a receive filter 1050 and ultimately to receiver circuitry 1060 via a low noise amplifier (LNA) 1054 and a switch 1058. In this architecture, the receive filter 1050 is in front of the LNA 1054 for enhanced receiver overload protection (e.g., for a transmit signal level at the LNA input of −34 dBm, overall noise figure may be 7.9 dB). The circulator 1040 is also operably coupled to transmitter circuitry 1070 through a switch 1072, a cavity filter 1080 and a power amplifier 1090.

FIG. 11 illustrates a full duplex radio architecture in accordance with a second option. In this regard, FIG. 11 shows an architecture for a relatively long blade antenna 1100 that may be provided in some embodiments. The antenna 1100 may include one or more elements 1110 (e.g., 10 in some cases) that may provide signals to a Butler combiner 1120, which may be operably coupled to a multipole throw switch 1130 (e.g., a ten pole switch). The switch 1130 may be operably coupled to a circulator 1140. The circulator 1140 may isolate signals among ports so that signals on port 1 go to port 2, signals on port 2 go to port 3, etc. The circulator 1140 may provide as much as 18 dB of isolation port-to-port with a relatively low insertion loss of 0.6 dB, as described above. However, in this example, an LNA 1154 is provided prior to a receive filter 1150. The receive filter 1150 is then operably coupled to the receiver circuitry 1160 via switch 1158. In this architecture, the receive filter 1150 is behind the LNA 1154 for reduced noise figure, but higher transmit signal level at the LNA 1154 (e.g., for a transmit signal level at the LNA input of +6 dBm, overall noise figure may be 6.1 dB). The circulator 1140 is also operably coupled to transmitter circuitry 1170 through a switch 1172, a cavity filter 1180 and a power amplifier 1190. In some alternative embodiments, either the architecture of FIG. 10 or the architecture of FIG. 11 could be duplicated with two duplexer elements replacing the circulators of each respective figure for an alternative approach.

Many modifications and other embodiments of the inventions set forth herein will come to mind to one skilled in the art to which these inventions pertain having the benefit of the teachings presented in the foregoing descriptions and the associated drawings. Therefore, it is to be understood that the inventions are not to be limited to the specific embodiments disclosed and that modifications and other embodiments are intended to be included within the scope of the appended claims. Moreover, although the foregoing descriptions and the associated drawings describe exemplary embodiments in the context of certain exemplary combinations of elements and/or functions, it should be appreciated that different combinations of elements and/or functions may be provided by alternative embodiments without departing from the scope of the appended claims. In this regard, for example, different combinations of elements and/or functions than those explicitly described above are also contemplated as may be set forth in some of the appended claims. In cases where advantages, benefits or solutions to problems are described herein, it should be appreciated that such advantages, benefits and/or solutions may be applicable to some example embodiments, but not necessarily all example embodiments. Thus, any advantages, benefits or solutions described herein should not be thought of as being critical, required or essential to all

22

embodiments or to that which is claimed herein. Although specific terms are employed herein, they are used in a generic and descriptive sense only and not for purposes of limitation.

What is claimed is:

1. An air-to-ground (ATG) network providing wireless communication to an in-flight aircraft capable of passing through various cells of the ATG network, the ATG network comprising:

a first ATG base station defining a first radiation pattern focusing energy toward the horizon;

a second ATG base station defining a second radiation pattern focusing energy toward the horizon; and

a plurality of additional ATG base stations, each of which defines a corresponding radiation pattern focusing energy toward the horizon,

wherein the first, second and additional ATG base stations are spaced apart from each other to define at least partially overlapping coverage areas to communicate with an antenna assembly on the in-flight aircraft in an ATG communication layer defined between a first altitude and a second altitude via the ATG network,

wherein a plurality of terrestrial base stations are configured to communicate primarily in a ground communication layer below the first altitude via a terrestrial communication network, and

wherein the first, second and additional ATG base stations are each configured to communicate in the ATG communication layer using the same radio frequency (RF) spectrum used by the terrestrial base stations in the ground communication layer.

2. The ATG network of claim 1, wherein a serving ATG base station from among the first, second and additional ATG base stations is in communication with the in-flight aircraft while being geographically located outside a coverage area of each of the terrestrial base stations in a portion of the ground communication layer above which the in-flight aircraft is located.

3. The ATG network of claim 1, further comprising a high altitude service layer disposed above the second altitude.

4. The ATG network of claim 3, wherein a high altitude service craft is disposed above the second altitude to support wireless communication with at least one asset outside the high altitude service layer.

5. The ATG network of claim 4, wherein the at least one asset comprises the in-flight aircraft in the ATG communication layer.

6. The ATG network of claim 4, wherein the at least one asset comprises a selected one of the first, second or additional ATG base stations.

7. The ATG network of claim 3, wherein a high altitude service craft is disposed above the second altitude to support wireless communication with a satellite.

8. The ATG network of claim 3, wherein a high altitude service craft is disposed above the second altitude to form an aircraft link with the in-flight aircraft in the ATG communication layer and a satellite link to a satellite.

9. The ATG network of claim 8, wherein the high altitude service craft forms an ATG link with a selected one of the first, second or additional ATG base stations.

10. The ATG network of claim 3, wherein a high altitude service craft is disposed above the second altitude to form an ATG link with a selected one of the first, second or additional ATG base stations and an aircraft link with the in-flight aircraft in the ATG communication layer.

11. The ATG network of claim 10, wherein the high altitude service craft forms a satellite link to a satellite.

US 9,730,077 B2

23

**12**. A system for supporting air-to-ground (ATG) wireless communication in various cells, the system comprising:

an in-flight aircraft including an antenna assembly;

a plurality of ATG base stations, each of which defines a corresponding radiation pattern focusing energy toward the horizon, wherein the base stations are spaced apart from each other to define at least partially overlapping coverage areas to communicate with the antenna assembly in an ATG communication layer defined between a first altitude and a second altitude via an ATG communication network;

a high altitude service craft disposed in a high altitude service layer above the second altitude; and

a plurality of terrestrial base stations configured to communicate primarily in a ground communication layer below the first altitude via a terrestrial communication network;

wherein the terrestrial base stations and the ATG base stations are each configured to communicate using the same radio frequency (RF) spectrum in the ground communication layer and ATG communication layer, respectively.

**13**. The system of claim **12**, wherein a serving ATG base station from among the plurality of ATG base stations is in

24

communication with the in-flight aircraft while being geographically located outside a coverage area of each of the terrestrial base stations in a portion of the ground communication layer above which the in-flight aircraft is located.

**14**. The system of claim **13**, the high altitude service craft supports wireless communication with at least one asset outside the high altitude service layer.

**15**. The system of claim **14**, wherein the at least one asset comprises the in-flight aircraft in the ATG communication layer.

**16**. The system of claim **14**, wherein the at least one asset comprises a selected one of the first, second or additional ATG base stations.

**17**. The system of claim **13**, wherein the high altitude service craft is disposed above the second altitude to support wireless communication with a satellite.

**18**. The system of claim **13**, wherein the high altitude service craft is disposed above the second altitude to form an aircraft link with the in-flight aircraft in the ATG communication layer and a satellite link to a satellite.

**19**. The system of claim **18**, wherein the high altitude service craft forms an ATG link with a selected one of the plurality of ATG base stations.

\* \* \* \* \*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 19th day of December, 2022, I caused this Non-Confidential Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Stephanie P. Koh, Esquire
Nathaniel C. Love, Esquire
Julia G. Tabat, Esquire
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

*Counsel for Appellees*

/s/ Lance A. Lawson
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*13,398*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: December 19, 2022        /s/ Lance A. Lawson
                                       *Counsel for Appellant*