# TABLE OF CONTENTS

**Document**                                                    **Appx Page Nos.**

Exhibit A: Gogo, Inc. Annual Report (Form 10-K) (Feb. 28, 2023)........... Appx9989-Appx10365

Exhibit B: Gogo, Inc. Q4 Quarterly Earnings Report (Form 8-K)
(Feb. 28, 2023) .......................................................................... Appx10366-Appx10380

Exhibit C: Gogo Inc. (GOGO) Q4 2022 Earnings Call Transcript, Seeking
Alpha (Feb. 28, 2023, 3:23 P.M. EST) ...................................... Appx10381-Appx10408

Exhibit D: "Business Breakdowns: Oakleigh Thorne – Gogo: Internet for
Private Jets," Colossus (June 22, 2022), Transcript................................... Appx10409-Appx10423

Exhibit E: Website capture of location of audio of Business Breakdowns
podcast, interview of Gogo's CEO, Oakleigh Thorne ............................... Appx10424-Appx10442

# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

**FORM 10-K**

---

(Mark One):

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

  **For the fiscal year ended December 31, 2022**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

  **For the transition period from _____ to _____**

**Commission File Number: 001-35975**

---



**Gogo Inc.**
(Exact name of registrant as specified in its charter)

| Delaware | 27-1650905 |
|---|---|
| (State or other jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**105 Edgeview Dr., Suite 300**
**Broomfield, CO 80021**
(Address of principal executive offices)
**Telephone Number (303) 301-3271**
(Registrant's telephone number, including area code)

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common stock, par value $0.0001 per share | GOGO | NASDAQ Global Select Market |
| Preferred Stock Purchase Rights | GOGO | NASDAQ Global Select Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☑  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.    Yes ☑  No ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐  No ☑

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant as of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, was $1,054,416,152 based upon the closing price reported for such date on the NASDAQ Global Select Market.

As of February 24, 2023, 127,910,134 shares of $0.0001 par value common stock were outstanding.

**Documents Incorporated By Reference**

Portions of the registrant's definitive Proxy Statement for its Annual Meeting of Stockholders scheduled to be held June 6, 2023 are incorporated by reference into Part III of this Form 10-K. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2022.

**Gogo Inc.**

**INDEX**

|  |  | Page |
|---|---|---|
| **Part I.** | | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 2. | Properties | 34 |
| Item 3. | Legal Proceedings | 34 |
| Item 4. | Mine Safety Disclosures | 34 |
| **Part II.** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 35 |
| Item 6. | Reserved | 36 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 52 |
| Item 8. | Financial Statements and Supplementary Data | 54 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 91 |
| Item 9A. | Controls and Procedures | 91 |
| Item 9B. | Other Information | 91 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 91 |
| **Part III.** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 93 |
| Item 11. | Executive Compensation | 93 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 93 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 94 |
| Item 14. | Principal Accounting Fees and Services | 94 |
| **Part IV.** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 95 |
| Item 16. | Form 10-K Summary | 99 |

1

Unless the context otherwise indicates or requires, as used in this Annual Report on Form 10-K for the fiscal year ended December 31, 2022, references to: (i) "we," "us," "our," "Gogo," or the "Company" refer to Gogo Inc. and its directly and indirectly owned subsidiaries as a combined entity, except where otherwise stated or where it is clear that the term means only Gogo Inc. exclusive of its subsidiaries; and (ii) "fiscal," when used in reference to any twelve-month period ended December 31, refers to our fiscal year ended December 31. Unless otherwise indicated, information contained in this Annual Report on Form 10-K is as of December 31, 2022. We have made rounding adjustments to reach some of the figures included in this Annual Report on Form 10-K and, unless otherwise indicated, percentages presented in this Annual Report on Form 10-K are approximate.

On December 1, 2020, we completed the previously announced sale of our commercial aviation ("CA") business to a subsidiary of Intelsat Jackson Holdings S.A. ("Intelsat") for a purchase price of $400.0 million in cash, subject to certain adjustments (the "Transaction"). As a result, all periods presented in this Annual Report on Form 10-K have been conformed to present the CA business as discontinued operations.

Upon the closing of the Transaction, we and Intelsat entered into a network sharing agreement (the "ATG Network Sharing Agreement"), pursuant to which we provide certain in-flight connectivity services on our ATG network to Intelsat, subject to certain revenue sharing obligations, and pursuant to which Intelsat has exclusive commercial aviation access to the ATG network in North America, subject to certain revenue guarantees.

### Cautionary Note Regarding Forward-Looking Statements

Certain statements in this report may constitute "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, without limitation, statements regarding our industry, business strategy, plans, goals and expectations concerning our market position, international expansion, future technologies, future operations, margins, profitability, future efficiencies, capital expenditures, liquidity and capital resources and other financial and operating information. When used in this discussion, the words "anticipate," "assume," "believe," "budget," "continue," "could," "estimate," "expect," "forecast," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "future" and the negative of these or similar terms and phrases are intended to identify forward-looking statements in this Annual Report on Form 10-K. Forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties that may cause actual results to differ materially. We describe risks and uncertainties that could cause actual results and events to differ materially under "Risk Factors," "Quantitative and Qualitative Disclosures about Market Risk," and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report. We undertake no obligation to update or revise publicly any forward-looking statements, whether because of new information, future events, or otherwise.

2

**Summary of Risk Factors**

The following summarizes the principal factors that make an investment in our company speculative or risky, all of which are more fully described in the Risk Factors section below. This summary should be read in conjunction with the Risk Factors section and should not be relied upon as an exhaustive summary of the material risks facing our business. The following factors could result in harm to our business, reputation, revenue, financial results and prospects, among other impacts:

*Risks Related to Our Business*

- our ability to continue to generate revenue from the provision of our connectivity services;

- our reliance on our key OEMs and dealers for equipment sales;

- the impact of competition;

- our reliance on third parties for equipment components and services;

- the impact of global supply chain and logistics issues and increasing inflation;

- our ability to expand our business outside of the United States;

- our ability to recruit, train and retain highly skilled employees;

- the impact of pandemics or other outbreaks of contagious diseases, including the COVID-19 pandemic, and the measures implemented to combat them;

- the impact of adverse economic conditions;

- our ability to fully utilize portions of our deferred tax assets;

- the impact of increased attention to climate change, ESG matters and conservation measures; and

- our ability to evaluate or pursue strategic opportunities.

*Risks Related to Our Technology and Intellectual Property*

- our ability to develop and deploy Gogo 5G, Global Broadband or other next generation technologies;

- our ability to maintain our rights to use our licensed 3Mhz of ATG spectrum in the United States and obtain rights to additional spectrum if needed;

- the impact of service interruptions or delays, technology failures, equipment damage or system disruptions or failures;

- the impact of assertions by third parties of infringement, misappropriation or other violations;

- our ability to innovate and provide products and services;

- our ability to protect our intellectual property rights;

- the impact of our use of open-source software; and

- the impact of equipment failure or material defects or errors in our software.

*Risks Related to Litigation and Regulation*

- our ability to comply with applicable foreign ownership limitations;

- the impact of government regulation of the internet and conflict minerals;

- our possession and use of personal information;

- risks associated with participation in the Federal Communications Commission's ("FCC") Reimbursement Program, should we decide to participate;

- our ability to comply with anti-bribery, anti-corruption and anti-money laundering laws;

- the extent of expenses, liabilities or business disruptions resulting from litigation; and

- the impact of global climate change and legal, regulatory or market responses to it.

3

*Risks Related to Our Indebtedness*

- the impact of our substantial indebtedness;

- our ability to obtain additional financing to refinance or repay our existing indebtedness;

- the impact of restrictions and limitations in the agreements and instruments governing our debt;

- the impact of increases in interest rates;

- the impact of a substantial portion of our indebtedness being secured by substantially all of our assets; and

- the impact of a downgrade, suspension or withdrawal of the rating assigned by a rating agency.

*Risks Related to Our Common Stock*

- the volatility of our stock price;

- our ability to fully utilize our tax losses;

- the dilutive impact of future stock issuances;

- the impact of our stockholder concentration and of our CEO and Chairman of the Board being a significant stockholder;

- our ability to fulfill our obligations associated with being a public company; and

- the impact of anti-takeover provisions, ownership provisions and certain other provisions in our charter, our bylaws, Delaware law, and our existing and any future credit facilities.

4

**Company Overview and Strategy**

*Our Mission and our Industry's Evolution*

Gogo is the world's largest provider of broadband connectivity services for the business aviation market. We have served this market for more than 25 years. Our mission is to enrich the lives of passengers and the efficiency of operators with the world's best business aviation in-flight connectivity and customer support. We have always sought to provide the best connectivity for the business aviation market regardless of technology, and we have a successful history of doing so. Until recently, we focused primarily on business aviation aircraft in North America, which comprise approximately 63% of the worldwide business aviation fleet, and we are the leading provider of in-flight connectivity in that market. Gogo started in analogue air-to-ground ("ATG") technology in the late 1990s, then, as analogue cellular backhaul disappeared, migrated to narrowband satellite connectivity in the early 2000s, then back to ATG with our digital broadband 3G and 4G networks beginning in 2010. We expect to commercially launch our fourth ATG network – Gogo 5G – in the fourth quarter of 2023. We also continue to provide narrowband satellite services to customers in North America and internationally through distribution agreements with satellite providers. As of December 31, 2022, we had approximately 6,900 ATG business aircraft online of which approximately 3,300 were equipped with our AVANCE platform and approximately 3,600 with Gogo Biz, our legacy ATG broadband system.

The business aviation in-flight connectivity market is evolving again due to advancements in technology and several change catalysts. The most significant advancement in technology driving change in our industry today is the introduction of low earth orbit ("LEO") satellite technology, which provides, among other things, a global service offering and significantly higher capacity and lower latency than alternatives available today. We believe that demand for in-flight connectivity will continue to increase because of changes in the demographics of our customer base, the proliferation of social applications and lifestyle changes that remain in a post-COVID world such as remote work and use of videoconferencing. Further, 66% of business aircraft in North America were manufactured before IFC was available as a linefit option. We expect approximately 25% of these aircraft will be replaced in the next five to seven years with new aircraft coming pre-installed with in-flight connectivity given customer expectations today.

We view all these significant changes as opportunities to leverage our technological know-how and deep understanding of the business aviation in-flight connectivity market to drive greater penetration of our solutions in our markets over the next five to ten years. As outlined below, we have refined our strategy to capture these opportunities, including an announcement in May 2022 that we are preparing to launch the first global broadband service designed for business aviation ("Global Broadband"). The service will use an electronically steered antenna ("ESA"), specifically designed with Hughes Network Systems, LLC ("Hughes") to address a broad range of business aviation aircraft, operating on a LEO satellite network operated by Network Access Associates, Ltd. ("OneWeb"). We believe that Global Broadband, in combination with or as an alternative to our ATG systems, will allow us to increase our penetration of the North American heavy jet market and provide an upgrade path for our existing ATG customer base. In addition, Global Broadband will allow us to penetrate the business aviation market outside of North America, where fewer than 6% of business aviation aircraft are installed with in-flight connectivity systems.

*Now and Next Strategy*

Given the industry evolution described above, we have refined our strategy, ultimately creating what we refer to as the "Now and Next Strategy". The Now and Next Strategy positions Gogo to penetrate the rest of the world business aviation market while maintaining and strengthening our leadership position in North America. The principal elements of our Now and Next Strategy include the following:

- Leveraging our deep understanding of the business aviation in-flight connectivity market to accelerate growth by (i) expanding our total addressable market through the broadening of the Gogo product line to meet the needs of every segment of the business aviation market; (ii) extending customer use of our services by driving penetration of our AVANCE platform, enhancing ATG networks, and providing easy upgrade paths to Global Broadband and other new technologies; and (iii) providing equivalent or better service at a lower cost of ownership than competitive products to all segments of the business aviation market;

- Preserving and expanding our relationships with Original Equipment Manufacturers ("OEMs"), our aftermarket dealers, and fractional jet operators by providing superior customer support, products and services;

- Maintaining a continuous culture of improvement by, among other things, building knowledge and maintaining flexibility to migrate to new hardware and network technologies as they evolve; and

- Pursuing a balanced capital allocation strategy focused on maintaining adequate liquidity, investing in strategic initiatives to drive competitive positioning and financial value, maintaining an appropriate level of leverage and enhancing shareholder value.

In executing the Now and Next Strategy, we will continue to adhere to the product development principles that have guided us historically. These include, among other things, (i) maintaining product offerings that fit the distinct needs of each segment of the business aviation market based on geography, mission, size of aircraft, and passenger preferences; (ii) building customer loyalty by providing easy and low-cost upgrade paths for our customers as their demand for capacity grows; and (iii) running all of our offerings on a single software-centric operating system via AVANCE, which allows for easy software upgrades and multiple-network access points to the aircraft allowing for easy upgrades to superior networks as technology evolves.

*Competitive Differentiators*

We believe Gogo is uniquely positioned to thrive in this dynamic industry environment, due in part to the competitive differentiators described below:

**Our Product Platform**. Our product platform includes three components – networks, antennas, and airborne equipment and software, each of which is discussed in greater detail below. The comprehensiveness and flexibility in our product platform allows us to align our value proposition with our customers' priorities and identify solutions based on geography, mission, size of aircraft and passenger preference.

**Our Distribution Relationships**. We believe that our distribution network is unmatched in our industry. Our distribution partners include every OEM of business aviation aircraft and an aftermarket network of approximately 120 dealers, many of whom we have worked with for decades. We have established trusted relationships with our distribution partners and a proven track record of generating revenues and profits for them, and they have trust and confidence in our ability to continue to do so. This facilitates our sales and our speed to market as our distribution partners are willing to invest in marketing and certification efforts for our equipment.

**Our Innovative Culture**. We continuously innovate and have a strong track record of innovation in our networks. As of February 24, 2023, we held approximately 457 U.S. and international patents, most of which relate to network technology. We pioneered and have led innovation in our industry for nearly 30 years, as evidenced by the three proprietary ATG network technologies that we have deployed for the business aviation market. We expect to commercially launch our fourth ATG network – Gogo 5G – in the fourth quarter of 2023.

*Products, Services, Customers and Customer Support*

We focus exclusively on selling in-flight connectivity to the business aviation market and implement our value proposition of offering the best products and services through a comprehensive portfolio consisting of our in-flight systems, in-flight services, aviation partner support, engineering, design and development services and production operations functions.

**In-Flight Systems**. Our customers have a broad range of equipment choices for their in-flight systems, which allows us to provide a solution based on geography, mission, size of aircraft and passenger preference. Key components of our in-flight systems include:

*Antennas*. Gogo has developed three families of ATG antennas, all of which act in pairs and are mounted on the belly of the aircraft. Gogo currently deploys omni-directional antennas and dual directional antennas, both of which support customers utilizing our 3G and 4G networks. In connection with the launch of Gogo 5G, Gogo will introduce the MB-13 antenna, which is capable of accessing Gogo's 4 MHz of licensed spectrum in the 800 MHz band and unlicensed spectrum in the 2.4 GHz band at the same time, enabling greater throughput than our omni-directional and dual directional antennas.

In connection with the launch of Global Broadband, Gogo is working with Hughes to design an ESA that will fit on a very broad range of business aviation aircraft – from light jets and turboprops to large-cabin jets. The ESA is expected to be delivered in the second half of 2024 and will operate on OneWeb's high speed, low latency LEO satellite network.

*Airborne Equipment and Software*. Our networks and systems are designed to provide the best in-flight Internet experience and highest network and system availability across the broadest range of aircraft wherever they fly, and a growing number of our installed aircraft are on the AVANCE platform. The AVANCE platform is software-centric and designed to be extensible as it includes hardware built with common components that operate on a single operating system across multiple devices. Approximately 80% of the components included in AVANCE L5™ and AVANCE L3™ (a compact version of AVANCE L5 designed for smaller aircraft) are common across the two systems. Because of this extensibility, we can add new products, features and options; we can increase connectivity speeds by augmenting spectrum; and we can add proprietary or third-party ATG or satellite networks, all with minimal or no hardware or aircraft modifications. For example, existing AVANCE customers who wish to add Global Broadband service will only have to install an ESA on top of their aircraft and run a power cable and ethernet cable to the AVANCE box inside the aircraft. For customers operating AVANCE-equipped aircraft in North America, AVANCE's unique multi-bearer capability will allow Gogo to combine capacity from its ATG network and the OneWeb LEO satellite network to provide more capacity than stand-alone LEO satellite networks can provide. We expect AVANCE's common componentity to facilitate standardization of hardware and FAA certifications across multiple products, spectrum frequencies and networks, and we expect that such standardization will in turn increase efficiency and improve quality in functions that include supply chain, production operations and customer support. Of the

6

AVANCE aircraft online at December 31, 2022, approximately 2,100 were equipped with AVANCE L5 and approximately 1,200 with AVANCE L3.

**In-Flight Services (Service Plans)**. We provide a wide range of in-flight services for passengers, flight and cabin crews and our aviation partners. We offer a variety of connectivity services tailored to our various networks and technologies that are generally priced on a per-aircraft per-month basis. We offer service plans ranging from unlimited data usage to a pay-as-you-go monthly consumption plan and offer alongside these data plans voice rates, inflight entertainment options such as Gogo Vision, and other service features.

**Customers and Distribution Partners**. We provide in-flight connectivity services to a variety of customers needing connectivity, but our end users are primarily aircraft owners/operators. As of December 31, 2022, our market was comprised of approximately 24,700 business aircraft in North America, of which approximately 30% have broadband connectivity, and approximately 14,400 business aircraft in the rest of the world, of which fewer than 6% have broadband connectivity. As of December 31, 2022, we had approximately 4,200 customers. Out top ten customers accounted for approximately 20% of our 2022 service revenue (excluding Intelsat), and no customer accounted for more than 10% of our revenue in 2022.

We also sell directly to every OEM of business aviation aircraft including Bombardier, Dassault Falcon, Embraer, Gulfstream, Pilatus and Textron Aviation. In the aftermarket, we sell through a global distribution network of approximately 120 independent dealers who are certified by the Federal Aviation Administration ("FAA") as Maintenance and Repair Organizations. Our independent dealers market, resell and obtain FAA-required supplemental type certificates ("STC") for our equipment. Our customers also include fractional jet operators such as Flexjet and NetJets, charter operators such as Wheels Up, corporate flight departments and individuals owning aircraft.

**Infrastructure**. The infrastructure supporting our in-flight connectivity services consists of our networks, towers, and data centers, each of which is described in greater detail below.

*Networks and Towers*. We have developed, deployed and operated our own networks for more than 25 years, resulting in experience and know-how that we believe is unmatched by any other provider in our industry. We hold the exclusive license to 4MHz of U.S. nationwide spectrum dedicated to ATG use, as well as the exclusive rights to the same spectrum in Canada. We currently operate a terrestrial network using 3 MHz of licensed spectrum in the 800 MHz band and approximately 260 terrestrial cell sites in the lower 48 states and parts of Alaska and Canada. All but one of our cell sites are leased from tower operators. Our terrestrial network targets approximately 24,700 business aircraft based in North America. As of December 31, 2022, this network supported 3.1 Mbps 3G service and 9.8 Mbps 4G service. Our proprietary ATG network provides lower latency and requires less powerful antennas than the networks operated by our geosynchronous ("GEO") satellite competitors and enables us to avoid the interference issues that can accompany use of shared, unlicensed spectrum. We expect to commercially launch our fourth ATG network – Gogo 5G – in the fourth quarter of 2023. We have announced completion of key Gogo 5G milestones including finishing construction of our initial 150 cell sites that comprise our 5G terrestrial network in the lower 48 states, obtaining a STC and Parts Manufacturing Approval ("PMA") for the 5G airborne antenna system, qualifying the airborne line replaceable unit ("LRU") for flight testing and signing an agreement with Jet Edge as our 5G launch partner. Customers who elect to not upgrade to Gogo 5G may continue to use our 3G and 4G service over our ATG networks in North America. The 3G and 4G service will also serve as a redundancy network and performance enhancement mechanism for Gogo 5G.

In addition, in May 2022 we announced that we have partnered with OneWeb to utilize their global LEO satellite network. They plan to complete launch of their network in April of 2023 and be ready to start offering aero service in 2024. In addition to the significant performance enhancements provided by the LEO network, Global Broadband expands our total addressable market by approximately 14,400 aircraft in the rest of the world.

*Ground Network and Data Centers*. We lease an extensive, predominantly fiber-optic network to connect our approximately 260 cell sites to our two data centers, the Internet and cloud-based services, and our network operations center ("NOC"). Our data centers and cloud-based services provide redundant telecommunications connections to the Internet and contain numerous servers that enable the expansive set of features that we offer. The NOC monitors daily network operations, conducts network diagnostics and coordinates responses to any performance issues. We augment our ability to monitor, maintain and update our in-flight systems while aircraft are on the ground with a terrestrial modem utilizing 3G, 4G and Wi-Fi wireless service.

**Support Organizations**. We strive to deliver a premium customer experience. We accomplish this through the support of the following functions.

*Customer Support*. We have created a support and service organization designed to provide operational assistance and comprehensive analytics to our customers. Our customer support organization is grouped into three subfunctions that include account teams, operational support, and comprehensive analytics. These teams assist with, among other things, installations, troubleshooting and system activations, and data analysis to evaluate our system and operational performance. We have specialized support for our OEM distribution partners and dealers who are responsible for obtaining the FAA certifications required for installation of our equipment on aircraft, and we support them in obtaining such certifications and installing the equipment through our aircraft

7

application engineers. We also deploy our field service engineering teams in key locations across the United States and Europe to support our customers' flight departments following installation of our equipment. Both the dealer network and customer flight departments have access to our technical and logistical support 24 hours a day, seven days a week.

*Engineering, Design and Development ("ED&D")*. Our large in-house ED&D operation is responsible for translating business requirements into products that comply with rigorous avionics certification requirements. Its capabilities include: (i) a radiofrequency engineering team with expertise in antenna specifications, radio technology, spectrum analysis, network design and regulatory requirements; (ii) an airborne platform development team which manages the design, development and testing of airborne equipment and its integration with ground systems and leads FAA certification efforts; (iii) a systems engineering team that manages all aspects of turning business requirements into technical specifications and is responsible for our program management process; (iv) an application development and business systems organization team that manages development of our internal business systems and the product extensions that sit on the AVANCE platform; and (v) a network engineering team that designs, implements and manages our network and data center infrastructure, security and core network functions.

*Production Operations*. Our manufacturing objective is to produce superior quality products that conform to avionics specifications while providing the best value to our customers. Given our highly specialized technology and required production levels, we design, assemble and test our airborne LRUs in-house, while relying on third parties to manufacture specific components based on our design specifications to maximize production efficiencies. We retain the intellectual property associated with the airborne LRUs. We also rely on third parties to manufacture our antennas and we generally share antenna design responsibilities and intellectual property with these vendors. Our manufacturing processes include internally designed test fixtures and software that we and our third-party manufacturers employ at all levels of manufacturing. Our manufacturing-related business processes – from sales forecasts to supply chain activities to shipping – are integrated and automated within our enterprise resource planning tools. Our manufacturing and repair facilities are FAA-certified.

### Competition

We compete against both equipment-providers and GEO- and LEO- satellite based telecommunications service providers, as well as resellers of the above, to the business aviation market, including Honeywell Aerospace, Collins Aerospace, Satcom Direct, Inmarsat, ViaSat and Starlink. In addition, SmartSky Networks, which in 2014 announced that it planned to launch an ATG network in the continental United States in 2016, announced in late 2022 that the network is "live nationwide." A number of our competitors are focused on servicing the heavy jet market through GEO satellite services. We may in the future face competition from other operators of LEO or other non-GEO satellite networks. We believe that the principal points of competition in our market are technological capabilities, price, geographic coverage, customer service, product development, conformity to customer specifications, regulatory compliance, quality of support after the sale and timeliness of delivery and installation.

### Licenses and Regulation

*Federal Aviation Administration*

The FAA prescribes standards and certification requirements for the manufacturing of aircraft and aircraft components, and certifies repair stations to perform aircraft maintenance, preventive maintenance and alterations, including the installation and maintenance of aircraft components. Each type of aircraft operated in the United States under an FAA-issued standard airworthiness certificate must possess an FAA Type Certificate, which constitutes approval of the design of the aircraft type based on applicable airworthiness standards. When a party other than the holder of the Type Certificate develops a major modification to an aircraft already type-certificated, that party must obtain an FAA-issued STC approving the design of the modified aircraft type. The dealers and OEMs to which we sell our equipment are generally responsible for obtaining STCs for each aircraft type on which our equipment will be installed, and we support them in those efforts. Separate STCs typically are required for different configurations of the same aircraft type, such as when they are configured differently for different owners and operators.

After an STC is obtained, a manufacturer desiring to manufacture components to be used in the modification covered by the STC must apply to the FAA for a PMA, which permits the holder to manufacture and sell components manufactured in conformity with the PMA and its approved design and data package. In general, each initial PMA is an approval of a manufacturing or modification facility's production quality control system. PMA supplements are obtained to authorize the manufacture of a particular part in accordance with the requirements of the pertinent PMA, including its production quality control system. We routinely apply for and receive such PMAs and supplements.

Certain of our FCC licenses are conditioned upon our ability to obtain from the FAA a "No Hazard Determination" for our cell sites, which indicates that a proposed structure will not, if built as specified, create a hazard to air navigation. When building or altering certain cell sites, we may first be required to obtain such a determination.

Our business depends on our continuing access to, or use of, these FAA certifications, authorizations and other approvals, and our employment of, or access to, FAA-certified engineering and other professionals.

8

In accordance with these certifications, authorizations and other approvals, the FAA requires that we maintain, review and document our quality assurance processes. The FAA may visit our facilities at any time as part of our agreement for certification as a manufacturing facility and repair station to ensure that our facilities, procedures and quality control systems continue to meet FAA requirements. In addition, we are responsible for informing the FAA of significant changes to our organization and operations, product failures or defects, and any changes to our operational facilities or FAA-approved quality control systems. Other FAA requirements include training procedures and drug and alcohol screening for safety-sensitive employees working at or our facilities or on aircraft.

### Foreign Aviation Regulation

According to the Convention on International Civil Aviation, the airworthiness of U.S.-registered and FAA type-certificated aircraft on which FAA-certified Gogo equipment is installed is recognized by civil aviation authorities ("CAAs") worldwide that are signatories to that Convention. As a result, Gogo does not expect to require further airworthiness certification formalities in countries outside of the United States for U.S.-registered aircraft that already have an STC issued by the FAA covering Gogo equipment. For aircraft registered with a CAA of a country other than the United States, the installation of Gogo equipment requires airworthiness certification from an airworthiness certification body. Typically, the CAA of the country in which the aircraft is registered is responsible for ensuring the airworthiness of any aircraft modifications under its authority.

The FAA holds bilateral agreements with certification authorities around the globe. Bilateral agreements facilitate the reciprocal airworthiness certification of civil aeronautical products that are imported/exported between two signatory countries. A Bilateral Airworthiness Agreement ("BAA") or Bilateral Aviation Safety Agreement ("BASA") with Implementation Procedures for Airworthiness provides for airworthiness technical cooperation between the FAA and its counterpart CAA. Under a BAA or BASA, the CAA of the aircraft's country of registration generally validates STCs issued by the FAA and then issues a Validation Supplemental Type Certificate. For countries with which the FAA does not have a BAA or BASA, Gogo must apply for certification approval with the CAA of the country in which the aircraft is registered. In order to obtain the necessary certification, Gogo will be required to comply with the airworthiness regulations of the country in which the aircraft is registered. Failure to address all foreign airworthiness and aviation regulatory requirements at the commencement of each aircraft operator's service in any country in which it registers aircraft when there are no applicable bilateral agreements may lead to significant additional costs related to certification and could impact the timing of our ability to provide our service on such aircraft.

### U.S. Department of Transportation

The U.S. Department of Transportation ("DOT") established an Advisory Committee on Accessible Air Transportation to negotiate and develop a proposed rule concerning accommodations for passengers with disabilities in three basic areas, including in-flight entertainment ("IFE") and closed captioning of IFE. The Committee issued a resolution in late 2016 that included its recommendations to the DOT for a rule on IFE. However, since a final rule on IFE has not yet been issued, it is unclear how, if at all, it may impact Gogo. According to the Agency Rule List – Spring 2022 posted by the Office of Information and Regulatory Affairs, Office of Management and Budget, the rulemaking about accessible IFE is a long-term action.

### Federal Communications Commission

Under the Communications Act of 1934, as amended (the "Communications Act"), the FCC licenses the spectrum that we use and regulates the construction, operation, acquisition and sale of our wireless services. The Communications Act and FCC rules also require the FCC's prior approval of the assignment or transfer of control of an FCC license, or the acquisition, directly or indirectly, of more than 25% of the equity or voting control of Gogo by non-U.S. individuals or entities.

Our various services are regulated differently by the FCC. For example, we provide some of our voice and data services (not including Gogo Biz or AVANCE) by reselling the telecommunications services of two satellite operators. Because we provide these services on a common carrier basis, we are subject to the provisions of Title II of the Communications Act, which require, among other things, that the charges and practices of common carriers be just, reasonable and non-discriminatory. In addition, we provide an interconnected voice over Internet protocol ("VoIP") service. The FCC applies many, but not all, of the same regulatory requirements to interconnected VoIP services as it does to common carrier telecommunications services.

We offer connectivity service in the United States to business aviation aircraft and, pursuant to the ATG Network Sharing Agreement, to certain commercial aircraft operated by Intelsat's airline customers, through our own facilities, using our ATG License, a nationwide commercial air-ground radiotelephone license in the 800 MHz band. We obtained and paid for this spectrum through an auction conducted by the FCC. See "ATG License Terms and Conditions."

The FCC's current rules classify broadband Internet access service as a lightly regulated, non-common carrier "information service," and remove virtually all of the previously imposed network neutrality restrictions on blocking access to lawful content, applications, services or non-harmful devices; impairing or degrading lawful Internet traffic on the basis of content, applications, services or non-harmful devices; favoring some lawful Internet traffic over other lawful traffic in exchange for consideration of any kind; or prioritizing the content and services of broadband providers' affiliates. We remain subject to certain modified transparency obligations that require disclosure of network management practices, performance, and commercial terms. To the extent the FCC

further restricts reasonable network management, or to the extent network neutrality proponents prevail on the adoption of further network neutrality restrictions, our business may be affected.

Our Internet access service is also subject to the FCC's data roaming rules, which require commercial mobile data service ("CMDS") providers like Gogo to negotiate roaming arrangements with any requesting facilities-based, technologically compatible providers of CMDS. The rules do not give other providers the right to install equipment on Gogo-equipped aircraft and do not require the Gogo service to be provided on a discounted basis, although the arrangement must be "commercially reasonable." The rules allow us to take reasonable measures to safeguard the quality of our service against network congestion that may result from roaming traffic.

In addition, most of our services are subject to various rules that seek to ensure that the services are accessible to persons with disabilities, including requirements related to the pass-through of closed captioning for certain IP-delivered video content offered through our Gogo Vision.

In addition to the two ATG licenses, we hold microwave licenses that are used for backhaul in our terrestrial network and an authorization for the provision of voice and data services between the United States and foreign points.

### ATG License Terms and Conditions

The FCC issued our ATG License on October 31, 2006, for a renewable 10-year term. We have satisfied our obligation under the license to provide "substantial service" to aircraft, and on January 25, 2017, we received confirmation from the FCC that the license has been renewed until October 31, 2026.

Our 1 MHz ATG license obtained in 2013 from LiveTV Airfone, LLC was also originally issued on October 31, 2006, for a renewable 10-year term, although there is no "substantial service" obligation that attaches to this license. Our application to renew our license was subsequently granted for an additional 10-year term. On August 3, 2017, the FCC released an order that, among other things, revised the wireless license renewal rules. As a result of this order, which applies to the industry generally, all licensees will need to make a showing (or certification) at renewal to demonstrate that the licensee provided and continues to provide service to the public. Because the 1 MHz ATG license has no construction or substantial service requirement, it is not currently clear what level and length of service the FCC will find adequate when considering the next renewal of the 1 MHz ATG license in 2026.

Our two ATG licenses contain certain conditions that require us to comply with all applicable FCC and FAA rules as well as all bilateral agreements between the United States and Canada and the United States and Mexico regarding the frequencies that are allocated for ATG services. These agreements apply to our use of the spectrum in areas adjacent to the United States' northern and southern borders and in and out of Canadian and Mexican airspace.

A bilateral ATG spectrum coordination agreement between the U.S. and Canada has been negotiated and approved and a bilateral agreement between the United States and Mexico is pending. In 2012, Industry Canada issued to our Canadian subsidiary a subordinate license that allows us to use Canadian ATG spectrum of which SkySurf Communications Inc. is the primary licensee, and in 2019 the primary license was renewed for an eight-year term expiring June 29, 2027. In 2012, we entered into a license agreement with SkySurf (the "License Agreement"), which commenced on August 14, 2012 and was recently renewed for a second ten-year term expiring July 24, 2032. Provided that the primary spectrum license agreement issued by Industry Canada (now Innovation, Science and Economic Development Canada or "ISED") to SkySurf remains in effect on July 24, 2032, the License Agreement is renewable at our option for a further five-year term. The term of the License Agreement, including the second 10-year term and any renewals, is contingent on the effectiveness of the primary spectrum license.

Any future coordination agreement with Mexico and/or a Mexican ATG licensee could affect our ability to provide our broadband Internet service in the border areas using our current cell sites at current operating power levels and could affect our ability to establish or maintain ATG service in the border areas as aircraft fly into and out of Mexican airspace.

### Equipment Certification

We may not lease, sell, market or distribute any radio transmission equipment used in the provision of our services unless such equipment is certified by the FCC as compliant with the FCC's technical rules. All certifications required for equipment currently used in the provision of our services have been obtained.

### Privacy and Data Security-Related Regulations

We collect personal information, such as name, address, e-mail address and credit card information, directly from our users when they register to use our services, along with certain identifiers associated with devices using our services. We also may obtain information about our users from third parties or create records that may be personal information in connection with our services. We use the information that we collect and create to, for example, consummate their purchase transaction, customize and personalize advertising and content for our users and enhance the entertainment options when using our service. Our collection, protection, disclosure and use of such information are required in some circumstances to comply with our privacy policies, applicable law, and our contractual obligations to aviation partners and other third parties, as well as industry standards such as the Payment Card Industry Data Security Standard.

10

Notwithstanding that broadband Internet access is currently classified as a Title I information service, we must continue to comply with certain Communications Act and FCC privacy and data security rules for our services, including certain provisions applicable to customer proprietary network information ("CPNI"). The FCC is currently considering additional CPNI and cybersecurity requirements, which may subject the Company to additional compliance obligations.

We are also subject to other federal and state consumer privacy and data security requirements. For example, Section 5 of the Federal Trade Commission ("FTC") Act prohibits "unfair or deceptive acts or practices in or affecting commerce." Although the FTC's authority to regulate the non-common carrier services offered by communications common carriers has not been fully delineated, the FTC may have jurisdiction over some or all of our services. The FTC has brought enforcement actions under the FTC Act against companies that among other things: (1) collect, use, share or retain personal information in a way that is inconsistent with the representations, commitments, and promises that they make in their privacy policies and other public statements; (2) have privacy policies that do not adequately inform consumers about the company's actual practices; and (3) fail to reasonably protect the security, privacy and confidentiality of nonpublic consumer information.

We may also be subject to state laws pertaining to privacy and data security, such as the "mini-FTC Acts," which prohibit unfair or deceptive acts or practices, along with data security breach notification laws requiring entities holding certain personal data to provide notices in the event of a breach of the security of that data. A few states have also imposed specific data security obligations. These state mini-FTC Acts, data security breach notification laws, and data security obligations may not extend to all of our services and their applicability may be limited by various factors, such as whether an affected party is a resident of a particular state.

Certain states have also enacted specific privacy laws to which we may be subject. For example, the California Consumer Privacy Act ("CCPA") took effect January 1, 2020 and provides broad new privacy rights for California consumers, including, among others, the right to obtain copies of their personal information collected in the past 12 months, the ability to opt out from the sale of personal information and the right to demand deletion of personal information. The CCPA also imposes compliance requirements on companies that do business in California and collect personal information from consumers, including, among others, notice, consent and service provider requirements. The CCPA also provides for civil penalties for violations as well as a private right of action for data breaches that may increase data breach litigation. The California Office of the Attorney General has published final regulations to implement portions of the CCPA. In addition, in November 2020 California voters passed the California Privacy Rights Act ("CPRA") ballot initiative, which introduced significant amendments to the CCPA. The CPRA went into effect on January 1, 2023, and new regulations are expected to take effect in 2023.

Other states have enacted privacy laws: the Virginia Consumer Data Protection Act ("VCDPA") went into effect on January 1, 2023, the Colorado Privacy Act and the Connecticut Data Privacy Act will take effect on July 1, 2023 and the Utah Consumer Privacy Act will take effect on December 31, 2023. These laws provide broad new privacy rights for consumers in these states, including the right to opt out of targeted advertising and certain profiling activities. Regulations relating to the Colorado Privacy Act are expected to be finalized in the course of 2023.  Depending on these developments, the measures we are required to take to comply with these laws may be significant.

Congress and other state legislatures have also been considering additional legislation relating to privacy and data breaches.  Should any additional laws be enacted, they could affect our business.

To the extent we collect personal information of residents of other countries, we may be subject to the data protection regulations of the relevant countries. On May 25, 2018, the General Data Protection Regulation ("GDPR") of the European Union ("EU") took effect, and it has imposed more restrictive privacy-related requirements for entities outside the EU that process personal information about European data subjects. EU member states also have some flexibility to supplement the GDPR with their own laws and regulations and may apply stricter requirements for certain data processing activities. Additionally, in Canada, the Personal Information Protection and Electronic Documents Act of 2000 ("PIPEDA") and substantially similar provincial laws may impose data privacy and security obligations on the processing of personal data. The regulation of data privacy and security in other jurisdictions continues to evolve.

In addition, certain countries have laws that restrict the transfer of personal information outside of such countries. For example, Switzerland, the United Kingdom and the member states of the EU impose restrictions on transferring such data to countries, including the U.S., that they do not deem to offer a similar standard of protection as they require. Certain mechanisms apply under Swiss, United Kingdom and EU member state laws that permit the cross-border transfer of personal information to countries that are not deemed adequate, such as the United States. Additionally, on July 16, 2020, the European Court of Justice (the highest EU court) ruled the EU-US privacy shield to be an invalid data transfer mechanism, confirmed that the Model Standard Contractual Clauses ("SCCs") remain valid, and left unaddressed some issues regarding supplementary measures that may need to be taken to support transfers. On September 27, 2021, new versions of the SCC went into effect. Depending on the supplementary measures that may need to be taken to support transfers and implement the SCC, our ability to lawfully transfer personally identifiable information out of relevant jurisdictions to the United States or other jurisdictions may be impacted.

11

Other countries, such as Australia, Brazil, China, India and Russia have also implemented, amended or been considering legislation regarding data protection, data security, breach notification and data transfers/localization. Such laws may affect our business and, should any additional laws be enacted in countries in which we do business, those laws may also affect our business.

### Truth in Billing and Consumer Protection

The FCC's Truth in Billing rules require full and fair disclosure of all charges on customer bills for telecommunications services, except for broadband Internet access services. Thus, these rules apply to our satellite-based services. This disclosure must include brief, clear and non-misleading plain language descriptions of the services provided. States also have the right to regulate wireless carriers' billing; however, we are not currently aware of any states that impose billing requirements on ATG services.

### CALEA

The FCC has determined that facilities-based broadband Internet access providers, which include Gogo, are subject to the Communications Assistance for Law Enforcement Act, or CALEA, which requires covered service providers to build certain law enforcement surveillance assistance capabilities into their communications networks and to maintain CALEA-related system security policies and procedures. We have implemented such policies and procedures and, based upon our periodic self-assessments, we believe that our network is compliant with CALEA.

### FCC Secure and Trusted Communications Networks Reimbursement Program (the "FCC Reimbursement Program")

On July 15, 2022, the Company was notified that it was approved for participation in the FCC Reimbursement Program, designed to reimburse providers of advanced communications services for reasonable costs incurred in the required removal, replacement, and disposal of covered communications equipment or services, that have been deemed to pose a national security risk, from their networks. Pursuant to the FCC Reimbursement Program, the FCC approved up to approximately $333 million in reimbursements to the Company to cover documented and approved costs to (i) remove and securely destroy all ZTE communications equipment and services in the Company's terrestrial U.S. networks and replace such equipment and (ii) remove and replace certain equipment installed on aircraft operated by the Company's ATG customers that is not compatible with the terrestrial equipment that will replace ZTE equipment. Due to a shortfall in the amount appropriated by Congress to fund the FCC Reimbursement Program, approximately $131 million of the approved amount is currently allocated to the Company under the program. If Congress appropriates additional funds for this purpose, the allocations of the Company and other approved applicants will be increased *pro rata*. Program participants are subject to a number of conditions and requirements under the FCC's rules including a requirement that they submit their first reimbursement request by July 14, 2023 and certify that they have developed a plan to permanently remove, replace and dispose of covered equipment or services within one year following the first reimbursement request. The rules permit participants to petition the FCC for one or more six-month extensions of the completion deadline. The Company has not yet determined whether it will participate in the FCC Reimbursement Program.

### Intellectual Property

We rely on a combination of intellectual property rights, including trade secrets, patents, copyrights, trademarks and domain names, as well as contractual restrictions to protect intellectual property and proprietary technology owned or used by us.

We have patented certain of our technologies in the United States and certain countries outside of the United States. As of February 24, 2023, we held U.S. patents expiring on dates ranging from June 2023 to January 2041 and foreign patents expiring on dates ranging from November 2024 to August 2039. We do not believe that our business is dependent to any material extent on any single patent or group of patents that we own. We also have a number of patent applications pending both in and outside of the United States and we will continue to seek patent protection in the United States and certain other countries to the extent we believe such protection is appropriate and cost-effective.

We consider our brands to be important to the success of our business and our competitive position. We rely on both trademark registrations and common law protection for trademarks. Our registered trademarks in the United States and certain other countries include, among others, "Gogo," "Gogo Biz" and "Gogo Vision," although we have not yet obtained registrations for our most important marks in all markets in which we currently do business or intend to do business in the future. Generally, the protection afforded for trademarks is perpetual, if they are renewed on a timely basis, if registered, and continue to be used properly as trademarks.

We license or purchase from third parties technology, software and hardware that are critical to providing our products and services. Much of this technology, software and hardware is customized for our use and would be difficult or time-consuming to obtain from alternative vendors. We also license our proprietary technology and software to third parties to enable them to integrate such technology and software into the products they provide to us. Many of our agreements with such third parties are renewable for indefinite periods of time unless either party chooses to terminate, although some of our agreements expire after fixed periods and require renegotiation prior to expiration in order to extend the term. Among the most material of our technology-related agreements are those for modems, base stations and antennas. Our agreements for modems, base stations and antennas do not renew automatically

12

and thus require periodic renegotiation. Such agreements, as well as certain licenses to commercially available software, are material to our business.

Under the terms of the Transaction, we retained ownership of the entire patent portfolio held by Gogo Inc. and its affiliates, including patents developed and obtained in connection with our former commercial aviation business. We have granted Intelsat a worldwide, perpetual, non-exclusive license to our patent portfolio for use in the commercial aviation and satellite mobility businesses (each as defined in the license agreement).

We have developed certain ideas, processes, and methods that contribute to our success and competitive position that we consider to be trade secrets. We protect our trade secrets by keeping them confidential through the use of internal and external controls, including contractual protections with employees, contractors, customers and vendors. Trade secrets can be protected for an indefinite period so long as their secrecy is maintained.

**Human Capital**

We believe that our success is the product of an integrated approach to talent management that touches every part of our business. Rather than focusing on individual processes, we manage our employee ecosystem holistically by encouraging behaviors, conversations, relationships and activities that represent best practices for a high performing culture. We are committed to fostering a highly engaged workforce and in turn driving satisfaction among partners and customers through initiatives that include the following:

- Compensation: Our compensation program is designed to attract, retain and reward the best performers. In addition to carefully calibrated salaries and bonuses, which are reviewed annually, our employees benefit from a generous benefit package, including employee stock purchase and 401(k) programs. Additionally, in 2022 and 2021 all of our employees were eligible for equity awards through our annual equity program as a part of their compensation. We also grant additional equity awards on an annual basis to employees identified as high performers.

- Training & Development: The continued development of our people is critical to our success. New hires participate in an onboarding and orientation program, which is intended to build knowledge and understanding of our business. We also invest in various professional development and leadership training initiatives and conduct quarterly forums relevant to our business that provide unique learning and networking opportunities across all business functions.

- Recognition: Our employees' success is celebrated. Our recognition programs include service awards, peer-to-peer recognition awards (called Gogo Props), spot bonuses for significant contributions above and beyond daily work efforts and special equity awards for high performers nominated by their managers. We believe these programs promote a positive employee experience that champions performance while creating a sense of community.

- Talent Review: We employ a comprehensive talent review program to assess the performance and capabilities of each individual. Annually we set company-wide priorities that serve as the basis upon which clear individual objectives are set across the entire workforce. Feedback is provided regularly and our annual talent review process identifies and supports high performers in the form of additional development opportunities so that each employee has the opportunity to reach their full potential. By investing in our people and taking the opportunity to promote from within when appropriate, we believe we are best able to reinforce our core values and achieve our strategic objectives.

- Culture and Engagement: We conduct annual employee engagement surveys to solicit feedback and help guide planning on all people-related efforts and initiatives that not only support our team members but propel our business forward. We have had strong participation in our engagement surveys and are proud that our results benchmark us as a high performing company. Our employees have the opportunity to learn more about our business strategy and ask questions of our leadership team during Town Hall meetings we host quarterly.

- Diversity, Equity & Inclusion (DEI): Gogo seeks to create an environment where each individual's uniqueness is respected and which allows for a sense of inclusion and belonging. We have formed a Diversity Council consisting of a diverse, cross-functional group of employees who provide input to our DEI initiatives. Most recently, Gogo named an individual as Vice President, Diversity, Equity and Inclusion who dedicates time and effort toward evolving and driving our DEI strategy and associated initiatives. We have established employee resource groups led by employees with diverse backgrounds, experiences or characteristics who share a common interest in professional development and improving corporate culture. Other key initiatives include building awareness of unconscious bias and investing in and seeking to expand our engagement with diverse students at targeted colleges and universities. We also publish an annual Diversity and Inclusion report that includes a summary of our various DEI initiatives, together with data highlighting certain DEI metrics relative to our employee population. A copy of the annual Diversity and Inclusion Report can be found on our website under the heading "Diversity".

  As of December 31, 2022, women and employees identifying with minority races comprised approximately 28.2% and 30.8%, respectively, of our workforce. We have nine members on our Board of Directors of which one is Black and a

woman. Of the five members on our Executive Leadership Team, two are women and another is Hispanic/Latinx. While Gogo promotes inclusiveness for all, we are focusing our recruiting efforts on expanding the diversity in our candidate pipeline overall, specifically including a greater focus on hiring more women and individuals who are Black.

The efforts outlined above are supported by our dedicated human resources team and led by our Executive Vice President, Chief People Experience Officer, who is responsible for developing and executing our human capital strategy and regularly updates our Board of Directors and senior management on the operation and status of our human capital activities.

As of December 31, 2022, we had 422 employees. No employee is a member of a labor union.

**Corporate Information**

Gogo Inc. is a holding company that does business through its subsidiaries. Our principal operating subsidiary is Gogo Business Aviation LLC, which is a direct, wholly-owned subsidiary of Gogo Intermediate Holdings LLC.

Our principal executive offices are located at 105 Edgeview Dr., Suite 300, Broomfield, CO 80021. Our telephone number is (303) 301-3271. Our website addresses are www.gogoair.com and www.business.gogoair.com.

**Available Information**

Our websites are located at www.gogoair.com and www.business.gogoair.com, and our investor relations website is located at http://ir.gogoair.com. Our Proxy Statements, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to reports filed or furnished pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are available free of charge on the investor relations website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. We also provide a link to the section of the SEC's website at www.sec.gov that has all of our public filings, including Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, all amendments to those reports, our Proxy Statements, and other ownership related filings.

We webcast our earnings calls and certain events we participate in or host with members of the investment community on our investor relations website. Additionally, we provide notifications of news or announcements regarding our financial performance, including SEC filings, investor events, press and earnings releases, and blogs as part of our investor relations website. Investors and others can receive notifications of new information posted on our investor relations website in real-time by signing up for email alerts and RSS feeds. Further corporate governance information, including our certificate of incorporation, bylaws, corporate governance guidelines, board committee charters, and code of business conduct, is also available on our investor relations website under the heading "Corporate Governance." The contents of our websites are not intended to be incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC, and any references to our websites are intended to be inactive textual references only.

14

Item 1A. Risk Factors

*You should consider and read carefully all of the risks and uncertainties described below, as well as other information included in this Annual Report on Form 10-K, including our consolidated financial statements and related notes. The risks described below are not the only ones facing us. The occurrence of any of the following risks or additional risks and uncertainties not presently known to us or that we currently believe to be immaterial could materially and adversely affect our business, financial condition and results of operations. This Annual Report on Form 10-K also contains forward-looking statements and estimates that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks and uncertainties described below.*

### Risks Related to Our Business

*We may be unable to continue to generate revenue from the provision of our connectivity services, which could materially and adversely affect our business and profitability.*

Our business is dependent on our ability to continuously attract and retain users of our connectivity and other service offerings, and we cannot be certain that we will be successful in these efforts or that customer retention levels will not materially decline. For the fiscal years ended December 31, 2022, 2021 and 2020, the Gogo service we provided on business aircraft (which excludes service provided on commercial aircraft under the ATG Network Sharing Agreement) generated approximately 71%, 75% and 78% of our revenue from continuing operations, respectively. A significant portion of such service revenue is generated through individual subscription agreements with our customers that cover a single or small number of aircraft, with the remainder generated through subscription agreements with certain fractional or charter operators covering larger fleets of aircraft. These agreements are generally no more than one-year in duration. As such, we have no assurance that any of such customers will renew their existing agreements with us upon expiration on comparable terms or at all, including as a result of a lack of demand or dissatisfaction with our services or the availability of superior or less expensive alternatives in the market. In addition, our subscription agreements are generally terminable at will by our customers and, if terminated, we may not be able to collect amounts we would have otherwise expected to receive during the full term of the agreement. To the extent that our subscribers terminate or fail to renew their contracts with us for any reason, our business prospects, financial condition and results of operations may be materially adversely affected.

Our subscription agreements do not generally contain minimum commitments for the usage of our connectivity and other services. We have in the past, and may in the future, experience periods of reduced usage of our services by our customers or allow customers to suspend their accounts, which could adversely impact our results of operations and profitability. For example, we experienced a sharp decrease in flight activity, an increase in account suspensions and a decrease in new plan activities in mid-2020 as a result of reduced travel demand due to the COVID-19 pandemic.

*We are reliant on our key OEMs and dealers for equipment sales.*

Revenue from equipment sales accounted for approximately 27%, 23% and 21% of our revenue from continuing operations for the fiscal years ended December 31, 2022, 2021 and 2020, respectively. More than 90% of our equipment revenue in each such fiscal year was generated from contracts with OEMs and after-market dealers. Almost all of our contracts with OEMs and dealers are terminable at will by either party on short notice. If one or more key OEMs or dealers terminates its relationship with us for any reason or our contract expires and is not renewed, our business and results of operations may be materially and adversely affected. In addition, pursuant to many of our contracts with our OEM distribution partners, we have agreed to deliver equipment and/or services, including equipment and services not yet in production, for a fixed price and, accordingly, take the risk of any cost overruns or delays in the completion of the design and manufacturing of the product. Certain of our contracts with our OEMs also include provisions that, under specified circumstances, entitle them to the benefit of certain more favorable provisions in other equipment contracts, including with respect to pricing. These provisions, some of which have retroactive effect, may limit the benefits we realize from contracts containing such provisions. Our inability to identify and offer improved terms to a distribution partner or customer in accordance with such a provision could negatively affect our relationship with that distribution partner or customer or give rise to a claim that we are in breach of such contract.

Many of our distribution partners have also not committed to purchase any minimum quantity of our equipment. In certain cases, we must anticipate the future volume of orders based upon non-binding production schedules provided by OEMs, historical purchasing patterns and informal discussions with customers and dealers as to their anticipated future requirements. Cancellations, reductions or delays by OEMs and dealers may have a material adverse effect on our business, financial condition and results of operations.

Some of our dealers are experiencing continuing issues with labor shortages, which has impacted their ability to install our equipment, leading to a longer period of time between shipment and activation of our equipment. If our dealers are unable to eliminate or mitigate these labor shortages, our business, financial condition and results of operations may be materially adversely affected.

Our distribution partners may be materially adversely impacted by economic downturns and market disruptions. See "*—Adverse economic conditions, including economic slowdowns, may have a material adverse effect on our business.*" In anticipation of changing economic conditions, OEMs in particular may be more conservative in their production, which may reduce our market opportunities. Further, unfavorable market conditions could cause one or more of our OEMs or dealers to file for bankruptcy, which may have a material adverse effect on our business, financial condition and results of operations.

### *Competition could result in price reduction, reduced revenue and loss of market position and could harm our results of operations.*

Our equipment and services are sold in competitive markets. Some of our current or potential future competitors are, or could potentially be, larger, more diversified corporations and have greater financial, marketing, production and research and development resources. As a result, they may be better able to withstand pricing pressures and the effects of periodic economic downturns. Some of our current or future competitors may offer a broader product line or broader geographic coverage to customers. Our business and results of operations may be materially adversely affected if our competitors:

- develop equipment or services that are superior to our equipment and services;

- develop equipment or services that are priced more competitively than our equipment and services;

- develop methods of more efficiently and effectively providing equipment and services; or

- adapt more quickly than we do to new technologies or evolving customer requirements.

We believe that the principal points of competition in our business are technological capabilities, geographic coverage, price, customer service, product development, conformity to customer specifications, compliance with regulatory certification requirements, quality of support after the sale and timeliness of delivery and installation. Maintaining and improving our competitive position will require continued investment in technology, manufacturing, engineering, quality standards, marketing and customer service and support. If we do not maintain sufficient resources to make these investments or are not successful in maintaining our competitive position, our operations and financial performance will suffer. We may not have the financial resources, technical expertise or support capabilities to continue to compete successfully. SmartSky recently announced that its ATG network in the continental United States, originally targeted for launch in 2016, is now "live nationwide." This is the first time that we have faced competition from a nationwide ATG network, and should such competitor be successful in entering our market, other competitors could be prompted to enter this business using the same or other ATG spectrum. Another in-flight connectivity provider has launched service on commercial aircraft in Europe using a hybrid ATG/satellite network.

While we have recently announced our plans to launch our LEO-satellite based Global Broadband service, we do not currently offer satellite-based broadband service and could face competition from owners of LEO and other new non-GEO satellite constellations should they decide to enter our market. Starlink, a division of Space Exploration Technologies Corp. that operates a LEO satellite network, has been awarded an ESIM (Earth Stations in Motion) license by the FCC that would cover aircraft and other moving vehicles. In October 2022, Starlink announced that it is taking orders for its planned global in-flight connectivity service, with equipment deliveries expected to begin in 2023. A failure to successfully anticipate and respond to Starlink and other established and new competitors may have a material adverse impact on our business and results of operations.

### *We depend upon third parties, many of which are single-source providers, to manufacture equipment components, provide services for our network and install and maintain our equipment.*

We rely on third-party suppliers for equipment components and services that we use to provide our services. Many suppliers of critical components of our equipment are single-source providers. Components for which we rely on single-source suppliers include, among others, the antennas and modems for all systems, the equipment used at our ATG cell site base stations and the ESA for our Global Broadband network. We plan to launch Global Broadband using OneWeb as our sole LEO satellite network provider. If we are required for any reason (including expiration of the contract, termination by one party for material breach or other termination events) to find one or more alternative suppliers, we estimate that the replacement process could take up to two years depending upon the component or service, and we may not be able to contract with such alternative suppliers on a timely basis, on commercially reasonable terms, or at all. Finding and contracting with suppliers of some components may be delayed or made more difficult by current suppliers' ownership of key intellectual property that requires alternative suppliers to either obtain rights to such intellectual property or develop new designs that do not infringe on such intellectual property. In addition, many of our components, such as the equipment used in our base stations, are highly integrated with other system components, which may further lengthen the time required for an alternative supplier to deliver a component or service that meets our system requirements. We also rely on third parties to provide the links between our data centers and our ground network. If we are not able to continue to engage suppliers with the capabilities or capacities required by our business, or if suppliers fail to deliver quality products, parts, equipment and services in sufficient quantities or on a timely basis consistent with our inventory needs and production schedule, our business, financial condition and results of operations may be materially adversely affected.

16

The supply of third-party components and services could be interrupted or halted by a termination of our relationships, a failure of quality control or other operational problems at such suppliers or a significant decline in their financial condition. If we are not able to continue to engage suppliers with the capabilities or capacities required by our business, or if such suppliers fail to deliver quality products, parts, equipment and services on a timely basis consistent with our schedule, our business, financial condition and results of operations may be materially adversely affected.

***Global supply chain challenges and logistics issues as well as increasing inflation have had, and may continue to have, an adverse effect on our business, financial condition and results of operations.***

In early 2020, many manufacturers of electronic components reduced their capacity in response to the reduced demand that accompanied the COVID-19 pandemic. While manufacturers have begun to increase manufacturing capacity as demand recovers from the impact of COVID-19, demand has exceeded supply in certain areas, and global shortages of electronic components have occurred. In addition, inflation, changes in trade policies, the imposition of duties and tariffs, potential retaliatory countermeasures, public health crises (such as the COVID-19 pandemic) and geopolitical conflicts continue to adversely impact the availability and price of electronic components.

We have experienced longer lead times and encountered delays in obtaining electronic components, and we expect longer lead times and delays to continue. While we believe that we have adequate inventory or will be able to acquire sufficient electronic components to meet customer demand as currently forecasted, increases in demand combined with a continued shortage of electronic components could cause product delays or shortages. We have prepaid the suppliers of certain components to help ensure adequate supply and expect to continue to do so, and we may face price increases for certain components due to the shortages. In addition, the effects of the pandemic include global logistics issues such as shipping logjams, workforce shortages and carrier capacity constraints, all of which may negatively affect our ability to obtain electronic and other components on a timely basis. We cannot predict how long the component shortages or logistics issues will continue.

***When we expand our business outside the United States with Global Broadband, we will be exposed to a variety of risks associated with international operations that could adversely affect our business.***

Although our operations and business are currently predominantly located in the United States, a component of our growth strategy involves the launch and expansion of our Global Broadband operations and customer base internationally. As we expand internationally, we expect that we would be subject to additional risks related to conducting operations outside the United States, including, but not limited to:

- difficulties in penetrating new markets due to established and entrenched competitors;

- difficulties in developing products and services that are tailored to the needs of local customers;

- the need to adapt and localize our products and services for specific countries;

- lack of local acceptance or knowledge of our products and services;

- changes in a specific country's or region's political or economic conditions;

- difficulties in obtaining required regulatory or other governmental approvals;

- greater difficulty in enforcing contracts and managing collections in countries where our recourse may be more limited, as well as longer collection periods;

- multiple and possibly overlapping tax structures;

- unexpected changes in laws and regulatory requirements, including with respect to taxes and trade laws;

- more stringent regulations relating to communications; privacy and data security and the unauthorized use of, or access to, commercial and personal data; and aerospace and liability standards;

- challenges inherent in efficiently managing employees over large geographic distances, including compliance with differing labor laws and the need to implement appropriate systems, policies and hiring, benefits and compliance programs;

- difficulties in managing a business in new markets with diverse cultures, languages, customs, legal systems, alternative dispute systems and regulatory systems;

- increased costs associated with international operations, including travel, real estate, infrastructure and legal compliance costs;

17

- currency exchange rate fluctuations and the resulting effect on our revenue and expenses and the cost and risk of entering into hedging transactions if we chose to do so in the future;

- the effect of other economic factors, including inflation, pricing and currency devaluation;

- limitations on our ability to reinvest earnings from operations in one country to fund the capital needs of our operations in other countries;

- laws and business practices favoring local competitors or general preferences for local vendors;

- operating in new, developing or other markets in which there are significant uncertainties regarding the interpretation, application and enforceability of laws and regulations, including relating to contract and intellectual property rights;

- limited or insufficient intellectual property protection or difficulties enforcing our intellectual property;

- political instability, social unrest, terrorist activities, acts of civil or international hostility, such as the current military conflict and escalating tensions between Russia and Ukraine, natural disasters and regional or global outbreaks of contagious diseases, such as the COVID-19 pandemic;

- restrictions on the ability of U.S. companies to do business in foreign countries; and

- exposure to liabilities under anti-corruption and anti-money laundering laws, including the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), the U.K. Bribery Act (the "Bribery Act") and similar laws and regulations in other jurisdictions.

These and other factors could affect our ability to compete successfully and expand internationally and, consequently, our business, financial condition and results of operations may be materially adversely affected.

***We may fail to recruit, train and retain the highly skilled employees that are necessary to remain competitive and execute our growth strategy. The loss of one or more of our key personnel could harm our business.***

Competition for key technical personnel in high-technology industries such as ours is intense. We believe that our future success depends in large part on our continued ability to hire, train, retain and leverage the skills of qualified engineers and other highly skilled personnel needed to maintain and grow our ATG networks and related technology and successfully deploy Gogo 5G, Global Broadband and other elements of our technology roadmap and new wireless telecommunications products and technology. We may not be as successful as our competitors at recruiting, training, retaining and utilizing these highly skilled personnel. Any failure to recruit, train and retain highly skilled employees may have a material adverse effect on our business.

We depend on the continued service and performance of our key personnel, including Oakleigh Thorne, our CEO. Such individuals have acquired specialized knowledge and skills with respect to Gogo and its operations. As a result, if any of our key personnel were to leave Gogo, we could face substantial difficulty in hiring qualified successors and could experience a loss of productivity while any such successor obtains the necessary training and expertise. We do not maintain key man insurance on any of our officers or key employees. In addition, much of our key technology and systems is custom-made for our business by our personnel. The loss of key personnel, including key members of our management team, could disrupt our operations and may have a material adverse effect on our business.

***Pandemics or other outbreaks of contagious diseases, including the COVID-19 pandemic, and the measures implemented to combat them have had, and may continue to have, a material adverse effect on our business.***

We face various risks related to public health issues, including epidemics, pandemics and other outbreak of infectious disease. For example, the COVID-19 pandemic caused a significant decline in international and domestic business aviation travel, which materially and adversely affected our business in 2020. Future pandemics and other outbreaks of contagious diseases could result in similar or worse impacts and significant business and operational disruptions, including business closures, supply chain disruptions, travel restrictions, stay-at-home orders and limitations on the availability of workforces.

Whether and to what extent future pandemics and other outbreaks of contagious diseases may impact our financial and operational performance will depend on developments that include the duration, spread and severity of the outbreak, the timetable for administering and efficacy of vaccines, the duration and geographic scope of related travel advisories and restrictions and the extent of the impact of the pandemic or outbreak on overall demand for commercial and business aviation travel, and other factors beyond our control, all of which are highly uncertain and cannot be predicted.

In addition to directly impacting demand for air travel, COVID-19 has had, and future pandemics and other outbreaks of contagious diseases and any resultant restrictions may have, a material and adverse impact on other aspects of our business, including:

- delays and difficulties in completing installations on certain aircraft; and

18

- limitations on our ability to market and grow our business and to promote technological innovation.

In addition, pandemics and other outbreaks of contagious diseases may also exacerbate other risks disclosed in this Annual Report on Form 10-K. For example, COVID-19 has had, and future pandemics and other outbreaks of contagious diseases may have, an adverse effect on our supply chain. See "*—Global supply chain challenges and logistics issues as well as increasing inflation have had, and may continue to have, an adverse effect on our business, financial condition and results of operations.*"

### *Adverse economic conditions, including economic slowdowns, may have a material adverse effect on our business.*

We cannot predict the nature, extent, timing or likelihood of any economic slowdown or the strength or sustainability of any economic recovery, worldwide, in the United States or in the aviation industry. Negative conditions in the general economy both in the United States and globally, including conditions resulting from changes in gross domestic product growth, declines in consumer confidence, labor shortages, inflationary pressures, rising interest rates, and financial and credit market fluctuations could cause a decrease in business investments, including spending on air travel and otherwise, and could materially and adversely affect the growth of our business. In particular, although inflation in the United States has been relatively low in recent years, the U.S. economy has recently experienced a significant inflationary effect from, among other things, supply chain disruptions and governmental stimulus or fiscal policies adopted in response to the COVID-19 pandemic. While we cannot predict any future trends in the rate of inflation, there is currently significant uncertainty in the near-term economic outlook. Continued inflation would further raise our costs for labor, materials and services, which could negatively impact our profitability and cash flows. Additionally, we may be unable to raise our prices for our equipment and services in amounts equal to the rate of inflation, and if our constrained supply chain continues, our operating profit and balance sheet may be negatively impacted.

In addition, geopolitical risks, including those arising from political turmoil, trade tension and/or the imposition of trade tariffs, terrorist activity and acts of civil or international hostility, are increasing. For instance, the ongoing military conflict between Russia and Ukraine has had negative impacts on the global economy, including by contributing to rapidly rising costs of living (driven largely by higher energy prices) in Europe and created uncertainty in the global capital markets and is expected to have further global economic consequences, including disruptions of energy markets. Further, other events outside of our control, including natural disasters, climate change-related events and regional or global outbreaks of contagious diseases, such as the COVID-19 pandemic, may arise from time to time and be accompanied by governmental actions that may increase international tension. Any such events and responses, including regulatory developments, may cause significant volatility and declines in the global markets, disproportionate impacts to certain industries or sectors, disruptions to commerce (including to economic activity, travel and supply chains), loss of life and property damage, and may materially and adversely affect the global economy or capital markets, as well as our business and results of operations. If conditions of the general economy or markets in which we operate worsen from present levels, it could lead to a decrease in air travel, cause owners and operators of business aircraft to cut costs by reducing their purchases or use of private aircraft or their use of in-flight Internet access on such aircraft or reduce the number of airline passengers on commercial aircraft to which we supply ATG network access. Should an economic slowdown occur in the U.S. or globally, our business and results of operations may be materially adversely affected.

### *We may not be able to fully utilize portions of our deferred tax assets, which would negatively impact our earnings and other comprehensive income.*

For the year ended December 31, 2022, our determination that we are more likely than not to realize a portion of our deferred tax assets resulted in a release of approximately $11.4 million of our valuation allowance. As discussed in more detail in the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates—Deferred Income Taxes - Valuation Allowance," our determination that we are more likely than not to realize a portion of our deferred tax assets represents our best estimate and considers both positive and negative factors. We considered positive factors including the sale of our CA business, the reduction in interest expense resulting from the Refinancing and the settlement of the 2022 Convertible Notes, strong demand for our products and services and pre-tax income from continuing operations in 2022 and the third and fourth fiscal quarters of 2021. The negative factors included cumulative pre-tax losses from continuing operations in the three-year period ending with the current quarter and our relatively short history of pre-tax income from continuing operations. It is possible that there will be changes in our business, our performance, our industry or otherwise that cause actual results to differ materially from this estimate. If those changes result in significant and sustained reductions in our pre-tax income or utilization of existing tax carryforwards in future periods, additional valuation allowances may have to be recorded, which could have a material adverse impact on earnings and/or other comprehensive income.

### *Increased attention to climate change, ESG matters and conservation measures may adversely impact our business.*

Concern over climate change, including the impact of global warming, has led to significant U.S. and international legislative and regulatory efforts to limit greenhouse gas ("GHG") emissions. See "*—Risks Related to Litigation and Regulation—We may be affected by global climate change or by legal and regulatory responses to such change.*" Increased awareness and any adverse publicity in the global marketplace about the GHGs emitted by companies in the airline and transportation industries could harm our

19

reputation and reduce customer demand for our services. Environmental activists and organizations have recently promoted the idea of "flight shaming," or advocating that consumers reduce their use of private jets and commercial air travel in favor of more environmentally sustainable modes of transportation such as boats, trains and buses. To the extent that our customers reduce their use of air travel in response to new environmental regulation or changes in public perception about the impact of air travel on climate change, our customers may reduce their usage of our services and, as a result, our business prospects, financial condition and results of operations may be materially adversely affected.

In addition, other stakeholders, including shareholders, customers, employees, regulators and suppliers, have also been focused on ESG matters. Companies that do not adapt to or comply with investor or other stakeholder expectations and standards, which are evolving, or that are perceived to have not responded appropriately to the growing concern regarding ESG issues, regardless of whether there is a legal requirement to do so, may suffer from reputational damage and other adverse consequences.

***We may be unsuccessful at evaluating or pursuing strategic opportunities, which could adversely affect our revenue, financial condition and results of operation.***

Our Board and management continuously assess whether shareholder value would be increased by engaging in strategic and/or financial relationships, transactions or other opportunities, including those that are suggested to us by third parties. There can be no assurance that we will pursue any strategic or financial relationship, transaction or other opportunity, the outcome of which is inherently uncertain. Further, the process of evaluating and pursuing any such relationship, transaction or other opportunity will involve the dedication of significant resources and the incurrence of significant costs and expenses. If we are unable to mitigate these or other potential risks relating to assessing and undertaking strategic opportunities, it may disrupt our business or adversely impact our revenue, financial condition and results of operation.

### Risks Related to Our Technology and Intellectual Property

***We may be unsuccessful or delayed in developing and deploying Gogo 5G or other next generation technologies.***

We are currently developing a next generation ATG network using 5G technology and unlicensed spectrum, which we intend to launch on a commercial, nationwide basis in the fourth quarter of 2023. Gogo 5G will be capable of working with different spectrum and supporting different next generation technologies. There can be no assurance that we will launch Gogo 5G or any other next generation technology in sufficient time to meet growing user expectations regarding the in-flight connectivity experience and to effectively compete in the business aviation market, due to, among other things, risks associated with: (i) our failure to design and develop a technology that provides the features and performance we require; (ii) integrating the solution with our existing ATG network; (iii) the availability of adequate spectrum; (iv) the failure of spectrum to perform as expected; (v) the failure of equipment and software to perform as expected; (vi) problems arising in the manufacturing process; (vii) our ability to negotiate contracts with suppliers on acceptable commercial and other terms; (viii) our reliance on single-source suppliers for the development and manufacturing of the core elements of the network and on other suppliers to provide certain components and services; and (ix) delays in obtaining or failures to obtain the required regulatory approvals for installation and operation of such equipment and the provision of service to passengers. As disclosed above under the caption *"—Risks Related to Our Business—Global supply chain challenges and logistics issues as well as increasing inflation have had, and may continue to have, an adverse effect on our business, financial condition and results of operations*," we have experienced longer lead times and encountered delays in obtaining certain electronic components used in our business. For instance, manufacturing issues with respect to the 5G chip necessitated process revisions and additional testing, which repeatedly delayed the delivery date for this component, and the supplier of the chip informed us in August 2022 of late-stage testing issues which will further delay delivery. We currently believe that this combination of delays will likely shift the launch of Gogo 5G service into the fourth quarter of 2023. If Gogo 5G or any other next generation technology fails to perform as expected or its commercial availability is significantly delayed as compared to the timelines we establish, our ability to meet users' expectations regarding our systems' performance and to effectively compete in our market may be impaired and our business, financial condition and results of operations may be materially adversely affected.

***We may be unsuccessful or delayed in developing and deploying our Global Broadband service.***

In May 2022, we announced our plans to launch Global Broadband using an ESA designed with Hughes and utilized on a LEO satellite network operated by OneWeb. There can be no assurance that we will launch Global Broadband  in sufficient time to effectively compete in the global business aviation market, if at all, due to, among other things, risks associated with: (i) OneWeb's failure to launch or delay in launching its LEO satellite network; (ii) the failure of our equipment and software to perform as expected; (iii) the failure of the OneWeb network to perform as expected; (iv) integrating our hardware and software with the OneWeb network; (v) problems arising in the manufacturing process; (vi) our ability to negotiate contracts with suppliers on acceptable commercial and other terms; (vii) our reliance on single-source suppliers for the development and manufacturing of the antenna and access to a LEO network; and (viii) delays in obtaining or failures to obtain the required regulatory approvals for installation and operation of such equipment and the provision of service to passengers. As disclosed above under the caption *"—Risks Related to Our Business—Global supply chain challenges and logistics issues as well as increasing inflation have had, and may continue to have, an adverse*

20

*effect on our business, financial condition and results of operations*," we have experienced longer lead times and encountered delays in certain electronic components used in our business, and such issues could affect the development of Global Broadband. If Global Broadband fails to perform as expected or its commercial availability is significantly delayed as compared to the timelines we establish, our ability to meet customers' or end users' expectations regarding our systems' performance and to effectively compete in our market may be impaired and our business, financial condition and results of operations may be materially adversely affected. See "*Risks Related to Our Business—Competition could result in price reduction, reduced revenue and loss of market position and could harm our results of operations*." Furthermore, under our agreement with Hughes we have committed to purchase, over a seven-year period, antennas with an aggregate purchase price of approximately $170 million, and we may make additional financial commitments in connection with Global Broadband. If we are not successful in launching Global Broadband, we may nonetheless, depending on the circumstances, be required to honor these commitments.

### *Our business is dependent on the availability of spectrum.*

In June 2006, we purchased at FCC auction an exclusive ten-year, 3 MHz license for ATG spectrum, and in April 2013, as part of our acquisition of LiveTV Airfone, LLC, we acquired an additional 1MHz ATG spectrum license. In 2017, our applications to renew our licenses were granted for additional ten-year terms without further payment. Any breach of the terms of our FCC licenses,  FCC waiver conditions or FCC regulations including foreign ownership restrictions, permitted uses of the spectrum and compliance with FAA regulations could result in the revocation, suspension, cancellation or reduction in the term of our licenses or a refusal by the FCC to renew the licenses upon expiration. Further, in connection with an application to renew our licenses upon expiration, a competitor could file a petition opposing such renewal on anti-competitive or other grounds. On August 3, 2017, the FCC released an order that, among other things, revised the wireless license renewal rules. As a result of this order, which applies to the industry generally, all licensees will need to make a showing (or certification) at renewal to demonstrate that the licensee provided and continues to provide service to the public. Because the 1 MHz ATG license has no construction or substantial service requirement, it is currently not clear what level and length of service the FCC will find adequate when considering the next renewal of the 1 MHz ATG license in 2026. While we do not currently use this license, changes in technology may enable its use in our network in the future. An ambiguous renewal requirement could impair our flexibility to use or otherwise realize the value of such spectrum beyond 2026.

Our ability to offer in-flight broadband Internet access through our ATG service currently depends on our ability to maintain rights to use the 3 MHz ATG spectrum in the U.S., and our failure to do so may have a material adverse effect on our business, financial condition and results of operations. In addition, our ability to meet increasing performance demands and expand our service offerings in the United States will depend in part upon our ability to successfully roll-out our plans to employ unlicensed spectrum in the 2.4 GHz band for concurrent use with the licensed 3 MHz spectrum to launch Gogo 5G, and may require that we obtain additional licensed or unlicensed spectrum suitable for our use. Such spectrum may not be available to us on commercially reasonable terms or at all. Our failure to obtain adequate spectrum could have a material adverse effect on our business, financial condition and results of operations.

### *Additional ATG spectrum, whether licensed or unlicensed, is or may become available in the future.*

While we have exclusive rights to the only broadband spectrum licensed by the FCC for ATG use, the FCC may in the future decide to auction additional spectrum for ATG use that is not currently designated for that purpose, or a competitor could develop technology or a business plan that allows it to cost effectively use spectrum not specifically reserved for ATG, but on which ATG use is not prohibited, to provide broadband connectivity.

The availability of additional spectrum in the marketplace that is available for ATG use may increase the possibility that we may face competition from one or more other ATG service providers in the future. For example, a prospective competitor has announced that its ATG network in the continental U.S. is available on a nationwide basis. Such network uses the same unlicensed spectrum that we intend to aggregate with our licensed spectrum for use in our Gogo 5G network.

### *We could be adversely affected if we or our third party suppliers or service providers suffer service interruptions or delays, technology failures, damage to equipment or system disruptions or failures arising from, among other things, force majeure events, cyber-attacks or other malicious activities.*

We rely heavily on communications, information systems (both internal and provided by third parties), and the internet to conduct our business. Our brand, reputation and ability to attract, retain and serve our customers depend upon the reliable performance of our ground network and in-flight systems. We have experienced interruptions in these systems in the past, and we may in the future experience service interruptions, service delays or technology or systems failures, which may be due to factors beyond our control. If we experience frequent system or network failures, our reputation, brand and customer retention could be harmed, and such failures could be material breaches of our customer contracts resulting in termination rights, penalties or claims for damages.

Our operations and services depend upon the extent to which our and our suppliers' equipment is protected against damage or interruption from fire, floods, earthquakes, tornadoes, power loss, solar flares, telecommunication failures, break-ins, acts of war or terrorism and similar events. We and our vendors, like other commercial entities, have been, and will likely continue to be, subject to a

21

variety of forms of cyberattacks with the objective of gaining unauthorized access to our systems and data or disrupting our operations. These include, but are not limited to, cyberattacks, phishing attacks, account takeover attempts, the introduction of computer viruses or malicious code (commonly referred to as "malware"), ransomware or other extortion tactics, denial of service attacks, credential stuffing, and other computer-related penetrations. Hardware, software or applications developed by us or received from third parties may contain exploitable vulnerabilities, bugs, or defects in design, maintenance or manufacture or other issues that could compromise information and cybersecurity. The risk of cyberattacks has also increased and will continue to increase in connection with Russia's invasion of Ukraine. In light of the Ukraine war and other geopolitical events and dynamics, including ongoing tensions with North Korea, Iran and other states, state-sponsored parties or their supporters may launch retaliatory cyberattacks, and may attempt to cause supply chain disruptions, or carry out other geopolitically motivated retaliatory actions that may adversely disrupt or degrade our operations and may result in data compromise. These security attacks can originate from a wide variety of sources/malicious actors, including, but not limited to, persons who constitute an insider threat, who are involved with organized crime, or who may be linked to terrorist organizations or hostile foreign governments. Those same parties may also attempt to fraudulently induce employees, customers, or other users of our systems to disclose sensitive information in order to gain access to our data or that of our customers or clients through social engineering, phishing, mobile phone malware, and other methods.

There is no assurance that administrative, physical, and technical controls and other preventive actions taken to reduce the risk of cyberattacks and protect our information technology will prevent physical and electronic break-ins, cyberattacks or other security breaches to such computer systems. In some cases, such physical and electronic break-ins, cyberattacks or other security breaches may not be immediately detected. If we or our vendors fail to prevent, detect, address and mitigate such incidents, this may impede or interrupt our business operations and could adversely affect our business, financial condition and results of operations.

A disaster such as a natural catastrophe, epidemic, pandemic, industrial accident, blackout, ransomware, computer virus, or other type of malware, terrorist attack, cyberattack or war, unanticipated problems with our or our vendors' disaster recovery systems (and the disaster recovery systems of such vendors' suppliers, vendors or subcontractors), could cause our computer systems to be inaccessible to our employees, distributors, vendors or customers or destroy valuable data. In addition, in the event that a significant number of our or our vendors' managers were unavailable following a disaster, our ability to effectively conduct business could be severely compromised. These interruptions also may interfere with our suppliers' ability to provide goods and services and our employees' ability to perform their job responsibilities. In addition, our flexible, hybrid work model, which allows our employees the option to work fully remote, could increase our operational risk, including, but not limited to, cybersecurity risks, and could impair our ability to manage our business. Unanticipated problems with, or failures of, our disaster recovery systems and business continuity plans could have a material impact on our ability to conduct business and on our results of operations and financial condition. The failure of our disaster recovery systems and business continuity plans could adversely impact our profitability and our business.

Regulators' or others' scrutiny of cybersecurity, including new laws or regulations, could increase our compliance costs and operational burdens, especially as regulatory and legislative focus on cybersecurity matters intensifies. Regulators, customers, or others may act against us for any cybersecurity failures. Our continuous technological evaluations and enhancements, including changes designed to update our protective measures, may increase our risk of a breach or gap in our security. We may incur higher costs to comply with laws related to, or regulators' scrutiny of, our use, collection, management, or transfer of data and other privacy practices. There can be no assurance that our continuous evaluation and enhancement of our cybersecurity and information security systems will be effective in preventing or limiting the impact of future cyberattacks.

***Assertions by third parties of infringement, misappropriation or other violations by us of their intellectual property rights could result in significant costs and materially adversely affect our business and results of operations.***

In recent years, there has been significant litigation involving intellectual property rights in many technology-based industries, including the wireless communications industry. We are currently facing, and may in the future face, claims that we or a supplier have violated patent, trademark or other intellectual property rights of third parties. Many companies, including our competitors, are devoting significant resources to obtaining patents that could potentially cover many aspects of our business. While we have reviewed the patent portfolios of certain competitors and other third parties, we have not exhaustively searched all patents relevant to our technologies and business and therefore it is possible that we may be unknowingly infringing the patents of others. Any infringement, misappropriation or related claims, whether or not meritorious and whether or not they result in litigation, are time-consuming, divert technical and management personnel and are costly to resolve. As a result of any such dispute, we may have to develop non-infringing technology, pay damages, enter into royalty or licensing agreements, cease providing certain products or services, adjust our merchandizing or marketing and advertising activities or take other actions to resolve the claims. These actions, if required, may be costly or unavailable on terms acceptable to us.

In February 2022, a competitor filed a patent infringement suit against us and also filed a motion for a preliminary injunction, which, if granted, would have prevented us from proceeding with Gogo 5G until the infringement suit is resolved. The court denied the competitor's motion for preliminary injunction but the competitor is appealing the denial. Adverse results in the appeal, the underlying infringement suit or other infringement suits could require us to develop non-infringing technology, pay damages, enter into royalty or licensing agreements, cease providing certain products or services, adjust our sales, marketing and advertising activities

22

or take other actions to resolve the claims. These actions, if required, may be costly or unavailable on terms acceptable to us. Even if we are successful in defending these claims, such litigation may be time-consuming and costly, divert management resources and could adversely affect our business relating to such disputed technology during its pendency.

Pursuant to our contracts with certain customers, we have agreed to indemnify such customers against such claims, and our indemnification obligations generally include defending or paying for the defense of the action and paying any judgments or other costs assessed against the customer in the event of an adverse outcome. In most cases, our contracts do not cap our indemnification obligations. In addition, certain of our suppliers do not indemnify us for third-party infringement or misappropriation claims arising from our use of supplier technology, and we may be liable in the event of such claims. Our inability to meet our indemnification obligations and our customers terminating or failing to renew their contracts may have a material adverse effect on our business and financial condition.

### *We or our technology suppliers may be unable to continue to innovate and provide products and services that are useful to customers and passengers.*

The market for our services is characterized by evolving technology, changes in customer and passenger needs and performance expectations, and frequent new service and product introductions. Our success will depend, in part, on our and our suppliers' ability to continue to enhance existing technology and services or develop new technology and services on a timely and cost-effective basis. If we or our suppliers fail to adapt quickly enough to changing technology, customer requirements and/or regulatory requirements, our business and results of operations may be materially adversely affected. We expect to have to invest significant capital to keep pace with innovation and changing technology, and if the amount of such investment exceeds our plans or the amount of investment permitted under the 2021 Credit Agreement (as defined below), it may have a material adverse effect on our results of operations.

As is common in industries like ours, changing technology may result in obsolescence as we implement new technologies and products and retire old technologies and products. As we encounter such obsolescence, we need to ensure that we have a sufficient supply of parts, products and equipment compatible with our existing technology, as well as access to maintenance, repair and other critical support services, until the transition is completed. Certain suppliers may determine to stop manufacturing and supplying end-of-life parts, products and equipment, or may stop providing related services, prior to completion of our transition. In the event that we are unable to obtain sufficient inventory from existing suppliers we would be required to engage new suppliers who have access to the intellectual property required to manufacture and support components that meet our specifications, and we may be unable to contract with such suppliers on commercially reasonable terms, or at all. We have implemented policies and procedures intended to ensure that we timely anticipate technology and product transitions and have access to sufficient inventory and services, but if such policies prove ineffective and we are unable to continue to engage suppliers with the capabilities or capacities required by our business to effect a transition, or if such suppliers fail to deliver quality products, parts, equipment and services in sufficient quantities or on a timely basis consistent with our schedule, our business, financial condition and results of operations may be materially adversely affected. In addition, following our retirement of end-of-life technologies and products, we may find that we have either obsolete or excess inventory on hand and might have to write off unusable inventory, which could have a material adverse effect on our results of operations.

### *We may be unable to protect our intellectual property rights.*

We regard our trademarks, service marks, copyrights, patents, trade secrets, proprietary technologies, domain names and similar intellectual property as important to our success. We rely on trademark, copyright and patent law, trade secret protection, and confidentiality agreements with our employees, vendors, customers and others to protect our proprietary rights. We have sought and obtained patent protection for certain of our technologies in the United States and certain other countries. Many of the trademarks that we use (including marks we have applied to register) contain words or terms having a somewhat common usage, such as "Gogo" and "Gogo Vision" and, as a result, we may have difficulty registering them in certain jurisdictions. We do not own, for example, the domain www.gogo.com and we have not yet obtained registrations for our most important marks in all markets in which we do business or may do business in the future. If other companies have registered or have been using in commerce similar trademarks for services similar to ours in foreign jurisdictions, we may have difficulty in registering, or enforcing an exclusive right to use, our marks in those foreign jurisdictions.

There can be no assurance that the efforts we have taken to protect our proprietary rights will be effective, that any patent and trademark applications will lead to issued patents and registered trademarks in all instances, that others will not obtain intellectual property rights to similar or superior technologies, products or services, or that our intellectual property will not be challenged, invalidated, misappropriated or infringed by others. Furthermore, the intellectual property laws and enforcement practices of other countries in which our service is or may in the future be offered may not protect our intellectual property rights to the same extent as the laws of the United States. We may need to expend additional resources to defend our intellectual property in these countries and our inability to do so could impair our business or adversely affect our international expansion. If we are unable to protect our intellectual property from unauthorized use, our ability to exploit our proprietary technology or our brand image may be harmed, which may materially adversely affect our business and results of operations.

23

*Our use of open-source software could limit our ability to commercialize our technology.*

Open-source software is software made widely and freely available to the public in human-readable source code form, usually with liberal rights to modify and improve such software. Some open-source licenses require as a condition of use that proprietary software that is combined with licensed open-source software and distributed must be released to the public in source code form and under the terms of the open-source license. Accordingly, depending on the manner in which such licenses were interpreted and applied, we could face restrictions on our ability to commercialize certain of our products and we could be required to: (i) release the source code of certain of our proprietary software to the public, including competitors, if the open-source software was linked in a manner that would require such release of our proprietary software source code; (ii) seek licenses from third parties for replacement software; and/or (iii) re-engineer our software in order to continue offering our products. Such consequences may materially adversely affect our business.

*The failure of our equipment or material defects or errors in our software may damage our reputation, result in claims against us that exceed our insurance coverage, thereby requiring us to pay significant damages, and impair our ability to sell our service.*

Our products contain complex systems, components and software that could contain errors or defects, particularly when we incorporate new technology or when new software is first introduced or new versions or enhancements are released. If any of our products are defective, we could be required to redesign or recall those products or pay substantial damages or warranty claims. In addition, such events could result in significant expenses and diversion of development and other resources, a reduction in sales or delay in market acceptance of our products and services, loss of existing customers, terminations of, failures to renew, penalties or damage claims under aviation partner contracts, harm to our reputation and brand image and increased insurance costs. If our in-flight system has a malfunction resulting from an error or defect or a problem with installation or maintenance and such malfunction causes physical damage to an aircraft or impairs its on-board electronics or avionics, significant property loss and serious personal injury or death could result. Any such failure could expose us to substantial personal injury claims, product liability claims or costly repair obligations. The aircraft operated by our customers may be very costly to repair and the damages in any product liability claims could be material. We carry aircraft and non-aircraft product liability insurance consistent with industry norms; however, such insurance coverage may not be sufficient to fully cover claims. A product recall or a product liability claim not covered by insurance could have a material adverse effect on our business, financial condition and results of operations. Further, we indemnify some of our customers for losses due to third-party claims and in certain cases the causes of such losses may include failure of our products. Should we be required by the FAA or otherwise to cease providing the Gogo service, even on a temporary basis, as a result of a product malfunction or defect, our business, financial condition and results of operations may also be materially adversely affected.

**Risks Related to Litigation and Regulation**

*If we fail to comply with the Communications Act and FCC regulations limiting ownership and voting of our capital stock by non-U.S. persons, we could lose our FCC license.*

Under the Communications Act and applicable FCC regulations, we are effectively restricted from having more than 25% of our capital stock owned or voted directly or indirectly by non-U.S. persons, including individuals and entities organized outside the United States or controlled by non-U.S. persons. We have established procedures to ascertain the nature and extent of our foreign ownership, and we believe that the indirect ownership of our equity by foreign persons or entities is below the 25% cap. However, as a publicly traded company we may not be able to determine with certainty the exact amount of our stock that is held by foreign persons or entities at any given time. A failure to comply with applicable restrictions on ownership by non-U.S. persons could result in an order requiring divestiture of the offending ownership interests, fines, denial of license renewal and/or spectrum license revocation proceedings, any of which may have a material adverse effect on our business, financial condition and results of operations.

*Regulation by United States and foreign government agencies, including the FCC, which issued our exclusive ATG spectrum license, and the FAA, which regulates the civil aviation manufacturing and repair industries in the United States, may increase our costs of providing service or require us to change our services.*

Any breach of the terms of our ATG spectrum licenses, authorizations and waivers obtained by us from time to time, or any violation of the Communications Act or the FCC's rules, could result in the revocation, suspension, cancellation or reduction in the term of a license or the imposition of fines. From time to time, the FCC may monitor or audit compliance with the Communications Act and the FCC's rules or with our licenses, including if a third party were to bring a claim of breach or noncompliance. In addition, the Communications Act, from which the FCC obtains its authority, may be amended in the future in a manner that could be adverse to us.

As discussed in more detail in the section entitled "Business—Licenses and Regulation—Federal Aviation Administration," FAA approvals required to operate our business include STCs and PMAs. While our distribution partners are responsible for obtaining STCs, obtaining PMAs is an expensive and time-consuming process that requires significant focus and resources. Prior to installation

24

of our equipment, any inability to obtain, delay in obtaining (including as a result of a government shutdown or funding shortages), or change in, needed FAA certifications, authorizations, or approvals, could have an adverse effect on our ability to meet our installation commitments, manufacture and sell parts for installation on aircraft, or expand our business. Following installation of our equipment, if we were to discover that our equipment or components of our equipment were not in compliance with specifications on which the STC authorizing installation was based, or if the FAA's requirements changed, our non-compliance could result in our incurring material costs to inspect and in some circumstances modify or replace such equipment, and could in rare circumstances result in our system being turned off or installed aircraft being grounded. If we fail to comply with the FAA's many regulations and standards that apply to our activities, we could lose the FAA certifications, authorizations, or other approvals on which our manufacturing, installation, maintenance, preventive maintenance and alteration capabilities are based. In addition, from time to time, the FAA or comparable foreign agencies adopt new regulations or amend existing regulations. The FAA could also change its policies regarding the delegation of inspection and certification responsibilities to private companies, which could adversely affect our business. To the extent that any such new regulations or amendments to existing regulations or policies apply to our activities, our compliance costs would likely increase.

As a broadband Internet provider, we must comply with the CALEA, which requires communications carriers to ensure that their equipment, facilities and services can accommodate certain technical capabilities in executing authorized wiretapping and other electronic surveillance. Currently, our CALEA solution is fully deployed in our network. However, we could be subject to an enforcement action by the FCC or law enforcement agencies for any delays in complying or failure to comply with, CALEA or similar obligations. Such enforcement actions could subject us to fines, cease and desist orders or other penalties, all of which may materially adversely affect our business and financial condition. Further, to the extent the FCC adopts additional capability requirements applicable to broadband Internet providers, its decision may increase the costs we incur to comply with such regulations.

We are also subject to regulation by certain foreign laws and regulatory bodies, including ISED, which issued our exclusive Canadian ATG subordinate spectrum license and regulates our use of the spectrum licensed to us.

Adverse decisions or regulations of these U.S. and foreign regulatory bodies may have a material adverse effect on our business and results of operations.  We are unable to predict the impact of regulations and other policy changes that could be adopted by the various governmental entities that oversee portions of our business.

***Our possession and use of personal information present risks and expenses that could harm our business. Unauthorized disclosure or manipulation of such data, whether through breach of our network security or otherwise, could expose us to costly litigation and damage our reputation.***

In the ordinary course of our business, we or our third-party providers collect, process and store sensitive data, including personal information of our employees and customers. The secure processing, maintenance and transmission of this information (and other sensitive data such as our proprietary business information and that of our customers and suppliers) is critical to our operations and business strategy. Despite our security measures, our information technology and infrastructure may be vulnerable to attacks by hackers or may be compromised due to employee error, malfeasance, hardware or software defects or other disruptions. Further, our in-cabin network operates as an open, unsecured Wi-Fi hotspot, and non-encrypted transmissions users send over this network may be vulnerable to access by other users on the same plane. Unauthorized use of our, or our third-party service providers', networks, computer systems and services could potentially jeopardize the security of confidential information, including personal information of passengers using our service. Data security threats are constantly evolving and may be difficult to anticipate or to detect for long periods of time, and may include ransomware attacks, network intrusion, data extortion, malware, phishing and other social engineering, business email compromise and insider threats, among others. There can be no assurance that any security measures we, or third parties, take will be effective in preventing these activities, given the constantly changing nature of the threats. Any such security incidents, unauthorized access or disclosure, or other loss of information could result in legal claims or proceedings and liability under our contracts with certain customers, which generally require us to indemnify the customer for passenger and other third-party claims arising from data security breaches. In addition, such incidents may disrupt our operations and the services we provide to customers, result in the loss of value of trade secrets, require expensive efforts to investigate, remediate or resolve, damage our reputation, and cause a loss of confidence in our products and services, all of which may have a material adverse effect on our business prospects, financial condition and results of operations.

A security incident or data breach, a failure to comply with applicable data protection laws, failure to comply with our policies and procedures, or a failure or perceived failure to provide users with adequate notice of our privacy policies or other privacy-related obligations to consumers could also subject us to litigation, investigations and regulatory penalties imposed by United States federal and state regulatory agencies, non-U.S. regulatory agencies or courts, all of which could have a material adverse effect on our business, financial condition and results of operations. As discussed in more detail in the section entitled "Business—Licenses and Regulation—Privacy and Data Security-Related Regulations," we could also be subject to certain state laws, federal and non-U.S. laws that impose data breach notification requirements, specific data security obligations, or other consumer privacy-related requirements. Our failure to comply with any of these rules or regulations, or an allegation or finding that we failed to comply, may have a material adverse effect on our business, financial condition and results of operations. These legal requirements are complex,

25

varied, rapidly evolving and often subject to interpretation, and there is a risk that, despite our efforts to comply, we may be found to be out of compliance with one or more of these requirements. Fines issued for non-compliance with such requirements may be substantial, including fines issued under the GDPR which can be as high as 4% of global revenue, and an adverse finding by a regulator or court may result in costly and onerous requirements being placed on the Company, a prohibition on engaging in certain aspects of our business or damage to our reputation. Certain data protection laws that apply to the Company establish a private right of action. In addition, non-compliance with certain of these requirements could lead to class action or other litigation based on theories that may include breach of contract or negligence, among others. Such litigation could result in material costs to the Company. We cannot be sure that a regulator would deem our security measures to be appropriate given the lack of prescriptive measures in certain data protection laws. Without more specific guidance, we cannot know whether our chosen security safeguards are adequate according to each applicable data protection law. Even in cases where the applicable requirements are explicit, we cannot be certain that safeguards designed to meet those requirements will be interpreted by a regulator or court as adequate or that those safeguards are operating in accordance with the requirements at all times. Given the evolving nature of security threats and evolving safeguards, we cannot be sure that our chosen security safeguards will protect against security threats to our business, nor can we be certain that we have not already experienced a cybersecurity incident or data breach of which we are unaware. Even security measures that are appropriate, reasonable, and/or in accordance with applicable legal requirements may not be able to fully protect our or our partners' information technology systems and the data contained in those systems. Moreover, interpretations or changes to new or existing data protection laws may impose on us responsibility for our employees and third parties that assist with aspects of our data processing. As a result, our employees' or third parties' intentional, unintentional, or inadvertent actions may increase our vulnerability or expose us to security threats, such as phishing attacks, and we may remain responsible for a successful phishing or other social engineering attack despite the quality and otherwise legal sufficiency of our technical security measures. A cybersecurity incident, data breach or other failure of our security measures may result in litigation, fines, reputational harm, operational disruption, and lost revenue.  In addition, compliance with complex variations in privacy and data security laws may require modifications to current business practices, including significant technology efforts that require long implementation timelines, increased costs and dedicated resources.

We depend on the security of the network infrastructure and products of our third-party providers of telecommunications, cloud computing, customer support and other vendors. Despite our efforts, those third parties may maintain inadequate safeguards to protect data they maintain for us or services on which we depend, or they may experience a cybersecurity incident or data breach despite safeguards that appear adequate. We also rely on hardware and software developed by third parties. Such hardware and software could contain security vulnerabilities or backdoors introduced by the vendor or an unauthorized third party, which could jeopardize the security of our systems, data and networks. Such incidents or breaches could expose us to regulatory and litigation risk, operational disruption and reputational harm and adversely affect our business.

### *Should the Company participate in the FCC Reimbursement Program, it could adversely affect our results of operations and financial condition.*

As discussed in more detail in the section entitled "Business — Licenses and Regulation — FCC Secure and Trusted Communications Networks Reimbursement Program," we have been approved for participation in the FCC Reimbursement Program. We are currently evaluating our participation in the FCC Reimbursement Program. Due to a shortfall in the funds appropriated by Congress for the program, the FCC has allocated to the Company approximately only $131 million of the approximately $333 million approved for reimbursement. There can be no assurance that Congress will appropriate any additional funds. If Congress fails to appropriate funds sufficient to fund all of the approved expenditures of the Company and other participants and we nevertheless decide to participate, we will be required to fund the portion of program costs that exceeds the FCC allocation, which currently amounts to approximately $202 million. In order to participate in the program, we must comply with various conditions and requirements established by the FCC, including a requirement that we submit our first reimbursement request by July 15, 2023, and complete the removal, replacement and disposal of applicable equipment within one year following such request. The FCC may grant one or more six-month extensions to a participant where it finds that due to factors beyond its control, the participant cannot complete the project by the deadline. Due to a number of factors including supply chain disruptions, the current insufficiency of FCC funding and the operational and logistical complexity of replacing airborne equipment, we do not believe that we can complete the project by July 2024, and we intend to seek extensions if we decide to participate. If the FCC does not grant the necessary extensions and the project is not completed by the FCC's deadline, we could face penalties or other sanctions.

In addition, if any of the Company's customers do not replace their airborne equipment with equipment that is compatible with the replacement terrestrial network equipment prior to the date on which the replacement terrestrial network equipment goes into effect, the Company will be unable to provide service to such customers until the airborne equipment is replaced. Such service disruptions could have a material adverse effect on our results of operations and financial condition.

### *Failure to comply with anti-bribery, anti-corruption and anti-money laundering laws could subject us to penalties and other adverse consequences.*

We are subject to the FCPA, the Bribery Act and other anti-corruption, anti-bribery and anti-money laundering laws in various jurisdictions around the world. The FCPA, the Bribery Act and similar applicable laws generally prohibit companies, their officers,

26

directors, employees and third-party intermediaries, business partners and agents from making improper payments or providing other improper things of value to government officials or other persons. We and our third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities and other third parties where we may be held liable for the corrupt or other illegal activities of these third-party business partners and intermediaries, our employees, representatives, contractors, resellers and agents, even if we do not explicitly authorize such activities. While we have policies and procedures and internal controls to address compliance with such laws, we cannot assure you that all of our employees and agents will not take actions in violation of our policies and applicable law, for which we may be ultimately held responsible. To the extent that we learn that any of our employees, third-party intermediaries, agents, or business partners do not adhere to our policies, procedures, or internal controls, we are committed to taking appropriate remedial action. In the event that we believe or have reason to believe that our directors, officers, employees, third-party intermediaries, agents, or business partners have or may have violated such laws, we may be required to investigate or have outside counsel investigate the relevant facts and circumstances. Detecting, investigating and resolving actual or alleged violations can be extensive and require a significant diversion of time, resources and attention from senior management. Any violation of the FCPA, the Bribery Act, or other applicable anti-bribery, anti-corruption laws and anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, loss of export privileges, severe criminal or civil sanctions, fines and penalties, all of which may have a material adverse effect on our business, financial condition and results of operations.

***Expenses, liabilities or business disruptions resulting from litigation could adversely affect our results of operations and financial condition.***

Our operations are characterized by the use of new technologies and services across multiple jurisdictions that implicate various statutes and a range of rules and regulations that may be subject to broad or creative interpretation. This may result in litigation, including class action lawsuits, the outcome of which may be difficult to assess or quantify due to the potential ambiguity inherent in these regulatory schemes and/or the nascence of our technologies and services. Plaintiffs may seek recovery of very large or indeterminate amounts, and the magnitude of the potential loss relating to such lawsuits may remain unknown for substantial periods of time. Any such claims or litigation may be time-consuming and costly, divert management resources, require us to change our products and services, or require us to pay significant monetary damages, which may have a material adverse effect on our results of operations. For example, we recently settled a securities class action lawsuit in which Gogo Inc. and certain of our current and former executives were defendants, and in February 2023, we received preliminary court approval to settle related derivative lawsuits in which Gogo Inc. is a nominal defendant and members of our Board of Directors and certain current and former executives are defendants. We are required to indemnify the directors and current and former officers who are defendants in the derivative lawsuit for their defense costs and any judgments resulting from such suits. In the future, we may be subject to additional securities class action or derivative litigation. From time to time, we may also be subject to other claims or litigation in the ordinary course of our business, including for example, claims related to employment matters.

In addition, costly and time-consuming litigation could be necessary to enforce our existing contracts and, even if successful, may have a material adverse effect on our business. In addition, litigation by or against any customer or supplier could have the effect of negatively impacting our reputation and goodwill with existing and potential customers and suppliers.

***We may be affected by global climate change or by legal and regulatory responses to such change.***

Concern over climate change, including the impact of global warming, has led to significant U.S. and international legislative and regulatory efforts to limit GHG emissions. Increasingly, state and local governments are also considering GHG regulatory requirements. Increased regulation regarding GHG emissions, especially aircraft emissions, could impose substantial costs on us. We may also incur additional expenses as a result of U.S. and international regulators requiring additional disclosures regarding GHG emissions. The adoption and implementation of new or more stringent international, federal, regional, state or local legislation, regulations or other initiatives that impose more stringent standards for GHG emissions may have a material adverse effect on our results of operations and financial condition.

***Regulations related to conflict minerals force us to incur additional expenses and may make our supply chain more complex.***

We are subject to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which requires us to diligence, disclose and report whether or not our products contain certain minerals and metals, known as "conflict minerals." These requirements could adversely affect the sourcing, availability and pricing of certain of the materials used in the manufacture of components in our products and equipment. In addition, we have incurred, and will continue to incur, costs to comply with the disclosure requirements, including costs related to conducting diligence procedures to determine the sources of conflict minerals that may be used or necessary to the production of our products and, if applicable, potential changes to products, processes or sources of supply as a consequence of such verification activities.

**Risks Related to Our Indebtedness**

27

For definitions of capitalized terms used and not defined in the following Risk Factors, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this Annual Report on Form 10-K.

***We and our subsidiaries have substantial debt and may incur substantial additional debt in the future, which could adversely affect our financial health, reduce our profitability, limit our ability to obtain financing in the future and pursue certain business opportunities and reduce the value of your investment.***

As of December 31, 2022, we had total consolidated indebtedness of approximately $714.1 million, all of which was borrowed under the Term Loan Facility.

We and our subsidiaries may incur additional debt in the future, including up to $100.0 million under the Revolving Facility, which could increase the risks described below and lead to other risks. The amount of our debt or such other obligations could have important consequences for holders of our common stock, including, but not limited to:

- a meaningful portion of our cash flows from operations is expected to be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available to us for other purposes;

- our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements or general corporate purposes may be limited, and our ability to satisfy our obligations with respect to our indebtedness may be impaired in the future;

- we may be at a competitive disadvantage compared to our competitors with less debt or with comparable debt at more favorable interest rates and which, as a result, may be better positioned to withstand economic downturns;

- our ability to refinance indebtedness may be limited or the associated costs may increase;

- our ability to engage in acquisitions without raising additional equity or obtaining additional debt financing may be impaired in the future;

- it may be difficult for us to satisfy our obligations to our creditors, resulting in possible defaults on and acceleration of such indebtedness;

- we may be more vulnerable to general adverse economic and industry conditions; and

- our flexibility to adjust to changing market conditions and our ability to withstand competitive pressures could be limited, or we may be prevented from making capital investments that are necessary or important to our operations in general, our growth strategy and our efforts to improve operating margins of our business units.

***We may have future capital needs and may not be able to obtain additional financing to fund our capital needs on acceptable terms, or at all.***

We have from time to time evaluated, and we continue to evaluate, our potential capital needs in light of increasing demand for our services, limitations on bandwidth capacity and performance and generally evolving technology in our industry. We may utilize one or more types of capital raising in order to fund any initiative in this regard, including the issuance of new equity securities and new debt securities, including debt securities convertible into our common stock. Our ability to generate positive cash flows from operating activities and the extent and timing of certain capital and other necessary expenditures are subject to numerous variables, such as costs related to execution of our current technology roadmap, including continuing development and deployment of Gogo 5G, Global Broadband and other future technologies. The market conditions and the macroeconomic conditions that affect the markets in which we operate could have a material adverse effect on our ability to secure financing on acceptable terms, if at all. We may be unable to secure additional financing on favorable terms or at all or our operating cash flows may be insufficient to satisfy our financial obligations under the 2021 Credit Agreement and other indebtedness outstanding from time to time.

Our ability to obtain additional financing for working capital, capital expenditures, acquisitions, debt service requirements or general corporate purposes is limited by the 2021 Credit Agreement. In the future, if our subsidiaries are in compliance with certain incurrence ratios or other covenant exceptions set forth in the 2021 Credit Agreement, our subsidiaries may be able to incur additional indebtedness, which indebtedness may be secured or unsecured, the incurrence of which may increase the risks created by our current substantial indebtedness. Events beyond our control can affect our ability to comply with these requirements. The 2021 Credit Agreement also limits the ability of Gogo Inc. to incur additional indebtedness under certain circumstances and limits the amount of cash that our subsidiaries may dividend, transfer or otherwise distribute to us.

The terms of any additional financing may further limit our financial and operating flexibility. Our ability to satisfy our financial obligations will depend upon our future operating performance, the availability of credit generally, economic conditions and financial, business and other factors, many of which are beyond our control. Furthermore, if financing is not available when needed, or is not available on acceptable terms, we may be unable to take advantage of business opportunities or respond to competitive pressures, any of which may have a material adverse effect on our business, financial condition and results of operations. Even if we are able to

28

obtain additional financing, we may be required to use the proceeds from any such financing to repay a portion of our outstanding debt.

If we raise additional funds or seek to reduce our current levels of indebtedness through further issuances of equity, convertible debt securities or other securities convertible into equity, our existing stockholders could suffer significant dilution in their percentage ownership of our company. In addition, any new securities we issue could have rights, preferences and privileges senior to those of holders of our common stock, and we may grant holders of such securities rights with respect to the governance and operations of our business. If we are unable to obtain adequate financing or financing on terms satisfactory to us, if and when we require it, our ability to grow or support our business and to respond to business challenges could be significantly limited.

***The agreements and instruments governing our debt contain restrictions and limitations that could adversely impact our ability to operate our business.***

The 2021 Credit Agreement contains covenants that, among other things, limit the ability of our subsidiaries and, in certain circumstances, us to:

- incur additional debt;
- pay dividends, redeem stock or make other distributions;
- make certain investments;
- create liens;
- transfer or sell assets;
- merge or consolidate with other companies; and
- enter into certain transactions with our affiliates.

Our ability to comply with the covenants and restrictions contained in the 2021 Credit Agreement may be affected by economic, financial and industry conditions beyond our control. Our failure to comply with obligations under the agreements and instruments governing our indebtedness may result in an event of default under such agreements and instruments. We cannot be certain that we will have funds available to remedy these defaults. A default, if not cured or waived, may permit acceleration of our indebtedness. If our indebtedness is accelerated, we cannot be certain that we will have sufficient funds available to pay the accelerated indebtedness or have the ability to refinance the accelerated indebtedness on terms favorable to us or at all. All of these covenants and restrictions could affect our ability to operate our business, may limit our ability in the future to satisfy currently outstanding obligations and may limit our ability to take advantage of potential business opportunities as they arise.

***An increase in interest rates would increase the cost of servicing our indebtedness and could reduce our profitability.***

Our debt outstanding under the Term Loan Facility bears interest, and any indebtedness under our Revolving Facility would bear interest, at variable rates. While we have entered into interest rate caps to hedge a portion of our exposure, we remain subject to interest rate risk under these facilities. Increases in interest rates would increase the cost of servicing our debt and could materially reduce our profitability and cash flows.

Any payments made under our interest rate caps are based on the three-month LIBOR interest rate. The upcoming cessation of the availability of LIBOR may adversely affect our business, financial position, results of operations and cash flows. On July 27, 2017, the United Kingdom's Financial Conduct Authority (the "FCA"), which regulates LIBOR, announced that it intends to stop encouraging or compelling banks to submit LIBOR quotations after 2021 (the "FCA Announcement"). On March 5, 2021, the ICE Benchmark Administration, which administers LIBOR, and FCA announced that all LIBOR settings will either cease to be provided by any administrator, or no longer be representative immediately after December 31, 2021, for all non-U.S. dollar LIBOR settings and one-week and two-month U.S. dollar LIBOR settings, and immediately after June 30, 2023 for the remaining U.S. dollar LIBOR settings (the "LIBOR Announcement").

It is not possible to predict the effect that the LIBOR Announcement, the discontinuation of LIBOR or the establishment of alternative reference rates may have on LIBOR, but financial products with interest rates tied to LIBOR may be adversely affected. Once LIBOR ceases to be published, it is uncertain whether it will continue to be viewed as an acceptable market benchmark, what rate or rates may become accepted alternatives to LIBOR or what the effect of any such changes in views or alternatives may be on the markets for LIBOR-indexed financial instruments.

We amended our 2021 Credit Agreement on February 2, 2023 to transition to the secured overnight financing rate as administered by the Federal Reserve Bank of New York ("SOFR") in anticipation of LIBOR's discontinuation. Any indebtedness under our 2021 Credit Agreement may bear interest at variable rates that use the forward-looking term rate based on SOFR. SOFR is calculated differently than LIBOR and has inherent differences, which could give rise to uncertainties, including the limited historical

29

data and volatility in the benchmark rates. We intend to transition our interest rate caps from LIBOR to SOFR before LIBOR's discontinuation. The full effects of the transition to SOFR remain uncertain.

***Indebtedness under the Facilities is secured by substantially all of our assets. As a result of these security interests, such assets would only be available to satisfy claims of our general creditors or to holders of our equity securities, if we were to become insolvent, to the extent the value of such assets exceeded the amount of our secured indebtedness and other obligations. In addition, the existence of these security interests may adversely affect our financial flexibility.***

Indebtedness under the Facilities is secured by a lien on substantially all of our assets. Accordingly, if an event of default were to occur under the 2021 Credit Agreement, to the extent amounts were outstanding under the Facilities, the lenders party to the 2021 Credit Agreement would have a prior right to our assets, to the exclusion of our general creditors in the event of our bankruptcy, insolvency, liquidation, or reorganization. In that event, our assets would first be used to repay in full all indebtedness and other obligations under the 2021 Credit Agreement, resulting in all or a portion of our assets being unavailable to satisfy the claims of our unsecured indebtedness. Only after satisfying the claims of our unsecured creditors and our subsidiaries' unsecured creditors would any amount be available for our equity holders. The pledge of these assets and other restrictions may limit our flexibility in raising capital for other purposes. Because substantially all of our assets are pledged under these financing arrangements, our ability to incur additional secured indebtedness or to sell or dispose of assets to raise capital may be impaired, which could have an adverse effect on our financial flexibility.

***A downgrade, suspension or withdrawal of the rating assigned by a rating agency to us, our subsidiaries or our indebtedness, if any, could cause our cost of capital to increase.***

Our Term Loan has been rated by nationally recognized rating agencies and may in the future be rated by additional rating agencies. We cannot assure you that any rating assigned will remain for any given period of time or that a rating will not be lowered or withdrawn entirely by a rating agency if, in that rating agency's judgment, circumstances relating to the basis of the rating, such as adverse changes in our business, so warrant. Any future lowering of ratings may make it more difficult or more expensive for us to obtain additional debt financing.

**Risks Related to Our Common Stock**

***The price of our common stock may be volatile, and the value of your investment could decline.***

The trading price of our common stock has been volatile since our IPO, which occurred on June 21, 2013 and in which shares of common stock were sold at a price of $17.00 per share. From the IPO date through February 24, 2023, the price of our common stock has ranged from a closing low of $1.40 per share to a closing high of $34.34 per share. In addition to the factors discussed in this Annual Report on Form 10-K, the trading price of our common stock may fluctuate widely in response to various factors, many of which are beyond our control. They include:

- aviation industry or general market conditions, including those related to disruptions to supply chains and installations;

- domestic and international economic factors unrelated to our performance;

- changes in technology or customer usage of Wi-Fi and Internet broadband services;

- any inability to timely and efficiently roll out Gogo 5G, Global Broadband or other components of our technology roadmap;

- new regulatory pronouncements and changes in regulatory guidelines;

- actual or anticipated fluctuations in our quarterly operating results and any inability to generate positive cash flows on a consolidated basis in the future or to obtain additional financing;

- changes in or failure to meet publicly disclosed expectations as to our future financial performance;

- changes in securities analysts' estimates of our financial performance or lack of research and reports by industry analysts;

- action by institutional stockholders or other large stockholders, including future sales;

- short-selling or other transactions involving derivatives of our securities;

- speculation in the press or investment community;

- investor perception of us and our industry;

- changes in market valuations or earnings of similar companies;

30

- announcements by us or our competitors of significant products, contracts, contract amendments, acquisitions or strategic partnerships;

- developments or disputes concerning patents or proprietary rights, including increases or decreases in litigation expenses associated with intellectual property lawsuits we may initiate, or in which we may be named as defendants;

- failure to complete significant sales;

- any future sales of our common stock or other securities;

- renewal of our FCC licenses and our ability to obtain additional spectrum; and

- additions or departures of key personnel.

In addition, the stock markets have experienced extreme price and volume fluctuations in recent years that have affected and continue to affect the market prices of equity securities of many technology companies. Stock prices of many such companies have fluctuated in a manner unrelated or disproportionate to the operating performance of those companies. These broad market fluctuations may adversely affect the trading price of our common stock. In the past, following periods of volatility in the market price of a company's securities, class action litigation has often been instituted against such company. Any litigation of this type brought against us could result in substantial costs and a diversion of our management's attention and resources, which may have a material adverse effect on our business, financial condition and results of operations.

***The utilization of our tax losses could be substantially limited if we experienced an "ownership change" as defined in the Internal Revenue Code.***

As of December 31, 2022, we had approximately $562 million in federal and $448 million in state net operating losses ("NOLs"). The federal NOLs will begin to expire in 2032. The state NOLs expire in various tax years beginning in 2023. Under Section 382 of the Code and corresponding provisions of state law, if a corporation undergoes an "ownership change," which is generally defined as an increase of more than 50% of the value of the Company's stock owned by certain "5-percent shareholders," as such term is defined in Section 382 of the Code, in its equity ownership over a rolling three-year period, the corporation's ability to use its pre-change NOLs and other pre-change tax attributes to offset its post-change income or taxes may be limited. To the extent there becomes a new 5-percent shareholder, we may experience an ownership change under Section 382 of the Code, which may result in the loss or impairment of some or all of our NOLs. The extent of any loss or impairment of our NOLs upon an ownership change would depend on several factors, including the nature of the NOLs, our stock price and extent of the ownership change.

In September 2020, our Board of Directors adopted a Section 382 Rights Agreement (as amended, the "Rights Agreement"), between the Company and Computershare Trust Company, N.A., as rights agent, and declared a dividend of one Right for each outstanding share of common stock of the Company outstanding on the record date of October 2, 2020, to the stockholders of record on that date. The Rights Agreement is designed to facilitate the Company's ability to protect its NOLs and certain other tax attributes in order to be able to offset potential future income taxes for federal income tax purposes. The Rights Agreement may make it more difficult for the Company to undergo an ownership change by deterring a third party from acquiring beneficial ownership of 4.9% or more of the shares of our common stock then outstanding. Beneficial ownership for purposes of the Rights Agreement is determined based on meeting one of several criteria, including (i) actual or constructive ownership pursuant to Section 382 of the Code and related regulations thereunder and (ii) beneficial ownership, directly or indirectly, within the meaning of Rules 13d-3 or 13d-5 promulgated under the Exchange Act. The limitations set forth in the Rights Agreement may adversely affect the marketability of our common stock by discouraging any individual or entity, together with their affiliates and associates, from acquiring beneficial ownership of 4.9% or more of the shares of our common stock then outstanding.

In addition, although the Rights Agreement is intended to reduce the likelihood of an ownership change that could adversely affect utilization of our NOLs, the Rights Agreement has been, and may be, ineffective at deterring shareholders from becoming 5-percent shareholders. For example, in September 2022 and December 2022, two institutional shareholders inadvertently crossed the 4.9% beneficial ownership threshold. In both such circumstances, our Board of Directors, rather than allowing a distribution of Rights to be triggered, determined that it was in the best interests of the Company to grant requests by such shareholders that they each be deemed an "Exempt Person" under the Rights Agreement. Each exemption required that the shareholder satisfy certain ownership conditions intended to prevent an ownership change and protect our ability to utilize our NOLs. Moreover, pursuant to the terms of the Rights Agreement, our Board of Directors may determine that it is in the best interests of the Company to exempt certain transactions, which could result in an ownership change, from triggering the Rights Agreement. Failure by an "Exempt Person" or other persons exempt from certain transaction under the Rights Agreement to comply with the conditions for such exemptions could result in an ownership change and result in the loss or impairment of some or all of our NOLs. If an ownership change occurs and our ability to use our NOLs is materially limited, it would harm our future operating results by effectively increasing our future tax obligations.

31

*Future stock issuances could cause substantial dilution and a decline in our stock price.*

We may issue additional shares of common stock or other equity or debt securities convertible into common stock from time to time in connection with a financing, acquisition, litigation settlement, employee arrangement, as consideration to third-party service or equipment providers or otherwise. Additional shares of common stock are also issuable upon exercise of outstanding stock options. We may also reserve additional shares of our common stock for issuance upon the exercise of stock options or other similar forms of equity incentives. We cannot predict the size of future issuances or the effect, if any, that they may have on the market price for our common stock. Any of these issuances could result in substantial dilution to our existing stockholders and could cause the trading price of our common stock to decline.

*A few significant stockholders, including affiliates of Oakleigh Thorne, our Chairman of the Board and CEO, and GTCR LLC and its affiliates, could exert influence over our company, and if the ownership of our common stock continues to be concentrated, or becomes more concentrated in the future, it could prevent our other stockholders from influencing significant corporate decisions.*

As of December 31, 2022, Oakleigh Thorne, our CEO and the Chairman of our Board of Directors, and the entities affiliated with Mr. Thorne (the "Thorne Entities") beneficially owned approximately 22% of the outstanding shares of our common stock, and funds managed by GTCR LLC and its affiliates ("GTCR") beneficially owned approximately 25% of the outstanding shares of our common stock. As a result, either the Thorne Entities or GTCR alone is able to exercise influence over all matters requiring stockholder approval for the foreseeable future, including approval of significant corporate transactions and the election of directors. Such ability to influence may reduce the market price of our common stock. In addition, together, GTCR and the Thorne Entities would be able to exercise control over such matters, which similarly may reduce the market price of our common stock.

As our CEO, Mr. Thorne has control over our day-to-day management and the implementation of major strategic initiatives and investments by our company, subject to authorization and oversight by our Board of Directors. As a member of our Board of Directors, Mr. Thorne owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, Mr. Thorne is entitled to vote his shares, and shares over which he has voting control, in his own interest, which may not always be in the interests of stockholders generally.

Our corporate governance guidelines address potential conflicts between a director's interests and our interests, and our code of business conduct, among other things, requires our employees and directors to avoid actions or relationships that might conflict or appear to conflict with their job responsibilities or our interests and to disclose their outside activities, financial interests or relationships that may present a possible conflict of interest or the appearance of a conflict to management or corporate counsel. These corporate governance guidelines and code of business ethics do not, by themselves, prohibit transactions with the Thorne Entities.

*Fulfilling our obligations associated with being a public company is expensive and time-consuming, and any delays or difficulties in satisfying these obligations may have a material adverse effect on our results of operations and our stock price.*

As a public company, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), and the related rules and regulations of the SEC, as well as NASDAQ rules, require us to implement various corporate governance practices and adhere to a variety of reporting requirements and complex accounting rules. Compliance with these public company obligations requires us to devote significant time and resources and places significant additional demands on our finance and accounting staff and on our financial accounting and information systems. We are also required under Sarbanes-Oxley to document and test the effectiveness of our internal control over financial reporting, and our independent registered public accounting firm is required to provide an attestation report on the effectiveness of our internal control over financial reporting. In addition, we are required under the Exchange Act to maintain disclosure controls and procedures and internal control over financial reporting. Any failure to maintain effective controls or implement required new or improved controls may materially adversely affect our results of operations or cause us to fail to meet our reporting obligations. If we are unable to conclude that we have effective internal control over financial reporting, or if our independent registered public accounting firm is unable to provide us with an unqualified report regarding the effectiveness of our internal control over financial reporting, investors could lose confidence in the reliability of our consolidated financial statements. This could result in a decrease in the value of our common stock. Failure to comply with Sarbanes-Oxley could potentially subject us to sanctions or investigations by the SEC, NASDAQ, or other regulatory authorities.

***Anti-takeover provisions in our charter documents and Delaware law, and certain provisions in our existing and any future credit facility could discourage, delay or prevent a change in control of our company and may affect the trading price of our common stock.***

Our amended and restated certificate of incorporation and amended and restated bylaws include a number of provisions that may discourage, delay or prevent a change in our management or control over us that stockholders may consider favorable. These provisions include:

- Authorization of the issuance of "blank check" preferred stock that could be issued by our Board of Directors to thwart a takeover attempt;

- Establishment of a classified Board of Directors, as a result of which our board is divided into three classes, with each class serving for staggered three-year terms, which prevents stockholders from electing an entirely new Board of Directors at an annual meeting;

- A requirement that directors only be removed from office for cause and only upon a supermajority stockholder vote;

- A provision that vacancies on the Board of Directors, including newly-created directorships, may be filled only by a majority vote of directors then in office;

- A limitation on who may call special meetings of stockholders;

- A prohibition on stockholder action by written consent, thereby requiring all actions to be taken at a meeting of the stockholders; and

- A requirement of supermajority stockholder voting to effect certain amendments to our amended and restated certificate of incorporation and amended and restated bylaws.

Additionally, our Board of Directors adopted the Rights Agreement, which is intended to reduce the likelihood of an ownership change under Section 382 of the Code by deterring a third party from acquiring beneficial ownership of 4.9% or more of the shares of our common stock then outstanding. The Rights Agreement, as well as the provisions described above, may prevent our stockholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context. Even in the absence of a takeover attempt, the existence of the Rights Agreement or such provisions may adversely affect the prevailing market price of our common stock if viewed as discouraging takeover attempts in the future.

The Rights Agreement as well as the provisions of our amended and restated certificate of incorporation and amended and restated bylaws may also make it difficult for stockholders to replace or remove our management or Board of Directors. These provisions may facilitate management entrenchment that may delay, deter, render more difficult or prevent a change in our control, which may not be in the best interests of our stockholders.

Under the terms of the 2021 Credit Agreement, a takeover of our company would allow the administrative agent and/or the lenders to terminate their commitments under the 2021 Credit Agreement and declare any and all outstanding amounts to be due and payable. This provision may have the effect of delaying or preventing a takeover of our company that would otherwise be beneficial to our stockholders.

***Our corporate charter and bylaws include provisions limiting ownership by non-U.S. citizens, including the power of our Board of Directors to redeem shares of our common stock from non-U.S. citizens.***

The Communications Act and FCC regulations impose restrictions on foreign ownership of FCC licensees, as described in the above risk factor, "*— Risks Related to Our Technology and Intellectual Property—If we fail to comply with the Communications Act and FCC regulations limiting ownership and voting of our capital stock by non-U.S. persons we could lose our FCC license.*" Our corporate charter and bylaws include provisions that permit our Board of Directors to take certain actions in order to comply with FCC regulations regarding foreign ownership, including but not limited to, a right to redeem shares of common stock from non-U.S. citizens at prices at or below fair market value. Non-U.S. citizens should consider carefully the redemption provisions in our certificate of incorporation prior to investing in our common stock.

These restrictions may also decrease the liquidity and value of our stock by reducing the pool of potential investors in our company and making the acquisition of control of us by third parties more difficult. In addition, these restrictions could adversely affect our ability to attract equity financing or consummate an acquisition of a foreign entity using shares of our capital stock.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

Currently, we lease approximately 120,000 square feet for our business in Broomfield, Colorado, under a lease agreement that expires in 2029. In addition, we lease approximately 11,700 square feet in Chicago, Illinois for those of our employees who live in the metropolitan Chicago area under a lease agreement that expires on May 31, 2032. We believe that our existing facilities will be adequate for the foreseeable future.

**Item 3. Legal Proceedings**

We are subject to several lawsuits arising out of the conduct of our business. See Note 17, "Commitments and Contingencies," to our consolidated financial statements for a discussion of litigation matters.

From time to time we may become involved in legal proceedings arising in the ordinary course of our business. We cannot predict with certainty the outcome of any litigation or the potential for future litigation. Regardless of the outcome of any particular litigation and the merits of any particular claim, litigation can have a material adverse impact on our company due to, among other reasons, any injunctive relief granted, which could inhibit our ability to operate our business, amounts paid as damages or in settlement of any such matter, diversion of management resources and defense costs.

**Item 4. Mine Safety Disclosures**

Not applicable.

34

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information for Common Stock**

Our common stock has been listed on the NASDAQ Global Select Market ("NASDAQ") under the symbol "GOGO" since June 21, 2013.

**Holders of Record**

As of February 24, 2023, there were 33 stockholders of record of our common stock, and the closing price of our common stock was $14.50 per share as reported on the NASDAQ. Because many of our shares of common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders.

**Repurchases of Equity Securities**

None.

**Recent Sale of Unregistered Securities**

None.

**Use of Proceeds from Registered Securities**

None.

**Securities Authorized for Issuance Under Equity Compensation Plans**

See Item 12, "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters," for information regarding securities authorized for issuance.

**Performance**

*This performance graph shall not be deemed "soliciting material" or to be "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed to be incorporated by reference into any filing of Gogo Inc. under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act.*

The following graph shows a comparison of cumulative total return for our common stock, the Standard & Poor's 500 Stock Index ("S&P 500"), the Nasdaq Composite Index ("NASDAQ Composite") and Standard & Poor's SmallCap 600 Index ("S&P SmallCap 600") for the period from December 31, 2017 through December 30, 2022, the last trading day of 2022. The graph assumes that $100 was invested at the market close on December 31, 2017 in our common stock, the S&P 500, the NASDAQ Composite and the S&P SmallCap 600 and assumes reinvestments of dividends, if any. The S&P SmallCap 600 was chosen because we do not believe we can reasonably identify an industry index or specific peer issuer that would offer a meaningful comparison. The S&P SmallCap 600

35

represents a broad-based index of companies with similar market capitalization. The comparisons in the graph below are based upon historical data and are not indicative of, nor intended to forecast, future performance of our common stock.



**Item 6. [Reserved]**

36

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion and analysis is intended to help the reader understand our business, financial condition, results of operations, liquidity and capital resources. You should read this discussion in conjunction with our consolidated financial statements and the related notes contained in this Annual Report on Form 10-K.

On December 1, 2020, we completed the previously announced sale of our commercial aviation ("CA") business to a subsidiary of Intelsat Jackson Holdings S.A. ("Intelsat") for a purchase price of $400.0 million in cash, subject to certain adjustments (the "Transaction"). As a result, all periods presented in our consolidated financial statements and other portions of this Annual Report on Form 10-K have been conformed to present the CA business as discontinued operations. There was no discontinued operations activity for the CA business after December 31, 2021.

The statements in this discussion regarding industry outlook, our expectations regarding our future performance, liquidity and capital resources and other non-historical statements in this discussion are forward-looking statements. These forward-looking statements are subject to numerous risks and uncertainties, including, but not limited to, the risks and uncertainties described under "Risk Factors" in this report. Our actual results may differ materially from those contained in or implied by any forward-looking statements.

Our fiscal year ends December 31 and, unless otherwise noted, references to years or fiscal are for fiscal years ended December 31. See "— Results of Operations."

**Company Overview**

Gogo is the world's largest provider of broadband connectivity services for the business aviation market. We have served this market for more than 25 years. Our mission is to enrich the lives of passengers and the efficiency of operators with the world's best business aviation in-flight connectivity and customer support. We have always sought to provide the best connectivity for the business aviation market regardless of technology, and we have a successful history of doing so. Until recently, we focused primarily on business aviation aircraft in North America, which comprise approximately 63% of the worldwide business aviation fleet, and we are the leading provider of in-flight connectivity in that market. Gogo started in analogue air-to-ground ("ATG") technology in the late 1990s, then, as analogue cellular backhaul disappeared, migrated to narrowband satellite connectivity in the early 2000s, then back to ATG with our digital broadband 3G and 4G networks beginning in 2010. We expect to commercially launch our fourth ATG network – Gogo 5G – in the fourth quarter of 2023. We also continue to provide narrowband satellite services to customers in North America and internationally through distribution agreements with satellite providers. In May 2022, in order to further serve our existing customers and expand our target market, we announced plans to expand our broadband offerings beyond ATG by launching the first global broadband service designed for business aviation ("Global Broadband"). The service will use an electronically steered antenna ("ESA"), specifically designed to address a broad range of business aviation aircraft, operating on a low earth orbit ("LEO") satellite network. The antenna will be designed with Hughes Network Systems, LLC ("Hughes") and utilized on a LEO satellite network operated by Network Access Associates Limited ("OneWeb").

Our chief operating decision maker evaluates performance and business results for our operations, and makes resource and operating decisions, on a consolidated basis. As we do not have multiple segments, we do not present segment information in this Annual Report on Form 10-K.

**Factors and Trends Affecting Our Results of Operations**

We believe that our operating and business performance is driven by various factors that affect the business aviation industry, including trends affecting the travel industry and trends affecting the customer bases that we target, as well as factors that affect wireless Internet service providers and general macroeconomic factors. Key factors that may affect our future performance include:

- costs associated with the implementation of, and our ability to implement on a timely basis, our technology roadmap, including upgrades to and installation of the ATG technologies we currently offer, Gogo 5G, Global Broadband and any other next generation or other new technology;

- our ability to manage issues and related costs that may arise in connection with the implementation of our technology roadmap, including technological issues and related remediation efforts and failures or delays on the part of antenna and other equipment developers and providers or satellite network providers, some of which are single-source;

- our ability to license additional spectrum and make other improvements to our network and operations as technology and user expectations change;

- the number of aircraft in service in our markets, including consolidations or changes in fleet size by one or more of our large-fleet customers;

- the economic environment and other trends that affect both business and leisure aviation travel;

37

- disruptions to supply chains and installations, including shortages of electronic components that have resulted in longer lead times and delays in obtaining certain electronic components used in the airborne equipment that we manufacture;

- the extent of our customers' adoption of our products and services, which is affected by, among other things, willingness to pay for the services that we provide, the quality and reliability of our products and services, changes in technology and competition from current competitors and new market entrants;

- our ability to engage suppliers of equipment components and network services on a timely basis and on commercially reasonable terms;

- our ability to fully utilize portions of our deferred tax assets;

- changes in laws, regulations and interpretations affecting telecommunications services globally, including those affecting our ability to maintain our licenses for ATG spectrum in the United States, obtain sufficient rights to use additional ATG spectrum and/or other sources of broadband connectivity to deliver our services, including Global Broadband, expand our service offerings and manage our network; and

- changes in laws, regulations and policies affecting our business or the business of our customers and suppliers globally, including changes that impact the design of our equipment and our ability to obtain required certifications for our equipment.

**Key Business Metrics**

Our management regularly reviews financial and operating metrics, including the following key operating metrics, to evaluate the performance of our business and our success in executing our business plan, make decisions regarding resource allocation and corporate strategies, and evaluate forward-looking projections.

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Aircraft online (at period end) | | | |
| ATG | 6,935 | 6,400 | 5,778 |
| Satellite | 4,475 | 4,567 | 4,702 |
| Average monthly connectivity service revenue per aircraft online | | | |
| ATG | $ 3,349 | $ 3,238 | $ 2,951 |
| Satellite | 268 | 250 | 212 |
| Units sold | | | |
| ATG | 1,334 | 869 | 667 |
| Satellite | 206 | 205 | 199 |
| Average equipment revenue per unit sold (in thousands) | | | |
| ATG | $ 68 | $ 71 | $ 68 |
| Satellite | 49 | 54 | 59 |

- *ATG aircraft online.* We define ATG aircraft online as the total number of business aircraft for which we provide ATG services as of the last day of each period presented. This number excludes aircraft receiving ATG service as part of the ATG Network Sharing Agreement with Intelsat.

- *Satellite aircraft online.* We define satellite aircraft online as the total number of business aircraft for which we provide narrowband satellite services as of the last day of each period presented.

- *Average monthly connectivity service revenue per ATG aircraft online.* We define average monthly connectivity service revenue per ATG aircraft online as the aggregate ATG connectivity service revenue for the period divided by the number of months in the period, divided by the number of ATG aircraft online during the period (expressed as an average of the month end figures for each month in such period). Revenue share earned from the ATG Network Sharing Agreement with Intelsat is excluded from this calculation.

- *Average monthly connectivity service revenue per satellite aircraft online.* We define average monthly connectivity service revenue per satellite aircraft online as the aggregate narrowband satellite connectivity service revenue for the period divided by the number of months in the period, divided by the number of narrowband satellite aircraft online during the period (expressed as an average of the month end figures for each month in such period).

- *Units sold.* We define units sold as the number of ATG or narrowband satellite units for which we recognized revenue during the period.

38

- *Average equipment revenue per ATG unit sold.* We define average equipment revenue per ATG unit sold as the aggregate equipment revenue from all ATG units sold during the period, divided by the number of ATG units sold.

- *Average equipment revenue per satellite unit sold*. We define average equipment revenue per satellite unit sold as the aggregate equipment revenue earned from all narrowband satellite units sold during the period, divided by the number of narrowband satellite units sold.

**Key Components of Consolidated Statements of Operations**

As a result of the Transaction, all periods presented in this Annual Report on Form 10-K have been conformed to present the CA business as a discontinued operation. We report the financial results of discontinued operations separately from continuing operations to distinguish the financial impact of disposal transactions from ongoing operations. The results of operations and cash flows of a discontinued operation are restated for all comparative periods presented. Refer to Note 20, "Discontinued Operations," to our consolidated financial statements for further information.

The following briefly describes certain key components of revenue and expenses as presented in our consolidated statements of operations.

*Revenue:*

We generate two types of revenue: service revenue and equipment revenue.

Service revenue primarily consists of monthly subscription and usage fees paid by aircraft owners and operators for telecommunication, data, and in-flight entertainment services. Service revenue is recognized as the services are provided to the customer. Beginning December 2020, service revenue includes revenue earned from the ATG Network Sharing Agreement with Intelsat.

Equipment revenue primarily consists of proceeds from the sale of ATG and narrowband satellite connectivity equipment and is recognized when control of the equipment is transferred to OEMs and dealers, which generally occurs when the equipment is shipped.

*Cost of Revenue:*

Cost of service revenue consists of ATG network costs, satellite provider service costs, transaction costs and costs related to network operations.

Cost of equipment revenue primarily consists of the costs of purchasing component parts used in the manufacture of our equipment and the production, installation, technical support and quality assurance costs associated with the equipment sales.

*Engineering, Design and Development Expenses:*

Engineering, design and development expenses include the costs incurred to design and develop our technologies and products and to obtain and maintain FAA and other regulatory certifications. This includes the design, development and integration of our ATG ground networks and airborne line replaceable units, the design and development of products and enhancements thereto, and program management activities. Engineering, design and development expenses also include costs associated with enhancements to existing products.

*Sales and Marketing Expenses:*

Sales and marketing expenses consist of costs associated with activities related to customer sales (including sales commissions), digital marketing and lead generation, advertising and promotions, product management, trade shows and customer service support for end users.

*General and Administrative Expenses:*

General and administrative expenses include personnel and related operating costs of the business support functions, including finance and accounting, legal, human resources, administrative, information technology, facilities and executive groups.

*Depreciation and Amortization:*

Depreciation expense includes expense associated with the depreciation of our network equipment, office equipment and furniture, fixtures and leasehold improvements, which is recorded over their estimated useful lives. Amortization expense includes the amortization of our finite-lived intangible assets on a straight-line basis over their estimated useful lives, which range from three to ten years depending on the assets being amortized.

**Critical Accounting Estimates**

Our discussion and analysis of our financial condition and results of operations are based on our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The preparation of our consolidated financial statements and related disclosures requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenue, costs and expenses, and related exposures. We base our estimates and assumptions on historical experience and other factors that we believe to be reasonable under the circumstances. In some instances, we could reasonably use different accounting estimates, and in some instances actual results could differ significantly from our estimates. We evaluate our estimates and assumptions on an ongoing basis. To the extent that there are differences between our estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flows will be affected.

We believe that the assumptions and estimates associated with the valuation allowance related to our deferred income tax assets have the greatest potential impact on and are the most critical to fully understanding and evaluating our reported financial results, and that they require our most difficult, subjective or complex judgments. For a discussion of our significant accounting policies to which many of these critical estimates relate, see Note 2, "Summary of Significant Accounting Policies," to our consolidated financial statements.

Note that these critical accounting estimates relate solely to our continuing operations. The accounting policies related to our discontinued operations are discussed in Note 20, "Discontinued Operations," to our consolidated financial statements.

*Deferred Income Taxes - Valuation Allowance:*

We account for the valuation allowance on our deferred income tax assets in accordance with Accounting Standards Codification Topic 740, *Income Taxes* ("ASC 740").

On a recurring basis, we assess the need for a valuation allowance related to our deferred income tax assets, which includes consideration of both positive and negative evidence to determine, based on the weight of the available evidence, whether it is more likely than not that some or all of our deferred tax assets will not be realized. In our assessment, we consider recent financial operating results, the scheduled expiration of our net operating losses, potential sources of taxable income, the reversal of existing taxable differences, taxable income in prior carryback years (if permitted under tax law) and tax planning strategies. We have a recent history of financial reporting losses, primarily driven by our divested CA business, resulting in cumulative pre-tax losses in the three-year period ending with the current quarter which is objectively verifiable negative evidence regarding future profitability. Cumulative pre-tax losses from continuing operations adjusted for the reduction in interest expense resulting from the Refinancing and the settlement of the 2022 Convertible Notes (as defined below) result in positive normalized income over the same three-year period. This is objectively verifiable positive evidence of our ability to generate positive earnings in the future.

When there is a recent history of operating losses and a return to operating profitability has not yet been demonstrated, we cannot rely on projections of future earnings for purposes of assessing recoverability of our deferred tax assets and instead must use our historical earnings for this assessment. In such cases, we use systematic and logical methods to estimate when deferred tax assets will reverse and generate tax deductions. The selection of methodologies and assessment of when temporary differences will result in deductible amounts involves significant management judgment and is inherently complex and subjective. Our determination that we are more likely than not to realize a portion of our deferred tax assets represents our best estimate and considers both positive and negative factors. We considered positive factors including the sale of our CA business, the reduction in interest expense resulting from the Refinancing and the settlement of the 2022 Convertible Notes, strong demand for our products and services and pre-tax income from continuing operations in the fiscal year ended December 31, 2022 and the third and fourth fiscal quarters of 2021. The negative factors included cumulative pre-tax losses from continuing operations in the three-year period ending with the current quarter and our relatively short history of pre-tax income from continuing operations. It is possible that there will be changes in our business, our performance, our industry or otherwise that cause actual results to differ materially from this estimate. If those changes result in significant and sustained reductions in our pre-tax income or utilization of existing tax carryforwards in future periods, additional valuation allowances may have to be recorded with corresponding adverse impacts on earnings and/or other comprehensive income. Such adverse impacts may be material.

For the year ended December 31, 2022, our determination that we are more likely than not to realize a portion of our deferred tax assets resulted in a release of approximately $11.4 million of our valuation allowance. The remaining valuation allowance is still required for deferred tax assets related to certain state and foreign NOLs, capital losses, and the Section 163(j) interest limitation carryforward, as we determined that it was more likely than not that, as of December 31, 2022, these deferred tax assets will not be realized.

See Note 15, "Income Tax," to our consolidated financial statements for additional information.

40

**Recent Accounting Pronouncements**

See Note 2, "Summary of Significant Accounting Policies," to our consolidated financial statements for additional information.

**Results of Operations**

The following table sets forth, for the periods presented, certain data from our consolidated statements of operations. The information contained in the table below should be read in conjunction with our consolidated financial statements and related notes.

**Consolidated Statements of Operations Data**
*(in thousands)*

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Revenue:** | | | |
| Service revenue | $ 296,329 | $ 259,583 | $ 211,987 |
| Equipment revenue | 107,738 | 76,133 | 57,731 |
| **Total revenue** | 404,067 | 335,716 | 269,718 |
| **Operating expenses:** | | | |
| Cost of service revenue (exclusive of items shown below) | 64,427 | 56,103 | 45,073 |
| Cost of equipment revenue (exclusive of items shown below) | 71,473 | 46,092 | 39,299 |
| Engineering, design and development | 29,587 | 24,874 | 25,227 |
| Sales and marketing | 25,471 | 20,985 | 15,135 |
| General and administrative | 58,203 | 51,554 | 54,467 |
| Depreciation and amortization | 12,580 | 15,482 | 14,166 |
| **Total operating expenses** | 261,741 | 215,090 | 193,367 |
| **Operating income** | 142,326 | 120,626 | 76,351 |
| **Other (income) expense:** | | | |
| Interest income | (2,386) | (191) | (722) |
| Interest expense | 38,872 | 67,472 | 125,787 |
| Loss on extinguishment of debt and settlement of convertible notes | — | 83,961 | — |
| Other (income) expense | 123 | 25 | (9) |
| **Total other expense** | 36,609 | 151,267 | 125,056 |
| **Income (loss) from continuing operations before income taxes** | 105,717 | (30,641) | (48,705) |
| Income tax provision (benefit) | 13,658 | (187,230) | (146) |
| **Net income (loss) from continuing operations** | 92,059 | 156,589 | (48,559) |
| **Net loss from discontinued operations, net of tax** | — | (3,854) | (201,477) |
| **Net income (loss)** | $ 92,059 | $ 152,735 | $ (250,036) |

**Years Ended December 31, 2022 and 2021**

*Revenue:*

Revenue and percent change for the years ended December 31, 2022 and 2021 were as follows *(in thousands, except for percent change)*:

| | For the Years Ended December 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 over 2021 |
| Service revenue | $ 296,329 | $ 259,583 | 14.2% |
| Equipment revenue | 107,738 | 76,133 | 41.5% |
| Total revenue | $ 404,067 | $ 335,716 | 20.4% |

Revenue increased to $404.1 million for the year ended December 31, 2022, as compared with $335.7 million for the prior year, due to increases in service and equipment revenue.

Service revenue increased to $296.3 million for the year ended December 31, 2022, as compared with $259.6 million for the prior year, primarily due to increases in ATG aircraft online and average monthly service revenue per ATG aircraft online. Average monthly service revenue per ATG unit online increased to $3,349 for the year ended December 31, 2022, as compared with $3,238 for the prior year.

41

Equipment revenue increased to $107.7 million for the year ended December 31, 2022, as compared with $76.1 million for the prior year, primarily due to increases in the number of ATG units sold, with 1,334 ATG units sold during the year ended December 31, 2022 as compared with 869 units for the prior year.

We expect service revenue to increase in the future as additional ATG aircraft come online and average monthly connectivity service revenue per ATG aircraft online increases, due in part to the expected impact of the launch of Gogo 5G. We expect equipment revenue to increase in the future as a larger number of ATG units, including Gogo 5G units, are sold. In addition, we expect further revenue growth as we launch Global Broadband.

*Cost of Revenue:*

Cost of service revenue and percent change for the years ended December 31, 2022 and 2021 were as follows *(in thousands, except for percent change)*:

| | For the Years Ended December 31, | | | % Change |
|---|---|---|---|---|
| | 2022 | | 2021 | 2022 over 2021 |
| Cost of service revenue | $ | 64,427 | $ | 56,103 | 14.8% |
| Cost of equipment revenue | $ | 71,473 | $ | 46,092 | 55.1% |

Cost of service revenue increased to $64.4 million for the year ended December 31, 2022, as compared with $56.1 million for the prior year, primarily due to increases in personnel costs and ATG network costs as well as a credit for regulatory surcharges included in the prior year, with no corresponding credit in the current year.

We expect cost of service revenue to increase over time, primarily due to service revenue growth and increasing ATG network costs associated with Gogo 5G. In addition, we expect cost of service revenue to increase as we launch Global Broadband.

Cost of equipment revenue increased to $71.5 million for the year ended December 31, 2022, as compared with $46.1 million for the prior year, primarily due to an increase in ATG units sold.

We expect that our cost of equipment revenue will increase with growth in ATG units sold, including Gogo 5G units following the launch of that service, and Global Broadband units sold following the launch of that service.

*Engineering, Design and Development Expenses:*

Engineering, design and development expenses increased to $29.6 million for the year ended December 31, 2022, as compared with $24.9 million for the prior year, primarily due to commencement of the Global Broadband development program.

We expect engineering, design and development expenses as a percentage of service revenue to increase over the next two years, driven by Global Broadband development costs and Gogo 5G program spend, and decrease over the long term as the level of investment decreases and revenue increases.

*Sales and Marketing Expenses:*

Sales and marketing expenses increased to $25.5 million for the year ended December 31, 2022, as compared with $21.0 million for the prior year, primarily due to increased personnel, travel, promotional and advertising expenses.

We expect sales and marketing expenses as a percentage of service revenue to remain relatively flat in the future.

*General and Administrative Expenses:*

General and administrative expenses increased to $58.2 million for the year ended December 31, 2022, as compared with $51.6 million for the prior year, primarily due to increases in legal expenses and stock-based compensation expense.

We expect general and administrative expenses as a percentage of service revenue to decrease over time.

*Depreciation and Amortization:*

Depreciation and amortization expense decreased to $12.6 million for the year ended December 31, 2022, as compared with $15.5 million for the prior year, primarily due to decreased amortization expense for capitalized software.

We expect that our depreciation and amortization expense will increase in the future as we launch our Gogo 5G network.

42

*Other (Income) Expense:*

Other (income) expense and percent change for the years ended December 31, 2022 and 2021 were as follows *(in thousands, except for percent change)*:

| | For the Years Ended December 31, | | | | % Change 2022 over 2021 |
| --- | --- | --- | --- | --- | --- |
| | **2022** | | **2021** | | |
| Interest income | $ | (2,386) | $ | (191) | 1149.2% |
| Interest expense | | 38,872 | | 67,472 | (42.4)% |
| Loss on extinguishment of debt and settlement of convertible notes | | — | | 83,961 | nm |
| Other expense, net | | 123 | | 25 | 392.0% |
| Total | $ | 36,609 | $ | 151,267 | (75.8)% |

Percentage changes that are considered not meaningful are denoted with nm.

Total other expense decreased to $36.6 million for the year ended December 31, 2022, as compared with $151.3 million for the prior year, primarily due to the prior year including the loss on extinguishment of debt and settlement of convertible notes as well as lower interest expense in the current year as a result of the Refinancing, the benefit from our interest rate caps and the conversion of all outstanding 2022 Convertible Notes that occurred in May 2022.

We expect our interest expense to fluctuate with changes in the variable rates associated with the Facilities, with increases partially offset by the impact of our interest rate caps. See Note 9, "Long-Term Debt and Other Liabilities," to our consolidated financial statements for additional information.

*Income Taxes:*

The effective income tax rate for the year ended December 31, 2022 was 12.9%, as compared with 611.0% for the prior year. The income tax expense of $13.7 million for the year ended December 31, 2022 was primarily due to pre-tax income, partially offset by the partial release of the valuation allowance against our deferred income tax assets and the tax benefits associated with stock-based compensation. The income tax benefit of $187.2 million for the year ended December 31, 2021 was a result of a partial release of the valuation allowance related to our deferred income tax assets during the year. See Note 15, "Income Tax," to our consolidated financial statements for additional information.

We expect our income tax provision to increase in the long term as we continue to generate positive pre-tax income, which we expect to be at least partially offset by reversals of our valuation allowance within the next twelve months.

*Discontinued Operations:*

For the year ended December 31, 2021, the loss from discontinued operations of $3.9 million was primarily related to stock-based compensation expense, partially offset by the recognition of a gain on sale of discontinued operations recorded as a deferred gain on sale at December 31, 2020.

See Note 20, "Discontinued Operations," to our consolidated financial statements for additional information.

**Years Ended December 31, 2021 and 2020**

"Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Annual Report on Form 10-K for the year ended December 31, 2021, filed with the SEC on March 3, 2022, includes a discussion of changes in our results of operations from fiscal year 2020 to fiscal year 2021.

**Non-GAAP Measures**

In our discussion below, we discuss Adjusted EBITDA and Free Cash Flow, as defined below, which are non-GAAP financial measurements. Management uses Adjusted EBITDA and Free Cash Flow for business planning purposes, including managing our business against internally projected results of operations and measuring our performance and liquidity. These supplemental performance measures also provide another basis for comparing period-to-period results by excluding potential differences caused by non-operational and unusual or non-recurring items. These supplemental performance measures may vary from and may not be comparable to similarly titled measures used by other companies. Adjusted EBITDA and Free Cash Flow are not recognized measurements under GAAP; when analyzing our performance with Adjusted EBITDA or liquidity with Free Cash Flow, as applicable, investors should (i) evaluate each adjustment in our reconciliation to the corresponding GAAP measure, and the explanatory footnotes regarding those adjustments, (ii) use Adjusted EBITDA in addition to, and not as an alternative to, net income (loss) attributable to common stock as a measure of operating results and (iii) use Free Cash Flow in addition to, and not as an alternative to, consolidated net cash provided by operating activities when evaluating our liquidity.

43

*Definition and Reconciliation of Non-GAAP Measures*

EBITDA represents net income (loss) attributable to common stock before interest expense, interest income, income taxes and depreciation and amortization expense.

Adjusted EBITDA represents EBITDA adjusted for (i) stock-based compensation expense included in the results of continuing operations, (ii) the results of discontinued operations, including stock-based compensation expense and the gain on the sale of CA, (iii) loss on extinguishment of debt and settlement of convertible notes and (iv) separation costs related to the sale of CA. Our management believes that the use of Adjusted EBITDA eliminates items that management believes have less bearing on our operating performance, thereby highlighting trends in our core business which may not otherwise be apparent. It also provides an assessment of controllable expenses, which are indicators management uses to determine whether current spending decisions need to be adjusted in order to meet financial goals and achieve optimal financial performance.

We believe that the exclusion of stock-based compensation expense from Adjusted EBITDA is appropriate given the significant variation in expense that can result from using the Black-Scholes model to determine the fair value of such compensation. The fair value of our stock options is determined using the Black-Scholes model and varies based on fluctuations in the assumptions used in this model, including inputs that are not necessarily directly related to the performance of our business, such as the expected volatility, the risk-free interest rate and the expected term of the options. Therefore, we believe that the exclusion of this cost provides a clearer view of the operating performance of our business. Further, stock option grants made at a certain price and point in time do not necessarily reflect how our business is performing at any particular time. While we believe that investors should have information about any dilutive effect of outstanding options and the cost of that compensation, we also believe that stockholders should have the ability to consider our performance using a non-GAAP financial measure that excludes these costs and that management uses to evaluate our business.

We believe it is useful for an understanding of our operating performance to exclude the results of our discontinued operations from Adjusted EBITDA because they are not part of our ongoing operations.

We believe it is useful for an understanding of our operating performance to exclude the loss on extinguishment of debt and settlement of convertible notes from Adjusted EBITDA because this activity is not related to our operating performance.

We believe it is useful for an understanding of our operating performance to exclude separation costs related to the sale of CA from Adjusted EBITDA for the year ended December 31, 2021 because of the non-recurring nature of this activity.

We also present Adjusted EBITDA as a supplemental performance measure because we believe that this measure provides investors, securities analysts and other users of our consolidated financial statements with important supplemental information with which to evaluate our performance and to enable them to assess our performance on the same basis as management.

Free Cash Flow represents net cash provided by operating activities, plus the proceeds from our interest rate caps, less purchases of property and equipment and the acquisition of intangible assets and cash paid to purchase our interest rate caps. We believe that Free Cash Flow provides meaningful information regarding our liquidity.

To conform to current year presentation, we included the cash paid for our interest rate caps in Free Cash Flow for the year ended December 31, 2021. We believe it is useful for an understanding of our liquidity to include the cash flows associated with interest rate caps to facilitate a more consistent comparison of net cash paid for interest and the interest rate changes for which we are hedged.

44

**Gogo Inc. and Subsidiaries**
**Reconciliation of GAAP to Non-GAAP Measures**
*(in thousands, except per share amounts)*
*(unaudited)*

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| **Adjusted EBITDA:** | | | |
| Net income (loss) attributable to common stock (GAAP) | $ 92,059 | $ 152,735 | $ (250,036 ) |
| Interest expense | 38,872 | 67,472 | 125,787 |
| Interest income | (2,386 ) | (191 ) | (722 ) |
| Income tax provision (benefit) | 13,658 | (187,230 ) | (146 ) |
| Depreciation and amortization | 12,580 | 15,482 | 14,166 |
| EBITDA | 154,783 | 48,268 | (110,951 ) |
| Stock-based compensation expense | 19,065 | 13,345 | 7,808 |
| Loss from discontinued operations | — | 3,854 | 201,477 |
| Loss on extinguishment of debt and settlement of convertible notes | — | 83,961 | — |
| Separation costs related to CA sale | — | 1,550 | — |
| Adjusted EBITDA | $ 173,848 | $ 150,978 | $ 98,334 |
| | | | |
| **Free Cash Flow:** | | | |
| Net cash provided by operating activities (GAAP) | $ 103,405 | $ 66,697 | $ 4,513 |
| Consolidated capital expenditures | (49,914 ) | (8,660 ) | (8,990 ) |
| Proceeds from (purchase of) interest rate caps | 4,292 | (8,629 ) | — |
| Free cash flow | $ 57,783 | $ 49,408 | $ (4,477 ) |

*Material limitations of Non-GAAP measures*

Although EBITDA, Adjusted EBITDA and Free Cash Flow are measurements frequently used by investors and securities analysts in their evaluations of companies, EBITDA, Adjusted EBITDA and Free Cash Flow each have limitations as an analytical tool, and you should not consider them in isolation or as a substitute for, or more meaningful than, amounts determined in accordance with GAAP.

Some of these limitations include:

- EBITDA and Adjusted EBITDA do not reflect interest income or expense;

· EBITDA and Adjusted EBITDA do not reflect cash requirements for our income taxes;

· EBITDA and Adjusted EBITDA do not reflect depreciation and amortization, which are significant and unavoidable operating costs given the level of capital expenditures needed to maintain our business;

· Adjusted EBITDA does not reflect non-cash components of employee compensation;

· Adjusted EBITDA does not reflect the results of discontinued operations;

· Adjusted EBITDA for the year ended December 31, 2021 does not reflect the separation costs related to the sale of CA;

· Adjusted EBITDA does not reflect the loss on extinguishment of debt and settlement of convertible notes;

· Free Cash Flow does not represent the total increase or decrease in our cash balance for the period; and

· since other companies in our industry or related industries may calculate these measures differently from the way we do, their usefulness as comparative measures may be limited.

**Liquidity and Capital Resources**

We have historically financed our growth and cash needs primarily through the issuance of common stock, non-convertible debt, senior convertible preferred stock, convertible debt, credit facilities and cash from operating activities. We continually evaluate our ongoing capital needs in light of increasing demand for our services, capacity requirements, evolving user expectations regarding the in-flight connectivity experience, evolving technologies in our industry and related strategic, operational and technological opportunities. If needed, we consider opportunities to raise additional capital in the public and private markets, utilizing one or more of the types of capital raising transactions through which we have historically financed our growth and cash needs, as well as other means of capital raising not previously used by us.

45

See the disclosure below under the heading "Debt Instruments" for the definitions of the debt and convertible debt instruments to which we refer in this section, as well as the indentures and other agreements that govern them.

Based on our current plans, we expect that our cash and cash equivalents, cash flows provided by operating activities and access to capital markets will be sufficient to meet the cash requirements of our business, including capital expenditure requirements and debt maturities, for at least the next twelve months and thereafter for the foreseeable future.

As detailed in Note 9, "Long-Term Debt and Other Liabilities," on April 30, 2021, GIH entered into the 2021 Credit Agreement with Gogo, the lenders and issuing banks party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent, which provides for the Term Loan Facility in an aggregate principal amount of $725.0 million, issued with a discount of 0.5%, and the Revolving Facility, which includes a letter of credit sub-facility.

On February 2, 2023, Gogo and GIH entered into an amendment to the Original 2021 Credit Agreement with Morgan Stanley Senior Funding, Inc., as administrative agent, which replaced all references in the Original 2021 Credit Agreement to LIBOR in respect of the applicable interest rates for the Facilities with an adjusted term SOFR rate, plus a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustment.

The Term Loan Facility amortizes in nominal quarterly installments equal to 1% of the aggregate initial principal amount thereof per annum, with the remaining balance payable upon final maturity on April 30, 2028. There are no amortization payments under the Revolving Facility, and all borrowings under the Revolving Facility mature on April 30, 2026.

The 2021 Credit Agreement contains covenants that limit the ability of GIH and its subsidiaries to incur additional indebtedness. Further, market conditions and/or our financial performance may limit our access to additional sources of equity or debt financing, or our ability to pursue potential strategic alternatives. As a result, we may be unable to finance the growth of our business to the extent that our cash, cash equivalents and short-term investments and cash generated through operating activities prove insufficient or we are unable to raise additional financing through the issuance of equity, permitted incurrences of debt (by us or by GIH and its subsidiaries), or the pursuit of potential strategic alternatives.

The proceeds of the Term Loan Facility were used, together with cash on hand, (i) to redeem in full and pay the outstanding principal amount of the 2024 Senior Secured Notes together with accrued and unpaid interest and redemption premiums and to pay fees associated with the termination of the ABL Credit Agreement (together with the redemption of the 2024 Senior Secured Notes, the "Refinancing"), and (ii) to pay fees and expenses incurred in connection with the Refinancing and the Facilities (the "Transaction Costs"). The Revolving Facility is available for working capital and general corporate purposes of Gogo and its subsidiaries and was undrawn as of December 31, 2022.

In May 2022, the remaining $102.8 million aggregate principal amount of the 2022 Convertible Notes was converted by holders into 17,131,332 shares of common stock.

In May 2021, we purchased interest rate caps with an aggregate notional amount of $650.0 million for $8.6 million. We receive payments in the amounts calculated pursuant to the caps for any period in which the three-month USD LIBOR rate increases beyond the applicable strike rate. The termination date of the cap agreements is July 31, 2027. The notional amounts of the interest rate caps periodically decrease over the life of the caps with the first reduction of $125 million occurring on July 31, 2023. While the interest rate caps are intended to limit our interest rate exposure under our variable rate indebtedness, which includes the Facilities, if our variable rate indebtedness does not decrease in proportion to the periodic decreases in the notional amount hedged under the interest rate caps, then the portion of such indebtedness that will be effectively hedged against possible increases in interest rates will decrease. In addition, the strike prices periodically increase over the life of the caps. As a result, the extent to which the interest rate caps will limit our interest rate exposure will decrease in the future.

For additional information on the interest rate caps, see Note 10, "Derivative Instruments and Hedging Activities," to our consolidated financial statements.

46

**Contractual Obligations and Commitments**

The following table summarizes our contractual obligations, comprised of our material future cash requirements and deferred revenue arrangements, as of December 31, 2022 *(in thousands)*.

| Contractual Obligations: | Total | | Less than 1 year | | 1-3 years | | 3-5 years | | More than 5 years |
|---|---|---|---|---|---|---|---|---|---|
| Finance lease obligations | $ | 147 | $ | 141 | $ | 4 | $ | 2 | $ | — |
| Operating lease obligations | | 113,682 | | 14,499 | | 29,314 | | 27,239 | | 42,630 |
| Purchase obligations [1] | | 369,180 | | 123,731 | | 64,909 | | 10,500 | | 170,040 |
| Term Loan Facility [2] | | 714,125 | | 7,250 | | 14,500 | | 14,500 | | 677,875 |
| Interest and fees on the Facilities [2][3] | | 309,035 | | 59,240 | | 116,839 | | 114,278 | | 18,678 |
| Deferred revenue arrangements [4] | | 3,430 | | 3,418 | | 12 | | — | | — |
| Other long-term obligations [5] | | 41,405 | | 9,146 | | 4,723 | | 1,865 | | 25,671 |
| Total | $ | 1,551,004 | $ | 217,425 | $ | 230,301 | $ | 168,384 | $ | 934,894 |

---

(1) As of December 31, 2022, our outstanding purchase obligations represented obligations to vendors incurred in order to meet operational requirements in the normal course of business, including the build out of Gogo 5G, Global Broadband, information technology, research and development, sales and marketing, general and administrative and production related activities.

(2) See Note 9, "Long-Term Debt and Other Liabilities," to our consolidated financial statements for more information.

(3) Interest on the Term Loan Facility is calculated for future periods using the interest rate in effect as of December 31, 2022.

(4) Amounts represent obligations to provide services for which we have already received cash from our customers.

(5) Other long-term obligations consist of estimated payments (undiscounted) for our asset retirement obligations, network transmission services and monthly payments of C$0.1 million (using the December 31, 2022 exchange rate) to the licensor of our Canadian ATG spectrum license over the estimated 25-year term of the agreement. Other long-term obligations exclude tax liability payments due to the uncertainty of their timing.

*Contractual Commitments:* We have agreements with various vendors under which we have remaining commitments to purchase hardware components and development services. Such commitments will become payable as we receive the hardware components or as development services are provided. See Note 17, "Commitments and Contingencies," to our consolidated financial statements for additional information.

*Leases and Cell Site Contracts:* We have lease agreements relating to certain facilities and equipment, which are considered operating leases. See Note 16, "Leases," to our consolidated financial statements for additional information.

*Indemnifications and Guarantees:* In accordance with Delaware law, we indemnify our officers and directors for certain events or occurrences while the officer or director is, or was, serving at our request in such capacity. The maximum potential amount of future payments we could be required to make under this indemnification is uncertain and may be unlimited, depending upon circumstances. However, our Directors' and Officers' insurance does provide coverage for certain of these losses.

In the ordinary course of business, we may occasionally enter into agreements pursuant to which we may be obligated to pay for the failure of performance of others, such as the use of corporate credit cards issued to employees. Based on historical experience, we believe that the risk of sustaining any material loss related to such guarantees is remote.

We have entered into a number of agreements pursuant to which we indemnify the other party for losses and expenses suffered or incurred in connection with any patent, copyright, or trademark infringement or misappropriation claim asserted by a third party with respect to our equipment or services. The maximum potential amount of future payments we could be required to make under these indemnification agreements is uncertain and is typically not limited by the terms of the agreements.

47

**Cash Flows**

The following table presents a summary of our cash flow activity for the periods set forth below *(in thousands)*:

| | For the Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2022 | | 2021 | | 2020 | |
| Cash flows from continuing operations: | | | | | | |
| Net cash provided by operating activities | $ | 103,405 | $ | 66,697 | $ | 4,513 |
| Net cash used in investing activities | | (70,418) | | (16,289) | | (8,990) |
| Net cash provided by (used in) financing activities | | (28,388) | | (331,037) | | 44,479 |
| Net cash provided by (used in) discontinued operations | | — | | (9,013) | | 220,139 |
| Effect of foreign exchange rate changes on cash | | 13 | | 40 | | (1,946) |
| Increase (decrease) in cash, cash equivalents and restricted cash | | 4,612 | | (289,602) | | 258,195 |
| Cash, cash equivalents and restricted cash at beginning of period | | 146,268 | | 435,870 | | 177,675 |
| Cash, cash equivalents and restricted cash at end of period | $ | 150,880 | $ | 146,268 | $ | 435,870 |
| Supplemental information: | | | | | | |
| Cash, cash equivalents and restricted cash at end of period | $ | 150,880 | $ | 146,268 | $ | 435,870 |
| Less: current restricted cash | | — | | 25 | | 525 |
| Less: non-current restricted cash | | 330 | | 330 | | — |
| Cash and cash equivalents at end of period | $ | 150,550 | $ | 145,913 | $ | 435,345 |

Following is a discussion of the year-over-year changes in cash flow activities.

***Net cash provided by operating activities from continuing operations:***

The following table presents a summary of our cash flows from operating activities from continuing operations for the periods set forth below *(in thousands)*:

| | For the Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2022 | | 2021 | | 2020 | |
| Net income (loss) | $ | 92,059 | $ | 156,589 | $ | (48,559) |
| Non-cash charges and credits | | 51,110 | | (69,027) | | 42,677 |
| Changes in operating assets and liabilities | | (39,764) | | (20,865) | | 10,395 |
| Net cash provided by operating activities from continuing operations | $ | 103,405 | $ | 66,697 | $ | 4,513 |

For the year ended December 31, 2022, cash provided by operating activities from continuing operations was $103.4 million, as compared with cash provided by operating activities from continuing operations of $66.7 million for the prior year. The principal contributors to the increase in operating cash flows were:

- A $55.6 million improvement in net income and non-cash charges and credits, as noted above under "—Results of Operations."

- An $18.9 million decrease in cash flows related to operating assets and liabilities resulting from:

  o A decrease in cash flows primarily due to the following:

    ▪ Changes in accounts receivable due to higher revenue;

    ▪ Changes in inventories due to additional purchases to meet increased demand and manage supply chain disruptions; and

    ▪ Changes in accounts payable and non-current assets and liabilities primarily due to the timing of payments.

  o Partially offset by an increase in cash flows due to the following:

    ▪ Changes in accrued interest primarily due to the timing of interest payments as compared with the prior year and lower interest expense resulting from the Refinancing; and

    ▪ Changes in contract assets and deferred revenue due to the timing of revenue recognition and payment or collection of cash.

For the year ended December 31, 2021, cash provided by operating activities from continuing operations was $66.7 million, as compared with cash provided by operating activities from continuing operations of $4.5 million for the prior year. The principal contributors to the increase in operating cash flows were:

- A $93.4 million improvement in net income (loss) and non-cash charges and credits, as noted above under "—Results of Operations."

- A $31.3 million decrease in cash flows related to operating assets and liabilities resulting from:

  o A decrease in cash flows primarily due to the following:

  - Changes in inventories due to increased equipment purchases;

  - Changes in accrued interest primarily due to the timing of payments as compared to the prior year and the reduced interest resulting from the Refinancing; and

  - Changes in prepaid expenses, accounts payable and accrued liabilities due primarily to the timing of payments.

  o Partially offset by an increase in cash flows due to changes in contract assets as compared to the prior year.

Cash paid for taxes totaled $0.4 million for each of the years ended December 31, 2022, 2021 and 2020. We expect cash tax payments to be immaterial for an extended period of time, subject to the availability of our net operating losses.

*Net cash used in investing activities from continuing operations:*

Cash used in investing activities from continuing operations was $70.4 million, $16.3 million and $9.0 million, respectively, for the years ended December 31, 2022, 2021 and 2020. Investing activities are primarily comprised of capital expenditures related to software development, data center upgrades and cell site construction. Cash used in investing activities for the year ended December 31, 2022 included proceeds of $4.3 million from interest rate caps, while cash used in investing activities for the year ended December 31, 2021 included $8.6 million for the purchase of interest rate caps. Additionally, cash used in investing activities for the year ended December 31, 2022 included the purchase of short-term investments for $24.8 million.

*Net cash provided by (used in) financing activities from continuing operations:*

Cash used in financing activities from continuing operations for the year ended December 31, 2022 was $28.4 million, primarily due to the repurchase of 1.5 million shares of common stock in a private transaction and principal repayments on the Term Loan Facility. See Note 3, "Earnings (Loss) Per Share," to our consolidated financial statements for additional information on the repurchase of common stock.

Cash used in financing activities from continuing operations for the year ended December 31, 2021 was $331.0 million, primarily due to the redemption of all of our outstanding 2024 Senior Secured Notes (including the make-whole premium payable under the indenture governing the 2024 Senior Secured Notes) for a redemption price totaling $1,023.1 million and the payment of $20.3 million of deferred financing fees associated with the issuance of the Facilities, offset in part by $721.4 million of gross proceeds from the Term Loan Facility.

Cash provided by financing activities from continuing operations for the year ended December 31, 2020 was $44.5 million, primarily due to the $51.8 million of proceeds from the issuance of additional 2024 Senior Secured Notes, offset by the repurchase of convertible notes, payments on finance leases and stock-based compensation activity.

*Net cash used in discontinued operations:*

Cash used in discontinued operations for the year ended December 31, 2021 was $9.0 million, primarily due to $7.8 million used in investing activities for a payment to Intelsat in settlement of working capital adjustments relating to the Transaction and $1.2 million used in operating activities primarily to pay the employer portion of taxes related to the vesting of equity awards and the exercise of stock options.

**Capital Expenditures**

Our business requires significant capital expenditures, primarily for technology development, equipment and capacity expansion. Capital spending for continuing operations for the periods presented in this report is associated with the expansion of our ATG network and data centers. We capitalized software development costs related to network technology solutions and new product/service offerings. We also capitalized costs related to the build-out of our office locations. For the year ended December 31, 2020, capital expenditures for our former CA business, presented as discontinued operations, included the purchase of airborne equipment related to the roll out and/or upgrade of service to our former airline partners' fleets.

Capital expenditures for continuing operations for the years ended December 31, 2022, 2021 and 2020 were $49.9 million, $8.7 million and $9.0 million, respectively. The increase in capital expenditures in 2022 as compared to 2021 was primarily due to the build out of Gogo 5G, and the decrease in capital expenditures in 2021 as compared with 2020 was primarily due a decrease in capitalized software, partially offset by an increase in network-related equipment.

We expect that our capital expenditures will decrease over time as we complete the Gogo 5G program.

49

**Debt Instruments**

Following is a discussion of the debt instruments we had in place as of December 31, 2022 as well as those we utilized during the years ended December 31, 2022, 2021 and 2020.

*2021 Credit Agreement*

On April 30, 2021, Gogo Intermediate Holdings LLC (a wholly owned subsidiary of Gogo Inc.) ("GIH") entered into a credit agreement (the "Original 2021 Credit Agreement," and, as it may be amended, supplemented or otherwise modified from time to time, the "2021 Credit Agreement") among Gogo, GIH, the lenders and issuing banks party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent, which provides for (i) a term loan credit facility (the "Term Loan Facility") in an aggregate principal amount of $725.0 million, issued with a discount of 0.5%, and (ii) a revolving credit facility (the "Revolving Facility" and together with the Term Loan Facility, the "Facilities") of up to $100.0 million, which includes a letter of credit sub-facility.

On February 2, 2023, Gogo and GIH entered into an amendment to the Original 2021 Credit Agreement with Morgan Stanley Senior Funding, Inc., as administrative agent, which replaced all references in the Original 2021 Credit Agreement to LIBOR in respect of the applicable interest rates for the Facilities with an adjusted term SOFR rate, plus a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustment.

The Term Loan Facility amortizes in nominal quarterly installments equal to 1% of the aggregate initial principal amount thereof per annum, with the remaining balance payable upon final maturity on April 30, 2028. There are no amortization payments under the Revolving Facility, and all borrowings under the Revolving Facility mature on April 30, 2026.

The Term Loan Facility bears annual interest at a floating rate measured by reference to, at GIH's option, either (i) an adjusted term SOFR rate (subject to a floor of 0.75%) plus an applicable margin of 3.75% and a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustments or (ii) an alternate base rate plus an applicable margin of 2.75%.

Loans outstanding under the Revolving Facility bear annual interest at a floating rate measured by reference to, at GIH's option, either (i) an adjusted term SOFR rate (subject to a floor of 0.00%) plus an applicable margin ranging from 3.25% to 3.75% per annum depending on GIH's senior secured first lien net leverage ratio and a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustments or (ii) an alternate base rate plus an applicable margin ranging from 2.25% to 2.75% per annum depending on GIH's senior secured first lien net leverage ratio. Additionally, unused commitments under the Revolving Facility are subject to a fee ranging from 0.25% to 0.50% per annum depending on GIH's senior secured first lien net leverage ratio. As of December 31, 2022, the fee for unused commitments under the Revolving Facility was 0.25% and the applicable margin was 3.25%.

The Facilities may be prepaid at GIH's option at any time without premium or penalty (other than customary breakage costs), subject to minimum principal payment amount requirements. Subject to certain exceptions and de minimis thresholds, the Term Loan Facility is subject to mandatory prepayments in an amount equal to: (i) 100% of the net cash proceeds of certain asset sales, insurance recovery and condemnation events, subject to reduction to 50% and 0% if specified senior secured first lien net leverage ratio targets are met; (ii) 100% of the net cash proceeds of certain debt offerings; and (iii) 50% of annual excess cash flow (as defined in the 2021 Credit Agreement), subject to reduction to 25% and 0% if specified senior secured first lien net leverage ratio targets are met.

The Revolving Facility includes a financial covenant set at a maximum senior secured first lien net leverage ratio of 7.50:1.00, which will apply if the outstanding amount of loans and unreimbursed letter of credit drawings thereunder at the end of any fiscal quarter exceeds 35% of the aggregate of all commitments thereunder.

The 2021 Credit Agreement contains customary events of default, which, if any of them occurred, would permit or require the principal, premium, if any, and interest on all of the then outstanding obligations under the Facilities to be due and payable immediately and the commitments under the Revolving Facility to be terminated.

*2022 Convertible Notes*

In November and December 2018, we issued a total of $237.8 million aggregate principal amount of 6.00% Convertible Senior Notes due 2022 (the "2022 Convertible Notes") in private offerings to qualified institutional buyers, including pursuant to Rule 144A under the Securities Act, and in concurrent private placements.

In January 2021, $1.0 million aggregate principal amount of 2022 Convertible Notes was converted by holders and settled through the issuance of 166,666 shares of common stock.

On March 17, 2021, Gogo entered into separate, privately negotiated exchange agreements (the "March 2021 Exchange Agreements") with certain holders of 2022 Convertible Notes. Pursuant to the March 2021 Exchange Agreements, such holders exchanged a total of $28,235,000 aggregate principal amount of 2022 Convertible Notes for 5,121,811 shares of our common stock on March 24, 2021. The negotiated exchange rate under the March 2021 Exchange Agreements was 181.40 shares of common stock per

50

$1,000 principal amount of the 2022 Convertible Notes, which resulted in a loss on settlement of $4.4 million, which is included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

On April 1, 2021, Gogo entered into a privately negotiated exchange agreement (the "GTCR Exchange Agreement") with an affiliate of funds managed by GTCR. Pursuant to the GTCR Exchange Agreement, GTCR exchanged $105,726,000 aggregate principal amount of 2022 Convertible Notes for 19,064,529 shares of our common stock on April 9, 2021. The negotiated exchange rate under the GTCR Exchange Agreement was 180.32 shares of common stock per $1,000 principal amount of 2022 Convertible Notes, which resulted in a loss on settlement of $14.6 million, which is included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

In May 2022, the remaining $102,788,000 aggregate principal amount of 2022 Convertible Notes was converted by holders into 17,131,332 shares of common stock. As of December 31, 2022, there were no outstanding 2022 Convertible Notes.

*2024 Senior Secured Notes*

On April 25, 2019 (the "Issue Date"), GIH and Gogo Finance Co. Inc. (a wholly owned subsidiary of GIH) ("Gogo Finance" and, together with GIH, the "Issuers") issued $905.0 million aggregate principal amount of 9.875% senior secured notes due 2024 (the "2024 Senior Secured Notes"), at a price equal to 99.512% of their face value, under an indenture, dated as of April 25, 2019, among the Issuers, Gogo, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee.

The Issuers issued an additional $20.0 million of 2024 Senior Secured Notes on May 7, 2019, which were issued at a price equal to 100.5% of their face value, and $50.0 million of 2024 Senior Secured Notes on November 13, 2020, which were issued at a price equal to 103.5% of their face value.

The 2024 Senior Secured Notes were guaranteed on a senior secured basis by Gogo and all of GIH's existing and future restricted subsidiaries (other than Gogo Finance), subject to certain exceptions. The 2024 Senior Secured Notes and the related guarantees were secured by certain liens on the Company's collateral, certain of which were released upon the closing of the Transaction and the remainder on the Redemption Date as defined below.

The 2024 Senior Secured Notes were redeemed on May 1, 2021 (the "Redemption Date") at a redemption price equal to 104.938% of the principal amount of the 2024 Senior Secured Notes redeemed, plus accrued and unpaid interest to (but not including) the Redemption Date. The make-whole premium paid in connection with the redemption was $48.1 million and we wrote off the remaining unamortized deferred financing costs of $15.2 million and the remaining debt discount of $1.3 million, which together are included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

*ABL Credit Facility*

On August 26, 2019, Gogo Inc., GIH and Gogo Finance entered into a credit agreement (the "ABL Credit Agreement") with the other loan parties party thereto, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and Morgan Stanley Senior Funding, Inc., as syndication agent, which provides for an asset-based revolving credit facility (the "ABL Credit Facility") of up to $30.0 million, subject to borrowing base availability, and includes letter of credit and swingline sub-facilities. The obligations under the ABL Credit Agreement were guaranteed by Gogo and all of its existing and future subsidiaries, subject to certain exceptions and secured by certain collateral of the Company. On April 30, 2021, the ABL Credit Agreement and all commitments thereunder were terminated. As a result of the termination, the remaining unamortized deferred financing costs of $0.3 million were written off as of May 1, 2021 and included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

*2020 Convertible Notes*

In March 2015, we issued $361.9 million aggregate principal amount of 3.75% Convertible Senior Notes due 2020 (the "2020 Convertible Notes") in a private offering to qualified institutional buyers, pursuant to Rule 144A under the Securities Act. In 2018 and 2019, we repurchased a total of $359.4 million aggregate principal amount of the 2020 Convertible Notes, and on March 1, 2020, the remaining $2.5 million aggregate principal amount of the 2020 Convertible Notes matured.

*Forward Transactions*

In connection with the issuance of the 2020 Convertible Notes, we paid approximately $140.0 million to enter into prepaid forward stock repurchase transactions (the "Forward Transactions") with certain financial institutions (the "Forward Counterparties"), pursuant to which we purchased approximately 7.2 million shares of common stock for settlement on or around the March 1, 2020 maturity date for the 2020 Convertible Notes, subject to the ability of each Forward Counterparty to elect to settle all or a portion of its Forward Transactions early.

51

On December 11, 2019, we entered into an amendment to one of the Forward Transactions (the "Amended and Restated Forward Transaction") to extend the expected settlement date with respect to approximately 2.1 million shares of common stock held by one of the Forward Counterparties, JPMorgan Chase Bank, National Association (the "2022 Forward Counterparty"), to correspond with the May 15, 2022 maturity date for the 2022 Convertible Notes. As a result of the Forward Transactions, total shareholders' equity within our consolidated balance sheets was reduced by approximately $140.0 million. In March 2020, approximately 5.1 million shares of common stock were delivered to us in connection with the Forward Transactions. In April 2021, approximately 1.5 million shares of common stock were delivered to us in connection with the Amended and Restated Forward Transaction. In May 2022, the approximately 0.6 million shares that were remaining under the Amended and Restated Forward Transactions were delivered to us. As of December 31, 2022, there were no prepaid forward stock repurchase transactions outstanding.

*Restricted Cash*

Our restricted cash balances were $0.3 million and $0.4 million, respectively, as of December 31, 2022 and 2021, and consisted primarily of a letter of credit issued for the benefit of the landlord of our office location in Chicago, IL.

For additional information on the 2021 Credit Agreement, the 2022 Convertible Notes, the 2024 Senior Secured Notes, the ABL Credit Facility and the 2020 Convertible Notes, see Note 9, "Long-Term Debt and Other Liabilities," to our consolidated financial statements.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Our exposure to market risk is currently confined to our cash and cash equivalents, short-term investments and debt. We have not used derivative financial instruments for speculation or trading purposes. The primary objectives of our investment activities are to preserve our capital for the purpose of funding operations while maximizing the income we receive from our investments without significantly increasing risk. To achieve these objectives, our investment policy allows us to maintain a portfolio of cash equivalents and short-term investments through a variety of securities, including U.S. Treasury securities, U.S. government agency securities, and money market funds. Our cash and cash equivalents as of both December 31, 2022 and December 31, 2021 primarily included amounts in bank deposit accounts and money market funds. As of December 31, 2022, cash equivalents and short-term investments included U.S. Treasury securities. We believe that a change in average interest rates would not affect our interest income and results of operations by a material amount. However, a change in interest rates could impact our interest income and results of operations to the extent that we invest in a material amount of interest-bearing securities.

The risk inherent in our market risk sensitive instruments and positions is the potential loss arising from interest rates as discussed below. The sensitivity analyses presented do not consider the effects that such adverse changes may have on the overall economic activity, nor do they consider additional actions we may take to mitigate our exposure to such changes. Actual results may differ.

*Interest Rate Risk:* We are exposed to interest rate risk on our variable rate indebtedness, which includes borrowings under the Term Loan Facility and Revolving Facility (if any). We assess our market risks based on changes in interest rates utilizing a sensitivity analysis that measures the potential impact on earnings and cash flows based on a hypothetical one percentage point change in interest rates. As of December 31, 2022, we had interest rate cap agreements to hedge a portion of our exposure to interest rate movements of our variable rate debt and to manage our interest expense. Currently, we receive payments in the amounts calculated pursuant to the caps for any period in which the three-month USD LIBOR rate increases beyond the applicable strike rate. The termination date of the cap agreements is July 31, 2027. Over the life of the interest rate caps, the notional amounts of the caps periodically decrease, while the applicable strike prices increase.

The notional amount of outstanding debt associated with interest rate cap agreements as of December 31, 2022 was $650.0 million. Based on our December 31, 2022 outstanding variable rate debt balance, a hypothetical one percentage point change in the applicable interest rate would impact our annual interest expense by approximately $1.2 million for the next twelve-month period, which includes the impact of our interest rate caps at a strike rate of 0.75% and the $125 million reduction in the notional amount that will occur on July 31, 2023. Excluding the impact of our interest rate caps, a hypothetical one percentage point change in the applicable interest rate would impact our annual interest expense by approximately $7.1 million for the next twelve-month period.

Our earnings are affected by changes in interest rates due to the impact those changes have on interest income generated from our cash, cash equivalents and short-term investments. Our cash and cash equivalents and short-term investments as of December 31, 2022 included amounts in bank deposit accounts, money market funds and U.S. Treasury securities. Our cash and cash equivalent accounts as of December 31, 2021 included amounts in bank deposit accounts and money market funds. We believe we have minimal interest rate risk as a 10% decrease in the average interest rate on our portfolio would have reduced interest income for the years ended December 31, 2022, 2021 and 2020 by immaterial amounts.

52

*Inflation:* We do not believe that inflation has had a material effect on our results of operations. However, there can be no assurance that our business will not be affected by inflation in the future.

**Item 8. Financial Statements and Supplementary Data**

**Gogo Inc.**

**Index to Consolidated Financial Statements**

| | Page No. |
|---|---|
| Report of Deloitte & Touche LLP, Independent Registered Public Accounting Firm (PCAOB ID No. 34) | 55 |
| Consolidated Balance Sheets | 57 |
| Consolidated Statements of Operations | 58 |
| Consolidated Statements of Comprehensive Income (Loss) | 59 |
| Consolidated Statements of Cash Flows | 60 |
| Consolidated Statements of Stockholders' Equity (Deficit) | 61 |
| Notes to Consolidated Financial Statements | 62 |

54

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Gogo Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Gogo Inc. and subsidiaries (the "Company") as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity (deficit), and cash flows, for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with the accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 28, 2023, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

***Income Taxes — Realizability of Deferred Tax Assets — Refer to Notes 2 and 15 to the financial statements***

The Company recognizes deferred income tax assets and liabilities for tax attributes and are based on the differences between the financial statement and tax basis of assets and liabilities, applying enacted statutory tax rates in effect for the year in which the tax differences are expected to reverse. The Company regularly assesses the need for a valuation allowance related to deferred income tax assets to determine, based on the weight of the available positive and negative evidence, whether it is more likely than not that some or all of such deferred assets will not be realized. The Company's assessment considers recent financial operating results, the scheduled expiration of its net operating losses, potential sources of taxable income, the reversal of existing taxable differences, taxable income in prior carryback years, if permitted under tax law, and tax planning strategies. Management has determined that it is more likely than not that sufficient taxable income will be generated in the future to realize $162.7 million of its deferred income tax assets as of December 31, 2022.

We identified management's determination that it is more likely than not that sufficient taxable income will be generated in the future to realize deferred income tax assets as a critical audit matter because of the significant judgments management makes related to taxable income. This required a high degree of auditor judgment and an increased extent of effort, including the need to involve our income tax specialists, when performing audit procedures to evaluate the reasonableness of management's estimates of taxable income.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the determination that it is more likely than not that sufficient taxable income will be generated in the future to realize deferred income tax assets included the following, among others, which were performed with the assistance of our income tax specialists:

- We tested the effectiveness of controls over deferred income tax assets, including management's controls over the estimates of taxable income and the determination of whether it is more likely than not that the deferred income tax assets will be realized.

- We evaluated the reasonableness of the methods, assumptions, and judgments used by management to determine whether it was more likely than not that certain tax attributes and deferred income tax assets could be realized.

- We evaluated whether the sources of management's estimated taxable income were of the appropriate character and sufficient to utilize the deferred income tax assets under the relevant tax law.  This included evaluating management's assessment of the scheduling of the reversal of existing temporary taxable differences and carryforward lives of the deferred income tax assets, and the availability of tax planning strategies as a source of future taxable income.

  - We tested the reasonableness of management's adjusted historical taxable income to project sources of future taxable income, and performed the following procedures related to historical taxable income:

  - Compared the historical taxable income to the amounts disclosed in the Company's historical financial statements.

  - Evaluated the recurring permanent differences included in the historical taxable income for reasonableness.

  - Tested the adjustments made to historical taxable income for nonrecurring items to assess if they were objectively verifiable.

  - Compared the historical taxable income to internal budgets and information communicated internally, to the Board of Directors and in Company press releases related to fiscal year 2023 and forward.

- We evaluated whether there was taxable income in prior carryback years that was of the appropriate character and available under the tax law.

/s/ Deloitte & Touche LLP

Chicago, Illinois
February 28, 2023

We have served as the Company's auditor since 2007.

**Gogo Inc. and Subsidiaries**
**Consolidated Balance Sheets**
*(in thousands, except share and per share data)*

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Assets** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 150,550 | $ 145,913 |
| Short-term investments | 24,796 | — |
| Total cash, cash-equivalents and short-term investments | 175,346 | 145,913 |
| Accounts receivable, net of allowances of $1,778 and $894, respectively | 54,210 | 37,730 |
| Inventories | 49,493 | 33,976 |
| Prepaid expenses and other current assets | 45,100 | 32,295 |
| **Total current assets** | 324,149 | 249,914 |
| **Non-current assets:** | | |
| Property and equipment, net | 104,595 | 63,672 |
| Intangible assets, net | 49,509 | 49,554 |
| Operating lease right-of-use assets | 75,261 | 70,989 |
| Other non-current assets, net of allowances of $501 and $455, respectively | 43,355 | 28,425 |
| Deferred income taxes | 162,657 | 185,133 |
| **Total non-current assets** | 435,377 | 397,773 |
| **Total assets** | $ 759,526 | $ 647,687 |
| **Liabilities and stockholders' deficit** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 13,646 | $ 17,203 |
| Accrued liabilities | 60,056 | 59,868 |
| Deferred revenue | 3,418 | 1,825 |
| Current portion of long-term debt | 7,250 | 109,620 |
| **Total current liabilities** | 84,370 | 188,516 |
| **Non-current liabilities:** | | |
| Long-term debt | 690,173 | 694,760 |
| Non-current operating lease liabilities | 79,241 | 77,329 |
| Other non-current liabilities | 7,611 | 7,236 |
| **Total non-current liabilities** | 777,025 | 779,325 |
| **Total liabilities** | 861,395 | 967,841 |
| **Commitments and contingencies (Note 17)** | | |
| **Stockholders' deficit** | | |
| Common stock, par value $0.0001 per share; 500,000,000 shares authorized at December 31, 2022 and 2021; 136,531,362 and 117,407,468 shares issued at December 31, 2022 and 2021, respectively; and 127,840,813 and 110,791,954 shares outstanding at December 31, 2022 and 2021, respectively | 14 | 11 |
| Additional paid-in capital | 1,385,933 | 1,258,477 |
| Accumulated other comprehensive income | 30,128 | 1,789 |
| Treasury stock, at cost | (156,375) | (128,803) |
| Accumulated deficit | (1,359,569) | (1,451,628) |
| **Total stockholders' deficit** | (101,869) | (320,154) |
| **Total liabilities and stockholders' deficit** | $ 759,526 | $ 647,687 |

*See the Notes to Consolidated Financial Statements*

57

**Gogo Inc. and Subsidiaries**
**Consolidated Statements of Operations**
*(in thousands, except per share amounts)*

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | 2020 |
| **Revenue:** | | | | | | |
| Service revenue | $ | 296,329 | $ | 259,583 | $ | 211,987 |
| Equipment revenue | | 107,738 | | 76,133 | | 57,731 |
| **Total revenue** | | 404,067 | | 335,716 | | 269,718 |
| **Operating expenses:** | | | | | | |
| Cost of service revenue (exclusive of items shown below) | | 64,427 | | 56,103 | | 45,073 |
| Cost of equipment revenue (exclusive of items shown below) | | 71,473 | | 46,092 | | 39,299 |
| Engineering, design and development | | 29,587 | | 24,874 | | 25,227 |
| Sales and marketing | | 25,471 | | 20,985 | | 15,135 |
| General and administrative | | 58,203 | | 51,554 | | 54,467 |
| Depreciation and amortization | | 12,580 | | 15,482 | | 14,166 |
| **Total operating expenses** | | 261,741 | | 215,090 | | 193,367 |
| **Operating income** | | 142,326 | | 120,626 | | 76,351 |
| **Other (income) expense:** | | | | | | |
| Interest income | | (2,386) | | (191) | | (722) |
| Interest expense | | 38,872 | | 67,472 | | 125,787 |
| Loss on extinguishment of debt and settlement of convertible notes | | — | | 83,961 | | — |
| Other (income) expense, net | | 123 | | 25 | | (9) |
| **Total other expense** | | 36,609 | | 151,267 | | 125,056 |
| **Income (loss) from continuing operations before income taxes** | | 105,717 | | (30,641) | | (48,705) |
| Income tax provision (benefit) | | 13,658 | | (187,230) | | (146) |
| **Net income (loss) from continuing operations** | | 92,059 | | 156,589 | | (48,559) |
| **Net loss from discontinued operations, net of tax** | | — | | (3,854) | | (201,477) |
| **Net income (loss)** | $ | 92,059 | $ | 152,735 | $ | (250,036) |
| | | | | | | |
| **Net income (loss) attributable to common stock per share—basic:** | | | | | | |
| Continuing operations | $ | 0.75 | $ | 1.50 | $ | (0.59) |
| Discontinued operations | | — | | (0.04) | | (2.45) |
| **Net income (loss) attributable to common stock per share—basic** | $ | 0.75 | $ | 1.46 | $ | (3.04) |
| | | | | | | |
| **Net income (loss) attributable to common stock per share—diluted:** | | | | | | |
| Continuing operations | $ | 0.71 | $ | 1.28 | $ | (0.59) |
| Discontinued operations | | — | | — | | (2.45) |
| **Net income (loss) attributable to common stock per share—diluted** | $ | 0.71 | $ | 1.28 | $ | (3.04) |
| | | | | | | |
| **Weighted average number of shares** | | | | | | |
| Basic | | 123,268 | | 103,400 | | 82,266 |
| Diluted | | 133,923 | | 127,205 | | 82,266 |

*See the Notes to Consolidated Financial Statements*

58

**Gogo Inc. and Subsidiaries**
**Consolidated Statements of Comprehensive Income (Loss)**
*(in thousands)*

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Net income (loss) | $ 92,059 | $ 152,735 | $ (250,036) |
| Other comprehensive income (loss), net of tax | | | |
| Currency translation adjustments | $ (265) | $ 53 | $ 1,243 |
| Cash flow hedges: | | | |
| Amount recognized in other comprehensive income (loss) | 34,765 | 2,747 | — |
| Less: income (loss) realized and reclassified to earnings | 6,161 | (2) | — |
| Changes in fair value of cash flow hedges | 28,604 | 2,749 | — |
| Other comprehensive income (loss), net of tax | 28,339 | 2,802 | 1,243 |
| Comprehensive income (loss) | $ 120,398 | $ 155,537 | $ (248,793) |

*See the Notes to Consolidated Financial Statements*

Gogo Inc. and Subsidiaries
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| **Operating activities from continuing operations:** | | | |
| Net income (loss) | $ 92,059 | $ 156,589 | $ (48,559) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | |
| Depreciation and amortization | 12,580 | 15,482 | 14,166 |
| Loss on asset disposals, abandonments and write-downs | 1,577 | 141 | 64 |
| Provision for expected credit losses | 1,047 | 284 | 1,071 |
| Deferred income taxes | 13,170 | (187,320) | (232) |
| Stock-based compensation expense | 19,065 | 13,345 | 7,808 |
| Amortization of deferred financing costs and interest rate caps | 4,215 | 4,661 | 5,892 |
| Accretion of debt discount | 456 | 419 | 13,908 |
| Loss on extinguishment of debt and settlement of convertible notes | — | 83,961 | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (17,482) | 1,925 | 1,315 |
| Inventories | (15,517) | (5,862) | 7,091 |
| Prepaid expenses and other current assets | 8,351 | (20,844) | (277) |
| Contract assets | (2,164) | (5,638) | (9,438) |
| Accounts payable | (2,540) | 3,806 | 4,963 |
| Accrued liabilities | (12,031) | 14,099 | 4,470 |
| Deferred revenue | 1,589 | (1,282) | 898 |
| Accrued interest | 4,647 | (8,694) | 787 |
| Other non-current assets and liabilities | (3,617) | 1,535 | 587 |
| **Net cash provided by operating activities from continuing operations** | 103,405 | 66,697 | 4,513 |
| **Investing activities from continuing operations:** | | | |
| Proceeds from sale of property and equipment | — | 1,000 | — |
| Purchases of property and equipment | (43,914) | (4,264) | (1,818) |
| Acquisition of intangible assets—capitalized software | (6,000) | (4,396) | (7,172) |
| Proceeds from (purchase of) interest rate caps | 4,292 | (8,629) | — |
| Purchases of short-term investments | (24,796) | — | — |
| **Net cash used in investing activities from continuing operations** | (70,418) | (16,289) | (8,990) |
| **Financing activities from continuing operations:** | | | |
| Proceeds from credit facility draw | — | — | 26,000 |
| Repayments of amounts drawn from credit facility | — | — | (26,000) |
| Repurchase of convertible notes | — | — | (2,498) |
| Proceeds from issuance of senior secured notes | — | — | 51,750 |
| Redemption of senior secured notes | — | (1,023,146) | — |
| Proceeds from term loan, net of discount | — | 721,375 | — |
| Payment of debt issuance costs | — | (21,103) | — |
| Repurchases of common stock | (18,375) | — | — |
| Payments on term loan | (7,250) | (3,625) | — |
| Payments on finance leases | (184) | (145) | (546) |
| Stock-based compensation activity | (2,579) | (4,393) | (4,227) |
| **Net cash provided by (used in) financing activities from continuing operations** | (28,388) | (331,037) | 44,479 |
| **Cash flows from discontinued operations:** | | | |
| Net cash used in operating activities | — | (1,211) | (137,200) |
| Net cash provided by (used in) investing activities | — | (7,802) | 357,393 |
| Net cash used in financing activities | — | — | (54) |
| **Net cash provided by (used in) discontinued operations** | — | (9,013) | 220,139 |
| Effect of foreign exchange rate changes on cash | 13 | 40 | (1,946) |
| **Increase (decrease) in cash, cash equivalents and restricted cash** | 4,612 | (289,602) | 258,195 |
| Cash, cash equivalents and restricted cash at beginning of period | 146,268 | 435,870 | 177,675 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 150,880 | $ 146,268 | $ 435,870 |
| Cash, cash equivalents and restricted cash at end of period | $ 150,880 | $ 146,268 | $ 435,870 |
| Less: current restricted cash | — | 25 | 525 |
| Less: non-current restricted cash | 330 | 330 | — |
| **Cash and cash equivalents at end of period** | $ 150,550 | $ 145,913 | $ 435,345 |
| **Supplemental Cash Flow Information:** | | | |
| Cash paid for interest | $ 41,209 | $ 71,114 | $ 106,051 |
| Cash paid for taxes | 377 | 376 | 401 |
| **Non-cash investing activities:** | | | |
| Purchases of property and equipment in current liabilities | $ 10,688 | $ 6,126 | $ 84 |

*See the Notes to Consolidated Financial Statements*

60

**Gogo Inc. and Subsidiaries**
**Consolidated Statements of Stockholders' Equity (Deficit)**
*(in thousands, except share data)*

| | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Treasury Stock | | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | Shares | Amount | |
| Balance at January 1, 2020 | 88,240,377 | 9 | 979,499 | (2,256) | (1,376,142) | — | — | (398,890) |
| Net loss | — | — | — | — | (250,036) | — | — | (250,036) |
| Currency translation adjustments, net of tax | — | — | — | 1,243 | — | — | — | 1,243 |
| Stock-based compensation expense | — | — | 14,458 | — | — | — | — | 14,458 |
| Issuance of common stock upon exercise of stock options | 87,104 | — | 262 | — | — | — | — | 262 |
| Issuance of common stock upon vesting of restricted stock units and restricted stock awards | 2,376,709 | — | — | — | — | — | — | — |
| Tax withholding related to vesting of restricted stock units | — | — | (5,470) | — | — | — | — | (5,470) |
| Issuance of common stock in connection with employee stock purchase plan | 363,209 | 1 | 983 | — | — | — | — | 984 |
| Settlement of prepaid forward shares | (5,077,400) | (1) | 98,858 | — | — | 5,077,400 | (98,857) | — |
| Impact of the adoption of new accounting standards | — | — | — | — | (3,665) | — | — | (3,665) |
| Balance at December 31, 2020 | 85,990,499 | 9 | 1,088,590 | (1,013) | (1,629,843) | 5,077,400 | (98,857) | (641,114) |
| Net income | — | — | — | — | 152,735 | — | — | 152,735 |
| Currency translation adjustments, net of tax | — | — | — | 53 | — | — | — | 53 |
| Fair value adjustments of cash flow hedge, net of tax | — | — | — | 2,749 | — | — | — | 2,749 |
| Stock-based compensation expense | — | — | 37,318 | — | — | — | — | 37,318 |
| Issuance of common stock upon exercise of stock options | 591,930 | — | 1,780 | — | — | — | — | 1,780 |
| Issuance of common stock upon vesting of restricted stock units and restricted stock awards | 1,346,000 | — | — | — | — | — | — | — |
| Tax withholding related to vesting of restricted stock units | — | — | (6,708) | — | — | — | — | (6,708) |
| Issuance of common stock in connection with employee stock purchase plan | 48,560 | — | 535 | — | — | — | — | 535 |
| Settlement of convertible notes | 24,353,006 | 2 | 154,439 | — | — | — | — | 154,441 |
| Settlement of prepaid forward shares | (1,538,049) | — | 29,946 | — | — | 1,538,049 | (29,946) | — |
| Impact of the adoption of ASU 2020-06 | — | — | (47,423) | — | 25,480 | — | — | (21,943) |
| Balance at December 31, 2021 | 110,791,954 | 11 | 1,258,477 | 1,789 | (1,451,628) | 6,615,449 | (128,803) | (320,154) |
| Net income | — | — | — | — | 92,059 | — | — | 92,059 |
| Currency translation adjustments, net of tax | — | — | — | (265) | — | — | — | (265) |
| Fair value adjustments of cash flow hedges, net of tax | — | — | — | 28,604 | — | — | — | 28,604 |
| Stock-based compensation expense | — | — | 19,065 | — | — | — | — | 19,065 |
| Issuance of common stock upon exercise of stock options | 758,681 | — | 2,023 | — | — | — | — | 2,023 |
| Issuance of common stock upon vesting of restricted stock units | 1,181,457 | 1 | — | — | — | — | — | 1 |
| Tax withholding related to vesting of restricted stock units | — | — | (8,257) | — | — | — | — | (8,257) |
| Issuance of common stock in connection with employee stock purchase plan | 52,480 | — | 642 | — | — | — | — | 642 |
| Settlement of convertible notes | 17,131,332 | 2 | 102,786 | — | — | — | — | 102,788 |
| Settlement of prepaid forward shares | (675,100) | — | 11,197 | — | — | 675,100 | (11,197) | — |
| Repurchase of common stock | (1,500,000) | — | — | — | — | 1,500,000 | (18,375) | (18,375) |
| Balance at December 31, 2022 | 127,840,313 | $ 14 | $ 1,385,933 | $ 30,128 | $ (1,359,569) | 8,690,549 | $ (158,375) | $ (101,869) |

*See the Notes to Consolidated Financial Statements*

61

Gogo Inc. and Subsidiaries
**Notes to Consolidated Financial Statements**

## 1. Background

Gogo ("we", "us," or "our") is the world's largest provider of broadband connectivity services for the business aviation market. We have served this market for more than 25 years. Our mission is to enrich the lives of passengers and the efficiency of operators with the world's best business aviation in-flight connectivity and customer support. We have always sought to provide the best connectivity for the business aviation market regardless of technology, and we have a successful history of doing so. Until recently, we focused primarily on business aviation aircraft in North America, which comprise approximately 63% of the worldwide business aviation fleet, and we are the leading provider of in-flight connectivity in that market. Gogo started in analogue air-to-ground ("ATG") technology in the late 1990s, then, as analogue cellular backhaul disappeared, migrated to narrowband satellite connectivity in the early 2000s, then back to ATG with our digital broadband 3G and 4G networks beginning in 2010. We expect to commercially launch our fourth ATG network – Gogo 5G – in the fourth quarter of 2023. We also continue to provide narrowband satellite services to customers in North America and internationally through distribution agreements with satellite providers. In May 2022, in order to further serve our existing customers and expand our target market, we announced plans to expand our broadband offerings beyond ATG by launching the first global broadband service designed for business aviation ("Global Broadband"). The service will use an electronically steered antenna, specifically designed to address a broad range of business aviation aircraft, operating on a low earth orbit ("LEO") satellite network. The antenna will be designed with Hughes Network Systems, LLC ("Hughes") and deployed on a LEO satellite network operated by Network Access Associates Limited ("OneWeb").

On December 1, 2020, we completed the previously announced sale of our commercial aviation ("CA") business to a subsidiary of Intelsat Jackson Holdings S.A. ("Intelsat") for a purchase price of $400.0 million in cash, subject to certain adjustments (the "Transaction").

At the closing of the Transaction, the parties entered into certain ancillary agreements, including a transition services agreement, an intellectual property license agreement and commercial agreements. The transition services agreement has been terminated. The commercial agreements include an ATG network sharing agreement with a 10-year term, pursuant to which we provide certain in-flight connectivity services on our current ATG network and, when available, our Gogo 5G network, subject to certain revenue sharing obligations. Under the ATG network sharing agreement, Intelsat has exclusive access to the ATG network for commercial aviation in North America, subject to minimum revenue guarantees.

As a result of the Transaction, the CA business is reported in discontinued operations and financial statements for the years ended December 31, 2021 and 2020 have been conformed to present the CA business as a discontinued operation. There was no discontinued operations activity for the CA business after December 31, 2021. We report the financial results of discontinued operations separately from continuing operations to distinguish the financial impact of disposal transactions from ongoing operations. Discontinued operations reporting occurs only when the disposal of a component or a group of components (i) meets the held-for-sale classification criteria or is disposed of by sale or other than by sale, and (ii) represents a strategic shift that will have a major effect on our operations and financial results.

Unless otherwise noted, discussion in these Notes to Consolidated Financial Statements refers to our continuing operations. Refer to Note 20, "Discontinued Operations," for further information.

## 2. Summary of Significant Accounting Policies

**Principles of Consolidation** – The consolidated financial statements include our wholly owned subsidiaries. All intercompany transactions and account balances have been eliminated.

Prior to the closing of the Transaction, we historically reported our results of operations in three segments: Commercial Aviation-North America ("CA-NA"), Commercial Aviation-Rest of World ("CA-ROW") and Business Aviation. We managed and reported these businesses separately, as they generally did not share the same customer base, had different products, pricing and expense structures, and measured operating performance and allocated resources on different bases. As a result of the Transaction, we operate in a single distinct business segment, Business Aviation, for which operating performance is measured and resources are allocated on a consolidated basis, consistent with the financial information regularly reviewed by the chief operating decision maker, our CEO. Therefore, we now report one business segment, comprised of our continuing operations. As we do not have multiple segments, we do not present segment information in this Annual Report on Form 10-K.

**Use of Estimates** - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, management evaluates the significant estimates and bases

62

such estimates on historical experience and on various other assumptions believed to be reasonable under the circumstances. However, actual results could differ materially from those estimates.

**Significant Risks and Uncertainties** - Our operations are subject to certain risks and uncertainties, including without limitation those associated with fluctuations in operating results, implementation of our technology roadmap, strategic alliances, relationships with customers, suppliers and dealers, supply chain disruptions, funding of our growth, financing terms that may restrict operations, regulatory issues, competition, the economy, technology trends, evolving industry standards and other events that may impact the demand for air travel.

**Cash, Cash Equivalents and Short-Term Investments** - We consider cash and cash equivalents to be short-term, highly liquid investments that have the following characteristics: readily convertible to known amounts of cash, so near their maturities that there is insignificant risk of changes in value due to any changes in market interest rates, and having maturities of three months or less when purchased. We continually monitor positions with, and the credit quality of, the financial institutions with which we invest. The carrying amounts reported in the balance sheets for cash and cash equivalents approximate the fair market value of these assets.

We consider short-term investments to be investments with maturities of twelve months or less (but greater than three months).

**Restricted Cash** - Certain cash amounts are restricted as to use and are classified outside of cash and cash equivalents. Cash amounts with restrictions of twelve months or less are included in Prepaid expenses and other current assets and amounts restricted for greater than twelve months are included in Other non-current assets in our consolidated balance sheets.

Our restricted cash balances were $0.3 million and $0.4 million, respectively, as of December 31, 2022 and 2021, and consisted primarily of a letter of credit issued for the benefit of the landlord of our office location in Chicago, IL.

**Concentrations of Credit Risk** - Financial instruments that potentially subject us to a concentration of credit risk consist principally of cash and cash equivalents. All cash and cash equivalents are invested with creditworthy financial institutions.

Our revenue from customers domiciled outside of the United States accounted for less than 10% of our total revenue for the years ended December 31, 2022, 2021 and 2020. Our long-lived assets outside of the United States were less than 10% of our consolidated long-lived assets as of December 31, 2022 and 2021.

**Income Tax** - We use an asset- and liability-based approach in accounting for income taxes. Deferred income tax assets and liabilities are recorded for tax attributes and are based on the differences between the financial statement and tax basis of assets and liabilities, applying enacted statutory tax rates in effect for the year in which the tax differences are expected to reverse. We regularly assess the need for a valuation allowance related to our deferred income tax assets to determine, based on the weight of the available positive and negative evidence, whether it is more likely than not that some or all of such deferred assets will not be realized. We also consider the existence of any uncertain tax positions and, as necessary, provide a reserve for any uncertain tax positions at each reporting date.

See Note 15, "Income Tax," for further details.

**Inventories** - Inventories consist primarily of telecommunications systems and parts and are recorded at the lower of average cost or net realizable value. We evaluate the need for write-downs associated with obsolete, slow-moving and nonsalable inventory by reviewing net realizable inventory values on a periodic basis.

See Note 5, "Inventories," for further details.

**Property and Equipment and Depreciation** - Property and equipment, including leasehold improvements, are stated at historical cost, less accumulated depreciation. Network asset inventory and construction in progress, which include materials, transmission and related equipment, interest and other costs relating to the construction and development of our network, are not depreciated until they are put into service. Network equipment consists of switching equipment, antennas, base transceiver stations, site preparation costs, and other related equipment used in the operation of our network. Depreciation expense totaled $7.9 million for each of the years ended December 31, 2022, 2021 and 2020. Depreciation of property and equipment is computed using the straight-line method over the estimated useful lives for owned assets, which are as follows:

| | |
|---|---|
| Office equipment, furniture, fixtures and other | 3-5 years |
| Leasehold improvements | 7-13 years |
| Network equipment | 5-25 years |

See Note 6, "Composition of Certain Balance Sheet Accounts," for further details.

Improvements to leased property are depreciated over the shorter of the useful life of the improvement or the term of the related lease. We reassess the useful lives of leasehold improvements when there are changes to the terms of the underlying lease. Such reassessment has resulted in the useful life of specific assets being adjusted to a shorter period than originally estimated, resulting in an increase in annual depreciation expense for those assets. Repairs and maintenance costs are expensed as incurred.

63

**Software Development Costs -** We capitalize costs for network and non-network software developed or obtained for internal use during the application development stage. These costs include purchased software and direct costs associated with the development and configuration of internal use software that supports the operation of our service offerings. These costs are included in Intangible assets, net, in our consolidated balance sheets and, when the software is placed in service, are amortized on a straight-line basis over their estimated useful lives. Costs incurred in the preliminary project and post-implementation stages, as well as maintenance and training costs, are expensed as incurred.

With respect to software sold as part of our equipment sales, we capitalize software development costs once technological feasibility has been established. Such capitalized software costs are amortized on a product-by-product basis over the remaining estimated economic life of the product, based on the greater of the ratio that current gross revenues for a product bear to the total of current and anticipated future gross revenues for that product or the straight-line method.

**Intangible Assets -** Intangible assets with indefinite lives are not amortized but are reviewed for impairment at least annually or whenever events or circumstances indicate the carrying value of the asset may not be recoverable. Our FCC Licenses, as defined in Note 8, "Intangible Assets," are our only material indefinite-lived intangible assets. We perform our annual impairment test of our FCC Licenses during the fourth quarter of each fiscal year. We assess qualitative factors to determine the likelihood of impairment. Our qualitative analysis includes, but is not limited to, assessing the changes in macroeconomic conditions, regulatory environment, industry and market conditions, financial performance versus budget and any other events or circumstances specific to the FCC Licenses. If it is more likely than not that the fair value of the FCC Licenses is greater than the carrying value, no further testing is required. If our qualitative analysis indicates more testing is required, or if we elect not to perform a qualitative analysis, we will apply the quantitative impairment test method.

Our quantitative impairment testing of the FCC Licenses uses the Greenfield method, an income-based approach. When performing this quantitative impairment testing, we estimate the value of our FCC spectrum licenses by calculating the present value of the cash flows of a hypothetical new market participant whose only assets are such licenses to determine the fair value of the FCC licenses. The estimate takes into account all costs and expenses necessary to build the Company's infrastructure during the start-up period, projected revenue, and cash flows once the infrastructure is completed. Since there is limited corroborating data available in the marketplace that would demonstrate a market participant's experience in establishing an "air-to-ground" business, we utilize our historic results and future projections as the underlying basis for the application of the Greenfield method. We follow the traditional discounted cash flow method, calculating the present value of a new market participant's estimated debt free cash flows, based on our historical weighted average cost of capital, adjusted to reflect the cost of capital for a new market participant.

Although we believe our projected future operating results and cash flows and related estimates regarding fair values are based on reasonable assumptions, projected operating results and cash flows may not always be achieved. The failure to achieve one or more of our assumptions regarding projected operating results and cash flows in the near term or long term could reduce the estimated fair value below carrying value and result in the recognition of an impairment charge. The results of our annual indefinite-lived intangible asset impairment assessments for 2022, 2021 and 2020 indicated no impairment.

Intangible assets that are deemed to have a finite life are amortized over their useful lives as follows:

| Software | 3-8 years |
|---|---|
| OEM and dealer relationships | 10 years |
| Service customer relationships | 5-7 years |
| Other intangible assets | 8 years |

See Note 8, "Intangible Assets," for further details.

**Long-Lived Assets -** We review our long-lived assets to determine potential impairment whenever events indicate that the carrying amount of such assets may not be recoverable. We do this by comparing the carrying value of the long-lived assets with the estimated future undiscounted cash flows expected to result from the use of the assets, including cash flows from disposition. If we determine an impairment exists, the asset is written down to estimated fair value. There were no impairments of long-lived assets in 2022, 2021 or 2020.

**Revenue Recognition -** Our revenue is primarily earned from providing connectivity and entertainment services and through sales of equipment.

We account for revenue in accordance with Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers* ("ASC 606"). We determine revenue recognition through the following steps:

- Identification of the contract, or contracts, with a customer;

- Identification of the performance obligations in the contract;

- Determination of the transaction price;

- Allocation of the transaction price to the performance obligations in the contract; and

64

- Recognition of revenue as we satisfy the performance obligations.

Service revenue primarily consists of monthly subscription and usage fees paid by aircraft owners and operators for telecommunication, data, and in-flight entertainment services and is recognized as the services are provided to the customer.

Equipment revenue primarily consists of proceeds from the sale of ATG and narrowband satellite connectivity equipment and is recognized when control of the equipment is transferred to OEMs and dealers, which generally occurs when the equipment is shipped.

In all cases, we evaluate whether a contract exists as it relates to collectability of the contract. Once a contract is deemed to exist, we evaluate the transaction price and deliverables under the contract.

A limited number of contracts contain multiple equipment and service deliverables. For these contracts, we account for each distinct good or service as a separate performance obligation. We allocate the contract's transaction price to each performance obligation using the relative standalone selling price, which is based on the actual selling price for any good or service sold separately to a similar class of customer.

See Note 4, "Revenue Recognition," for further information.

**Research and Development Costs** - Expenditures for research and development are charged to expense as incurred and totaled $29.6 million, $24.9 million and $25.2 million for the years ended December 31, 2022, 2021 and 2020, respectively. Research and development costs are reported as engineering, design and development expenses in our consolidated statements of operations.

**Warranty** - We provide warranties on parts and labor related to our products. Our warranty terms range from two to five years. Warranty reserves are established for costs that are estimated to be incurred after the sale, delivery and installation of the products under warranty. The warranty reserves are determined based on known product failures, historical experience and other available evidence, and are included in accrued liabilities in our consolidated balance sheets.

See Note 7, "Composition of Certain Reserves and Allowances," for the details of the changes in our warranty reserve.

**Asset Retirement Obligations** - We have certain asset retirement obligations related to contractual commitments to remove our network equipment and other assets from leased cell sites upon termination of the site leases. The asset retirement obligations are classified as a noncurrent liability in our consolidated balance sheets.

See Note 6, "Composition of Certain Balance Sheet Accounts," for the details of the changes in our asset retirement obligations.

**Fair Value of Financial Instruments** - We group financial assets and financial liabilities measured at fair value into three levels of hierarchy based on the markets in which the assets and liabilities are traded and the reliability of the assumptions used to determine fair value.

See Note 13, "Fair Value of Financial Assets and Liabilities," for further information.

**Derivatives** - We are exposed to interest rate risk on our variable rate borrowings. We currently use interest rate caps to manage our exposure to interest rate changes, and have designated these interest rate caps as cash flow hedges for accounting purposes. We account for these interest rate caps in accordance with ASC 815, *Derivatives and Hedging*, which requires companies to recognize all derivative instruments as either assets or liabilities at fair value in the balance sheet. We record the effective portion of changes in the fair value of our cash flow hedges to other comprehensive income (loss), net of tax, and subsequently reclassify these amounts into earnings in the period during which the hedged transaction is recognized.

See Note 10, "Derivative Instruments and Hedging Activities," for further information.

**Earnings (Loss) Per Share** - We calculate basic earnings (loss) per share using the weighted-average number of common shares outstanding during the period. We calculate diluted earnings (loss) per share using the weighted-average number of common shares outstanding and all dilutive potential common shares outstanding.

See Note 3, "Earnings (Loss) Per Share," for further information.

**Stock-Based Compensation Expense** - Compensation cost is measured and recognized at fair value for all stock-based payments, including stock options. For time-based vesting stock options, we estimate fair value using the Black-Scholes option-pricing model, which requires assumptions, such as expected volatility, risk-free interest rate, expected life, and dividends. Forfeitures are recognized when they occur. Restricted stock units ("RSUs") and restricted stock are measured based on the fair market value of the underlying stock on the date of grant. For awards with a market condition (which we have used on a limited basis), we estimate fair value using the Monte Carlo Simulation model, which requires assumptions, such as volatility, risk-free interest rate, expected life and dividends. Our stock-based compensation expense is recognized over the applicable vesting period and is included in the same operating expense line items in the consolidated statements of operations as the base cash compensation paid to the underlying employees.

See Note 14, "Stock-Based Compensation and 401(k) Plan," for further information.

65

**Leases** – We account for leases in accordance with Accounting Standards Codification Topic 842, *Leases* ("ASC 842").

We have operating lease agreements for which we have recorded lease liabilities and right-of-use assets for leases primarily related to cell sites and office buildings. We determine whether a contract contains a lease at contract inception and calculate the lease liability and right-of-use asset using our incremental borrowing rate. Our cell site leases generally have terms of five to ten years, with renewal options for an additional five to 25 years. For certain cell sites, the renewal options are deemed to be reasonably certain to be exercised. Our building leases have original terms of ten years, with renewal options for an additional five years. We recognize operating lease expense on a straight-line basis over the lease term. We have finance leases for computer and office equipment. Covenants within the Term Loan Facility contain certain restrictions on our ability to enter into new finance lease arrangements.

See Note 16, "Leases," for further information.

**Advertising Costs** - Costs for advertising are expensed as incurred.

**Debt Issuance Costs** - We defer loan origination fees and financing costs related to our various debt offerings as deferred financing costs. Additionally, we defer fees paid directly to the lenders related to amendments of our various debt offerings as deferred financing costs. We amortize these costs over the term of the underlying debt obligation using the effective interest method and include them in interest expense in the consolidated statement of operations. The fees incurred but not paid directly to the lenders in connection with amendments are expensed as incurred to interest expense. Deferred financing costs associated with future debt issuances are written off in the period during which we determine that the debt will no longer be issued.

See Note 9, "Long-Term Debt and Other Liabilities," for further information.

**Comprehensive Income (Loss)** - Comprehensive income for the years ended December 31, 2022 and 2021 is net income plus or minus unrealized gains and losses on foreign currency translation adjustments and the changes in fair value of cash flow hedges. Comprehensive loss for the year ended December 31, 2020 is net loss plus unrealized gains on foreign currency translation adjustments.

**Recently Issued Accounting Pronouncements**

The Company considers the applicability and impact of all Accounting Standards Updates (ASUs) issued by the Financial Accounting Standards Board (FASB). ASUs not listed below were assessed and determined to be either not applicable or expected to have minimal impact on our consolidated financial statements.

*Accounting standards adopted:*

On January 1, 2022, we adopted ASU 2021-10, Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance to increase the transparency of transactions with a government accounted for by applying a grant or contribution accounting model by analogy. ASU 2021-10 requires an entity to disclose information about the nature of the transactions, including the significant terms and conditions, accounting policy used to account for the transactions, and the effect of the transactions on the financial statements. Adoption of this standard did not have a material impact on our consolidated financial statements.

## 3. Earnings (Loss) Per Share

Basic and diluted earnings (loss) per share have been calculated using the weighted-average number of common shares outstanding for the period.

The shares of common stock effectively repurchased in connection with the Forward Transactions (as defined and described in Note 9, "Long-Term Debt and Other Liabilities") are considered participating securities requiring the two-class method to calculate basic and diluted earnings per share. Net earnings will be allocated between shares of common stock and participating securities on a one-to-one basis. In periods of a net loss, the shares associated with the Forward Transactions will not receive an allocation of losses, as the counterparties to the Forward Transactions are not required to fund losses. Additionally, the calculation of weighted average shares outstanding as of December 31, 2021 and 2020 excludes approximately 0.6 million and 2.1 million shares, respectively, associated with the Forward Transactions.

The diluted earnings (loss) per share calculations exclude the effect of stock options, deferred stock units, restricted stock units and convertible notes when the computation is anti-dilutive. For the years ended December 31, 2022 and 2021, the weighted average number of shares excluded from the computation was 0.5 million and 5.7 million shares, respectively. As a result of the net loss for the year ended December 31, 2020, all of the outstanding shares of common stock underlying stock options, deferred stock units, restricted stock units and convertible notes were excluded from the computation of diluted shares outstanding because they were anti-dilutive.

During September 2022, we repurchased 1.5 million shares of common stock in a private transaction for an aggregate purchase price of $18,345,000, or $12.23 per share (the "Repurchase"). The Repurchase decreased the weighted average shares outstanding for the year ended December 31, 2022.

The following tables sets forth the computation of basic and diluted earnings per share for the years ended December 31, 2022, 2021 and 2020; however, for the reasons described above, the shares associated with the Forward Transactions are excluded from the computation of basic earnings per share (*in thousands, except per share amounts*):

| | 2022 | | | 2021 | | |
|---|---|---|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| Net income from continuing operations | $ 92,059 | | | $ 156,589 | | |
| Less: Participation rights on Forward Transactions allocated to continuing operations | 171 | | | 1,484 | | |
| | | | | | | |
| **Basic Earnings Per Share from Continuing Operations** | | | | | | |
| Undistributed income from continuing operations | $ 91,888 | 123,268 | $ 0.75 | $ 155,105 | 103,400 | $ 1.50 |
| | | | | | | |
| **Effect of Dilutive Securities from Continuing Operations** | | | | | | |
| Stock-based compensation | | 4,881 | | | 6,674 | |
| 2022 Convertible Notes | 2,770 | 5,774 | | 7,221 | 17,131 | |
| | | | | | | |
| **Diluted Earnings Per Share from Continuing Operations** | | | | | | |
| Undistributed income from continuing operations and assumed conversions | $ 94,658 | 133,923 | $ 0.71 | $ 162,326 | 127,205 | $ 1.28 |
| | | | | | | |
| **Net loss from discontinued operations** | $ — | | | $ (3,854 ) | | |
| Less: Participation rights on Forward Transactions allocated to discontinued operations | — | | | (36 ) | | |
| | | | | | | |
| **Basic Loss Per Share from Discontinued Operations** | | | | | | |
| Undistributed loss from discontinued operations | $ — | 123,268 | $ — | $ (3,818 ) | 103,400 | $ (0.04 ) |
| | | | | | | |
| **Effect of Dilutive Securities from Discontinued Operations** | | | | | | |
| Stock-based compensation | — | 4,881 | | 3,615 | 6,674 | |
| 2022 Convertible Notes | — | 5,774 | | — | 17,131 | |
| | | | | | | |
| **Diluted Loss Per Share from Discontinued Operations** | | | | | | |
| Undistributed loss from discontinued operations and assumed conversions | $ — | 133,923 | $ — | $ (203 ) | 127,205 | $ — |
| | | | | | | |
| **Earnings per share - basic** | | | $ 0.75 | | | $ 1.46 |
| **Earnings per share - diluted** | | | $ 0.71 | | | $ 1.28 |

| | For the Year Ended December 31, |
|---|---|
| | 2020 |
| Net loss from continuing operations | $ (48,559 ) |
| Net loss from discontinued operations | (201,477 ) |
| Net loss | (250,036 ) |
| Less: Participation rights of the Forward Transactions | |
| Undistributed losses | $ (250,036 ) |
| Weighted-average common shares outstanding-basic and diluted | 82,266 |
| Net loss attributable to common stock per share-basic and diluted: | |
| Net loss from continuing operations | $ (0.59 ) |
| Net loss from discontinued operations | (2.45 ) |
| Net loss | $ (3.04 ) |

**4. Revenue Recognition**

**Remaining Performance Obligations**

As of December 31, 2022, the aggregate amount of the transaction price in our customer contracts allocated to unsatisfied performance obligations was approximately $102 million. We have excluded from this amount consideration from contracts that have an original duration of one year or less. Approximately $80 million primarily represents connectivity and entertainment service revenues which are recognized as services are provided, which is expected to occur through the remaining term of the contract. The remaining $22 million of such amount represents future equipment revenue that is expected to be recognized primarily within the next two years.

**Disaggregation of revenue**

The following table presents our revenue disaggregated by category *(in thousands)*:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2020** | |
| **Service revenue** | | | | | | |
| Connectivity | $ | 291,444 | $ | 255,786 | $ | 209,160 |
| Entertainment and other | | 4,885 | | 3,797 | | 2,827 |
| **Total service revenue** | $ | 296,329 | $ | 259,583 | $ | 211,987 |
| **Equipment revenue** | | | | | | |
| ATG | $ | 91,152 | $ | 61,780 | $ | 45,200 |
| Satellite | | 9,992 | | 11,048 | | 11,746 |
| Other | | 6,594 | | 3,305 | | 785 |
| **Total equipment revenue** | $ | 107,738 | $ | 76,133 | $ | 57,731 |
| **Customer type** | | | | | | |
| Aircraft owner/operator/service provider | $ | 296,329 | $ | 259,583 | $ | 211,987 |
| OEM and aftermarket dealer | | 107,738 | | 76,133 | | 57,731 |
| **Total revenue** | $ | 404,067 | $ | 335,716 | $ | 269,718 |

**Contract balances**

Our current and non-current contract asset balances totaled $19.9 million and $17.8 million as of December 31, 2022 and 2021, respectively. Contract assets represent the aggregate amount of revenue recognized in excess of billings primarily for certain sales programs.

Our current and non-current deferred revenue balances totaled $3.4 million and $1.8 million as of December 31, 2022 and 2021, respectively. Deferred revenue includes, among other things, fees paid for equipment and subscription connectivity products.

**Major Customers**

No customer accounted for more than 10% of total revenue for the years ended December 31, 2022, 2021 and 2020 and no customer accounted for more than 10% of accounts receivable as of December 31, 2022 or 2021.

**5. Inventories**

Inventories consist primarily of telecommunications systems and parts and are recorded at the lower of average cost or net realizable value. We evaluate the need for write-downs associated with obsolete, slow-moving and nonsalable inventory by reviewing net realizable inventory values on a periodic basis.

Inventories as of December 31, 2022 and 2021 were as follows *(in thousands)*:

| | December 31, | | | |
|---|---|---|---|---|
| | **2022** | | **2021** | |
| Work-in-process component parts | $ | 34,840 | $ | 21,570 |
| Finished goods | | 14,653 | | 12,406 |
| Total inventory | $ | 49,493 | $ | 33,976 |

**6. Composition of Certain Balance Sheet Accounts**

Prepaid expenses and other current assets as of December 31, 2022 and 2021 were as follows (*in thousands*):

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Interest rate caps and receivable | $ 28,496 | $ 925 |
| Contract assets | 6,494 | 4,533 |
| Prepaid inventories | 2,901 | 2,525 |
| Insurance receivable [(1)] | — | 17,300 |
| Tenant improvement allowance receivables | — | 1,936 |
| Other | 7,209 | 5,076 |
| Total prepaid expenses and other current assets | $ 45,100 | $ 32,295 |

(1)     See Note 17, "Commitments and Contingencies," for additional information.

Property and equipment as of December 31, 2022 and 2021 were as follows (*in thousands*):

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Office equipment, furniture, fixtures and other | $ 17,242 | $ 12,759 |
| Leasehold improvements | 15,357 | 13,545 |
| Network equipment | 179,363 | 142,601 |
| | 211,962 | 168,905 |
| Accumulated depreciation | (107,367) | (105,233) |
| Property and equipment, net | $ 104,595 | $ 63,672 |

Other non-current assets as of December 31, 2022 and 2021 were as follows (*in thousands*):

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Interest rate caps | $ 25,578 | $ 11,359 |
| Contract assets, net of allowances of $501 and $455, respectively | 13,376 | 13,217 |
| Revolving credit facility deferred financing costs | 1,445 | 1,879 |
| Other | 2,956 | 1,970 |
| Total other non-current assets | $ 43,355 | $ 28,425 |

Accrued liabilities as of December 31, 2022 and 2021 were as follows (*in thousands*):

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Employee compensation and benefits | $ 19,235 | $ 13,791 |
| Accrued interest | 9,878 | 6,231 |
| Operating leases | 9,094 | 7,444 |
| Network equipment | 8,748 | 3,179 |
| Warranty reserve | 2,300 | 2,450 |
| Taxes | 2,282 | 1,997 |
| Litigation settlement accrual [(1)] | — | 17,300 |
| Other | 8,519 | 7,476 |
| Total accrued liabilities | $ 60,056 | $ 59,868 |

(1)     See Note 17, "Commitments and Contingencies," for additional information.

Other non-current liabilities as of December 31, 2022 and 2021 consist of the following (*in thousands*):

69

| | December 31, | | |
|---|---|---|---|
| | **2022** | | **2021** |
| Asset retirement obligations | $ | 6,032 | $ | 4,861 |
| Other | | 1,579 | | 2,375 |
| Total other non-current liabilities | $ | 7,611 | $ | 7,236 |

Changes in our non-current asset retirement obligations for the years ended December 31, 2022 and 2021 consist of the following (*in thousands*):

| | **Asset Retirement Obligation** |
|---|---|
| Balance – January 1, 2021 | $ | 4,401 |
| Liabilities incurred | — |
| Liabilities settled | — |
| Accretion expense | 460 |
| Foreign exchange rate adjustments | — |
| Balance – December 31, 2021 | 4,861 |
| Liabilities incurred | 682 |
| Liabilities settled | (43) |
| Accretion expense | 553 |
| Foreign exchange rate adjustments | (21) |
| Balance – December 31, 2022 | $ | 6,032 |

## 7. Composition of Certain Reserves and Allowances

**Credit Losses** — We regularly evaluate our accounts receivable and contract assets for expected credit losses. Our expected loss allowance methodology for accounts receivable is developed using historical collection experience, current and future economic and market conditions, and a review of the current status of each customer's trade accounts receivables. Due to the short-term nature of such receivables, the estimated amount of accounts receivable that may not be collected is based on the aging of the accounts receivable balances and the financial condition of customers. Additionally, specific allowance amounts are established to record the appropriate provision for customers that have a higher probability of default. Our monitoring activities include timely account reconciliation, dispute resolution, payment confirmation, consideration of each customer's financial condition and macroeconomic conditions. Balances are written off when determined to be uncollectible. We apply a similar methodology to our current and non-current contract asset balances. However, due to the inherent additional risk associated with a long-term receivable, an additional provision for credit loss is applied to contract asset balances that will diminish over time as the contract nears its expiration date.

Estimates are used to determine the expected loss allowances. Such allowances are based on management's assessment of anticipated payment, taking into account available historical and current information as well as management's assessment of potential future developments. We are continuously monitoring our assumptions used to determine our expected credit losses, including the impact of COVID-19, which could cause us to record additional material credit losses in future periods.

Changes in our allowances for credit losses for the years ended December 31, 2022 and 2021 were as follows (*in thousands*):

| | **Accounts Receivable** | | **Other non-current assets** | |
|---|---|---|---|---|
| Balance at January 1, 2021 | $ | 1,044 | $ | 375 |
| Provision for expected credit losses | | 204 | | 80 |
| Write-offs charged against the allowances | | (371) | | — |
| Other | | 17 | | — |
| Balance at December 31, 2021 | | 894 | | 455 |
| Provision for expected credit losses | | 1,001 | | 46 |
| Write-offs charged against the allowances | | (326) | | — |
| Other | | 209 | | |
| Balance at December 31, 2022 | $ | 1,778 | $ | 501 |

**Warranties** — We provide warranties on parts and labor related to our products. Our warranty terms range from two to five years. Warranty reserves are established for costs that are estimated to be incurred after the sale, delivery and installation of the products under warranty. The warranty reserves are determined based on known product failures, historical experience and other available evidence, and are included in accrued liabilities in our consolidated balance sheets.

70

Changes in our warranty reserve for the years ended December 31, 2022 and 2021 were as follows (*in thousands*):

| | | Warranty Reserve |
|---|---|---|
| Balance – January 1, 2021 | $ | 2,400 |
| Accruals for warranties issued | | 126 |
| Settlements and adjustments to warranties | | (76) |
| Balance – December 31, 2021 | | 2,450 |
| Accruals for warranties issued | | 1,583 |
| Settlements and adjustments to warranties | | (1,733) |
| Balance – December 31, 2022 | $ | 2,300 |

## 8. Intangible Assets

Our intangible assets are comprised of indefinite- and finite-lived intangible assets and goodwill. We own the rights to 3 MHz of ATG spectrum in the nationwide 800 MHz Commercial Air-Ground Radiotelephone band (the "3 MHz FCC License"), which is used in the operation of our ATG network, and the license for 1 MHz of ATG spectrum in the nationwide 800MHz Commercial Air-Ground Radiotelephone band (the "1 MHz FCC License") acquired as part of our acquisition of LiveTV Airfone, LLC. Together we refer to the 3 MHz FCC License and the 1 MHz FCC License as the "FCC Licenses." The FCC Licenses were originally issued with 10-year terms and we have renewed both licenses for subsequent 10-year terms. Such licenses are subject to further renewal by the FCC, and renewals of licenses held by others have occurred routinely and at nominal cost. Moreover, we have determined that there are currently no legal, regulatory, contractual, competitive, economic, or other factors that limit the useful life of the FCC Licenses. As a result, the FCC Licenses are treated as indefinite-lived intangible assets which we do not amortize. We reevaluate the useful life of the FCC Licenses each year to determine whether events and circumstances continue to support an indefinite useful life. Our annual impairment assessment of the FCC Licenses for 2022, 2021 and 2020 indicated no impairment.

Our software relates to the development of internal use software which is used to run our network and support our service offerings. Software also includes software embedded in the equipment that we sell to our customers.

Our goodwill balance was $0.6 million as of December 31, 2022 and 2021.

Our intangible assets, other than goodwill, as of December 31, 2022 and 2021 were as follows (*in thousands, except for weighted average remaining useful life*):

| | Weighted Average Remaining Useful Life (in years) | As of December 31, 2022 | | | As of December 31, 2021 | | |
|---|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| **Amortized intangible assets:** | | | | | | | |
| Software | 6.4 | $ 59,932 | $ (43,950) | $ 15,982 | $ 54,128 | $ (39,289) | $ 14,839 |
| Other intangible assets | 8.0 | 624 | — | 624 | 1,812 | — | 1,812 |
| Service customer relationships | | 8,081 | (8,081) | — | 8,081 | (8,081) | — |
| OEM and dealer relationships | | 6,724 | (6,724) | — | 6,724 | (6,724) | — |
| Total amortized intangible assets | | 75,361 | (58,755) | 16,606 | 70,745 | (54,094) | 16,651 |
| **Unamortized intangible assets:** | | | | | | | |
| FCC Licenses | | 32,283 | — | 32,283 | 32,283 | — | 32,283 |
| **Total intangible assets** | | $ 107,644 | $ (58,755) | $ 48,889 | $ 103,028 | $ (54,094) | $ 48,934 |

Amortization expense for the years ended December 31, 2022, 2021 and 2020 was $4.7 million, $7.5 million and $6.3 million, respectively.

Amortization expense for each of the next five years and thereafter is estimated to be as follows (*in thousands*):

| Years ending December 31, | | Amortization Expense |
|---|---|---|
| 2023 | $ | 2,447 |
| 2024 | $ | 2,369 |
| 2025 | $ | 2,192 |
| 2026 | $ | 2,094 |
| 2027 | $ | 1,930 |
| Thereafter | $ | 5,574 |

Actual future amortization expense could differ from the estimated amount as the result of future investments and other factors.

**9. Long-Term Debt and Other Liabilities**

Long-term debt as of December 31, 2022 and 2021 was as follows (*in thousands*):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Term Loan Facility | $ 711,263 | $ 718,057 |
| 2022 Convertible Notes | — | 102,788 |
| Total debt | 711,263 | 820,845 |
| Less: deferred financing costs | (13,840) | (16,465) |
| Less: current portion of long-term debt | (7,250) | (109,620) |
| Total long-term debt | $ 690,173 | $ 694,760 |

*2021 Credit Agreement*

On April 30, 2021, Gogo and Gogo Intermediate Holdings LLC ("GIH") (a wholly owned subsidiary of Gogo) entered into a credit agreement (the "Original 2021 Credit Agreement," and, as it may be amended, supplemented or otherwise modified from time to time, the "2021 Credit Agreement") among Gogo, GIH, the lenders and issuing banks party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent, which provides for (i) a term loan credit facility (the "Term Loan Facility") in an aggregate principal amount of $725.0 million, issued with a discount of 0.5%, and (ii) a revolving credit facility (the "Revolving Facility" and together with the Term Loan Facility, the "Facilities") of up to $100.0 million, which includes a letter of credit sub-facility.

On February 2, 2023, Gogo and GIH entered into an amendment to the Original 2021 Credit Agreement with Morgan Stanley Senior Funding, Inc., as administrative agent, which replaced all references in the Original 2021 Credit Agreement to LIBOR in respect of the applicable interest rates for the Facilities with an adjusted term secured overnight financing rate as administered by the Federal Reserve Bank of New York ("SOFR"), plus a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustment.

The Term Loan Facility amortizes in nominal quarterly installments equal to one percent of the aggregate initial principal amount thereof per annum, with the remaining balance payable upon final maturity of the Term Loan Facility on April 30, 2028. There are no amortization payments under the Revolving Facility, and all borrowings under the Revolving Facility mature on April 30, 2026.

The Term Loan Facility bears annual interest at a floating rate measured by reference to, at GIH's option, either (i) an adjusted term SOFR rate (subject to a floor of 0.75%) plus an applicable margin of 3.75% and a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustments or (ii) an alternate base rate plus an applicable margin of 2.75%.

Loans outstanding under the Revolving Facility bear annual interest at a floating rate measured by reference to, at GIH's option, either (i) an adjusted term SOFR rate (subject to a floor of 0.00%) plus an applicable margin ranging from 3.25% to 3.75% per annum depending on GIH's senior secured first lien net leverage ratio and a credit spread adjustment based on the Alternative Reference Rates Committee recommended spread adjustments or (ii) an alternate base rate plus an applicable margin ranging from 2.25% to 2.75% per annum depending on GIH's senior secured first lien net leverage ratio. Additionally, unused commitments under the Revolving Facility are subject to a fee ranging from 0.25% to 0.50% per annum depending on GIH's senior secured first lien net leverage ratio.

The Facilities may be prepaid at GIH's option at any time without premium or penalty (other than customary breakage costs), subject to minimum principal payment amount requirements.

Subject to certain exceptions and de minimis thresholds, the Term Loan Facility is subject to mandatory prepayments in an amount equal to:

- 100% of the net cash proceeds of certain asset sales, insurance recovery and condemnation events, subject to reduction to 50% and 0% if specified senior secured first lien net leverage ratio targets are met;

- 100% of the net cash proceeds of certain debt offerings; and

- 50% of annual excess cash flow (as defined in the 2021 Credit Agreement), subject to reduction to 25% and 0% if specified senior secured first lien net leverage ratio targets are met.

The 2021 Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants. The negative covenants include restrictions on, among other things: incurrence of indebtedness or issuance of disqualified equity interests; incurrence or existence of liens; consolidations or mergers; activities of Gogo and any subsidiary holding a license issued by the Federal Communications Commission; investments, loans, advances, guarantees or acquisitions; asset sales; dividends or

72

other distributions on equity; purchase, redemption or retirement of capital stock; payment or redemption of certain junior indebtedness; entry into other agreements that restrict the ability to incur liens securing the Facilities; and amendment of organizational documents; in each case subject to customary exceptions.

The Revolving Facility includes a financial covenant set at a maximum senior secured first lien net leverage ratio of 7.50:1.00, which will apply if the outstanding amount of loans and unreimbursed letter of credit drawings thereunder at the end of any fiscal quarter exceeds 35% of the aggregate of all commitments thereunder.

The 2021 Credit Agreement contains customary events of default, which, if any of them occurred, would permit or require the principal, premium, if any, and interest on all of the then outstanding obligations under the Facilities to be due and payable immediately and the commitments under the Revolving Facility to be terminated.

The proceeds of the Term Loan Facility were used, together with cash on hand, (i) to redeem in full and pay the outstanding principal amount of the 2024 Senior Secured Notes (as defined below) together with accrued and unpaid interest and redemption premiums and to pay fees associated with the termination of the ABL Credit Agreement (as defined below and, together with the redemption of the 2024 Senior Secured Notes, the "Refinancing"), and (ii) to pay fees and expenses incurred in connection with the Refinancing and the Facilities. The Revolving Facility is available for working capital and general corporate purposes of GIH and its subsidiaries and was undrawn as of December 31, 2022 and 2021.

As of December 31, 2022 and 2021, the outstanding principal amount of the Term Loan Facility was $714.1 million and $721.4 million, respectively, the unaccreted debt discount was $2.8 million and $3.3 million, respectively, and the net carrying amount was $711.3 million and $718.1 million, respectively.

We paid approximately $19.7 million of loan origination and financing costs related to the Facilities which are being accounted for as deferred financing costs on our consolidated balance sheets and are amortized over the terms of the Facilities. Total amortization expense was $2.6 million and $1.8 million, respectively, for the years ended December 31, 2022 and 2021 and is included in Interest expense in our consolidated statements of operations. As of December 31, 2022 and 2021, the balance of unamortized deferred financing costs related to the Facilities was $15.3 million and $17.9 million, respectively.

On April 30, 2021, Gogo, GIH, and each direct and indirect wholly-owned U.S. restricted subsidiary of GIH (Gogo and such subsidiaries collectively, the "Guarantors") entered into a guarantee agreement (the "Guarantee Agreement") in favor of Morgan Stanley Senior Funding, Inc., as collateral agent (the "Collateral Agent"), whereby GIH and the Guarantors guarantee the obligations under the Facilities and certain other secured obligations as set forth in the Guarantee Agreement, and GIH and the Guarantors entered into a collateral agreement (the "Collateral Agreement"), in favor of the Collateral Agent, whereby GIH and the Guarantors grant a security interest in substantially all of their respective tangible and intangible assets (including the equity interests in each direct material wholly-owned U.S. restricted subsidiary owned by GIH or any Guarantor, and 65% of the equity interests in any non-U.S. subsidiary held directly by GIH or any Guarantor), subject to certain exceptions, to secure the obligations under the Facilities and certain other secured obligations as set forth in the Collateral Agreement.

*2022 Convertible Notes*

On November 21, 2018, we issued $215.0 million aggregate principal amount of 6.00% Convertible Senior Notes due 2022 (the "2022 Convertible Notes") in private offerings to qualified institutional buyers, including pursuant to Rule 144A under the Securities Act, and in concurrent private placements. We granted an option to the initial purchasers to purchase up to an additional $32.3 million aggregate principal amount of 2022 Convertible Notes to cover over-allotments, of which $22.8 million was subsequently exercised during December 2018, resulting in a total issuance of $237.8 million aggregate principal amount of 2022 Convertible Notes.

In January 2021, $1.0 million aggregate principal amount of 2022 Convertible Notes was converted by holders and settled through the issuance of 166,666 shares of common stock.

On March 17, 2021, Gogo entered into separate, privately negotiated exchange agreements (the "March 2021 Exchange Agreements") with certain holders of the 2022 Convertible Notes. Pursuant to the March 2021 Exchange Agreements, such holders exchanged a total of $28,235,000 aggregate principal amount of 2022 Convertible Notes for 5,121,811 shares of our common stock on March 24, 2021. The negotiated exchange rate under the March 2021 Exchange Agreements was 181.40 shares of common stock per $1,000 principal amount of the 2022 Convertible Notes, which resulted in a loss on settlement of $4.4 million, which is included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

On April 1, 2021, Gogo entered into a privately negotiated exchange agreement (the "GTCR Exchange Agreement") with an affiliate of funds managed by GTCR LLC ("GTCR"). Pursuant to the GTCR Exchange Agreement, GTCR exchanged $105,726,000 aggregate principal amount of 2022 Convertible Notes for 19,064,529 shares of our common stock on April 9, 2021. The negotiated exchange rate under the GTCR Exchange Agreement was 180.32 shares of common stock per $1,000 principal amount of 2022 Convertible Notes, which resulted in a loss on settlement of $14.6 million, which is included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

73

As of December 31, 2021, the outstanding principal amount of the 2022 Convertible Notes was $102.8 million and was classified as Current portion of long-term debt in the consolidated balance sheets.

In May 2022, the remaining $102,788,000 aggregate principal amount of 2022 Convertible Notes was converted by holders into 17,131,332 shares of common stock. Thorndale Farm Private Equity Fund 2, LLC, an entity affiliated with our Chairman and Chief Executive Officer, held $8,000,000 aggregate principal amount of 2022 Convertible Notes that was converted into 1,333,333 shares of common stock. As of December 31, 2022, there were no outstanding 2022 Convertible Notes.

We incurred approximately $8.1 million of issuance costs related to the issuance of the 2022 Convertible Notes that were amortized over the term of the 2022 Convertible Notes using the effective interest method. Total amortization expense was $0.4 million, $1.4 million and $1.8 million, respectively, for the years ended December 31, 2022, 2021 and 2020. Amortization expense is included in Interest expense in the consolidated statements of operations. As of December 31, 2021, the balance of unamortized deferred financing costs related to the 2022 Convertible Notes was $0.4 million and was included as a reduction to the carrying amount of the debt in our consolidated balance sheets. See Note 11, "Interest Costs," for additional information.

The 2022 Convertible Notes had an initial conversion rate of 166.6667 shares of common stock per $1,000 principal amount of 2022 Convertible Notes, which was equivalent to an initial conversion price of approximately $6.00 per share of our common stock. Prior to conversion, the shares of common stock subject to conversion were considered in the diluted earnings per share calculations under the if-converted method if their impact was dilutive.

*Forward Transactions*

In connection with the issuance of our 3.75% Convertible Senior Notes due 2020 (the "2020 Convertible Notes"), we paid approximately $140.0 million to enter into prepaid forward stock repurchase transactions (the "Forward Transactions") with certain financial institutions (the "Forward Counterparties"), pursuant to which we purchased approximately 7.2 million shares of common stock for settlement on or around the March 1, 2020 maturity date for the 2020 Convertible Notes, subject to the ability of each Forward Counterparty to elect to settle all or a portion of its Forward Transactions early.

On December 11, 2019, we entered into an amendment to one of the Forward Transactions (the "Amended and Restated Forward Transaction") to extend the expected settlement date with respect to approximately 2.1 million shares of common stock held by one of the Forward Counterparties, JPMorgan Chase Bank, National Association (the "2022 Forward Counterparty"), to correspond with the May 15, 2022 maturity date for the 2022 Convertible Notes. As a result of the Forward Transactions, total shareholders' equity within our consolidated balance sheets was reduced by approximately $140.0 million. In March, 2020, approximately 5.1 million shares of common stock were delivered to us in connection with the Forward Transactions. In April 2021, approximately 1.5 million shares of common stock were delivered to us in connection with the Amended and Restated Forward Transaction. In May 2022, the approximately 0.6 million shares that were remaining under the Amended and Restated Forward Transactions were delivered to us. As of December 31, 2022, there were no prepaid forward stock repurchase transactions outstanding.

*2024 Senior Secured Notes*

On April 25, 2019, GIH and Gogo Finance Co. Inc. (a wholly owned subsidiary of GIH) ("Gogo Finance" and, together with GIH, the "Issuers") issued $905.0 million aggregate principal amount of 9.875% senior secured notes due 2024 (the "2024 Senior Secured Notes"), at a price equal to 99.512% of their face value, under an indenture, dated as of April 25, 2019, among the Issuers, Gogo, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee.

On May 7, 2019, the Issuers issued an additional $20.0 million of 2024 Senior Secured notes, which were issued at a price equal to 100.5% of their face value, and $50.0 million of 2024 Senior Secured Notes on November 13, 2020, which were issued at a price equal to 103.5% of their face value.

The 2024 Senior Secured Notes were guaranteed on a senior secured basis by Gogo and all of GIH's existing and future restricted subsidiaries (other than Gogo Finance), subject to certain exceptions. The 2024 Senior Secured Notes and the related guarantees were secured by certain liens on the Company's collateral, which were released upon the closing of the Transaction.

We paid approximately $22.6 million of origination fees and financing costs related to the issuance of the 2024 Senior Secured Notes, which were accounted for as deferred financing costs on our consolidated balance sheets and were being amortized over the contractual term of the 2024 Senior Secured Notes using the effective interest method. Total amortization expense was $1.4 million and $3.7 million, respectively, for the years ended December 31, 2021 and 2020. Amortization expense is included in Interest expense in the consolidated statements of operations.

The 2024 Senior Secured Notes were redeemed on May 1, 2021 (the "Redemption Date") at a redemption price equal to 104.938% of the principal amount of the 2024 Senior Secured Notes redeemed, plus accrued and unpaid interest to (but not including) the Redemption Date. The make-whole premium paid in connection with the redemption was $48.1 million. We wrote off the remaining unamortized deferred financing costs of $15.2 million and the remaining debt discount of $1.3 million, which together are included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

*ABL Credit Facility*

On August 26, 2019, Gogo, GIH and Gogo Finance entered into a credit agreement (the "ABL Credit Agreement") with the other loan parties party thereto, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and Morgan Stanley Senior Funding, Inc., as syndication agent, which provided for an asset-based revolving credit facility (the "ABL Credit Facility") of up to $30.0 million, subject to borrowing base availability, and includes letter of credit and swingline sub-facilities. The obligations under the ABL Credit Agreement were guaranteed by Gogo and all of its existing and future subsidiaries, subject to certain exceptions and secured by collateral of the Company. On April 30, 2021, the ABL Credit Agreement and all commitments thereunder were terminated. As a result of the termination, the remaining unamortized deferred financing costs of $0.3 million were written off as of May 1, 2021 and included in Loss on extinguishment of debt and settlement of convertible notes in our consolidated statements of operations for the year ended December 31, 2021.

*2020 Convertible Notes*

In March 2015, we issued $361.9 million aggregate principal amount of 3.75% Convertible Senior Notes due 2020 (the "2020 Convertible Notes") in a private offering to qualified institutional buyers, pursuant to Rule 144A under the Securities Act. In 2018 and 2019, we repurchased a total of $359.4 million aggregate principal amount of the 2020 Convertible Notes, and on March 1, 2020, the remaining $2.5 million aggregate principal amount of the 2020 Convertible Notes matured.

**10. Derivative Instruments and Hedging Activities**

We are exposed to interest rate risk on our variable rate borrowings. We currently use interest rate caps to manage our exposure to interest rate changes, and have designated these interest rate caps as cash flow hedges for accounting purposes. Accordingly, the earnings impact of the derivatives designated as cash flow hedges is recorded upon the recognition of the variable interest payments related to the hedged debt.

In May 2021, we purchased interest rate caps with an aggregate notional amount of $650.0 million for $8.6 million. The cost of the interest rate caps will be amortized to interest expense using the caplet method, from the effective date through termination date. We receive payments in the amount calculated pursuant to the caps for any period in which the three-month USD LIBOR rate increases beyond the applicable strike rate. The notional amounts of the interest rate caps periodically decrease over the life of the caps.

The notional amounts, strike rates and end dates of the cap agreements are as follows (*notional amounts in thousands*):

| Start Date | End Date | Notional Amounts | Strike Rate |
|---|---|---|---|
| 7/31/2021 | 7/31/2023 | $ 650,000 | 0.75 % |
| 7/31/2023 | 7/31/2024 | 525,000 | 0.75 % |
| 7/31/2024 | 7/31/2025 | 350,000 | 1.25 % |
| 7/31/2025 | 7/31/2026 | 250,000 | 2.25 % |
| 7/31/2026 | 7/31/2027 | 200,000 | 2.75 % |

We record the effective portion of changes in the fair value of our cash flow hedges to other comprehensive income (loss), net of tax, and subsequently reclassify these amounts into earnings in the period during which the hedged transaction is recognized. The amounts included in accumulated other comprehensive income will be reclassified to interest expense in the event the hedges are no longer considered effective, in accordance with ASC 815, *Derivatives and Hedging*. No gains or losses of our cash flow hedges were considered to be ineffective and reclassified from other comprehensive income (loss) to earnings for the years ended December 31, 2022 and 2021. We estimate that approximately $1.5 million currently recorded in accumulated other comprehensive income (loss) will be recognized in earnings over the next 12 months. We assess the effectiveness of the hedge on an ongoing basis. Cash flows from interest rate caps are classified in the consolidated statement of cash flows as investing activities from continuing operations.

For the year ended December 31, 2022, we recorded an unrealized gain on the interest rate caps of $28.4 million, net of tax of $9.3 million. For the year ended December 31, 2021, we recorded an unrealized gain on the interest rate caps of $2.7 million, net of tax of $0.9 million. Unrealized gains and losses on interest rate caps exclude amortization of the purchase price paid for the interest rate caps.

75

When derivatives are used, we are exposed to credit loss in the event of non-performance by the counterparties; however, non-performance is not anticipated. ASC 815, *Derivatives and Hedging*, requires companies to recognize all derivative instruments as either assets or liabilities at fair value in the balance sheet. The fair values of the interest rate derivatives are based on quoted market prices for similar instruments from commercial banks (based on significant observable inputs - Level 2 inputs).

The following table presents the fair value of our interest rate derivatives included in the consolidated balance sheets for the periods presented (in thousands):

| Derivatives designated as hedging instruments | Balance sheet location | December 31, | |
|---|---|---|---|
| | | 2022 | 2021 |
| Current portion of interest rate caps | Prepaid expenses and other current assets | $ 24,459 | $ 925 |
| Non-current portion of interest rate caps | Other non-current assets | $ 25,578 | 11,359 |

*Fair Value Measurement*

Our derivative assets and liabilities consist principally of interest rate caps, which are carried at fair value based on significant observable inputs (Level 2 inputs). Derivatives entered into by us are typically executed over-the-counter and are valued using discounted cash flows along with fair value models that primarily use market observable inputs. These models take into account a variety of factors including, where applicable, maturity, interest rate yield curves, and counterparty credit risks.

**11. Interest Costs**

We capitalize a portion of our interest on funds borrowed during the active construction period of major capital projects. Capitalized interest is added to the cost of the underlying assets and amortized over the useful lives of the assets.

The following is a summary of our interest costs for the years ended December 31, 2022, 2021 and 2020 *(in thousands)*:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Interest costs charged to expense | $ 43,530 | $ 62,390 | $ 105,988 |
| Amortization of deferred financing costs | 3,058 | 4,661 | 5,892 |
| Accretion of debt discount | 456 | 419 | 13,907 |
| Amortization of the purchase price of interest rate caps | 157 | 2 | — |
| Interest rate cap benefit | (8,329) | — | — |
| Interest expense | 38,872 | 67,472 | 125,787 |
| Interest costs capitalized to property and equipment | 920 | 4 | — |
| Interest costs capitalized to software | 472 | 311 | 885 |
| Total interest costs | $ 40,264 | $ 67,787 | $ 126,672 |

**12. Common Stock and Preferred Stock**

*Common Stock* – We have one class of common stock outstanding as of December 31, 2022 and 2021. Our common stock is junior to our preferred stock, if and when issued. Our Third Amended and Restated Certificate of Incorporation authorizes a total of 500,000,000 shares of common stock with a par value of $0.0001 per share.

*Preferred Stock* – Our Third Amended and Restated Certificate of Incorporation authorizes 100,000,000 shares of new preferred stock with a par value of $0.01 per share. No shares of this new preferred stock have been issued. The preferred stock may be issued, from time to time, in one or more series as authorized by the Board of Directors, which has the authority to designate the terms of any series of preferred stock issued, including, without limitation, the number of shares to be included in such series of preferred stock, any dividend, redemption, conversion rights or voting powers and the designations, preferences and relative participating, optional or other special rights.

*Shareholder Rights Plan* – On September 23, 2020, our Board of Directors adopted a Section 382 Rights Agreement (as amended, the "Rights Agreement"), between the Company and Computershare Trust Company, N.A., as rights agent (the "Rights Agent"), and declared a dividend of one preferred share purchase right (a "Right") for each outstanding share of common stock of the Company, outstanding on the record date of October 2, 2020, to the stockholders of record on that date. Each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of Series A Preferred Stock, par value $0.01 per share, of the Company (the "Preferred Shares") at a price of $38.40 per one one-thousandth of a Preferred Share represented by a Right, subject to adjustment. In December 2022, the Company entered into Amendment No. 1 to the Rights Agreement with the Rights Agent, which, among other things, changed the Distribution Date (as defined below) from the close of business on the tenth to the thirtieth day after the Stock Acquisition Date (as defined in the Rights Agreement), with certain exceptions.

The purpose of the Rights Agreement is to facilitate the Company's ability to preserve its net operating losses ("NOLs") and certain other tax attributes in order to be able to offset potential future income taxes for federal income tax purposes. The Company's ability to use its NOLs and other tax attributes would be substantially limited if it experiences an "ownership change," as such term is defined in Section 382 of the Internal Revenue Code of 1986, as amended (the "Code"). A company generally experiences an ownership change if the percentage of the value of its stock owned by certain "5-percent shareholders," as such term is defined in Section 382 of the Code, increases by more than 50 percentage points over a rolling three-year period. The Rights Agreement is intended to reduce the likelihood of an ownership change under Section 382 of the Code by deterring any person or group from acquiring beneficial ownership of 4.9% or more of the shares of the Company's common stock then-outstanding.

The Rights are attached to all shares of the Company's common stock, and until the Distribution Date (as defined below), the Rights will be transferred with and only with the common stock. As long as the Rights are attached to the common stock, the Company will issue one Right with each new share of common stock so that all such shares of common stock will have Rights attached (subject to certain limited exceptions). The Rights will separate and begin trading separately from the common stock, and Right certificates will be caused to evidence the Rights, on the earlier to occur of (i) the close of business on the thirtieth day following public disclosure of facts indicating that a person or group has acquired beneficial ownership of 4.9% or more of the outstanding common stock (an "Acquiring Person") (or, in the event the Board of Directors determines to effect an exchange in accordance with Section 24 of the Rights Agreement and the Board of Directors determines that a later date is advisable, then such later date) and (ii) the close of business on the tenth business day (or such later date as may be determined by action of the Board of Directors prior to such time as any person becomes an Acquiring Person) following the commencement of a tender offer or exchange offer the consummation of which would result in the beneficial ownership by a person or group of 4.9% or more of the outstanding common stock (the earlier of such dates, the "Distribution Date").

The Rights are not exercisable until the Distribution Date. The Rights will expire on the earlier to occur of (i)  the date on which the Board of Directors determines in its sole discretion that (x) the Rights Agreement is no longer necessary for the preservation of material valuable NOLs or tax attributes or (y) the NOLs and tax attributes have been fully utilized and may no longer be carried forward and (ii) the close of business on September 23, 2023.  The Rights Agreement was approved by the Company's stockholders at the Company's 2021 annual meeting of stockholders.

On September 15, 2022, pursuant to the Rights Agreement and following approval by the Board of Directors, the Company requested that BlackRock, Inc. (together with its subsidiaries and funds under management, "BlackRock"), as promptly as practicable, divest sufficient shares of the Company's common stock to take BlackRock's beneficial ownership below 4.9% so as to not be deemed an "Acquiring Person" under the Rights Agreement. On September 28, 2022, following confirmation that it had divested sufficient shares of the Company's common stock so as to not be deemed an "Acquiring Person" under the Rights Agreement, the Board of Directors granted a request by BlackRock that it be deemed an "Exempt Person" under the Rights Agreement, subject to BlackRock satisfying certain ownership conditions, including that neither BlackRock, Inc. nor any subsidiary or individual fund will have an economic interest of 4.9% or more of the Company's common stock. Additionally, on December 29, 2022, the Board of Directors determined another shareholder not to be deemed an "Acquiring Person" under the Rights Agreement and granted a request from the shareholder that it be deemed an "Exempt Person" under the Rights Agreement, subject to such shareholder satisfying certain ownership conditions.

### 13. Fair Value of Financial Assets and Liabilities

A three-tier fair value hierarchy has been established which prioritizes the inputs used in measuring fair value. These tiers include:

- *Level 1* - defined as observable inputs such as quoted prices for identical assets or liabilities in active markets;

- *Level 2* - defined as observable inputs other than Level 1 inputs such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities; and

- *Level 3* - defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

Refer to Note 10, "Derivative Instruments and Hedging Activities," for fair value information relating to our interest rate caps.

*Long-Term Debt:*

As of December 31, 2022 and 2021, our financial assets and liabilities that are disclosed but not measured at fair value include the Term Loan Facility, and solely as of December 31, 2021, the 2022 Convertible Notes, which are reflected on the consolidated balance sheets at cost. The fair value measurements are classified as Level 2 within the fair value hierarchy since they are based on quoted market prices of our instruments in markets that are not active. We estimated the fair value of the Term Loan Facility, and

77

solely as of December 31, 2021, the 2022 Convertible Notes, by calculating the upfront cash payment a market participant would require to assume these obligations. The upfront cash payments used in the calculations of fair value on our consolidated balance sheets, excluding any issuance costs, are the amount that a market participant would be willing to lend at such date to an entity with a credit rating similar to ours and that would allow such an entity to achieve sufficient cash inflows to cover the scheduled cash outflows under the Term Loan Facility, and solely as of December 31, 2021, the 2022 Convertible Notes.

The fair value and carrying value of long-term debt as of December 31, 2022 and 2021 was as follows (in thousands):

|  | December 31, 2022 | | | | December 31, 2021 | | | |
|  | Fair Value [(1)] | | Carrying Value | | Fair Value [(1)] | | Carrying Value | |
|---|---|---|---|---|---|---|---|---|
| Term Loan Facility | $ | 708,000 | $ | 711,263 [(2)] | $ | 723,000 | $ | 718,057 [(2)] |
| 2022 Convertible Notes | $ | — | $ | — | $ | 230,000 | $ | 102,788 |

(1)  Fair value amounts are rounded to the nearest million.

(2)  Carrying value of the Term Loan Facility reflects the unaccreted debt discount of $2.8 million and $3.3 million, respectively, as of December 31, 2022 and 2021. See Note 9, "Long-Term Debt and Other Liabilities," for further information.

## 14. Stock-Based Compensation and 401(k) Plan

As of December 31, 2022, we maintained three stock-based incentive compensation plans: the Second Amended and Restated Gogo Inc. 2016 Omnibus Incentive Plan (the "2016 Omnibus Plan"), the Gogo Inc. 2013 Omnibus Incentive Plan (the "2013 Omnibus Plan"), and The Aircell Holdings Inc. Stock Option Plan, collectively referred to as the "Stock Plans," as well as an Employee Stock Purchase Plan ("ESPP"), as discussed below. Our Stock Plans provide for the grant of both equity and cash awards, including non-qualified stock options, incentive stock options, stock appreciation rights, performance awards (shares and units), restricted stock, RSUs, deferred share units ("DSUs") and other stock-based awards and dividend equivalents to eligible employees, directors and consultants, as determined by the Compensation Committee of our Board of Directors (the "Compensation Committee").

Under the Stock Plans, 33,234,128 shares of common stock were reserved for issuance. As of December 31, 2022, 6,941,586 shares remained available for grant under our Stock Plans. The contractual life of granted options is 10 years. Except as otherwise approved by the Compensation Committee, all options that are unvested as of the date on which a recipient's employment terminates, as well as vested options that are not exercised within a prescribed period following termination, are forfeited and become available for future grants. Options granted beginning in 2010 but prior to the Option Exchange (as defined below) include options that (a) vest in specified increments over a four-year period, (b) vest on the date of grant for certain options granted to non-employee members of our Board of Directors or (c) vest on the first anniversary of the date of grant for certain options granted to non-employee members of our Board of Directors. In June 2020, we consummated an option exchange program that was approved by our stockholders at the annual meeting held on April 29, 2020 in which previously outstanding eligible options (which excluded options granted for service by non-executive members of our Board of Directors) to purchase 6,664,773 shares of common stock were surrendered and cancelled and we granted replacement options (the "Replacement Options") in exchange for the tendered options. Of the 4,168,455 options we granted in 2020, 2,896,383 were Replacement Options. The Replacement Options vested in a single installment on December 31, 2022.

Beginning in 2013, we granted RSUs, which generally vest in equal annual increments over a four-year period. Vested RSUs will be settled, at the discretion of the Compensation Committee, in shares of our common stock or in cash equal to the value of the applicable number of shares of our common stock on the vesting date. We also granted DSUs to directors, some of which vest on the grant date and others on the first anniversary of the grant date. DSUs will be settled in shares of our common stock 90 days after the director ceases to serve as a director. We intend to settle RSU and DSU awards in stock and we have the shares available to do so.

The following is a summary of our stock-based compensation expense included in the consolidated statements of operations, excluding the stock-based compensation expense for discontinued operations, for the years December 31, 2022, 2021 and 2020 (in thousands):

|  | For the Years Ended December 31, | | | | | |
|  | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| Cost of service revenue | $ | 1,073 | $ | 472 | $ | 119 |
| Cost of equipment revenue |  | 1,022 |  | 523 |  | 235 |
| Engineering, design and development |  | 2,532 |  | 1,358 |  | 560 |
| Sales and marketing |  | 2,628 |  | 1,615 |  | 880 |
| General and administrative |  | 11,810 |  | 9,377 |  | 6,014 |
| Total stock-based compensation expense | $ | 19,065 | $ | 13,345 | $ | 7,808 |

78

A summary of stock option activity for the year ended December 31, 2022 is as follows:

| | Number of Options | | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|---|
| Options outstanding – January 1, 2022 | 4,802,342 | $ | 4.18 | 6.57 | $ | 45,927 |
| Granted | — | $ | — | | | |
| Exercised | (758,681) | $ | 2.67 | | | |
| Forfeited | — | $ | — | | | |
| Expired | (30,900) | $ | 17.78 | | | |
| Options outstanding – December 31, 2022 | 4,012,761 | $ | 4.36 | 5.38 | $ | 42,396 |
| Options exercisable – December 31, 2022 | 3,708,974 | $ | 4.51 | 5.32 | $ | 38,696 |

As of December 31, 2022, total unrecognized compensation costs related to unvested stock options were approximately $0.4 million which is expected to be recognized over a weighted average period of approximately 1 year. The total grant date fair value of stock options vested in 2022, 2021 and 2020 was approximately $18 million, $10 million and $16 million, respectively.

We estimate the fair value of stock options using the Black-Scholes option-pricing model. No stock options were granted during the year ended December 31, 2022. Weighted average assumptions used and weighted average grant date fair value of stock options granted for the years ended December 31, 2021 and 2020 were as follows:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Approximate risk-free interest rate | 1.0 % | 0.5 % |
| Average expected life (years) | 5.50 | 6.20 |
| Dividend yield | N/A | N/A |
| Volatility | 77.0 % | 66.8 % |
| Weighted average grant date fair value of common stock underlying options granted | $    9.66 | $    2.59 |
| Weighted average grant date fair value of stock options granted | $    6.22 | $    1.56 |

The risk-free interest rate assumptions were based on the U.S. Treasury yield curve for the term that mirrored the expected term in effect at the time of grant. The expected life of our stock options was determined based upon a simplified assumption that the stock options will be exercised evenly from vesting to expiration, as we do not have sufficient historical exercise data to provide a reasonable basis upon which to estimate the expected life. The dividend yield was based on expected dividends at the time of grant. Beginning in 2020, we calculated volatility based exclusively on our common stock.

The following table summarizes the activities for our unvested RSUs and DSUs for the year ended December 31, 2022:

| | Number of Underlying Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested – January 1, 2022 | 3,998,688 | $ | 7.40 |
| Granted | 1,513,287 | $ | 17.21 |
| Vested | (1,897,299) | $ | 6.50 |
| Forfeited/canceled | (148,451) | $ | 10.32 |
| Unvested – December 31, 2022 | 3,466,225 | $ | 12.46 |

As of December 31, 2022, there was approximately $30 million of unrecognized compensation cost related to unvested employee RSUs. This amount is expected to be recognized over a weighted-average period of approximately 2.6 years. The total grant date fair value of RSUs and DSUs vested in 2022 was approximately $12 million.

**ESPP -** In June 2013, the Board of Directors and stockholders approved the ESPP, which became effective on June 26, 2013, and in 2017 and 2020, the ESPP was amended to increase the number of shares reserved thereunder. The ESPP allows eligible employees to purchase a limited number of shares of common stock during pre-specified offering periods at a discount established by the Compensation Committee which may not exceed 15% of the fair market value of the common stock at the beginning or end of the offering period (whichever is lower). Under the ESPP, 2,200,000 shares were reserved for issuance and 52,489 shares of common stock were issued during the year ended December 31, 2022. As of December 31, 2022, 714,091 shares remained available for purchase under the ESPP.

**401(k) Plan -** Under our 401(k) plan, all employees who are eligible to participate are entitled to make tax-deferred contributions, subject to Internal Revenue Service limitations. We match 100% of the employee's first 4% of contributions made, subject to annual

limitations. Our matching contributions were $2.1 million, $1.8 million, and $1.5 million for the years ended December 31, 2022, 2021 and 2020, respectively.

## 15. Income Tax

For financial reporting purposes, the income (loss) from continuing operations before income taxes included the following components for the years ended December 31, 2022, 2021, and 2020 (*in thousands*):

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| United States | $ 105,450 | $ (27,557) | $ (45,840) |
| Foreign | 267 | (3,084) | (2,865) |
| Income (loss) before income taxes | $ 105,717 | $ (30,641) | $ (48,705) |

Significant components of the provision (benefit) for income taxes from continuing operations for the years ended December 31, 2022, 2021, and 2020 are as follows (*in thousands*):

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | 488 | 90 | 86 |
| Foreign | — | — | — |
| | 488 | 90 | 86 |
| Deferred: | | | |
| Federal | 11,830 | (166,706) | (318) |
| State | 2,464 | (20,614) | 86 |
| Foreign | (1,124) | — | — |
| | 13,170 | (187,320) | (232) |
| Total | $ 13,658 | $ (187,230) | $ (146) |

The provision (benefit) for income taxes from continuing operations differs from income taxes computed at the federal statutory tax rates for the years ended December 31, 2022, 2021, and 2020 as a result of the following items:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Federal statutory rate | 21.0 % | 21.0 % | 21.0 % |
| Effect of: | | | |
| Change in valuation allowance | (10.9) | 595.5 | (48.9) |
| State income taxes-net of federal tax benefit | 4.0 | 3.2 | 14.0 |
| R&D credit | (0.4) | 8.3 | — |
| Excess tax benefits on stock-based compensation | (2.0) | (3.0) | 1.2 |
| Loss on settlement of 2022 Convertible Notes | — | (12.9) | — |
| Other | 1.2 | (1.1) | 13.0 |
| Effective tax rate | 12.9 % | 611.0 % | 0.3 % |

80

Components of the net deferred income tax asset as of December 31, 2022 and 2021 are as follows (*in thousands*):

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Deferred income tax assets:** | | |
| Compensation accruals | $ 2,912 | $ 2,492 |
| Stock options | 8,483 | 7,839 |
| Inventory | 990 | 823 |
| Warranty reserves | 565 | 609 |
| Fixed assets | 6,438 | 5,821 |
| Capital loss | 10,425 | 10,425 |
| Deferred revenue | 18 | 184 |
| Federal net operating loss (NOL) | 118,043 | 144,591 |
| State NOL | 26,033 | 29,690 |
| Foreign NOL | 14,430 | 15,478 |
| Interest carryforward | 67,644 | 71,778 |
| UNICAP adjustment | 4,739 | 1,070 |
| Finite-lived intangible assets | 3,334 | 3,374 |
| Operating lease liability | 21,744 | 21,118 |
| R&D credit | 3,005 | 2,538 |
| Section 174 costs | 4,624 | — |
| Other | 4,802 | 4,983 |
| Total deferred income tax assets | 298,229 | 322,813 |
| **Deferred income tax liabilities:** | | |
| Indefinite-lived intangible assets | (9,138) | (8,043) |
| Right-of-use asset | (18,525) | (17,684) |
| Interest rate cap valuation | (10,213) | (909) |
| Other | (226) | (324) |
| Total deferred income tax liabilities | (38,102) | (26,960) |
| Total deferred income tax | 260,127 | 295,853 |
| Valuation allowance | (97,470) | (110,720) |
| Net deferred income tax asset | $ 162,657 | $ 185,133 |

We regularly assess the need for a valuation allowance related to our deferred income tax assets to determine, based on the weight of the available positive and negative evidence, whether it is more likely than not that some or all of such deferred assets will not be realized. In our assessments, the Company considers recent financial operating results, the scheduled expiration of our net operating losses, potential sources of taxable income, the reversal of existing taxable differences, taxable income in prior carryback years, if permitted under tax law, and tax planning strategies. Based on our most recent assessment, for the year ended December 31, 2022, we released $11.4 million of the valuation allowance for the portion of our deferred income tax assets that we are more likely than not going to utilize. As of December 31, 2022, we can demonstrate an estimate of objectively verifiable future income based on the prior three years of pre-tax income from continuing operations, adjusted for the change in interest expense resulting from the Refinancing and the settlement of the 2022 Convertible Notes. This estimate of future income, along with our assessment of the other positive and negative evidence considered, supports the release of a portion of the valuation allowance. The remaining valuation allowance is still required for deferred tax assets related to certain state and foreign NOLs, capital losses, and the Section 163(j) interest limitation carryforward as it was more likely than not as of December 31, 2022 that these deferred tax assets will not be realized. If we continue to sustain our current operating performance, additional reversals of our valuation allowance could occur within the next twelve months.

As of December 31, 2022, the federal net operating loss ("NOL") carryforward amount was approximately $562 million, the state NOL carryforward amount was approximately $448 million and the Section 163(j) interest limitation carryforward amount was $292 million. The federal NOLs will begin to expire in 2032. The state NOLs expire in various tax years beginning in 2023. The interest carryforward does not expire. As of December 31, 2022, the Canadian NOL carryforward amount was approximately $54 million, and it will begin to expire in 2032.

Utilization of our NOL, interest and tax credit carryforwards may be subject to substantial annual limitations due to the ownership change limitations provided by the Internal Revenue Code and similar state provisions. Such annual limitations could result in the expiration of the NOL and tax credit carryforwards before their utilization. The interest carryforward arises from the Tax Cuts and Jobs Act and generally limits the interest expense deduction to 30% of income (loss) attributable to common stock before interest expense, interest income, income taxes and depreciation and amortization for tax years 2018 to 2021 and 30% of income (loss) attributable to common stock before interest expense, interest income and income taxes for 2022 and subsequent years. The interest carryforward will not expire as it may be carried forward indefinitely.

81

**Uncertain Tax Positions** - As of December 31, 2022, the total amount of gross unrecognized tax benefits was $0.8 million, which, if recognized, would impact the Company's effective tax rate. As of December 31, 2021, we did not have any gross unrecognized tax benefits.

The aggregate change in the balance of gross unrecognized tax benefits, which excludes interest and penalties for the year ended December 31, 2022 is as follows *(in thousands)*:

|  | For the Year Ended December 31, |
|---|---|
|  | 2022 |
| Beginning balances | $ — |
|     Increases related to tax positions taken during a prior year | 555 |
|     Decreases related to tax positions taken during a prior year | — |
|     Increases related to tax positions taken during the current year | 244 |
|     Decreases related to settlements with taxing authorities | — |
|     Decreases related to expiration of the statute of limitations | — |
| Ending balances | $ 799 |

We are subject to taxation and file income tax returns in the United States federal jurisdiction and many states and Canada. With few exceptions, as of December 31, 2022, we are no longer subject to U.S. federal, state, local or foreign examinations by tax authorities for years before 2019.

We record penalties and interest relating to uncertain tax positions in the income tax provision line item in the consolidated statement of operations. No penalties or interest related to uncertain tax positions were recorded for the years ended December 31, 2022, 2021 or 2020. As of December 31, 2022 and 2021, we did not have a liability recorded for interest or potential penalties.

We do not expect a change in the unrecognized tax benefits within the next 12 months.

## 16. Leases

The following is a summary of our lease expense included in the consolidated statement of operations *(in thousands)*:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| Operating lease cost | $ 14,964 | $ 13,203 | $ 11,688 |
| Finance lease cost: | | | |
|     Amortization of leased assets | 156 | 35 | 230 |
|     Interest on lease liabilities | 40 | 50 | 113 |
| Total lease cost | $ 15,160 | $ 13,288 | $ 12,031 |

Other information regarding our leases is as follows *(in thousands, except lease terms and discount rates)*:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| **Supplemental cash flow information** | | | |
| Cash paid for amounts included in measurement of lease liabilities: | | | |
|     Operating cash flows used in operating leases | $ 15,194 | $ 13,930 | $ 12,733 |
|     Operating cash flows used in finance leases | $ 40 | $ 51 | $ 113 |
|     Financing cash flows used in finance leases | $ 184 | $ 145 | $ 546 |
| Non-cash items: | | | |
|     Operating leases obtained | $ 13,547 | $ 43,148 | $ 5,342 |
|     Finance leases obtained | $ 11 | $ — | $ 428 |
| **Weighted average remaining lease term** | | | |
| Operating leases | 8 years | 9 years | 7 years |
| Finance leases | 1 year | 2 years | 2 years |
| **Weighted average discount rate** | | | |
| Operating leases | 6.7% | 7.0% | 11.2% |
| Finance leases | 17.0% | 18.6% | 10.5% |

Annual future minimum lease payments as of December 31, 2022 (*in thousands*):

| Years ending December 31, | | Operating Leases | | Financing Leases |
|---|---|---:|---|---:|
| 2023 | $ | 14,499 | S | 141 |
| 2024 | | 15,087 | | 4 |
| 2025 | | 14,227 | | 2 |
| 2026 | | 14,048 | | — |
| 2027 | | 13,191 | | — |
| Thereafter | | 42,630 | | — |
| Total future minimum lease payments | | 113,682 | | 147 |
| Less: Amount representing interest | | (25,347 ) | | (9 ) |
| Present value of net minimum lease payments | $ | 88,335 | S | 138 |
| **Reported as of December 31, 2022** | | | | |
| Accrued liabilities | $ | 9,094 | S | 133 |
| Non-current operating lease liabilities | | 79,241 | | — |
| Other non-current liabilities | | — | | 5 |
| Total lease liabilities | $ | 88,335 | S | 138 |

As of December 31, 2022, there were no significant leases which had not yet commenced.

## 17. Commitments and Contingencies

**Contractual Commitments –** We have agreements with various vendors under which we have remaining commitments to purchase hardware components and development services. Such commitments will become payable as we receive the hardware components or as development services are provided.

In June 2022, we and Hughes entered into a supply and product support agreement (the "SPSA"), providing for our purchase from Hughes of airborne antennas for use on a LEO satellite network, and the performance by Hughes of services related thereto. Under the SPSA, we commit to purchase, over a seven-year period that will begin on completion of a project milestone currently expected to occur at the end of 2024, antennas with an estimated aggregate purchase price of approximately $170 million. During that seven-year period, Hughes may not sell substantially similar equipment to other purchasers in our primary target market.

**Indemnifications and Guarantees –** In accordance with Delaware law, we indemnify our officers and directors for certain events or occurrences while the officer or director is, or was, serving at our request in such capacity. The maximum potential amount of future payments we could be required to make under this indemnification is uncertain and may be unlimited, depending upon circumstances. However, our Directors' and Officers' insurance does provide coverage for certain of these losses.

In the ordinary course of business, we may occasionally enter into agreements pursuant to which we may be obligated to pay for the failure of the performance of others, such as the use of corporate credit cards issued to employees. Based on historical experience, we believe that the risk of sustaining any material loss related to such guarantees is remote.

We have entered into a number of agreements pursuant to which we indemnify the other party for losses and expenses suffered or incurred in connection with any patent, copyright, or trademark infringement or misappropriation claim asserted by a third party with respect to our equipment or services. The maximum potential amount of future payments we could be required to make under these indemnification agreements is uncertain and is typically not limited by the terms of the agreements.

**Securities Litigation –** On June 27, 2018, a purported stockholder of the Company filed a putative class action lawsuit in the United States District Court for the Northern District of Illinois, Eastern Division (the "Court") styled Pierrelouis v. Gogo Inc., naming the Company, its former Chief Executive Officer and Chief Financial Officer, its current Chief Financial Officer and its then-current President, Commercial Aviation, as defendants purportedly on behalf of all purchasers of our securities from February 27, 2017 through May 4, 2018. The complaint asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder, alleging misrepresentations or omissions by us purporting to relate to the reliability of and installation and remediation costs associated with CA's 2Ku antenna. The plaintiffs sought to recover from us and the individual defendants an unspecified amount of damages. In December 2018, the plaintiffs filed an amended complaint and in February 2019, we filed a motion to dismiss such amended complaint. In October 2019, the judge granted the motion to dismiss on two independent grounds, finding that the plaintiffs failed to plausibly allege that the defendants made materially false or misleading statements and that the plaintiffs failed to plead with particularity that the defendants acted with scienter. The amended complaint was dismissed without prejudice, and in December 2019, the defendants filed a second amended complaint. In July 2020, the plaintiffs filed a motion requesting leave to file a proposed third amended complaint, which was granted by the Court. The plaintiffs proceeded to file the third amended complaint in July 2020 and we filed a motion to dismiss in September 2020. In April 2021, the Court denied our motion to dismiss, and the defendants filed their answer and affirmative defenses to the third amended complaint in June 2021.

83

The parties engaged in mediation and reached a tentative resolution that included a cash payment of $17.3 million (funded by our Directors' and Officers' ("D&O") insurance policy) in exchange for a dismissal with prejudice of the class claims and full releases. As a result of this development, the Company accrued a $17.3 million liability within Accrued liabilities and a corresponding insurance receivable in Prepaid expenses and other current assets in the consolidated balance sheets as of December 31, 2021. On April 12, 2022, the parties entered into a Stipulation and Agreement of Settlement memorializing these terms (the "Class Action Settlement"). On May 3, 2022, the Court signed an order (i) preliminarily approving the Class Action Settlement; (ii) certifying the settlement class; (iii) approving the notice to be sent to members of the settlement class; and (iv) scheduling a final hearing for August 30, 2022, and the insurance carriers subsequently deposited the settlement amount into escrow. On August 31, 2022, the Court issued a final judgment approving the Class Action Settlement and dismissing all claims against the defendants with prejudice. The Company released the $17.3 million liability and corresponding insurance receivable after the Court approved the Class Action Settlement.

**Derivative Litigation** – On September 25, 2018 and September 26, 2018, two purported stockholders of the Company filed substantively identical derivative lawsuits in the Court, styled Nanduri v. Gogo Inc. and Hutsenpiller v. Gogo Inc., respectively. Both lawsuits were purportedly brought derivatively on behalf of us and name us as a nominal defendant and name as defendants each then-current member of the Company's Board of Directors, its former Chief Executive Officer and Chief Financial Officer, its then-current President, Commercial Aviation, and its current Chief Executive Officer and Chief Financial Officer. The complaints assert claims under Section 14(a) of the Securities Exchange Act of 1934, breach of fiduciary duty, unjust enrichment, and waste of corporate assets, and allege misrepresentations or omissions by us purporting to relate to the 2Ku antenna's reliability and installation and remediation costs, as well as allegedly excessive bonuses, stock options, and other compensation paid to current officers and directors and excessive severance paid to former officers. The plaintiffs seek to recover, on our behalf, an unspecified amount of damages from the individual defendants. The two lawsuits were consolidated and were stayed pending a final disposition of the motion to dismiss in the class action suit and remain stayed. In addition, a purported stockholder has sent a letter to the Company's Board of Directors, dated June 21, 2021, demanding based on substantially the same allegations, that the Company sue certain current and former Officers for, *inter alia*, breach of fiduciary duty. The two derivative lawsuits and the litigation demand letter are collectively referred to herein as the "Derivative Matters" and the plaintiffs in the two derivative lawsuits and the purported stockholder who sent the litigation demand letter are collectively referred to herein as the "Stockholders."

On January 5, 2023, following mediation, the defendants and the Stockholders entered into Stipulation and Agreement of Settlement (the "Derivative Settlement") under which the Company, in consideration of dismissal of the two derivative lawsuits with prejudice and a release of all claims asserted against the Company and the individual defendants in the Derivative Matters, will implement certain corporate governance initiatives and cause its D&O insurance carrier to pay the Stockholders' attorneys' fees. Under the terms of the Derivative Settlement, the defendants will not be required to pay any damages. We have accrued a liability for attorneys' fees within Accrued liabilities and a corresponding receivable in Prepaid expenses and other current assets in the consolidated balance sheets.

On February 1, 2023, the Court granted preliminary approval of the proposed Derivative Settlement, approved various notices to be disseminated to the Company's stockholders and the schedule for dissemination, and scheduled a final hearing for April 11, 2023. The Derivative Settlement is conditioned on final Court approval. We believe that the claims are without merit and will continue to defend them vigorously should the Derivative Settlement for any reason not become final.

**SmartSky Litigation** – On February 28, 2022, SmartSky Networks, LLC brought suit against Gogo Inc. and its subsidiary Gogo Business Aviation LLC in the U.S. District Court for the District of Delaware alleging that Gogo 5G infringes four patents owned by the plaintiff. On February 21, 2023, the plaintiff amended its complaint to allege that Gogo 5G infringes two additional patents recently issued to the plaintiff. The suit seeks an unspecified amount of compensatory damages as well as treble damages for alleged willful infringement and reimbursement of plaintiff's costs, disbursements and attorneys' fees. Under a schedule agreed upon by the parties, fact discovery and claim construction proceedings will be substantially completed by the end of 2023 or early 2024, and expert discovery by early-to-mid 2024, with dispositive motions to follow. A trial date has been scheduled for April 14, 2025. Also on February 28, 2022, the plaintiff filed a motion (the "PI Motion") requesting that the Court preliminarily enjoin the Company from making, using, offering to sell or selling the Gogo 5G system. On September 26, 2022, the Court issued an order denying the PI Motion. The plaintiff has appealed the denial to the U.S. Court of Appeals for the Federal Circuit. We expect that briefing for the appeal will be completed by early March of 2023, after which the appellate court will schedule oral argument. We believe that the plaintiff's claims are without merit and intend to continue to vigorously defend our position in the infringement suit and defend against the appeal. The outcomes of the appeal and the underlying litigation are inherently uncertain. No amounts have been accrued for any potential losses under this matter, as we cannot reasonably predict the outcome of the litigation or any potential losses.

From time to time we may become involved in legal proceedings arising in the ordinary course of our business. We cannot predict with certainty the outcome of any litigation or the potential for future litigation. Regardless of the outcome of any particular litigation and the merits of any particular claim, litigation can have a material adverse impact on our company due to, among other reasons, any injunctive relief granted, which could inhibit our ability to operate our business, amounts paid as damages or in settlement of any such matter, diversion of management resources and defense costs.

84

**18. Accumulated Other Comprehensive Income (Loss)**

The following is a summary of changes in accumulated other comprehensive income (loss) by component *(in thousands)*:

| | Currency Translation Adjustment | | Change in Fair Value of Cash Flow Hedge | | Total | |
|---|---|---|---|---|---|---|
| **Balance at January 1, 2020** | $ | (2,256) | $ | — | $ | (2,256) |
| Other comprehensive income before reclassifications | | 1,243 | | | | 1,243 |
| Less: income (loss) realized and reclassified to earnings | | — | | — | | — |
| Net current period comprehensive income | | 1,243 | | — | | 1,243 |
| **Balance at December 31, 2020** | $ | (1,013) | $ | — | $ | (1,013) |
| Other comprehensive income before reclassifications | | 53 | | 2,747 | | 2,800 |
| Less: loss realized and reclassified to earnings | | — | | (2) | | (2) |
| Net current period comprehensive income | | 53 | | 2,749 | | 2,802 |
| **Balance at December 31, 2021** | $ | (960) | $ | 2,749 | $ | 1,789 |
| Other comprehensive income (loss) before reclassifications | | (265) | | 34,765 | | 34,500 |
| Less: income realized and reclassified to earnings | | — | | 6,161 | | 6,161 |
| Net current period comprehensive income (loss) | | (265) | | 28,604 | | 28,339 |
| **Balance at December 31, 2022** | $ | (1,225) | $ | 31,353 | $ | 30,128 |

85

The following presents the condensed financial information of our parent company on a standalone basis.

**Gogo Inc.**
**Condensed Balance Sheets**
*(in thousands)*

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Assets: | | |
| Cash and cash equivalents | $ 37,174 | $ 55,069 |
| Prepaid expenses and other current assets | — | 25 |
| Deferred income taxes | 172,871 | 186,041 |
| Total assets | $ 210,045 | $ 241,135 |
| | | |
| Liabilities and stockholders' deficit: | | |
| Other current liabilities | $ 113 | $ 740 |
| Current portion of long-term debt | — | 102,370 |
| Investments and payables with subsidiaries | 311,801 | 458,179 |
| Total liabilities | 311,914 | 561,289 |
| Total stockholders' deficit | (101,869) | (320,154) |
| Total liabilities and stockholders' deficit | $ 210,045 | $ 241,135 |

**Gogo Inc.**
**Condensed Statements of Operations and Comprehensive Income (Loss)**
*(in thousands)*

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| Interest income | $ (455) | $ (6) | $ (451) |
| Interest expense | 2,770 | 9,504 | 29,318 |
| Loss on extinguishment of debt | — | 18,948 | — |
| Other | 1 | (4) | 4 |
| Total other expense | 2,316 | 28,442 | 28,871 |
| Loss before income taxes | (2,316) | (28,442) | (28,871) |
| Income tax provision (benefit) | 13,658 | (187,230) | (146) |
| Equity (gains) losses of subsidiaries | (108,033) | 6,053 | 221,311 |
| Net income (loss) | $ 92,059 | $ 152,735 | $ (250,036) |
| Comprehensive income (loss) | $ 92,059 | $ 152,735 | $ (250,036) |

86

**Gogo Inc.**
**Condensed Statements of Cash Flows**
*(in thousands)*

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Net income (loss) | $ 92,059 | $ 152,735 | $ (250,036) |
| Accretion of debt discount | — | — | 13,255 |
| Amortization of deferred financing costs | 418 | 1,387 | 1,781 |
| Loss on extinguishment of debt | — | 18,948 | |
| Subsidiary equity (gains) losses | (108,033) | 6,053 | 221,311 |
| Deferred income taxes | 13,170 | (187,220) | (232) |
| Other operating activities | (627) | 1,819 | (114) |
| Net cash used in operating activities | (3,013) | (6,278) | (14,035) |
| Investments and advances with subsidiaries | 6,047 | 11,552 | (45,097) |
| Net cash provided by (used in) investing activities | 6,047 | 11,552 | (45,097) |
| Financing activities: | | | |
| Repurchase of convertible notes | — | — | (2,498) |
| Repurchase of common stock | (18,375) | — | — |
| Stock-based compensation activity | (2,579) | (5,245) | (4,227) |
| Net cash used in financing activities | (20,954) | (5,245) | (6,725) |
| Increase (decrease) in cash, cash equivalents and restricted cash | (17,920) | 29 | (65,857) |
| Cash, cash equivalents and restricted cash at beginning of period | 55,094 | 55,065 | 120,922 |
| Cash, cash equivalents and restricted cash at end of period | $ 37,174 | $ 55,094 | $ 55,065 |
| Cash, cash equivalents and restricted cash at end of period | $ 37,174 | $ 55,094 | $ 55,065 |
| Less: current restricted cash | — | 25 | — |
| Less: non-current restricted cash | — | — | — |
| Cash and cash equivalents at end of period | $ 37,174 | $ 55,069 | $ 55,065 |

**20. Discontinued Operations**

As discussed in Note 1, "Background," on December 1, 2020, we completed the sale of our CA business to Intelsat. As a result of the Transaction, the CA business is reported for all periods as discontinued operations.

The following table summarizes the results of discontinued operations which are presented as Net loss from discontinued operations, net of tax, in our consolidated statements of operations *(in thousands)*:

87

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Revenue:** | | | |
| Service revenue | $ — | $ — | $ 192,616 |
| Equipment revenue | — | — | 40,483 |
| **Total revenue** | — | — | 233,099 |
| **Operating expenses:** | | | |
| Cost of service revenue (exclusive of items shown below) | — | — | 145,958 |
| Cost of equipment revenue (exclusive of items shown below) | — | — | 33,978 |
| Engineering, design and development | — | — | 57,167 |
| Sales and marketing | — | — | 24,121 |
| General and administrative | — | 6,283 | 40,551 |
| Impairment of long-lived assets | — | — | 47,375 |
| Depreciation and amortization | — | — | 119,827 |
| **Total operating expenses** | — | 6,283 | 468,977 |
| **Operating loss** | — | (6,283) | (235,878) |
| **Other (income) expense:** | | | |
| Gain on sale of CA business | — | (1,598) | (37,958) |
| Other (income) expense | — | — | 3,134 |
| **Total other (income) expense:** | — | (1,598) | (34,824) |
| **Loss before income taxes** | — | (4,685) | (201,054) |
| Income tax provision (benefit) | — | (831) | 423 |
| **Net loss from discontinued operations, net of tax** | $ — | $ (3,854) | $ (201,477) |

The following discussion relates entirely to discontinued operations.

**Gain on Sale** – Upon the closing of the Transaction on December 1, 2020, we received initial gross proceeds of $386.3 million, which reflects the $400.0 million purchase price, adjusted for cash, debt, transaction expenses and working capital. The final purchase price was subject to change due to customary post-closing purchase price adjustment procedures set forth in the purchase and sale agreement between Gogo and Intelsat, that were not yet complete. As the post-closing purchase price adjustment was not yet finalized and therefore represented a contingent gain, $9.4 million was recorded as a deferred gain on sale included within Accrued liabilities as of December 31, 2020. During December 2020, we recognized within Gain on sale of CA business a pretax gain on sale of $38.0 million, computed as the $386.3 million of initial gross proceeds less (i) the potential $9.4 million post-closing purchase price adjustment not yet finalized, (ii) the carrying value of the assets and liabilities transferred in the Transaction and (iii) Transaction-related costs. In October 2021, the independent accounting firm engaged to resolve a dispute between the parties regarding the working capital matter determined the final amount of the working capital adjustments to be $7.8 million. In the fourth quarter of 2021, Gogo paid Intelsat the $7.8 million and recognized an additional Gain on sale of CA business of $1.6 million.

**Stock-Based Compensation** – In August 2020, the Compensation Committee approved modifications to the vesting conditions and exercise periods of outstanding equity compensation awards held by certain of our then-current employees who became employees of Intelsat in the Transaction. These modifications became effective upon the consummation of the Transaction. Pursuant to such modifications, the options and restricted stock units ("RSUs") held by Intelsat employees generally vested on the earlier of (i) the original vesting date and (ii) December 1, 2021; provided that the employee did not voluntarily resign from and was not terminated for cause by Intelsat prior to such date. Certain of these awards vested based on conditions that are not classified as a service, market or performance condition and as a result such awards were classified as a liability. Other than mark-to-market adjustments, all costs related to stock-based compensation for our prior employees who became employees of Intelsat in the Transaction were recognized as of December 31, 2020. For the year ended December 31, 2021, $24.0 million was reclassified from Accrued liabilities to Additional paid-in capital as the awards vested during the period. As of December 31, 2021, there were no remaining liability-classified awards.

The following is a summary of our stock-based compensation expense by operating expense line contained within the results of discontinued operations for the years December 31, 2022, 2021 and 2020 (*in thousands*):

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cost of service revenue | $ — | $ — | $ 7,647 |
| Cost of equipment revenue | — | — | — |
| Engineering, design and development | — | — | 5,836 |
| Sales and marketing | — | — | 7,911 |
| General and administrative | — | 4,817 | 4,413 |
| Total stock-based compensation expense | $ — | $ 4,817 | $ 25,807 |

See Note 14, "Stock-Based Compensation and 401(k) Plan," for additional information on our stock-based compensation plans.

88

**Other Costs Classified to Discontinued Operations** – During the year ended December 31, 2021, we incurred $1.5 million of additional costs (exclusive of the gain on sale, stock-based compensation expense noted above and income tax benefit) primarily due to employer-paid taxes arising from the exercise of stock options by former employees then employed by Intelsat.

**Change in Estimates** – During the second quarter of 2020, our agreement with Delta Air Lines, Inc. ("Delta") to provide 2Ku service on certain Delta aircraft was amended to change the contract expiration date from February 2027 with respect to all aircraft to a staggered, fleet by fleet expiration schedule under which expiration dates will occur between November 2020 and July 2022 (the "Delta amendment"). As a result, the useful lives of the equipment installed on these fleets were shortened to align with the expiration dates in the amended agreement. The change in estimated useful lives resulted in approximately $41.0 million of accelerated depreciation during the year ended December 31, 2020. We ceased depreciating these assets and other depreciable assets included as part of discontinued operations when the CA business was classified as held for sale. Additionally, the amortization periods for the remaining deferred airborne lease incentives associated with the equipment installed on the 2Ku fleets were shortened to align with the new expiration dates, which resulted in approximately $42.0 million of accelerated amortization during the year ended December 31, 2020. Amortization of deferred airborne lease incentives is a reduction to cost of service revenue.

**Credit Losses** – During the year ended December 31, 2020, we recorded $10.7 million of provisions for expected credit losses, primarily related to one international airline partner entering bankruptcy administration, while we had recoveries of approximately $0.6 million.

**Arrangements with Commercial Airlines** – For our divested CA business, pursuant to contractual agreements with our airline partners, we placed our equipment on commercial aircraft operated by the airlines in order to deliver our service to passengers on the aircraft. We had two types of commercial airline arrangements: turnkey and airline-directed. Under the airline-directed model, we transferred control of the equipment to the airline and therefore the airline was our customer in these transactions. Under the turnkey model, we had not transferred control of our equipment to our airline partner and, as a result, the airline passenger was deemed to be our customer. Transactions with our airline partners under the turnkey model were accounted for as an operating lease of space on an aircraft.

We recognized $71.2 million for the year ended December 31, 2020 as a reduction to our cost of service revenue from the amortization of deferred airborne lease incentives.

Under the turnkey model, the revenue share paid to our airline partners represented operating lease payments. These payments were deemed to be contingent rental payments as the payments due to each airline were based on a percentage of our CA service revenue generated from that airline's passengers, which was unknown until realized. Therefore, we estimated the lease payments due to an airline at the commencement of our contract with such airline. This rental expense is included in cost of service revenue and is partially offset by the amortization of the deferred airborne lease incentives discussed above. Due to the accelerated amortization resulting from the Delta amendment and a significant reduction in revenue share as a result of COVID-19, the amortization of deferred airborne lease incentives exceeded our revenue share expense by $49.1 million for the year ended December 31, 2020.

**Asset Impairment** – We reviewed our long-lived assets, including property and equipment, right-of-use assets, and other non-current assets, for potential impairment whenever events indicated that the carrying amount of such assets might not be recoverable. We performed this review by comparing the carrying value of the long-lived assets to the estimated future undiscounted cash flows expected to result from the use of the assets. We grouped certain long-lived assets by airline contract and by technology. If we determined that an impairment existed, the amount of the impairment was computed as the difference between the asset group's carrying value and its estimated fair value, following which the assets were written down to their estimated fair values.

In light of the COVID-19 pandemic and its impact on air travel, including decreased flights, decreased gross passenger opportunity and our airline partners' temporary parking of a significant number of their aircraft, we conducted a review as of March 31, 2020 and determined that the carrying values for the asset groups related to three of our airline agreements for the CA business exceeded their estimated undiscounted cash flows, which triggered the need to estimate the fair value of these assets. Fair value reflects our best estimate of the discounted cash flows of the impaired assets. For the airborne assets and right-of-use assets associated with the three airline agreements (the "impaired assets"), we recorded an impairment charge of $46.4 million for the three-month period ended March 31, 2020, reflecting the difference between the carrying value and the estimated fair value of the impaired assets.  We conducted another review as of June 30, 2020 due to the continuation of the COVID-19 pandemic as well as the signing of the Delta amendment and determined that $1.0 million of deferred STC costs was impaired due to the bankruptcy of three airline partners. As such, we recorded a $1.0 million charge for impairment of long-lived assets for the three-month period ended June 30, 2020. For the year ended December 31, 2020, charges recorded for impairments of long-lived assets totaled $47.4 million.

## Revenue Recognition

We account for revenue in accordance with Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers* ("ASC 606").

CA's airline-directed contracts contain multiple performance obligations, which primarily include the sale of equipment, installation services, connectivity services and entertainment services. For these contracts, we accounted for each distinct good or

service as a separate performance obligation. We allocated the contract's transaction price to each performance obligation using the relative standalone selling price, which was based on the actual selling price for any good or service sold separately to a similar class of customer, if available. To the extent a good or service was not sold separately, we used our best estimate of the standalone selling price and maximized the use of observable inputs. The primary method we used to estimate the standalone selling price was the expected cost-plus margin approach.

The contractual consideration used for allocation purposes includes connectivity and entertainment services, which may be based on a fixed monthly fee per aircraft or a variable fee based on the volume of connectivity activity, or a combination of both. Examples of variable consideration within CA's airline contracts include megabyte overages and pay-per-use sessions.

We constrained our estimates to reduce the probability of a significant revenue reversal in future periods, allocated variable consideration to the identified performance obligations and recognized revenue in the period the services were provided. Our estimates were based on historical experience, anticipated future performance, market conditions and our best judgment at the time. For 2020, our estimates included management's best assumptions for the continued impact of COVID-19, which included decreased flights and gross passenger opportunity ("GPO").

A significant change in one or more of these estimates could have affected estimated contract value. For example, estimates of variable revenue within certain contracts required estimation of the number of sessions or megabytes that would be purchased over the contract term and the average revenue per connectivity session, which varies based on the connectivity options available to passengers on each airline. Estimated revenue under these contracts anticipated increases in take rates over time and assumed an average revenue per session consistent with our historical experience.

We regularly reviewed and updated our estimates, especially in light of COVID-19, and recognized adjustments under the cumulative catch-up method. Any adjustments under this method were recorded as a cumulative adjustment in the period identified and revenue for future periods was recognized using the new adjusted estimate.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**(a) Evaluation of Disclosure Controls and Procedures**

Management, with the participation of our Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended) as of December 31, 2022 that are designed to provide reasonable assurance that information required to be disclosed in this report is recorded, processed, summarized and reported within required time periods. Based upon this evaluation, our Chief Executive Officer and the Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of December 31, 2022.

**(b) Management's Annual Report on Internal Control Over Financial Reporting**

The management of Gogo Inc. is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a – 15(f) and 15d – 15(f) under the Securities Exchange Act of 1934. Gogo's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of its published financial statements in accordance with accounting principles generally accepted in the United States of America.

The management of Gogo, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have assessed the effectiveness of Gogo's internal control over financial reporting as of December 31, 2022, based on the criteria set forth in Internal Control-Integrated Framework (2013 Framework) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessment, the Company's management concluded that our internal control over financial reporting was effective as of December 31, 2022.

Deloitte & Touche LLP, the Company's independent registered public accounting firm, has issued an attestation report on our internal control over financial reporting as of December 31, 2022, which report is included on Page 92 of this Annual Report on Form 10-K under the caption entitled "Report of Independent Registered Public Accounting Firm."

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of the effectiveness to future periods are subject to risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**(c) Changes in Internal Control over Financial Reporting**

There have been no material changes to our internal control over financial reporting in connection with the evaluation required by Rules 13a-15(f) and 15d-15(f) under the Exchange Act during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

91

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Gogo Inc.

### Opinion on Internal Control over Financial Reporting

We have audited the internal control over financial reporting of Gogo Inc. and subsidiaries (the "Company") as of December 31, 2022, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2022, of the Company and our report dated February 28, 2023, expressed an unqualified opinion on those financial statements.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte & Touche LLP

Chicago, Illinois
February 28, 2023

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission ("SEC") within 120 days of the fiscal year ended December 31, 2022.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

Information appearing under the caption "Security Ownership of Certain Beneficial Owners and Management" in our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022 is incorporated herein by reference.

The following table sets forth the number of shares of our common stock reserved for issuance under our equity compensation plans (which includes amounts for both continuing and discontinued operations) as of the end of 2022:

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (#) (a) | Weighted average exercise price of outstanding options, warrants and rights ($) (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a))(#) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 8,425,904 [1] | 4.36 [2] | 7,655,677 [3] |
| Equity compensation plans not approved by security holders | N/A | N/A | N/A |
| **Total** | 8,425,904 | 4.36 | 7,655,677 |

(1)  Represents the number of shares associated with options, RSUs and DSUs outstanding as of December 31, 2022.

(2)  Represents the weighted average exercise price of the 4,012,761 options disclosed in column (a).

(3)  Represents the number of shares remaining available for future issuance under our Second Amended and Restated 2016 Omnibus Incentive Plan (6,939,571 shares), 2013 Omnibus Incentive Plan (2,015 shares) and ESPP (714,091 shares). Of this number, only 4,787,000 shares are available for issuance with respect to RSUs, DSUs and other awards based on the full value of stock (rather than an increase in value) under the 2016 Omnibus Plan and 2013 Omnibus Plan.

93

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

**Item 14. Principal Accounting Fees and Services**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

94

Part IV

**Item 15. Exhibits, Financial Statement Schedules**

We have filed the following documents as part of this Annual Report on Form 10-K:

1.     Consolidated Financial Statements:

|  | Page No. |
|---|---|
| Report of Independent Registered Public Accounting Firm | 55 |
| Consolidated Balance Sheets | 57 |
| Consolidated Statements of Operations | 58 |
| Consolidated Statements of Comprehensive Income (Loss) | 59 |
| Consolidated Statements of Cash Flows | 60 |
| Consolidated Statements of Stockholders' Equity (Deficit) | 61 |
| Notes to Consolidated Financial Statements | 62 |

2.     Financial Statement Schedules:

All schedules have been omitted because they are not required, not applicable, not present in amounts sufficient to require submission of the schedule, or the required information is otherwise included.

3.     Exhibits

| Exhibit Number | Description of Exhibits |
|---|---|
| 2.1**† | Purchase and Sale Agreement by and among Gogo Inc. and Intelsat Jackson Holdings S.A., dated August 31, 2020 (incorporated by reference to Exhibit 2.1 to Form 8-K filed on September 1, 2020 (File No. 001-35975)) |
| 3.1 | Third Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Form 10-Q filed on August 7, 2013 (File No. 001-35975)) |
| 3.2 | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2 to Form 10-Q filed on August 7, 2013 (File No. 001-35975)) |
| 3.3 | Certificate of Designations of Series A Preferred Stock of Gogo Inc., as filed with the Secretary of State of the State of Delaware on September 23, 2020 (incorporated by reference to Exhibit 3.1 to Form 8-K filed on September 23, 2020 (File No. 001-35975)) |
| 4.1 | Form of Common Stock Certificate (incorporated by reference to Exhibit 4.1 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 4.2 | Registration Rights Agreement, dated as of December 31, 2009, by and between AC Holdco Inc. and the Class A Holders, the Ripplewood Investors, the Thorne Investors and the other investors named therein (incorporated by reference to Exhibit 4.3 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 4.3 | Description of Capital Stock and Registered Securities (incorporated by reference to Exhibit 4.10 to Form 10-K filed on March 11, 2021 (File No. 001-35975)) |
| 4.4 | Section 382 Rights Agreement, dated as of September 23, 2020, between Gogo Inc. and Computershare Trust Company, N.A., as rights agent (incorporated by reference to Exhibit 4.1 to Form 8-K filed on September 23, 2020 (File No. 001-35975)) |
| 4.5 | Registration Rights Agreement, dated as of April 9, 2021, by and among Gogo Inc., Silver (XII) Holdings, LLC and Silver (Equity) Holdings, LP (incorporated by reference to Exhibit 10.2 to Form 8-K filed on April 14, 2021 (File No. 001-35975)) |
| 4.6 | Amendment to the Registration Rights Agreement, dated as of April 9, 2021, by and between Gogo Inc. (f/k/a AC HoldCo Inc.) and Thorndale Farm Gogo, LLC (as assignee to the interests of the Thorne Investors, as defined therein) (incorporated by reference to Exhibit 10.3 to Form 8-K filed on April 14, 2021 (File No. 001-35975)) |
| 4.7 | Amendment to the Registration Rights Agreement, dated as of May 25, 2021, by and among Gogo Inc., Silver (XII) Holdings, LLC and Silver (Equity) Holdings, LP (incorporated by reference to Exhibit 4.3 to Form 10-Q filed on August 5, 2021 (File No. 001-35975)) |
| 4.8 | Amendment No. 2 to the Registration Rights Agreement, dated as of March 2, 2022, by and among Gogo Inc., Silver (XII) Holdings, LLC and Silver (Equity) Holdings LP (incorporated by reference to Exhibit 4.10 to Form 10-K filed on March 3, 2022 (File No. 001-35975)) |
| 4.9 | Amendment No. 1 to Section 382 Rights Agreement, dated as of December 27, 2022, by and between Gogo Inc. and Computershare Trust Company, N.A., as rights agent |
| 10.1.1† | Qualcomm Technologies, Inc. Master Software Agreement, dated June 13, 2018, by and between Qualcomm Technologies, Inc. and Gogo LLC (incorporated by reference to Exhibit 10.1.48 to Form 10-Q filed on November 6, 2018 (File No. 001-35975)) |

| | |
|---|---|
| 10.1.2† | Qualcomm Technologies, Inc. AMSS OS Software Addendum to Master Software Agreement, dated June 13, 2018, by and between Qualcomm Technologies, Inc. and Gogo LLC (incorporated by reference to Exhibit 10.1.49 to Form 10-Q filed on November 6, 2018 (File No. 001-35975)) |
| 10.1.3† | Access Point Patent License Agreement, dated July 6, 2018, by and between Qualcomm Incorporated and Gogo LLC (incorporated by reference to Exhibit 10.1.50 to Form 10-Q filed on November 6, 2018 (File No. 001-35975)) |
| 10.1.4† | ATG Network Sharing Agreement, dated as of December 1, 2020, by and between Gogo Business Aviation LLC and Gogo LLC (incorporated by reference to Exhibit 10.1 to Form 8-K filed on December 1, 2020 (File No. 001-35975)) |
| 10.1.5† | Master Services Agreement, dated as of November 25, 2019, by and between Gogo Business Aviation LLC and Airspan Networks Inc. (incorporated by reference to Exhibit 10.1.5 to Form 10-K filed on March 11, 2021 (File No. 001-35975)) |
| 10.1.6† | Supply and Product Support Agreement, dated as of November 25, 2019, by and between Gogo Business Aviation LLC and Airspan Networks Inc. (incorporated by reference to Exhibit 10.1.6 to Form 10-K filed on March 11, 2021 (File No. 001-35975)) |
| 10.1.7† | Master Services Agreement, dated as of May 21, 2022, by and between Gogo Business Aviation LLC and Hughes Network Systems, LLC (incorporated by reference to Exhibit 10.1 to Form 8-K filed on May 26, 2022 (File No. 001-35975)) |
| 10.1.8† | Supply and Product Support Agreement, dated as of June 6, 2022, by and between Gogo Business Aviation LLC and Hughes Network Systems, LLC (incorporated by reference to Exhibit 10.1 to Form 8-K filed on June 14, 2022 (File No. 001-35975)) |
| 10.2.1# | Employment Agreement, by and between Gogo Business Aviation LLC, as assignee of Gogo LLC, and Barry Rowan, effective as of April 24, 2017 (incorporated by reference to Exhibit 10.2.14 to Form 10-Q filed on May 4, 2017 (File No. 001-35975)) |
| 10.2.2# | Change in Control Severance Agreement, dated as of April 24, 2017, by and between Gogo Inc. and Barry Rowan (incorporated by reference to Exhibit 10.2.15 to Form 10-Q filed on May 4, 2017 (File No. 001-35975)) |
| 10.2.3# | Employment Agreement, dated March 4, 2018, between Gogo Inc., Gogo Business Aviation LLC, as assignee of Gogo LLC, and Oakleigh Thorne (incorporated by reference to Exhibit 10.2.12 to Form 10-Q filed on May 4, 2018 (File No. 001-35975)) |
| 10.2.4# | Form of Change in Control Severance Agreement, for named executive officers other than Oakleigh Thorne, Barry Rowan and Jessica Betjemann (incorporated by reference to Exhibit 10.2.10 to Form 10-K filed on March 13, 2020 (File No. 001-25975)) |
| 10.2.5# | Amendment No. 1 to the Form of Change in Control Severance Agreement for named executive officers other than Oakleigh Thorne and Barry Rowan (incorporated by reference to Exhibit 10.2.18 to Form 10-Q filed on May 4, 2018 (File No. 001-35975)) |
| 10.2.6# | Employment Agreement, dated as of January 1, 2008, between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC) and Marguerite Elias (incorporated by reference to Exhibit 10.2.20 to Form 10-Q filed on May 9, 2019 (File No. 001-35975)) |
| 10.2.7# | Amendment No. 1 to the Employment Agreement, between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC) and Marguerite Elias, effective as of December 31, 2008 (incorporated by reference to Exhibit 10.2.21 to Form 10-Q filed on May 9, 2019 (File No. 001-35975)) |
| 10.2.8# | Amendment No. 2 to the Employment Agreement, between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC) and Marguerite Elias, effective as of November 30, 2017 (incorporated by reference to Exhibit 10.2.22 to Form 10-Q filed on May 9, 2019 (File No. 001-35975)) |
| 10.2.9# | Director Compensation Policy, effective March 4, 2021 (incorporated by reference to Exhibit 10.6 to Form 10-Q filed on May 6, 2021 (File No. 001-35975)) |
| 10.2.10# | Amended and Restated Employment Agreement, dated as of February 10, 2020, between Gogo LLC and Karen Jackson (incorporated by reference to Exhibit 10.5 to Form 10-Q filed on August 5, 2021 (File No. 001-35795)) |
| 10.2.11# | Employment Agreement, dated as of August 27, 2018, between Gogo Business Aviation LLC and Sergio Aguirre (incorporated by reference to Exhibit 10.6 to Form 10-Q filed on August 5, 2021 (File No. 001-35795)) |
| 10.2.12# | Form of Director Deferred Share Unit Agreement for Gogo Inc. Omnibus Incentive Plan (incorporated by reference to Exhibit 10.7 to Form 10-Q filed on August 5, 2021 (File No. 001-35795)) |
| 10.2.13# | Amendment to Non-Employee Director Options and Deferred Stock Units (incorporated by reference to Exhibit 10.8 to Form 10-Q filed on August 5, 2021 (File No. 001-35795)) |
| 10.2.14# | Amendment No. 1, dated March 25, 2022, to the Employment Agreement between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC), and Oakleigh Thorne (incorporated by reference to Exhibit 10.2.1 to Form 10-Q filed on May 5, 2022 (File No. 001-35975)) |
| 10.2.15# | Amendment No. 1, dated March 25, 2022, to the Employment Agreement between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC), and Barry Rowan (incorporated by reference to Exhibit 10.2.2 to Form 10-Q filed on May 5, 2022 (File No. 001-35975)) |

| | |
|---|---|
| 10.2.16# | Amendment No. 1, dated March 25, 2022, to the Employment Agreement between Gogo Business Aviation LLC and Sergio Aguirre (incorporated by reference to Exhibit 10.2.3 to Form 10-Q filed on May 5, 2022 (File No. 001-35975)) |
| 10.2.17# | Amendment No. 3, dated March 25, 2022, to the Employment Agreement between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC), and Marguerite Elias (incorporated by reference to Exhibit 10.2.4 to Form 10-Q filed on May 5, 2022 (File No. 001-35975)) |
| 10.2.18# | Amendment No. 1, dated March 25, 2022, to the Employment Agreement between Gogo Business Aviation LLC, as assignee of Gogo LLC (f/k/a Aircell LLC), and Karen Jackson (incorporated by reference to Exhibit 10.2.5 to Form 10-Q filed on May 5, 2022 (File No. 001-35975)) |
| 10.2.19# | Employment Agreement, effective as of March 11, 2023, by and between Gogo Business Aviation LLC and Jessica Betjemann (incorporated by reference to Exhibit 10.1 to Form 8-K filed on February 14, 2023 (File No. 001-35975)) |
| 10.2.20# | Change in Control Severance Agreement, effective as of March 11, 2023, by and between Gogo Inc. and Jessica Betjemann (incorporated by reference to Exhibit 10.2 to Form 8-K filed on February 14, 2023 (File No. 001-35975)) |
| 10.2.21# | Employment Agreement, effective as of November 2, 2022, by and between Gogo Business Aviation LLC and Crystal Gordon |
| 10.2.22# | Change in Control Severance Agreement, effective as of November 2, 2022, by and between Gogo Inc. and Crystal Gordon |
| 10.3.1# | Aircell Holdings Inc. Stock Option Plan (incorporated by reference to Exhibit 10.3.1 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.3.2# | Amendment No. 1 to the Aircell Holdings Inc. Stock Option Plan, effective as of June 2, 2010 (incorporated by reference to Exhibit 10.3.2 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.3.3# | Amendment No. 2 to the Aircell Holdings Inc. Stock Option Plan, dated as of December 14, 2011(incorporated by reference to Exhibit 10.3.3 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.3.4# | Amendment No. 3 to the Aircell Holdings Inc. Stock Option Plan, effective as of May 31, 2013 (incorporated by reference to Exhibit 10.3.4 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.3.5# | Form of Stock Option Agreement for Aircell Holdings Inc. Stock Option Plan (incorporated by reference to Exhibit 10.3.5 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.3.6# | Form of Stock Option Agreement for Aircell Holdings Inc. Stock Option Plan (for June 2013 grants) (incorporated by reference to Exhibit 10.3.6 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.4.1# | Gogo Inc. Omnibus Incentive Plan (incorporated by reference to Exhibit 10.5 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.4.2# | Form of Stock Option Agreement for Gogo Inc. Omnibus Incentive Plan (incorporated by reference to Exhibit 10.5.2 to Form 10-K filed on March 14, 2014 (File No. 001-35975)) |
| 10.4.3# | Form of Restricted Stock Unit Agreement for Gogo Inc. Omnibus Incentive Plan (incorporated by reference to Exhibit 10.4.3 to Form 10-K filed on February 27, 2015 (File No. 001-35975)) |
| 10.4.4# | Form of Restricted Stock Agreement for Gogo Inc. Omnibus Incentive Plan (incorporated by reference to Exhibit 10.4.4 to Form 10-K filed on February 27, 2015 (File No. 001-35975)) |
| 10.4.5# | Form of Stock Option Agreement for Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.6 to Form 10-Q filed on August 4, 2016 (File No. 001-35975)) |
| 10.4.6# | Form of Performance Stock Option Agreement for Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.7 to Form 10-Q filed on August 4, 2016 (File No. 001-35975)) |
| 10.4.7# | Form of Restricted Stock Unit Agreement for Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.8 to Form 10-Q filed on August 4, 2016 (File No. 001-35975)) |
| 10.4.8# | Form of Performance Restricted Stock Unit Agreement for Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.9 to Form 10-Q filed on August 4, 2016 (File No. 001-35975)) |
| 10.4.9# | Amended and Restated Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Annex A to the definitive proxy statement on Schedule 14A filed on April 27, 2018 (File No. 001-35975)) |
| 10.4.10# | Second Amended and Restated Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.1 to Form 10-Q filed on August 5, 2022 (File No. 001-35975)) |
| 10.4.11# | Form of Restricted Stock Unit Agreement for Second Amended and Restated Gogo Inc. 2016 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.402 to Form 10-Q filed on November 3, 2022 (File No. 001-35975)) |
| 10.5# | Gogo Inc. Annual Incentive Plan (as amended as of April 14, 2016) (incorporated by reference to Exhibit 10.4.10 to Form 10-Q filed on August 4, 2016 (File No. 001-35975)) |
| 10.6# | Gogo Inc. Section 409A Specified Employee Policy (incorporated by reference to Exhibit 10.7 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.7.1# | Form of Indemnification Agreement entered into between Gogo Inc. and each of its Directors (incorporated by reference to Exhibit 10.7.1 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |
| 10.7.2# | Form of Indemnification Agreement entered into between Gogo Inc. and each of its Officers (incorporated by reference to Exhibit 10.7.2 to Gogo Inc. Registration Statement on Form S-1 (File No. 333-178727)) |

| 10.8.1# | Form of Director Deferred Share Unit Agreement for Gogo Inc.'s Omnibus Incentive Plan (incorporated by reference to Exhibit 10.10.2 to Form 10-K filed on March 14, 2014 (File No. 001-35975)) |
| 10.8.2# | Form of Director Stock Option Agreement for Gogo Inc. Omnibus Incentive Plan (incorporated by reference to Exhibit 10.10.3 to Form 10-K filed on March 14, 2014 (File No. 001-35975)) |
| 10.8.3# | Director Compensation Policy, effective July 1, 2019 (incorporated by reference to Exhibit 10.9.4 to Form 10-K filed on March 13, 2020 (File No. 001-35975)) |
| 10.8.4# | Form of Director Stock Option Agreement for Amended and Restated Gogo Inc. 2016 Omnibus Incentive Plan (effective April 29, 2020) (incorporated by reference to Exhibit 10.9.1 to Form 10-Q filed on August 10, 2020 (File No. 001-35975)) |
| 10.8.5# | Amendment to Non-Employee Director Stock Option Agreements for Amended and Restated Gogo Inc. 2016 Omnibus Incentive Plan granted before April 29, 2020 (effective April 29, 2020) (incorporated by reference to Exhibit 10.9.2 to Form 10-Q filed on August 10, 2020 (File No. 001-35975)) |
| 10.9.1 | Credit Agreement, dated as of April 30, 2021, among Gogo Inc., Gogo Intermediate Holdings LLC, the lenders and issuing banks party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent (incorporated by reference to Exhibit 10.1 to Form 8-K filed on May 3, 2021 (File No. 001-35975)) |
| 10.9.2 | Guarantee Agreement, dated as of April 30, 2021, among Gogo Inc., Gogo Intermediate Holdings LLC and certain of its subsidiaries, and Morgan Stanley Senior Funding, Inc., as collateral agent. (incorporated by reference to Exhibit 10.2 to Form 8-K filed on May 3, 2021 (File No. 001-35975)) |
| 10.9.3 | Collateral Agreement, dated as of April 30, 2021, among Gogo Inc., Gogo Intermediate Holdings LLC and certain of its subsidiaries, and Morgan Stanley Senior Funding, Inc., as collateral agent (incorporated by reference to Exhibit 10.3 to Form 8-K filed on May 3, 2021 (File No. 001-35975)) |
| 10.9.4 | First Amendment to Credit Agreement, dated as of February 2, 2023, among Gogo Inc., Gogo Intermediate Holdings LLC and Morgan Stanley Senior Funding, Inc., as administrative agent |
| 21.1 | List of Subsidiaries |
| 23.1 | Consent of Independent Registered Public Accounting Firm – Deloitte & Touche LLP |
| 24.1 | Power of Attorney (included on signature page) |
| 31.1 | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 * | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 * | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | Inline XBRL Instance Document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |
| * | This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Registrant under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing. |
| ** | Certain schedules and other similar attachments to such agreement have been omitted pursuant to Item 601(a)(5) of Regulation S-K. The Company will furnish a copy of such omitted documents to the SEC upon request. |
| # | Indicates management contract or compensatory plan or arrangement. |
| † | Certain provisions of this exhibit have been omitted pursuant to Item 601 (b)(10)(iv) of Regulation S-K. |

98

**Item 16. Form 10-K Summary**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Gogo Inc. (the registrant) has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 28, 2023.

Gogo Inc.

| | |
|---|---|
| By: | /s/ Oakleigh Thorne |
| Name: | Oakleigh Thorne |
| Title: | Chief Executive Officer and Chairman of the Board |
| | (Principal Executive Officer) |

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Barry Rowan and Crystal L. Gordon, and each of them, his or her true and lawful attorneys-in-fact and agents, with full power to act separately and full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-facts and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as they or he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or either of them or his or their substitute or substitutes may lawfully do or cause to be done by virtue hereof.

This Power of Attorney shall not revoke any powers of attorney previously executed by the undersigned. This Power of Attorney shall not be revoked by any subsequent power of attorney that the undersigned may execute, unless such subsequent power of attorney specifically provides that it revokes this Power of Attorney by referring to the date of the undersigned's execution of this Power of Attorney. For the avoidance of doubt, whenever two or more powers of attorney granting the powers specified herein are valid, the agents appointed on each shall act separately unless otherwise specified.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Gogo Inc. and in the capacities indicated, on February 28, 2023.

| Signature | Title |
|---|---|
| /s/ Oakleigh Thorne | Chief Executive Officer and Chairman of the Board |
| Oakleigh Thorne | (Principal Executive Officer) |
| /s/ Barry Rowan | Executive Vice President and Chief Financial Officer |
| Barry Rowan | (Principal Financial Officer) |
| /s/ Jessica G. Betjemann | Senior Vice President, Finance, Chief Accounting Officer and Treasurer |
| Jessica G. Betjemann | (Principal Accounting Officer) |
| /s/ Mark Anderson | Director |
| Mark Anderson | |
| /s/ Robert L. Crandall | Director |
| Robert L. Crandall | |
| /s/ Hugh W. Jones | Lead Independent Director |
| Hugh W. Jones | |
| /s/ Michele Coleman Mayes | Director |
| Michele Coleman Mayes | |
| /s/ Robert H. Mundheim | Director |
| Robert H. Mundheim | |
| /s/ Christopher D. Payne | Director |
| Christopher D. Payne | |
| /s/ Charles C. Townsend | Director |
| Charles C. Townsend | |
| /s/ Harris N. Williams | Director |
| Harris N. Williams | |

100

**Exhibit 4.9**

## AMENDMENT NO. 1 TO SECTION 382 RIGHTS AGREEMENT

This Amendment No. 1 (this "**Amendment**") is made and entered into as of December 27, 2022, by and between Gogo Inc., a Delaware corporation (the "**Company**"), and Computershare Trust Company, N.A., a federally chartered trust company, as rights agent (the "**Rights Agent**").  Capitalized terms used herein and not otherwise defined herein have the respective meanings ascribed to those terms in the Rights Agreement (as defined below).

WHEREAS, the parties to this Amendment previously entered into the Section 382 Rights Agreement, dated as of September 23, 2020 (the "**Rights Agreement**");

WHEREAS, pursuant to Section 27 of the Rights Agreement, prior to the Close of Business on the tenth day following the Stock Acquisition Date (or, if the tenth day following the Stock Acquisition Date occurs before the Record Date, the Close of Business on the Record Date), the Company may from time to time, and the Rights Agent shall if the Company so directs in writing, supplement or amend the Rights Agreement without the approval of any holders of Right Certificates in order to make any change to or delete any provision in the Rights Agreement or to adopt any other provisions with respect to the Rights which the Company may deem necessary or desirable; and

WHEREAS, the parties to this Amendment now desire to amend the Rights Agreement in accordance with the terms and conditions set forth herein and therein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the parties hereto, intending to be legally bound, hereby agree as set forth herein:

Section 1.1 <u>Amendments</u>.

(a)             Section 3.1 of the Rights Agreement is hereby amended and restated as follows:

"Until the earlier of (i) the Close of Business on the thirtieth day after the Stock Acquisition Date (or, in the event that the Board of Directors determines on or before such thirtieth day to effect an exchange in accordance with Section 24 and determines that a later date is advisable, such later date) and (ii) the Close of Business on the tenth Business Day (or such later date as may be determined by action of the Board of Directors prior to such time as any Person becomes an Acquiring Person) after the date of the commencement by any Person (other than the Company, any Subsidiary of the Company, any employee benefit plan of the Company or of any Subsidiary of the Company, any entity holding shares of Common Stock for or pursuant to the terms of any such benefit plan or any Exempt Person) of a tender or exchange offer the consummation of which would result in any Person becoming an Acquiring Person (the earlier of (i) or (ii) being herein referred to as the "**Distribution Date**") (*provided*, that if such tender or exchange offer is terminated prior to the occurrence of a Distribution Date, then no Distribution Date shall occur as a result of such tender or exchange offer), (A) the Rights will be evidenced by the certificates (or other evidence of book-entry or other uncertificated ownership) for shares of Common Stock registered in the names of the holders thereof (which shall also be deemed to be Right Certificates) and not by separate Right Certificates (*provided*, that each certificate (or other evidence of book-entry or other uncertificated ownership) representing shares of Common Stock outstanding as of

the Close of Business on the Record Date evidencing the Rights shall be deemed to incorporate by reference the terms of this Agreement, as amended from time to time), and (B) the right to receive Right Certificates will be transferable only in connection with the transfer of the underlying shares of Common Stock. As soon as practicable after the Distribution Date, the Company will prepare and execute, the Rights Agent will countersign, and the Company will send or cause to be sent (and the Rights Agent will, if requested, at the expense of the Company and upon receipt of all relevant information, send) by first-class, postage-prepaid mail, to each record holder of shares of Common Stock as of the Close of Business on the Distribution Date (other than any Acquiring Person or any Associate or Affiliate of any Acquiring Person), at the address of such holder shown on the records of the Company, a Right Certificate, substantially in the form of **Exhibit B** hereto, evidencing one Right for each share of Common Stock so held, subject to adjustment as provided herein; *provided*, that the Rights may instead be recorded in book-entry or other uncertificated form, in which case such book-entries or other evidence of ownership shall be deemed to be Right Certificates for all purposes of this Agreement; *provided*, *further*, that all procedures relating to actions to be taken or information to be provided with respect to such Rights recorded in book-entry or other uncertificated forms, and all requirements with respect to the form of any Right Certificate set forth in this Agreement, may be modified as necessary or appropriate to reflect book-entry or other uncertificated ownership. As of the Distribution Date, the Rights will be evidenced solely by such Right Certificates."

(b)          Section 25.2 of the Rights Agreement is hereby amended and restated as follows:

"The Company shall, as soon as practicable after a Stock Acquisition Date (or after the date of any Board of Directors determination pursuant to the third paragraph of Section 1.1), give to the Rights Agent and each holder of a Right Certificate, in accordance with Section 26, a notice that describes the transaction in which a Person became an Acquiring Person and the consequences of the transaction to holders of Rights under Section 11.1.2."

(c)          Section 26 of the Rights Agreement is hereby amended and restated as follows:

"Notices or demands authorized by this Agreement to be given or made by the Rights Agent or by the holder of any Right Certificate to or on the Company shall be sufficiently given or made if in writing and when sent by overnight delivery service or first-class mail, postage prepaid, properly addressed (until another address is filed in writing with the Rights Agent) as follows:

Gogo Inc.
105 Edgeview Dr., Suite 300
Broomfield, CO 80021
Attention: Crystal Gordon, EVP and General Counsel

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: William D. Regner

2

Subject to the provisions of Section 21, any notice or demand authorized by this Agreement to be given or made by the Company or by the holder of any Right Certificate to or on the Rights Agent shall be deemed given upon receipt and shall be sufficiently given or made if in writing when sent by overnight delivery service or registered or certified mail properly addressed (until another address is filed in writing with the Company) as follows:

Computershare Trust Company, N.A.
150 Royall Street
Canton, MA 02021
Attention: Client Services

Notices or demands authorized by this Agreement to be given or made by the Company or the Rights Agent to the holder of any Right Certificate shall be sufficiently given or made if in writing, when sent by first-class mail, postage prepaid, addressed to such holder at the address of such holder as shown on the registry books of the Company."

Section 1.2 <u>Effect</u>.   Except as expressly provided in this Amendment, all of the terms and provisions of the Rights Agreement are and will remain in full force and effect. Nothing in this Amendment shall be construed to modify any provision of the Rights Agreement other than as specifically set forth herein.

Section 1.3 <u>Miscellaneous</u>.    The provisions of Sections 28 (Successors), 29 (Benefits of this Agreement), 30 (Severability), 31 (Governing Law), 32 (Counterparts), 33 (Descriptive Headings and Construction) and 34 (Administration) of the Rights Agreement are hereby incorporated into this Amendment, *mutatis mutandis*.

[Remainder of page left intentionally blank; signature pages follow.]

3

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be duly executed as of the day and year first above written.

GOGO INC.

By   /s/ Crystal L. Gordon
Name:    Crystal L. Gordon
Title:     EVP and General Counsel

COMPUTERSHARE TRUST COMPANY, N.A.

By   /s/ Patrick Hayes
Name:    Patrick Hayes
Title:     Manager, Client Management

[*Signature Page to Amendment No. 1 to Section 382 Rights Agreement*]

Exhibit 10.2.21

# EMPLOYMENT AGREEMENT

This Employment Agreement (this ***"Agreement"***), is entered into as of November 2, 2022 (the "***Effective Date***") by and between **Gogo Business Aviation LLC**, 105 Edgeview Dr., Suite 300, Broomfield, CO 80021 (the ***"Company"***), and **Crystal Gordon** ("***Executive***"). Certain capitalized terms used herein have the meanings given to them in Section 20 hereof.

AGREEMENT:

In consideration of the mutual covenants contained herein, the parties agree as follows:

**1.** **Employment**. The Company hereby agrees to employ Executive, and Executive hereby accepts such employment upon the terms and conditions set forth herein.

**2.** **Capacity and Duties**. As of the Effective Date, Executive shall be employed by the Company as its Executive Vice President, General Counsel and Corporate Secretary. During Executive's employment with the Company, Executive shall perform the duties and bear the responsibilities commensurate with Executive's position, and shall serve the Company faithfully and to the best of Executive's ability, under the direction of the Company's Chief Executive Officer. Executive shall also perform such other duties as may be reasonably requested from time to time by the Company's Chief Executive Officer or the Board of Directors of Gogo Inc. ("***Parent***"). Executive's actions shall at all times be such that they do not discredit the Company or its products and services, and Executive shall not engage in any business activity or activities that require significant personal services by Executive or that, in the sole judgment of the Company, may conflict with the proper performance of Executive's duties hereunder. Executive shall devote all Executive's working time, working attention, and working energies to the business of the Company.

**3.** **Compensation**.

(a) **Starting Bonus.** The Company shall pay to Executive a starting bonus of $300,000, subject to withholdings for federal, state and local taxes, FICA and other withholding required by applicable law, regulation or ruling. Such bonus shall be payable on the first regular payroll date following Executive's 30th day of employment. In the event that Executive's employment is terminated for Cause or Executive resigns without Good Reason prior to the third anniversary of the Effective Date, Executive will promptly repay a pro-rata portion of the bonus to the Company. The amount to be repaid shall be calculated by dividing the number of days elapsed from the Effective Date to the Termination Date by 995.

(b) **Base Salary and Annual Bonus**. The Company shall pay to Executive as base compensation for all of the services to be rendered by Executive under this Agreement a salary at the rate of $370,000 per annum (the **"*Base Salary*"**), payable in accordance with such normal payroll practices as are adopted by the Company from time to time, subject to withholdings for federal, state and local taxes, FICA and other withholding required by applicable law, regulation or ruling. The Base Salary shall be reviewed at least annually. In addition, Executive shall be eligible for an annual bonus with a target of seventy-five percent (75%) of Base Salary. The amount of such annual bonus, if any, shall be decided by the Compensation Committee of the Board of Directors of Parent, and shall be based upon achievement of objectives established by

1

the Compensation Committee, all as determined in the reasonable discretion of the Compensation Committee.

(c)     **Reimbursement of Expenses, Company Facilities**.  The Company shall pay or reimburse Executive for all reasonable, ordinary and necessary travel and other expenses incurred by Executive in the performance of Executive's obligations under this Agreement, in accordance with the Company's travel and expense reimbursement policies for management employees.  The Company shall provide to Executive, at the Company's principal place of business, the necessary office facilities and equipment to perform Executive's obligations under this Agreement. The Company will reimburse Executive for up to $10,000 of attorney's fees incurred in connection with the review and negotiation of the terms and conditions of employment.

(d)     **Discretionary Time Off.**  The Company has no formal vacation or time off policy with set time off amounts and accruals.  Instead, Executive will have the flexibility to take time off as determined by Executive, subject to the approval of the CEO.

(e)     **Benefits**.  Subject to applicable eligibility requirements, Executive shall be eligible to participate in all normal company benefits including the Company's 401(k), retirement, medical, dental and life and disability insurance plans and programs in accordance with the terms thereof.  Any such benefits, plans and/or programs shall be subject to change or termination from time to time, as determined by the Company.

(f)     **Directors and Officers Insurance**.  Officers and directors' liability insurance shall be obtained and maintained by the Company for coverage of the Company, other executives of the Company and Executive, at no cost to Executive.

(g)     **Equity**.  Executive shall receive a new hire equity grant with a fair market value of $200,000, which shall consist of restricted stock units in Parent ("RSU's"). Such grant shall be dated November 30, 2022, and the number of RSUs shall be determined based on the closing price of the Common Stock on such date. The RSUs will vest in equal increments on each of the first four anniversaries of the grant date assuming Executive's continued employment. In addition, Executive shall be eligible to participate in an annual equity award program, as approved by the Compensation Committee of the Board of Directors of Parent.

4.     **Confidentiality; Ownership of Confidential Information and Inventions**.

(a)     **Receipt of Confidential Information**.  Executive's employment by the Company creates a relationship of confidence and trust between Executive and the Company with respect to certain information applicable to the business of the Company and its clients or customers.  Executive acknowledges that during Executive's employment by the Company and as a result of the confidential relationship with the Company established thereby, Executive shall be receiving Confidential Information and that the Confidential Information is a highly valuable asset of the Company.

(b)     **Nondisclosure**.  During Executive's employment with the Company and at all times thereafter, regardless of the reason for the termination of such employment, Executive shall retain in strict confidence and shall not use for any purpose whatsoever or divulge, disseminate, or disclose to any third party (other than in the furtherance of the business purposes

2

of the Company and with the Company's prior written consent) all Confidential Information, all of which is deemed confidential and proprietary.  Notwithstanding anything in this Agreement to the contrary, nothing contained in this Agreement limits the Executive's ability to communicate with or participate in any investigation or proceeding regarding possible violations of U.S. Federal securities laws that may be conducted by the U.S. Securities and Exchange Commission, the U.S. Department of Justice, the U.S. Consumer Financial Protection Bureau or the U.S. Commodity Futures Trading Commission.

    **(c)**   **Disclosure**.  Executive shall inform the Company promptly and fully of all Inventions by a written report, setting forth in detail a description of the Invention, the procedures used and the results achieved.  Executive shall submit a report upon completing any studies or research projects undertaken on the Company's behalf, whether or not Executive believes that project has resulted in an Invention.  Executive agrees to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all Inventions, which records shall be available to and remain the sole property of the Company at all times.

    **(d)**   **Ownership; Cooperation**.  All Confidential Information and Inventions shall be and remain the sole property of the Company.  Executive promptly shall execute and deliver to the Company any instruments deemed necessary by it to effect disclosure and assignment of all Inventions to the Company including, without limitation, assignment agreements satisfactory to the Company.  Upon request of the Company, during and after Executive's employment with the Company, Executive shall execute patent, copyright, trademark, mask work or other applications and any other instruments deemed necessary by the Company for the prosecution of such patent applications or the acquisition of letters patent or registration of copyrights, trademarks or mask works in the United States and foreign countries based on such Inventions; *provided, however,* that if Executive incurs any expenses in connection with the foregoing obligation after Executive's employment with the Company is terminated, the Company shall compensate Executive at a reasonable rate for the time actually spent by Executive at the Company's request in satisfying such obligation.

    **(e)**   **Works for Hire**.  To the extent the Inventions consist of original works of authorship which are made by Executive (solely or jointly with others) within the scope of Executive's employment and which are protectable by copyright, Executive acknowledges that all such original works of authorship are "works for hire" as that term is defined in the United States Copyright Act (17 U.S.C., Section 101).

    **5.**   **Covenants-Not-to-Compete**.  In consideration of Executive's continued employment as an executive of the Company and in consideration of the Company's obligations contained in this Agreement, including, without limitation, its agreeing to pay severance benefits in the circumstances specified in Section 9(a), and because Executive shall have access to Confidential Information, including, without limitation, Trade Secrets, Executive hereby covenants as follows (as used in this Section the term "Company" includes Gogo Inc. and its Affiliates):

    **(a)**   **Covenants**.  Without the prior written consent of the Board, (x) during Executive's employment with the Company and (y) for twelve (12) months after leaving the employment of the Company, whether voluntarily or involuntarily, Executive shall not directly or

3



indirectly, personally, by agency, as an employee, consultant, officer or director, through a corporation, partnership, limited liability company, or by any other artifice or device:

(i) Own, manage, operate, control, work for, provide services to, employ, have any financial interest in, consult to, lend Executive's name to or engage in any capacity in any enterprise, business, company or other entity (whether existing or newly established) engaged in a Competitive Business, whether in anticipation of monetary compensation or otherwise;

(ii) Solicit or otherwise induce any person who is then or was employed by the Company or otherwise engaged by the Company as an independent contractor or consultant at any time during the twelve (12) month period preceding Executive's last day of employment, to terminate their employment or service with the Company to engage in any Competitive Business, or intentionally interfere with the relationship of the Company with any such employee, former employee or person, it being understood that a general advertisement of employment opportunities to which a current or former employee of the Company or any of its Affiliates responds shall not constitute solicitation or inducement for purposes of this Section 5 (a)(ii), or hire any such former employee within ninety days following their termination of employment with the Company or any of its Affiliates;

(iii) Solicit or service in any way in connection with or relating to a Competitive Business, on behalf of Executive or on behalf of or in conjunction with others, any client or customer, or prospective client or customer of the Company, or induce any customer, client, prospective customer or client, vendor, consultant, strategic partner or independent contractor of the Company to terminate or negatively alter their relationship with the Company, who has been solicited or serviced by the Company or any of its Affiliates; or

(iv) Assist others in doing anything prohibited by clause (i), (ii) or (iii) above. Due to the global nature of the Company's business and its competition there is no applicable geographic restriction on the covenants set forth herein. The covenants in this Section 5(a) shall be specifically enforceable. However, the covenants in this Section 5(a) shall not be construed to prohibit the ownership of not more than one percent of the equity of any publicly-held entity engaged in direct competition with the Company, so long as Executive is not otherwise engaged with such entity in any of the other activities specified in Section 5(a)(i) through (iv) above.

(b) **Reformation and/or Severability of Covenants**.  If a court determines that any of the foregoing covenants is an unenforceable restriction, the court is authorized and requested to revise such provision to include the maximum restriction allowed under applicable law. If any provision of this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, and cannot be modified to be enforceable, such determination shall not affect the validity of any other provision of this Agreement, and such other

4

provisions shall remain in full force and effect. Each provision, paragraph and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant.

(c)         **Acknowledgment**.  Executive acknowledges that the covenants made by Executive in this Agreement are intended to protect the legitimate business interests of the Company and not to prevent or interfere with Executive's ability to earn a living.

6.         **Injunctive Relief; Legal Fees**.  If Executive violates any of the provisions of Section 4 or 5 hereof (the ***"Applicable Sections"***), the Company shall be entitled to seek and, if awarded by a court or arbitrator, obtain immediate and permanent injunctive relief in addition to all other rights and remedies it may have, it being agreed that a violation of the Applicable Sections would cause the Company irreparable harm, and the damages which the Company would sustain upon such violation are difficult or impossible to ascertain in advance.  If the Company takes legal action to enforce the covenants contained in the Applicable Sections, or to enjoin Executive from violating the Applicable Sections, as part of its damages, the prevailing party shall be entitled to recover its reasonable legal costs and expenses for bringing and maintaining any such action from the losing party.

7.         **No Conflict**.  Executive represents and warrants to the Company that (a) Executive has not signed any employment agreement, confidentiality agreement, non-competition covenant or the like with any other employer and (b) Executive's employment with the Company will not violate any other agreement or arrangement Executive has or may have had with any other former employer.  Executive covenants that under no circumstances shall Executive disclose to the Company or use for the benefit of the Company any confidential or proprietary information of any former employer or other third party, and Executive shall hold all such information in confidence, and shall comply with the terms of any and all applicable agreements between Executive and the third party with respect to such information.

8.         **Termination**.  Executive and the Company each acknowledge that either party has the right to terminate Executive's employment with the Company at any time for any reason whatsoever, with or without cause, pursuant to the following:

(a)         **Termination by the Company Without Cause**.  Upon thirty (30) days' written notice to Executive, or at the Company's discretion, pay in lieu of notice;

(b)         **Disability**.  Immediately upon written notice to Executive, if Executive is prevented from performing Executive's duties by reason of illness or incapacity for a continuous period of 180 days;

(c)         **Death**.  Immediately upon the death of Executive; or

(d)         **Termination by the Company for Cause**.  Immediately upon  "Cause", which for purposes of this Agreement shall mean Executive's (1) willful gross misconduct or gross or persistent negligence in the discharge of her duties; (2) act of dishonesty or concealment; (3) breach of her fiduciary duty or duty of loyalty to the Company; (4) a  breach of Section 4 or 5 hereof; (5) any other material breach by Executive of this Agreement, which breach has not been cured by Executive within thirty (30) days after written notice of such breach is given to Executive

5

by the Company; (6) commission of one or more acts of substance abuse which are materially injurious to the Company; (7) conviction or plea of no contest to a felony involving money or other property of the Company (excluding traffic or other similar violations); or (8) conviction or a plea of no contest to a criminal offense that would, if committed in the State of Colorado, constitute a felony under the laws of the State of Colorado or the United States of America.

(e)        **Voluntary Resignation**.  Executive may terminate Executive's employment under this Agreement upon thirty (30) days' written notice to the Company.  The Company, at its discretion, may waive the thirty (30) day notice requirement, and in such event shall be required to make any payments in lieu of notice.

(f)        **Resignation for Good Reason**.  Executive may terminate her employment under this Agreement immediately upon a showing of "Good Reason," which for purposes of this Agreement shall mean (1) a reduction by the Company in Executive's Base Salary; (2) a material diminution of Executive's duties or responsibilities such that such duties and responsibilities, when viewed in the aggregate, are not a least commensurate with those duties and responsibilities normally associated with and appropriate to her position; (3) the relocation of Executive's principal place of employment to a geographic location more than fifty (50) miles from the Company's headquarters as of the Effective Date; or (4) any material breach by the Company of its obligations to Executive hereunder.  In the event that Executive believes that circumstances constituting "Good Reason" have occurred and Executive wishes to terminate her employment as a result of such occurrence, Executive must provide the Company written notice within 3 days from the initial existence of the occurrence.  If within 30 days following the Company's receipt of such notice it corrects the circumstances constituting "Good Reason," then Executive shall not be entitled to terminate her employment under this Section 8(f) as a result of such circumstances.  Furthermore, Executive shall not be entitled to terminate her employment under this Section 8(f) as a result of any circumstances constituting "Good Reason" unless her resignation occurs within 30 days following the expiration of the Company's cure period.

9.        **Termination Benefits**.

(a)        **Termination by the Company Without Cause or Resignation for Good Reason**.  If Executive is terminated under Section 8(a) or resigns for Good Reason under Section 8(f), and following the execution (and expiration of any revocation period), not later than 45 days following the termination date, of a separation agreement containing a general release of all claims against Parent, the Company and its Affiliates, the Company shall pay Executive an amount equal to twelve (12) months of Executive's then-current Base Salary, payable in installments as set forth hereinafter (each such payment a ***"Severance Payment"***).  The Severance Payments shall be payable in installments, by direct deposit, in accordance with the Company's normal payroll practices.  The first installment of the Severance Payments shall be made on the first payroll date after the execution (and expiration of any revocation period) of such separation agreement or, if the 45-day period following the termination date spans two calendar years and the Severance Payment is subject to Section 409A of the Internal Revenue Code, after such 45-day period, and shall include all installments of the Severance Payments that would have been paid if the general release of claims had been fully effective on the termination date.  In addition, during the twelve (12) months following termination, should Executive timely elect to continue coverage pursuant

6

to COBRA, the Company agrees to reimburse Executive for the COBRA premiums due to maintain health insurance coverage that is substantially equivalent to that which she received immediately prior to Executive's termination.  The Company shall also pay Executive (i) any salary earned but unpaid prior to termination, (ii) any business expenses incurred but not reimbursed as of the date of termination, and (iii) any award under the annual bonus program referred to in Section 3(a) that has been approved by the Chief Executive Officer and Parent's Board of Directors but not paid prior to termination.

**(b)**        **Other Termination**.   In all other cases, the Company's obligation to make payments hereunder shall cease upon such termination, except the Company shall pay Executive (i) any salary earned but unpaid prior to termination, and (ii) any business expenses incurred but not reimbursed as of the date of termination.

**(c)**        **Survival of Obligations**.  Executive's obligations pursuant to Sections 4 and 5 shall survive the expiration of the term of Executive's employment under this Agreement or any early termination thereof.

**(d)**        **Returns**.  Upon termination of Executive's employment under this Agreement, or as otherwise requested by the Company, immediately upon the Company's request, Executive shall return to the Company all Company files, notes, business plans and forecasts, financial information, computer-recorded information, tangible property including computers, software, credit cards, entry cards, identification badges, cell phones, pager, keys, tools, equipment and any materials of any kind which contain or embody any proprietary or confidential information of the Company (and all reproductions thereof).

**10.**     **Notices**.  All notices, reports, records or other communications which are required or permitted to be given to the parties under this Agreement shall be sufficient in all respects if given in writing and delivered in person, by telecopy, by overnight courier, or by registered or certified mail, postage prepaid, return receipt requested, to the receiving party at the address listed on the first page of this Agreement, or to such other address as such party may have given to the other by notice pursuant to this Section 10.  Notice shall be deemed given on the date of delivery, in the case of personal delivery or telecopy, or on the delivery or refusal date, as specified on the return receipt, in the case of overnight courier or registered or certified mail.

**11.**     **Further Assurances**.  The parties shall cooperate fully with each other and execute such further instruments, documents and agreements, and shall give such further written assurances, as may be reasonably requested by one another to better evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intent and purposes of this Agreement.  Without limiting the generality of the foregoing, Executive shall cooperate fully in assisting the Company to comply with contractual obligations of the Company to third parties regarding Inventions, Trade Secrets and copyrights.

**12.**     **Waiver of Breach**.  A waiver by the Company of a breach of any provision of this Agreement by Executive shall not operate or be construed as a waiver of any subsequent breach by Executive.

7

13.     **Applicable Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado.  Any action pursuant to Section 4 or 5 above may be brought in the Courts in the State of Colorado, and by execution of this Agreement, Executive irrevocably submits to such jurisdiction.

14.     **Arbitration**.

**(a)**          Any dispute arising in connection with this Agreement or Executive's employment with the Company, except for equitable or injunctive actions pursuant to Section 4 or 5 above, or claims by Executive for workers' compensation, unemployment compensation or benefits under a Company benefits plan, shall be submitted to final and binding arbitration.  Judgment upon any award rendered by arbitration may be entered in any court having jurisdiction thereof.

**(b)**          The arbitrator shall be selected by the mutual agreement of the parties.  Any arbitrator selected shall be a professional having at least ten years of experience in labor or employment related practice areas.  If the amount in dispute exceeds $250,000, the parties shall select, by mutual agreement, a panel of three arbitrators, rather than one arbitrator, to resolve the dispute.

**(c)**          The arbitration shall be conducted in Denver, Colorado (unless the corporate headquarters of the Company shall have been moved to another location, in which case the arbitration shall be conducted in such location).  Reasonable discovery shall be permitted as determined by the arbitrator or arbitrators.  Both parties to an arbitration shall have the right to be represented by counsel.  The attorneys' fees and costs of the arbitrator and arbitration proceedings are to be shared equally between the parties, and all other costs and attorneys' fees are to be paid by the party incurring such costs and fees.

**(d)**          Except as otherwise provided herein, this arbitration procedure is the exclusive remedy for any contractual, non-contractual or statutory claim of any kind, including claims arising under federal, state and local statutory law, including, but not limited to, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*; the Colorado Anti-Discrimination Act, C.R.S. 24-34-401, *et seq.*; and common law or equitable claims alleging breach of contract, defamation, fraud, outrageous conduct, promissory estoppel, violation of public policy, wrongful discharge or any other tort, contract or equitable theory.  Executive agrees to exhaust any and all internal dispute resolution procedures established by the Company prior to pursuing arbitration under this Agreement.

15.     **Severability**.  If any provision of this Agreement shall be held by any Court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the enforceability of all other provisions of this Agreement shall be unimpaired.

16.     **Binding Agreement**.  Executive shall not delegate or assign any of Executive's rights or obligations under this Agreement.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by Executive, the Company and the

8

Company's successors and assigns; *provided, however*, that the Company may not assign this Agreement to any other person or entity without the prior written consent of Executive except (a) to Parent or (b) in connection with a sale, assignment or other transfer by the Company of all or a substantial portion of its assets or business, in each of which events assignment of this Agreement is expressly permitted without the consent of Executive.

**17.     Merger; Amendment**.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof and no other statement, representation, warranty or covenant has been made by either party except as expressly set forth herein.  This Agreement may be amended at any time, *provided* that such amendment is in writing and is signed by each of the parties.

**18.     Nature of Employment**.  EXECUTIVE IS EMPLOYED WITH THE COMPANY FOR NO SPECIFIC TERM OF EMPLOYMENT, AND IS EMPLOYED AT THE WILL OF THE COMPANY.  NOTHING IN THIS AGREEMENT SHALL IN ANY WAY RESTRICT EXECUTIVE'S RIGHT OR THE RIGHT OF THE COMPANY TO TERMINATE EXECUTIVE'S EMPLOYMENT AT ANY TIME, FOR ANY REASON OR FOR NO REASON, WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE.

**19.     Section 409A**.  This Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "***Code***"), and shall be interpreted and construed consistently with such intent.  The payments to Executive pursuant to this Agreement are also intended to be exempt from Section 409A of the Code to the maximum extent possible, under the separation pay exemption pursuant to Treasury regulation §1.409A-1(b)(9)(iii), as short-term deferrals pursuant to Treasury regulation §1.409A-1(b)(4), or another applicable exemption under Section 409A of the Code or the Treasury regulations promulgated thereunder.  In the event the terms of this Agreement would subject Executive to taxes or penalties under Section 409A of the Code ("***409A Penalties***"), the Company and Executive shall cooperate diligently to amend the terms of the Agreement to avoid such 409A Penalties, to the extent possible.  To the extent any amounts under this Agreement are payable by reference to Executive's "termination of employment" or similar terms, such term and similar terms shall be deemed to refer to Executive's "separation from service," within the meaning of Section 409A of the Code.  Notwithstanding any other provision in this Agreement, if Executive is a "specified employee," as defined in Section 409A of the Code, as of the date of Executive's separation from service, then to the extent any amount payable under this Agreement (i) constitutes the payment of nonqualified deferred compensation, within the meaning of Section 409A of the Code, (ii) is payable upon Executive's separation from service and (iii) under the terms of this Agreement would be payable prior to the six-month anniversary of Executive's separation from service, such payment shall be delayed until the earlier to occur of (a) the six-month anniversary of the separation from service or (b) the date of Executive's death.  Any reimbursement payable to Executive pursuant to this Agreement shall be conditioned on the submission by Executive of all expense reports reasonably required by the Company under any applicable expense reimbursement policy, and shall be paid to Executive promptly following receipt of such expense reports, but in no event later than the last day of the calendar year following the calendar year in which Executive incurred the reimbursable expense.  Any amount of expenses eligible for reimbursement, or in-kind benefit provided, during a calendar year shall not affect the amount of expenses eligible for reimbursement, or in-kind benefit to be provided, during any other calendar year.  The right to any reimbursement or in-kind

9

benefit pursuant to this Agreement shall not be subject to liquidation or exchange for any other benefit. Executive's right to receive any installment payments under this Agreement, including without limitation any salary continuation payments that are payable in installments in accordance with the Company's normal payroll practices, shall be treated as a right to receive a series of separate payments and, accordingly, each such installment payment shall at all times be considered a separate and distinct payment as permitted under Section 409A of the Code. Whenever a provision under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

20.     **Definitions**. In addition to terms defined above and elsewhere in this Agreement, the following terms shall have the meanings set forth below:

*"Affiliate"* means (i) any parent or subsidiary of the Company and (ii) any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Company. For purposes of this definition, the terms "controls," "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

*"Air-to-Ground Communication"* means (i) data and/or voice communications directly or indirectly between an aircraft and the ground, including communications between an aircraft and the ground transmitted in whole or in part by satellite, (ii) data and/or voice communications within an aircraft, including all communications to or from the cabin and/or the cockpit of an aircraft, (iii) any and all related products and services and (iv) any and all products and services directly supportive thereof. For the avoidance of doubt, Air-to-Ground Communications does not include communications by satellite that do not involve communication to or from an aircraft.

*"Competitive Business"* means any business engaged in (i) providing Air-to-Ground Communications, (ii) assembling, manufacturing, installing or selling equipment involved in or relating to Air-to-Ground Communications or (iii) any other business or activities that are substantially in competition with any other businesses in which the Company or any of its Affiliates engages in during Executive's employment or is actively contemplating entering into during Executive's employment. For purposes of this Agreement, in the event that a Competitive Business includes an organization with separate and distinct business units, to the extent possible, and upon the written approval of the Company, the term Competitive Business may be limited to only those business units(s) or persons of the Competitive Business that are engaged in, related to or become engaged in, or related to the business of Air-to-Ground Communications.

*"Confidential Information"* means all information relating to the Company, its Affiliates and their respective customers and suppliers considered by the Company or its Affiliates to be confidential and proprietary including, without limitation, (a) business plans, research, development and marketing strategies, customer names and lists, product and service prices and lines, processes, designs, formulae, methods, financial information, costs and supplies and (b) the Trade Secrets (as defined below). Confidential Information may include information which has been acquired or created by Executive or has otherwise become known to Executive through Executive's employment with Company. Confidential Information may also include information belonging to

10

the Company's clients, customers or suppliers. "Confidential Information" shall not include the foregoing that is or becomes (i) in the public domain other than through acts by Executive, (ii) already lawfully in Executive's possession at the time of disclosure by the Company as evidenced by Executive's written records, (iii) disclosed to Executive by a third party who is not prohibited from disclosing the information pursuant to any fiduciary, contractual or other duty to any person or (iv) required by law, rule, regulation or court order to be disclosed. Confidential Information also does not include information that cannot be considered confidential under applicable law.

**"Existing Proprietary Rights"** means all inventions, original works of authorship, developments, improvements and trade secrets that Executive has, alone or jointly with others, made, conceived, developed or reduced to practice or caused to be made, conceived, developed or reduced to practice prior to the Effective Date, whether or not patentable or registrable under patent, copyright or similar statutes, a list of which is attached to this Agreement as **Exhibit A**.

**"Inventions"** means discoveries, concepts, ideas, methods, formulae, techniques, developments, know-how, inventions and improvements, whether or not patentable or registrable under patent, copyright or similar statutes, conceived of or made by Executive at any time, whether before, during or after business hours, or with the use of the Company's resources, facilities, materials or personnel, either solely or jointly with others after the Effective Date and during Executive's employment by the Company, or within one (1) year of the termination of Executive's employment with the Company;  and, if based on or related to the Company's business, including, without limitation, existing and planned products and services and future products and services of the Company and its Affiliates.

**"Trade Secrets"** means any and all technology and information relating to the Company's and its Affiliates' business or their respective patents, methods, formulae, software, know-how, designs, products, processes, services, research development, inventions, systems, engineering and manufacturing which have been designated as secret or confidential or are the subject of efforts that are reasonable under the circumstances to maintain their secrecy or confidentiality and which are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons.

The parties have executed this Agreement on the date first above written, effective as of the Effective Date.

COMPANY:                                                EXECUTIVE:

**GOGO BUSINESS AVIATION LLC**               Crystal Gordon

/s/ Marguerite M. Elias                                 /s/ Crystal L. Gordon

Date: September 21, 2022                            Date: September 27, 2022

11

**Exhibit A**

**Existing Proprietary Rights**

**None**

ADVANCE \y 700

12

Exhibit 10.2.22

# CHANGE IN CONTROL SEVERANCE AGREEMENT

This Change in Control Severance Agreement is entered into on this 2nd day of November, 2022 (this *"Agreement"*) by and between Gogo Inc., a Delaware corporation ("the *Company"*), and Crystal Gordon (*"Executive"*).  Certain capitalized terms used herein have the meanings given to them in Section 16 hereof.

## RECITALS:

**WHEREAS,** the Board of Directors of the Company (the "*Board*") considers the maintenance of a sound management to be essential to protecting and enhancing the best interests of the Company and its stockholders and, in this connection, recognizes that the possibility of a Change in Control may exist from time to time, and that this possibility, and the uncertainty and questions it may raise among management, may result in the departure or distraction of management personnel to the detriment of Gogo and its stockholders; and

**WHEREAS,** the Board has determined that appropriate steps should be taken to encourage the continued attention and dedication of members of management of the Company and its Subsidiaries to their assigned duties without the distraction which may arise from the possibility of a Change in Control.

## AGREEMENT:

In consideration of the mutual covenants contained herein, the parties agree as follows:

     **1.**     **At-Will Employment**.  The Company and Executive acknowledge that the Executive's employment is and shall continue to be at-will, as defined under applicable law. If the Executive's employment terminates for any reason, the Executive shall not be entitled to any payments, benefits, damages, awards or compensation other than as provided by this Agreement or the Employment Agreement, or as may otherwise be established under the then-existing employee benefit plans or policies of the Company and its Subsidiaries at the time of termination.

     **2.**     **Change in Control and Severance Benefits**.

          **(a)**          **Severance Payments**.  If Executive's employment is terminated as a result of a Qualifying Termination, the Company shall pay Executive an amount equal to

the sum of (i) twelve (12) months of Executive's Base Salary, pursuant to Section 9(a) of the Employment Agreement (the "**Basic Separation Payment**"), and (ii) six (6) months of Executive's Base Salary plus an  amount equal to the product of (x) 1/12 of Executive's Target Bonus and (y) the number of months in the Severance Period (the, **"Additional Payment")**.  Notwithstanding anything to the contrary in the Employment Agreement, the Company shall pay the Additional Payment together with the Basic Separation Payment (collectively, the "**Severance Payment**"), in cash in a single lump sum payment, within ten (10) days following the Date of Termination. In addition, during the eighteen (18) months following the Date of Termination or, if a shorter period, the maximum period permitted by law, should Executive timely elect to continue coverage pursuant to COBRA, the Company agrees to reimburse Executive for the COBRA premiums due to maintain health insurance coverage that is substantially equivalent to that which he or she received immediately prior to Executive's termination (the "**COBRA Payments**"). The Company shall also pay Executive (A) any salary earned but unpaid prior to termination and all accrued but unused paid time off or vacation, (B) any business or reimbursable relocation expenses incurred but not reimbursed as of the Date of Termination in accordance with the applicable business expense reimbursement policy of the Company, effective on the Date of Termination, and (C) any award under the Annual Bonus Program that has been approved by the Company's Chief Executive Officer and the Compensation Committee of the Board but not paid prior to termination.

    **(b)**    **Option Acceleration**.  If Executive's employment is terminated as a result of a Qualifying Termination, then (i) the vesting of each Award that vests based on continued service, and the exercisability of each such Award that is a stock option, shall be automatically accelerated in full as of the Date of Termination, and (ii) each Award that vests based on performance shall remain outstanding through the normal performance vesting date thereof (or, in the case of each such Award that is a stock option, until the 90th day following such normal performance vesting date) and shall vest and/or be forfeited based on the satisfaction of the applicable performance goals to the same extent as if the Executive's services to the Company had not ended (provided that, to the extent any such Award is subject to both performance and service-based vesting, the service-based vesting shall be automatically accelerated in full as of the Date of Termination).  The Award shall continue to be exercisable in accordance with the Executive's Award Agreement, and with respect to Awards other than stock options and restricted stock awards, will be settled upon vesting to the extent such accelerated vesting is permitted by Section 409(A) of the Code or, if not so permitted, on the scheduled settlement date in accordance with Executive's

Award Agreement, including in each case  without any limitation any provisions that provide that in connection with a Change in Control, an Award may be surrendered and cancelled in exchange for a cash payment.

(c)          **Other Termination.**  If the Executive's employment terminates other than as a result of a Qualifying Termination, the Executive shall not be entitled to receive severance or other benefits hereunder, but may be eligible for such severance and benefits (if any) as may then be available under the Employment Agreement and the then-existing severance and benefit plans and policies of the Company and its Subsidiaries.

(d)          **No Mitigation Requirement.**  The Executive shall not be required to mitigate the amount provided for in this section by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for in this section be reduced by the amount of any compensation earned by the Executive as the result of employment by another employer, or by any set-off, counterclaim, recoupment, or other claim, right or action the Company may have against the Executive.

**3.**      **Notices**.   All notices, reports, records or other communications which are required or permitted to be given to the parties under this Agreement shall be sufficient in all respects if given in writing and delivered in person, by telecopy, by overnight courier, or by registered or certified mail, postage prepaid, return receipt requested, to the Company at its corporate headquarters to the attention of the Corporate Secretary and to the Executive at the home address most recently provided by Executive to the Company,  or, in the case of either party, to such other address as such party may have given to the other by notice pursuant to this Section 3.   Notice shall be deemed given on the date of delivery, in the case of personal delivery or telecopy, or on the delivery or refusal date, as specified on the return receipt, in the case of overnight courier or registered or certified mail.   Any termination by the Company or any of its Subsidiaries for Cause or by Executive for Good Reason shall be communicated by a notice of termination ("***Notice of Termination***") to the other party given in accordance with this Agreement. Such notice shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination under the provision so indicated. The failure by the Company or Executive  to include in the notice any fact or  circumstance which contributes to a showing of Cause or Good Reason, respectively, shall not waive any right of the Company or the Executive, as the case may be, hereunder, or

preclude the Company or the Executive, as the case may be, from asserting such fact or circumstance in enforcing its or his or her rights hereunder.

    **4.**    **Limitation of Benefits.**

        **(a)**    If upon a Change in Control any of the payments and benefits provided for under this Agreement or any other agreement or arrangement between the Company and its affiliates and Executive ("***Payments***") would constitute a "parachute payment" within the meaning of section 280G of the Code ("***Parachute Payments***"), then, if and solely to the extent that reducing the benefits payable hereunder, would result in the Executive receiving a greater amount, on an after-tax basis, taking into account any excise tax imposed pursuant to section 4999 of the Code (the "***Excise Tax***") and all applicable income, employment and other taxes payable on such amounts, the amounts payable hereunder shall be reduced or eliminated, as the case may be, so that the total amount of Parachute Payments received by the Executive would result in no portion of the payments being subject to the Excise Tax.

        **(b)**    Any such reduction in the amount of compensation or benefits effected pursuant to this Section 4 shall first come from the Additional Payment and then, in order and in each case, solely to the extent necessary, from the Basic Separation Payment, the COBRA Payments and the benefit of the option acceleration provided in Section 2(b).

    **5.**    **Restrictive Covenants.**  Notwithstanding anything to the contrary in this Agreement, Sections 4, 5, 6 and 7 of the Executive's Employment Agreement shall remain in full force and effect.

    **6.**    **Further Assurances**.  The parties shall cooperate fully with each other and execute such further instruments, documents and agreements, and shall give such further written assurances, as may be reasonably requested by one another to better evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intent and purposes of this Agreement.

    **7.**    **Applicable Law**.  This Agreement shall be governed by and construed in accordance with internal laws, but not the conflicts of law rules, of the State of Colorado.

8.      **Arbitration.**

**(a)**                    Any dispute arising in connection with this Agreement shall be submitted to final and binding arbitration.  Judgment upon any award rendered by arbitration may be entered in any court having jurisdiction thereof.

**(b)**                    The arbitrator shall be selected by the mutual agreement of the parties.  Any arbitrator selected shall be a professional having at least ten years of experience in labor or employment related practice areas.  If the amount in dispute exceeds $250,000, the parties shall select, by mutual agreement, a panel of three arbitrators, rather than one arbitrator, to resolve the dispute.

**(c)**                    The arbitration shall be conducted in Denver, Colorado (unless the corporate headquarters of the Company shall have been moved to another location, in which case the arbitration shall be conducted in such location).  Reasonable discovery shall be permitted as determined by the arbitrator or arbitrators.  Both parties to an arbitration shall have the right to be represented by counsel.  The Company shall be responsible for paying all administrative fees, costs and expenses associated with the arbitration, including filing fees, the arbitrator's fees, and the expense of the arbitration proceedings, with all other costs and attorneys' fees to be paid by the party incurring such costs and fees (subject to any reimbursement pursuant to Section 9).

**(d)**                    Except as otherwise provided herein, this arbitration procedure is the exclusive remedy for any contractual, non-contractual or statutory claim of any kind, including claims arising under federal, state and local statutory law, including, but not limited to, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*; the Colorado Anti-Discrimination Act, C.R.S. 24-34-401, *et seq.*; and common law or equitable claims alleging breach of contract, defamation, fraud, outrageous conduct, promissory estoppel, violation of public policy, wrongful discharge or any other tort, contract or equitable theory.  Executive agrees to exhaust any and all internal dispute resolution procedures established by the Company prior to pursuing arbitration under this Agreement.

9.      **Reimbursement of Legal Expenses.**  If any contest or dispute shall arise between the Company and the Executive regarding any provision of this Agreement, the

Company shall reimburse the Executive for all legal fees and expenses reasonably incurred by the Executive in connection with such contest or dispute, but only if the Executive prevails to a substantial extent with respect to at least one of Executive's material claims brought and pursued in connection with such contest or dispute. Such reimbursement shall be made as soon as practicable following the resolution of such contest or dispute (whether or not appealed) to the extent the Company receives written evidence of such fees and expenses.  Any such reimbursements or expenses shall be paid not later than as soon as practicable following the resolution of the dispute but in no event later than the end of the first taxable year of the Executive in which the Company and the Executive enter into a legally binding settlement of such dispute, the Company concedes that the amount is payable, or the Company is required to make such payment pursuant to a final and nonappealable judgment or other binding decision.

          **10.**     **Severability**.  If any provision of this Agreement shall be held by any Court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the enforceability of all other provisions of this Agreement shall be unimpaired.

          **11.**     **Binding Agreement**.  Executive shall not delegate or assign any of Executive's rights or obligations under this Agreement; provided, however, that the terms of this Agreement and all rights of Executive hereunder shall inure to the benefit of, and be enforceable by, Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  The Company shall cause any successor to the Company (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) or to all or substantially all of the Company's business and/or assets to assume the Company's obligations under this Agreement and agree expressly to perform the Company's obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this section or which becomes bound by the terms of the Agreement by operation of law or otherwise. This Agreement may be amended only by a written amendment executed by both parties.

**12.** **Effect on other Agreements and Benefits.** Except to the extent expressly set forth herein, any benefit or compensation to which Executive is entitled under the Employment Agreement, any other agreement between Executive and the Company or any of its Subsidiaries or any plan maintained by the Company or any of its Subsidiaries in which the Executive participates or participated shall not be modified or lessened in any way, but shall be payable according to the terms of the applicable plan or agreement. Notwithstanding the foregoing, any severance benefit received by Executive under this Agreement shall be in lieu of any severance benefits to which the Executive would otherwise be entitled under the Employment Agreement or any other severance policy or plan maintained by the Company or any of its Subsidiaries.

**13.** **Employment Taxes.** All payments made pursuant to this Agreement shall be subject to withholding of applicable income and employment taxes.

**14.** **Section 409A.** This Agreement is intended to comply with the requirements of Section 409A of the Code, and shall be interpreted and construed consistently with such intent. The payments to Executive pursuant to this Agreement are also intended to be exempt from Section 409A of the Code to the maximum extent possible. The amount referred to herein as the "Basic Separation Payment" is intended to be exempt from being treated as deferred compensation under the separation pay exemption pursuant to Treasury regulation §1.409A-1(b)(9). The change in the time and form of payment of the Separation Payment from installments as provided in the Employment Agreement to a lump sum payment as provided herein is intended to comply with Section 409A in reliance on such subsection of the regulations and, as applicable, Treasury regulation §1.409A-3(c). The amount referred to herein as the "Additional Payment" is a new legally binding right created pursuant to this Agreement and is intended to be exempt from Section 409A of the Code as short-term deferral pursuant to Treasury regulation §1.409A-1(b)(4). In the event the terms of this Agreement would subject Executive to taxes or penalties under Section 409A of the Code (*"409A Penalties*"), the Company and Executive shall cooperate diligently to amend the terms of the Agreement to avoid such 409A Penalties, to the extent possible. To the extent any amounts under this Agreement are payable by reference to Executive's "termination of employment," such term shall be deemed to refer to Executive's "separation from service," within the meaning of Section 409A of the Code. Notwithstanding any other provision in this Agreement, if Executive is a "specified employee," as defined in Section 409A of the Code, as of the date of Executive's separation from service, then to the extent any amount payable under this Agreement (i) constitutes

the payment of nonqualified deferred compensation, within the meaning of Section 409A of the Code, (ii) is payable upon Executive's separation from service and (iii) under the terms of this Agreement would be payable prior to the six-month anniversary of Executive's separation from service, such payment shall be delayed until the earlier to occur of (a) the six-month anniversary of the separation from service or (b) the date of Executive's death.  Any amount of expenses eligible for reimbursement, or in-kind benefit provided, during a calendar year shall not affect the amount of expenses eligible for reimbursement, or in-kind benefit to be provided, during any other calendar year.  The right to any reimbursement or in-kind benefit pursuant to this Agreement shall not be subject to liquidation or exchange for any other benefit.

**15.**     **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

**16.**     **Definitions**.  In addition to terms defined above and elsewhere in this Agreement, the following terms shall have the meanings set forth below:

***"Affiliate"*** means with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

***"Annual Bonus Plan"*** means the annual bonus plan established by the Board in which members of management participate.

"***Award***" means any options, restricted stock, restricted stock units or other equity incentives awarded to the Executive under the Gogo Inc. 2016 Omnibus Incentive Plan or any other plan implemented by the Company.

***"Award Agreement"*** means the written agreement between the Company and the Executive evidencing an Award under the Gogo Inc. 2016 Omnibus Incentive Plan or any other plan implemented by the Company.

---

**"*Base Salary*"** means the Executive's annual base salary paid or payable by the Company or any of its Subsidiaries at the rate in effect (or required to be in effect before any diminution that is a basis of the Executive's termination for Good Reason) on the Date of Termination.

**"*Cause*"** shall have the meaning ascribed to it in the Employment Agreement.

**"*Change in Control*"** means:

(i)     the acquisition by any person, entity or "group" (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the then outstanding equity interests in the Company or the combined voting power of the Company's then outstanding voting securities, excluding acquisitions by the Thorne Affiliates, as defined in the Stockholders' Agreement; or

(ii)     the consummation of a reorganization, merger or consolidation of the Company or the sale of all or substantially all of the assets of the Company, in each case with respect to which the Thorne Affiliates and any other persons who held equity interests in the Company immediately prior to such reorganization, merger, consolidation or sale do not immediately thereafter own, directly or indirectly, 50% or more of the combined voting power of the then outstanding securities of the surviving or resulting corporation or other entity.

**"*Code*"** means the Internal Revenue Code of 1986, as amended from time to time.

**"*Date of Termination*"** means (i) if the Executive's employment is terminated by the Company for Cause, or by the Executive for Good Reason, the date of receipt of the Notice of Termination or such later date specified in the Notice of Termination, as the case may be, (ii) if the Executive's employment is terminated by the Company other than for Cause or Disability, the date on which the Company notifies the Executive of such termination, (iii) if the Executive resigns without Good Reason, the date on which the Executive notifies the Company of such termination, and (iv) if the Executive's employment is terminated by reason of death or Disability, the date of death of Executive or the 30th day after receipt of notice of Disability from Executive, as the case may be. Notwithstanding the foregoing, in no event shall the Date of Termination occur until the Executive experiences a "separation

from service" within the meaning of Section 409A of the Code, and the date on which such separation from service occurs shall be the "Date of Termination."

***"Disability"*** means a condition such that the Executive by reason of physical or mental disability becomes unable to perform his or her normal duties for more than one hundred eighty (180) days in the aggregate (excluding infrequent or temporary absence due to ordinary transitory illness) during any twelve-month period.

***"Employment Agreement"*** means the Employment Agreement, dated November 2, 2022 between Gogo Business Aviation LLC and Executive, and any other written agreement between Executive and the Company or any of its Subsidiaries.

***"Good Reason"*** means (i) a reduction by the Company or any of its Subsidiaries in Executive's Base Salary or in his or her Target Bonus; (ii) a material diminution in the Executive's position with the Company, such that the Executive is required to perform duties and responsibilities following the Change in Control which would have been assigned to a position that would have been below the level of Vice President under the title structure in effect at the Company immediately prior to the Change in Control; (iii) the relocation of Executive's principal place of employment to a geographic location greater than fifty (50) miles from the Company's headquarters immediately prior to the Change in Control, (iv) the occurrence of a Change in Control in which the acquiror does not assume the obligations of the Company or its Subsidiaries under the Employment Agreement; and (v) any material failure by the Company or any Subsidiary to pay the Executive any compensation when otherwise due under the terms of the Employment Agreement; provided, however, that Executive may resign for Good Reason only if (i) he or she has given the Company written notice of its breach within 90 days of the date that the Executive discovers such breach and (ii) the Company has not remedied such breach on or before the 30th day following the Company's receipt of such notice.

***"Person"*** means an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust, joint venture, association or other similar entity, whether or not a legal entity.

"***Qualifying Termination***" means:

(i)                     at any time within the period commencing on the date of the consummation of a Change in Control and ending twenty-four (24) months thereafter, the



Executive's employment is terminated (A) involuntarily for any  reason other than Cause, death or Disability or (B) by the Executive for Good Reason; or

(ii)                                 at any time following the date the Company or any of its Affiliates enters into an agreement with a third party and the consummation of the transactions contemplated by such agreement would result in a Change in Control of the Company and prior to the date of the consummation of the Change in Control pursuant to such agreement, the Executive's employment is terminated (A) involuntarily for any reason other than Cause, death, or Disability or (B) by the Executive for Good Reason; provided, however, that in the case of each of clauses (A) and (B) the affected Executive demonstrates that such termination or circumstance leading to such termination (1) was at the request of a third party or any of their Affiliates with which the Company had entered into such agreement contemplating a Change in Control; or (2) otherwise occurred in connection with a Change in Control.

"*Severance Period*" shall mean 18 months.

"*Stockholders' Agreement*" means the Stockholders' Agreement, dated December 31, 2009, between the Company and the stockholders who are parties thereto, as amended.

"*Subsidiary*" means any corporation or limited liability company in which the Company, directly or indirectly, holds a majority of the voting power of such entity's outstanding shares of capital stock or membership interests.

"*Target Bonus*" means the target bonus, determined by multiplying an agreed-upon  percentage times Base Salary, for which Executive is eligible under the Annual Bonus Plan at the percentage in effect (or required to be in effect before any diminution that is a basis of the Executive's termination for Good Reason) on the Date of Termination.

The parties have executed this Agreement on the date first above written, effective as of the Effective Date.

**COMPANY:**                                          **EXECUTIVE:**

**Gogo Inc.**

Date: September 21, 2022                              Date: September 27, 2022

/s/ Marguerite M Elias                                 /s/ Crystal L. Gordon
Title: EVP and General Counsel                        Print Name: Crystal L. Gordon

---

**FIRST AMENDMENT TO CREDIT AGREEMENT**

Dated as of February 2, 2023

among

GOGO INC.,

as Holdings,

GOGO INTERMEDIATE HOLDINGS LLC,

as the Borrower

and

MORGAN STANLEY SENIOR FUNDING, INC.

as Administrative Agent

This FIRST AMENDMENT TO CREDIT AGREEMENT (this "**Amendment**"), dated as of February 2, 2023, by and between Gogo Inc., a Delaware corporation ("**Holdings**"), Gogo Intermediate Holdings LLC, a Delaware limited liability company (the "**Borrower**"), and Morgan Stanley Senior Funding, Inc., as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**").

PRELIMINARY STATEMENTS:

(1)   The Borrower, Holdings, the Administrative Agent, the Lenders from time to time party thereto and the Issuing Banks from time to time party thereto are party to that certain Credit Agreement, dated as of April 30, 2021 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the date hereof, the "**Existing Credit Agreement**"); and the Existing Credit Agreement as amended by this Amendment, the "**Amended Credit Agreement**"); and

(2)   The Administrative Agent and the Borrower desire to amend certain provisions of the Existing Credit Agreement, in each case, in accordance with Section 1.10 of the Existing Credit Agreement and, subject to the terms and conditions set forth herein, this Amendment shall become effective on the First Amendment Effective Date (as defined below);

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and subject to the conditions set forth herein, the parties hereto hereby agree as follows:

SECTION 1.   Defined Terms.   Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Amended Credit Agreement.

SECTION 2.   Amendments to the Existing Credit Agreement. Subject to the satisfaction of the conditions precedent set forth in Section 4 hereof, on and as of the First Amendment Effective Date, (A) the Existing Credit Agreement is hereby amended by (i) deleting the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~), and (ii) adding the double underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the Amended Credit Agreement attached hereto as Annex A and (B) Exhibit C-1 to the Existing Credit Agreement is hereby amended by (i) deleting the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~), and (ii) adding the double underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth attached hereto as Annex B. The amendments to the Existing Credit Agreement and Exhibit C-1 shall constitute amendments stemming from an Early Opt-in Election (as defined in the Existing Credit Agreement).

2

SECTION 3.  Representations of the Loan Parties.  Each Loan Party hereby represents and warrants to the Administrative Agent as of the First Amendment Effective Date that (a) it has all corporate or other organizational power and authority to execute, deliver and perform its obligations under this Amendment, (b) the execution, delivery and performance of this  Amendment has been duly authorized by all necessary corporate or other organizational action, and (c) each of this Amendment has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as such enforceability may be limited by Debtor Relief Laws or other laws affecting creditors' rights generally and by general principles of equity and principles of good faith and fair dealing.

SECTION 4.  Conditions Precedent.  The effectiveness of this Amendment, including Section 2 hereof, is subject to the satisfaction or waiver of the following condition (the date of such satisfaction or waiver, the "*First Amendment Effective Date*"):

(a)  The Administrative Agent's receipt of executed counterparts of this Amendment, which shall be originals or pdf copies or facsimile or delivered by other electronic method unless otherwise specified, properly executed by a Responsible Officer of each applicable Loan Party, in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 5.  Reference to and Effect on the Loan Documents.  (a) On and after the First Amendment Effective Date, each reference in the Amended Credit Agreement to "hereunder", "hereof", "Agreement", "this Agreement" or words of like import and each reference in the other Loan Documents to "Credit Agreement", "thereunder", "thereof" or words of like import shall, unless the context otherwise requires, mean and be a reference to the Amended Credit Agreement.  On and after the First Amendment Effective Date, this Amendment shall be a Loan Document under the Existing Credit Agreement and the Amended Credit Agreement.

(b)  The Guarantees, the Collateral Documents and each other Loan Document shall continue to be in full force and effect and are hereby in all respects ratified and confirmed, and the respective guarantees, pledges, grants of security interests and other agreements, as applicable, under each of the Guarantees and the Collateral Documents, notwithstanding the consummation of the transactions contemplated hereby, shall continue to be in full force and effect and shall accrue to the benefit of the Secured Parties under the Existing Credit Agreement and the Amended Credit Agreement.  Without limiting the generality of the foregoing, the Guarantees and the Collateral Documents and all of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Loan Documents, in each case, as may be amended by this Amendment.

(c)  The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

SECTION 6.  Execution in Counterparts.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.  Delivery of an executed counterpart of a signature page to this Amendment by .pdf or other electronic form shall be effective as delivery of a manually executed original counterpart of this Amendment.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Amendment and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form,

3

each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 7.    <u>Amendments; Headings; Severability</u>.    This Amendment may not be amended nor may any provision hereof be waived except pursuant to a writing signed by the Administrative Agent and the Loan Parties.  The Section headings used herein are for convenience of reference only, are not part of this Amendment and are not to affect the construction of, or to be taken into consideration in interpreting this Amendment.  Any provision of this Amendment held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8.    <u>Governing Law; Etc</u>.

(a)    THIS AMENDMENT AND EACH OTHER LOAN DOCUMENT SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE GUARANTY AND COLLATERAL DOCUMENTS, BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    EACH PARTY HERETO HEREBY AGREES AS SET FORTH IN SECTIONS 9.09 AND 9.10 OF THE EXISTING CREDIT AGREEMENT AS IF SUCH SECTIONS WERE SET FORTH IN FULL HEREIN.

SECTION 9.    <u>No Novation</u>.    This Amendment shall not extinguish the obligations for the payment of money outstanding under the Existing Credit Agreement or discharge or release the Lien or priority of any Collateral Document or any other security therefor.  Nothing herein contained shall be construed as a substitution or novation of the obligations outstanding under the Existing Credit Agreement or instruments securing the same, which shall remain in full force and effect, except to any extent modified hereby or by instruments executed concurrently herewith and except to the extent repaid as provided herein.  Nothing implied in this Amendment or in any other document contemplated hereby shall be construed as a release or other discharge of any of the Loan Parties under any Loan Document from any of its obligations and liabilities as a borrower, guarantor or pledgor under any of the Loan Documents.

SECTION 10.    <u>Notices</u>.    All notices hereunder shall be given in accordance with the provisions of Section 9.01 of the Amended Credit Agreement. Notwithstanding the foregoing, execution and delivery of this Amendment shall constitute notice for purposes of Section 1.10(c) of the Existing Credit Agreement.

SECTION 11.    <u>Entire Agreement</u>.    This Amendment, the Amended Credit Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

[Signature Pages Follow]

4

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**GOGO INC.**, as Holdings

By:     /s/ Crystal L. Gordon
Name:   Crystal L. Gordon
Title:    Executive Vice President, General Counsel
        and Secretary

**GOGO INTERMEDIATE HOLDINGS LLC**, as the Borrower

By:     /s/ Crystal L. Gordon
Name:   Crystal L. Gordon
Title:    Executive Vice President, General Counsel
        and Secretary

5

**MORGAN STANLEY SENIOR FUNDING, INC.,**
as Administrative Agent and as Collateral Agent

By:    <u>/s/ Mara MacDonald</u>
Name:   Mara MacDonald
Title:    Authorized Signatory

ANNEX A

[See attached.]

CREDIT AGREEMENT

dated as of April 30, 2021

**As amended by the First Amendment to Credit Agreement,**

**Dated as of February 2, 2023**

among

GOGO INC.,
as Holdings,

GOGO INTERMEDIATE HOLDINGS LLC,
as the Borrower

the Lenders and Issuing Banks party hereto and
MORGAN STANLEY SENIOR FUNDING, INC.,
as Administrative Agent

MORGAN STANLEY SENIOR FUNDING, INC., CREDIT SUISSE
LOAN FUNDING LLC, DEUTSCHE BANK SECURITIES, INC.,
BENEFIT STREET PARTNERS L.L.C., and CBAM PARTNERS, LLC
as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| ARTICLE I DEFINITIONS |  |  | 1 |
| | SECTION 1.01 | Defined Terms | 1 |
| | SECTION 1.02 | Classification of Loans and Borrowings | 84 |
| | SECTION 1.03 | Terms Generally | 84 |
| | SECTION 1.04 | Accounting Terms; GAAP | 86 |
| | SECTION 1.05 | Effectuation of Transactions | 86 |
| | SECTION 1.06 | Limited Condition Transactions | 86 |
| | SECTION 1.07 | Additional Alternative Currencies | 87 |
| | SECTION 1.08 | Currency Equivalents Generally | 87 |
| | SECTION 1.09 | Change in Currency | 88 |
| | SECTION 1.10 | ~~Adjusted LIBO Rate~~**Rates** | 89 |
| | SECTION 1.11 | Divisions | 90 |
| ARTICLE II THE CREDITS |  |  | 90 |
| | SECTION 2.01 | Commitments | 90 |
| | SECTION 2.02 | Loans and Borrowings | 90 |
| | SECTION 2.03 | Requests for Borrowings | 91 |
| | SECTION 2.04 | [Reserved] | 92 |
| | SECTION 2.05 | Letters of Credit | 92 |
| | SECTION 2.06 | Funding of Borrowings | 98 |
| | SECTION 2.07 | Interest Elections | 99 |
| | SECTION 2.08 | Termination and Reduction of Commitments | 100 |
| | SECTION 2.09 | Repayment of Loans; Evidence of Debt | 101 |
| | SECTION 2.10 | Amortization of Term Loans | 102 |

SECTION 2.11          Prepayment of Loans                                                                    102

SECTION 2.12          Fees                                                                                   115

SECTION 2.13          Interest                                                                               116

SECTION 2.14          ~~Alternate Rate of Interest~~**Inability to Determine Rates**                        117

SECTION 2.15          Increased Costs                                                                        118

SECTION 2.16          Break Funding Payments                                                                 119

SECTION 2.17          Taxes                                                                                  120

SECTION 2.18          Payments Generally; Pro Rata Treatment; Sharing of Setoffs                            124

SECTION 2.19          Mitigation Obligations; Replacement of Lenders                                        126

SECTION 2.20          Incremental Credit Extensions                                                         127

SECTION 2.21          Refinancing Amendments                                                                132

SECTION 2.22          Defaulting Lenders                                                                     133

SECTION 2.23          Illegality                                                                             135

SECTION 2.24          Loan Modification Offers                                                               136

**SECTION 2.25**          **Benchmark Replacement Setting**                                                     **137**

ARTICLE III REPRESENTATIONS AND WARRANTIES                                                                  139

SECTION 3.01          Organization; Powers                                                                  139

SECTION 3.02          Authorization; Enforceability                                                         139

SECTION 3.03          Governmental Approvals; No Conflicts                                                  139

SECTION 3.04          Financial Condition; No Material Adverse Effect                                       139

SECTION 3.05          Properties                                                                            140

SECTION 3.06          Litigation and Environmental Matters                                                  140

SECTION 3.07          Compliance with Laws; No Default.                                                     140

SECTION 3.08          Investment Company Status                                                             140

SECTION 3.09          Taxes                                                                                 141

-ii-

SECTION 3.10      ERISA                                                          141

SECTION 3.11      Disclosure                                                     142

SECTION 3.12      Subsidiaries                                                   142

SECTION 3.13      Intellectual Property; Licenses, Etc.                          142

SECTION 3.14      Solvency                                                       142

SECTION 3.15      Federal Reserve Regulations                                   142

SECTION 3.16      USA PATRIOT Act; OFAC and FCPA                                 143

SECTION 3.17      Use of Proceeds                                               143

SECTION 3.18      Regulatory Matters.                                           143

SECTION 3.19      Collateral Matters                                            143

ARTICLE IV CONDITIONS                                                            144

SECTION 4.01      Effective Date                                                 144

SECTION 4.02      Each Credit Event                                             146

ARTICLE V AFFIRMATIVE COVENANTS                                                  147

SECTION 5.01      Financial Statements and Other Information                     147

SECTION 5.02      Notices of Material Events                                     150

SECTION 5.03      Information Regarding Collateral                               151

SECTION 5.04      Existence; Conduct of Business                                 151

SECTION 5.05      Payment of Taxes, etc.                                         151

SECTION 5.06      Maintenance of Properties                                      151

SECTION 5.07      Insurance                                                      151

SECTION 5.08      Books and Records; Inspection and Audit Rights                 153

SECTION 5.09      Compliance with Laws                                           153

SECTION 5.10      Use of Proceeds and Letters of Credit                          153

SECTION 5.11      Additional Subsidiaries                                        154

-iii-

| | | |
|---|---|---|
| SECTION 5.12 | Further Assurances | 154 |
| SECTION 5.13 | Designation of Subsidiaries | 155 |
| SECTION 5.14 | Certain Post-Closing Obligations | 156 |
| SECTION 5.15 | Transactions with Affiliates | 156 |
| **ARTICLE VI NEGATIVE COVENANTS** | | 157 |
| SECTION 6.01 | Indebtedness; Certain Equity Securities | 157 |
| SECTION 6.02 | Liens | 165 |
| SECTION 6.03 | Fundamental Changes; Holdings Covenant | 169 |
| SECTION 6.04 | Investments, Loans, Advances, Guarantees and Acquisitions | 171 |
| SECTION 6.05 | Asset Sales | 175 |
| SECTION 6.06 | [Reserved]. | 178 |
| SECTION 6.07 | Restricted Payments; Certain Payments of Indebtedness | 178 |
| SECTION 6.08 | FCC License Holder Covenant | 184 |
| SECTION 6.09 | Restrictive Agreements | 184 |
| SECTION 6.10 | Amendment of Organizational Documents | 186 |
| SECTION 6.11 | Financial Performance Covenant | 186 |
| **ARTICLE VII EVENTS OF DEFAULT** | | 187 |
| SECTION 7.01 | Events of Default | 187 |
| SECTION 7.02 | Right to Cure | 190 |
| SECTION 7.03 | Application of Proceeds | 192 |
| **ARTICLE VIII ADMINISTRATIVE AGENT** | | 193 |
| SECTION 8.01 | Appointment and Authority | 193 |
| SECTION 8.02 | Rights as a Lender | 193 |
| SECTION 8.03 | Exculpatory Provisions | 194 |
| SECTION 8.04 | Reliance by Administrative Agent | 194 |

-iv-

SECTION 8.05    Delegation of Duties    195

SECTION 8.06    Resignation of Administrative Agent    195

SECTION 8.07    Non-Reliance on Administrative Agent and Other Lenders    196

SECTION 8.08    No Other Duties, Etc.    197

SECTION 8.09    Administrative Agent May File Proofs of Claim    197

SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement    198

SECTION 8.11    Return of Certain Payments.    199

ARTICLE IX MISCELLANEOUS    200

SECTION 9.01    Notices    200

SECTION 9.02    Waivers; Amendments    202

SECTION 9.03    Expenses; Indemnity; Damage Waiver    205

SECTION 9.04    Successors and Assigns    208

SECTION 9.05    Survival    215

SECTION 9.06    Counterparts; Integration; Effectiveness    215

SECTION 9.07    Severability    216

SECTION 9.08    Right of Setoff    217

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process    217

SECTION 9.10    WAIVER OF JURY TRIAL    218

SECTION 9.11    Headings    218

SECTION 9.12    Confidentiality    218

SECTION 9.13    USA PATRIOT Act    220

SECTION 9.14    Release of Liens and Guarantees    220

SECTION 9.15    No Advisory or Fiduciary Responsibility    221

SECTION 9.16    Interest Rate Limitation    222

SECTION 9.17    Judgment Currency    222

-v-

SECTION 9.18    Intercreditor Agreement.                                                                223

SECTION 9.19    Cashless Settlement                                                                     223

SECTION 9.20    Acknowledgement and Consent to Bail-In of EEA Financial Institutions                   223

SECTION 9.21    Certain ERISA Matters                                                                   224

SECTION 9.22    Acknowledgement Regarding Any Supported QFCs                                            224

SCHEDULES:

| Schedule 1.01 | — | Excluded Subsidiaries |
| Schedule 2.01 | — | Commitments and Loans |
| Schedule 2.05 | — | Letter of Credit Commitments |
| Schedule 3.03 | — | Government Approvals; No Conflicts |
| Schedule 3.06 | — | Litigation and Environmental Matters |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 5.14 | — | Certain Post-Closing Obligations |
| Schedule 5.15 | — | Existing Affiliate Transactions |
| Schedule 6.01 | — | Existing Indebtedness |
| Schedule 6.02 | — | Existing Liens |
| Schedule 6.04 | — | Existing Investments |
| Schedule 6.05 | — | Asset Sales |
| Schedule 6.09 | — | Existing Restrictions |
| Schedule 9.01 | — | Notices |

EXHIBITS:

| Exhibit A | — | Form of Assignment and Assumption |
| Exhibit B | — | Form of Guarantee Agreement |
| Exhibit C-1 | — | Form of Notice of Borrowing |
| Exhibit C-2 | — | [Reserved] |
| Exhibit D | — | Form of Collateral Agreement |
| Exhibit E-1 | — | Form of Pari Passu Intercreditor Agreement |
| Exhibit E-2 | — | [Reserved] |
| Exhibit E-3 | — | Form of Junior Intercreditor Agreement |
| Exhibit F | — | Form of Intercompany Note |
| Exhibit G | — | Form of Specified Discount Prepayment Notice |
| Exhibit H | — | Form of Specified Discount Prepayment Response |
| Exhibit I | — | Form of Discount Range Prepayment Notice |
| Exhibit J | — | Form of Discount Range Prepayment Offer |
| Exhibit K | — | Form of Solicited Discounted Prepayment Notice |
| Exhibit L | — | Form of Solicited Discounted Prepayment Offer |
| Exhibit M | — | Form of Acceptance and Prepayment Notice |

| Exhibit N-1 | — | Form of United States Tax Compliance Certificate 1 |
| Exhibit N-2 | — | Form of United States Tax Compliance Certificate 2 |
| Exhibit N-3 | — | Form of United States Tax Compliance Certificate 3 |
| Exhibit N-4 | — | Form of United States Tax Compliance Certificate 4 |
| Exhibit O | — | Form of Note |
| Exhibit P | — | Form of Solvency Certificate |
| Exhibit Q | — | Form of Letter of Credit Request |

-vii-

CREDIT AGREEMENT dated as of April 30, 2021 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), among Gogo Inc., a Delaware corporation ("Holdings"), Gogo Intermediate Holdings LLC, a Delaware limited liability company ("Gogo" or the "Borrower"), the Lenders and Issuing Banks party hereto and Morgan Stanley Senior Funding, Inc., as Administrative Agent and Collateral Agent.

Preliminary Statements:

WHEREAS, in order to finance the Debt Repayment and to provide for the working capital needs and general corporate requirements (including to finance permitted Investments, acquisitions, capital expenditures and Restricted Payments) of Holdings and its Restricted Subsidiaries, the Borrower has requested that the Lenders extend credit in the form of (a) Initial Term Loans in an aggregate principal amount of $725,000,000 on the Effective Date and (b) Revolving Loans at any time and from time to time prior to the Revolving Loan Maturity Date in an aggregate principal amount of up to $100,000,000.

WHEREAS, the proceeds of the Loans borrowed on the Effective Date will be used to fund (x) any original issue discount or upfront fees in connection with the Loans (y) the Debt Repayment and (z) the Transaction Costs.

WHEREAS, the Borrower has requested that the Issuing Banks issue Letters of Credit to support certain obligations incurred by Holdings and its Restricted Subsidiaries.

WHEREAS, the Lenders and the Issuing Banks are willing to extend credit to the Borrower on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01     Defined Terms.

As used in this Agreement, the following terms have the meanings specified below: "2020 Q4 EBITDA Amount" shall mean $35,000,000.

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

**"ABR Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".**

"Acceptable   Discount"     has   the   meaning   assigned to   such term in Section 2.11(a)(ii)(D)(2).

"Acceptable Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Acceptance and Prepayment Notice" means an irrevocable written notice from a Term Lender accepting a Solicited Discounted Prepayment Offer to make a Discounted Term Loan Prepayment at the Acceptable Discount specified therein pursuant to Section 2.11(a)(ii)(D) substantially in the form of Exhibit M.

"Acceptance Date" has the meaning specified in Section 2.11(a)(ii)(D)(2).

"Accepting Lenders" has the meaning specified in Section 2.24(a).

"Acquired EBITDA" means, with respect to any Acquired Entity or Business or any Converted Restricted Subsidiary (any of the foregoing, a "Pro Forma Entity") for any period, the amount for such period of Consolidated EBITDA of such Pro Forma Entity (determined as if references to Holdings, the Borrower and the Restricted Subsidiaries in the definition of "Consolidated EBITDA" were references to such Pro Forma Entity and its subsidiaries that will become Restricted Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business" has the meaning given such term in the definition of "Consolidated EBITDA."

"Additional Lender" means any Additional Revolving Lender or any Additional Term Lender, as applicable.

"Additional Revolving Lender" means, at any time, any bank, financial institution or other institutional lender or investor (other than any natural person) that agrees to provide any portion of any (a) Incremental Revolving Commitment Increase or Additional/Replacement Revolving Commitments pursuant to an Incremental Facility Amendment in accordance with Section 2.20 or (b) Credit Agreement Refinancing Indebtedness pursuant to a Refinancing Amendment in accordance with Section 2.21; provided that each Additional Revolving Lender shall be subject to the approval of the Administrative Agent (and, if such Additional Revolving Lender will provide an Incremental Revolving Commitment Increase or any Additional/Replacement Revolving Commitment, each Issuing Bank), in each case only if such consent would be required under Section 9.04(b) for an assignment of Revolving Loans or Revolving Commitments, as applicable, to such bank, financial institution or other institutional lender or investor (such approval in each case not to be unreasonably withheld, conditioned or delayed) and the Borrower.

"Additional Term Lender" means, at any time, any bank, financial institution or other institutional lender or investor (other than any natural person) that agrees to provide any portion of any
(a) Incremental Term Loans pursuant to an Incremental Facility Amendment in accordance with Section 2.20 or (b) Credit Agreement Refinancing Indebtedness pursuant to a Refinancing Amendment in accordance with Section 2.21; provided that each Additional Term Lender shall be subject to the approval of the Borrower.

"Additional/Replacement Revolving Commitment" has the meaning assigned to such term in Section 2.20(a).

2

"**Adjusted Daily Simple SOFR**" **shall mean an interest rate per annum equal to (a) the Daily Simple SOFR, plus (b) a percentage per annum as set forth below for the applicable Interest Period therefor; provided that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.**

| Interest Period | Percentage |
|---|---|
| One month | 0.11448% |
| Three months | 0.26161% |
| Six months | 0.42826% |

~~"**Adjusted LIBO Rate**" means, with respect to any Eurodollar Borrowing denominated in Dollars or an Alternative Currency for any Interest Period, an interest rate per annum equal to (i) the LIBO Rate for such Interest Period multiplied by (ii) the Statutory Reserve Rate; provided that (i) with respect to the Term Loans, in no event shall the Adjusted LIBO Rate be less than 0.75% and (ii) with respect to the Revolving Loans, in no event shall the Adjusted LIBO Rate be less than 0.00%.~~

"**Adjusted Term SOFR**" **means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.**

"Administrative Agent" means Morgan Stanley Senior Funding, Inc., in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 9.01, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders in writing.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Class" has the meaning specified in Section 2.24(a).

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Affiliated Debt Fund" means any Affiliated Lender that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course and whose managers have fiduciary duties to the third-party investors in such fund or investment vehicle independent of their duties to Holdings or the GTCR Group.

"Affiliated Lender" means, at any time, any Lender that is any Person (other than Holdings or any of its Subsidiaries) contemplated by the definition of the GTCR Group at such time.

3

"Agent" means any of the Administrative Agent, the Collateral Agent, each Joint Lead Arranger, any successors and assigns of the foregoing in such capacity, and "Agents" means two or more of them.

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Agreement" has the meaning given to such term in the preliminary statements hereto.

"Agreement Currency" has the meaning assigned to such term in Section 9.17.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.00% and (c) the Adjusted ~~LIBO Rate for the applicable Loan~~ **Term SOFR for a one-month tenor in effect** on such day (or if such day is not a Business Day, the immediately preceding Business Day) ~~for a deposit in Dollars with a maturity of one month plus 1.00%; provided that, solely for purposes of the foregoing, the Adjusted LIBO Rate for any day shall be calculated using the LIBO Rate on such day at approximately 11:00 a.m. (New York City time) for a deposit in Dollars with a maturity of one month. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the Adjusted LIBO Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition of Federal Funds Effective Rate, the Alternate Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the preceding sentence until the circumstances giving rise to such inability no longer exist~~**plus 1.00 %**. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted ~~LIBO Rate~~**Term SOFR** shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted ~~LIBO Rate~~**Term SOFR**, respectively.

"Alternative Currency" means each currency (other than Dollars) that is requested by the Borrower and approved in accordance with Section 1.07.

"Alternative Currency Equivalent" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or the relevant Issuing Bank, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date or other applicable date of determination) for the purchase of such Alternative Currency with Dollars.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

4

"Applicable Asset Disposition Percentage" means, for any Asset Disposition Prepayment Event, (a) 100% if the Senior Secured First Lien Net Leverage Ratio (determined on a Pro Forma Basis after giving effect to such Prepayment Event and the use of proceeds therefrom) as of the last day of the most recently ended four fiscal quarters for which financial statements have been prepared or have been required to have been delivered pursuant to Section 5.01 hereof is greater than 4.50:1.00, (b) 50% if the Senior Secured First Lien Net Leverage Ratio (determined on a Pro Forma Basis after giving effect to such Prepayment Event and the use of proceeds therefrom) as of the last day of the most recently ended four fiscal quarters for which financial statements have been prepared or have been required to have been delivered pursuant to Section 5.01 hereof is less than or equal to 4.50:1.00 and greater than 4.00:1.00 and

(c) 0% if the Senior Secured First Lien Net Leverage Ratio (determined on a Pro Forma Basis after giving effect to such Prepayment Event and the use of proceeds therefrom) as of the last day of the most recently ended four fiscal quarters for which financial statements have been prepared or have been required to have been delivered pursuant to Section 5.01 hereof is less than or equal to 4.00:1.00.

"Applicable Country" means (i) Canada, Cayman Islands, Ireland, Luxembourg and the United Kingdom and (ii) any other country or jurisdiction in which a Foreign Subsidiary that the Borrower elects to add as a Subsidiary Loan Party pursuant to Section 5.11(a) is incorporated or organized that is reasonably acceptable to the Administrative Agent.

"Applicable Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(2).

"Applicable Fronting Exposure" means, with respect to any Person that is an Issuing Bank at any time, the sum of (a) the aggregate amount of all Letters of Credit issued by such Person in its capacity as an Issuing Bank (if applicable) that remains available for drawing at such time and (b) the aggregate amount of all LC Disbursements made by such Person in its capacity as an Issuing Bank (if applicable) that have not yet been reimbursed by or on behalf of the Borrower at such time.

"Applicable Percentage" means, at any time with respect to any Revolving Lender, the percentage of the aggregate Revolving Commitments represented by such Lender's Revolving Commitment at such time (or, if the Revolving Commitments have terminated or expired, such Lender's share of the total Revolving Exposure at that time); provided that, with respect to Letters of Credit, LC Disbursements and LC Exposure, "Applicable Percentage" shall mean the percentage of the aggregate Revolving Commitments represented by such Lender's Revolving Commitment at such time (or, if the Revolving Commitments have terminated or expired, such Lender's share of the total Revolving Exposure at that time); provided further that, at any time any Revolving Lender shall be a Defaulting Lender, "Applicable Percentage" shall mean the percentage of the total Revolving Commitments (disregarding any such Defaulting Lender's Revolving Commitment) represented by such Lender's Revolving Commitment. If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments pursuant to this Agreement and to any Lender's status as a Defaulting Lender at the time of determination.

5

"Applicable Rate" means, for any day, (a) with respect to any Initial Term Loan that is an ABR Loan, 2.75% or ~~Eurodollar~~SOFR Loan, 3.75% and (b) with respect to any Revolving Loan that is an ABR Loan or ~~Eurodollar~~SOFR Loan, the applicable rate per annum set forth below under the caption "ABR Spread" or "Adjusted ~~LIBO~~Term SOFR Rate Spread" as the case may be, based upon the Senior Secured First Lien Net Leverage Ratio as of the end of the fiscal quarter of the Borrower for which consolidated financial statements have theretofore been most recently delivered pursuant to Section 5.01(a) or 5.01(b); underlined provided that, for purposes of this clause (b), until the date of the delivery of the consolidated financial statements pursuant to Section 5.01(b) as of and for the fiscal quarter ended September 30, 2021, the Applicable Rate shall be based on the rates per annum set forth in Category 1:

| Senior Secured First Lien Net Leverage Ratio: | ABR Spread | Adjusted ~~LIBO~~Term SOFR Rate Spread |
|---|---|---|
| Category 1<br>Greater than or equal to 5.00 to 1.00 | 2.75% | 3.75% |
| Category 2<br>Less than 5.00 to 1.00 but greater than or equal to 4.00 to 1.00 | 2.50% | 3.50% |
| Category 3<br>Less than 4.00 to 1.00 | 2.25% | 3.25% |

For purposes of the foregoing, each change in the Applicable Rate resulting from a change in the Senior Secured First Lien Net Leverage Ratio shall be effective during the period commencing on the date of delivery to the Administrative Agent pursuant to Section 5.01(a) or 5.01(b) of the consolidated financial statements and related Compliance Certificate indicating such change and ending on the date immediately preceding the effective date of the next such change. Notwithstanding the foregoing, the Applicable Rate, at the option of the Required Term Loan Lenders or the Required Revolving Lenders, with respect to respective Loans, as applicable, shall be based on the rates per annum set forth in the next highest category if the Borrower fails to deliver the consolidated financial statements required to be delivered pursuant to Section 5.01(a) or 5.01(b) within thirty (30) days after the time periods specified herein for such delivery, during the period commencing on the date that is thirty (30) days after the date such financial statements were required to be delivered pursuant to Section 5.01(a) or 5.01(b) until the date that such financial statements are so delivered.

"Appropriate Lender" means, at any time, (a) with respect to Loans of any Class, the Lenders of such Class and (b) with respect to Letters of Credit, (i) the relevant Issuing Banks and (ii) the Revolving Lenders.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Foreign Bank" has the meaning assigned to such term in the definition of "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Asset Disposition Prepayment Event" means any Prepayment Event pursuant to clause (a) of the definition thereof.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04(b)), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Auction Agent" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.11(a)(ii)(A); provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent).

"Audited Financial Statements" means each of the audited consolidated balance sheets of Holdings and its Subsidiaries as of and for each of the Fiscal Years ended December 31, 2018, December 31, 2019 and December 31, 2020 and the related audited consolidated statements of operations, comprehensive income (loss), cash flows and stockholders' equity.

"Available Amount" means, as of any date of determination, a cumulative amount equal to (without duplication):

(a)    the greater of $70,000,000 and 50.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time, plus

(b)    (x) 100% of Consolidated EBITDA determined on a cumulative basis during the period beginning on the first day of the fiscal quarter in which the Closing Date occurs and ending on the last day of the last fiscal quarter preceding the date of determination for which financial statements    of the Borrower have been or are required to have been delivered pursuant to Section 5.01(a) or 5.01(b) (which amount shall never be less than $0) minus (y) an amount equal to 1.40 multiplied by Consolidated Cash Interest Expense for such period (provided that if the deduction pursuant to this clause (y) would result in the amount this clause (b) to be less than $0, such amount shall be deemed to be $0), plus

(c)    to the extent not included in Consolidated Net Income, returns, profits, distributions and similar amounts received in cash or Permitted Investments by the Borrower and its Restricted Subsidiaries on Investments made using the Available Amount and cash received from the sale of Investments made using the Available Amount or pursuant to Section 6.04(o) or (cc), plus

(d)    Investments of the Borrower or any of the Restricted Subsidiaries in any Unrestricted Subsidiary, non-Subsidiary joint venture or minority investment made using the Available Amount that has been re-designated as a Restricted Subsidiary or that has been merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary, or the assets of which has been transferred to a Loan Party or any of its Restricted Subsidiaries (up to the fair market value determined in good faith by the Borrower of the Investments of the Borrower and the Restricted Subsidiaries in such Unrestricted Subsidiary at the time of such re-designation or merger or consolidation), plus

7

(e) to the extent not included in Consolidated Net Income, any Net Proceeds from other Disposition of any Unrestricted Subsidiary (including the issuance of stock of an Unrestricted Subsidiary), non-Subsidiary joint venture or minority investment received by the Borrower or any Restricted Subsidiary (or the fair market value of the assets thereof that have been transferred to the Borrower or any Restricted Subsidiary), plus

(f)      to the extent not included in Consolidated Net Income, dividends, profits, or other distributions, returns on capital or similar amounts received by Holdings, the Borrower or any Restricted Subsidiary from an Unrestricted Subsidiary, non-Subsidiary joint venture or minority investment (or from the sale of the assets thereof), plus

(g)      to the extent not included in Consolidated Net Income, the aggregate proceeds and the fair market value (as reasonably determined by the Borrower) of marketable securities or other property received by the Borrower or a Restricted Subsidiary since the Effective Date from any Person other than the Borrower or a Restricted Subsidiary, plus

(h)      the aggregate amount of any Retained Declined Proceeds since the Effective Date, to the extent not applied to prepay any Permitted Junior Priority Refinancing Debt or pari passu Indebtedness as contemplated by Section 2.11(e) and Section 6.07(b), plus

(i)      the aggregate amount of any Retained Asset Sale Proceeds since the Effective Date.

"Available Equity Amount" means a cumulative amount equal to (without duplication):

(a)      the Net Proceeds of new public or private issuances of Qualified Equity Interests (excluding Qualified Equity Interests the proceeds of which will be applied as Cure Amounts) in the Borrower or any direct or indirect parent of the Borrower which are contributed to the Borrower, plus

(b)      capital contributions received by the Borrower after the Effective Date in cash or Permitted Investments (other than in respect of any Disqualified Equity Interest), plus

(c)      the net cash proceeds received by the Borrower or any Restricted Subsidiary from Indebtedness and Disqualified Equity Interest issuances issued after the Effective Date and which have been exchanged or converted into Qualified Equity Interests, plus

(d)      returns, profits, distributions and similar amounts received in cash or Permitted Investments by the Borrower or any Restricted Subsidiary on Investments made using the Available Equity Amount, plus

(e)      capital contributions in respect of Term Loans and Incremental Term Loans acquired by Affiliated Lenders (including Affiliated Debt Funds) that have been contributed to Holdings and subsequently contributed to the Borrower (other than in respect of any Disqualified Equity Interest and excluding amounts received from the Borrower or any Restricted Subsidiary) and cancelled after the Effective Date and on or prior to such date.

8

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, ~~as applicable, (x) if such Benchmark is a term rate,~~ any tenor for such Benchmark ~~(or payment period for interest calculated with reference to such Benchmark, as applicable,~~ component thereof) that is or may be used for determining the length of an ~~Interest Period~~ interest period pursuant to this Agreement ~~or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case,~~ as of such date and not including, for the avoidance of doubt, ~~shall exclude~~ any tenor for such Benchmark that is ~~removed~~then-removed from the definition of "Interest Period" pursuant to Section ~~1.10~~2.25.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Basel III" means: (A) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated; and (B) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011 as amended, supplemented or restated; and (C) any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

~~"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.~~

"Benchmark" means, initially, the ~~Screen~~Term SOFR Reference Rate; provided that if a Benchmark Transition Event ~~or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have~~has occurred with respect to the ~~Screen~~Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section ~~1.10~~2.25.

**"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:**

(a) the Adjusted Daily Simple SOFR; or

"Benchmark Replacement" means (b)  the sum of: (ai) the alternate benchmark rate (which may be a SOFR-Based Rate) that has been selected by the Administrative Agent and the Borrower giving due consideration to (iA) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (iiB) any evolving or then-prevailing market convention for determining a benchmark rate of interest as a replacement to the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities and (bii) the related Benchmark Replacement Adjustment; provided that, if .

If the Benchmark Replacement as so-determined pursuant to clause (a) or (b) above would be less than (i) in the case of the Initial Term Loans, 0.75% the Floor, the Benchmark Replacement will be deemed to be 0.75% the Floor for the purposes of this Agreement and (ii) otherwise, 0.00%, the Benchmark Replacement will be deemed to be 0.00% for the purposes of this Agreementthe other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the Adjusted LIBO Ratethen-current Benchmark with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (ia) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of thesuch Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (iib) any evolving or then-prevailing market convention for determining

a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of thesuch Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides, in consultation with the Borrower, is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlierearliest to occur of the following events with respect to the then-current Benchmark:

(1a)  in the case of clause (1a) or (2b) of the definition of "Benchmark Transition Event," the later of (ai) the date of the public statement or publication of information referenced therein and (bii) the date on which the administrator of thesuch Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide theall Available Tenors of such Benchmark (or such component thereof); or

10

Appx10143

(2~~b~~) in the case of clause (3~~c~~) of the definition of "Benchmark Transition Event," the ~~first~~ date ~~of the public~~ on which such Benchmark ~~or the published component used in the calculation thereof~~) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication ~~of information~~ referenced ~~therein~~ in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1~~a~~) a public statement or publication of information by or on behalf of the administrator of ~~the~~such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide ~~the~~all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely,~~;~~ provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide ~~the~~any Available Tenor of such Benchmark (or such component thereof);

(2~~b~~)   a public statement or publication of information by the regulatory supervisor for the administrator of ~~the~~such Benchmark~~, the U.S.~~ (or the published component used in the calculation thereof), the Federal Reserve ~~System~~Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for ~~the~~such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for ~~the~~such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for ~~the~~such Benchmark (or such component), which states that the administrator of ~~the~~such Benchmark (or such component) has ceased or will cease to provide ~~the~~all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely,~~;~~ provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide ~~the~~any Available Tenor of such Benchmark (or such component thereof); or

(3~~c~~)   a public statement or publication of information by the regulatory supervisor for the administrator of ~~the~~ ~~Benchmark announcing that the Benchmark is no longer~~such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not ~~be,~~ representative.

~~"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.~~

11

Appx10144

**For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).**

"Benchmark Unavailability Period" means, ~~if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Benchmark and solely to the extent that the Benchmark has not been replaced with a Benchmark Replacement,~~ the period (~~x~~if any) (a) beginning at the time that ~~such~~a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder **and under any Loan Document** in accordance with Section ~~1.10~~2.25 and (~~y~~b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder ~~pursuant to~~and under any Loan Document in accordance with Section ~~1.10~~2.25.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code, and (c) any Person whose assets include (for purposes of the ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

**"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.**

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on

behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Gogo. The term "Borrower" shall also include any Successor Borrower created pursuant to Section 6.03(a)(iv).

"Borrower Materials" has the meaning assigned to such term in Section 5.01.

"Borrower Offer of Specified Discount Prepayment" means the offer by the Borrower to make  a  voluntary prepayment  of  Term Loans  at  a  Specified  Discount  to  par  pursuant  to Section 2.11(a)(ii)(B).

"Borrower Solicitation of Discount Range Prepayment Offers" means the solicitation by the Borrower of offers for, and the corresponding acceptance by a Term Lender of, a voluntary prepayment of Term Loans at a specified range at a discount to par pursuant to Section 2.11(a)(ii)(C).

"Borrower Solicitation of Discounted Prepayment Offers" means the solicitation by the Borrower of offers for, and the subsequent acceptance, if any, by a Term Lender of, a voluntary prepayment

12

of Term Loans at a discount to par pursuant to Section 2.11(a)(ii)(D).

"Borrowing" means Loans of the same Class, Type and currency, made, converted or continued on the same date and, in the case of ~~Eurodollar~~SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means (i) in the case of a Borrowing denominated in Dollars or any Alternative Currency of Term Loans, $5,000,000, (ii) in the case of a ~~Eurodollar~~SOFR Revolving Borrowing, the lesser of $500,000 and the remaining Commitments of the applicable Class and (iii) in the case of an ABR Revolving Borrowing, the lesser of $250,000 and the remaining Commitments of the applicable Class.

"Borrowing Multiple" means in the case of a Borrowing denominated in Dollars or any Alternative Currency (i) in the case of Term Loans, $1,000,000, (ii) in the case of a ~~Eurodollar~~SOFR Revolving Borrowing, $500,000 and (iii) in the case of an ABR Revolving Borrowing, $250,000.

"Borrowing Request" means (i) a request by the Borrower for a Borrowing in accordance with Section 2.03 and (ii) with respect to Letters of Credit, a Letter of Credit Request.

"Business Day" means (i) subject to clause (ii) below, any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Requirements of Law to remain closed, and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on or with respect to, Loans denominated in any other Alternative Currency, any day that is a Business Day described in clause (i) and that is also a day which is not a legal holiday or a day on which banking institutions are authorized or required by Requirements of Law or other government action to remain closed in the country of issuance of the applicable currency.

"Canadian Dollars" or "CAD$" means the lawful money of Canada.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided that all obligations of any Person that are or would be characterized as an operating lease as determined in accordance with GAAP as in effect on December 31, 2018 (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease) for purposes of this Agreement regardless of any change in GAAP following December 31, 2018 that would otherwise require such obligation to be recharacterized as a Capital Lease Obligation, to the extent that financial reporting shall not be affected hereby or thereby. For purposes of Section 6.02, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Capitalized Leases" means all leases that have been or are required to be, in accordance with GAAP as in effect on December 31, 2018, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP; provided further that all obligations of any Person that are or would be characterized as an operating lease as determined in accordance with GAAP as in effect on December 31, 2018 (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capitalized Lease) for purposes of this Agreement regardless of any change in GAAP following December 31, 2018 that would otherwise require such

13

obligation to be recharacterized as a Capitalized Lease.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries.

"Cash Expenditures" means the sum, without duplication, of:

(a)     without duplication of the amounts in clause (e) below in prior fiscal years, the amount of capital expenditures and intellectual property development expenditures made in cash or accrued during such period, except to the extent that such expenditures were financed with the proceeds of long-term Indebtedness (other than revolving loans) of the Borrower and its Restricted Subsidiaries;

(b)     the aggregate amount of all principal payments of Indebtedness (including (1) the principal component of payments in respect of Capitalized Leases and (2) the amount of any mandatory prepayment of Loans to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of the amount of such increase, but excluding all other prepayments of Term Loans and other Senior Secured First Lien Indebtedness and all prepayments of revolving loans (including Revolving Loans (except to the extent the prepayment thereof reduces the Borrower's prepayment obligation pursuant to clause (i) of the proviso to the first sentence of Section 2.11(d)) made during such period, other than (A) in respect of any revolving credit facility except to the extent there is an equivalent permanent reduction in commitments thereunder and (B) to the extent financed with the proceeds of other long-term Indebtedness (other than revolving loans) of the Borrower or its Restricted Subsidiaries;

(c)     at the option of the Borrower, without duplication of amounts pursuant to clause (e) below in prior fiscal years, the amount of Investments (other than Investments in Permitted Investments) and acquisitions made in accordance with Section 6.04 (other than Investments pursuant to Section 6.04(a), (c), (e)(ii), (g), (k), (o), (p), (q) or (hh)) to the extent that such Investments and acquisitions were not financed with the proceeds of long-term Indebtedness (other than revolving loans) of the Borrower or its Restricted Subsidiaries;

(d)     at the option of the Borrower, the amount of dividends and other Restricted Payments (including the amount of Tax Distributions made by the Borrower during such period or payable after such period in respect of income generated during such period) pursuant to Section 6.07(a) (other than pursuant to Section 6.07(a)(i), (a)(viii), (a)(xiii) or (a)(xvii)(2)), in each case to the extent not deducted in arriving at Consolidated Net Income) and paid in cash during such period or payable in respect of such period, to the extent such dividends and Restricted Payments were not financed with the proceeds of long-term Indebtedness (other than revolving loans) of the Borrower or its Restricted Subsidiaries; provided that any amount included pursuant to this clause (d) for such period in respect of amounts payable during a subsequent period shall not be included in any subsequent period and, to the extent not actually paid during such subsequent period, shall be subtracted from Cash Expenditures for such subsequent period;

(e)     at the option of the Borrower, and without duplication of amounts included in Cash Expenditures in prior periods, (1) the aggregate consideration required to be paid in cash by the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts, commitments, letters of intent or purchase orders (the "Contract Consideration"), in each case, entered into prior to or during such period, or at the option of the Borrower, after the applicable period and prior to the applicable Excess Cash Flow due date, and (2) to the extent set forth in a certificate of a Financial Officer delivered to the Administrative Agent at or before the time the Compliance Certificate for the period ending simultaneously with such Test

14

Period is required to be delivered pursuant to Section 5.01(d) (which shall be satisfied if such certification is included in the Compliance Certificate), the aggregate amount of Cash that is reasonably expected to be paid in respect of planned cash expenditures by the Borrower or any of the Restricted Subsidiaries (the "Planned Expenditures"), in the case of each of clauses (1) and (2), relating to Permitted Acquisitions, other Investments (other than Investments in Permitted Investments pursuant to Section 6.04(a) and Investments pursuant to Section 6.04(a), (c), (e)(ii), (g), (k), (o), (p), (q) or (hh)), restructuring charges, or capital expenditures (including Capitalized Software Expenditures or other purchases or development of Intellectual Property) to be consummated or made during a subsequent Test Period (and in the case of Planned Expenditures, the immediately succeeding fiscal year); provided, that to the extent the aggregate amount of proceeds actually utilized to finance such Permitted Acquisitions, Investments, restructuring charges or capital expenditures during such Test Period is less than the Contract Consideration and Planned Expenditures, the amount of such shortfall shall be subtracted from Cash Expenditures at the end of such Test Period;

(f)     the aggregate amount of payments and expenditures actually made by the Borrower and its Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees and restructuring charges) to the extent that such payments and expenditures are not expensed or did not otherwise reduce Consolidated Net Income or are added back to Consolidated Net Income during such period; and

(g)     the amount of taxes (including penalties and interest) paid in cash and/or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period.

"Cash Interest Coverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (1) Consolidated EBITDA to (2) Consolidated Cash Interest Expense for such Test Period.

"Cash Management Obligations" means (a) obligations of Holdings, the Borrower or any Restricted Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"Cash Management Services" has the meaning assigned to such term in the definition of "Secured Cash Management Obligations."

"Casualty Event" means any event that gives rise to the receipt by Holdings, the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in an amount in excess of $15,000,000 in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"CFC" means a "controlled foreign corporation" within the meaning of Sections 956 and 957 of the Code.

"Change in Control" means (a) the failure of Holdings directly or indirectly through wholly owned subsidiaries, to own all of the Equity Interests of the Borrower, or (b) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group, other than the Permitted Holders, (directly or indirectly, including through one or more holding companies), of the Equity Interests in Holdings representing 50% or more of the aggregate ordinary voting power for the election of members of the Board of Directors of Holdings represented by the issued and outstanding Equity Interests in Holdings, unless the Permitted Holders (directly or indirectly, including through one of more holding

15

companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of Directors of Holdings. For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13d-3 and 13d-5 under the Exchange Act, (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding Equity Interests of Holdings or the Borrower, as applicable, directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (b) of this definition is triggered.

Notwithstanding the preceding or any provision of Section 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Equity Interests subject to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Equity Interests in connection with the transactions contemplated by such agreement and (ii) the right to acquire Equity Interests (so long as such Person does not have the right to direct the voting of the Equity Interests subject to such right) or any veto power in connection with the acquisition or disposition of Equity Interests will not cause a party to be a beneficial owner.

"Change in Law" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by the United States, Canada, the European Union, United Kingdom or other foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," but only to the extent such rules, regulations, or published interpretations or directives are applied to Holdings and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including, without limitation, to the extent enacted, adopted, promulgated or issued after the date of this Agreement, for purposes of Section 2.15.

"Class" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Other Revolving Loans, Term Loans, Incremental Term Loans or Other Term Loans, (b) any Commitment, refers to whether such Commitment is a Revolving Commitment, Additional/Replacement Revolving Commitment, Other Revolving Commitment, Term Commitment or Other Term Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments. Other Term Commitments, Other Term Loans, Other Revolving Commitments (and the Other Revolving Loans made pursuant thereto), Additional/Replacement Revolving Commitments and Incremental Term Loans that have different terms and conditions shall be construed to be in different Classes.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured

16

Obligations.

"<u>Collateral Agent</u>" has the meaning given to such term in Section 8.01(b) and its successors in such capacity as provided in Article VIII.

"<u>Collateral Agreement</u>" means the Collateral Agreement among the Loan Parties party thereto and the Collateral Agent, substantially in the form of Exhibit D.

"<u>Collateral and Guarantee Requirement</u>" means, at any time, the requirement that:

(a)      the Administrative Agent shall have received from (i) Holdings, the Borrower and each of the Restricted Subsidiaries (other than any Excluded Subsidiary) either (x) a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Guarantee Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person and (ii) Holdings, the Borrower and each Subsidiary Loan Party either (x) a counterpart of each applicable Security Document duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Subsidiary Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), either (A) to the extent applicable, a supplement to each applicable Security Document, substantially the form specified therein, duly executed and delivered on behalf of such Person or (B) a Security Document, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent, documents of the type referred to in Section 4.01(d) within the time periods set forth in Sections 5.11 and 5.12;

(b)      all outstanding Equity Interests of the Borrower, and each Restricted Subsidiary (other than any Equity Interests constituting Excluded Assets) owned by or on behalf of any Loan Party, shall have been pledged, charged or otherwise made subject to security pursuant to the applicable Security Document, and the Administrative Agent shall have received certificates, if any, representing all such Equity Interests to the extent constituting "certificated securities", together with all certificates, documents of title and other documentary evidence of ownership and undated stock powers or other instruments of transfer with respect thereto endorsed in blank, in each case, to the extent required to perfect the security interest therein under the laws of the United States or any state thereof;

(c)      if any Indebtedness for borrowed money of Holdings, the Borrower or any Subsidiary in a principal amount of $25,000,000 or more is owing by such obligor to any Loan Party and such Indebtedness shall be evidenced by a promissory note, such promissory note shall be pledged or otherwise secured pursuant to the applicable Security Document, and the Administrative Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank; <u>provided</u>, however, that the foregoing delivery requirement with respect to any intercompany indebtedness may be satisfied by delivery of an omnibus or global intercompany note executed by all Loan Parties as payees and all such obligors as payors;

(d)      all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and Intellectual Property Security Agreements with respect to any Trademarks, Patents and Copyrights that are registered, issued or applied-for in the United States and that constitute Collateral, for the filing with the United States Patent and Trademark Office and the United States Copyright Office to the extent required by this Agreement, the Security Documents, Requirements of Law and as reasonably requested by the Administrative Agent to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, this Agreement, the Security Documents and the other

17

provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording; and

(e)  the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property duly executed and delivered by the record owner of such Mortgaged Property (if the Mortgaged Property is in a jurisdiction that imposes a mortgage recording or similar tax is imposed on the amount secured by such Mortgage, then the amount secured by such Mortgage shall be limited to the fair market value of such Mortgaged Property, as reasonably determined by Holdings), (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements (other than a creditor's rights endorsement) as the Administrative Agent may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that the Administrative Agent shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the fair market value of such Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will the Borrower be required to obtain independent appraisals of such Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property, and if any Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be located in special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 5.07(b), (iv) in each case if reasonably requested by the Administrative Agent, a customary legal opinion with respect to each such Mortgage, from counsel qualified to opine in each jurisdiction (i) where a Mortgaged Property is located regarding the enforceability of the Mortgage and (ii) where the applicable Loan Party granting the Mortgage on said Mortgaged Property is organized or incorporated, regarding the due authorization, execution and delivery of such Mortgage, and in each case, such other customary matters as may be in form and substance reasonably satisfactory to the Administrative Agent, (v) a survey or existing survey together with a no change affidavit of such Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys and otherwise reasonably satisfactory to the Administrative Agent, and (vi) evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary, if, and for so long as the Administrative Agent and the Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of withholding or other material taxes)), is excessive in relation to the benefits to be obtained by the Lenders therefrom; (b) Liens required to be granted from time to time pursuant to the term "Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in this Agreement and the Security Documents; (c) in no event shall control agreements or other control or similar arrangements be required with respect to cash, Permitted Investments, other deposit accounts, securities and commodities accounts (including securities entitlements and related assets), letter of credit rights or other assets requiring perfection by control (but not, for avoidance of doubt, possession); (d) in no event shall any Loan Party be required to complete any filings

18

or other action with respect to the perfection of security interests in any jurisdiction outside of the United States (or any state, commonwealth or territory thereof or the District of Columbia) or with respect to an Electing Foreign Guarantor, its Applicable Country, or to perfect or make enforceable any security interests in any such assets (it being understood that all security granted by a Loan Party located in the United States (or any state, commonwealth or territory thereof or the District of Columbia) (other than Mortgages) shall be governed by the law of the state of New York); (e) in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements; (f) other than the filing of UCC financing statements (and, if applicable, corresponding or customary filings in an Applicable Country with respect to an Electing Foreign Guarantor), no perfection shall be required with respect to promissory notes evidencing debt for borrowed money in a principal amount of less than $25,000,000; (g) in no event shall any Loan Party be required to complete any filings or other action (including entering into any source code escrow arrangements or seeking registration of any Copyrights) with respect to security interests in Intellectual Property beyond the filing of Intellectual Property Security Agreements with the United States Patent and Trademark Office and the United States Copyright Office; (h) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements (and, if applicable, corresponding or customary filings in an Applicable Country with respect to an Electing Foreign Guarantor)); (i) in no event shall environmental reports be required to be delivered to the Administrative Agent or the Lenders; (j) in no event shall notices be required to be sent to account debtors or other contractual third-parties unless an Event of Default has not been cured or waived and is continuing and the Loans have been accelerated pursuant to Section 7.01 or are otherwise due and payable in full; and (l) in no event shall the Collateral include any Excluded Assets. The Administrative Agent may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) and any other obligations under this definition where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement (including as set forth on Schedule 5.14) or the Security Documents.

"Commitment" means with respect to any Lender, its Revolving Commitment, Other Revolving Commitment of any Class, Term Commitment, Other Term Commitment of any Class or any combination thereof (as the context requires).

"Commitment Fee Percentage" means, for any day, the applicable percentage set forth below under the caption "Commitment Fee Percentage" based upon the Senior Secured First Lien Net Leverage Ratio as of the end of the fiscal quarter of the Borrower for which consolidated financial statements have theretofore been most recently delivered pursuant to Section 5.01(a) or 5.01(b); provided that, until the date of the delivery of the consolidated financial statements pursuant to Section 5.01(b) as of and for the fiscal quarter ended September 30, 2021, the Commitment Fee Percentage shall be based on the rates per annum set forth in Category 1:

| Senior Secured First Lien Net Leverage Ratio | Commitment Fee Percentage |
|---|---|
| Category 1<br>Greater than or equal to 5.00 to 1.00 | 0.50% |
| Category 2<br>Less than 5.00 to 1.00 but greater than or equal to 4.00 to 1.00 | 0.375% |

19

Category 3
Less than 4.00 to 1.00    0.25%

For purposes of the foregoing, each change in the Commitment Fee Percentage resulting from a change in the Senior Secured First Lien Net Leverage Ratio shall be effective during the period commencing on and including the date of delivery to the Administrative Agent pursuant to

Section 5.01(a) or 5.01(b) of the consolidated financial statements and related Compliance Certificate indicating such change and ending on the date immediately preceding the effective date of the next such change. Notwithstanding the foregoing, the Commitment Fee Percentage, at the option of the Administrative Agent or the Required Revolving Lenders, shall be based on the rates per annum set forth in the next highest category if the Borrower fails to deliver the consolidated financial statements required to be delivered pursuant to Section 5.01(a) or 5.01(b) within thirty (30) days after the time periods specified herein for such delivery, during the period commencing on the date that is thirty (30) days after the date such financial statements were required to be delivered pursuant to Section 5.01(a) or 5.01(b) until the date that such financial statements are so delivered.

"Commitment Letter" means the commitment letter among the Borrower and the Joint Lead Arrangers dated as of March 31 2021.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications Act" means the Communications Act of 1934, as amended, and any similar or successor Federal statute, and the rules and regulations of the FCC or any other similar or successor agency thereunder.

"Communications Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued , promulgated or entered into by a Governmental Authority (including the FCC) relating in any way to the use of radio frequency spectrum or the offering or provision of video, communications, telecommunications or information services (including the Communications Act).

"Compliance Certificate" means the certificate required to be delivered pursuant to Section 5.01(d).

"Compounded SOFR" means the compounded average of SOFR for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent in accordance with:

(1)  the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that:

(2)  if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines are substantially consistent with prevailing market convention for determining Compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time (as a result of amendment or as originally executed);

20

provided, further, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (y) or clause (z) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement".

**"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Administrative Agent decides, in consultation with the Borrower, may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides, in consultation with the Borrower, is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).**

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Cash Interest Expense" means cash interest expense (including respect of Capitalized Lease Obligations and dividends in respect of Disqualified Equity Interests), net of cash interest income of the Borrower and its Restricted Subsidiaries, including all commissions, discounts and other cash fees and charges owed with respect to letters of credit and bankers' acceptance financing and net cash costs (less net cash payments) under Swap Agreements, but excluding, for the avoidance of doubt, (a) any non-cash interest expense, (b) capitalized interest, whether paid or accrued, (c) the amortization of original issue discount resulting from the issuance of indebtedness at less than par, (d) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses, (e) any expenses resulting from discounting of Indebtedness in connection with the application of recapitalization account or purchase accounting, (f) penalties or interest related to taxes and any other amounts of non-cash interest resulting from the effects of acquisition method accounting or purchase accounting, (g) the accretion or accrual of, or accrued interest on, discounted liabilities (other than indebtedness) during such period, (h) non-cash interest expense attributable to the movement of the mark-to-market valuation of hedging Obligations or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging, (k) all non-recurring interest expenses consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP and (l) expensing of bridge, arrangement, structuring, commitment or other financing fees; provided however for purposes of determining the Cash Interest Coverage Ratio for any relevant Test Period prior to the first anniversary of the Closing Date, Consolidated Cash Interest Expense shall be calculated on an annualized basis.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent deducted (and not added back), other than with respect to clauses (xvi), (xx) and (xxi), in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total interest expense and, to the extent not reflected in such total interest expense, the sum of (A) premium payments, debt discount, fees, charges and related expenses incurred in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets plus (B) the portion of rent expense with respect to such period under Capitalized Leases that is treated as interest expense in accordance with GAAP plus (C) the implied interest component of synthetic leases with respect to such period plus (D) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments plus (E) bank and letter of credit fees and banker's acceptance fees and costs of surety bonds in connection with financing activities, plus (F) any commissions, discounts, yield and other fees and charges (including any interest expense) related to any Qualified Securitization Facility plus (G) all cash dividend payments on any series of preferred stock or Disqualified Equity Interests, in each case, that constitutes Indebtedness;

(ii)    provision for taxes based on income, profits or capital and sales taxes, including federal, foreign, state, franchise, excise, and similar taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations;

(iii)    Non-Cash Charges as elected by the Borrower;

(iv)    operating expenses incurred on or prior to the Effective Date attributable to (A) salary obligations paid to employees terminated prior to the Effective Date and (B) wages paid to executives in excess of the amounts Gogo and its Subsidiaries are required to pay pursuant to any employment agreements;

(v)    extraordinary charges, expenses or losses in accordance with GAAP;

22

(vi)        unusual, exceptional or non-recurring charges, expenses or losses and any other charge, expense or loss not in the ordinary course of business (including any unusual or non-recurring operating expenses directly attributable to the implementation of cost savings initiatives), integration costs, severance, relocation costs, office and facilities' opening costs and other business optimization expenses (including related to new product introductions and new system design and implementation costs), recruiting costs and fees, signing fees, expenses, costs and bonuses, retention or completion bonuses, contract termination costs, transaction fees and expenses, transition costs, systems establishment costs, costs related to closure/consolidation of office and facilities, costs related to the implementation of operational and reporting systems and technology initiatives, consulting fees and expenses, any one time expense relating to enhanced accounting function or other transaction costs (including those associated with becoming a standalone entity or a public company), expenses relating to any decommissioning or reconfiguration of fixed assets for alternative use, costs incurred in connection with acquisitions and non-recurring intellectual property development, internal costs in respect of strategic initiatives and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), project start up costs, Public Company Costs or any other costs incurred in connection with any of the foregoing;

(vii)        restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves, including with respect to the items described in clause (III) below), whether or not classified as restructuring expense on the consolidated financial statements;

(viii)        minority interest expense and the amount of any non-controlling interest consisting of income attributable to non-controlling interests of third parties in any Non-Wholly Owned Subsidiary deducted (and not added back in such period) in calculating Consolidated Net Income;

(ix)        the amount of expenses relating to payments made to option holders of the Borrower, Holdings or any Holdings Parent in connection with, or as a result of, any distribution being made to shareholders of such Person or its direct or indirect parent companies, which payments are being made to compensate such option holders as though they were shareholders at the time of, and entitled to share in, such distribution, in each case to the extent permitted by the Loan Documents;

(x)        (A) losses on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business) and (B) any net loss from operations expected to be disposed of, abandoned or discontinued within twelve months after the end of such period;

(xi)        any non-cash loss attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging but only to the extent the cash impact resulting from such loss has not been realized);

(xii)        any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(xiii)        [reserved];

23



(xiv)    any costs or expenses incurred by Holdings, the Borrower or any Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Borrower or Net Proceeds of an issuance of Equity Interests of Holdings (other than Disqualified Equity Interests);

(xv)    any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature;

(xvi)    (A) any add-backs and adjustments of the type set forth in the Model or the Information Memorandum, (B) adjustments specified in any quality of earnings or similar report prepared by independent certified public accountants of nationally recognized standing or any other accounting firm reasonably acceptable to the Administrative Agent in connection with any acquisition and (C) adjustments consistent with Regulation S-X;

(xvii)    the amount of losses on Dispositions of accounts receivable, Securitization Assets and related assets incurred in connection with a Qualified Securitization Facility;

(xviii)    any increase in expenses resulting from the revaluation of inventory (including any impact of changes of inventory valuation policy methods including changes in capitalization of variances), other inventory adjustments or any increase in expenses due to purchase accounting;

(xix)    charges, losses or expenses to the extent indemnified or insured or reimbursed or otherwise paid in cash by a third party (or reasonably expected to be so paid or reimbursed within 365 days after the end of such period (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days));

(xx)    solely for purposes of determining compliance with the Financial Performance Covenant in respect of any period which includes the exercise of a Cure Right (but not for the determination of Consolidated EBITDA for any other purposes), any Cure Amount;

(xxi)    to the extent that any Holdings Parent Specified Expenses would have been added back to Consolidated EBITDA pursuant to clauses (a)(i) through (xx) above had such charge, tax or expense been incurred directly by Holdings, such Holdings Parent Specified Expenses; and

(xxii)    costs, charges, accruals, reserves or expenses (including rationalization, legal, tax, structuring, financial advisory, investment banking, any transaction or retention bonus or similar payment and fees, costs and expenses of any counsel, consultants or other advisors and other costs and expenses) attributable to the undertaking and/or implementation of any Specified Transaction or any of the items in clause (b) and/or clauses (II) and (III) to the proviso below (in each case, whether or not consummated);

plus

24

(b) with application of run rate cost savings, operating expense reductions, other operating improvements and "run rate" synergies related to the Transactions, any Specified Transaction, any restructuring, cost saving initiative or other initiative, in each case, which are factually supportable and projected by the Borrower in good faith to result from actions with respect to which substantial steps have been, will be, or are expected to be taken (in the good faith determination of the Borrower), in each case on or prior to the date that is 24 months after such Transactions, Specified Transaction, restructuring, cost saving initiative or other initiative is initiated (including new contracts and optimization actions and including actions initiated prior to the Effective Date) (which cost savings, operating expense reductions, other operating improvements and synergies shall be added to Consolidated EBITDA until fully realized and calculated on a pro forma basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of the relevant period), net of the amount of actual benefits realized from such actions; provided that no cost savings, operating expense reductions, other operating improvements or synergies shall be added pursuant to this clause (b) to the extent duplicative of any expenses or charges relating to such cost savings, operating expense reductions or synergies that are included in clauses (a)(vi) and (a)(vii) above or in the definition of "Pro Forma Adjustment" (it being understood and agreed that "run rate" shall mean the full recurring benefit that is associated with any action taken);

plus

(c) to the extent covered by business interruption insurance and actually reimbursed or otherwise paid in cash, expenses or losses relating to business interruption or, so long as Holdings or the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days);

less

(d) without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i) extraordinary gains and unusual or non-recurring gains and any other gains not in the ordinary course of business;

(ii) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period);

(iii) gains on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business); and

(iv) any loss relating to hedging obligations associated with transactions realized in the current period that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clauses (a)(xii) and (a)(xiii) above; plus

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries in accordance with GAAP; provided that:

25

(y) to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging,

(II)       there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) to the extent not included in Consolidated Net Income, the Acquired EBITDA of any Person, property, business, line of business, division, business unit or asset acquired by Holdings, the Borrower or any Restricted Subsidiary during such period (other than any Unrestricted Subsidiary) to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business, line of business, division, business unit or assets to the extent not so acquired) (including the commencement of activities constituting such business) (each such Person, property, business, line of business, division, business unit or asset acquired, including pursuant to the Transactions or pursuant to a transaction consummated prior to the Effective Date, and not subsequently so disposed of, an "Acquired Entity or Business"), and the Acquired EBITDA of any Unrestricted Subsidiary that is converted into a Restricted Subsidiary during such period (each, a "Converted Restricted Subsidiary"), in each case based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical Pro Forma Basis, (B) an adjustment equal to the amount of the Pro Forma Adjustment for such period (including the portion thereof occurring prior to such acquisition or conversion) and (C) the aggregate amount of consolidated net income projected by the Borrower in good faith to result from binding contracts (or amendments or supplements to existing contracts) entered into (or reasonably anticipated to be entered into (including amendments and supplements to existing contracts), as determined by the Borrower in good faith) (x) during such period, (y) after such period or (z) prior to the commencement of such period if, in the case of this clause (z), as of such date, the expected full run-rate benefit of such previously entered into contract (together with any amendments or supplements thereto up to the date of determination) shall not have been realized (as determined by the Borrower in good faith);

(III)      there shall be (A) to the extent included in Consolidated Net Income, excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business, line of business, division, business unit or asset (other than any Unrestricted Subsidiary) sold, transferred or otherwise disposed of, closed or classified as discontinued operations in accordance with GAAP (other than (x) if so classified on the basis that it is being held for sale unless such sale has actually occurred during such period and (y) for periods prior to the applicable sale, transfer or other disposition, if the Disposed EBITDA of such Person, property, business, line of business, division, business unit or asset is positive (i.e., if such Disposed EBITDA is negative, it shall be added back in determining Consolidated EBITDA for any period)) by Holdings, the Borrower or any Restricted Subsidiary during such period (each such Person, property, business, line of business, division, business unit or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity or Business"), and the Disposed EBITDA of any Restricted Subsidiary that is converted into an Unrestricted Subsidiary during such period (each, a "Converted Unrestricted Subsidiary"), in each case based on the Disposed EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical Pro Forma Basis and (B) to the extent not included in Consolidated Net Income, included in determining Consolidated EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal);

26

(IV)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA any expense (or income) as a result of adjustments recorded to contingent consideration liabilities relating to the Transaction or any Permitted Acquisition (or other Investment permitted hereunder); and

(V)    to the extent not already included in Consolidated Net Income, Consolidated EBITDA shall include the amount of proceeds received or due from reimbursement of expenses and charges pursuant to indemnification and other reimbursement provisions in connection with any acquisition or other Investment or any disposition of any asset permitted hereunder.

For the purposes of determining Consolidated EBITDA prior to December 31, 2021, Consolidated EBITDA shall be deemed to equal (a) for the Test Period ended December 31, 2020, 2020 Q4 EBITDA Amount multiplied by four, (b) for the Test Period ended March 31, 2021 (i) 2020 Q4 EBITDA Amount multiplied by three, plus (ii) Consolidated EBITDA for the fiscal quarter ended March 31, 2021, (c) for the Test Period ending June 30, 2021 (i) 2020 Q4 EBITDA Amount multiplied by two, plus (ii) Consolidated EBITDA for each of the fiscal quarters ending March 31, 2021 and June 30, 2021, and (d) for the Test Period ending September 30, 2021 (i) 2020 Q4 EBITDA Amount plus (ii) Consolidated EBITDA for each of the fiscal quarters ending March 31, 2021, June 30, 2021 and September 30, 2021 (it being understood that such amounts are subject to adjustments, as and to the extent otherwise contemplated in this Agreement, in connection with any Pro Forma Adjustment, any calculation on a Pro Forma Basis or any adjustment pursuant to clause (b)(i) above).

"Consolidated Net Income" means, for any period, the net income (loss) of the Borrower and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)    extraordinary items for such period,

(b)    the cumulative effect of any change in accounting principles during such period,

(c)    any Transaction Costs incurred during such period,

(d)    any accruals, payments, fees, costs and expenses (including rationalization, legal, tax, structuring, financial advisory, investment banking, any transaction or retention bonus or similar payment and fees, costs and expenses of any counsel, consultants or other advisors and other costs and expenses) incurred during such period, or any amortization thereof for such period, in connection with the Transactions, any Specified Transactions, any non-recurring costs to acquire equipment to the extent not capitalized in accordance with GAAP, Investments (including any earn-outs), Restricted Payments, Dispositions, recapitalization, issuances of Indebtedness or Equity Interests (including any initial public offering) or repayment of debt, refinancing transactions or amendment or other modification of any debt instrument, and restructurings, workouts and extensions and refinancings of any of the foregoing, non-competition agreements, one-time accruals, up-front fees, financing fees, commitment fees, costs, expenses or premiums related to any repayment of debt, issuance of equity securities, refinancing transaction or amendment or other modification of or waiver or consent relating to any debt instrument (in each case, including the Transaction Costs and any such transaction consummated prior to the Effective Date and any such transaction undertaken but not completed and including costs and expenses of the Administrative Agent and Lenders that are reimbursed and fees paid to the Permitted Holders) and any charges or non-recurring merger or amalgamation costs incurred

27

during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the costs of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

        (e)      any income (loss) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

        (f)      accruals and reserves that are established or adjusted as a result of the Transactions or any Permitted Acquisition or other Investment not prohibited under this Agreement in accordance with GAAP (including any adjustment of estimated payouts on earn-outs) or changes as a result of the adoption or modification of accounting policies during such period;

        (g)      stock-based award compensation expenses,

        (h)      any income (loss) attributable to deferred compensation plans or trusts,

        (i)      the amount of any expense required to be recorded as compensation expense related to contingent transaction consideration,

        (j)      currency translation gains and losses related to currency remeasurements of assets, liabilities or indebtedness (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

        (k)      costs related to the implementation of operational and reporting systems and technology initiatives; and

        (l)      the non-cash portion of "straight-line" rent expense less the cash portion of "straight-line" rent expense which exceeds the amount expensed in respect of such rent expense,

There shall be included in Consolidated Net Income, without duplication, (i) the amount of any cash tax benefits related to the tax amortization of intangible assets in such period, (ii) any dividends or other distributions received in cash or other Permitted Investments from Unrestricted Subsidiaries and (iii) the effects from applying acquisition method accounting, including applying acquisition method accounting or recapitalization accounting adjustments to inventory, property and equipment, loans and leases, software, goodwill, in process research and development and other intangible assets and deferred revenue (including deferred costs related thereto) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and its Restricted Subsidiaries), as a result of the Transactions, any acquisition or Investment consummated prior to the Effective Date and any Permitted Acquisitions (or other Investment not prohibited hereunder) or the amortization or write-off of any amounts thereof.

"Consolidated Net Tangible Assets" means the aggregate amount of assets (including deferred tax assets (without reducing such deferred tax assets by deferred tax liabilities) after deducting therefrom all goodwill, trade names, trademarks, patents, unamortized debt discount and expense, investments and other like intangibles, all as set forth in the most recent consolidated balance sheet of the Borrower and its Restricted Subsidiaries, determined on a Pro Forma Basis.

"Consolidated Senior Secured First Lien Net Indebtedness" means, as of any date of determination, the aggregate amount of Senior Secured First Lien Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with

GAAP, consisting only of Senior Secured First Lien Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit (and in the case of trade letters of credit, unreimbursed for more than three (3) Business Days) and the principal portion of obligations in respect of Capitalized Leases but excluding any obligations under or in respect of Qualified Securitization Facilities, minus the aggregate amount of cash and Permitted Investments of the Borrower and its Restricted Subsidiaries (excluding cash and Permitted Investments that are listed as "restricted" on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, other than any such amounts that are restricted in favor of the Administrative Agent).

"Consolidated Senior Secured Net Indebtedness" means, as of any date of determination, the aggregate amount of Senior Secured Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, consisting only of Senior Secured Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit (and in the case of trade letters of credit, unreimbursed for more than three (3) Business Days) and the principal portion of obligations in respect of Capitalized Leases, but excluding any obligations under or in respect of Qualified Securitization Facilities, minus the aggregate amount of cash and Permitted Investments of the Borrower and its Restricted Subsidiaries (excluding cash and Permitted Investments that are listed as "restricted" on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, other than any such amounts that are restricted in favor of the Administrative Agent).

"Consolidated Total Net Indebtedness" means, as of any date of determination, the aggregate amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, consisting only of Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit (and in the case of trade letters of credit, unreimbursed for more than three (3) Business Days) and the principal portion of obligations in respect of Capitalized Leases, but excluding any obligations under or in respect of Qualified Securitization Facilities, minus the aggregate amount of cash and Permitted Investments of the Borrower and its Restricted Subsidiaries (excluding cash and Permitted Investments that are listed as "restricted" on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of such date, other than any such amounts that are restricted in favor of the Administrative Agent).

"Consolidated Working Capital" means, at any date, the excess (which may be negative) of (a) the sum of all amounts (other than cash and Permitted Investments) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date, excluding the current portion of deferred income taxes over (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries on such date, but excluding, without duplication, (i) the current portion of any Funded Debt, (ii) all Indebtedness consisting of Loans and obligations under Letters of Credit and Capital Lease Obligations to the extent otherwise included therein, (iii) the current portion of interest, (iv) the current portion of current and deferred income taxes, (v) accrual of any costs or expenses related to restructuring reserves, (vi) the current portion of pension liabilities and (vii) deferred revenue; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in working capital (A) arising from acquisitions or dispositions by the Borrower and its Restricted Subsidiaries shall be measured from the date on which such acquisition or disposition occurred until the first anniversary of such acquisition or disposition with respect to the Person subject to such acquisition or disposition and (B) shall exclude (I) the impact of non-cash adjustments contemplated in the Excess Cash Flow calculation, (II) the impact of adjusting items in the definition of Consolidated Net Income and (III) any changes in current assets or current liabilities as a result of (x) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under hedging agreements or other derivative obligations or (y) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent.

"Contract Consideration" has the meaning assigned to such term in the definition of "Excess Cash Flow."

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Converted Restricted Subsidiary" has the meaning given such term in the definition of "Consolidated EBITDA."

"Converted Unrestricted Subsidiary" has the meaning given such term in the definition of "Consolidated EBITDA."

"Copyright" has the meaning assigned to such term in the Collateral Agreement. "Corresponding Tenor" with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the Benchmark. "Covered Entity" means any of the following:

    (i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

    (ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

    (iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Credit Agreement Refinancing Indebtedness" means Indebtedness issued, incurred or otherwise obtained by the Borrower (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Term Loans, Revolving Loans (or unused Revolving Commitments), ("Refinanced Debt"); provided that such exchanging, extending, renewing, replacing or refinancing Indebtedness (a) is in an original aggregate principal amount not greater than the aggregate principal amount of the Refinanced Debt (plus any premium, original issue discount and upfront fees, accrued interest and fees and expenses incurred in connection with such exchange, extension, renewal, repayment, replacement or refinancing and the incurrence of such new Credit Agreement Refinancing Indebtedness) plus additional amounts to the extent otherwise permitted to be incurred under this Agreement (which additional amounts, for the avoidance of doubt, shall constitute a utilization of the relevant basket or exception pursuant to which such additional amount is permitted to be incurred), (b) (i) except in the case of Extendable Bridge Loans, does not mature earlier than or, except in the case of Revolving Commitments, have a Weighted Average Life to Maturity shorter than the Refinanced Debt and (ii) if such Indebtedness is unsecured or secured by the Collateral on a junior lien basis to the Secured Obligations, does not have scheduled amortization or required payments of principal prior to the maturity date of the Refinanced Debt (except in the case of Extendable Bridge Loans) (except for customary payments in respect of asset sales, insurance and condemnation proceeds events, change of control or similar events and AHYDO catch up payments and offers to purchase upon an event of default), (c) shall not be guaranteed by any entity that is not, or that does not substantially concurrently become, a Loan Party, (d) in the case of any secured Indebtedness that is (i) not secured by any assets not securing the Secured Obligations and (ii) subject to the relevant Intercreditor Agreement(s), (e) solely in the case such Credit Agreement Refinancing Indebtedness is pari passu in right of payment and security with the Initial Term Loans, such Credit Agreement Refinancing Indebtedness may participate on a pro rata basis (or on less than a pro rata basis if the Borrower and the Lenders thereunder elect lesser payments) (but not greater than pro rata basis) in any mandatory prepayments hereunder (other than mandatory prepayments resulting from a refinancing of any facility which may be applied exclusively to the facility being refinanced), and (f) has covenants and events of default (excluding, for the avoidance of doubt, pricing, interest rate margins, rate floors, discounts, fees, collateral, guarantees, premiums and prepayment or redemption provisions) that are not materially more favorable (when taken as a whole) to the lenders or investors providing such Indebtedness than the covenants and events of default of this Agreement (when taken as a whole) are to the Lenders (unless (x) such covenants or other provisions are applicable only to periods after the maturity date of the Refinanced Debt at the time of such refinancing, (y) the Revolving Lenders or the Lenders under the Initial Term Loans, as applicable, also receive the benefit of such more favorable covenants and events of default (together with, at the election of the Borrower, any applicable "equity cure" provisions with respect to any financial maintenance covenant) (it being understood that, to the extent that any covenant, event of default or guarantee is added or modified for the benefit of any such Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders if such covenant, event of default or guarantee is (i) also added or modified for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of such Indebtedness, or (ii) with respect to any "springing" financial maintenance covenant or other covenant only applicable to, or for the benefit of, a revolving credit facility, also added for the benefit of each revolving credit facility hereunder (and not for the benefit of any term loan facility hereunder) or (iii) only applicable after the Latest Maturity Date at the time of such refinancing) or (z) such terms and conditions are otherwise on current market terms (in the good faith judgment of the Borrower)). For the avoidance of doubt, it is understood and agreed that (x) notwithstanding anything in this Agreement to the contrary, in the case of any Indebtedness incurred to modify, refinance, refund, extend, renew or replace Indebtedness initially incurred in reliance on and measured by reference to a percentage of Consolidated EBITDA at the time of incurrence, and such modification, refinancing, refunding, extension, renewal or replacement would cause the percentage of Consolidated EBITDA to be exceeded if calculated based on the percentage of Consolidated EBITDA on the date of such modification, refinancing, refunding, extension, renewal or replacement, such percentage of Consolidated EBITDA restriction shall not be deemed to be exceeded so

31

long as such incurrence otherwise constitutes "Credit Agreement Refinancing Indebtedness") and (v) such Credit Agreement Refinancing Indebtedness shall not be subject to any "most favored nation" pricing provisions.

"Cure Amount" has the meaning assigned to such term in Section 7.02(a).

"Cure Right" has the meaning assigned to such term in Section 7.02(a).

"Cure Termination Date" has the meaning assigned to such term in Section 7.02(a).

"Cured Default" has the meaning assigned to such term in Section 1.03.

"Daily Simple SOFR" means, for any day, **(a "**SOFR~~, with the conventions for this rate (which may include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that, if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.~~ **Rate Day"), a rate per annum equal to SOFR for the day that is five U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.**

"Debt Repayment" means the repayment, refinancing, roll over, termination, discharge, defeasance or release, or the arrangement for the repayment, refinancing, roll over, termination, discharge, defeasance or release in a manner reasonably satisfactory to the Administrative Agent of all Indebtedness (including any accrued and unpaid interest and any make whole or other premiums thereon) and guaranties and security granted by (i) Borrower and its Subsidiaries under the 9.875% secured notes facility evidenced by that certain Indenture, dated as of April 25, 2019 (as amended, restated, supplemented or otherwise modified), among the Borrower, Gogo Finance Co. Inc. and the other parties thereto and (ii) Holdings and its Subsidiaries under the asset based credit facilities evidenced by that certain Credit Agreement, dated as of August 26, 2019 (as amended, restated, supplemented or otherwise modified), among Holdings, the Borrower, Gogo Finance Co. Inc. and JPMorgan Chase Bank, N.A., as administrative agent and the other parties thereto.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, examinership or similar debtor relief laws of the United States or other applicable jurisdictions (domestic or foreign) from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Direction" has the meaning assigned to such term in Section 9.24(c). "Defaulting Lender" means, subject to Section 2.22(b), any Lender that (a) has failed to perform any of its funding obligations hereunder (or otherwise failed to pay over to the Administrative Agent any amounts owed by such Lender hereunder), including in respect of its Loans or participations in respect of Letters of Credit, within one (1) Business Days of the date required to be funded by it hereunder unless such Lender notifies

32

the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Borrower, the Administrative Agent, any Issuing Bank or any Lender that it does not intend to comply with its funding obligations or has made a public statement or provided any written notification to any Person to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent (whether acting on its own behalf or at the reasonable request of the Borrower (it being understood that the Administrative Agent shall comply with any such reasonable request)) or any Issuing Bank, to confirm in a manner satisfactory to the Administrative Agent, such Issuing Bank and the Borrower that it will comply with its funding obligations (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become or is insolvent (or has admitted in writing that it is insolvent), (ii) become the subject of a proceeding under any Debtor Relief Law, (iii) had a receiver, conservator, trustee, administrator, examiner, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a substantial part of its assets or a custodian appointed for it or a substantial part of its assets, (iv) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment or (v) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority, where such ownership interest or proceeding does not result in or provide such Lender or Person with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender or Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Lender or Person.

"Defaulting Lender Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to any Issuing Bank, such Defaulting Lender's Applicable Percentage of the Loan Document Obligations with respect to the Letters of Credit issued by such Issuing Bank other than Loan Document Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or cash collateralized in accordance with the terms hereof.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Derivative Instrument" means with respect to a Person, any contract or instrument to which such Person is a party (whether or not requiring further performance by such Person), the value and/or cash flows of which (or any portion thereof) are based on the value and/or performance of the Loans and/or any Deliverable Obligations or "Obligations" (as defined in the ISDA CDS Definitions) with respect to the Loan Parties; provided that a "Derivative Instrument" will not include any contract or instrument that is entered into pursuant to bona fide market-making activities.

"Designated Non-Cash Consideration" means the fair market value of non-cash consideration received by the Borrower or a Subsidiary in connection with a Disposition pursuant to Section 6.05(k) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180

33

days following the consummation of the applicable Disposition)"

"Discount Prepayment Accepting Lender" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(2).

"Discount Range" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Discount Range Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Discount Range Prepayment Notice" means a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.11(a)(ii)(C) substantially in the form of Exhibit I.

"Discount Range Prepayment Offer" means the irrevocable written offer by a Term Lender, substantially in the form of Exhibit J, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"Discount Range Prepayment Response Date" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Discount Range Proration" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(3).

"Discounted Prepayment Determination Date" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Discounted Prepayment Effective Date" means in the case of a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offers, five (5) Business Days following the receipt by each relevant Term Lender of notice from the Auction Agent in accordance with Section 2.11(a)(ii)(B), Section 2.11(a)(ii)(C) or Section 2.11(a)(ii)(D), as applicable unless a shorter period is agreed to between the Borrower and the Auction Agent.

"Discounted Term Loan Prepayment" has the meaning assigned to such term in Section 2.11(a)(ii)(A).

"Dispose" and "Disposition" each have the meaning assigned to such term in Section 6.05.

"Disposed EBITDA" means, with respect to any Sold Entity or Business or Converted Unrestricted Subsidiary for any period through (but not after) the date of such Disposition or conversion, the amount for such period of Consolidated EBITDA of such Sold Entity or Business or Converted Unrestricted Subsidiary (determined as if references to the Borrower and its Restricted Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries or to such Converted Unrestricted Subsidiary and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business or Converted Unrestricted Subsidiary.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event

34

(a)      matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)      is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

(c)      is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date ninety-one (91) days after the Latest Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change in control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after the Termination Date and (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof) or any of its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person or as a result of such employee's termination, death or disability.

"Disqualified Lenders" means (i) those Persons identified by the Borrower to the Joint Lead Arrangers in writing prior to the Effective Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Borrower and its Subsidiaries, (iii) Excluded Affiliates, (iv) in the case of each Person identified pursuant to clauses (i) or (ii) above, any of their Affiliates that are either (x) identified in writing by the Borrower to the Administrative Agent from time to time or (y) known or reasonably identifiable as an Affiliate of any such Person, but excluding any Affiliate that is primarily engaged in, or that advises funds other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which such Person included pursuant to clause (ii) does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity (provided, further that any additional designation permitted by the foregoing shall not apply retroactively to any prior assignment to any Lender (or prior participation in the Loans) so long as such Lender or Participant continues to hold or participate in such Loans) and (v) at any time, or with respect to any action (or proposed action) in connection with which, a Net Short Representation is required to be made (or deemed made) hereunder, any Lender (or prospective Lender) that the Borrower has designated in a written notice to the Administrative Agent as a Disqualified Institution on the basis that the Borrower has determined in good faith that such Person has breached its Net Short Representation at such time or in connection with such action (or proposed action). Upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is a Disqualified Lender, the Administrative Agent shall be permitted to disclose to such Lender the list of Disqualified Lenders.

"Dollar Amount" means, at any time:

(a)       with respect to an amount denominated in Dollars, such amount;

(b)       with respect to any amount denominated in a currency other than Dollars, where a determination of such amount is required to be made under any Loan Document by the Administrative Agent or any Issuing Bank, the equivalent amount thereof in Dollars as determined by the Administrative Agent or such Issuing Bank, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date or other applicable date of determination) for the purchase of Dollars with such alternative currency; and

(c)       with respect to any amount denominated in a currency other than Dollars, where a determination of such amount is required to be made under any Loan Document by Holdings, the Borrower or any Restricted Subsidiary, the equivalent amount thereof in Dollars as determined on the basis of the Exchange Rate for such currency and as determined in accordance with Section 1.08.

"Dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Borrower organized or incorporated in the United States (or any state thereof or the District of Columbia).

"ECF Percentage" means, with respect to the prepayment required by Section 2.11(d) with respect to any fiscal year of the Borrower, if the Senior Secured First Lien Net Leverage Ratio (after giving effect to the applicable prepayment pursuant to Section 2.11(d), and after giving effect to any voluntary prepayments made pursuant to Section 2.11(a) prior to the date of such prepayment as the Senior Secured First Lien Net Leverage Ratio may be recalculated to give pro forma effect to the making of the foregoing payments) as of the end of such fiscal year (as adjusted pursuant to the foregoing) is (a) greater than 4.50 to 1.00, 50% of Excess Cash Flow for such fiscal year, (b) greater than 4.00 to 1.00, but less than or equal to 4.50 to 1.00, 25% of Excess Cash Flow for such fiscal year and (c) less than or equal to 4.00 to 1.00, 0% of Excess Cash Flow for such fiscal year.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

~~"Early Opt-in Election" means the occurrence of:~~

~~(i)            a determination by the Administrative Agent and the Borrower or (ii) a notification by the Required Lenders to the Administrative Agent (with the consent of the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 1.10, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to~~

~~replace the Benchmark; and~~

~~(ii)        the election by the Administrative Agent and the Borrower or (ii) the election by the Required Lenders (with the consent of the Borrower) to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.~~

"<u>Effective Date</u>" means April 30, 2021.

"<u>Effective Date Loan Parties</u>" means (i) Holdings, (ii) the Borrower and (iii) each other Restricted Subsidiary of the Borrower that is a Loan Party as of the Effective Date.

"<u>Effective Yield</u>" means, as to any Indebtedness, the effective yield on such Indebtedness in the reasonable determination of the Administrative Agent and the Borrower and consistent with generally accepted financial practices, taking into account the applicable interest rate margins, any interest rate floors (the effect of which floors shall be determined in a manner set forth in the proviso below) or similar devices and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (a) the remaining Weighted Average Life to Maturity of such Indebtedness and (b) four years following the date of incurrence thereof) payable generally to lenders or other institutions providing such Indebtedness, but excluding any underwriting, arrangement, syndication, commitment, unused line, prepayment, amendment, structuring, ticking or other similar fees payable in connection therewith (regardless of whether paid in whole or in part to the relevant lenders); <u>provided</u> that with respect to any Indebtedness that includes a "~~LIBOR~~<u style="color:blue">Term SOFR</u> floor" or "Base Rate floor," (i) to the extent that the ~~LIBO~~<u style="color:blue">Term SOFR</u> Rate or Alternate Base Rate (without giving effect to any floors in such definitions), as applicable, on the date that the Effective Yield is being calculated is less than such floor, the amount of such difference shall be deemed added to the interest rate margin for such Indebtedness for the purpose of calculating the Effective Yield and (ii) to the extent that the ~~LIBO~~<u style="color:blue">Term SOFR</u> Rate or Alternate Base Rate (without giving effect to any floors in such definitions), as applicable, on the date that the Effective Yield is being calculated is greater than such floor, then the floor shall be disregarded in calculating the Effective Yield.

"<u>Electing Foreign Guarantor</u>" means any Foreign Subsidiary domiciled in an Applicable Country that, at the option and in the sole discretion of the Borrower, has been designated a Subsidiary Loan Party in an Applicable Country in accordance with Section 5.11.

"<u>Electing Guarantor</u>" means any Excluded Subsidiary that, at the option and in the sole discretion of the Borrower, has been designated a Subsidiary Loan Party in accordance with Section 5.11.

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than Holdings, the Borrower or any of their respective Affiliates), other than, in each case, (i) a natural person (or a holding company, investment vehicle or trust for, or owned and operated by a natural person), (ii) a Defaulting Lender or (iii) a Disqualified Lender. Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall have no responsibility or liability for monitoring or enforcing the list of Disqualified Lenders or for any assignment made to a Disqualified Lender unless (A) such assignment resulted from the Administrative Agent's gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (B) such assignment resulted from a material breach of the Loan Documents by the Administrative Agent (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

37

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or limited European currency.

"Environmental Laws" means all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, disposal or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person (whether evidenced by share certificates (or similar) or not).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Pension Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Pension Plan or by application of Section 4069 of ERISA with respect to any terminated plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan, or to an intention to terminate or to appoint a trustee to administer any plan or plans in respect of which such Loan Party or ERISA Affiliate would be deemed to be an employer under Section 4069 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability, or the failure of a Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability; or (i) the withdrawal of a Loan Party or any ERISA Affiliate from a Pension Plan subject to

Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"Escrowed Proceeds" means the proceeds from the offering of any debt securities plus any deposit to cover accrued interest or other breakage costs or other Indebtedness paid into an escrow account with an independent escrow agent on the date of the applicable offering or incurrence pursuant to escrow arrangements that permit the release of amounts on deposit in such escrow account upon satisfaction of certain conditions or the occurrence of certain events. The term "Escrowed Proceeds" shall include any interest earned on the amounts held in escrow.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Euro" or "€" means the lawful single currency of any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union..

"Eurodollar" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" means, for any period, an amount equal to the excess of:

    (a)      the sum, without duplication, of:

           (i)       Consolidated Net Income for such period,

           (ii)       an amount equal to the amount of all Non-Cash Charges to the extent deducted in arriving at such Consolidated Net Income,

           (iii)      decreases in Consolidated Working Capital,

           (iv)      an amount equal to the aggregate net non-cash loss on dispositions by the Borrower and its Restricted Subsidiaries during such period (other than dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income; and

           (v)      all cash taxes and cash distributions deducted from Consolidated Net Income, less

    (b)      the sum, without duplication, of:

           (i)       an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (including any amounts included in Consolidated Net Income of proceeds received or due from business interruption insurance or reimbursement of expenses and charges pursuant to indemnification and other reimbursement provisions in connection with any acquisition or other Investment or any disposition of any asset permitted under this

Agreement to the extent such amounts are due but not received during such period) and cash charges, expenditures and losses added to (or excluded from the determination of) Consolidated Net Income pursuant to clauses (a) through (l) of the definition of "Consolidated Net Income" (other than cash charges in respect of Transaction Costs paid on or about the Effective Date to the extent financed with the proceeds of long-term Indebtedness (other than revolving loans) incurred on the Effective Date),

(ii)       [reserved],

(iii)      [reserved],

(iv)      an amount equal to the aggregate net non-cash gain on dispositions by the Borrower and its Restricted Subsidiaries during such period (other than dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)       increases in Consolidated Working Capital for such period,

(vi)      cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Restricted Subsidiaries other than Indebtedness,

(vii)     [reserved]

(viii)    [reserved];

(ix)      [reserved],

(x)       cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of Non-Cash Charges included in the calculation of Consolidated Net Income in any prior period,

(xi)      the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and its Restricted Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness, in each case to the extent not deducted in determining Consolidated Net Income,

(xii)     [reserved], and

(xiii)    the amount of taxes (including penalties and interest) paid in cash and/or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period; and

(xiv)    the aggregate amount of Transaction Costs incurred during such period.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Exchange Rate" means, on any day, for purposes of determining the Dollar Amount of any currency, the currency exchange rate at which such other currency may be exchanged into Dollars, at the time of determination based on such rate in effect on the first Business Day of the fiscal quarter of the Borrower in which such determination occurs or in respect of which such determination is made, for the most recently ended fiscal month of the Borrower, as reasonably determined in good faith by the Borrower based on commonly used financial reporting sources; _provided_ further that, if an amount that is to otherwise be converted using the foregoing methodology has been hedged, swapped or otherwise effectively converted into another currency pursuant to a Swap Agreement to which any Loan Party is a party, the currency exchange rate so utilized for that amount shall be as set forth in such Swap Agreement (copies of which shall be made available to the Administrative Agent upon request).

"Existing Convertible Notes" means the 6.00% convertible senior notes due 2022 issued by Holdings on November 31, 2019 in an original aggregate principal amount of $215,000,000.

"Excluded Affiliates" means (a) any Affiliates of any Joint Lead Arranger that are engaged as principals primarily in private equity, mezzanine financing or venture capital transactions or any such Affiliate's officers, directors, employees, legal counsel, independent auditors, professionals and other experts or agents and (b) any Affiliates of any Joint Lead Arranger and any of their employees that are engaged directly or indirectly in the sale of Gogo as sell-side representatives or any such Affiliate's officers, directors, legal counsel, independent auditors, professionals and other experts or agents (other than, in the case of clauses (a) and (b) above, (x) such employees that are required, in accordance with industry regulations or such Joint Lead Arranger's (or its Affiliate's) internal policies and procedures, to act in a supervisory capacity or (y) such Joint Lead Arranger's (or its Affiliate's) internal legal, compliance, risk management, credit or investment committee members).

"Excluded Assets" means (a) any fee-owned real property that is not Material Real Property and all leasehold (including ground lease) interests in real property (including requirements to deliver landlord lien waivers, estoppels and collateral access letters), (b) motor vehicles and other assets subject to certificates of title or ownership (to the extent a security interest therein cannot be perfected by the filing of a UCC-1 financing statement), (c) letter of credit rights (except to the extent constituting supporting obligations (as defined under the UCC) in which a security interest can be perfected with the filing of a UCC-1 financing statement), (d) commercial tort claims with a value of less than $25,000,000, (e) Excluded Equity Interests, (f) any lease, contract, license, sublicense, other agreement or document, government approval, charter, authorization or franchise (or any asset subject to such agreement or arrangement) with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations would require the consent of a third party (unless such consent has been received) or violate or invalidate, constitute a breach of or a default under, or create a right of termination in favor of any party (other than any Loan Party) to, such lease, contract, license, sublicense, other agreement or document, government approval, charter, authorization or franchise (but after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code, or any other applicable Requirements of Law), (g) any asset subject to a Lien of the type permitted by Section 6.02(iv) (whether or not incurred pursuant to such Section) or a Lien permitted by Section 6.02(xi),, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under any agreement pursuant to which such Lien has been created (but after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code, or any other applicable Requirements of Law), (h) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act and any other Intellectual Property in

41

any jurisdiction where such pledge or security interest would cause the invalidation or abandonment of such Intellectual Property under applicable law, (i) any asset (including Equity Interests) if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any Requirements of Law, rule or regulation, contractual obligation existing on the Effective Date (or, if later, the date the Person owning the asset becomes a Restricted Subsidiary, so long as the applicable contractual obligation was not entered into in contemplation of such Person becoming a Restricted Subsidiary) or agreements with any Governmental Authority (other than to the extent that any such prohibition would be rendered ineffective pursuant to the applicable anti-assignment provisions of the Uniform Commercial Code, or any other applicable Requirements of Law) or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority (provided that there shall be no requirement to obtain the consent of any governmental authority or third party, including, without limitation, no requirement to comply with the Federal Assignment of Claims Act or any similar statute), unless such consent, approval, license or authorization has been received, (j) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time) and pledges and security interests prohibited by applicable law, rule or regulation or agreements with any Governmental Authority, (k) Securitization Assets subject to a Qualified Securitization Facility, (l) cash, Permitted Investments and any Deposit Accounts (as defined in the Collateral Agreement) (other than cash, Permitted Investments and Deposit Accounts representing proceeds of other "Collateral"), any Securities Account (as defined in the Collateral Agreement), commodities account or similar account (including securities entitlements and related assets) (except in each case to the extent perfected solely through the filing of a UCC financing statement) and any other assets requiring perfection through control agreements or perfection by "control", other than with respect to the pledge of Equity Interests by a Loan Party, (m) other than with respect to the pledge of Equity Interests by a Loan Party, any assets located or titled outside of the United States or, in the case of any Electing Foreign Guarantor, any Applicable Country, (n) any assets to the extent that the granting of a Lien thereon to secure the Secured Obligations could reasonably be expected to result in adverse (other than de minimis consequences) tax consequences or adverse regulatory consequences (including as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction), in each case, as reasonably determined by the Borrower, (o) any assets with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower (as agreed to in writing), the cost or other consequences (including adverse tax consequences) of pledging such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (p) any aircraft, airframes, aircraft engines or helicopters, or any Equipment (as defined under the UCC) or other assets constituting a part hereof, to the extent a Lien on any such assets may not be perfected by the filing of a UCC-1 financing statement or (q) leased cell towers to the extent a leasehold mortgage is required to create or perfect a security interest therein.

"Excluded Equity Interests" means Equity Interests in any (a) Unrestricted Subsidiary, (b) Immaterial Subsidiary, (c) Subsidiary of a Domestic Subsidiary that is a CFC (except that up to 65% of the equity interests of any CFC that is owned directly and indirectly by Loan Parties that are not CFCs, other than a U.S. Loan Party described in clause (e) of this definition of "Excluded Equity Interests," shall not be Excluded Equity Interests), (d) joint ventures and Non-Wholly Owned Subsidiaries to the extent a security interest therein would be prohibited by the terms of the applicable Person's organizational or joint venture document (after giving effect to applicable anti-assignment provisions of the Uniform Commercial Code), (e) Domestic Subsidiary that has no material assets other than the equity and/or debt of one or more CFCs and cash or cash equivalents (except that up to 65% of the equity interests of any such Subsidiary shall not be Excluded Equity Interests) and (f) not-for-profit Subsidiary, captive insurance company or special purpose securitization vehicle (or similar entity), including any Securitization Subsidiary.

"Excluded Information" has the meaning assigned to such term in Section 2.11(a)(ii)(A). "Excluded Subsidiary" means (a) any Subsidiary that is not a Wholly Owned Subsidiary of the Borrower, (b) each Subsidiary listed on Schedule 1.01, (c) any Subsidiary that is prohibited by applicable law, rule or

regulation or contractual obligation existing on the Effective Date or if later, the date such Subsidiary first becomes a Restricted Subsidiary (but, in the case of a contractual obligation, to the extent not incurred in contemplation of such Subsidiary becoming a Restricted Subsidiary), from guaranteeing the Secured Obligations or which would require any governmental or regulatory consent, or third party consent, approval, license or authorization to do so, unless such consent, approval, license or authorization has been obtained, (d) any Immaterial Subsidiary, (e) any Subsidiary to the extent the provision of a Guarantee by such Subsidiary could reasonably be expected to result in adverse (other than de minimis) tax consequences as reasonably determined by the Borrower, (f) any Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower (as agreed in writing), the cost, burden or other consequences of providing the Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (g) any Subsidiary that is (or, if it were a Loan Party, would be) an "investment company" under the Investment Company Act of 1940, as amended, (h) any not-for profit Subsidiaries, captive insurance companies or other special purpose subsidiaries, (i) any Foreign Subsidiary other than a Foreign Subsidiary that becomes a Loan Party pursuant to Section 5.11, (j) any direct or indirect Subsidiary of a CFC that is a direct or indirect Subsidiary of the Borrower or any other Domestic Subsidiary), (k) any direct or indirect Foreign Subsidiary of any other Domestic Subsidiary that is a CFC, (l) any special purpose securitization vehicle (or similar entity), including any Securitization Subsidiary, (m) any Domestic Subsidiary that has no material assets other than the equity and/or debt of one or more CFCs and cash or cash equivalents (and any Subsidiary of such Domestic Subsidiary), (n) each Unrestricted Subsidiary, (o) any Subsidiary for which the providing of a Guarantee could reasonably be expected to result in any violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors (or other governing body) or managers and (p) any Restricted Subsidiary acquired pursuant to a Permitted Acquisition (or other Investment not prohibited by this Agreement) financed with Indebtedness permitted under <u>Section 6.01</u> hereof as assumed Indebtedness and any Restricted Subsidiary thereof that Guarantees such Indebtedness, in each case to the extent such Indebtedness prohibits such Subsidiary from becoming a Loan Guarantor; <u>provided</u> that any Immaterial Subsidiary that is a signatory to any Collateral Agreement or the Guarantee Agreement shall be deemed not to be an Excluded Subsidiary for purposes of this Agreement and the other Loan Documents unless the Borrower has otherwise notified the Administrative Agent.

"<u>Excluded Swap Obligation</u>" means, with respect to any Loan Guarantor at any time, any Secured Swap Obligation under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Guarantor of, or the grant by such Loan Guarantor of a security interest to secure, such Secured Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Guarantor's failure for any reason to constitute an "eligible contract participant," as defined in the Commodity Exchange Act (determined after giving effect to any "Keepwell", support or other agreement for the benefit of such Loan Guarantor) at the time such guarantee or grant of a security interest becomes effective with respect to such related Secured Swap Obligation. If a Secured Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Secured Swap Obligation that is attributable to swaps that are or would be rendered illegal due to such guarantee or security interest.

"<u>Excluded Taxes</u>" means, with respect to the Administrative Agent, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) such recipient's net income (however denominated) and franchise Taxes imposed on it (in lieu of net income Taxes) by a jurisdiction (i) as a result of such recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction, or (ii) Other Connection Taxes, (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any

43

jurisdiction described in clause (a) above, (c) any withholding Tax imposed pursuant to FATCA, (d) any withholding Tax that is attributable to a Lender's failure to comply with Section 2.17(f), and (e) except in the case of an assignee pursuant to a request by the Borrower under Section 2.19 hereto, any withholding Taxes imposed on amounts payable to a Lender pursuant to a Requirement of Law in effect at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a).

"Extendable Bridge Loans" means bridge facilities which, subject to customary conditions, would either automatically be converted into or required to be exchanged for permanent refinancing that does not mature earlier than the Latest Maturity Date for the Initial Term Loans.

"FAA" means the Federal Aviation Administration, and any successor agency of the United States government exercising substantially equivalent powers.

"FAA Approval" means any governmental certification, authorization or approval granted by the FAA, or by any other Governmental Authority pursuant to applicable law, to any Loan Party or assigned or transferred to any Loan Party pursuant to applicable law.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable thereto), any current or future U.S. Department of the Treasury regulations thereunder or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code as of the date of this Agreement (or any amended or successor version described above) and any intergovernmental agreements implementing the foregoing or any treaty, regulation or law implementing any such intergovernmental agreement.

"FCC" means the Federal Communications Commission, and any successor agency of the United States government exercising substantially equivalent powers.

"FCC License" means any governmental authorization granted by the FCC pursuant to the Communications Act or by any other Governmental Authority pursuant to Communications Laws, to any Loan Party or assigned or transferred to any Loan Party pursuant to Communications Laws.

"FCC License Holder" means (a) as of the Effective Date, AC BidCo LLC and (b) after the Effective Date, any Subsidiary that the Borrower designates to hold FCC Licenses.

"FCPA" has the meaning specified in Section 3.16(a).

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; provided that the Federal Funds Effective Rate, if negative, shall be deemed to be 0.00%.

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Fee Letter" means the fee letter among the Borrower and the Joint Lead Arrangers dated as of March 31, 2021.

44

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or corporate controller (or other officer of equivalent duties) of Holdings or the Borrower, as applicable.

"Financial Performance Covenant" means the covenant set forth in Section 6.11. "Financing Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, (b) the borrowing of Loans hereunder and the use of the proceeds thereof and (c) the issuance, amendment or extension of Letters of Credit hereunder and the use of proceeds thereof.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

**"First Amendment" means that certain First Amendment to Credit Agreement, dated as of February 2, 2023, by and between the Borrower, Holdings, the Administrative Agent and the Collateral Agent.**

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

**"Floor" means a rate of interest, (i) in the case of Term Loans, equal to 0.75% and (ii) in the case of Revolving Loans, equal to 0.00%.**

"Foreign Lender" means a Lender that is not a United States Person (as defined in Section 7701(a)(30) of the Code).

"Foreign Subsidiary" means any Restricted Subsidiary of the Borrower, other than a Domestic Subsidiary.

"Fronting Exposure Cap" means, with respect to each Issuing Bank, the product of (i) the Letter of Credit Sublimit multiplied by (ii) the Applicable Percentage of such Issuing Bank (or its affiliated Revolving Lender). The initial amount of each Issuing Bank's Fronting Exposure Cap is set forth on Schedule 2.01(C).

"Funded Debt" means all Indebtedness of the Borrower and its Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"Funds Certain Provision" has the meaning assigned to such term in Section 4.01. "GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative

45

Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations shall be determined in accordance with the definition of Capital Lease Obligations.

"General Investment Basket" has the meaning given to such term in Section 6.04(m). "Gogo" has the meaning given to such term in the preliminary statements hereto.

"Governmental Approvals" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether federal, state, provincial, territorial, local or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government in any jurisdiction (including any supra national bodies such as the European Union or the European Central Bank).

"GTCR Group" means GTCR LLC, GTCR Fund XII/A LP, GTCR Fund XII/C LP, GTCR Co Invest XII, LP and any of their respective funds or partnerships managed or advised by them, or any of their respective Affiliates (other than any portfolio companies of any of the foregoing).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement" means the Master Guarantee Agreement among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit B.

46

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other hazardous or toxic substances, wastes, chemicals, pollutants, contaminants of any nature and in any form regulated pursuant to any Environmental Law.

"Holdings" has the meaning given to such term in the preliminary statements hereto. The term "Holdings" shall also include any Successor Holdings created pursuant to Section 6.03(a)(iv).

"Holdings Parent" means any direct or indirect parent company of Holdings.

"Holdings Parent Specified Expenses" shall mean any charge, tax or expense incurred or accrued by Holdings or any Holdings Parent during any period to the extent that the Borrower has made a Restricted Payment (or has made any Investment in lieu thereof pursuant to Section 6.04(l)) to Holdings or such Holdings Parent in respect thereof pursuant to Section 6.07(a)(vii), but in each case limited to the amount of such Restricted Payment or Investment.

~~"ICE LIBOR" has the meaning assigned to such term in the definition of "Alternate Base Rate."~~

"Identified Participating Lenders" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(3).

"Identified Qualifying Lenders" has the meaning specified in Section 2.11(a)(ii)(D)(3).

**"Illegality Notice" has the meaning specified in Section 2.23.**

"Immaterial Subsidiary" means any Subsidiary of the Borrower that, as of the date of the most recent financial statements required to be delivered pursuant to Section 5.01(a) or (b), does not have (a) assets (when combined with the assets of all other Immaterial Subsidiaries, after eliminating intercompany obligations) in excess of 5.0% of Consolidated Net Tangible Assets or (b) Consolidated EBITDA (when combined with the Consolidated EBITDA of all other Immaterial Subsidiaries, after eliminating intercompany obligations) for the period of four consecutive fiscal quarters ending on such date in excess of 5.0% of the Consolidated EBITDA of the Borrower and the Restricted Subsidiaries for such period.

"Incremental Cap" means, as of any date of determination, the sum of (I)(a) the greater of (A) $140,000,000 and (B) 100% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time (clause (A) and (B) being the "Starter Amount") (*minus* amounts incurred prior to the date of determination in respect of all Incremental Facilities and Incremental Equivalent Debt, in each case, incurred in reliance on this clause (a), and all amounts incurred pursuant to clause (A)(I)(x) of Section 6.01(a)(xv) or clause (A)(I)(x) of Section 6.01(a)(xvi)), provided that the maximum amount deducted pursuant to this clause (I) (a) shall not exceed the greater of $140,000,000 and 100% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time), plus (b)(i) the aggregate principal amount of all Term Loans voluntarily prepaid pursuant to Section 2.11(a)(i), (ii) the aggregate amount of all Term Loans repurchased and prepaid pursuant to Section 2.11(a)(ii) or otherwise in a manner not prohibited by Section 9.04(g) (determined based on the face amount of such prepayment rather than the actual cash applied), (iii) all reductions of Revolving Commitments pursuant to Section 2.08(b) and (iv) the aggregate principal amount of all Incremental

47

Facilities, Incremental Equivalent Debt and other Indebtedness secured by the Collateral on a *pari passu* basis voluntarily prepaid or repurchased (determined based on the face amount of such prepayment rather than the actual cash applied); in each case prior to such date (other than, in each case, prepayments, repurchases and commitment reductions made with the proceeds of the incurrence of Credit Agreement Refinancing Indebtedness or other long-term Indebtedness (other than revolving loans) (the sum of the amounts set forth in this clause (b), the "<u>Voluntary Prepayment Amount</u>") <u>plus</u> (II) the maximum aggregate principal amount that can be incurred without causing the Senior Secured First Lien Net Leverage Ratio, after giving effect to the incurrence of any such Incremental Facility or Incremental Equivalent Debt) (which shall assume that the full amount of any Incremental Revolving Commitment Increase and Additional/Replacement Revolving Commitments being established at such time are fully drawn (but pro forma for the use thereof) and without deducting in calculating the numerator of such Senior Secured First Lien Net Leverage Ratio any cash proceeds thereof, provided that to the extent the proceeds of any such Incremental Facility or Incremental Equivalent Debt are to be used to repay Indebtedness it shall not limit the Borrower's ability to give pro forma effect to such repayment and all other adjustments contemplated by the definition of "Pro Forma Basis"), and the use of proceeds thereof, on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Facility or Incremental Equivalent Debt made pursuant to the foregoing clause (I)) (i) to exceed 5.00 to 1.00 for the most recent Test Period ended or (ii) if incurred in connection with a Permitted Acquisition or other permitted Investment, to increase immediately after giving effect to such Permitted Acquisition or Investment; <u>provided</u>, that in the case of an Incremental Facility or Incremental Equivalent Debt that is secured by the Collateral on a junior lien basis to the Secured Obligations, in lieu of complying with the Senior Secured First Lien Net Leverage Ratio set forth above in this clause (II), the Senior Secured Net Leverage Ratio, after giving effect to the incurrence of such junior lien Incremental Facility or Incremental Equivalent Debt (without deducting in calculating the numerator of such Senior Secured Net Leverage Ratio any cash proceeds thereof, provided that to the extent the proceeds of any such Incremental Facility or Incremental Equivalent Debt are to be used to repay Indebtedness it shall not limit the Borrower's ability to give pro forma effect to such repayment and all other adjustments contemplated by the definition of "Pro Forma Basis") and the use of proceeds thereof, shall (i) not exceed 5.50 to 1.00 on a Pro Forma Basis for the most recent Test Period ended or (ii) if incurred in connection with a Permitted Acquisition or other permitted Investment, not increase immediately after giving effect to such Permitted Acquisition or Investment; <u>provided</u>, <u>further</u>, that if such Incremental Facility or Incremental Equivalent Debt is unsecured or secured by assets not constituting Collateral, in lieu of complying with the Senior Secured First Lien Net Leverage Ratio set forth above in this clause (II), either (A) the Total Net Leverage Ratio, after giving effect to the incurrence of any such Incremental Facility or Incremental Equivalent Debt (without deducting in calculating the numerator of such Total Net Leverage Ratio any cash proceeds thereof, provided that to the extent the proceeds of any such Incremental Facility or Incremental Equivalent Debt are to be used to repay Indebtedness it shall not limit the Borrower's ability to give pro forma effect to such repayment and all other adjustments contemplated by the definition of "Pro Forma Basis") and the use of proceeds thereof, shall (i) not exceed 6.00 to 1.00 on a Pro Forma Basis for the most recent Test Period ended or (ii) if incurred in connection with a Permitted Acquisition or other permitted Investment, not increase immediately after giving effect to such Permitted Acquisition or Investment or (B) the Cash Interest Coverage Ratio, after giving effect to the incurrence of such Incremental Facility or Incremental Equivalent Debt and the use of proceeds thereof, shall (i) not be less than 2.00 to 1.00 on a Pro Forma Basis for the most recent Test Period ended or (ii) if incurred in connection with a Permitted Acquisition or other permitted Investment, not decrease immediately after giving effect to such Permitted Acquisition or Investment (the sum of the amounts set forth in this clause (II), the "<u>Ratio Incremental Amount</u>"). Any ratio (or with respect to clause (B) of the Starter Amount, Consolidated EBITDA) calculated for purposes of determining the "Incremental Cap" shall be calculated on a Pro Forma Basis for the most recent Test Period ended and subject to Section 1.06 to the extent applicable and, at the option of the Borrower, any unfunded Incremental Facility or Incremental Equivalent Debt may be tested at the time of the initial funding in lieu of the time of establishment. Loans may be incurred under both clauses (I) and (II), and proceeds from any such incurrence may be utilized in

48

a single transaction by first calculating the incurrence under clause (II) above (and any concurrent Borrowing of Revolving Loans) and then calculating the incurrence under clause (I) above (if any) and, for the avoidance of doubt, the Senior Secured First Lien Net Leverage Ratio, Senior Secured Net Leverage Ratio, Total Net Leverage Ratio, or Cash Interest Coverage Ratio, as applicable shall be permitted to exceed the maximum (or minimum, as applicable) ratio set forth in clause (II) above to the extent of such amounts incurred in reliance on clause (I) (and any concurrent Borrowing of Revolving Loans) at substantially the same time. Unless the Borrower otherwise elects in writing to the Administrative Agent, the Borrower shall be deemed to have used amounts, if any, that are available under clause (II) above prior to the utilization of amounts under clause (I) above. The Borrower may reclassify all or any portion of Indebtedness originally designated as incurred under clause (I) above as having been incurred under clause (II) above so long as, at the time of such reclassification, the Borrower would be permitted to incur the aggregate principal amount of Indebtedness being so reclassified under clause (II) above (it being understood and agreed that such reclassification shall be automatic if at the end of any fiscal quarter such reclassification would then be permitted).

"Incremental Equivalent Debt" has the meaning assigned to such term in Section 6.01(a)(xxiii).

"Incremental Facility" has the meaning assigned to such term in Section 2.20(a).

"Incremental Facility Amendment" has the meaning assigned to such term in Section 2.20(d).

"Incremental Loan" has the meaning assigned to such term in Section 2.20(a).

"Incremental Revolving Commitment Increase" has the meaning assigned to such term in Section 2.20(a).

"Incremental Term Facility" has the meaning assigned to such term in Section 2.20(a).

"Incremental Term Increase" has the meaning assigned to such term in Section 2.20(a).

"Incremental Term Loan" means any Term Loan provided under any Incremental Facility.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding prepaid interest thereon), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (x) trade accounts payable in the ordinary course of business, (y) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid after being due and payable and (z) expenses accrued in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; provided that the term "Indebtedness" shall not include (i)

49

deferred or prepaid revenue, tax liabilities, liabilities associated with customer prepayments and deposits and any such obligations incurred under ERISA and other accrued obligations (including transfer pricing), and customary obligations under employment agreements and deferred compensation, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, or other contingent post-closing purchase price adjustments, non-compete or consulting obligations, (iii) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (iv) Indebtedness of Holdings, or any Person that is a Holdings Parent appearing on the balance sheet of the Borrower solely by reason of push down accounting under GAAP, (v) Indebtedness that is non-recourse to the Borrower or any of its Restricted Subsidiaries or (vi) for the avoidance of doubt, any Qualified Equity Interests issued by Holdings or the Borrower. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of the Borrower and the Restricted Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations (including intercompany liabilities related to the payment of the purchase price for Securitization Assets pursuant to a Qualified Securitization Facility) and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business.

"Indemnified Taxes" means all Taxes, other than Excluded Taxes and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Information Memorandum" means the Confidential Information Memorandum relating to Holdings and the Transactions (if any) and/or the lender presentation delivered to prospective lenders prior to the Effective Date.

"Initial Default" has the meaning assigned to such term in Section 1.03.

"Initial Term Loans" means the Loans made pursuant to Section 2.01(a).

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Intellectual Property Security Agreements" means short-form security agreements, suitable for filing with the United States Patent and Trademark Office or the United States Copyright Office (as applicable), with respect to any Trademarks, Patents and Copyrights that are registered, issued or applied-for in the United States and that constitute Collateral.

"Intercompany License Agreement" means any cost sharing agreement, commission or royalty agreement, license or sub-license agreement, distribution agreement, services agreement, intellectual property rights transfer agreement or any related agreements, in each case where all the parties to such agreement are one or more of the Borrower or a Restricted Subsidiary.

50

"Intercreditor Agreement" means the Pari Passu Intercreditor Agreement or the Junior Intercreditor Agreement, as applicable.

"Interest Election Request" means a request by the Borrower to convert or continue a Revolving Borrowing or Term Borrowing in accordance with Section 2.07.

"Interest Payment Date" means (x)(a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and (b) with respect to any ~~Eurodollar~~SOFR Loan, the last ~~Business Day of the~~day of each Interest Period ~~applicable to the Borrowing of which such Loan is a part~~therefor and, in the case of ~~a Eurodollar Borrowing with an~~any Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at ~~three-month~~intervals ~~of three months' duration~~after the first day of such Interest Period, and (y) the Revolving Maturity Date or the Term Maturity Date, as applicable.

"Interest Period" means, ~~with respect~~as to any ~~Eurodollar~~Borrowing, the period commencing on the date ~~of~~such ~~Borrowing is disbursed or converted to or continued as a Eurodollar~~Loan or Borrowing and ending on the ~~date~~numerically corresponding day in the calendar month that is one, ~~two,~~ three or six months thereafter ~~as selected by the Borrower in its~~(in each case, subject to the availability thereof), as specified in the applicable Borrowing Request (or, ~~if available to each Lender participating therein, twelve months or any shorter period as the Borrower may~~ elect) Interest Election Request; provided that (~~a~~i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (~~b~~ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month ~~at the end~~of such Interest Period ~~and,~~ (~~e~~iii) no Interest Period shall extend beyond ~~(i) in the case of Term Loans, the Term Maturity Date and (ii) in the case of Revolving Loans,~~ the Revolving Maturity Date and the Term Maturity Date, as applicable and (iv) no tenor that has been removed from this definition pursuant to Section 2.25(d) shall be available for specification in such Borrowing Request or Interest Election Request. For purposes hereof, the date of a Loan or Borrowing initially shall be the date on which such Loan or Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan or Borrowing.

~~"Interpolated Rate" means in relation to the "LIBO Rate" for any Loan, the rate which results from interpolating on a linear basis between: (i) the rate displayed on pages LIBOR01 or LIBOR02 of the Thomson Reuters screen (or on any successor or substitute page of such service) for the longest period (for which that rate is available) which is less than the Interest Period and (ii) the rate displayed on pages LIBOR01 or LIBOR02 of the Thomson Reuters screen (or on any successor or substitute page of such service) for the shortest period (for which that rate is available) which exceeds the Interest Period, each as of approximately 11:00 A.M., London, England time, two (2) Business Days prior to the commencement of such Interest Period.~~

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of Holdings and its Subsidiaries (i) intercompany advances arising from their cash management, tax, and accounting operations and (ii) intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of

51

business) or (c) the purchase or acquisition in one transaction or a series of transactions of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; provided that, in the event that any Investment is made by Holdings or any Restricted Subsidiary in any Person through one or more other substantially concurrent interim transfers of any amount through any other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 6.04. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, <u>minus</u> any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (c) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, <u>minus</u> any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (d) any Investment (other than any Investment referred to in clause (a), (b) or (c) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), <u>plus</u> (i) the cost of all additions thereto and <u>minus</u> (ii) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause (ii) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto and without duplication of amounts increasing the Available Amount or the Available Equity Amount), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; <u>provided</u> that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"<u>Investor</u>" means a holder of Equity Interests in Holdings (or any direct or indirect parent thereof).

"<u>ISDA Definitions</u>" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

52

"ISP" means with respect to any standby Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be reasonably acceptable to the applicable Issuing Bank and in effect at the time of issuance of such Letter of Credit).

"Issuing Bank" means each of (a) the Administrative Agent, (b) each other Revolving Lender as of the Effective Date and (c) each Revolving Lender that shall have become an Issuing Bank hereunder as provided in Section 2.05(k) (other than any Person that shall have ceased to be an Issuing Bank as provided in Section 2.05(l)), each in its capacity as an issuer of Letters of Credit hereunder. Each Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate or such branch with respect to Letters of Credit issued by such Affiliate or such branch. Any Issuing Bank may cause Letters of Credit to be issued by unaffiliated financial institutions and such Letters of Credit shall be treated as issued by such Issuing Bank for all purposes under the Loan Documents.

"Joint Lead Arranger" means each of Morgan Stanley Senior Funding, Inc., Credit Suisse Loan Funding LLC, Deutsche Bank Securities, Inc., Benefit Street Partners L.L.C. and CBAM Partners, LLC, each in their capacity as joint lead arranger and joint bookrunner, and any permitted successors and assigns of the foregoing.

"Judgment Currency" has the meaning assigned to such term in Section 9.17.

"Junior Financing" means (a) any Indebtedness (other than (i) any permitted intercompany Indebtedness owing to Holdings, the Borrower or any Restricted Subsidiary or any Permitted Unsecured Refinancing Debt or (ii) any Indebtedness in an aggregate principal amount not exceeding $30,000,000) that is subordinated in right of payment to the Loan Document Obligations or that is secured by the Collateral on a junior lien basis relative to the liens granted pursuant to the Loan Documents securing the Secured Obligations and (b) any Permitted Refinancing in respect of the foregoing.

"Junior Intercreditor Agreement" means the Junior Intercreditor Agreement substantially in the form of Exhibit E-3 among the Administrative Agent and one or more Senior Representatives for holders of Indebtedness permitted by this Agreement to be secured by the Collateral on a junior basis, with such modifications thereto as the Administrative Agent and the Borrower may reasonably agree.

"Latest Maturity Date" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Other Term Loan, any Other Term Commitment, any Other Revolving Loan or any Other Revolving Commitment, in each case as extended in accordance with this Agreement from time to time.

"LC Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or renewal or increase of the amount thereof.

"LC Disbursement" means an honoring of a drawing by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate amount of all Letters of Credit that remains available for drawing at such time and (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Revolving Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time. For

all purposes of this Agreement and after the date of termination, a Letter of Credit shall, if its undrawn amount may still be drawn thereunder by reason of the operation of Rule 3.13 or 3.14 of the ISP or for any Letter of Credit issued with the exclusion of Article 36 of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; *provided* that with respect to any Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

"LCT Election" has the meaning assigned to such term in Section 1.06.

"LCT Test Date" has the meaning assigned to such term in Section 1.06.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, an Incremental Facility Amendment, a Loan Modification Agreement or a Refinancing Amendment, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption and, as the context requires, includes an Issuing Bank, and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender".

"Letter of Credit" means any letter of credit issued pursuant to this Agreement other than any such letter of credit that shall have ceased to be a "Letter of Credit" outstanding hereunder pursuant to Section 9.05.

"Letter of Credit Request" has the meaning assigned to such term in Section 2.05(b).

"Letter of Credit Sublimit" means $30,000,000.

~~"LIBO Rate" means, for any Interest Period with respect to a Eurodollar Borrowing denominated in Dollars or any Alternative Currency, the rate per annum equal to (i) the London interbank offered rate administered by ICE Benchmark Administration Limited (or such other commercially available source providing quotations of that rate as may be designated by the Administrative Agent from time to time, including any Person that takes over administration of the rate) displayed on the pages LIBOR01 or LIBOR02 of the Thomson Reuters screen (or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters) at approximately 11:00 a.m., London, England time, two (2) London Banking Days prior to the commencement of such Interest Period, for deposits in the relevant currency (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (ii) if such published rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the Interpolated Rate.~~

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, assignment by way of security, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Limited Condition Transaction" means (i) any acquisition or Investment or Restricted Payment and (ii) any redemption, repurchase, defeasance, satisfaction and discharge, conversion or repayment of Indebtedness (including the Existing Convertible Notes) requiring notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge, conversion or repayment.

"Loan Document Obligations" means the due and punctual payment by the Borrower of (i) the principal of the Loans and LC Disbursements, and all accrued and unpaid interest thereon at the applicable rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, examinership, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, including obligations to pay fees, expenses, reimbursement obligations and indemnification obligations and obligations to provide cash collateral, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, examinership, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding); provided that for the avoidance of doubt, the "Loan Document Obligations" of any Loan Party shall not include any Excluded Swap Obligation of such Loan Party.

"Loan Documents" means this Agreement, any Refinancing Amendment, any Loan Modification Agreement, any Incremental Facility Amendment, the Guarantee Agreement, the Collateral Agreement, the other Security Documents and any other Intercreditor Agreement (if applicable), except for purposes of Section 9.02, any Note delivered pursuant to Section 2.09(f), and any other document entered into or delivered by a Loan Party in connection with the foregoing and designated by the Borrower as a Loan Document therein for purposes of this Agreement.

"Loan Equivalent" has the meaning specified in the definition of "Required Additional Debt Terms".

"Loan Guarantors" means Holdings and the Subsidiary Loan Parties, in each case to the extent such entity provides a guaranty of the Secured Obligations.

"Loan Modification Agreement" means a Loan Modification Agreement, among the Borrower, and one or more Accepting Lenders, and acknowledged by the Administrative Agent, effecting one or more Permitted Amendments and such other amendments hereto and to the other Loan Documents as are contemplated by Section 2.24.

"Loan Modification Offer" has the meaning specified in Section 2.24(a).

"Loan Parties" means the Loan Guarantors and the Borrower.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

~~"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.~~

"Majority in Interest", when used in reference to Lenders of any Class, means, at any time, (a) in the case of the Revolving Lenders, Lenders having Revolving Exposures and unused Revolving Commitments representing more than 50% of the sum of the aggregate Revolving Exposures and the unused aggregate Revolving Commitments at such time and (b) in the case of the Term Lenders of any Class, Lenders holding outstanding Term Loans of such Class representing more than 50% of all Term Loans of

such Class outstanding at such time; provided that whenever there are one or more Defaulting Lenders, the total outstanding Term Loans and Revolving Exposure of, and the unused Revolving Commitments of, such Defaulting Lender shall be excluded for purposes of making a determination of the Majority in Interest.

"Market Capitalization" means an amount equal to (i) the total number of issued and outstanding shares of common stock or common equity interests of Holdings on the date of the declaration of a Restricted Payment multiplied by (ii) the arithmetic mean of the closing prices per share of such common stock or common equity interests on the principal securities exchange on which such common stock or common equity interests are traded for the thirty (30) consecutive trading days immediately preceding the date of declaration of such Restricted Payment.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement."

"Material Adverse Effect" means (a) a material adverse effect on the business, financial condition or results of operations of the Loan Parties and their Subsidiaries, taken as a whole and (b) a material adverse effect on the material rights and remedies of the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders under the Loan Documents, taken as a whole.

"Material Indebtedness" means Indebtedness for borrowed money (other than the Loan Document Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate principal amount exceeding $35,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material IP" means Intellectual Property owned by any Loan Party or Restricted Subsidiary that is material to the business or operations of the Borrower or its Restricted Subsidiaries.

"Material Non-Public Information" means (a) if Holdings is a public reporting company, material non-public information with respect to Holdings or its Subsidiaries, or the respective securities of any of the foregoing, and (b) if Holdings is not a public reporting company, information that is (i) of a type that would not be publicly available if Holdings were a public reporting company and (ii) material with respect to Holdings or its Subsidiaries or any of their respective securities for purposes of United States Federal and state and applicable foreign securities laws.

"Material Real Property" means any real property (including fixtures) located in the United States of America and owned in fee by any Loan Party with a fair market value, as reasonably determined by the Borrower in good faith at the time of acquisition, greater than or equal to $25,000,000.

"Material Subsidiary" means any Subsidiary other than an Immaterial Subsidiary.

"Maximum Rate" has the meaning assigned to such term in Section 9.16.

"Merger" has the meaning given to such term in the preliminary statements hereto.

"Model" means the model delivered to the Joint Lead Arrangers on or about March 25, 2021.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, charge, deed of trust, assignment of leases and rents or other security document granting a Lien on any Mortgaged Property in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations, as the same may be amended, amended and restated, supplemented and otherwise modified from time to time. Each Mortgage shall be in form and substance reasonably satisfactory to the Administrative Agent and the Borrower.

"Mortgaged Property" means each parcel of Material Real Property with respect to which a Mortgage will (or is required to be) be granted pursuant to the Collateral and Guarantee Requirement, Section 5.11, Section 5.12 or Section 5.14 (if any).

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by Holdings, the Borrower and any Restricted Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by Holdings, the Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than the Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the pro rata portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of Holdings, the Borrower or the Restricted Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or any Restricted Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable), the amount of dividends and other restricted payments that Holdings, the Borrower and/or its Restricted Subsidiaries may make pursuant to Section 6.07(a)(vii)(A) or (B) as a result of such event, and the amount of any reserves established by Holdings, the Borrower and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"Net Short Lender" means at any date of determination, each Lender that has a Net Short Position as of such date; provided that Unrestricted Lenders shall not be Net Short Lenders.

"Net Short Position" means, with respect to a Lender (other than an Unrestricted Lender), as a date of determination, the net positive position, if any, held by such Lender that is remaining after deducting any long position that the Lender holds (i.e., a position (whether as an investor, lender or holder

57

of Loans, debt obligations and/or Derivative Instruments) where the Lender is exposed to the credit risk of Deliverable Obligations of the Loan Parties) from any short positions (i.e., a position as described above, but where the Lender is instead protected from the credit risk described above).

For purposes of determining whether a Lender (other than an Unrestricted Lender) has a Net Short Position on any date of determination:

(a)    Derivative Instruments shall be counted at the notional amount (in Dollars) of such Derivative Instrument; provided that, subject to clause (e) below, the notional amount of Derivative Instruments referencing an index that includes any of the Loan Parties or any bond or loan obligation issued or guaranteed by any Loan Party shall be determined in proportionate amount and by reference to the percentage weighting of the component which references any Loan Party or any bond or loan obligation issued or guaranteed by any Loan Party that would be a "Deliverable Obligation" or an "Obligation" (as defined in the ISDA CDS Definitions) of the Loan Parties;

(b)    notional amounts of Derivative Instruments in other currencies shall be converted to the Dollar equivalent thereof by such Lender in accordance with the terms of such Derivative Instruments, as applicable; provided that if not otherwise provided in such Derivative Instrument, such conversion shall be made in a commercially reasonable manner consistent with generally accepted financial practices and based on the prevailing conversion rate determined (on a midmarket basis) by such Lender, acting in a commercially reasonable manner, on the date of determination;

(c)    Derivative Instruments that are documented using either the 2014 ISDA Credit Derivatives Definitions or the 2003 ISDA Credit Derivatives Definitions (or any successor definitions thereof, collectively, the "ISDA CDS Definitions") shall be deemed to create a short position with respect to the Loans if such Lender is a protection buyer or the equivalent thereof for such Derivative Instrument and (i) the Loans are a "Reference Obligation" under the terms of such derivative transaction (whether specified by name in the related documentation, included as a "Standard Reference Obligation" on the most recent list published by Markit, if "Standard Reference Obligation" is specified as applicable in the relevant documentation or in any other manner) or (ii) the Loans would be a "Deliverable Obligation" or an "Obligation" (as defined in the ISDA CDS Definitions) of the Loan Parties under the terms of such derivative transaction;

(d)    credit derivative transactions or other Derivative Instruments not documented using the ISDA CDS Definitions shall be counted for purposes of the Net Short Position determination if, with respect to the Loans, such transactions are functionally equivalent to a transaction that offers such Lender protection in respect of the Loans; and

(e)    Derivative Instruments in respect of an index that includes any of the Loan Parties or any instrument issued or guaranteed by any of the Loan Parties shall not be deemed to create a short position, so long as (A) such index is not created, designed, administered or requested by such Lender and (B) the Loan Parties, and any Deliverable Obligation of the Loan Parties, collectively, shall represent less than 5.0% of the components of such index.

58

"Net Short Representation" means, with respect to any Lender (other than an Unrestricted Lender) at any time, a representation and warranty (including any deemed representation and warranty, as the case may be) from such Lender to the Borrower that it is not (x) a Net Short Lender at such time or (y) knowingly and intentionally acting in concert with any of its Affiliates for the express purpose of creating (and in fact creating) the same economic effect with respect to the Loan Parties as though such Lender were a Net Short Lender at such time.

"New Project" shall mean (a) each facility which is either a new facility, branch or office or an expansion, relocation, remodeling or substantial modernization of an existing facility, branch or office owned by Holdings or its Subsidiaries which in fact commences operations and (b) each creation (in one or a series of related transactions) of a business unit to the extent such business unit commences operations or each expansion (in one or a series of related transactions) of business into a new market.

"Non-Accepting Lender" has the meaning assigned to such term in Section 2.24(c).

"Non-Cash Charges" means (a) any impairment charge or asset write-off or write-down related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities pursuant to GAAP, (b) all losses from Investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) depreciation and amortization including amortization or impairment of intangibles (including goodwill) (including, without limitation, as they relate to amortization of deferred financing fees or costs, Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pension and other post-employment benefits) and (e) other non-cash charges, expenses and losses, including, without limitation, any non-cash translation loss and non-cash expense relating to the vesting of warrants, non-cash asset write-offs or write-downs, non-cash write offs of debt discounts and debt incurrences, non-cash costs and commissions, non-cash discounts and other non-cash fees and charges with respect to Indebtedness, interest rate protection and other hedging agreements, provided, in each case, that if any non-cash charges added back pursuant to clause (iii) of the definition of Consolidated EBITDA represent an accrual or reserve for potential cash items in any future period to the extent the Borrower elects to include such non-cash charges, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent.

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c). "Non-Refinancing Lender" has the meaning assigned to such term in Section 2.21(b). "Non-Wholly Owned Subsidiary" of any Person means any subsidiary of such Person other than a Wholly Owned Subsidiary.

"Not Otherwise Applied" means, with reference to the Available Amount or the Available Equity Amount, as applicable, that such amount was not previously applied pursuant to Sections 6.01(a)(xiv), 6.02(xxviii) (to the extent not used in connection with securing Indebtedness incurred under Section 6.01(a)(xiv)), 6.04(m), 6.07(a)(viii) and 6.07(b)(iv).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit O, payable to a Lender in a principal amount equal to the principal amount of the Revolving Commitment, or Term Loans, as applicable, of such Lender.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Offered Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

59

"Offered Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Organizational Documents" means, with respect to any Person, the charter, articles or certificate of organization or incorporation and bylaws or other organizational, constitutional or governing documents of such Person (including any certificates of incorporation and/or certificates of incorporation on a change of name).

"Other Connection Taxes" means, with respect to any recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Revolving Commitments" means one or more Classes of Revolving Commitments hereunder or extended Revolving Commitments that result from a Refinancing Amendment or a Loan Modification Agreement.

"Other Revolving Loans" means one or more classes of Revolving Loans made pursuant to any Other Revolving Commitment or a Loan Modification Agreement.

"Other Taxes" means any and all present or future recording, stamp, registration duties, documentary, excise, transfer, sales, property or similar Taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Other Term Commitments" means one or more Classes of term loan commitments hereunder that result from a Refinancing Amendment or a Loan Modification Agreement.

"Other Term Loans" means one or more Classes of Term Loans that result from a Refinancing Amendment or a Loan Modification Agreement.

"Outstanding Amount" means (a) with respect to the Revolving Loans on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Loans (including any refinancing of outstanding unpaid drawings under Letters of Credit or LC Credit Extensions as a Borrowing of Revolving Loans), occurring on such date; and (b) with respect to any LC Exposure on any date, the outstanding amount thereof on such date after giving effect to any LC Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Letters of Credit (including any refinancing of outstanding unpaid drawings under Letters of Credit or LC Credit Extensions as a Borrowing of Revolving Loan) or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"Overnight Rate" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"Pari Passu Intercreditor Agreement" means the Pari Passu Intercreditor Agreement substantially in the form of Exhibit E-1 among the Administrative Agent and one or more Senior Representatives for holders of Indebtedness permitted by this Agreement to be secured by the Collateral on a pari passu basis (but without regard to the control of remedies), with such modifications thereto as the Administrative Agent and the Borrower may reasonably agree.

60

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"Participating Lender" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(2).

"Patent" has the meaning assigned to such term in the Collateral Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pension Plan" means any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

**"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".**

"Permitted Acquisition" means the purchase or other acquisition, by merger, amalgamation, consolidation or otherwise, by Holdings or any Restricted Subsidiary of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person; provided that (a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Restricted Subsidiary (including as a result of a merger, amalgamation or consolidation between any Restricted Subsidiary and such Person), or (ii) such Person is merged or amalgamated into or consolidated with a Restricted Subsidiary and such Restricted Subsidiary is the surviving entity of such merger, amalgamation or consolidation, (b) the business of such Person, or such assets, as the case may be, constitute a business permitted by Section 5.16, (c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in clauses (a), (b), (c) and (d) of the definition of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken (or arrangements for the taking of such actions after the consummation of the Permitted Acquisition shall have been made that are reasonably satisfactory to the Administrative Agent) (unless such newly created or acquired Subsidiary is designated as an Unrestricted Subsidiary pursuant to Section 5.13 or is otherwise an Excluded Subsidiary) and (d) no Specified Event of Default shall have occurred and be continuing at the time of execution of a binding agreement in respect thereof.

"Permitted Activities" has the meaning assigned to such term in Section 6.08.

"Permitted Amendment" means an amendment to this Agreement and, if applicable the other Loan Documents, effected in connection with a Loan Modification Offer pursuant to Section 2.24, providing for an extension of a maturity date applicable to the Loans and/or Commitments of the Accepting Lenders and, in connection therewith, (a) a change in the Applicable Rate with respect to the Loans and/or Commitments of the Accepting Lenders, and/or (b) a change in the fees payable to, or the inclusion of new fees to be payable to, the Accepting Lenders, and/or (c) a change in Sections 2.08(b), 2.08(c), 2.10(c), 2.11(a), 2.11(e) and/or 2.11(f) with respect to the Loans and/or Commitments of the Accepting Lenders

and/or (d) additional or modified covenants, events of default, or guarantees or other provisions (it being understood that to the extent that any covenant, event of default, guarantee or other provision is added or modified for the benefit of any such Loans and/or Commitments, no consent shall be required by the Administrative Agent or any of the Lenders if such covenant, event of default, guarantee or other provision is either (i) also added or modified for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of such Loans and/or Commitments, (ii) only applicable after the Latest Maturity Date at the time of such Loan Modification Offer or (iii) in the aggregate, not materially more restrictive to the Loan Parties (as determined in good faith by the Borrower) when taken as a whole, than the terms of the Loans hereunder).

"<u>Permitted Encumbrances</u>" means:

(a)    Liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are not required to be paid pursuant to Section 5.05 (assuming Section 5.05 were applicable thereto);

(b)    Liens with respect to outstanding motor vehicle fines and carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's or construction contractors' Liens and other similar Liens, imposed by law or Contract (to the extent providing for Liens that are similar in scope to the foregoing), arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days, or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)    Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance, social security, retirement and other similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Restricted Subsidiary or otherwise supporting the payment of items set forth in the foregoing clause (i);

(d)    Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)    minor survey exceptions, minor encumbrances, covenants, conditions, easements, rights-of-way, restrictions, encroachments, protrusions, by-law, regulation or zoning restrictions, reservations of or rights of others for sewers, electric lines, telegraph and telephone lines and other similar purposes and other similar encumbrances and minor title defects or irregularities affecting real property, that, in the aggregate, do not materially interfere with the ordinary conduct of the business of Holdings and its Restricted Subsidiaries, taken as a whole, or which are set forth in the title insurance policy delivered with respect to the Mortgaged Property and are "insured over" in such insurance policy;

(f)    Liens securing, or otherwise arising from, judgments not constituting an Event

62

(g)    Liens on goods the purchase price of which is financed by a documentary or trade letter of credit issued for the account of the Borrower or any of its Restricted Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01;

(h)    the filing of UCC (or equivalent) financing statements solely as a precautionary measure or required notice in connection with operating leases or consignment of goods;

(i)    rights of recapture of unused real property (other than any Mortgaged Property) in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(j)    Liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(k)    Liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by Holdings, the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(l)    Liens arising from grants of licenses or sublicenses of Intellectual Property made in the ordinary course of business or that do not interfere in any material respect with the business of Holdings and its Restricted Subsidiaries, taken as a whole; provided that such Liens do not secure any Indebtedness;

(m)    rights of setoff, banker's liens, netting agreements and other Liens arising by operation of law or by of the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(n)    Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent in respect of leased properties, so long as such Liens are not exercised;

(o)    securities to public utilities or to any Governmental Authority when required by the utility or other authority in connection with the supply of services or utilities to the Borrower and any Restricted Subsidiaries;

(p)    servicing agreements, development agreements, site plan agreements and other agreements with any Governmental Authority pertaining to the use or development of any of the assets of the Person, provided same are complied with in all material respects and do not materially reduce the value of the assets of the Person or materially interfere with the use of such assets in the operation of the business of such Person;

63

(q)   [reserved];

(r)   [reserved];

(s)   customary rights of first refusal or first offer, and tag, drag and similar rights in joint venture agreements;

(t)   Liens arising from Permitted Investments described in clause (e) of the definition thereof; and

(u)   with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by any Requirements of Law in the ordinary course of business.

"Permitted First Priority Refinancing Debt" means any secured Indebtedness incurred by the Borrower and/or any Subsidiary Loan Party (and any Guarantee thereof by Holdings) in the form of one or more series of senior secured notes or senior secured loans (or revolving commitments in respect thereof, with revolving commitments deemed loans in the full amount of such commitment); provided that (i) such Indebtedness is secured by the Collateral (and no other assets which are not Collateral) on a pari passu basis (but without regard to the control of remedies) with the Initial Term Loans, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness or a Permitted Refinancing of Incremental Equivalent Debt, (iii) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers, AHYDO catch up payments or offers upon an event of default) that could result in redemptions of such Indebtedness prior to the maturity of the Refinanced Debt, (iv) such Indebtedness is not guaranteed by an entity that is not a Loan Party and (v) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to the Pari Passu Intercreditor Agreement and, if applicable, the Junior Intercreditor Agreement; provided that if such Indebtedness is the initial of any Incremental Facility, Incremental Equivalent Debt, other Indebtedness secured by the Collateral on a *pari passu* basis or Permitted First Priority Refinancing Debt incurred by the Borrower, then the Borrower, the other Loan Parties, the Administrative Agent and the Senior Representative for such Indebtedness shall have executed and delivered a customary intercreditor agreement with the Administrative Agent and/or Collateral Agent substantially in the form of the Pari Passu Intercreditor Agreement, together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders not less than five Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof, in each case in form and substance reasonably satisfactory to the Administrative Agent and/or Collateral Agent (it being understood that junior Liens are not required to be pari passu with other junior Liens, and that Indebtedness secured by junior Liens may be secured by Liens that are pari passu with, or junior in priority to, other Liens that are junior to the Liens securing the Secured Obligations) to provide for the sharing of the Collateral on a pari passu basis among the holders of the Secured Obligations and the holders of such Permitted First Priority Refinancing Debt. Permitted First Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Holders" means GTCR Group, Oakleigh Thorne, Thorndale Farm, LLC and each of their respective Affiliates.

64

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    Dollars, Euros, Canadian Dollars, Sterling, or such other currencies held by it from time to time in the ordinary course of business;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) Canada, (iii) Switzerland, (iv) United Kingdom, or (v) any member state of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member state of the European Union is pledged in support thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least (x) $250,000,000 in the case of U.S. banks or (y) $100,000,000 in the case of non-U.S. banks, or the U.S. dollar equivalent (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)    repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $250,000,000 or its equivalent for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) Canada, (iii) Switzerland, (iv) United Kingdom, or (v) any member state of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, in which such Person shall have a perfected first priority security interest (subject to no other Liens) or title to which shall have been transferred to such Person and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(f)    marketable short-term money market and similar highly liquid funds either (i) having assets in excess of $250,000,000 or its equivalent, or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)    securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, Canada, Switzerland, United Kingdom, a member of the European Union or by any political subdivision or taxing authority of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

65

(h)    investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)    instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j)    investments, classified in accordance with GAAP as current assets of the Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)    with respect to Holdings or any Foreign Subsidiary: (i) obligations of the national government of the country in which Holdings or such Subsidiary maintains its chief executive office and principal place of business; provided such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Subsidiary maintains its chief executive office and principal place of business; provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank; and

(l)    investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

"Permitted Junior Priority Refinancing Debt" means any secured Indebtedness incurred by the Borrower and/or any Subsidiary Loan Party (and any Guarantee thereof by Holdings) in the form of one or more series of junior lien secured notes or junior lien secured loans (or revolving commitments in respect thereof, with revolving commitments deemed to be loans in the full amount of such commitments); provided that (i) such Indebtedness is secured by the Collateral on a junior lien basis to the Initial Term Loans and/or Initial Revolving Commitments and the obligations in respect of any Permitted First Priority Refinancing Debt, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness or a Permitted Refinancing of Incremental Equivalent Debt, (iii) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers, AHYDO catch up payments, offers upon an event of default or excess cash flow payments (subject to the prior payment of the Loan Document Obligations or the prior offer thereof to prepay the Loan Document Obligations)) that could result in redemptions of such Indebtedness prior to the maturity of the Refinanced Debt, (iv) such Indebtedness is not guaranteed by any entity that is not a Loan Party and (v) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to the Junior Intercreditor Agreement, as applicable; provided that if such Indebtedness is the initial of any Incremental Facility, Incremental Equivalent Debt, other Indebtedness secured by the Collateral on a junior basis or Permitted Junior Priority Refinancing Debt incurred by the Borrower, then the Borrower, the other

66

Loan Parties, the Administrative Agent and the Senior Representatives for such Indebtedness shall have executed and delivered the Junior Intercreditor Agreement, as applicable. Permitted Junior Priority Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other amounts paid, and fees (including original issue discount and fees incurred in connection with the resulting Indebtedness) and expenses incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder; provided that the principal amount (or accreted value, if applicable) may exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended to the extent such excess amount (and the terms thereof) is otherwise permitted to be incurred under Section 6.01, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v), (a)(vii) or (a)(viii) (or except in the case of Extendable Bridge Loans), Indebtedness resulting from such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and (except in the case of Revolving Commitments) has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended (as determined by the Borrower in good faith) or otherwise reasonably satisfactory to the Administrative Agent. For the avoidance of doubt, it is understood and agreed that (x) notwithstanding anything in this Agreement to the contrary, in the case of any Indebtedness incurred to modify, refinance, refund, extend, renew or replace Indebtedness initially incurred in reliance on and measured by reference to a percentage of Consolidated EBITDA at the time of incurrence, and such modification, refinancing, refunding, extension, renewal or replacement would cause the percentage of Consolidated EBITDA to be exceeded if calculated based on the percentage of Consolidated EBITDA on the date of such modification, refinancing, refunding, extension, renewal or replacement, such percentage of Consolidated EBITDA restriction shall not be deemed to be exceeded so long as such incurrence otherwise constitutes a "Permitted Refinancing" and (y) a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness.

"Permitted Reorganization" means any re-organization or other similar activities among Holdings, the Borrower and the Restricted Subsidiaries related to Tax planning and re-organization, so long as, after giving effect thereto, (a) the Loan Parties are in compliance with the Collateral and Guarantee Requirement and Sections 5.11, (b) taken as a whole, the value of the Collateral securing the Secured Obligations and the Guarantees by the Guarantors of the Secured Obligations are not materially reduced and (c) the Liens in favor of the Administrative Agent for the benefit of the Secured Parties under the Security Documents are not materially impaired.

"Permitted Unsecured Refinancing Debt" means any unsecured Indebtedness incurred by the Borrower and/or any Loan Party in the form of one or more series of unsecured notes or unsecured loans (or revolving commitments in respect thereof, with revolving commitments deemed to be loans in the full amount of such commitments); provided that (i) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness or a Permitted Refinancing of Incremental Equivalent Debt, (ii) such Indebtedness does not have mandatory redemption features (other than customary asset sale, insurance and

condemnation proceeds events, change of control offers, AHYDO catch up payments or offers upon an event of default) that could result in redemptions of such Indebtedness prior to the maturity of the Refinanced Debt, (iii) such Indebtedness is not guaranteed by any entity that is not a Loan Party, and (iv) such Indebtedness is not secured by any Lien on any property or assets of Holdings, the Borrower or any Restricted Subsidiary. Permitted Unsecured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"Person" means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Planned Expenditures" has the meaning assigned to such term in clause (b) of the definition of "Excess Cash Flow".

"Platform" has the meaning assigned to such term in Section 5.01. "Prepayment Event" means:

(a)    (i) any non-ordinary course sale, transfer or other disposition of any property or asset of Holdings or any of its Restricted Subsidiaries permitted by Section 6.05(k) or 6.05(n) other than dispositions resulting in aggregate Net Proceeds not exceeding $15,000,000 in the case of any single transaction or series of related transactions and (ii) any Casualty Event; or

(b)    the incurrence by the Borrower or any of its Restricted Subsidiaries of any Indebtedness, other than Indebtedness (i) permitted under Section 6.01 (except for Credit Agreement Refinancing Indebtedness, the incurrence of which shall constitute a Prepayment Event) or (ii) permitted by the Required Lenders pursuant to Section 9.02.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. for such day or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Each change in the Prime Rate shall be effective from and including the date change is publicly announced as being effective.

"Pro Forma Adjustment" means, for any Test Period with respect to the Acquired EBITDA of the applicable Pro Forma Entity or the Consolidated EBITDA of Holdings, the pro forma increase in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, projected by the Borrower in good faith to be reasonably anticipated to be realizable from actions taken or expected to be taken within twenty-four (24) months following any applicable acquisition (including the Transactions), Specified Transactions, dispositions, operational change or initiative as a result of actions taken or expected to be taken (including the effect of increased pricing in customer contracts) or a plan for realization shall have been established, for the purposes of realizing cost savings, operating expense reductions or other operating improvements and synergies; provided that (A) such calculation shall be made on a Pro Forma Basis as though such cost savings, operating expense reduction, other operating improvements and synergies (on a "run rate" basis) had been realized on the first day of such period and, for purposes of projecting such pro forma increase to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, such calculation shall be made on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and "run rate" synergies had been realized commencing on the first day of

68

such period and that such cost savings, operating expense reductions, other operating improvements and synergies were realized on a "run rate" basis during the entirety of such Test Period and (B) any such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, shall be without duplication for cost savings, operating expense reductions, other operating improvements and synergies or additional costs already included in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, for such Test Period and, for the avoidance of doubt, shall not be required to comply with Regulation S-X.

"<u>Pro Forma Basis</u>," "<u>Pro Forma Compliance</u>" and "<u>Pro Forma Effect</u>" mean, with respect to compliance with any test, financial ratio or covenant hereunder required by the terms of this Agreement to be made on a Pro Forma Basis or after giving Pro Forma Effect thereto, that (a) to the extent applicable, the Pro Forma Adjustment and the Pro Forma Disposal Adjustment shall have been made and (b) the Transactions, all Specified Transactions, operational changes or initiatives described in the definition of "Pro Forma Adjustment" or "Consolidated EBITDA" and the following transactions in connection therewith that have been made during the applicable period of measurement or subsequent to such period and prior to or simultaneously with the event for which the calculation is made shall be deemed to have occurred as of the first day of the applicable period of measurement in such test, financial ratio or covenant: (i) income statement items (whether positive or negative) attributable to the property or Person subject to such Transaction, Specified Transaction, operational change or initiative (A) in the case of a Disposition of all or substantially all Equity Interests in any subsidiary of the Borrower or any division, product line, or facility used for operations of Holdings, the Borrower or any of their respective Subsidiaries, shall be excluded and (B) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction," shall be included, (ii) any retirement of Indebtedness, and (iii) any Indebtedness incurred or assumed by the Borrower or any of their respective Subsidiaries in connection therewith and if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination and interest on any Indebtedness under a revolving credit facility computed on a pro forma basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period; <u>provided</u> that, without limiting the application of the Pro Forma Adjustment pursuant to clause (a) above, the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and give effect to operating expense reductions that are (i) (x) directly attributable to such transaction, (y) expected to have a continuing impact on the Borrower or any of their respective Subsidiaries and (z) factually supportable or (ii) otherwise consistent with the definition of Pro Forma Adjustment.

"<u>Pro Forma Disposal Adjustment</u>" means, for any Test Period with respect to any Sold Entity or Business, the pro forma increase or decrease in Consolidated EBITDA projected by the Borrower in good faith to be realizable within twenty-four (24) months following the date the applicable Person, property, business, line of business, division, business unit or asset becomes a Sold Entity or Business as a result of contractual arrangements between the Borrower or any Restricted Subsidiary entered into with such Sold Entity or Business at the time of its disposal which represent an increase or decrease in Consolidated EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent Test Period prior to its disposal. Any such pro forma increase or decrease in Consolidated EBITDA shall be certified by a Financial Officer, the chief executive officer or president of the Borrower in the Compliance Certificate.

"<u>Pro Forma Entity</u>" has the meaning given to such term in the definition of "Acquired EBITDA."

"Pro Forma Financial Statements" means the unaudited consolidated pro forma balance sheet of Holdings and its Subsidiaries as of December 31, 2020, and the related unaudited pro forma consolidated statement of income of the Borrower and its Subsidiaries as of and for the twelve-month period then ended, prepared after giving effect to the Transactions (and which may exclude, at the Borrower's option, the impact of purchase accounting effects required by GAAP) as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of income) and any other adjustments as agreed by Holdings and the Joint Lead Arrangers (which need not be prepared in compliance with Regulations S-X of the Securities Act of 1933, as amended, or (at the option of the Borrower) include adjustments for purchase accounting).

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company Costs" means the costs relating to establishing compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the Borrower's or its Restricted Subsidiaries' establishment of compliance with the obligations of a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning set forth in Section 9.22.

"Qualified Equity Interests" means Equity Interests of Holdings or the Borrower other than Disqualified Equity Interests.

"Qualified Holding Company Debt" means Indebtedness of Holdings (A) that is not subject to any Guarantee by any Restricted Subsidiary of Holdings (other than a Subsidiary as contemplated under Section 6.03(b)(i)), (B) that has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (C) below), (C) that has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior notes (or no more restrictive than is customary) of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior notes of a holding company, including (x) customary asset sale (including insurance proceeds), change of control provisions and customary acceleration rights after an event of default and (y) customary "AHYDO" payments) and (D) if such Indebtedness is secured, it shall only be secured by assets of any direct or indirect parent entity of Holdings and any Restricted Subsidiary of Holdings that is permitted to guarantee such Indebtedness as provided in clause (A) of this definition; provided that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Specified Event of Default shall have occurred and be continuing.

"Qualified Securitization Facility" means any Securitization Facility that meets the following conditions: (a) the board of directors of the Borrower shall have determined in good faith that

70

such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the applicable Securitization Subsidiary and (b) the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Borrower).

"Qualifying Lender" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(3).

"Ratio Incremental Amount" has the meaning set forth in the definition of "Incremental Cap".

"Refinanced Debt" has the meaning assigned to such term in the definition of "Credit Agreement Refinancing Indebtedness."

"Refinancing Amendment" means an amendment to this Agreement in form reasonably satisfactory to the Administrative Agent and the Borrower executed by each of (a) the Borrower and Holdings, (b) the Administrative Agent and (c) each Additional Lender and Lender that agrees to provide any portion of the Credit Agreement Refinancing Indebtedness being incurred pursuant thereto, in accordance with Section 2.21.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Regulated Entity" means (a) any swap dealer registered with the U.S. Commodity Futures Trading Commission or security-based swap dealer registered with the U.S. Securities and Exchange Commission, as applicable; or (b) any commercial bank with a consolidated combined capital and surplus of at least $5,000,000,000 that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board of Directors of the Federal Deposit Insurance Corporation under 12 C.F.R. part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to in clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"Reimbursement Date" has the meaning assigned to such term in Section 2.05(f).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, controlling persons, trustees, administrators, managers, advisors and representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns of each of the foregoing.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Federal Reserve Board ~~and/or~~ the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board ~~and/or~~ the Federal Reserve Bank of New York, or any successor thereto.

"Removal Effective Date" has the meaning assigned to such term in Section 8.06. "Repricing Transaction" means, (i) any prepayment or repayment of the Initial Term Loans, in whole or in part, with the proceeds of, or conversion of any portion of the Initial Term Loans into, any new or replacement tranche of syndicated term loans under credit facilities incurred for the primary purpose of repaying, refinancing, or replacing Initial Term Loans with loans (including any yank-a-bank assignment in accordance with Section 9.02(c)) in connection therewith) bearing interest with an Effective Yield less than the Effective Yield applicable to such portion of the Initial Term Loans (as such comparative yields are determined in the reasonable judgment of the Administrative Agent consistent with generally accepted financial practices) and (ii) any amendment to the initial Term Loans (including any yank-a-bank assignment in accordance with Section 9.02(c) in connection therewith) which reduces the Effective Yield applicable to the Initial Term Loans; underlined provided that a Repricing Transaction shall not include any event described above that is not consummated for the primary purpose of lowering the effective interest cost or weighted average yield applicable to the Initial Term Loans, including, without limitation, any such event consummated in connection with a Change in Control or a Transformative Event.

"Required Additional Debt Terms" means with respect to any Indebtedness, (a) such Indebtedness does not mature earlier than the Latest Maturity Date for the Initial Term Loans (except in the case of Extendable Bridge Loans), (b) such Indebtedness (other than Extendable Bridge Loans) does not have a shorter Weighted Average Life to Maturity than the Initial Term Loans, (c) if such Indebtedness is unsecured or secured by the Collateral on a junior lien basis to the Secured Obligations, such Indebtedness does not have scheduled amortization or mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, change of control offers, AHYDO catch up payments, offers upon an event of default or, in the case of junior lien secured debt, excess cash flow payments (subject to the prior prepayment of the Loan Document Obligations or the prior offer thereof to prepay the Loan Document Obligations)) that could result in redemptions of such Indebtedness prior to the Latest Maturity Date, (d) such Indebtedness is not guaranteed by any entity that is not a Loan Party, (e) such Indebtedness of a Loan Party that is secured (i) is not secured by any assets not securing the Secured Obligations and (ii) is subject to the relevant Intercreditor Agreement, (f) the terms and conditions of such Indebtedness (excluding pricing, amortization, interest rate margins, rate floors, discounts, fees, collateral, guarantees, premiums and prepayment or redemption provisions) are not materially more restrictive to the Borrower (when taken as a whole) than the terms and conditions of this Agreement (when taken as a whole) are to the Borrower (unless (x) such terms and conditions are applicable only to periods after the Latest Maturity Date at such time, (y) the Lenders also receive the benefit of such more favorable terms and conditions or (z) such terms are reasonably satisfactory to the Administrative Agent) (together with, at the election of the Borrower, any applicable "equity cure" provisions with respect to any financial covenant) (it being understood that, to the extent that any covenant, event of default, guarantee or other provision is added or modified for the benefit of any such Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders if such covenant, event of default or guarantee is either (i) also added or modified for the benefit of any corresponding Loans remaining outstanding after the issuance or incurrence of any such Indebtedness in connection therewith or (ii) only applicable after the Latest Maturity Date at such time); underlined provided that the Borrower may, in its sole discretion, deliver a certificate of a Responsible Officer of the Borrower to the Administrative Agent at least five (5) Business Days prior to the incurrence of such indebtedness, together with a reasonably detailed description of the material terms and conditions of such resulting Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, and such certificate shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five (5) Business Day

period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees) and (g) if such Indebtedness in the form of a floating rate U.S. dollar denominated term loan (I) is secured on a pari passu basis with the Initial Term Loans and ranks pari passu with the Initial Term Loans in right of payment, (II) is incurred prior to the date that is six (6) months after the Effective Date, (III) has a maturity date prior to one year after the Term Maturity Date of the Initial Term Loans and (IV) is not incurred in connection with an acquisition or Investment permitted by the terms of this Agreement (a "<u>Loan Equivalent</u>"), in the event that the Effective Yield for any such Loan Equivalent is greater than the Effective Yield for the Initial Term Loans by more than 0.50% per annum, then the Effective Yield for the Initial Term Loans shall be increased (without the requirement for any Lender consent) to the extent necessary so that the Effective Yield for the Initial Term Loans is equal to the Effective Yield for such Loan Equivalent minus 0.50% per annum; provided that if such Loan Equivalent includes an interest rate floor greater than the applicable interest rate floor under the Initial Term Loans, such differential between interest rate floors shall be equated to the applicable interest rate margin for purposes of determining whether an increase to the interest rate margin under the Initial Term Loans shall be required, but only to the extent an increase in the interest rate floor in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder, and in such case, the interest rate floor (but not the interest rate margin) applicable to the Initial Term Loans shall be increased to the extent of such differential between interest rate floors.

"<u>Required Lenders</u>" means, at any time, Lenders having Revolving Exposures, Term Loans and unused Commitments representing more than 50% of the aggregate Revolving Exposures, outstanding Term Loans and unused Commitments at such time; <u>provided</u> that to the extent set forth in Section 9.02 or Section 9.04 whenever there are one or more Defaulting Lenders, the total outstanding Term Loans and Revolving Exposures of, and the unused Revolving Commitments of, each Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Required Revolving Lenders</u>" means, at any time, Revolving Lenders having Revolving Exposures and unused Commitments representing more than 50.0% of the aggregate Revolving Exposures and unused Commitments at such time; <u>provided</u> that to the extent set forth in Section 9.02 or Section 9.04 whenever there are one or more Defaulting Lenders, the total outstanding Revolving Exposures of, and the unused Revolving Commitments of, each Defaulting Lender, shall be excluded for purposes of making a determination of Required Revolving Lenders.

"<u>Requirements of Law</u>" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, statutory instruments, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Resignation Effective Date</u>" has the meaning assigned to such term in Section 8.06.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, director, company secretary or other similar officer, manager or a member of the Board of Directors of a Loan Party and with respect to certain limited liability companies, partnerships, and as to any document delivered on the Effective Date or thereafter pursuant to paragraph (a)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

73

"Restricted Investment" means any Investment not otherwise permitted by Section 6.04.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Restricted Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Restricted Subsidiary.

"Restricted Prepayment Event" has the meaning assigned to such term in Section 2.11(g).

"Restricted Subsidiary" means, unless otherwise specified, any Subsidiary of the Borrower, other than an Unrestricted Subsidiary.

"Retained Asset Sale Proceeds" has the meaning assigned to such term in Section 2.11(c).

"Retained Declined Proceeds" has the meaning assigned to such term in Section 2.11(e).

"Revaluation Date" means (a) the date of delivery of each Revolving Borrowing Request, (b) the date of issuance, extension or renewal of any Letter of Credit denominated in an Alternative Currency, in each case at the discretion of the Administrative Agent and/or any Issuing Bank or (c) the date of conversion or continuation of any Revolving Borrowing denominated in an Alternative Currency pursuant to Section 2.02.

"Revolving Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Revolving Maturity Date and the date of termination of the Revolving Commitments.

"Revolving Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to (i) make Revolving Loans, (ii) [reserved] and (iii) acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum possible aggregate amount of such Lender's Revolving Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Assumption, (ii) a Refinancing Amendment, (iii) an Incremental Revolving Commitment Increase, (iv) a Loan Modification Agreement or (v) an Additional/Replacement Revolving Commitment. The initial amount of each Lender's Revolving Commitment is set forth on Schedule 2.01(A) or, in each case, in the Assignment and Assumption, Loan Modification Agreement, Incremental Facility Amendment or Refinancing Amendment pursuant to which such Lender shall have assumed its Revolving Commitment, as the case may be. As of the Effective Date, the initial aggregate amount of the Lenders' Revolving Commitments is $100,000,000.

"Revolving Exposure" means, with respect to any Revolving Lender at any time, the sum of the outstanding principal amount of such Revolving Lender's Revolving Loans, its LC Exposure at such time.

"Revolving Lender" means a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"Revolving Loan" mean a Loan made by a Revolving Facility Lender pursuant to Section

"Revolving Maturity Date" means (i) April 30, 2026 (or if such day is not a Business Day, the immediately preceding Business Day) or (ii) with respect to any Revolving Lender that has extended its Revolving Commitment pursuant to a Permitted Amendment and with respect to any Issuing Bank that has consented to such extension, the extended maturity date set forth in any such Loan Modification Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country or territory which is the target of any comprehensive Sanctions (as of the date of this Agreement, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctions" means any economic sanctions administered or enforced by the United States Government (including without limitation, OFAC).

~~"Screen Rate" means, for any day and time, with respect to any Eurodollar Borrowing in Dollars and for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for the relevant currency) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); provided that if the Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.~~

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Cash Management Obligations" means the due and punctual payment and performance of all obligations of Holdings, the Borrower and any Restricted Subsidiaries in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services, corporate credit and purchasing cards and related programs or any automated clearing house transfers of funds (collectively, "Cash Management Services") provided to Holdings, the Borrower or any Restricted Subsidiary (whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor)) that are (a) owed to the Administrative Agent or any of its Affiliates, (b) owed on the Effective Date to a Person that is a Lender or an Affiliate of a Lender as of the Effective Date or within 30 days thereafter or (c) owed to a Person that is an Agent, a Lender or an Affiliate of an Agent or Lender at the time such obligations are incurred.

"Secured Obligations" means (a) the Loan Document Obligations, (b) the Secured Cash Management Obligations and (c) the Secured Swap Obligations (excluding with respect to any Loan Guarantor, Excluded Swap Obligations of such Loan Guarantor).

"Secured Parties" means (a) each Lender, (b) each Issuing Bank, (c) the Administrative Agent, (d) the Collateral Agent, (e) each Joint Lead Arranger, (f) each Person to whom any Secured Cash

Management Obligations are owed, (g) each counterparty to any Swap Agreement the obligations under which constitute Secured Swap Obligations, (h) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, (i) [reserved] and (j) the permitted successors and assigns of each of the foregoing.

"Secured Swap Obligations" means the due and punctual payment and performance of all obligations of the Borrower and its Restricted Subsidiaries under each Swap Agreement that (a) is with a counterparty that is the Administrative Agent or any of its Affiliates, (b) is in effect on the Effective Date with a counterparty that is a Lender, an Agent or an Affiliate of a Lender or an Agent as of the Effective Date or within 30 days thereafter or (c) is entered into after the Effective Date with any counterparty that is (i) a Lender, an Agent or an Affiliate of a Lender or an Agent at the time such Swap Agreement is entered into or (ii) a party to a Swap Agreement with a Loan Party and at the Borrower's request, delivers to the Administrative Agent a written notice (1) appointing the Administrative Agent as its agent under the applicable Loan Documents and (2) agreeing to be bound by Article VIII and Sections 9.03, 9.09 and 9.10 as if such Person were a Lender; provided that any designation pursuant to this clause (ii) shall not create in favor of such Person (x) any rights in connection with management or release of Collateral or the obligations of any Loan Party under the Loan Documents or (y) any voting or approval rights under the Loan Documents.

"Securitization Assets" means the accounts receivable, royalty and other similar rights to payment and proceeds thereof and any other assets related thereto including contract rights, lockbox accounts and records that are customarily sold or pledged in connection with securitization transactions and the proceeds thereof.

"Securitization Facility" means any of one or more receivables securitization financing facilities as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the obligations of which are non-recourse (except for customary representations, warranties, repurchase covenants, performance guarantees, servicing covenants and indemnities made in connection with such facilities), the Borrower or any Restricted Subsidiary (other than a Securitization Subsidiary) pursuant to which the Borrower or any Restricted Subsidiary sells or grants a security interest in Securitization Assets to either (a) a Person that is not a Restricted Subsidiary or (b) a Securitization Subsidiary that in turn sells or pledges Securitization Assets to a Person that is not a Restricted Subsidiary.

"Securitization Fees" means distributions or payments made directly or by means of discounts with respect to any interest issued or sold in connection with, and other fees paid to a Person that is not a Securitization Subsidiary in connection with, any Qualified Securitization Facility.

"Securitization Subsidiary" means any Subsidiary formed for the purpose of, and that engages only in one or more Qualified Securitization Facilities and other activities reasonably related thereto.

"Security Documents" means the Collateral Agreement, the Mortgages and each other security agreement or pledge agreement executed and delivered pursuant to the Collateral and Guarantee Requirement, Sections 5.11, 5.12 or 5.14 to secure any of the Secured Obligations.

"Senior Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured on the Collateral on a pari passu or junior basis, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

76

"Senior Secured First Lien Indebtedness" means any Indebtedness of the Borrower and its Restricted Subsidiaries that is secured by a Lien on the Collateral (but without regard to control of remedies) other than the Second Lien Term Loans and any other such Indebtedness to the extent secured by the Collateral on a junior basis to the Liens granted under the Security Documents in favor of the Collateral Agent for the benefit of the Secured Parties in respect of the Initial Term Loans.

"Senior Secured First Lien Net Leverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated Senior Secured First Lien Net Indebtedness as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"Senior Secured Indebtedness" means any Indebtedness of the Borrower and its Restricted Subsidiaries that is secured by a Lien on the Collateral.

"Senior Secured Net Leverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated Senior Secured Net Indebtedness as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"Settlement" means the transfer of cash or other property with respect to any credit or debit card charge, check or other instrument, electronic funds transfer, or other type of paper-based or electronic payment, transfer, or charge transaction for which a Person acts as a processor, remitter, funds recipient or funds transmitter in the ordinary course of its business.

"Settlement Asset" means any cash, receivable or other property, including a Settlement Receivable, due or conveyed to a Person in consideration for a Settlement made or arranged, or to be made or arranged, by such Person or an Affiliate of such Person.

"Settlement Indebtedness" means any payment or reimbursement obligation in respect of a Settlement Payment.

"Settlement Lien" means any Lien relating to any Settlement or Settlement Indebtedness (and may include, for the avoidance of doubt, the grant of a Lien in or other assignment of a Settlement Asset in consideration of a Settlement Payment, Liens securing intraday and overnight overdraft and automated clearing house exposure, and similar Liens).

"Settlement Payment" means the transfer, or contractual undertaking (including by automated clearing house transaction) to effect a transfer, of cash or other property to effect a Settlement.

"Settlement Receivable" means any general intangible, payment intangible, or instrument representing or reflecting an obligation to make payments to or for the benefit of a Person in consideration for a Settlement made or arranged, or to be made or arranged, by such Person.

"SOFR" ~~with respect to any day means~~ **means a rate equal to** the secured overnight financing rate ~~published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website~~ **as administered by the SOFR Administrator**.

~~"SOFR-Based Rate" means SOFR, Daily Simple SOFR, Compounded SOFR or Term SOFR.~~

**"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).**

**"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.**

**"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".**

"Sold Entity or Business" has the meaning assigned to such term in the definition of the term "Consolidated EBITDA."

"Solicited Discount Proration" has the meaning  assigned  to  such  term  in Section 2.11(a)(ii)(D)(3).

"Solicited Discounted Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Solicited Discounted Prepayment Notice" means an irrevocable written notice of a Borrower Solicitation of Discounted Prepayment Offers made pursuant to Section 2.11(a)(ii)(D) substantially in the form of Exhibit K.

"Solicited Discounted Prepayment Offer" means the irrevocable written offer by each Term Lender, substantially in the form of Exhibit L, submitted following the Administrative Agent's receipt of a Solicited Discounted Prepayment Notice.

"Solicited Discounted Prepayment Response Date" has the meaning assigned to such term in Section 2.11(a)(ii)(D)(1).

"Specified Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(1).

"Specified Discount Prepayment Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(1).

"Specified Discount Prepayment Notice" means an irrevocable written notice of the Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.11(a)(ii)(B) substantially in the form of Exhibit G.

"Specified Discount Prepayment Response" means the irrevocable written response by each Term Lender, substantially in the form of Exhibit H, to a Specified Discount Prepayment Notice.

"Specified Discount Prepayment Response Date" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(1).

"Specified Discount Proration" has the meaning assigned to such term in Section 2.11(a)(ii)(B)(3).

"Specified Event of Default" means an Event of Default under Section 7.01(a), (b), (h) or (i).

"Specified Transaction" means any Investment, acquisition (including the commitment of activities constituting such business), sale, transfer or other disposition of assets, incurrence or repayment

78

of Indebtedness (including any repayment of the Existing Convertible Notes), incurrence of Liens, Restricted Payment, subsidiary designation, commencement of a New Project or other event that by the terms of the Loan Documents requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis after giving Pro Forma Effect thereto.

"Spot Rate" means, on any day, with respect to any currency other than Dollars (for purposes of determining the Dollar Amount thereof) or Dollars (for purposes of determining the Alternative Currency Equivalent thereof), the rate at which such currency may be exchanged into Dollars or the applicable Alternative Currency, as the case may be, as set forth at approximately 11:00 a.m., New York City time, two (2) Business Days prior to such date on the applicable Bloomberg Key Cross Currency Rates Page. In the event that any such rate does not appear on any Bloomberg Key Cross Currency Rates Page, the Spot Rate shall be determined by reference to such other publicly available service for displaying exchange rates selected by the Administrative Agent for such purpose, or, at the discretion of the Administrative Agent, such Spot Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m., local time in such market, two (2) Business Days prior to such date for the purchase of Dollars or the applicable Alternative Currency, as the case may be, for delivery two (2) Business Days later; provided that, if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent may use any other reasonable method it deems appropriate to determine such rate, and such determination shall be presumed correct absent manifest error.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve, liquid asset or similar percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority to be applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities. Such reserve, liquid asset or similar percentages shall include those imposed pursuant to Regulation D of the Board of Governors. ~~Eurodollar~~SOFR Loans shall be deemed to be subject to such reserve, liquid asset or similar requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any other Requirements of Law. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Sterling" or "£" means the lawful currency for the time being of the United Kingdom.

"Submitted Amount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"Submitted Discount" has the meaning assigned to such term in Section 2.11(a)(ii)(C)(1).

"subsidiary" means, with respect to any Person (the "parent") at any date (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more subsidiaries of such Person and (ii) any partnership, limited liability company, association, or other similar non-corporate entity in which such Person and/or one or more subsidiaries of such Person owns more than a 50% equity interest at the time.

"Subsidiary" means any subsidiary of the Borrower (unless otherwise specified). "Subsidiary Loan Party" means each Restricted Subsidiary of the Borrower that is a party to the Guarantee Agreement or a guaranty governed by the laws of the Applicable Country in which a Foreign Subsidiary is incorporated or organized pursuant to Section 5.11.

"Successor Borrower" has the meaning assigned to such term in Section 6.03(a)(iv).

"Supermajority Lenders" means, at any time, Lenders having Revolving Exposures, Term Loans and unused Commitments representing more than 66 2/3% of the aggregate Revolving Exposures, outstanding Term Loans and unused Commitments at such time; provided that to the extent set forth in Section 9.02 or Section 9.04 whenever there are one or more Defaulting Lenders, the total outstanding Term Loans and Revolving Exposures of, and the unused Revolving Commitments of, each Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders.

"Supported QFC" has the meaning set forth in Section 9.22.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Target Person" has the meaning assigned to such term in Section 6.04.

"Tax Distributions" has the meaning assigned to such term in Section 6.07(a)(vii)(A).

"Tax Group" has the meaning assigned to such term in Section 6.07(a)(vii)(A).

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make a Term Loan hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Lender hereunder. The amount of each Lender's Term Commitment as of the Effective Date is set forth on Schedule 2.01. As of the Effective Date, the total Term Commitment is $725,000,000.

"Term Lender" means a Lender with a Term Commitment or an outstanding Term Loan.

"Term Loans" means Initial Term Loans, Other Term Loans and Incremental Term Loans, as the context requires.

"Term Maturity Date" means April 30, 2028 (or, with respect to any Term Lender that has extended the maturity date of its Term Loans in accordance with the terms of this Agreement, the extended maturity date set forth in the applicable Loan Modification Agreement, Refinancing Amendment or other amendment hereto).

"Term SOFR" means,

(a)　for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)　for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Adjustment" means, for any calculation with respect to a SOFR Loan, a percentage per annum as set forth below for the applicable Interest Period therefor:

| Interest Period | Percentage |
|---|---|
| One month | 0.11448% |
| Three months | 0.26161% |
| Six months | 0.42826% |

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

81

"Term SOFR **Reference Rate**" means the forward-looking term rate based on SOFR ~~that has been selected or recommended by the Relevant Governmental Body~~.

"Termination Date" means the date on which all Commitments have expired or been terminated, all Secured Obligations have been paid in full in cash (other than (x) Secured Swap Obligations not yet due and payable, (y) Secured Cash Management Obligations not yet due and payable and (z) contingent obligations not yet accrued and payable) and all Letters of Credit have expired or been terminated (other than Letters of Credit that have been cash collateralized or backstopped by an institution and otherwise pursuant to arrangements reasonably satisfactory to the applicable Issuing Bank).

"Test Period" means, at any date of determination, the period of four consecutive fiscal quarters of the Borrower then last ended as of such time for which financial statements have been delivered pursuant to Section 5.01(a) or (b) or, at the option of the Borrower, in connection with a Limited Condition Transaction, the period of four consecutive fiscal quarters of the Borrower for which financial statements have been delivered to the Administrative Agent on or prior to the applicable LCT Test Date; <u>provided</u> that for any date of determination before the delivery of the financial statements for the fiscal period ended December 31, 2021, Consolidated EBITDA shall be calculated as provided in the last paragraph of the definition thereof.

"Total Net Leverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated Total Net Indebtedness of the Borrower and the Restricted Subsidiaries as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"Trademark" has the meaning assigned to such term in the Collateral Agreement.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by Holdings, the Borrower or any other Subsidiary in connection with the Transactions, including fees, costs and expenses of any counsel, consultants and other advisors.

"Transactions" means (a) the Financing Transactions, (b) the Debt Repayment, and (c) the payment of the Transaction Costs.

"Transformative Event" means any merger, acquisition, investment, dissolution, liquidation, consolidation or disposition that is either (a) not permitted by the terms of the Loan Documents immediately prior to the consummation of such transaction or (b) if permitted by the terms of the Loan Documents immediately prior to the consummation of such transaction, would not provide the Borrower and its Restricted Subsidiaries with adequate flexibility under the Loan Documents for the continuation and/or expansion of their combined operations following such transaction, as reasonably determined by the Borrower acting in good faith.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted ~~LIBO Rate~~**Term SOFR** or Alternate Base Rate.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the term "UCC" and "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UCP" means, with respect to any commercial Letter of Credit, the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce, in its Publication No. 600 (or such later version thereof as may be reasonably acceptable to the applicable Issuing Bank and in effect at the time of issuance of such Letter of Credit). On an exception basis and if specifically requested by the Borrower, a standby Letter of Credit may be issued subject to UCP.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the **applicable** Benchmark Replacement excluding the **related** Benchmark Replacement Adjustment.

**"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.**

"U.S. Special Resolution Regimes" has the meaning set forth in Section 9.22.

"United States" and "U.S." means the United States of America.

"United States Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f)(ii)(C).

"Unrestricted Lender" means any Regulated Entity, any Revolving Lender as of the Effective Date, any Joint Lead Arranger or any of their respective Affiliates.

"Unrestricted Subsidiary" means any Subsidiary designated by the Borrower as an Unrestricted Subsidiary pursuant to Section 5.13 subsequent to the Effective Date.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Voluntary Prepayment Amount" has the meaning set forth in the definition of "Incremental Cap".

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness, in each case, without giving effect to any reductions of amortization or other scheduled payments for periods where amortization has been reduced as a result of the prepayment of the applicable Indebtedness.

"Wholly Owned Restricted Subsidiary" means any Restricted Subsidiary that is a Wholly Owned Subsidiary.

"Wholly Owned Subsidiary" means, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, or other similar non-corporate entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of the preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "~~Eurodollar~~SOFR Loan" or "ABR Loan") or by Class and Type (e.g., a "~~Eurodollar~~SOFR Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing" or "Term Borrowing") or by Type (e.g., a "~~Eurodollar~~SOFR Borrowing") or by Class and Type (e.g., a "~~Eurodollar~~SOFR Revolving Borrowing"). Borrowings of Revolving Loans are sometimes referred to herein as "Revolving Borrowings".

SECTION 1.03    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect

84

as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

All references to "in the ordinary course of business" of the Borrower or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of the Borrower or such Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Borrower and its Subsidiaries in the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses of the United States or any other jurisdiction in which the Borrower or any Subsidiary does business, as applicable.

For purposes of determining compliance with any Section of Article VI, in the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Restricted Payment, Affiliate transaction, restrictive agreement or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at the time of incurrence or consummation thereof shall be deemed to be incurred or otherwise permitted under such clause(s) determined by the Borrower in its sole discretion at such time of incurrence or consummation, as applicable (or any later time from time to time, in each case, as determined by the Borrower in its sole discretion at such time and thereafter may be reclassified by the Borrower (it being understood and agreed that such reclassification shall be automatic if at the end of any fiscal quarter such reclassification would then be permitted)).

When the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day.

The Administrative Agent does not warrant nor accept any responsibility nor shall the Administrative Agent have any liability with respect to (i) any ~~Benchmark Replacement~~ Conforming Changes, (ii) the administration, submission or any matter relating to the rates in the definition of Benchmark or with respect to any rate that is an alternative, comparable or successor rate thereto or (iii) the effect of any of the foregoing.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, except as otherwise prescribed herein.

(b)    Notwithstanding anything in this Agreement to the contrary, for purposes of determining compliance with any test contained in this Agreement, Consolidated EBITDA, the Total Net Leverage Ratio, the Senior Secured First Lien Net Leverage Ratio, the Senior Secured Net Leverage Ratio and the Cash Interest Coverage Ratio shall be calculated on a Pro Forma Basis to give effect to the Transaction and all Specified Transactions that have been made during the applicable period of measurement or subsequent to such period and prior to or simultaneously with the event for which the calculation is made.

SECTION 1.05    Effectuation of Transactions.

All references herein to Holdings, the Borrower and their respective Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of Holdings, the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions to occur on the Effective Date, unless the context otherwise requires.

SECTION 1.06    Limited Condition Transactions.

Notwithstanding anything in this Agreement or any Loan Document to the contrary, when calculating any applicable ratio, the amount or availability of the Available Amount or any other basket (including incremental facilities or any baskets based on Consolidated EBITDA or total assets), or determining other compliance with this Agreement (including the determination of compliance with representations, warranties or any provision of this Agreement which requires that no Default or Event of Default has occurred, is continuing or would result therefrom) in connection with a Specified Transaction or other transaction undertaken in connection with the consummation of a Limited Condition Transaction, the date of determination of such ratio, the amount or availability of the Available Amount or any other basket and determination of the accuracy of any representation or warranty or whether a Default or Event of Default has occurred, is continuing or would result therefrom or other applicable covenant shall, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Transaction, an "LCT Election"), be deemed to be the date the definitive agreements for such Limited Condition Transaction are entered into (the "LCT Test Date") and if, after such ratios and other provisions are measured on a Pro Forma Basis after giving effect to such Limited Condition Transaction and the other Specified Transactions or other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they occurred at the beginning of the applicable Test Period ending prior to the LCT Test Date, the Borrower could have taken such action on the relevant LCT Test Date in compliance with such ratios and provisions, such provisions shall be deemed to have been complied with. For the avoidance of doubt, (x) if any of such ratios are exceeded as a result of fluctuations in such ratio (including due to fluctuations in Consolidated EBITDA of the Borrower and its Subsidiaries) at or prior to the consummation of the relevant Limited Condition Transaction, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Limited Condition Transaction is permitted hereunder and (y) such ratios and other provisions shall not be tested at the time of consummation of such Limited Condition Transaction or related Specified Transactions or other transactions. If the Borrower has made an LCT Election for any Limited Condition Transaction, then in connection with any subsequent

86

calculation of any ratio or basket availability with respect to any other Specified Transaction on or following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement for such Limited Condition Transaction is terminated or expires without consummation of such Limited Condition Transaction, any such ratio or basket shall be calculated on a Pro Forma Basis assuming such Limited Condition Transaction and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated.

SECTION 1.07    Additional Alternative Currencies.

(a)    The Borrower may from time to time request that ~~Eurodollar~~**SOFR** Revolving Loans be made and/or Letters of Credit be issued in a currency other than Dollars or those specifically listed in the definition of "Alternative Currency." In the case of any such request with respect to the making of ~~Eurodollar~~**SOFR** Revolving Loans, such request shall be subject to the approval of the Administrative Agent and all of the Revolving Lenders. In the case of any such request with respect to the issuance of Letters of Credit, such request shall be subject to the approval of the Administrative Agent, the applicable Issuing Bank and all of the Revolving Lenders.

(b)    Any such request shall be made to the Administrative Agent not later than 11:00 a.m. (New York City time), ten (10) Business Days prior to the date of the desired Revolving Borrowing or issuance of Letters of Credit (or such other time or date as may be agreed by the Administrative Agent and, in the case of any such request pertaining to Letters of Credit, each Issuing Bank, in its or their sole discretion). In the case of any such request pertaining to ~~Eurodollar~~**SOFR** Revolving Loans, the Administrative Agent shall promptly notify each Revolving Lender thereof. In the case of any such request pertaining to Letters of Credit, the Administrative Agent shall promptly notify the applicable Issuing Bank thereof. Each Revolving Lender (in the case of any such request pertaining to ~~Eurodollar~~**SOFR** Revolving Loans) or each Issuing Bank (in the case of a request pertaining to Letters of Credit) shall notify the Administrative Agent, not later than 11:00 a.m. (New York City time), two (2) Business Days after its receipt of such request as to whether it consents, in its sole discretion, to the making of ~~Eurodollar~~**SOFR** Revolving Loans or the issuance of Letters of Credit, as the case may be, in such requested currency.

(c)    Any failure by a Revolving Lender or an Issuing Bank, as the case may be, to respond to such request within the time period specified in the last sentence of clause (b) above shall be deemed to be a refusal by such Revolving Lender or such Issuing Bank, as the case may be, to permit ~~Eurodollar~~**SOFR** Revolving Loans to be made or Letters of Credit to be issued in such requested currency. If the Administrative Agent and all the Revolving Lenders consent to making ~~Eurodollar~~**SOFR** Revolving Loans in such requested currency, the Administrative Agent shall so notify the Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Borrowings of ~~Eurodollar~~**SOFR** Revolving Loans. If the Administrative Agent and each Issuing Bank consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.07, the Administrative Agent shall promptly so notify the Borrower.

SECTION 1.08    Currency Equivalents Generally.

(a)    The Administrative Agent shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Amounts of a Borrowing or an issuance of any Letter of Credit or extension, renewal or increase of the amount thereof and any amounts outstanding hereunder denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall

be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. Except as set forth in this Agreement, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Amount as so determined by the Administrative Agent or the Issuing Banks, as applicable and notified to the Borrower.

(b)    Wherever in this Agreement in connection with a Borrowing, conversion, continuation or prepayment of a ~~Eurodollar~~SOFR Loan or the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Borrowing, ~~Eurodollar~~SOFR Loan or Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar Amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the applicable Issuing Bank, as the case may be and notified to the Borrower.

(c)    For purposes of determining compliance as of any date with any covenant or incurrence test under any Loan Document or for purposes of making any determination under any Default or Event of Default hereunder or for any other specified purpose hereunder, amounts incurred or outstanding in currencies (other than Dollars) shall be translated into Dollars at the Exchange Rate; <u>provided</u> that if any Indebtedness or Liens are incurred to extend, replace, refund, refinance, renew or defease other Indebtedness or Liens denominated in currencies (other than Dollars), and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the amount of any premium paid, and fees and expenses incurred, in connection with such extension, replacement, refunding refinancing, renewal or defeasance (including any fees and original issue discount incurred in respect of such resulting Indebtedness). No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in any covenant, representation or Default or Event of Default under any Loan Document being exceeded solely as a result of changes in currency exchange rates from the applicable Exchange Rate on the first Business Day of the fiscal quarter of the Borrower in which such determination occurs or in respect of which such determination is made.

SECTION 1.09    <u>Change in Currency</u>.

(a)    Each obligation of the Borrower to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euros at the time of such adoption (in accordance with the EMU Legislation). If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency; <u>provided</u> that if any Revolving Borrowing in the currency of such member state is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Borrowing, at the end of the then current Interest Period.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be necessary to reflect the adoption of the Euro by any member state of the European Union.

(c)    Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be necessary to reflect a change in currency of any other country.

88

SECTION 1.10    Adjusted LIBO Rates

The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation, administration, submission, or calculation of or any other matter related to the Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

(a)    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark

Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders; *provided* that, to the extent the Benchmark is replaced with a SOFR-Based Rate, Lenders shall only be entitled to object to the Benchmark Replacement Adjustments with respect thereto. Any such amendment with respect to an Early Opt-in Election will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of the Benchmark with a Benchmark Replacement pursuant to this Section 1.10 will occur prior to the applicable Benchmark Transition Start Date.

(b)    In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(c)    The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii)

89

~~the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 1.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 1.10.~~

~~(d)　　　Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Eurocurrency Rate Borrowing of, conversion to or continuation of Eurocurrency Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon Adjusted Eurocurrency Rate will not be used in any determination of Base Rate.~~

SECTION 1.11　　<u>Divisions</u>.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE II

<u>THE CREDITS</u>

SECTION 2.01　　<u>Commitments</u>.

Subject to the terms and conditions set forth herein, (a) each Term Lender agrees to make Term Loans to the Borrower on the Effective Date denominated in Dollars in a principal amount not exceeding such Term Lender's Term Commitment and (b) each Revolving Lender agrees to make Revolving Loans to the Borrower denominated in Dollars or an Alternative Currency, from time to time during the Revolving Availability Period in an aggregate principal amount which will not result in such Revolving Lender's Revolving Exposure of such Class exceeding such Revolving Lender's Revolving Commitment of such Class.　Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans. Amounts repaid or prepaid in respect of Term Loans may not be reborrowed.

SECTION 2.02　　<u>Loans and Borrowings</u>.

(a)　　　Each (i) Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class and (ii) Revolving Loans shall be made by the Revolving Lenders ratably in accordance with their respective Revolving Commitments. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, <u>provided</u> that the Commitments of the Lenders are several and other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

90

(b)      Subject to Section 2.14, each Revolving Borrowing and Term Borrowing shall be comprised entirely of ABR Loans or ~~Eurodollar~~**SOFR** Loans as the Borrower may request in accordance herewith, provided that all Borrowings made on the Effective Date must be made as ABR Borrowings unless the Borrower shall have given the notice required for a ~~Eurodollar~~**SOFR** Borrowing under Section 2.03 and provided an indemnity letter extending the benefits of Section 2.16 to Lenders in respect of such Borrowings. Revolving Loans denominated in (i) Dollars or Canadian Dollars may be ABR Loans or ~~Eurodollar~~**SOFR** Loans and (ii) any Alternative Currency (other than Canadian Dollars) shall be ~~Eurodollar~~**SOFR** Loans. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)      At the commencement of each Interest Period for any ~~Eurodollar~~**SOFR** Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a ~~Eurodollar~~**SOFR** Borrowing that results from a continuation of an outstanding ~~Eurodollar~~**SOFR** Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of eight ~~Eurodollar~~**SOFR** Borrowings outstanding *plus* an additional two ~~Eurodollar~~**SOFR** Borrowings for each outstanding Incremental Facility. Notwithstanding anything to the contrary herein, an ABR Revolving Borrowing of the applicable Class may be in an aggregate amount equal to the entire unused balance of the aggregate
Revolving Commitments of such Class or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(f).

SECTION 2.03      Requests for Borrowings.

To request a Revolving Borrowing or Term Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a ~~Eurodollar~~**SOFR** Borrowing, not later than 2:00 p.m., New York City time, three (3) Business Days (or, in the case of any ~~Eurodollar~~**SOFR** Borrowing to be made on the Effective Date, one (1) Business Day) before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 1:00 p.m., New York City time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Borrowing Request signed by the Borrower substantially in the form of Exhibit C-1. Each such telephonic and written Borrowing Request shall specify the following information:

(i)      whether the requested Borrowing is to be a Revolving Borrowing, a Term Borrowing or a Borrowing of any other Class (specifying the Class thereof);

(ii)      the aggregate amount of such Borrowing;

(iii)      the date of such Borrowing, which shall be a Business Day;

(iv)      whether such Borrowing is to be an ABR Borrowing or a ~~Eurodollar~~**SOFR** Borrowing;

91

Appx10224

in the case of a ~~Eurodollar~~**SOFR** Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(vi)        the location and number of the Borrower's account or accounts to which funds are to be disbursed; and

(vii)        in the case of a Revolving Borrowing, the currency in which such Borrowing is to be denominated.

If no election as to the Type of Borrowing is specified as to any requested Borrowing in Dollars or Canadian Dollars, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested ~~Eurodollar~~**SOFR** Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.   If no currency is specified with respect to any requested ~~Eurodollar~~**SOFR** Borrowing, then the Borrower shall be deemed to have requested that the Borrowing be denominated in Dollars. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04        [Reserved].

SECTION 2.05        Letters of Credit.

(a)        General. Subject to the terms and conditions set forth herein (including Section 2.22), each Issuing Bank agrees, in reliance upon the agreements of the Revolving Lenders and the Borrower set forth in this Section 2.05 and elsewhere in the Loan Documents, to issue Letters of

Credit denominated in Dollars or an Alternative Currency for the Borrower's own account (or for the account of any Subsidiary so long as the Borrower is an obligor in respect of all Loan Document Obligations arising under or in respect of such Letter of Credit), in a form reasonably acceptable to the Administrative Agent and the applicable Issuing Bank, which shall reflect the standard operating procedures of such Issuing Bank, at any time and from time to time during the period from the Effective Date until the date that is the third (3rd) Business Day prior to the Revolving Maturity Date; provided that

(x) none of Morgan Stanley Senior Funding, Inc., Credit Suisse AG or Deutsche Bank Securities, Inc. (or any of their respective Affiliates) shall be required to issue any Letter of Credit other than standby Letters of Credit denominated in Dollars without its consent and (y) no Issuing Bank shall be required to issue any Letter of Credit if after giving effect thereto the LC Exposure with respect to all Letters of Credit issued by such Issuing Bank would exceed the amount set forth across from its name on Schedule 2.05 (or in the documents pursuant to which such Issuing Bank became an Issuing Bank). In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by a Borrower to, or entered into by the Borrower with, the applicable Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b)        Issuance, Amendment, Renewal or Extension; Certain Conditions.    To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall deliver in writing by hand delivery or facsimile (or transmit by electronic communication, if arrangements for doing so have been approved by the recipient) to the applicable Issuing Bank and the Administrative Agent (at least three (3) Business Days before the requested date of issuance, amendment, renewal or extension (or, in the case of any such request to be made on the Effective Date, one (1) Business Day) or such shorter period as the applicable Issuing Bank and the Administrative Agent may agree) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended

92

or extended, and specifying the date of issuance, amendment, renewal or extension, as the case may be (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (d) of this Section 2.05), the amount and currency of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend or extend, as the case may be, such Letter of Credit. Each such notice shall be in the form of Exhibit Q, appropriately completed (each, a "<u>Letter of Credit Request</u>"). If requested by the applicable Issuing Bank, the Borrower also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be issued, amended or extended only if (and upon issuance, amendment, renewal or extension of any Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, (i) subject to Section 9.04(b)(ii), the Applicable Fronting Exposure of each Issuing Bank shall not exceed its Fronting Exposure Cap, (ii) the aggregate Revolving Exposures shall not exceed the aggregate Revolving Commitments and (iii) the aggregate LC Exposure shall not exceed the Letter of Credit Sublimit. Letters of Credit will be available to be issued up to an aggregate face amount not to exceed the Letter of Credit Sublimit. No Issuing Bank shall be under any obligation to issue any Letter of Credit if (i) any order, judgment or decree of any Governmental Authority or arbitrator shall enjoin or restrain such Issuing Bank from issuing the Letter of Credit, or any Requirements of Law applicable to such Issuing Bank or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Bank shall prohibit the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon such Issuing Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise fully compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which such Issuing Bank in good faith deems material to it, (ii) the issuance of such Letter of Credit would violate one or more policies of such Issuing Bank now or hereafter in effect and applicable to letters of credit generally, (iii) except as otherwise agreed in writing by the Administrative Agent and the applicable Issuing Bank, such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency, (iv) except as otherwise agreed by the Administrative Agent and such Issuing Bank, the Letter of Credit is in an initial stated amount less than $100,000, or (v) any Lender is at that time a Defaulting Lender, if after giving effect to Section 2.22(a)(iv), any Defaulting Lender Fronting Exposure remains outstanding, unless such Issuing Bank has entered into arrangements, including the delivery of cash collateral, reasonably satisfactory to such Issuing Bank with the Borrower or such Lender to eliminate such Issuing Bank's Defaulting Lender Fronting Exposure arising from either the Letter of Credit then proposed to be issued or such Letter of Credit and all other LC Exposure as to which such Issuing Bank has Defaulting Lender Fronting Exposure. No Issuing Bank shall be under any obligation (i) to amend or extend any Letter of Credit if (x) such Issuing Bank would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof or (y) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit or (ii) to issue any Letter of Credit if such Letter of Credit contains any provisions for automatic reinstatement of all or any portion of the stated amount thereof after any drawing thereunder or after the expiry date of such Letter of Credit (provided that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods as provided in Section 2.05(d)).

          (c)     <u>Notice</u>. Each Issuing Bank agrees that, upon any issuance, amendment, renewal or extension of a Letter of Credit, it shall have given to the Administrative Agent written notice thereof required under paragraph (m)(iii) of this Section 2.05.

          (d)     <u>Expiration Date</u>. Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date that is one year after the date of the issuance of such Letter of Credit (or, in the case of any extension thereof, the date to which it has been extended (not in excess of one year from the last applicable expiry date)) or such later date as may be agreed by the applicable Issuing Bank and (ii) the date that is three (3) Business Days prior to the Revolving Maturity Date; <u>provided</u> that if such expiry date is not a Business Day, such Letter of Credit shall expire at or prior to the close of business on the next

93

succeeding Business Day; provided further that any Letter of Credit may, upon the request of the Borrower, include a provision whereby such Letter of Credit shall be renewed or extended automatically for additional consecutive periods of up to one year or such longer period as may be agreed by the applicable Issuing Bank (but not beyond the date that is three (3) Business Days prior to the Revolving Maturity Date) unless the applicable Issuing Bank notifies the beneficiary thereof within the time period specified in such Letter of Credit or, if no such time period is specified, at least thirty (30) days prior to the then-applicable expiration date, that such Letter of Credit will not be renewed or extended; provided further that such Letter of Credit shall not be required to expire on such third (3rd) Business Day prior to the Revolving Maturity Date if such Letter of Credit is cash collateralized or backstopped in an amount, by an institution and otherwise pursuant to arrangements, in each case reasonably acceptable to the applicable Issuing Bank. For the avoidance of doubt, if the Revolving Maturity Date occurs prior to the expiration of any Letter of Credit as a result of the last proviso in the foregoing sentence, then upon the taking of actions described in such proviso with respect to such Letter of Credit, all participations in such Letter of Credit under the terminated Revolving Commitments shall terminate.

(e)  Participations. Immediately upon the issuance of each Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank that is the issuer thereof or the Lenders, each Revolving Lender shall be deemed to have purchased and the applicable Issuing Bank shall be deemed to have sold a participation in such Letter of Credit equal to such Revolving Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent,

for the account of such Issuing Bank, such Revolving Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrower on the date due as provided in paragraph (f) of this Section 2.05, or of any reimbursement payment required to be refunded to the Borrower for any reason. All fundings of such participations shall be denominated in Dollars. Each Revolving Lender acknowledges and agrees that its acquisition of participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment or extension of any Letter of Credit or the occurrence and continuance of a Default or any reduction or termination of the Revolving Commitments, and that each payment required to be made by it under the preceding sentence shall be made without any offset, abatement, withholding or reduction whatsoever.

(f)  Reimbursement. If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount (in same day funds) equal to such LC Disbursement not later than 4:00 p.m. New York City time one Business Day following the day that the Borrower receives written notice (including via e-mail) of such LC Disbursement (the "Reimbursement Date"), together with accrued interest or fees thereon in accordance with clause (i) of this Section 2.05. Anything contained herein to the contrary notwithstanding, (i) unless the Borrower shall have notified the Administrative Agent and the applicable Issuing Bank prior to 4:00 p.m., New York City time, on the date such LC Disbursement is made that the Borrower intends to reimburse the applicable Issuing Bank for the amount of the LC Disbursement (including any accrued interest or fees thereon), whether with its own funds or with the proceeds of Revolving Loans, the Borrower shall be deemed to have given a timely Borrowing Request to the Administrative Agent requesting Revolving Lenders to make Revolving Loans that are ABR Revolving Loans on the Reimbursement Date in an amount equal to such LC Disbursement (together with any accrued interest or fees thereon), and (ii) subject to satisfaction or waiver of the conditions specified in Section 4.02, Revolving Lenders shall, on the Reimbursement Date, make Revolving Loans that are ABR Revolving Loans in an amount equal to their Applicable Percentage of such LC Disbursement (together with any accrued interest or fees thereon), the proceeds of which shall be applied directly by the Administrative Agent to reimburse the applicable Issuing Bank for the amount of such LC Disbursement

94

(together with any accrued interest or fees thereon); provided that if for any reason proceeds of Revolving Loans are not received by the applicable Issuing Bank on the Reimbursement Date in an amount equal to such LC Disbursement (together with any accrued interest or fees thereon), the Borrower shall reimburse the applicable Issuing Bank, on demand, in an amount in same day funds equal to the excess of such LC Disbursement (together with any accrued interest or fees thereon) over the aggregate amount of such Revolving Loans, if any, which are so received. The Revolving Loans made pursuant to this paragraph (f) shall be made without regard to the Borrowing Minimum.

        (g)    <u>Obligations Absolute</u>. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (f) of this Section 2.05 is absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, this Agreement or any other Loan Document, or any term or provision herein or therein, (ii) any exchange, change, waiver or release of any Collateral for, or any other Person's guarantee of or other liability for, any of the Secured Obligations, (iii) the existence of any claim, set-off, defense or other right which the Borrower or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), the applicable Issuing Bank, any Lender or any other Person or, in the case of a Lender, against the Borrower, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between the Borrower or one or more of its Subsidiaries and the beneficiary for which any Letter of Credit was procured), (iv) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (v) payment by an Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit (<u>provided</u> that the Borrower shall not be obligated to reimburse such LC Disbursements unless payment is made against presentation of a draft or other document that at least substantially complies with the terms of such Letter of Credit), (vi) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiaries; (vii) any breach hereof or any other Loan Document by any party hereto or thereto, (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; (ix) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.05, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder or (x) any adverse change in the relevant exchange rates or in the availability of any Alternative Currency to the Borrower or in the relevant currency markets generally. As between the Borrower and any Issuing Bank, the Borrower assumes all risks of the acts and omissions of, or misuse of such Letters of Credit and the proceeds thereof, by the respective beneficiaries of such Letters of Credit or any assignees or transferees thereof. In furtherance and not in limitation of the foregoing, none of the Administrative Agent, the Lenders, the Issuing Banks or any of their Related Parties shall have any liability or responsibility for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged, other than a failure to confirm such documents comply with the terms of such Letter of Credit; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) its honor of any presentation under a Letter of Credit that appears on its face to substantially comply with the terms and conditions of such Letter of Credit; (v) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder); (vi) errors in interpretation of technical terms; (vii) any loss or delay in the transmission of any document required in order to make a drawing under any such Letter of Credit; (viii) the misapplication by the beneficiary of any

95

such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (ix) any consequences arising from causes beyond the control of the applicable Issuing Bank, including any act by a Governmental Authority and fluctuation in currency exchange rates. None of the above shall affect or impair, or prevent the vesting of, any of the applicable Issuing Bank's rights or powers hereunder or place any Issuing Bank under any liability to the Borrower or any other Person. Notwithstanding the foregoing, none of the above shall be construed to excuse any Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential, incidental, exemplary or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by Requirements of Law) suffered by the Borrower that are caused by such Issuing Bank's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final, nonappealable judgment) when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented that appear on their face to be in substantial compliance with the terms of a Letter of Credit, an Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if (notwithstanding the appearance of substantial compliance) such documents are not in strict compliance with the terms of such Letter of Credit, and any such acceptance or refusal shall be deemed not to constitute gross negligence or willful misconduct.

(h)      <u>Disbursement Procedures</u>. Each Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Each Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed in writing by hand delivery or facsimile) of such demand for payment and whether such Issuing Bank has made or will make an LC Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligations to reimburse such Issuing Bank and the Revolving Lenders with respect to any such LC Disbursement in accordance with paragraph (f) of this Section 2.05.

(i)      <u>Interim Interest</u>. If an Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Revolving Loans; <u>provided</u> that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (f) of this Section 2.05, then Section 2.13(c) shall apply. Interest accrued pursuant to this paragraph shall be paid to the Administrative Agent, for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (f) of this Section 2.05 to reimburse such Issuing Bank shall be for the account of such Lender to the extent of such payment and shall be payable on demand or, if no demand has been made, on the date on which the Borrower reimburses the applicable LC Disbursement in full.

(j)      <u>Cash Collateralization</u>. If (i) effective immediately, without demand or other notice of any kind, as of any expiration date of a Letter of Credit, such Letter of Credit may for any reason remain outstanding and partially or wholly undrawn, (ii) effective immediately, without demand or other notice of any kind, as of the occurrence and during the continuance of any Event of Default under paragraph (h) or (i) of Section 7.01, or (iii) any Event of Default under paragraph (a) or (b) of Section 7.01 shall occur and be continuing, on the Business Day on which the Borrower receives notice from the Administrative Agent, the applicable Issuing Bank or the Required Lenders (or, if the maturity of the Loans has been accelerated, Revolving Lenders with LC Exposure representing more than 50% of the aggregate LC Exposure of all Revolving Lenders) demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Secured Parties, an amount of cash in Dollars or an Alternative Currency, as the case may

96

be, equal to the portions of the LC Exposure attributable to Letters of Credit, as of such date, plus any accrued and unpaid interest thereon. The Borrower also shall deposit cash collateral pursuant to this paragraph as and to the extent required by Section 2.11(b). Each such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement and the other Loan Documents. At any time that there shall exist a Defaulting Lender, if any Defaulting Lender Fronting Exposure remains outstanding (after giving effect to Section 2.22(a)(iv)), then promptly upon the request of the Administrative Agent or any Issuing Bank, the Borrower shall deliver to the Administrative Agent cash collateral in an amount sufficient to cover such Defaulting Lender Fronting Exposure (after giving effect to any cash collateral provided by the Defaulting Lender). The Administrative Agent (for the benefit of the Secured Parties) shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent in Permitted Investments and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Notwithstanding anything to the contrary set forth in this Agreement, moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Banks for LC Disbursements for which they have not been reimbursed and, to the extent not so applied, the balance shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Lenders with LC Exposure representing more than 50% of the aggregate LC Exposure of all the Revolving Lenders), such balance shall be applied to satisfy other obligations of the Borrower under this Agreement. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default or the existence of a Defaulting Lender, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived or after the termination of Defaulting Lender status, as applicable. If the Borrower is required to provide an amount of cash collateral hereunder pursuant to Section 2.11(b), such amount (to the extent not applied as aforesaid) shall be returned to the Borrower as and to the extent that, after giving effect to such return, the Borrower would remain in compliance with Section 2.11(b) and no Event of Default shall have occurred and be continuing.

        (k)    <u>Designation of Additional Issuing Banks</u>. The Borrower may, at any time and from time to time, designate as additional Issuing Banks one or more Revolving Lenders that agree in writing to serve in such capacity as provided below. The acceptance by a Revolving Lender of an appointment as an Issuing Bank hereunder shall be evidenced by an agreement, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Borrower, executed by the Borrower, the Administrative Agent and such designated Revolving Lender and, from and after the effective date of such agreement, (i) such Revolving Lender shall have all the rights and obligations of an Issuing Bank under this Agreement and (ii) references herein to the term "Issuing Bank" shall be deemed to include such Revolving Lender in its capacity as an issuer of Letters of Credit hereunder.

        (l)    <u>Resignation or Termination of an Issuing Bank</u>. Subject to the appointment and acceptance of a successor Issuing Bank reasonably acceptable to the Borrower, any Issuing Bank may resign at any time by giving thirty (30) days' written notice to the Administrative Agent, the Lenders and the Borrower. The Borrower may terminate the appointment of any Issuing Bank as an "Issuing Bank" hereunder by providing a written notice thereof to such Issuing Bank, with a copy to the Administrative Agent. Any such termination shall become effective upon the earlier of (i) such Issuing Bank's acknowledging receipt of such notice and (ii) the fifth Business Day following the date of the delivery thereof; <u>provided</u> that no such termination shall become effective until and unless the LC Exposure attributable to all Letters of Credit issued by such Issuing Bank (or its Affiliates) shall have been reduced to zero. At the time any such resignation or termination shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the resigning or terminated Issuing Bank pursuant to Section 2.12(b).

Notwithstanding the effectiveness of any such resignation or termination, the resigning or terminated Issuing Bank shall remain a party hereto and shall continue to have all the rights of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation or termination, but shall not (a) be required (and shall be discharged from its obligations) to issue any additional Letters of Credit or extend or increase the amount of Letters of Credit then outstanding, without affecting its rights and obligations with respect to Letters of Credit previously issued by it, or (b) be deemed an Issuing Bank for any other purpose.

(m) <u>Issuing Bank Reports to the Administrative Agent</u>. Unless otherwise agreed by the Administrative Agent, each Issuing Bank shall, in addition to its notification obligations set forth elsewhere in this Section 2.05, report in writing to the Administrative Agent (i) periodic activity (for such period or recurrent periods as shall be requested by the Administrative Agent) in respect of Letters of Credit issued by such Issuing Bank, including all issuances, extensions, amendments and renewals, all expirations and cancellations and all disbursements and reimbursements, (ii) within five (5) Business Days following the time that such Issuing Bank issues, amends, renews or extends any Letter of Credit, the date of such issuance, amendment, renewal or extension, and face amount of the Letters of Credit issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and whether the amounts thereof shall have changed), (iii) on each Business Day on which such Issuing Bank makes any LC Disbursement, the date and amount of such LC Disbursement, (iv) on any Business Day on which a Borrower fails to reimburse an LC Disbursement required to be reimbursed to such Issuing Bank on such day, the date of such failure and amount of such LC Disbursement and (v) on any other Business Day, such other information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by such Issuing Bank; <u>provided</u> that no Issuing Bank shall have any liability hereunder to any Person for any failure to deliver the reports contemplated by this paragraph (m) of Section 2.05.

(n) <u>Applicability of ISP and UCP</u>. Unless otherwise expressly agreed by the applicable Issuing Bank and the Borrower when a Letter of Credit is issued or when it is amended with the consent of the beneficiary thereof, (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit. Notwithstanding the foregoing, the applicable Issuing Bank shall not be responsible to the Borrower for, and the applicable Issuing Bank's rights and remedies against the Borrower shall not be impaired by, any action or inaction of the applicable Issuing Bank required or permitted under any law, order or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the applicable law or any order of any Governmental Authority in a jurisdiction where the applicable Issuing Bank or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade (BAFT), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

SECTION 2.06    <u>Funding of Borrowings</u>.

(a) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 (noon), New York City time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower; <u>provided</u> that ABR Revolving Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(f) shall be remitted by the Administrative Agent to the applicable Issuing Bank.

98

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.06 and may, in reliance on such assumption and in its sole discretion, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with Section 2.13. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)    The obligations of the Lenders hereunder to make Term Loans and Revolving Loans, to fund participations in Letters of Credit and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

SECTION 2.07    Interest Elections.

(a)    Each Revolving Borrowing of the applicable Class and each Term Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a ~~Eurodollar~~**SOFR** Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a ~~Eurodollar~~**SOFR** Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07; provided that, notwithstanding anything to the contrary herein, no Loan may be converted into or continued as a Loan denominated in a different currency but instead must be prepaid in the original currency of such Loan and reborrowed in the other currency. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Revolving Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery, facsimile or other electronic transmission to the Administrative Agent of a written Interest Election Request signed by the Borrower.

(c)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a ~~Eurodollar~~**SOFR** Borrowing; and

(iv)    if the resulting Borrowing is to be a ~~Eurodollar~~**SOFR** Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a ~~Eurodollar~~**SOFR** Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request in accordance with this Section 2.07, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a ~~Eurodollar~~**SOFR** Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid, at the end of such Interest Period such Borrowing, shall be continued as a ~~Eurodollar~~**SOFR** Borrowing of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing no outstanding Borrowing may be converted to or continued as a ~~Eurodollar~~**SOFR** Borrowing in excess of one month.

SECTION 2.08    Termination and Reduction of Commitments.

(a)    Unless previously terminated, (i) the Term Commitments shall terminate at 5:00 p.m., New York City time, on the Effective Date and (ii) the Revolving Commitments shall terminate on the Revolving Maturity Date.

100

Appx10233

(b)     The Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class, provided that (i) each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $500,000 unless such amount represents all of the remaining Commitments of such Class, (ii) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.11, the aggregate Revolving Exposures would exceed the aggregate Revolving Commitments and (iii) if, after giving effect to any reduction of the Revolving Commitments, the Letter of Credit Sublimit exceeds the amount of the Revolving Commitments, such sublimit shall be automatically reduced by the amount of such excess. Except as provided above, the amount of any such Commitment reduction shall not be applied to the Letter of Credit Sublimit unless otherwise specified by the Borrower.

(c)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section 2.08 at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.   Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.   Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable; provided that a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of any credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable and specified event or condition, in which case such notice may be revoked or extended by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date of termination) if such condition is not satisfied. The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of unused portions of the Letter of Credit Sublimit or the unused Commitments of any Class under this Section 2.08. Any termination or reduction of the Commitments of any Class shall be permanent.   Each reduction of (x) the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class and (y) the Revolving Commitments shall be made to any Class of Revolving Commitment as directed by the Borrower (including to any Class of existing or extended Revolving Commitments).

SECTION 2.09     <u>Repayment of Loans; Evidence of Debt</u>.

(a)     The Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan of such Lender on the Revolving Maturity Date and (ii) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.10.

(b)     [Reserved].

(c)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder and the amount of any purchases and sales by such Lender of participations in Letters of Credit.

(d)     The Administrative Agent shall, in connection with the maintenance of the Register in accordance with Section 9.04(b)(iv), maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

101

(e)　The entries made in the accounts maintained pursuant to paragraph (d) of this Section 2.09 shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the accounts maintained by the Administrative Agent pursuant to Section 2.09(d) and any Lender's records pursuant to Section 2.09(c), the accounts maintained by the Administrative Agent pursuant to Section 2.09(d) shall govern and control.

(f)　Any Lender may request through the Administrative Agent that Loans of any Class made by it be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).

SECTION 2.10　　<u>Amortization of Term Loans</u>.

(a)　Subject to adjustment pursuant to paragraph (c) of this Section 2.10, the Borrower shall repay Initial Term Loans on the last day of each March, June, September and December (commencing on September 30, 2021), an aggregate amount equal to 0.25% of the aggregate principal amount of all Initial Term Loans outstanding on the Effective Date (as such repayment amount shall be reduced as a result of the application of prepayments in accordance with the order of priority determined under <u>Section 2.11</u>); <u>provided</u> that if any such date is not a Business Day, such payment shall be due on the next preceding Business Day.

(b)　To the extent not previously paid, all Term Loans shall be due and payable on the Term Maturity Date.

(c)　Any prepayment of a Term Borrowing of any　Class　(i) pursuant　to Section 2.11(a) shall be applied to reduce the subsequent scheduled and outstanding repayments of the Term Borrowings of such Class to be made pursuant to this Section 2.10 as directed by the Borrower (and absent such direction in direct order of maturity) and (ii) pursuant to Section 2.11(c) or 2.11(d) shall be applied to reduce the subsequent scheduled and outstanding repayments of the Term Borrowings of such Class to be made pursuant to this Section 2.10, or, in each case except as otherwise provided in any Incremental Facility Amendment, Refinancing Amendment or Loan Modification Agreement, pursuant to the corresponding section of such Incremental Facility Amendment, Refinancing Amendment or Loan Modification Agreement, as applicable, as directed by the Borrower and, in the absence of such direction, in direct order of maturity (including any Incremental Facility).

(d)　Prior to any repayment of any Term Borrowings of any Class hereunder, the Borrower shall select the Borrowing or Borrowings of the applicable Class to be repaid and shall notify the Administrative Agent by telephone (confirmed by hand delivery or facsimile) of such election not later than 2:00 p.m., New York City time, one (1) Business Day before the scheduled date of such repayment. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16 and shall be applied in direct order of maturity. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Term Borrowings shall be accompanied by accrued interest on the amount repaid.

SECTION 2.11　　<u>Prepayment of Loans</u>.

(a)　(i) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty; <em>provided</em> that in the event that, on or prior to the date that is six (6) months after the Effective Date, the Borrower (x) makes any prepayment of Initial

102

Term Loans in connection with any Repricing Transaction, (y) effects any amendment of this Agreement resulting in a Repricing Transaction or (z) makes a mandatory prepayment of Initial Term Loans pursuant to Section 2.11(c) in connection with a Prepayment Event described in clause (b) of the definition of "Prepayment Event", in any such case, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Term Lenders holding Initial Term Loans, (I) a prepayment premium of 1.00% of the principal amount of the Initial Term Loans being prepaid in connection with such Repricing Transaction and (II) in the case of clause (y), an amount equal to 1.00% of the aggregate amount of the applicable Initial Term Loans of non-consenting Lenders outstanding immediately prior to such amendment that are subject to an effective pricing reduction pursuant to such amendment.

(ii)    Notwithstanding anything in any Loan Document to the contrary, Holdings, the Borrower or any of their respective Subsidiaries may offer to prepay all or a portion of the outstanding Class of any Term Loans on the following basis:

(A)    Holdings, the Borrower or any of their respective Subsidiaries shall have the right to make a voluntary prepayment of Term Loans at a discount to par (such prepayment, the "Discounted Term Loan Prepayment") pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers, in each case made in accordance with this Section 2.11(a)(ii); provided that (x) Holdings, the Borrower or any of their respective Subsidiaries shall not make any Borrowing of Revolving Loans to fund any Discounted Term Loan Prepayment and (y) Holdings, the Borrower or any of their respective Subsidiaries shall not initiate any action under this Section 2.11(a)(ii) in order to make a Discounted Term Loan Prepayment unless (I) at least ten (10) Business Days shall have passed since the consummation of the most recent Discounted Term Loan Prepayment as a result of a prepayment made by Holdings, the Borrower or any of their respective Subsidiaries on the applicable Discounted Prepayment Effective Date; or (II) at least three (3) Business Days shall have passed since the date Holdings, the Borrower or any of their respective Subsidiaries were notified that no Term Lender was willing to accept any prepayment of any Term Loan and/or Other Term Loan at the Specified Discount, within the Discount Range or at any discount to par value, as applicable, or in the case of Borrower Solicitation of Discounted Prepayment Offers, the date of Holdings', the Borrower's or any of their respective Subsidiaries' election not to accept any Solicited Discounted Prepayment Offers and (z) each Lender participating in any Discounted Term Loan Prepayment acknowledges and agrees that in connection with such Discounted Term Loan Prepayment, (1) the Borrower then may have, and later may come into possession of, information regarding the Term Loans or the Loan Parties hereunder that is not known to such Lender and that may be material to a decision by such Lender to participate in such Discounted Term Loan Prepayment ("Excluded Information"), (2) such Lender has independently and, without reliance on Holdings, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to participate in such Discounted Term Loan Prepayment notwithstanding such Lender's lack of knowledge of the Excluded Information and (3) none of Holdings, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by Requirements of Law, any claims such Lender may have against Holdings, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information; provided further that any Term Loan that is prepaid will be automatically and irrevocably cancelled.

Case: 23-1058    Document: 28    Page: 250    Filed: 08/07/2023

(B)     (1) Subject to the proviso to subsection (A) above, Holdings, the Borrower or any of their respective Subsidiaries may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with three (3) Business Days' notice in the form of a Specified Discount Prepayment Notice; provided that (I) any such offer shall be made available, at the sole discretion of Holdings, the Borrower or any of their respective Subsidiaries, to each Term Lender and/or each Lender with respect to any Class of Term Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "Specified Discount Prepayment Amount") with respect to each applicable tranche, the tranche or tranches of Term Loans subject to such offer and the specific percentage discount to par (the "Specified Discount") of such Term Loans to be prepaid (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $1,000,000 and whole increments of $500,000 in excess thereof and (IV) each such offer shall remain outstanding through the Specified Discount Prepayment Response Date. The Auction Agent will promptly provide each relevant Term Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York City time, on the third Business Day after the date of delivery of such notice to the relevant Term Lenders (the "Specified Discount Prepayment Response Date").

(2)     Each relevant Term Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its relevant then outstanding Term Loans at the Specified Discount and, if so (such accepting Term Lender, a "Discount Prepayment Accepting Lender"), the amount and the tranches of such Lender's Term Loans to be prepaid at such offered discount. Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable. Any Term Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(3)     If there is at least one Discount Prepayment Accepting Lender, Holdings, the Borrower or any of their respective Subsidiaries will make prepayment of outstanding Term Loans pursuant to this paragraph (B) to each Discount Prepayment Accepting Lender in accordance with the respective outstanding amount and tranches of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to subsection (2); provided that, if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made pro-rata among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (in consultation with Holdings, the Borrower or any of their respective Subsidiaries and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate

104

such proration (the "Specified Discount Proration"). The Auction Agent shall promptly, and in any case within three (3) Business Days following the Specified Discount Prepayment Response Date, notify (I) Holdings, the Borrower or any of their respective Subsidiaries of the respective Term Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Term Loans to be prepaid at the Specified Discount on such date and (III) each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, tranche and Type of Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to Holdings, the Borrower or any of their respective Subsidiaries and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to Holdings, the Borrower or any of their respective Subsidiaries shall be due and payable by Holdings, the Borrower or any of their respective Subsidiaries on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

105

(subject to the provisos set forth in clause (A) of Holdings, the Borrower or any of their respective Subsidiaries may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with three (3) Business Days' notice in the form of a Discount Range Prepayment Notice; <u>provided</u> that (I) any such solicitation shall be extended, at the sole discretion of Holdings, the Borrower or any of their respective Subsidiaries, to each Term Lender and/or each Lender with respect to any Class of Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "<u>Discount Range Prepayment Amount</u>"), the tranche or tranches of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "<u>Discount Range</u>") of the principal amount of such Term Loans with respect to each relevant tranche of Term Loans willing to be prepaid by Holdings, the Borrower or any of their respective Subsidiaries (it being understood that different Discount Ranges and/or Discount Range Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $1,000,000 and whole increments of $500,000 in excess thereof and (IV) each such solicitation by Holdings, the Borrower or any of their respective Subsidiaries shall remain outstanding through the Discount Range Prepayment Response Date.    The Auction Agent will promptly provide each relevant Term Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding relevant Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York City time, on the third Business Day after the date of delivery of such notice to the relevant Term Lenders (the "<u>Discount Range Prepayment Response Date</u>").    Each relevant Term Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "<u>Submitted Discount</u>") at which such Term Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Term Loans (the "<u>Submitted Amount</u>") such Lender is willing to have prepaid at the Submitted Discount. Any Term Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(2)    The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (in consultation with Holdings, the Borrower or any of their respective Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this subsection (C). Holdings, the Borrower or any of their respective Subsidiaries agree to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by the Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "<u>Applicable Discount</u>") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount

106

Range Prepayment Amount and (II) the sum of all Submitted Amounts. Each Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following subsection (3)) at the Applicable Discount (each such Lender, a "<u>Participating Lender</u>").

(3)     If there is at least one Participating Lender, Holdings, the Borrower or any of their respective Subsidiaries will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; <u>provided</u> that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "<u>Identified Participating Lenders</u>") shall be made pro-rata among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (in consultation with Holdings, the Borrower or any of their respective Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "<u>Discount Range Proration</u>").    The Auction Agent shall promptly, and in any case within five (5) Business Days following the Discount Range Prepayment Response Date, notify (I) Holdings, the Borrower or any of their respective Subsidiaries of the respective Term Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount and tranches of Term Loans to be prepaid at the Applicable Discount on such date, (III) each Participating Lender of the aggregate principal amount and tranches of such Lender to be prepaid at the Applicable Discount on such date, and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to Holdings, the Borrower or any of their respective Subsidiaries and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to Holdings, the Borrower or any of their respective Subsidiaries shall be due and payable by the Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(D)     (1) Subject to the proviso to subsection (A) above, Holdings, the Borrower or any of their respective Subsidiaries may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with three (3) Business Days' notice in the form of a Solicited Discounted Prepayment Notice; provided that (I) any such solicitation shall be extended, at the sole discretion of Holdings, the Borrower or any of their respective Subsidiaries, to each Term Lender and/or each Lender with respect to any Class of Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate Dollar Amount of the Term Loans (the "<u>Solicited Discounted Prepayment Amount</u>") and the tranche or tranches of Term Loans Holdings,

107

the Borrower or any of their respective Subsidiaries is willing to prepay at a discount (it being understood that different solicited Discounted Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such an event, each such offer will be treated as a separate offer pursuant to the terms of this Section), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $1,000,000 and whole increments of $500,000 in excess thereof and (IV) each such solicitation by Holdings, the Borrower or any of their respective Subsidiaries shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each relevant Term Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Term Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m., New York City time on the third Business Day after the date of delivery of such notice to the relevant Term Lenders (the "<u>Solicited Discounted Prepayment Response Date</u>"). Each Term Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date, and (z) specify both a discount to par (the "<u>Offered</u> <u>Discount</u>") such Term Lender is willing to be applied to the prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and tranches of such Term Loans (the "<u>Offered Amount</u>") such Term Lender is willing to have prepaid subject to such Offered Discount.   Any Term Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(2)    The Auction Agent shall promptly provide Holdings, the Borrower or any of their respective Subsidiaries with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Holdings, the Borrower or any of their respective Subsidiaries shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Term Lenders in the Solicited Discounted Prepayment Offers that is acceptable to Holdings, the Borrower or any of their respective Subsidiaries (the "<u>Acceptable Discount</u>"), if any. If Holdings, the Borrower or any of their respective Subsidiaries elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the third Business Day after the date of receipt by Holdings, the Borrower or any of their respective Subsidiaries from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this subsection (2) (the "<u>Acceptance Date</u>"),

Holdings, the Borrower or any of their respective Subsidiaries shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount. If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from Holdings, the Borrower or any of their respective Subsidiaries by the Acceptance Date, Holdings, the Borrower or any of their respective Subsidiaries shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(3)    Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, within three (3) Business Days after receipt of an Acceptance and Prepayment Notice (the "<u>Discounted Prepayment Determination Date</u>"), the Auction Agent will determine (in consultation with

108

Holdings, the Borrower or any of their respective Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the tranches of Term Loans (the "Acceptable Prepayment Amount") to be prepaid by Holdings, the Borrower or any of their respective Subsidiaries at the Acceptable Discount in accordance with this Section 2.11(a)(ii)(D). If Holdings, the Borrower or any of their respective Subsidiaries elects to accept any Acceptable Discount, then Holdings, the Borrower or any of their respective Subsidiaries agrees to accept all Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount. Each Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "Qualifying Lender").        Holdings, the Borrower or any of their respective Subsidiaries will prepay outstanding Term Loans pursuant to this subsection (D) to each Qualifying Lender in the aggregate principal amount and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; provided that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "Identified Qualifying Lenders") shall be made pro-rata among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (in consultation with Holdings, the Borrower or any of their respective Subsidiaries and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "Solicited Discount Proration"). On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) Holdings, the Borrower or any of their respective Subsidiaries of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Term Lender who made a Solicited Discounted Prepayment Offer of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the

tranches to be prepaid to be prepaid at the Applicable Discount on such date,

(III) each Qualifying Lender of the aggregate principal amount and the tranches of such Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Borrower and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Borrower shall be due and payable by the Borrower on the Discounted Prepayment Effective Date in accordance with subsection (F) below (subject to subsection (J) below).

(E)     In connection with any Discounted Term Loan Prepayment, Holdings, the Borrower or any of their respective Subsidiaries and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Term Loan Prepayment, the payment of reasonable and customary fees and expenses from Holdings, the Borrower or any of their respective Subsidiaries in connection therewith.

(F)     If any Term Loan is prepaid in accordance with paragraphs (B) through (D) above, Holdings, the Borrower or any of their respective Subsidiaries shall prepay such Term Loans on the Discounted Prepayment Effective Date. Holdings, the Borrower or any of their respective Subsidiaries shall make such prepayment to the Auction Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 11:00 a.m. New York City time on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the remaining principal installments of the relevant tranche of Term Loans as directed by the Borrower. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this Section 2.11(a)(ii) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable. The aggregate principal amount of the tranches and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment.

(G)     To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this Section 2.11(a)(ii), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by Holdings, the Borrower or any of their respective Subsidiaries.

(H)     Notwithstanding anything in any Loan Document to the contrary, for purposes of this Section 2.11(a)(ii), each notice or other communication required to be delivered or otherwise provided to the Auction Agent (or its delegate) shall be deemed to have been given upon Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; underlined provided that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next Business Day.

(I)     Each of Holdings, the Borrower or any of their respective Subsidiaries and the Lenders acknowledges and agrees that the Auction Agent may perform any and all of its duties under this Section 2.11(a)(ii) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate.   The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and their respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.11(a)(ii) as well as activities of the Auction Agent.

(J)     Holdings, the Borrower or any of their respective Subsidiaries shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its

offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice thereof at its discretion at any time on or prior to the applicable Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discounted Prepayment Response Date, as applicable (and if such offer is revoked pursuant to the preceding clauses, any failure by the Borrower to make any prepayment to a Term Lender, as applicable, pursuant to this Section 2.11(a)(ii) shall not constitute a Default or Event of Default under Section 7.01 or otherwise).

(b)        In the event and on each occasion that the aggregate Revolving Exposures exceed the aggregate Revolving Commitments (other than as a result of currency fluctuations on any date that is not a Revaluation Date), the Borrower shall prepay Revolving Borrowings (or, if no such Borrowings are outstanding, deposit cash collateral in an account with the Administrative Agent pursuant to Section 2.05(j)) in an aggregate amount necessary to eliminate such excess within one (1) Business Day following Borrower's receipt of written notice from the Administrative Agent.

(c)        If any Net Proceeds are received by or on behalf of Holdings or its Restricted Subsidiaries in respect of any Prepayment Event, the Borrower shall, within five (5) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event," on the date of such Prepayment Event), prepay Initial Term Loans in an aggregate amount equal to (x) in the case of any Asset Disposition Prepayment Event, the Applicable Asset Disposition Percentage of such Net Proceeds (any such amounts not required to be prepaid as a result of the application of clauses (b) or (c) of the definition of "Applicable Asset Disposition Percentage", the "Retained Asset Sale Proceeds") and (y) in the case of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event," 100% of such Net Proceeds; provided that, in the case of any Asset Disposition Prepayment Event, if Holdings, the Borrower or any of the Restricted Subsidiaries invest (or commit to invest) the Net Proceeds from such event (or a portion thereof) within 18 months after receipt of such Net Proceeds in the business of the Borrower and the other Subsidiaries, then no prepayment shall be required pursuant to this paragraph in respect of such Net Proceeds in respect of such event (or the applicable portion of such Net Proceeds, if applicable) except to the extent of any such Net Proceeds therefrom that have not been so invested (or committed to be invested) by the end of such 18-month period (or if committed to be so invested within such 18-month period, have not been so invested within 24 months after receipt thereof), at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so invested (or committed to be invested); provided further that the Borrower may use a portion of such Net Proceeds to prepay or repurchase any Incremental Term Loans, Other Term Loans or other Indebtedness, in each case that is secured by the Collateral on a pari passu basis with the Loans to the extent such other Indebtedness and the Liens securing the same are permitted hereunder and the documentation governing such other Indebtedness requires such a prepayment or repurchase thereof with the proceeds of such Prepayment Event, in each case in an amount not to exceed the product of (x) the amount of such Net Proceeds and (y) a fraction, the numerator of which is the outstanding principal amount of such other Indebtedness and the denominator of which is the aggregate outstanding principal amount of Initial Term Loans and such other Indebtedness.

(d)        Following the end of each fiscal year of Holdings, commencing with the fiscal year ending December 31, 2022, the Borrower shall prepay Initial Term Loans in an aggregate amount equal to the ECF Percentage of Excess Cash Flow for such fiscal year; provided that such amount shall be reduced by the aggregate amount of (A) at the option of the Borrower, and without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate amount of applicable Cash Expenditures made (or committed or planned to be made) during such year or after such fiscal year and prior to the time such prepayment is due and (B) prepayments and repurchases of (i) Term Loans (and,(x)amounts used to repay borrowings of Revolving Loans incurred on the Effective Date to fund original issue discount or upfront

111

fees resulting from the Joint Lead Arrangers' exercise of the "pricing flex" provisions of the Fee Letter and (y) to the extent the Revolving Commitments are reduced in a corresponding amount pursuant to Section 2.08, Revolving Loans) made pursuant to Section 2.11(a) or otherwise in a manner not prohibited by Section 9.04(g) during such fiscal year or after such fiscal year and prior to the time such prepayment is due (without duplication to subsequent years) as provided below (<u>provided</u> that such reduction as a result of prepayments pursuant to Section 2.11(a)(ii) or repurchases pursuant to Section 9.04(g) shall not be limited to the actual amount of such cash prepayment and instead shall be given credit for the face amount of such prepayment) and (ii) other Senior Secured First Lien Indebtedness (provided that in the case of the prepayment of any revolving commitments, there is a corresponding reduction in commitments) made during such fiscal year or after such fiscal year and prior to the time such prepayment is due (without duplication to subsequent years) (excluding all such prepayments funded with the proceeds of other long term Indebtedness (other than revolving loans)); <u>provided</u> <u>further</u>, at the option of the Borrower, all such payments shall be applied to the immediately subsequent fiscal year to the extent the amount of such prepayment exceeds the amount of the prepayment required to be made from Excess Cash Flow for such fiscal year; <u>provided further</u> that no prepayment shall be required with respect to any applicable fiscal year to the extent Excess Cash Flow for such period is equal to or less than $10,000,000 (and for such period such prepayment shall be determined based solely on the amount in excess of $10,000,000). Each prepayment pursuant to this paragraph shall be made on or before the date that is ten (10) days after the date on which financial statements are required to be delivered pursuant to Section 5.01 with respect to the fiscal year for which Excess Cash Flow is being calculated.

112

(e)     Prior to any optional prepayment of Borrowings pursuant to Section 2.11(a)(i), the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section 2.11. In the event of any optional prepayment of Revolving Borrowings, the Borrower shall select the Class or Classes of Revolving Borrowings to be prepaid.   In the event of any mandatory prepayment of Term Borrowings made at a time when Term Borrowings of more than one Class remain outstanding, the Borrower shall select Term Borrowings to be prepaid so that the aggregate amount of such prepayment is allocated between Term Borrowings (and, to the extent provided in the Refinancing Amendment for any Class of Other Term Loans, the Borrowings of such Class) pro rata based on the aggregate principal amount of outstanding Borrowings of each such Class; provided that any Term Lender (and, to the extent provided in the Refinancing Amendment or Loan Modification Agreement for any Class of Other Term Loans, any Lender that holds Other Term Loans of such Class) may elect, by notice to the Administrative Agent by telephone (confirmed by facsimile) at least two (2) Business Days prior to the prepayment date, to decline all or any portion of any prepayment of its Term Loans or Other Term Loans of any such Class pursuant to this Section 2.11 (other than an optional prepayment pursuant to paragraph (a)(i) of this Section or a mandatory prepayment as a result of the Prepayment Event set forth in clause (b) of the definition thereof, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Term Loans or Other Term Loans of any such Class but was so declined (and not used pursuant to the immediately following sentence) shall be retained by Holdings or its Restricted Subsidiaries (such amounts, "Retained Declined Proceeds"). An amount equal to any portion of a mandatory prepayment of Term Borrowings that is declined by the Lenders under this Section 2.11(e) may, to the extent not prohibited hereunder or under the documentation governing the Permitted First Priority Refinancing Debt or the Pari Passu Intercreditor Agreement, be applied by the Borrower to prepay (at the Borrower's election), pari passu Indebtedness or Permitted Junior Priority Refinancing Debt or may be retained to be used for any other purposes not prohibited hereunder. Optional prepayments of Term Borrowings shall be allocated among the Classes of Term Borrowings as directed by the Borrower. In the absence of a designation by the Borrower as described in the preceding provisions of this paragraph of the Type of Borrowing of any Class, the Administrative Agent shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16, provided that, in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.11(c) or (d), such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are ABR Loans or ~~Eurodollar~~**SOFR** Loans.

(f)     The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a)(i) by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a ~~Eurodollar~~**SOFR** Borrowing, not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment.   Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment as a result of a Prepayment Event set forth in clause (a) of the definition thereof, a reasonably detailed calculation of the amount of such prepayment. Notwithstanding anything to the contrary contained in this Agreement, any notice of optional prepayment under Section 2.11(f) may state that it is conditional upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable an specified event of condition), in which case such notice may be revoked or extended by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a

Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13, and subject to Section 2.11(g)(i), shall be without premium or penalty. At the Borrower's election in connection with any prepayment pursuant to this Section 2.11, such prepayment shall not be applied to any Term Loan or Revolving Loan of a Defaulting Lender (under any of subclauses (a), (b) or (c) of the definition of "Defaulting Lender") and shall be allocated ratably among the relevant non-Defaulting Lenders.

　　　　　(g)　　　Notwithstanding any other provisions of Section 2.11(c) or (d), (A) to the extent that any of or all the Net Proceeds of any Prepayment Event by a Subsidiary of Holdings that is organized or incorporated under the laws of a jurisdiction other than the United States, any state, commonwealth or territory thereof or the District of Columbia, giving rise to a prepayment pursuant to Section 2.11(c) or

(d) (a "Restricted Prepayment Event") or Excess Cash Flow are prohibited or delayed by applicable local law (including financial assistance, corporate benefit, restrictions on repatriating or upstreaming of cash

intra-group and the fiduciary and statutory duties of the directors of the relevant subsidiaries) from being repatriated to the Borrower, the portion of such Net Proceeds or Excess Cash Flow so affected will not be required to be taken into account in determining the amount to be applied to repay Term Loans at the times provided in Section 2.11(c) or (d), as the case may be, and such amounts may be retained by such Subsidiary, (B) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Restricted Prepayment Event or Excess Cash Flow would have an adverse (other than de minimis) tax or cost consequence to any Loan Party or any direct or indirect equity holder thereof with respect to such Net Proceeds or Excess Cash Flow, the Net Proceeds or Excess Cash Flow so affected will not be required to be taken into account in determining the amount to be applied to repay Term Loans at the times provided in Section 2.11(c) or Section 2.11(d), as the case may be, and such amounts may be retained by such Subsidiary, (C) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Restricted Prepayment Event or Excess Cash Flow would violate any material organizational document restrictions (as a result of minority ownership) and restrictions in other material agreements (to the extent not in violation of Section 6.09), the Net Proceeds or Excess Cash Flow so affected will not be required to be taken into account in determining the amount to be applied to repay Term Loans at the times provided in Section 2.11(c) or Section 2.11(d), as the case may be, and such amounts may be retained by such Subsidiary and (D) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Restricted Prepayment Event or Excess Cash Flow would give rise to a risk of liability for the directors of such Subsidiary, the Net Proceeds or Excess Cash Flow so affected will not be required to be taken into account in determining the amount to be applied to repay Term Loans at the times provided in Section 2.11(c) or Section 2.11(d), as the case may be, and such amounts may be retained by such Subsidiary; provided that to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Restricted Prepayment Event could reasonably be expected to have adverse Tax cost consequences for Holdings, the Borrower or any Restricted Subsidiary with respect to such Net Proceeds, an amount equal to such Net Proceeds that would be so affected will not be subject to repayment under this Section 2.11 and such amounts shall be available for general corporate purposes of the Loan Parties and their Subsidiaries as long as not required to be prepaid in accordance with this Section 2.11. For the avoidance of doubt, Borrower shall be permitted to make any repayments required by Section 2.11(c) or Section 2.11(d) from any source of funds and shall not be required to make any repayments from funds contained in any particular Loan Party. The non-application of any such prepayment amounts as a result of the foregoing provisions will not constitute a Default or Event of Default and such amounts shall be available for working capital and general corporate purposes of the Loan Parties and their Subsidiaries as long as not required to be prepaid in accordance with such provisions. Notwithstanding the foregoing, any payments actually made by the Loan Parties shall be applied net of an amount equal to the additional Taxes of Holdings, its Subsidiaries and the direct and indirect holders of Equity Interests in Holdings that would be payable or reserved against and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs.

114

SECTION 2.12     Fees

     (a)     The Borrower agrees to pay to the Administrative Agent in Dollars for the account of each Revolving Lender (other than a Defaulting Lender) a commitment fee, which shall accrue at the rate of the Commitment Fee Percentage per annum on the average daily unused amount of the Revolving Commitment of such Lender during the period from and including the Effective Date to but excluding the date on which the Revolving Commitments terminate. Accrued commitment fees shall be payable in arrears on the last Business Day of March, June, September and December of each year and on the date on which the Revolving Commitments terminate, commencing on the last Business Day of the first full fiscal quarter ending after the Effective Date. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). For purposes of computing commitment fees, a Revolving Commitment of a Lender shall be deemed to be used to the extent of the outstanding Revolving Loans and LC Exposure of such Lender.

     (b)     The Borrower agrees to pay (i) to the Administrative Agent in Dollars for the account of each Revolving Lender (other than any Defaulting Lender) a participation fee with respect to its participations in Letters of Credit, which shall accrue at all times during the Revolving Availability Period at the Applicable Rate used to determine the interest rate applicable to ~~Eurodollar~~**SOFR** Revolving Loans on the daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements but taking into account the maximum amount available to be drawn under all outstanding Letters of Credit, whether or not such maximum amount is then in effect) during the period from and including the Effective Date to and including the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to each Issuing Bank in Dollars a fronting fee (which fee shall be calculated by the Administrative Agent in consultation with the applicable Issuing Bank and payable directly to the applicable Issuing Bank), which shall accrue at the rate to be agreed by each Issuing Bank, not to be greater than 0.125% per annum on the daily amount of the LC Exposure attributable to Letters of Credit issued by such Issuing Bank (excluding any portion thereof attributable to unreimbursed LC Disbursements but taking into account the maximum amount available to be drawn under all outstanding Letters of Credit, whether or not such maximum amount is then in effect) during the period from and including the Effective Date to and including the later of the date of termination of the Revolving Commitments and the date on which there ceases to be any LC Exposure, as well as such Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.   Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the last Business Day of March, June, September and December, respectively, commencing on the last Business Day of the first full fiscal quarter ending after the Effective Date; underlined provided that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand. Any other fees payable to an Issuing Bank pursuant to this paragraph shall be payable within 10 days after written demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

     (c)     The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Administrative Agent.

115

(d)      The Borrower agrees to pay on the Effective Date to each Term Lender party to this Agreement as a Term Lender on the Effective Date, as fee compensation for the funding of such Term Lender's Initial Term Loan, a closing fee in an amount equal to 1.00% of the stated principal amount of such Term Lender's Initial Term Loan. Such fees shall be payable to each Lender out of the proceeds of such Term Lender's Initial Term Loan as and when funded on the Effective Date and shall be treated (and reported) by the Borrower and Term Lenders as a reduction in issue price of the Initial Term Loans for U.S. federal, state and local income tax purposes. Such closing fee will be in all respects fully earned, due and payable on the Effective Date and non-refundable and non-creditable thereafter.

(e)      Notwithstanding the foregoing, and subject to Section 2.22, the Borrower shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section 2.12.

SECTION 2.13      <u>Interest</u>.

(a)      The Loans comprising each ABR Borrowing denominated in Dollars shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)      The Loans comprising each ~~Eurodollar~~**SOFR** Borrowing shall bear interest at the Adjusted ~~LIBO~~**Term SOFR** Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)      Notwithstanding the foregoing, if upon the occurrence and during the continuance of any Specified Event of Default, any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.13 **(provided that, with respect to a SOFR Loan, the determination of the applicable interest rate is subject to Section 2.25(e) to the extent that Loans may not be converted to, or continued as, SOFR Loans, pursuant thereto)** or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to ABR Revolving Loans as provided in paragraph (a) of this <u>Section 2.13</u>; <u>provided</u> that no amount shall be payable pursuant to this Section 2.13(c) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; <u>provided</u>, <u>further</u> that no amounts shall accrue pursuant to this Section 2.13(c) on any overdue amount, reimbursement obligation in respect of any LC Disbursement or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)      Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments, <u>provided</u> that (i) interest accrued pursuant to paragraph (c) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Revolving Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any ~~Eurodollar~~**SOFR** Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)      All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted ~~LIBO~~**Term SOFR** Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

116

**(f)** In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

SECTION 2.14 ~~Alternate Rate of Interest~~Inability to Determine Rates~~. If prior to the commencement of any Interest Period for a Eurodollar Borrowing:~~

.

(a) Subject to Section 2.25, if, on or prior to the first day of any Interest Period for any SOFR Loan, the Administrative Agent determines (which determination shall be conclusive **and binding** absent manifest error) that ~~adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or~~ **"Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, the Administrative Agent will promptly so notify the Borrower and each Lender.**

~~(b) the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period (in each case with respect to the Loans impacted by this clause (b) or clause (a) above, "Impacted Loans"):~~

117

~~(c)~~ <u>Upon notice thereof by</u> the Administrative Agent ~~shall give notice thereof~~ to the Borrower ~~and~~<u>, any obligation of</u> the Lenders ~~by telephone or facsimile as promptly as practicable thereafter and, to make SOFR Loans, and any right of the~~ <u>Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods)</u> until the Administrative Agent ~~notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) in the event any Loans denominated in Dollars or Canadian Dollars are so affected, (x) any Interest Election Request that requests the~~<u>revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending</u> <u>request for a borrowing of</u>, conversion ~~of any Borrowing in Dollars or Canadian Dollars~~ to~~,~~ or continuation of ~~any Borrowing in Dollars or Canadian Dollars as, a Eurodollar Borrowing in Dollars or Canadian Dollars shall be ineffective and (y) if any Borrowing Request requests a Eurodollar Borrowing in Dollars or Canadian Dollars, then such Borrowing shall be made as an ABR Borrowing, unless such Borrowing is a Revolving Facility Borrowing denominated in Canadian Dollars, in which case such Borrowing Request shall be ineffective and (ii) in the event any Loans denominated in an Alternative Currency (other than Canadian Dollars) are so affected, the relevant~~<u>SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for</u> <u>a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any</u> <u>outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the</u> <u>end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay</u> <u>accrued interest on the amount so converted, together with any additional amounts required</u> <u>pursuant to Section 2.16. Subject to Section 2.25, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that " Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the</u> interest rate <u>on ABR Loans</u> shall be determined ~~in accordance with clause (ii~~<u>by the Administrative Agent</u> <u>without reference to clause (c</u>) of the definition of "~~LIBO Rate~~"<u>; provided,</u> ~~however, that, in each case, the Borrower may revoke any Borrowing Request that is pending when such notice is received~~<u>ABR" until the Administrative Agent revokes such determination</u>.

~~(d)        Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (a) of this Section 2.14 and/or is advised by the Required Lenders of their determination in accordance with clause (b) of this Section 2.14 and the Borrower shall so request, the Administrative Agent, the Required Lenders and the Borrower shall negotiate~~

~~in good faith to amend the definition of "LIBO Rate" and other applicable provisions to preserve the original intent thereof in light of such change; provided that, until so amended, such Impacted Loans will be handled as otherwise provided pursuant to the terms of this Section 2.14.~~

SECTION 2.15        <u>Increased Costs</u>.

(a)        If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any Issuing Bank (except any such reserve requirement reflected in the Adjusted ~~LIBO~~<u>Term SOFR</u> Rate; or

(ii)        impose on any Lender or any Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or ~~Eurodollar~~<u>SOFR</u> Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any ~~Eurodollar~~SOFR Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or issue any Letter of Credit) or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank hereunder (whether of principal, interest or otherwise), then, from time to time upon request of such Lender or Issuing Bank, the Borrower will pay to such Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Bank, as the case may be, for such increased costs actually incurred or reduction actually suffered.

(b)      If any Lender or Issuing Bank determines that any Change in Law regarding capital requirements has the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuing Bank's policies and the policies of such Lender's or Issuing Bank's holding company with respect to capital adequacy), then, from time to time upon request of such Lender or Issuing Bank, the Borrower will pay to such Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company for any such reduction actually suffered.

(c)      A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or Issuing Bank or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section 2.15 delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender or Issuing Bank, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)      Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender or Issuing Bank pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender or Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefor; <u>provided further</u> that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16      <u>Break Funding Payments</u>.

In the event of (a) the payment of any principal of any ~~Eurodollar~~SOFR Loan other than on the last day of ~~an~~the Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any ~~Eurodollar~~SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any ~~Revolving Loan or Term~~SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any ~~Eurodollar~~SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to <u>Section 2.19</u> or <u>Section 9.02(c)</u>, then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense (excluding loss of profit) actually incurred by it as a result of such event. **For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 2.16, each Lender shall be deemed to have funded each Eurodollar Loan made by it at the Adjusted LIBO Rate for such**

119

**Loan by a matching deposit or other borrowing in the applicable interbank market for a comparable amount and for a comparable period, whether or not such Eurodollar Loan was in fact so funded.** A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 and the reasons therefor delivered to the Borrower shall be prima facie evidence of such amounts. The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt of such demand **_thereof_**; _provided_ that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.16 for any loss, cost or expense more than 180 days prior to the date that such Lender delivers such certificate. Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern. Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.16 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities.

SECTION 2.17      <u>Taxes</u>.

(a)      Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable Requirements of Law. If the applicable withholding agent (including, for the avoidance of doubt, the Administrative Agent or any Loan Party) shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Taxes from such payments, then the applicable withholding agent shall make such deductions and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes or Other Taxes, then the amount payable by the applicable Loan Party shall be increased as necessary so that after all such required deductions have been made (including such deductions applicable to additional amounts payable under this Section 2.17), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made.

(b)      Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Requirements of Law.

(c)      The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender within 30 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document and any Other Taxes paid by the Administrative Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)      To the extent required by any applicable Requirements of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered

120

the exemption from, or reduction of withholding Tax ineffective) such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to Section 2.17 and without limiting any obligation of the Loan Parties to do so pursuant to such Section) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses, and any other out-of-pocket expenses, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 2.17(d). The agreements in this Section 2.17(d) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, any assignment of rights by a Loan Party, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

      (e)      As soon as practicable after any payment of any Taxes by a Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

      (f)      Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, (i) complete any documentation required for the Borrower to obtain clearance to make payments under the Loan Documents without, or with a reduction in, any withholding Tax, (ii) provide the Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by any Requirement of Law, or reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents and (iii) deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation expired, obsolete or inaccurate in any respect (including any specific documentation required below in this Section 2.17(f)), deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to Tax at a rate reduced by an applicable tax treaty, the Borrower, Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate.

      Without limiting the generality of the foregoing:

      (i)      Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding.

(ii)    Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(B)    two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit N-1, N-2, N-3 or N-4 (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms),

(D)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or

other successor forms) or any other required information from each beneficial owner that would be required under this Section 2.17 if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    two properly completed and duly signed copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    If a payment made to any Lender under any Loan Document would be subject to withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Notwithstanding any other provision of this clause (f), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(iv)    The Administrative Agent shall deliver to the Borrower on or before the date on which it becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form or comparable form for any successor Administrative Agent) certifying that the Administrative Agent is exempt from U.S. federal backup withholding.

123

---

(g)       If the Borrower determines in good faith that a reasonable basis exists for contesting any Taxes for which indemnification has been demanded hereunder, the Administrative Agent or the relevant Lender, as applicable, shall use commercially reasonable efforts to cooperate with the Borrower in a reasonable challenge of such Taxes if so requested by the Borrower, provided that (a) the Administrative Agent or such Lender determines in its reasonable discretion that it would not be subject to any unreimbursed third party cost or expense or otherwise be prejudiced by cooperating in such challenge, (b) the Borrower pays all related expenses of the Administrative Agent or such Lender, as applicable and (c) the Borrower indemnifies the Administrative Agent or such Lender, as applicable, for any liabilities or other costs incurred by such party in connection with such challenge. If the Administrative Agent or a Lender receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.17 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agree promptly to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.       The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary, this Section 2.17(g) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person). Notwithstanding anything herein to the contrary, the Borrower shall not be required to compensate such Lender for any amount incurred under this Section 2.17 more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such one hundred and eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

(h)       The agreements in this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(i)       For purposes of this Section 2.17, the term "Lender" shall include any Issuing Bank and the term "applicable Requirements of Law" includes FATCA.

SECTION 2.18       Payments       Generally;       Pro Rata Treatment; Sharing of Setoffs.

(a)       The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) at or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time, on the date when due), in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Except as otherwise expressly provided herein

124

and except with respect to principal of or interest on Loans denominated in an Alternative Currency, all such payments shall be made in Dollars to such account as may be specified by the Administrative Agent. Except as otherwise expressly provided herein and except with respect to principal of or interest on Loans denominated in Dollars, all payments by the Borrower hereunder with respect to principal of and interest on Loans denominated in any Alternative Currency shall be made in such Alternative Currency to such account as may be specified by the Administrative Agent. If, for any reason, the Borrower is prohibited by any Requirements of Law from making any required payment hereunder in an Alternative Currency, the Borrower shall make such payment in Dollars in the Dollar Amount of the Alternative Currency payment amount (it being agreed that, for purposes of this sentence, the Dollar Amount shall be determined by the Administrative Agent pursuant to clause (b) of the definition of "Dollar Amount"). Payments to be made directly to any Issuing Bank shall be made as expressly provided herein and except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day.    If any payment on a ~~Eurodollar~~ **SOFR** Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension.

(b)        If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) <u>first</u>, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) <u>second</u>, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

125

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans, Term Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans, Term Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Loans, Term Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Loans, Term Loans and participations in LC Disbursements; underline provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant or (C) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Revolving Commitments of that Class or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower's rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Banks hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders or Issuing Banks, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or Issuing Banks, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest

thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(e), Section 2.05(f), Section 2.06(a), Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.19     underline Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender

126

pursuant to Section 2.17 or any event gives rise to the operation of Section 2.23, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or its participation in any Letter of Credit affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17 or mitigate the applicability of Section 2.23, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)    If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.23, (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender is or becomes a Disqualified Lender or (iv) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (I) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable (and if a Revolving Commitment is being assigned and delegated, each Issuing Bank), which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and unreimbursed participations in LC Disbursements, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments or (II) terminate the Commitment of such Lender and repay all Loan Document Obligations of the Borrower owing to such Lender relating to the Loans held by such Lender as of such termination date (including in the case of a Repricing Transaction, any "prepayment premium" pursuant to Section 2.11 that would otherwise be owed in connection therewith). A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.20    Incremental Credit Extensions.

(a)    The Borrower may at any time or from time to time on one or more occasions after the Effective Date, by written notice delivered to the Administrative Agent request (i) one or more additional Classes of term loans (each an "Incremental Term Facility"), (ii) one or more additional term loans of the same Class of any existing Class of term loans (each an "Incremental Term Increase"), (iii) one or more increases in the amount of the Revolving Commitments of any Class (each such increase, an "Incremental Revolving Commitment Increase") and/or (iv) one or more additional Classes of Revolving Commitments (the "Additional/Replacement Revolving Commitments," and, together with any Incremental Term Facility, Incremental Term Increase and the Incremental Revolving Commitment

127

Increases, the "Incremental Facilities" and any Loans thereunder, the "Incremental Loans"), provided that, after giving effect to the effectiveness of any Incremental Facility Amendment, subject to certain "funding provisions" to be agreed to by the Borrower and the Incremental Facilities Lenders, no Specified Event of Default shall have occurred and be continuing or would result therefrom (provided, that in the case of an Incremental Facility incurred to finance a Limited Condition Transaction, if the Borrower has made an LCT Election, such condition shall be that no Event of Default shall have occurred and be continuing as at the LCT Test Date). Notwithstanding anything to contrary herein, the aggregate principal amount of the Incremental Facilities that can be incurred at any time shall not exceed the Incremental Cap at such time. Each Incremental Facility shall be in a minimum principal amount of $5,000,000 and integral multiples of $1,000,000 in excess thereof if such Incremental Facilities are denominated in Dollars (unless the Borrower and the Administrative Agent otherwise agree); provided that such amount may be less than $5,000,000 to the extent such amount represents all the remaining availability under the aggregate principal amount of Incremental Facilities then permitted to be incurred. The Borrower may appoint any Person to arrange such Incremental Facility and provide such arranger any titles with respect to such Incremental Facility as it deems appropriate.

(b)      (i) The Incremental Term Loans (a)(1) shall rank equal or junior in right of payment and equal or junior in right of security with the Term Loans or may be unsecured, and if junior in right of payment and/or security or unsecured, shall be established as a separate facility than the facility for the Term Loans that are secured by the Collateral on a first priority basis, (2) shall be structured such that neither Holdings nor any Restricted Subsidiary is a guarantor with respect to such Indebtedness unless Holdings or such Restricted Subsidiary is a Loan Party which shall have previously or substantially concurrently guaranteed the Secured Obligations, and (3) if secured, the obligations in respect thereof shall not be secured by Liens on the assets of Holdings, the Borrower and its Restricted Subsidiaries, other than assets constituting Collateral, and if established as a separate facility, shall be subject to a customary intercreditor agreement with the Administrative Agent and/or Collateral Agent substantially consistent with the applicable Intercreditor Agreement together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five (5) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof, in each case in form and substance reasonably satisfactory to the Administrative Agent and/or Collateral Agent (it being understood that junior Liens are not required to be pari passu with other junior Liens, and that Indebtedness secured by junior liens may be secured by Liens that are pari passu with or junior in priority to, other Liens that are junior to the Liens securing the Secured Obligations), (b) shall not (except in the case of Extendable Bridge Loans) mature earlier than the Term Maturity Date of the Initial Term Loans, (c) shall not (except in the case of Extendable Bridge Loans) have a shorter Weighted Average Life to Maturity than the remaining Initial Term Loans, (d) shall have a maturity date (subject to clause (b)), an amortization schedule (subject to clause (c)), interest rates (including through fixed interest rates), "most favored nation" provisions (if any), interest margins, rate floors, upfront fees, funding discounts, original issue discounts, financial covenants (if any) and prepayment terms and premiums as determined by the Borrower and the Additional Term Lenders thereunder; provided that, for any floating-rate U.S. dollar-denominated Incremental Term Loans which (I) are secured on pari passu basis with the Initial Term Loans and ranking pari passu with the Initial Term Loans in right of payment, (II) are incurred prior to the date that is six (6) months after the Effective Date, (III) have a maturity date prior to one year after the Term Maturity Date of the Initial Term Loans and (IV) are not incurred in connection with an acquisition or Investment permitted by the terms of this Agreement, in the event that the Effective Yield for any such Incremental Term Loans is greater than the Effective Yield for the Initial Term Loans, then the Effective Yield for the Initial Term Loans shall be increased to the extent necessary so that the Effective Yield for the Initial Term Loans is equal to the Effective Yield for such Incremental Term Loans minus 0.50% per annum; provided, further, that if the Incremental Term Loans include an interest rate floor

greater than the applicable interest rate floor under the Initial Term Loans, such differential between interest rate floors shall be equated to the applicable interest rate margin for purposes of determining whether an increase to the interest rate margin under the Initial Term Loans shall be required, but only to the extent an increase in the interest rate floor in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder, and in such case, the interest rate floor (but not the interest rate margin) applicable to the Initial Term Loans shall be increased to the extent of such differential between interest rate floors, (e) any Incremental Term Facility may provide for the ability to participate (x) on a pro rata basis or less than pro rata basis (but not greater than pro rata basis) in any voluntary prepayments of the Initial Term Loans and (y) on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than in the case of prepayment with Other Term Loans incurred pursuant to a Refinancing Amendment to refinance such Incremental Term Loans or any other Credit Agreement Refinancing Indebtedness in respect of such Incremental Term Loans) in any mandatory prepayments of the Initial Term Loans and (f) may otherwise have terms and conditions different from those of the Term Loans (including currency denomination); provided that to the extent the terms and documentation with respect to such Incremental Term Loans are not consistent with the existing Initial Term Loans (except with respect to matters contemplated by clauses (a), (b), (c), (d) and (e) above), the covenants, events of default and guarantees of any such Incremental Term Loans shall not be materially more restrictive to the Borrower, when taken as a whole, than the terms of the Initial Term Loans unless (1) Lenders under the Initial Term Loans also receive the benefit of such more restrictive terms (it being understood that, to the extent that any covenant, event of default or guarantee is added or modified for the benefit of any Incremental Term Facility, no consent shall be required from the Administrative Agent or any of the Term Lenders to the extent such covenant, event of default or guarantee is also added or modified for the benefit of the existing Term Loans), (2) any such provisions apply after the Term Maturity Date with respect to the Initial Term Loans or (3) such terms are reasonably satisfactory to the Administrative Agent and the Borrower. Any Incremental Term Increase shall be on the same terms and pursuant to the same documentation applicable to the Term Loans (except with respect to matters contemplated by clauses (a), (b), (c), (d) and (e) above). Any Incremental Term Facility shall be on terms and pursuant to documentation as determined by the Borrower and the Additional Term Lenders providing such Incremental Term Facility, subject to the restrictions and exceptions set forth above.

(ii)      The Incremental Revolving Commitment Increase shall be treated the same as the Class of Revolving Commitments being increased (including with respect to maturity date thereof) and shall be considered to be part of the Class of Revolving Loans being increased (it being understood that, if required to consummate an Incremental Revolving Commitment Increase, the pricing, interest rate margins, "most favored rate" provisions (if any), rate floors and undrawn commitment fees on the Class of Revolving Commitments being increased may be increased and additional upfront or similar fees may be payable to the lenders providing the Incremental Revolving Commitment Increase (without any requirement to pay such fees to any existing Revolving Lenders)). Any Incremental Revolving Commitment Increase shall be on the same terms and pursuant to the same documentation applicable to the Revolving Loans (excluding upfront fees and customary arranger fees).

(iii)     The Additional/Replacement Revolving Commitments (a)(1) shall rank equal or junior in right of payment and equal or junior in right of security with the Revolving Loans or may be unsecured, and if junior in right of payment and/or security or unsecured, shall be established as a separate facility than the facility for the Revolving Loans that are secured by the Collateral on a first priority basis, (2) shall be structured such that neither Holdings nor any Restricted Subsidiary is a borrower or a guarantor with respect to such Indebtedness unless Holdings or such Restricted Subsidiary is a Loan Party which shall have previously or substantially concurrently borrowed or guaranteed, as applicable, the Secured Obligations, and (3) if secured, the obligations in respect thereof shall not be secured by Liens on the assets of Holdings, the Borrower and its Restricted Subsidiaries, other than assets constituting Collateral, and if established as a separate facility, shall

129

be subject to a customary intercreditor agreement with the Administrative Agent and/or Collateral Agent substantially consistent with the applicable Intercreditor Agreement together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders not less than five Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof, in each case in form and substance reasonably satisfactory to the Administrative Agent and/or Collateral Agent (it being understood that junior Liens are not required to be pari passu with other junior Liens, and that Indebtedness secured by junior liens may be secured by Liens that are pari passu with or junior in priority to, other Liens that are junior to the Liens securing the Secured Obligations), (b) shall not mature earlier than the Revolving Maturity Date with respect to the initial Revolving Loans and shall require no mandatory commitment reduction prior to the Revolving Maturity Date applicable to the initial Revolving Loans, (c) shall have interest rates (including through fixed interest rates), interest margins, rate floors, upfront fees, arrangement fees, structuring fees, ticking fees, amendment fees, consent fees, and any other fees, undrawn commitment fees, funding discounts, original issue discounts, prepayment terms and premiums, and commitment reduction and termination terms as determined by the Borrower and the lenders of such commitments, (d) shall contain borrowing, repayment and termination of Commitment procedures as determined by the Borrower and the lenders of such commitments, (e) may include provisions relating to letters of credit, as applicable, issued thereunder, which issuances shall be on terms substantially similar (except for the overall size of such subfacilities, the fees payable in connection therewith and the identity of the letter of credit issuer, as applicable, which shall be determined by the Borrower, the lenders of such commitments and the applicable letter of credit issuers and borrowing, repayment and termination of commitment procedures with respect thereto, in each case which shall be specified in the applicable Incremental Facility Amendment) to the terms relating to the Letters of Credit with respect to the applicable Class of Revolving Commitments or otherwise reasonably acceptable to the Administrative Agent and (f) may otherwise have terms and conditions different from those of the Revolving Commitments and the Revolving Loans made under this Agreement (including currency denomination); <u>provided</u> that (x) to the extent the terms and documentation with respect to such Additional/Replacement Revolving Commitments are not consistent with the existing Revolving Commitments (except with respect to matters contemplated by clauses (b), (c), (d) and (e) above), the covenants, events of default and guarantees of any such Additional/Replacement Revolving Commitments shall not be materially more restrictive to the Borrower, when taken as a whole, than the terms of the Revolving Commitments unless (1) Lenders under Revolving Commitments also receive the benefit of such more restrictive terms (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any Additional/Replacement Revolving Commitment, no consent shall be required from the Administrative Agent or any of the Revolving Lenders to the extent that such financial maintenance covenant is also added for the benefit of the existing Revolving Commitments), (2) any such provisions apply after the Revolving Maturity Date or (3) such terms shall be reasonably satisfactory to the Administrative Agent and the Borrower and (y) in no event shall it be a condition to the effectiveness of, or initial borrowing under, any such Additional/Replacement Revolving Commitments that any representation or warranty of any Loan Party set forth herein be true and correct, except and solely to the extent required by the Additional/Replacement Revolving Lenders providing such Additional/Replacement Revolving Commitments. Any Additional/Replacement Revolving Commitments shall be on terms and pursuant to documentation as determined by the Borrower and the Additional/Replacement Revolving Lenders providing such Additional/Replacement

130

Revolving Commitments, subject to the restrictions set forth above; provided further that, notwithstanding anything to the contrary in this Section 2.19 or otherwise, (1) the borrowing and repayment (except for (x) payments of interest and fees at different rates, (B) repayments required upon the maturity date of the Revolving Loan Commitments and (C) repayment made in connection with a permanent repayment and termination of any commitments) of Loans with respect to Additional/Replacement Revolving Commitments after the associated Incremental Facility closing date shall be made on a pro rata basis with all other Revolving Loan Commitments, and (2) the permanent repayment of Revolving Loans with respect to, and termination of, Additional/Replacement Revolving Commitments after the associated Incremental Facility closing date shall be made on a pro rata basis with all other Revolving Loan Commitments, except that the Borrower shall be permitted to permanently repay and terminate commitments of any such Class on a better than a pro rata basis as compared to any other Class with a later maturity date than such Class. Any Additional/Replacement Revolving Commitments may constitute a separate Class or Classes, as the case may be, of Commitments from the Classes constituting the Revolving Loan Commitments prior to the Incremental Facility closing date.

(c)     Each notice from the Borrower pursuant to this Section shall set forth the requested amount of the relevant Incremental Term Loans, Incremental Revolving Commitment Increases or Additional/Replacement Revolving Commitments.

(d)     Commitments in respect of any Incremental Term Increase and Incremental Revolving Commitment Increases shall become Commitments (or in the case of an Incremental Revolving Commitment Increase to be provided by an existing Lender with a Revolving Commitment, an increase in such Lender's applicable Revolving Commitment) under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent (provided, that if such amendment does not affect the rights, duties, privileges or obligations of the Administrative Agent, the Administrative Agent shall not be required to execute, accept or acknowledge such amendment). An Incremental Facility may be provided, subject to the prior written consent of the Borrower (not to be unreasonably withheld), by any existing Lender (it being understood that no existing Lender shall have the right to participate in any Incremental Facility or, unless it agrees, be obligated to provide any Incremental Loans) or by any Additional Lender. Any loan under an Incremental Term Increase and any loan under an Incremental Revolving Commitment Increase shall be a "Loan" for all purposes of this Agreement and the other Loan Documents.   The Incremental Facility Amendment may, subject to Section 2.20(b), without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.20 (including, in connection with an Incremental Revolving Commitment Increase, to reallocate Revolving Exposure on a pro rata basis among the relevant Revolving Lenders and including voting rights as contemplated by Section 9.02). The effectiveness of any Incremental Facility Amendment and the occurrence of any credit event (including the making (but not the conversion or continuation) of a Loan and the issuance, increase in the amount, or extension of a Letter of Credit thereunder) pursuant to such Incremental Facility Amendment shall be subject to the satisfaction of such conditions as the parties thereto shall agree and as required by this Section 2.20. The Borrower will use the proceeds of the Incremental Term Loans, Incremental Revolving Commitment Increases and Additional/Replacement Revolving Commitments for any purpose not prohibited by this Agreement.

(e)     Notwithstanding anything to the contrary, this Section 2.20 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

SECTION 2.21    Refinancing Amendments

(a)      At any time after the Effective Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness in respect of (i) all or any portion of the Term Loans then outstanding under this Agreement (which for purposes of this clause (i) will be deemed to include any then outstanding Other Term Loans) or (ii) all or any portion of the Revolving Loans (or unused Revolving Commitments) under this Agreement (which for purposes of this clause (ii) will be deemed to include any then outstanding Other Revolving Loans and Other Revolving Commitments), in the form of (x) Other Term Loans or Other Term Commitments or (y) Other Revolving Loans or Other Revolving Commitments, as the case may be, in each case pursuant to a Refinancing Amendment; provided that such Credit Agreement Refinancing Indebtedness (i) will be unsecured or will rank pari passu or junior in right of payment and of security with the other Loans and Commitments hereunder, (ii) will have such pricing and optional prepayment terms as may be agreed by the Borrower and the Lenders thereof, and (iii) the Net Proceeds of such Credit Agreement Refinancing Indebtedness shall be applied, substantially concurrently with the incurrence thereof, to the prepayment of any outstanding Term Loans or reduction of Revolving Commitments being so refinanced, as the case may be. The effectiveness of any Refinancing Amendment shall be subject to the satisfaction on the date thereof of the conditions as agreed between the lenders providing such Credit Agreement Refinancing Indebtedness and the Borrower. Each Class of Credit Agreement Refinancing Indebtedness incurred under this Section 2.21 shall be in an aggregate principal amount that is (x) not less than $5,000,000 in the case of Other Term Loans or $5,000,000 in the case of Other Revolving Loans and (y) an integral multiple of $1,000,000 in excess thereof (in each case unless the Borrower and the Administrative Agent otherwise agree). Any Refinancing Amendment may provide for the issuance of Letters of Credit for the account of the Borrower pursuant to any Other Revolving Commitments established thereby, in each case on terms substantially equivalent to the terms applicable to Letters of Credit under the Revolving Commitments; provided that no Issuing Bank shall be required to act as "issuing bank" under any such Refinancing Amendment without its written consent. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto (including any amendments necessary to treat the Loans and Commitments subject thereto as Other Term Loans, Other Revolving Loans, Other Revolving Commitments and/or Other Term Commitments). Any Refinancing Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section. In addition, if so provided in the relevant Refinancing Amendment and with the consent of each Issuing Bank, participations in Letters of Credit expiring on or after the Revolving Maturity Date shall be reallocated from Lenders holding Revolving Commitments to Lenders holding extended revolving commitments in accordance with the terms of such Refinancing Amendment; provided, however, that such participation interests shall, upon receipt thereof by the relevant Lenders holding Revolving Commitments, be deemed to be participation interests in respect of such Revolving Commitments and the terms of such participation interests (including, without limitation, the commission applicable thereto) shall be adjusted accordingly.

(b)      If, in connection with any proposed Refinancing Amendment with respect to any Class of Loans, any Lender of such Class declines to provide any portion of the Credit Agreement Refinancing Indebtedness on the terms provided by the other Lenders providing such Credit Agreement Refinancing Indebtedness (each such Lender, a "Non-Refinancing Lender") then the Borrower may, on notice to the Administrative Agent and the Non-Refinancing Lender, (i) cause such Lender to (and such Lender shall be obligated to (and to the extent such Non-Refinancing Lender does not execute such Refinancing Amendment, such Refinancing Amendment shall nonetheless be effective without such signature of the Non-Refinancing Lender)) assign and delegate, without recourse (in accordance with and subject to the

132

restrictions contained in Section 9.04) all or any part of its interests, rights and obligations under this Agreement in respect of the Loans and Commitments of the applicable Class to one or more Eligible Assignees (which Eligible Assignee may be another Lender, if a Lender accepts such assignment) in connection with such Refinancing Amendment; <u>provided</u> that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; <u>provided</u>, further, that (a) such Non-Refinancing Lender shall have received payment of an amount equal to the outstanding principal of the Loans of the applicable Class assigned by it pursuant to this Section 2.21(b), accrued interest thereon, accrued fees and all other amounts (including any amounts under Section 2.11) payable to it hereunder from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) and (b) no processing and recordation fee specified in Section 9.04(b) shall be payable in connection therewith.

(c)     This Section 2.21 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

SECTION 2.22     <u>Defaulting Lenders</u>.

(a)     <u>Adjustments</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     <u>Waivers and Amendments</u>.   Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.02.

133

(ii) <u>Reallocation of Payments</u>. Subject to the last sentence of Section 2.11(f), any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, in the case of a Revolving Lender, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to each Issuing Bank hereunder; <u>third</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>fourth</u>, in the case of a Revolving Lender, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; <u>fifth</u>, to the payment of any amounts owing to the Lenders or the Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender, such Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; <u>sixth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Loan Party as a result of any judgment of a court of competent jurisdiction obtained by any Loan Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and <u>seventh</u>, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if such payment is a payment of the principal amount of any Loans or LC Disbursements and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of, and LC Disbursements owed to, the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to Section 2.05(j) or this Section 2.22(a)(ii). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to Section 2.05(j) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)      <u>Certain Fees</u>. That Defaulting Lender (x) shall not be entitled to receive or accrue any commitment fee pursuant to Section 2.12(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (y) shall be limited in its right to receive Letter of Credit fees as provided in Section 2.12(b).

(iv)      <u>Reallocation of Applicable Percentages to Reduce Fronting Exposure</u>. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to Section 2.05 and the payments of participation fees pursuant to Section 2.12(b), the "Applicable Percentage" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Commitment of that Defaulting Lender; <u>provided</u> that the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit shall not exceed the positive difference, if any, of (1) the Revolving Commitment of that non-Defaulting Lender <u>minus</u> (2) the sum of (A) the aggregate principal amount of the Revolving Loans of that non-Defaulting Lender plus (B) the LC Exposure of that non-Defaulting Lender.

(v)      <u>Cash Collateral</u>. If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, cash collateralize the Issuing Banks' Defaulting Lender Fronting Exposure in accordance with the procedures set forth in Section 2.05(j).

134

(b) ~~Defaulting Lender Cure.~~ If the Borrower, the Administrative Agent and each Issuing Bank agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.22(a)(iv) or the proviso to the definition thereof), whereupon that Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and <u>provided further</u> that except to the extent otherwise expressly agreed by the affected parties and subject to Section 9.20, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.23    <u>Illegality</u>.

If any Lender ~~reasonably~~ determines that any law has made it unlawful, or **that** any Governmental Authority has asserted that it is unlawful, for any Lender **or its applicable lending office** to make, maintain or fund Loans whose interest is determined by reference to ~~the Adjusted LIBO Rate (whether denominated in Dollars or an Alternative Currency),~~**SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR,** or to determine or charge interest ~~rates~~ based upon ~~the Adjusted LIBO Rate~~**SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR**, then, ~~on~~**upon** notice thereof by such Lender to **the** Borrower (through the Administrative Agent) **(an "Illegality Notice"), (i**~~a~~) any obligation of ~~such Lender to make or continue Eurodollar Loans in the affected currency or currencies~~**the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans** or to convert ABR Loans to ~~Eurodollar~~**SOFR** Loans ~~in the affected currency or currencies~~, shall be suspended, and (**ii**~~b~~) ~~if such notice asserts the illegality of such Lender making or maintaining ABR Loans~~ the interest rate on which ~~is determined by reference to the Adjusted LIBO Rate component of the Alternate Base Rate, the interest rate on such ABR Loans of such Lender~~**ABR Loans is determined** shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to ~~the Adjusted LIBO Rate component of the~~ **clause (c) of the definition of "**Alternate Base Rate~~**"**~~, in each case until ~~such~~**each affected** Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of ~~such notice, (x)~~**an Illegality Notice,** the Borrower shall, **if necessary to avoid such illegality,** upon three Business Days' notice from ~~such~~**any** Lender (with a copy to the Administrative Agent), prepay or (I) if applicable and such Loans are denominated in Dollars, convert all ~~Eurodollar~~**SOFR** Loans ~~of such Lender~~ to ABR Loans (the interest rate on which ABR Loans ~~of such Lender~~ shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to ~~the Adjusted LIBO Rate component of the~~ **clause (c) of the definition of "**Alternate Base Rate~~**"**~~), ~~either~~ on the last day of the Interest Period therefor, if ~~such Lender~~**all affected** **Lenders** may lawfully continue to maintain such ~~Eurodollar~~**SOFR** Loans to such day, or immediately, if ~~such~~**any** Lender may not lawfully continue to maintain such ~~Eurodollar~~**SOFR** Loans, **to such day** or (II) if applicable and such Loans are denominated in an Alternative Currency, to the extent the Borrower and the applicable Lenders agree, convert such Loans to Loans bearing interest at an alternative rate mutually acceptable to the Borrower and all of the applicable Lenders, in each case, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such ~~Eurodollar~~**SOFR** Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such ~~Eurodollar~~**SOFR** Loans; provided, however, that if the Borrower and the applicable Lender cannot agree within a reasonable time on an alternative rate for such Loans denominated in an Alternative Currency, the Borrower may, at its discretion, either (i) prepay such Loans

135

or (ii) maintain such Loans outstanding, in which case, the interest rate payable to the applicable Lender on such Loans will be the rate determined by such Lender as its cost of funds to fund a Borrowing of such Loans with maturities comparable to the Interest Period applicable thereto plus the Applicable Rate unless the maintenance of such Loans outstanding on such basis would not stop the conditions described in the first sentence of this Section 2.23 from existing (in which case the Borrower shall be required to prepay such Loans), and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Adjusted ~~LIBO~~**Term SOFR** Rate, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate, applicable to such Lender without reference to the Adjusted ~~LIBO~~**Term SOFR** Rate component thereof**, in each case** until the Administrative Agent is advised in writing by ~~such~~**each affected** Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon ~~the Adjusted LIBO Rate~~**SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR**. Each Lender agrees to notify the Administrative Agent and the Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon the Adjusted ~~LIBO~~**Term SOFR** Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted**, together with any additional amounts required pursuant to Section 2.16**.

SECTION 2.24    <u>Loan Modification Offers</u>.

(a)    At any time after the Effective Date, the Borrower may on one or more occasions, by written notice to the Administrative Agent, make one or more offers (each, a "<u>Loan Modification Offer</u>") to all the Lenders of one or more Classes (each Class subject to such a Loan Modification Offer, an "<u>Affected Class</u>") to effect one or more Permitted Amendments relating to such Affected Class pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrower (including mechanics to permit cashless rollovers and exchanges by Lenders). Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become effective. Permitted Amendments shall become effective only with respect to the Loans and Commitments of the Lenders of the Affected Class that accept the applicable Loan Modification Offer (such Lenders, the "<u>Accepting Lenders</u>") and, in the case of any Accepting Lender, only with respect to such Lender's Loans and Commitments of such Affected Class as to which such Lender's acceptance has been made.

(b)    A Permitted Amendment shall be effected pursuant to a Loan Modification Agreement executed and delivered by Holdings, Borrower, each applicable Accepting Lender and the Administrative Agent (<u>provided</u>, that if such amendment does not affect the rights, duties, privileges or obligations of the Administrative Agent, the Administrative Agent shall only be required to acknowledge such amendment). The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement. Each Loan Modification Agreement may, without the consent of any Lender other than the applicable Accepting Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section 2.24, including any amendments necessary to treat the applicable Loans and/or Commitments of the Accepting Lenders as a new "Class" of loans and/or commitments hereunder.

136

(c) if, in connection with any proposed Loan Modification Offer, any Lender declines to consent to such Loan Modification Offer on the terms and by the deadline set forth in such Loan Modification Offer (each such Lender, a "Non-Accepting Lender") then the Borrower may, on notice to the Administrative Agent and the Non-Accepting Lender, (i) replace such Non-Accepting Lender in whole or in part by causing such Lender to (and such Lender shall be obligated to) assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04) all or any part of its interests, rights and obligations under this Agreement in respect of the Loans and Commitments of the Affected Class to one or more Eligible Assignees (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; provided, further, that (a) the applicable assignee shall have agreed to provide Loans and/or Commitments on the terms set forth in the applicable Permitted Amendment, (b) such Non-Accepting Lender shall have received payment of an amount equal to the outstanding principal of the Loans of the Affected Class assigned by it pursuant to this Section 2.24(c), accrued interest thereon, accrued fees and all other amounts (including any amounts under Section 2.11) payable to it hereunder from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) and (c) the processing and recordation fee specified in Section 9.04(b) shall be payable or (ii) terminate the Commitment of such Lender and in the case of a Lender, repay all Loan Document Obligations of the Borrower owing to such Lender relating to the Loans held by such Lender as of such termination date (including in the case of a Repricing Transaction, any "prepayment premium" pursuant to Section 2.11 that would otherwise be owed in connection therewith).

(d)        Notwithstanding anything to the contrary, this Section 2.24 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

### SECTION 2.25    Benchmark Replacement Setting.

(a)        Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

137

(b)     **Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time with the consent of the Borrower (except such consent shall not be required with respect to any Conforming Changes that the Administrative Agent determines are required or advisable due to (i) the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, (ii) compliance with any request or directive (whether or not having the force of law) from any supervisory authority or Governmental Authority or (iii) any administrative or operational changes) and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.**

(c)     **Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.25(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.25, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.25.**

(d)     **Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.**

(e)     **Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.**

138

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower represents and warrants to the Lenders that as of the Effective Date and following the Effective Date, as of the date of any Borrowing or the date of issuance, amendment that increases the amount available to be drawn thereunder, renewal or extension of any Letter of Credit solely as and when required pursuant to Section 4.02:

SECTION 3.01     Organization; Powers.

Each of Holdings, the Borrower and the Restricted Subsidiaries is (a) duly organized or incorporated, validly existing and in good standing (to the extent such concept exists in the jurisdiction of organization of such Person) under the laws of the jurisdiction of its organization or incorporation, (b) has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except in the cases of clause (a) (other than with respect to the Borrower), clause (b) and clause (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02     Authorization; Enforceability.

This Agreement has been duly authorized, executed and delivered by each of Holdings and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of Holdings, the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable Debtor Relief Laws and any other applicable bankruptcy, insolvency, reorganization, moratorium, examinership or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03     Governmental Approvals; No Conflicts.

Except as set forth on Schedule 3.03, the Financing Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except Loan filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of, or (ii) any Requirements of Law applicable to, Holdings, the Borrower or any Restricted Subsidiary, (c) will not violate or result in a default under any indenture or other agreement or instrument that constitutes Material Indebtedness binding upon Holdings, the Borrower or any Restricted Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Holdings, the Borrower or any Restricted Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of Holdings, the Borrower or any Restricted Subsidiary (other than Liens created under the Loan Documents) except (in the case of each of clauses (a), (b)(ii) and (c)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04     Financial Condition;     No   Material Adverse Effect.

(a)     The Pro Forma Financial Statements have been prepared in good faith, based on

139

assumptions and adjustments believed by the Borrower to be reasonable as of the date of delivery thereof, and, to the knowledge of Holdings and the Borrower, present fairly in all material respects on a pro forma basis the estimated unaudited financial position of Holdings and its Subsidiaries as at December 31 , 2020 and their estimated unaudited results of operations for the period covered thereby, in each case after giving effect to the Transactions, subject to audit adjustments.

(b)     Since the December 31, 2020, there has been no Material Adverse Effect.

SECTION 3.05     Properties.

Each of Holdings, the Borrower and the Restricted Subsidiaries has good and marketable title to, or valid leasehold interests in, all its real and personal property material to its business, if any (including all of the Mortgaged Properties, if any), (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06     Litigation and Environmental Matters.

(a)     Except as set forth on Schedule 3.06, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings or the Borrower, threatened in writing against or affecting Holdings, the Borrower or any Restricted Subsidiary that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except as set forth on Schedule 3.06, and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of Holdings or the Borrower, become subject to any Environmental Liability or (iii) has received written notice of any claim with respect to any Environmental Liability.

SECTION 3.07     Compliance with Laws; No Default.

Each of Holdings, the Borrower and the Restricted Subsidiaries is in compliance with all Requirements of Law applicable to it or its property except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

SECTION 3.08     Investment Company Status.

None of the Loan Parties is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

140

SECTION 3.09    Taxes

Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings, the Borrower and each Restricted Subsidiary (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes that are being contested in good faith by appropriate proceedings, provided that Holdings, the Borrower or Restricted Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP.

SECTION 3.10    ERISA.

(a)      Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Pension Plan sponsored by a Loan Party is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)      Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the six year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)      Except as could not reasonably be expected, individually or in the aggregate to result in a Material Adverse Effect: (i) each employee benefit plan (as defined in Section 3(2) of ERISA) sponsored by Holdings or the Borrower that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service; (ii) to the knowledge of Holdings and the Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status; and (iii) there are no pending or, to the knowledge of Holdings and the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any such plan.

141

As of the Effective Date, (in the case of any of the following relating to Gogo), all written factual information and written factual data (other than projections, any pro forma financial information (including the Pro Forma Financial Statements), budgets, other forward-looking information or information consisting of statements, estimates or forecasts regarding the future condition of the industries in which the Loan Parties operate and information of a general economic or industry specific nature) made available to the Administrative Agent, any Joint Lead Arranger or any Lender in connection with the Transactions, when taken as a whole after giving effect to all supplements and updates provided thereto, is correct in all material respects and does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not materially misleading in the light of the circumstances under which they were made; provided that, with respect to the projections of Holdings and its Subsidiaries included in the Information Memorandum, Holdings and the Borrower represent that such projections, when taken as a whole, were prepared in good faith based upon assumptions believed by them to be reasonable at the time furnished, it being understood that (i) such projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings and (iii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

SECTION 3.12  Subsidiaries.

As of the Effective Date, immediately after giving effect to the Transactions to occur on the Effective Date, Schedule 3.12 sets forth the name of, and the ownership interest of each Restricted Subsidiary of Holdings.

SECTION 3.13      Intellectual Property; Licenses, Etc.

Except as could not reasonably be expected to have a Material Adverse Effect, each of Holdings, the Borrower and the Restricted Subsidiaries owns, licenses or possesses the right to use all Intellectual Property that is reasonably necessary for the operation of its business substantially as currently conducted. To the knowledge of Holdings and the Borrower, no Intellectual Property used by Holdings, the Borrower or any Restricted Subsidiary in the operation of its business as currently conducted infringes upon the Intellectual Property of any Person except for such infringements that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of Holdings and the Borrower, threatened in writing against Holdings, the Borrower or any Restricted Subsidiary, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 3.14      Solvency.

On the Effective Date, immediately after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are solvent (determined in accordance with the Solvency Certificate delivered on the Effective Date in the form of Exhibit P attached hereto).

SECTION 3.15      Federal Reserve Regulations.

No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock (within the meaning of Regulation U of the Board of Governors) or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

142

(a)      The Borrower will not directly or, knowingly, indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person for the purpose of funding activities or business of or with any Person that is the subject of Sanctions, or in any Sanctioned Country, in each case, in violation of applicable Sanctions, or in any other manner that would result in a violation by any party to this Agreement of Sanctions applicable to such party. The Borrower will not use the proceeds of the Loans for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity on behalf of a government, in order to obtain, retain or direct business or obtain any improper advantage, in each case in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA") or any other applicable anti-corruption law.

(b)      Each of Holdings, the Borrower and the Restricted Subsidiaries is in compliance in all material respects with (i) applicable regulations and other Sanctions administered by OFAC, (ii) Title III of the USA Patriot Act and (iii) the FCPA.

(c)      None of Holdings, the Borrower, any of the Restricted Subsidiaries or, to the knowledge of the Borrower, any director or officer thereof, are individuals or entities currently on OFAC's list of Specially Designated Nationals and Blocked Persons and/or any similar list maintained by OFAC, nor is Holdings, the Borrower or any Restricted Subsidiary located, organized or resident in a Sanctioned Country.

SECTION 3.17      <u>Use of Proceeds</u>

The Borrower has used and will only use the proceeds of the Loans and the Letters of Credit issued hereunder only in compliance with (and not in contravention of) Section 5.10.

SECTION 3.18      <u>Regulatory Matters.</u>

The Loan Parties have all material FCC Licenses and FAA Approvals necessary to operate the Loan Parties' business in all material respects as required under applicable Communication Laws, and all such FCC Licenses and FAA Approvals have been validly issued in the name of a Loan Party. There are no applications, proceedings or complaints pending or, to the best of the Loan Parties' knowledge, threatened regarding the Loan Parties' FCC Licenses and FAA Approvals that could reasonably be expected to have a Material Adverse Effect.

SECTION 3.19      <u>Collateral Matters.</u>

(a)      The Collateral Agreement, upon execution and delivery thereof by the parties thereto, will be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid and enforceable security interest in the Collateral (as defined therein) and (i) when the Collateral (as defined therein) constituting certificated securities (as defined in the Uniform Commercial Code), solely to the extent required by the Collateral and Guarantee Requirement, is delivered to the Collateral Agent, together with instruments of transfer duly endorsed in blank, the security interest created under the Collateral Agreement will constitute a fully perfected security interest in all right, title and interest of the pledgors thereunder in such Collateral, prior and superior in right to any other Person other than any Liens permitted under Section 6.02, and (ii) when financing statements in appropriate form are filed in the applicable filing offices, the security interest created under the Collateral Agreement will constitute a fully perfected security interest in all right, title and interest of the Loan Parties in the remaining Collateral (as defined therein) to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, prior and superior to the rights of any other Person, but subject to Liens permitted under Section 6.02.

143

(b)    Each Mortgage, upon execution and delivery thereof by the parties thereto, will create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid and enforceable security interest in all the applicable mortgagor's right, title and interest in and to the Mortgaged Properties subject thereto and the proceeds thereof, and when the Mortgages have been filed in the jurisdictions specified therein, the Mortgages will constitute a fully perfected security interest in all right, title and interest of the mortgagors in the Mortgaged Properties and the proceeds thereof, prior and superior in right to any other Person, but subject to Liens permitted under Section 6.02.

(c)    Upon the recordation of the Intellectual Property Security Agreements with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, and the filing of the financing statements referred to in paragraph (a) of this Section, the security interest created under the Collateral Agreement will constitute a fully perfected security interest in all right, title and interest of the Loan Parties in the Intellectual Property (as defined in the Collateral Agreement) in which a security interest may be perfected by filing in the United States of America, in each case prior and superior in right to any other Person, but subject to Liens permitted under Section 6.02

## ARTICLE IV

## CONDITIONS

SECTION 4.01    Effective Date.

The obligation of each Lender to make Loans and the obligations of each Issuing Bank to issue Letters of Credit hereunder on the Effective Date shall be subject to satisfaction of the following conditions (or waiver thereof in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from the Borrower and Holdings either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent, the Lenders and the Issuing Banks and dated the Effective Date) of Kirkland & Ellis LLP, New York counsel for the Loan Parties. Each of Holdings and the Borrower hereby requests such counsel to deliver such opinion.

(c)    The Administrative Agent shall have received (a) a customary certificate of each Loan Party, dated the Effective Date, executed by any Responsible Officer of such Loan Party including or attaching only those documents referred to in paragraph (d) of this Section 4.01 and confirming that such documents are correct, complete and in full force and effect and have not been amended or superseded as of the Effective Date and (b) a certificate of a Responsible Officer of the Borrower certifying that the condition set forth in Section 4.01(h) has been satisfied.

144

(d)      The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) copies of resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by a secretary, an assistant secretary or a Responsible Officer of such Loan Party as being in full force and effect without modification or amendment and (iv) a good standing certificate (to the extent such concept exists in the jurisdiction of incorporation, organization or formation of such Loan Party) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(e)      The Administrative Agent shall have received (or shall receive substantially contemporaneously with funding on the initial Loans hereunder) (which amounts may be funded from the proceeds of the initial Loans hereunder) all fees and other amounts previously agreed in writing by the Joint Lead Arrangers and the Borrower to be due and payable on or prior to the Effective Date and reimbursement or payment of all reasonable and documented out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel to the extent required to be reimbursed pursuant to the Commitment Letter) required to be reimbursed or paid by any Loan Party under any Loan Document in the case of such expenses, to the extent invoiced at least three (3) Business Days prior to the Effective Date.

(f)      Holdings, the Borrower and the Subsidiary Loan Parties shall have satisfied the Collateral and Guarantee Requirement (in each case other than in accordance with Section 5.14), subject to the Funds Certain Provision.

(g)      The Joint Lead Arrangers shall have received the Audited Financial Statements and the Pro Forma Financial Statements.

(h)      The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (without duplication of any materiality qualifier therein).

(i)      The Debt Repayment shall have been consummated, or substantially concurrently with the initial funding of Loans on the Effective Date, shall be consummated.

(j)      The Joint Lead Arrangers and the Lenders shall have received a certificate from a Financial Officer or other similar officer of the Borrower certifying as to the solvency of the Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions, substantially the form of Exhibit P.

(k)      The Administrative Agent and the Joint Lead Arrangers shall have received (x) at least three (3) Business Days prior to the Effective Date, all documentation and other information about Holdings, the Borrower and the other Effective Date Loan Parties as shall have been reasonably requested in writing at least ten (10) Business Days prior to the Effective Date by the Administrative Agent or the Joint Lead Arrangers that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and (y) at least three business days prior to the Closing Date, to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230 (the "<u>Beneficial Ownership Regulation</u>"), a certificate regarding beneficial ownership as required by the Beneficial Ownership Regulation with respect to the Borrower.

145

(l) Prior to, or substantially concurrently with the initial funding of Loans on the Effective Date, not less than $105,000,000 of the Existing Convertible Notes shall have been, or shall have been irrevocably committed to be, converted to equity of Holdings in accordance with the terms of the definitive documentation with respect to the Existing Convertible Notes.

Notwithstanding anything herein to the contrary, it is understood that, to the extent any lien search, insurance certificate or endorsement or security interest in any Collateral is not or cannot be provided and/or perfected on the Effective Date (other than the pledge and perfection of the security interests in equity securities of the Borrower and its material, wholly owned domestic Restricted Subsidiaries (to the extent required under the terms hereof) and assets   with respect to which a lien may be perfected by the filing of a financing statement under the Uniform Commercial Code)) after your use of commercially reasonable efforts to do so or without undue burden or expense, then the provision and/or delivery of any lien search, insurance certificate or endorsement or the provision and/or perfection of a security interest in such Collateral shall not constitute a condition for purposes of this Section 4.01, but instead shall be required to be provided and/or delivered within ninety (90) days after the Effective Date (or such later date as agreed by the Administrative Agent) pursuant to arrangements and timing to be mutually agreed by the Administrative Agent and the Borrower acting reasonably (or, in the case of any possessory collateral, within ninety (90) days after the Effective Date (or such later date as reasonably agreed by the Administrative Agent) giving due regard to stay at home, social distancing and other COVID-19 related measures limiting physical interaction (including any quarantine, "shelter in place," "stay at home," workforce reduction, facility capacity limitation, social distancing, shut down, closure, sequester, safety or similar applicable law, directive, guidelines or recommendations promulgated by any governmental authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to the disease known as "COVID-19," including the CARES Act and Families First Act) (the "<u>Funds Certain Provision</u>").

SECTION 4.02     <u>Each Credit Event</u>.

After the Effective Date, subject to the provision in the last paragraph hereof, the obligation of each Lender to make a Loan on the occasion of any Borrowing, and of each Issuing Bank to issue, amend, renew or extend any Letter of Credit (other than (x) any Borrowing or issuance, amendment that increases the amount available to be drawn thereunder, renewal or extension of a Letter of Credit on the Effective Date, and (y) any Borrowing or issuance of a Letter of Credit under any Incremental Facility), is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the following conditions:

(a)     The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as the case may be; <u>provided</u> that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date.

(b)     At the time of and immediately after giving effect to such Borrowing, or the issuance, amendment, renewal or extension of such Letter of Credit, as the case may be, no Default or Event of Default shall have occurred and be continuing.

(c)     The Administrative Agent and, if applicable, the relevant Issuing Bank, shall have received a Borrowing request;

; provided that the conditions set forth in clauses (a) and (b) above shall not apply to any Borrowing after the Effective Date but prior to July 1, 2022, the proceeds of which are to be used directly or indirectly to pay or retire or redeem the Existing Convertible Notes.

146

Each Borrowing (provided that a conversion or a continuation of a Borrowing shall not constitute a Borrowing for purposes of this Section 4.02), other than a Borrowing on the Effective Date or under any Incremental Facility or a Borrowing the proceeds of which are used to finance a Limited Condition Transaction or to redeem the Existing Convertible Notes, and each issuance, amendment, renewal or extension of a Letter of Credit (other than any issuance, amendment, renewal or extension of a Letter of Credit on the Effective Date) shall be deemed to constitute a representation and warranty by Holdings and the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section 4.02.

ARTICLE V

AFFIRMATIVE COVENANTS

　　　　From and after the Effective Date and until the Termination Date, each of Holdings (solely in the case of Section 5.12) and the Borrower covenants and agrees with the Lenders that:

　　　　SECTION 5.01　　Financial　　Statements　　and Other Information.

　　　　The Borrower will furnish to the Administrative Agent, on behalf of each Lender:

　　　　(a)　　on or before the date that is one hundred and twenty/twenty-one (120/121) days after the end of each fiscal year of Holdings commencing with the fiscal year ended December 31, 2021, audited consolidated balance sheet and audited consolidated statements of income and retained earnings and statement of cash flows of Holdings and its Subsidiaries as of the end of and for such year, and related notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year and accompanied by customary management discussion and analysis, all reported on by an independent public accountant of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than an "emphasis of matter" paragraph or any such exception, qualification or explanatory paragraph that is expressly solely with respect to, or expressly resulting solely from, (i) an upcoming maturity date of any Indebtedness that is scheduled to occur within one year from the time such report and opinion are delivered, (ii) any potential or actual inability to satisfy a financial maintenance covenant, including the Financial Performance Covenant, or (iii) the activities, operations, financial results, assets or liabilities of any Unrestricted Subsidiary)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

　　　　(b)　　commencing with the financial statements for the fiscal quarter ended March 31, 2021, on or before the date that is sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year of Holdings, unaudited consolidated balance sheet and unaudited consolidated statements of income and retained earnings and statement of cash flows of Holdings and its subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year and accompanied by customary management discussion and analysis, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

　　　　(c)　　simultaneously with the delivery of each set of consolidated financial statements referred to in clauses (a) and (b) above, the related unaudited consolidating financial information reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements;

147

(d)        not later than five (5) Business Days after any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer (i) certifying as to whether an Event of Default has occurred and is continuing and, if an Event of Default has occurred and is continuing, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth (I) (A) if the Financial Performance Covenant is then being tested, reasonably detailed calculations of the Financial Performance Covenant and (B) in the case of financial statements delivered under paragraph (a) above and only to the extent the Borrower would be required to prepay Term Borrowings pursuant to Section 2.11(d), beginning with the financial statements for the fiscal year of the Borrower ending December 31, 2022, a calculation of Excess Cash Flow for such fiscal year and (II) if the Applicable Rate is to be determined in accordance with Category 2 or Category 3, a calculation of the Senior Secured First Lien Net Leverage Ratio as of the last day of the applicable fiscal quarter or fiscal year;

(e)        [reserved];

(f)        to the extent the Borrower is required to or voluntarily does file such documents with the SEC or with any national securities exchange, promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and registration statements (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) filed by Holdings, the Borrower or any Restricted Subsidiary with the SEC or with any national securities exchange; and

(g)        promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Restricted Subsidiary, as the Administrative Agent may reasonably request in writing, in each case subject to the limitations set forth below and in Sections 5.08 and 9.12; provided that, none of the Borrower nor any Restricted Subsidiary will be required to disclose any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement, (iii) that is subject to attorney client or similar privilege or constitutes attorney work product or (iv) constitutes Material Non-Public Information as reasonably determined by the Borrower;

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 5.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (x) the applicable financial statements of (i) any Holdings Parent that, directly or indirectly, holds all of the Equity Interests of the Borrower and holds no other material assets other than the Equity Interests of Holdings or (ii) any Wholly Owned Restricted Subsidiary of the Borrower that, together with its consolidated Restricted Subsidiaries, constitutes substantially all of the assets of the Borrower and its consolidated Subsidiaries (a "Qualified Reporting Subsidiary") or (y) the Form 10-K or 10-Q (or the equivalent), as applicable, of the Borrower (or Holdings or any Holdings Parent) filed with the SEC within the applicable time periods required by applicable law and regulations (including any extended deadlines available thereunder); provided that (i) to the extent such information relates to any Holdings Parent, or any Qualified Reporting Subsidiary, such information is accompanied by consolidating information, which may be unaudited, that explains in reasonable detail the differences between the information relating to such parent or Qualified Reporting Subsidiary, on the one hand, and the information relating to Holdings and its Subsidiaries on a standalone basis, on the other hand, and (ii) to the extent such information is in lieu of information required to be provided under Section 5.01(a), such materials are accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the

148

scope of such audit (other than an "emphasis of matter" paragraph or any such exception, qualification or explanatory paragraph that is expressly solely with respect to, or expressly resulting solely from, (i) an upcoming maturity date under any Indebtedness that is scheduled to occur within one year from the time such report and opinion are delivered, (ii) any potential or actual inability to satisfy a financial maintenance covenant, including the Financial Performance Covenant, or (iii) the activities, operations, financial results, assets or liabilities of any Unrestricted Subsidiary)).

Documents required to be delivered pursuant to Section 5.01(a), (b) or (f) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Holdings or the Borrower posts such documents, or provides a link thereto on Holdings' or the Borrower's website on the Internet at the website address listed on Schedule 9.01 (or otherwise notified pursuant to Section 9.01(d)); or (ii) on which such documents are posted on Holdings' or the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent upon its reasonable request until a written notice to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify the Administrative Agent (by fax or electronic mail) of the posting of any such documents and upon its reasonable request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Any financial statements required to be delivered pursuant to Sections 5.01(a), (b) or (f) shall not be required to contain all purchase accounting adjustments relating to the Transactions or any other transaction(s) permitted hereunder to the extent it is not practicable to include any such adjustments in such financial statements.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in GAAP, or the respective interpretation thereof, and that such restatements will not result in a Default or an Event of Default under the Loan Documents.

149

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Joint Lead Arrangers may make available to the Lenders and the Issuing Banks materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to the Borrower's or their Affiliates' securities. The Borrower hereby agrees that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (x) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (y) the Administrative Agent and the Joint Lead Arrangers shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information". Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (c) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any Material Non-Public Information and all other information shall be assumed to contain Material Non-Public Information.

Notwithstanding anything to the contrary herein, neither Holdings nor any Subsidiary shall be required to deliver, disclose, permit the inspection, examination or making of copies of or excerpts from, or any discussion of, any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent (or any Lender (or their respective representatives or contractors)) is prohibited by applicable law, fiduciary duty or binding agreement, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) with respect to which any Loan Party or any Subsidiary owes confidentiality obligations (to the extent not created in contemplation of such Loan Party's or Subsidiary's obligations under this Section 5.01) to any third party; provided that in the event that you do not provide information in reliance on the exclusions in this sentence, you shall use your commercially reasonable efforts to provide notice to the Administrative Agent promptly upon obtaining knowledge that such information is being withheld.

SECTION 5.02      Notices of Material Events.

Promptly after any Responsible Officer of the Borrower obtains actual knowledge thereof, the Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)      the occurrence of any Event of Default;

(b)      to the extent permissible by Requirements of Law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another executive officer the Borrower or any Subsidiary, affecting Holdings, the Borrower or any Subsidiary or the receipt of a written notice of an Environmental Liability, in each case that would reasonably be expected to result in a Material Adverse Effect; and

150

(c)      the occurrence of any ERISA Event or ERISA Events that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03      Information Regarding Collateral.

(a)      The Borrower will furnish to the Administrative Agent prompt (and in any event within forty-five (45) days after or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Mortgaged Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction.

(b)      The Borrower shall provide in each Compliance Certificate delivered pursuant to Section 5.01(d) any changes, if any, to Schedule III to the Collateral Agreement as required to make such schedules accurate as of the last day of the fiscal quarter for which such Compliance Certificate is delivered.

SECTION 5.04      Existence; Conduct of Business.

The Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, FCC Licenses, permits, privileges, franchises, Intellectual Property and Governmental Approvals material to the conduct of its business, except to the extent (other than with respect to the preservation of the existence of the Borrower) that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

SECTION 5.05      Payment of Taxes, etc.

The Borrower will, and will cause each Restricted Subsidiary to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by Holdings, the Borrower or any of their respective Subsidiaries or (b) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.06      Maintenance of Properties.

The Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all tangible property material to the conduct of its business in good working order and condition (casualty, condemnation and ordinary wear and tear excepted), except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.07      Insurance.

(a)      The Borrower will, and will cause each Restricted Subsidiary to maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the

151

Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment or the management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment or the management of the Borrower) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Administrative Agent, upon written request from the Administrative Agent (not to exceed one time per fiscal year, unless and Event of Default has occurred and is continuing), information presented in reasonable detail as to the insurance so carried. The Borrower shall, and shall cause each Loan Party organized or existing under the laws of the United States (or any state thereof or the District of Columbia) to (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured as its interests may appear on each such general liability policy of insurance belonging to or insuring such Loan Party (other than directors and officers policies, workers compensation policies and business interruption insurance) and (ii) in the case of each casualty insurance policy belonging to or insuring a Loan Party organized or existing under the laws of the United States (or any state thereof or the District of Columbia), include a loss payable clause or mortgagee endorsement that names the Collateral Agent, on behalf of the Secured Parties, as the loss payee or mortgagee thereunder.

(b)        If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause each Loan Party to (i) maintain, or cause to be maintained, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the flood insurance so carried.

152

The Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder)) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or the Restricted Subsidiaries, as the case may be. The Borrower will, and will cause each Restricted Subsidiary to, permit any representatives designated by the Administrative Agent, upon reasonable prior notice, to visit and inspect its tangible properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and financial condition with its senior officers and independent accountants, all at such reasonable times and as often as reasonably requested; <u>provided</u> that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this Section 5.08 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default and such time shall be at the Borrower's expense; <u>provided, further</u> that (a) when an Event of Default exists, the Administrative Agent (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. For the avoidance of doubt, this Section 5.08 is subject to the last paragraph of Section 5.01.

SECTION 5.09      <u>Compliance with Laws</u>.

Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, comply with all Requirements of Law (including Environmental Laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, that the Borrower will, and will cause each Restricted Subsidiary to comply in all material respects with the FCPA, Sanctions and the USA PATRIOT Act.

SECTION 5.10      <u>Use of Proceeds and Letters of Credit</u>.

The Borrower will use the proceeds of the Term Loans borrowed on the Effective Date and may use up to $10,000,000 of Revolving Loans drawn on the Effective Date (excluding any undrawn Letters of Credit) plus an additional amount of Revolving Loans to account for the amount of original issue discount or upfront fees resulting from the Joint Lead Arrangers' exercise of the "market flex" provisions of the Fee Letter, together with cash on hand of the Borrower to directly or indirectly finance the Transactions, directly or indirectly pay all or a portion of the Transaction Costs, to increase cash on hand and for other working capital purposes. The proceeds of the Revolving Loans drawn after the Effective Date will be used only for general corporate purposes, and the Letters of Credit will be used to backstop or replace letters of credit outstanding on the Effective Date and for working capital and general corporate purposes, in each case, including capital expenditures, Permitted Acquisitions, Investments, Restricted Payments, refinancing of Indebtedness, repayment of the Existing Convertible Notes and any other transactions not prohibited by this Agreement.

153

(a)    If (i) any additional Restricted Subsidiary, organized or incorporated in the United States (or any state thereof or the District of Columbia), is formed or acquired after the Effective Date, (ii) any Restricted Subsidiary ceases to be an Excluded Subsidiary or (iii) the Borrower, at its option, elects to cause a Subsidiary of the Borrower organized or incorporated in the United States (or any state thereof or the District of Columbia), an Electing Foreign Guarantor or to the extent reasonably acceptable to the Administrative Agent, a Subsidiary that is not a Wholly Owned Subsidiary (including any consolidated Affiliate in which the Borrower and their respective Subsidiaries own no Equity Interest) to become a Subsidiary Loan Party, then the Borrower will, within ninety (90) days (or such longer period as may be agreed to by the Administrative Agent in its reasonable discretion) after (x) such newly formed or acquired Restricted Subsidiary is formed or acquired (unless such Restricted Subsidiary is an Excluded Subsidiary), (y) such Restricted Subsidiary ceases to be an Excluded Subsidiary or (z) the Borrower has made such election, cause such Restricted Subsidiary to satisfy the Collateral and Guarantee Requirement with respect to such Restricted Subsidiary and with respect to any Equity Interest in or Indebtedness of such Restricted Subsidiary owned by or on behalf of any Loan Party (or with respect to an Electing Foreign Guarantor, cause such Electing Foreign Guarantor to execute a guaranty of the Secured Obligations (which may be the Guarantee Agreement or, if reasonably required by the Administrative Agent in order to create a legally enforceable Guarantee of the Secured Obligations, a guaranty governed by the laws of the Applicable Country in which such Electing Foreign Guarantor is incorporated or organized, in each case with such changes or limitations as are customary in the Applicable Country as are reasonably agreed by the Administrative Agent) and all documents, financing statements, agreements, instruments, certificates, notices and acknowledgements and filings which the Administrative Agent may reasonably request to ensure the creation, perfection and priority of the Liens on the assets of such Electing Foreign Guarantor, in each case (i) in a form reasonably acceptable to the Administrative Agent and the Borrower, (ii) governed by the laws of the Applicable Country in which such Electing Foreign Guarantor is incorporated or organized and (iii) subject to customary exceptions for transactions of this type in such Applicable Country consistent, where applicable, with the definition of "Excluded Assets"), and any such Restricted Subsidiary shall be a Loan Party and Subsidiary Loan Party for all purposes hereunder. In the event that the Borrower elects to cause an Excluded Subsidiary to be a Subsidiary Loan Party in accordance with the foregoing, such Excluded Subsidiary shall cease to be an Excluded Subsidiary for purposes of the Loan Documents until redesignation as an Excluded Subsidiary in accordance with the terms hereof.

(b)    Notwithstanding the foregoing, in the event any real property would be required to be mortgaged pursuant to this Section 5.11, the Borrower shall be required to comply with the "Collateral and Guarantee Requirement" as it relates to such real property within 90 days following the formation or acquisition of such real property or such Restricted Subsidiary or the identification of such new Material Subsidiary, or such longer time period as agreed by the Administrative Agent in its reasonable discretion.

SECTION 5.12    Further Assurances.

(a)    Each of Holdings and the Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

154

(b)    Subject in each case, to the limitations set forth in the Security Documents, if, after the Effective Date, any material assets (other than Excluded Assets), including any Material Real Property, are acquired by the Borrower or any other Loan Party or are held by any Subsidiary on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Borrower will notify the Administrative Agent thereof, and, if requested by the Administrative Agent, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section but only as and to the extent required pursuant to the "Collateral and Guarantee Requirement," all at the expense of the Loan Parties and subject to the second to last paragraph of the definition of the term "Collateral and Guarantee Requirement." In the event any Material Real Property is mortgaged pursuant to this Section 5.12(b), the Borrower or such other Loan Party, as applicable, shall be required to comply with the "Collateral and Guarantee Requirement" and paragraph (a) of this Section 5.12 within ninety (90) days following the acquisition of such Material Real Property or such longer time period as agreed by the Administrative Agent in its reasonable discretion.

SECTION 5.13    Designation of Subsidiaries.

(a)    The Borrower may at any time after the Effective Date designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) immediately after such designation on a Pro Forma Basis, no Default or Event of Default shall have occurred and be continuing, (ii) no Restricted Subsidiary that owns or exclusively licenses any Material IP of the Borrower or its Restricted Subsidiaries, or that holds any FCC Licenses, may be designated as an Unrestricted Subsidiary other than in connection with transactions that have a bona fide business purpose (as determined by the Borrower in good faith) utilizing available basket exceptions as necessary and (iii) the designation of any Subsidiary as an Unrestricted Subsidiary after the Effective Date shall constitute an Investment by the Borrower or its Restricted Subsidiaries therein at the date of designation in an amount equal to the fair market value (as determined in good faith by the Borrower) of the Borrower's or its respective subsidiaries' (as applicable) investment therein as of such designation date. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (x) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (y) a return on any Investment by the Borrower in such Unrestricted Subsidiary pursuant to the preceding sentence in an amount equal to the fair market value (as determined
in good faith by the Borrower) at the date of such designation of the Borrower's or its Subsidiaries' (as applicable) Investment in such Subsidiary.

(b)    The Borrower may at any time after the Effective Date designate any Restricted Subsidiary that is an Excluded Subsidiary as an Electing Guarantor in accordance with Section 5.11 or Electing Guarantor as an Excluded Subsidiary. The designation of any Excluded Subsidiary as an Electing Guarantor shall constitute a return on any Investment by the Borrower in such Excluded Subsidiary in an amount equal to the fair market value (as determined in good faith by the Borrower) at the date of such designation of the Borrower's or its Subsidiaries' (as applicable) Investment in such Subsidiary.    The designation of any Electing Guarantor as an Excluded Subsidiary after the Effective Date shall constitute (i) the incurrence at the time of designation of Indebtedness or Liens of such Subsidiary existing at such time and (ii) an Investment by the Borrower or its Restricted Subsidiaries therein at the date of designation in an amount equal to the fair market value (as determined in good faith by the Borrower) of the Borrower's or its respective subsidiaries' (as applicable) investment therein.

155

As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14 or such later date as the Administrative Agent agrees to in writing, including to reasonably accommodate circumstances unforeseen on the Effective Date, the Borrower and each other Loan Party shall deliver the documents or take the actions specified on Schedule 5.14 that would have been required to be delivered or taken on the Effective Date, in each case except to the extent otherwise agreed by the Administrative Agent pursuant to its authority as set forth in the definition of the term "Collateral and Guarantee Requirement."

SECTION 5.15 Transactions with Affiliates.

The Borrower will conduct, and cause each of the Restricted Subsidiaries to conduct, all transactions with any of its Affiliates on terms, taken as a whole, substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate or, if in the good faith judgment of the Board of Directors no comparable arm's-length transaction is available with which to compare such transaction, on terms otherwise fair to the Borrower or such Restricted Subsidiary from a financial point of view, except that the following in any event shall be permitted: (i) (A) transactions between or among the Borrower or any Restricted Subsidiary or any entity that becomes a Restricted Subsidiary as a result of such transaction and (B) transactions involving aggregate payment or consideration of less than $15,000,000, (ii) any transaction or series of related transactions involving aggregate consideration in excess of $30,000,000 for which the Borrower has delivered to the Administrative Agent a resolution adopted in good faith by the majority of the Board of Directors of the Borrower, approving such transaction, (iii) the Transactions and the payment of fees and expenses as part of or in connection with the Transactions and transactions constituting any Permitted Reorganization, (iv) the payment of expenses and indemnities to the GTCR Group (or management companies of the GTCR Group) to the extent such expenses and indemnities relate to the ownership and operation of the Borrower and its Restricted Subsidiaries, (v) issuances, sale or transfer of Equity Interests of the Borrower to the extent otherwise permitted by this Agreement, (vi) compensation (including bonuses and securities issuances or other payments, awards, grants in cash or otherwise) and employee benefit arrangements and severance arrangements between the Borrower and its Restricted Subsidiaries and their respective officers, directors, managers, consultants and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Section 6.04) or any acquisition or other Investment permitted hereunder), (vii) payments by the Borrower and its Restricted Subsidiaries pursuant to tax sharing agreements among Holdings (and any such parent thereof), the Borrower and the Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries, to the extent such payments are permitted by Section 6.07, (viii) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers and employees of Holdings (or any Holdings Parent), the Borrower, and the Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries, (ix) transactions pursuant to permitted agreements in existence or contemplated on the Effective Date and set forth on Schedule 5.15 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, (x) Restricted Payments permitted under Section 6.07 and loans and advances in lieu thereof pursuant to Section 6.04(l), (xi) payments to or from, and transactions with, any joint venture in the ordinary course of business (including, without limitation, any cash management activities related thereto), (xii) transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, (xiii) sales or pledges of accounts receivable, or

156

participations therein, or Securitization Assets or related assets, the creation of intercompany debt or other customary transactions or obligations, in each case, in connection with or any Qualified Securitization Facility, (xiv) customary payments by the Borrower and its Restricted Subsidiaries to the GTCR Group made for any financial advisory, consulting, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions, divestitures or financings), which payments are approved by the majority of the members of the Board of Directors or a majority of the disinterested members of the Board of Directors of the Borrower in good faith, (xv) the existence and performance of agreements and transactions with any Unrestricted Subsidiary that were entered into prior to the designation of a Restricted Subsidiary as such Unrestricted Subsidiary to the extent that the transaction was permitted at the time that it was entered into with such Restricted Subsidiary, and transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary and not in contemplation of such Unrestricted Subsidiary becoming redesignated as a Restricted Subsidiary, (xvi) Affiliate repurchases of the Loans to the extent permitted hereunder and the holdings of such Loans and the payments and other transactions contemplated herein in respect thereof, (xvii) any transaction between or among the Borrower or any Restricted Subsidiary and any non-wholly owned Affiliate of the Borrower or a joint venture or similar entity that is otherwise permitted hereunder to the extent such Affiliate, joint venture or similar entity is an Affiliate solely because the Borrower or a Restricted Subsidiary owns an equity interest in or otherwise controls such Affiliate, joint venture or similar entity, (xviii) payments and expenses pursuant to any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current, former or future officers, directors, employees, managers, consultants and independent contractors of the Borrower, any Subsidiary or any direct or indirect parent of the Borrower, (xix) any lease entered into between the Borrower or any Restricted Subsidiary, as lessee and any Affiliate of the Borrower, as lessor, and any transaction(s) pursuant to that lease, (xx) payments and expenses pursuant to Intercompany License Agreements in the ordinary course of business or consistent with industry practice, (xxi) the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to equity holders of the Borrower or any direct or indirect parent of the Borrower pursuant to an equity holders agreement, registration rights agreement or similar agreement entered into on or after the Effective Date, (xxii) pledges and other transfers of Equity Interests in Unrestricted Subsidiaries, (xxiii) any transactions with an Affiliate in which the consideration paid consists solely of Equity Interests of the Borrower or a direct or indirect parent of the Borrower and (xxiv) Investments by any Investor or direct or indirect parent of the Borrower in securities of the Borrower.

ARTICLE VI

<u>NEGATIVE COVENANTS</u>

From and after the Effective Date and until the Termination Date, each of Holdings (solely in the case of Section 6.03) and the Borrower covenants and agrees with the Lenders that:

SECTION 6.01     <u>Indebtedness; Certain Equity Securities</u>.

(a)     The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur or assume any Indebtedness, except:

(i)     Indebtedness of the Borrower and any of the Restricted Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Section 2.20 or 2.21);

(ii)     Indebtedness, including intercompany Indebtedness, outstanding on the Effective Date; <u>provided</u> that any Indebtedness in excess of $2,500,000 individually shall only be permitted if set forth on Schedule 6.01 (unless such Indebtedness is permitted by another clause in this Section 6.01), and any Permitted Refinancing thereof;

157

(B) Guarantees by the Borrower and any Restricted Subsidiaries in respect of Indebtedness of Holdings, the Borrower or any Restricted Subsidiary otherwise permitted hereunder; provided that (A) such Guarantee is permitted under Section 6.04 (other than Section 6.04(u)) and (B) if the Indebtedness being Guaranteed is subordinated to the Loan Document Obligations, such Guarantee shall be subordinated to the Guarantee of the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)    Indebtedness of (x) the Borrower owing to Holdings or any Restricted Subsidiary or (y) any Restricted Subsidiary owing to Holdings, the Borrower or any other Restricted Subsidiary, in each case, to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Restricted Subsidiary that is not a Loan Party shall be subordinated to the Loan Document Obligations on terms (i) at least as favorable to the Lenders as those set forth in the form of intercompany note attached as Exhibit F or (ii) otherwise reasonably satisfactory to the Administrative Agent;

(v)    (A) Indebtedness (including Capital Lease Obligations and purchase money Indebtedness) incurred, issued or assumed by the Borrower or any Restricted Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement, and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof); provided, further, that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) shall not exceed the greater of (A) $40,000,000 and (B) 30.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time;

(vi)    Indebtedness in respect of Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(vii)    (a) Indebtedness (1) assumed or acquired in connection with a Permitted Acquisition or permitted Investment or secured by any assets so acquired so long as not incurred in contemplation thereof, (2) of any Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary so long as such Indebtedness was not incurred by such Unrestricted Subsidiary in contemplation of such redesignation (it being acknowledged that (x) a Person that becomes a direct or indirect Restricted Subsidiary of the Borrower as a result of a Permitted Acquisition or permitted Investment may remain liable with respect to Indebtedness existing on the date of such acquisition (and not incurred in contemplation thereof) and (y) an Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary may remain liable with respect to Indebtedness existing on the date of such redesignation (and not incurred in contemplation thereof)) or (3) incurred in contemplation of a Permitted Acquisition or other permitted Investment; provided that the aggregate principal amount of such Indebtedness outstanding under this clause (3) (at the time of incurrence (or as of the LCT Test Date if a Limited Condition Transaction) does not exceed at any time the sum of (I) the greater of (x) $56,000,000 and (y) 40.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time, plus (II) unlimited additional Indebtedness if, for purposes of this clause (II), immediately after giving effect to such Permitted Acquisition or permitted Investment, as the case may be, and the assumption of such Indebtedness, on a Pro Forma Basis, the Borrower would be able to incur $1.00 of Indebtedness (of the same payment and lien priority as the Indebtedness incurred pursuant to this clause (3)) under the Ratio Incremental Amount (it being understood and agreed that unless notified by the Borrower, (A) the Borrower shall be deemed to have used capacity under this clause (II) (to the extent compliant therewith) prior to utilization of amounts of the type described in clause (I) above, (B) Indebtedness may be incurred in

158

respect of both this clause (II) and clause (I) above and the proceeds from any such incurrence in respect of both clauses may be utilized in a single transaction by first calculating the incurrence in respect of this clause (II) (and any concurrent Borrowing of Revolving Loans) and then calculating the incurrence in respect of clause (I) above (and, for the avoidance of doubt, the Senior Secured First Lien Net Leverage Ratio, the Senior Secured Net Leverage Ratio or Total Net Leverage Ratio may be exceeded or the Cash Interest Coverage Ratio may be less than the required minimum, in each case as a result thereof) and (C) the Borrower may re-designate any such Indebtedness originally incurred in respect of clause (I) as incurred in respect of clause (II) if, at the time of such re-designation, the Borrower would be permitted to incur such Indebtedness under clause (II) the aggregate principal amount of Indebtedness being so re-designated (for purposes of clarity, with any such re-designation having the effect of increasing the Borrower's ability to incur Indebtedness in respect of clause (I) as of the date of such re-designation by the amount of such Indebtedness so re-designated) (it being understood and agreed that such reclassification shall be automatic if at the end of any fiscal quarter such reclassification would be permitted); and (b) in respect of the foregoing, any Permitted Refinancing thereof; provided further that any such Indebtedness incurred pursuant to this clause (3), shall have a Weighted Average Life to Maturity not shorter than the remaining Weighted Average Life to Maturity of the Initial Term Loans outstanding at the time such Indebtedness is incurred and (y) if secured by the Collateral, shall be subject to the Pari Passu Intercreditor Agreement or the Junior Intercreditor Agreement, as applicable;

(viii)  Indebtedness to the seller of any business or assets acquired by the Borrower or any Restricted Subsidiary in a transaction permitted hereunder (including Indebtedness to finance the payment of earnout obligations owing to such seller as a result of such transaction), provided that the aggregate principal amount of Indebtedness permitted under this Section 6.01(a)(viii) at any one time outstanding shall not exceed the greater of (A) $21,000,000 and (B) 15% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time;

(ix)  [Reserved];

(x)  Indebtedness incurred by the Borrower or any Restricted Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business on arm's length commercial terms on a non-recourse basis;

(xi)  Settlement Indebtedness;

(xii)  Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with securities or deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(xiii)  Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, earn-outs, incentive non-competes and other contingent obligations), or other similar arrangements incurred or assumed in connection with any Permitted Acquisition, any other Investment or any Disposition, in each case, permitted under this Agreement;

(xiv)  Indebtedness of the Borrower or any Restricted Subsidiary or any Person that becomes a Restricted Subsidiary after the Effective Date (or of any Person not previously a Restricted Subsidiary that is merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary including the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary);

159

<u>provided</u> that, at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xiv) shall not exceed the sum of (A) the greater of (x) $60,000,000 and (y) 45.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time <u>plus</u> (B) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of incurring such Indebtedness <u>plus</u> (C) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of incurring such Indebtedness; <u>provided</u> that any amounts included in the definition of "Available Amount" may only be used for incurrence of such Indebtedness so long as no Specified Event of Default shall have occurred and be continuing at such time (it being understood that any Indebtedness deemed incurred or issued pursuant to this clause (xiv) will cease to be deemed incurred or issued or outstanding for the purpose of this clause (xiv) but will be deemed incurred or issued under clause (xvi) from and after the first date on which the Borrower or such Restricted Subsidiaries could have incurred such Indebtedness under clause (xvi));

(xv)   (A) unsecured Indebtedness and Indebtedness secured by assets not constituting Collateral of the Borrower or any Restricted Subsidiary or any Person that becomes a Restricted Subsidiary after the Effective Date (or of any Person not previously a Restricted Subsidiary that is merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary including the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary); <u>provided</u> that after giving effect to the incurrence of such Indebtedness on a Pro Forma Basis, such amount shall not exceed the sum of (I) (x) the greater of $140,000,000 and 100% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time (<i>minus</i> the amounts of all Incremental Facilities and Incremental Equivalent Debt, in each case incurred pursuant to clause (I)(a) of the definition of "Incremental Cap" and all amounts previously incurred pursuant to clause (A)(I)(x) of this Section 6.01(a)(xv) or of Section 6.01(a)(xvi)), <u>plus</u> (y) the Voluntary Prepayment Amount (<i>minus</i>, without duplication, the amounts of all Incremental Facilities and Incremental Equivalent Debt, in each case incurred pursuant to clause (I)(b) of the definition of "Incremental Cap" and all amounts previously incurred pursuant to clause (A)(I)(y) of this Section 6.01(a)(xv) or of Section 6.01(a)(xvi)) <u>plus</u> (II) the maximum aggregate principal amount that can be incurred without causing, at the election of the Borrower, either (i) the Total Net Leverage Ratio, on a Pro Forma Basis (calculated without deducting from the numerator of such Total Net Leverage Ratio any cash proceeds of such Indebtedness and assuming that, in the case of any revolving facility being established under this clause (xv), that all commitments with respect thereto were fully drawn); <u>provided</u> that to the extent the proceeds of any such Indebtedness are to be used to repay Indebtedness, the Borrower's ability to give pro forma effect to such repayment and all other adjustments contemplated by the definition of "Pro Forma Basis" shall not be limited), to (1) exceed 6.00 to 1.00 for the most recent Test Period ended or (2) if incurred in connection with a Permitted Acquisition or other permitted Investment, to increase immediately after giving effect to such Permitted Acquisition or Investment or (ii) the Cash Interest Coverage Ratio, on a Pro Forma Basis, to (1) be less than 2.00 to 1.00 for the most recent Test Period ended or (2) if incurred in connection with a Permitted Acquisition or other permitted Investment, to decrease immediately after giving effect to such Permitted Acquisition or Investment and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing subclause (A) so long as the obligors thereon do not include any Person that is not the Borrower or any Restricted Subsidiary; <u>provided</u> <u>further</u> that such Indebtedness complies with clauses (a), (b) and (c) of the definition of "Required Additional Debt Terms"; <u>provided</u>, <u>further</u>, that Indebtedness may be incurred under both clauses (I) and (II), and proceeds from any such incurrence may be utilized in a single transaction by first calculating the incurrence under clause (II) above (and any concurrent Borrowing of Revolving Loans) and then calculating the incurrence under clause (I) above) (if any) and, for the avoidance of doubt, the Total Net Leverage Ratio (or Cash Interest Coverage Ratio) shall be permitted to exceed the maximum (or minimum) ratio set forth in clause (II) above to the extent such amounts incurred in reliance on

160

clause (I) (and any concurrent borrowing of Revolving Loans) at substantially the same time and the Borrower may re-designate any such Indebtedness originally incurred in respect of clause (I) as incurred in respect of clause (II) if, at the time of such re-designation, the Borrower would be permitted to incur such Indebtedness under clause (II) the aggregate principal amount of Indebtedness being so re-designated (for purposes of clarity, with any such re-designation having the effect of increasing the Borrower's ability to incur Indebtedness in respect of clause (I) as of the date of such re-designation by the amount of such Indebtedness so re-designated (it being understood and agreed that such reclassification shall be automatic if at the end of any fiscal quarter such reclassification would be permitted));

(xvi)  (A) Indebtedness of the Borrower or any Restricted Subsidiary or any Person that becomes a Restricted Subsidiary after the Effective Date (or of any Person not previously a Restricted Subsidiary that is merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary including the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary) that is secured on a pari passu or junior basis to the Secured Obligations and the agent for such Indebtedness has become a party to the applicable Intercreditor Agreement; provided that after giving effect to the incurrence of such Indebtedness on a Pro Forma Basis, such amount shall not exceed the sum of (I) (x) the greater of $140,000,000 and 100% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time (*minus* the amounts of all Incremental Facilities and Incremental Equivalent Debt, in each case incurred pursuant to clause (I)(a) of the definition of "Incremental Cap" and all amounts previously incurred pursuant to clause (A)(I)(x) of this Section 6.01(a)(xvi) or of Section 6.01(a)(xv)), plus (y) the Voluntary Prepayment Amount (*minus*, without duplication, the amounts of all Incremental Facilities and  Incremental Equivalent Debt, in each case incurred pursuant to clause (I)(b) of the definition of "Incremental Cap" and all amounts previously incurred pursuant to clause (A)(I)(y) of this Section 6.01(a)(xvi) or of Section 6.01(a)(xv)), plus (II) in the case of Indebtedness secured on a pari passu basis with the Secured Obligations, the maximum aggregate principal amount that can be incurred without causing the Senior Secured First Lien Net Leverage Ratio, on a Pro Forma Basis (calculated without deducting from the numerator of such Senior Secured First Lien Net Leverage Ratio any cash proceeds of such Indebtedness and assuming that, in the case of any revolving facility being established under this clause (xvi), that all commitments with respect thereto were fully drawn; provided that to the extent the proceeds of any such Indebtedness are to be used to repay Indebtedness, the Borrower's ability to give pro forma effect to such repayment and all other adjustments contemplated by the definition of "Pro Forma Basis" shall not be limited), to (1) exceed 5.00 to 1.00 for the most recent Test Period ended or (2) if incurred in connection with a Permitted Acquisition or other permitted Investment, increase immediately after giving effect to such Permitted Acquisition or Investment plus (III) in the case of Indebtedness secured on a junior basis to the Secured Obligations, the maximum aggregate principal amount that can be incurred without causing the Senior Secured Net Leverage Ratio, on a Pro Forma Basis (calculated without deducting from the numerator of such Senior Secured Net Leverage Ratio any cash proceeds of such Indebtedness and assuming that, in the case of any revolving facility being established under this clause (xvi), that all commitments with respect thereto were fully drawn; provided that to the extent the proceeds of any such Indebtedness are to be used to repay Indebtedness, the Borrower's ability to give pro forma effect to such repayment and all other adjustments contemplated by the definition of "Pro Forma Basis" shall not be limited), to (1) exceed 5.50 to 1.00 for the most recent Test Period ended or (2) if incurred in connection with a Permitted Acquisition or other permitted Investment, increase immediately after giving effect to such Permitted Acquisition or Investment), and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing subclause (A) so long as the obligors thereon do not include any Person that is not the Borrower or any Restricted Subsidiary; provided further that such Indebtedness complies with clauses (a), (b), (c) and (e) of the definition of "Required Additional Debt Terms"; provided further that Indebtedness may be incurred under both clauses (I)

161

and (II) or clauses (I) and (III) and proceeds from any such incurrence may be utilized in a single transaction by first calculating the incurrence under clause (II) or (III) above (and any concurrent Borrowing of Revolving Loans) and then calculating the incurrence under clause (I) above) (if any) and, for the avoidance of doubt, the Senior Secured First Lien Net Leverage Ratio or Senior Secured Net Leverage Ratio, as applicable, shall be permitted to exceed the maximum ratio set forth in clause (II) or (III) above to the extent of such amounts incurred in reliance on clause (I) (and any concurrent Borrowing of Revolving Loans) at substantially the same time and the Borrower may re-designate any such Indebtedness originally incurred in respect of clause (I) as incurred in respect of clause (II) if, at the time of such re-designation, the Borrower would be permitted to incur such Indebtedness under clause (II) the aggregate principal amount of Indebtedness being so re-designated (for purposes of clarity, with any such re-designation having the effect of increasing the Borrower's ability to incur Indebtedness in respect of clause (I) as of the date of such re-designation by the amount of such Indebtedness so re-designated (it being understood and agreed that such reclassification shall be automatic if at the end of any fiscal quarter such reclassification would be permitted));

(xvii)  Indebtedness in an amount not to exceed one times the unutilized amounts pursuant to clause (xvi) of Section 6.07 (provided that any such usage under this clause shall reduce the amounts available under such clause (xvi) of Section 6.07);

(xviii) Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xix)  Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(xx)  [reserved];

(xxi)  Permitted Unsecured Refinancing Debt, and any Permitted Refinancing thereof; provided, that (A) in the case of any Permitted Unsecured Refinancing Debt that constitutes a Permitted Refinancing of Incremental Equivalent Debt, the obligor thereon shall be the Borrower and (B) in the case of any Permitted Refinancing of any Permitted Unsecured Refinancing Debt, the obligor thereon shall be the Borrower or a Subsidiary Loan Party; provided further that in the case of any Permitted Unsecured Refinancing Debt that constitutes a Permitted Refinancing of Incremental Equivalent Debt (or any Permitted Refinancing thereof), such Indebtedness shall comply with clauses (c) and (e) of the definition of "Credit Agreement Refinancing Indebtedness";

(xxii)  Permitted First Priority Refinancing Debt and Permitted Junior Priority Refinancing Debt, and any Permitted Refinancing of any of the foregoing; provided, that (A) in the case of any Permitted First Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt that constitutes a Permitted Refinancing of Incremental Equivalent Debt, the obligor thereon shall be the Borrower and (B) in the case of any Permitted Refinancing of any Permitted First Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt, the obligor thereon shall be the Borrower or a Subsidiary Loan Party; provided further that in the case of any Permitted First Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt that constitutes a Permitted Refinancing of Incremental Equivalent Debt (or any Permitted Refinancing thereof), such Indebtedness shall comply with clauses (c), (d) and (e) of the definition of "Credit Agreement Refinancing Indebtedness";

(xxiii) Indebtedness of the Borrower issued in lieu of Incremental Facilities consisting of one or more series of secured or unsecured loans, bonds, notes or debentures (which loans, bonds, notes or debentures, if secured, may be secured either by Liens pari passu with the Liens on the Collateral securing the Secured Obligations (but without regard to control of remedies) or by Liens

162

having a junior priority relative to the Liens on the Collateral securing the Secured Obligations) (and any Registered Equivalent Notes issued in exchange therefor) (the Indebtedness incurred under this clause (xxiii) being "<u>Incremental Equivalent Debt</u>"); <u>provided</u> that (x) the aggregate principal amount of all such Indebtedness incurred pursuant to this clause (xxiii) shall not exceed, at the time of incurrence, the Incremental Cap at such time, and (y) such Indebtedness complies with the provisions of the Required Additional Debt Terms (other than clause (g) thereof except in the case of floating rate U.S. dollar denominated term loans secured on a pari passu basis in right of payment with the Initial Term Loans);

(xxiv) Indebtedness of any Restricted Subsidiary that is not a Loan Party in an amount not to exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the sum of (I) the greater of (A) $50,000,000 and (B) 36% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time <u>plus</u> (II) an unlimited amount of Indebtedness if such Indebtedness is in the form of ordinary course working capital lines of credit or other local lines of credit that is non-recourse to any Loan Party and is not secured by assets constituting Collateral;

(xxv) Indebtedness incurred by the Borrower or any Restricted Subsidiary in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other indemnification or reimbursement-type obligations;

(xxvi) obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(xxvii) Indebtedness representing deferred compensation or stock-based compensation owed to employees of the Borrower or the Restricted Subsidiaries incurred in the ordinary course of business or consistent with past practice;

(xxviii) Indebtedness consisting of promissory notes issued by the Borrower or any Restricted Subsidiary to future, current or former officers, directors, employees, managers and consultants or their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Borrower or any direct or indirect parent of the Borrower to the extent permitted by Section 6.07(a);

(xxix) Indebtedness incurred in connection with a Qualified Securitization Facility in an amount not to exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of (A) $40,000,000 and (B) 30.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Rest Period as of such time;

(xxx) Indebtedness of any Restricted Subsidiary that is a joint venture in an amount not to exceed, at the time of incurrence thereof and after giving Pro Forma Effect thereto, the greater of (A) $35,000,000 and (B) 25.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time; and

(xxxi) endorsement of instruments or other payment items for deposit in the ordinary course of business;

(xxxii) to the extent constituting Indebtedness, Guarantees in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrower and its Restricted Subsidiaries;

(xxxiii) performance Guarantees of the Borrower and the Restricted Subsidiaries primarily guaranteeing performance of contractual obligations of the Borrower or Restricted Subsidiaries to a third party and not primarily for the purpose of guaranteeing payment of Indebtedness;

(xxxiv) Indebtedness in respect of trade letters of credit not to exceed $10,000,000 at any time outstanding;

(xxxv) obligations in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of the Borrower or any Subsidiary of the Borrower to the extent required by law or in connection with any statutory filing or the delivery of audit opinions; and

(xxxvi) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxxv) above.

(b)    The Borrower will not, and will not permit any Restricted Subsidiary to, issue any Disqualified Equity Interests in excess of the greater of (A) $20,000,000 and (B) 15.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time, except (x) to the extent incurred as Indebtedness under Section 6.01(a) and (y) (i) preferred Equity Interests issued to and held by Holdings, the Borrower or any Restricted Subsidiary, and (ii) preferred Equity Interests issued to and held by joint venture partners after the Effective Date; provided that in the case of this clause (ii) any such issuance of preferred Equity Interests shall be deemed to be incurred Indebtedness and subject to the provisions set forth in Section 6.01(a) and (b).

For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the categories of Indebtedness described in clauses (a)(i) through (a)(xxxvi) above, the Borrower may, in its sole discretion, at the time of incurrence, divide, classify or reclassify, or at any later time divide, classify or reclassify, such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; provided that all Indebtedness outstanding under the Loan Documents will be deemed to have been incurred in reliance only on the exception in clause (a)(i).

For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the amount of any premium paid, and fees and expenses incurred, in connection with such extension, replacement, refunding refinancing, renewal or defeasance (including any fees and original issue discount incurred in respect of such resulting Indebtedness).

164

SECTION 6.02 Liens.

The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased) or hereafter acquired (but not leased) by it, except:

(i) Liens created under the Loan Documents;

(ii) Permitted Encumbrances;

(iii) Liens existing on the Effective Date; provided that any Lien securing Indebtedness or other obligations in excess of $2,500,000 individually shall only be permitted if set forth on Schedule 6.02 (unless such Lien is permitted by another clause in this Section 6.02) and any modifications, replacements, renewals or extensions thereof; provided further that such modified, replacement, renewal or extension Lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such Lien and (2) proceeds and products thereof;

(iv) Liens securing Indebtedness permitted under Section 6.01(a)(v); provided that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for replacements, additions, accessions and improvements to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for replacements, additions, accessions and improvements to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v) (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) in the ordinary course of business that do not (A) interfere in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor, licensor, sublicensor or sublessor under any lease or license entered into by the Borrower or any Restricted Subsidiary in the ordinary course of its business or consistent with past practice;

(vi) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii) Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection; (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business; or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(viii) Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements

165

with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)    Liens on property or other assets of any Restricted Subsidiary that is not a Loan Party, which Liens secure Indebtedness of such Restricted Subsidiary or another Restricted Subsidiary that is not a Loan Party, in each case permitted under Section 6.01;

(x)    Liens granted in favor of the Borrower or any Restricted Subsidiary;

(xi)    Liens existing on property or other assets at the time of its acquisition or existing on the property or other assets of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Effective Date and any modifications, replacements, renewals or extensions thereof; provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary and (B) such Lien does not extend to or cover any other assets or property (other than any replacements of such property or assets and additions and accessions thereto, the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, and proceeds or products thereof and, in the case of multiple equipment financings provided by any lender, other equipment financed by such lender);

(xii)    Liens on cash, Permitted Investments or other marketable securities securing Letters of Credit of any Loan Party that are cash collateralized on the Effective Date in an amount of cash, Permitted Investments or other marketable securities with a fair market value of up to 105% of the face amount of such Letters of Credit being secured;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xvii) ground leases in respect of real property on which facilities owned or leased by the Borrower or any of the Restricted Subsidiaries are located;

166

(xviii) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)　Liens on the Collateral securing Indebtedness permitted　under Section 6.01(a)(xxii) (to the extent not secured by assets that constitute Collateral) or 6.01(a)(xxiii), as long as such Liens are subject to the applicable Intercreditor Agreement;

(xx)　Liens securing Indebtedness on real property other than the Material Real Properties (except as required by this Agreement);

(xxi)　Settlement Liens;

(xxii) Liens securing Indebtedness permitted under Section 6.01(a)(iv), (vii)(2), (vii)(3), (viii), (xiv), (xv), (xvi) (to the extent secured by the Collateral on a pari passu or junior lien basis to the Initial Term Loans), (xvii) or (xxxiv); <u>provided further</u> that if such Liens are secured by the Collateral on a pari passu basis with, or junior basis to, the Liens that secure the Initial Term Loans, the agent for such Indebtedness shall have entered into the applicable Intercreditor Agreement;

(xxiii) Liens on assets of any Restricted Subsidiary that is not a Loan Party (x) securing working capital lines in foreign jurisdictions and/or (y) securing other obligations or Indebtedness permitted by Section 6.01;

(xxiv) Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; <u>provided</u> such satisfaction or discharge is permitted hereunder;

(xxv) Receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvi) Liens on Equity Interests of (I) any joint venture (a) securing obligations of such joint venture or (b) pursuant to the relevant joint venture agreement or arrangement or (II) any Unrestricted Subsidiary;

(xxvii) [reserved];

(xxviii) other Liens; <u>provided</u> that, at the time of the granting thereof and after giving Pro Forma Effect thereto, the aggregate amount of obligations secured by all Liens incurred in reliance on this clause (xxviii) shall not exceed the sum (A) of the greater of (x) $60,000,000 and (y) 45.0% of Consolidated EBITDA computed on a Pro Forma Basis for the most recently ended Test Period as of such time <u>plus</u> (B) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of incurring of such Liens <u>plus (C)</u> the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of incurring of such Liens; <u>provided further</u> that any amounts included the definition of "Available Amount" may only be used for incurrence of such Liens so long as no Specified Event of Default shall have occurred and be continuing at such time or at the time of the relevant LCT Election (provided that, with respect to any such obligation, the amount of such obligation shall be the lesser of (x) the outstanding face amount of such obligation and (y) the fair market value of the assets securing such obligation);; <u>provided further</u> that if such Liens are secured by the Collateral on a pari passu basis with, or junior basis to, the Liens that secure the Initial Term Loans, the agent for such Indebtedness shall have entered into the applicable Intercreditor Agreement;

(xxix) Liens on accounts receivable, Securitization Assets and related assets incurred in connection with a Qualified Securitization Facility;

167

(xxx)Liens in escrowed proceeds for the benefit of the related holders of debt securities or other Indebtedness (or the underwriters for arrangers thereof) or on cash set aside at the time of the incurrence of any Indebtedness or government securities purchased with such cash, in either case to the extent such cash or government securities prefund the payment of interest on such Indebtedness and are held in an escrow account or similar arrangement to be applied for such purpose;

(xxxi)Liens of bailees arising as a matter of law or pursuant to the standard terms of agreement of such bailee in the ordinary course of business; provided that such Liens shall extend only to the assets subject to such bailment;

(xxxii)Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Borrower and its Subsidiaries;

(xxxiii)utility and similar deposits in the ordinary course of business;

(xxxiv)purchase options, call and similar rights of, and restrictions for the benefit of, a third party with respect to Equity Interests held by the Borrower or any Restricted Subsidiary in joint ventures;

(xxxv)Liens in favor of the Borrower or a Restricted Subsidiary arising in connection with Intercompany License Agreements;

(xxxvi)Liens on cash or Permitted Investments securing any Swap Agreement (or any obligations in respect of the clearing thereof) so long as the fair market value of the assets securing such Swap Agreement does not exceed $20,000,000 at any time;

(xxxvii)Liens (i) attaching solely to cash advances and cash earnest money deposits in connection with Investments permitted under Section 6.04 or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted hereunder;

(xxxviii)[reserved]; and

(xxxix)any Lien resulting from the rules and regulations of any clearing system or stock exchange over shares and/or other securities held in that clearing system or stock exchange.

For purposes of determining compliance with this Section 6.02, in the event that any Lien (or any portion thereof) meets the criteria of more than one of the categories of Liens described in clauses (i) through (xxxix) above, the Borrower may, in its sole discretion, at the time of incurrence, divide, classify or reclassify, or at any later time divide, classify or reclassify, such Lien (or any portion thereof) and will only be required to include the amount and type of such Lien in one or more of the above clauses; provided that all Liens created under the Loan Documents will be deemed to have been incurred in reliance only on the exception in clause (i).

(a)    Holdings and the Borrower will not, and will not permit any Restricted Subsidiary to, merge into or amalgamate or consolidate with any other Person, or permit any other Person to merge into or amalgamate or consolidate with it, or liquidate or dissolve (which, for the avoidance of doubt, shall not restrict Holdings, the Borrower or any Restricted Subsidiary from changing its organizational form), except that:

(i)    any Restricted Subsidiary may merge, amalgamate or consolidate with (A) the Borrower; provided that the Borrower shall be the continuing or surviving Person, or (B) any one or more Restricted Subsidiaries; provided, further, that when any Subsidiary Loan Party is merging, amalgamating or consolidating with another Restricted Subsidiary (1) the continuing or surviving Person shall be a Subsidiary Loan Party or the Borrower or (2) if the continuing or surviving Person is not a Subsidiary Loan Party, the acquisition of such Subsidiary Loan Party by such surviving Restricted Subsidiary is otherwise permitted under Section 6.04;

(ii)    (A) any Restricted Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any Restricted Subsidiary that is not a Loan Party and (B)(x) any Restricted Subsidiary may liquidate or dissolve and (y) any Restricted Subsidiary may change its legal or organizational form if the Borrower determines in good faith that such action is in the best interests of Holdings, the Borrower and its Restricted Subsidiaries and is not materially disadvantageous to the Lenders;

(iii)    any Restricted Subsidiary may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then (A) the transferee must be a Loan Party, (B) to the extent the transferee is not a Loan Party, such transaction would constitute an Investment that is a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with Section 6.04 or (C) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for fair market value (as determined in good faith by the Borrower) and any promissory note or other non-cash consideration received in respect thereof is a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with Section 6.04;

(iv)    (I) the Borrower may merge, amalgamate or consolidate with (or Dispose of all or substantially all of its assets to) any other Person; provided that (A) the Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not the Borrower or is a Person into which the Borrower has been liquidated (or, in connection with a Disposition of all or substantially all of the Borrower's assets, is the transferee of such assets) (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States (or any state thereof), (2) the Successor Borrower shall expressly assume all of the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Administrative Agent, (3) each Loan Party other than the Borrower, unless it is the other party to such merger, amalgamation or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory  to the Administrative Agent, that its Guarantee of and grant of any Liens as security for the Secured Obligations shall apply to the Successor Borrower's obligations under this Agreement and (4) the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower stating that such merger, amalgamation or consolidation complies with this Agreement; provided further that (y) if such Person is not a

169

Loan Party, no Event of Default (or, to the extent related to a Permitted Acquisition or any Investment not prohibited by Section 6.04, no Specified Event of Default) shall exist after giving effect to such merger, amalgamation or consolidation and (z) if the foregoing requirements are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement and the other Loan Documents; provided further that (A) the Borrower shall have provided any documentation and other information about the Successor Borrower to the extent reasonably requested in writing promptly, and in any case within one Business Day following the delivery of the certificate in clause (4), by any Lender or Issuing Bank through the Administrative Agent that such Lender or Issuing Bank shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA PATRIOT Act and (B) such Lender or Issuing Bank, as applicable, shall be reasonably satisfied that its review of such documentation and information requested and delivered pursuant to clause (A) complies with such applicable "know your customer" and anti-money laundering rules and regulations (provided, that for the avoidance of doubt, the Borrower's failure to deliver information requested after the first Business Day following delivery of the certificate in clause (4) above shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents) or (II) Holdings may merge, amalgamate or consolidate with (or Dispose of all or substantially all of its assets to) any other Person; provided that (A) Holdings shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not Holdings or is a Person into which Holdings has been liquidated (or, in connection with a Disposition of all or substantially all of Holdings' assets, is the transferee of such assets) (any such Person, the "Successor Holdings"), (1) the Successor Holdings shall be an entity organized or existing under the laws of the United States (or any state thereof), (2) the Successor Holdings shall expressly assume all of the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Administrative Agent, (3) each Loan Party other than Holdings, unless it is the other party to such merger, amalgamation or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent, that its Guarantee of and grant of any Liens as security for the Secured Obligations shall apply to the Successor Holdings' obligations under this Agreement and (4) Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings stating that such merger, amalgamation or consolidation complies with this Agreement; provided further that (y) if such Person is not a Loan Party, no Event of Default (or, to the extent related to a Permitted Acquisition or any Investment not prohibited by Section 6.04, no Specified Event of Default) shall exist after giving effect to such merger, amalgamation or consolidation and (z) if the foregoing requirements are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement and the other Loan Documents; provided further that (A) Holdings shall have provided any documentation and other information about the Successor Holdings to the extent reasonably requested in writing promptly, and in any case within one Business Day following the delivery of the certificate in clause (4), by any Lender or Issuing Bank through the Administrative Agent that such Lender or Issuing Bank shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA PATRIOT Act and (B) such Lender or Issuing Bank, as applicable, shall be reasonably satisfied that its review of such documentation and information requested and delivered pursuant to clause (A) complies with such applicable "know your customer" and anti-money laundering rules and regulations (provided, that for the avoidance of doubt, Holdings' failure to deliver information requested after the first Business Day following delivery of the certificate in clause (4) above shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents);

170

(v)     any Restricted Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 6.04; provided that the continuing or surviving Person shall be the Borrower or a Restricted Subsidiary, which together with each of the Restricted Subsidiaries, shall have complied with the requirements of Sections 5.11 and 5.12;

(vi)     Holdings, the Borrower and the Restricted Subsidiaries may consummate the Transactions and any Permitted Reorganization; and

(vii)     any Restricted Subsidiary may effect a merger, amalgamation, dissolution, liquidation consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

(b)     Holdings, the Borrower or any Restricted Subsidiary, will not make any change in its fiscal year; provided that, Holding may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

(c)     Holdings will not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests or debt interests of the Borrower and any other Subsidiary (including any Subsidiary that is not the Borrower or a Subsidiary of the Borrower which is formed solely for purposes of acting as a co-obligor with respect to any Qualified Holding Company Debt and which does not conduct, transact or otherwise engage in any material business or operation, and, in each case, activities incidental thereto), (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and its Subsidiaries, (iv) the performance of its obligations under and in connection with the Loan Documents and any documentation governing any Indebtedness or Guarantee and the other agreements contemplated hereby and thereby and any Permitted Reorganization, (v) any public offering of its stock or any other issuance or registration of its Equity Interests for sale or resale not prohibited by this Agreement, including the costs, fees and expenses related thereto, (vi) the incurrence and maintenance of the Existing Convertible Notes (including any Permitted Refinancing thereof), (vii) making any dividend or distribution or other transaction similar to a Restricted Payment, or any Investment in the Borrower or any other Subsidiary, (viii) the incurrence of Qualified Holding Company Debt or the guaranteeing of any Indebtedness permitted under Section 6.01 or the issuance of letters of support for any of its Subsidiaries entered into in the ordinary course of business or in connection with the delivery of audit opinions, (ix) incurring fees, costs and expenses in the ordinary course of business, including relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, (x) providing indemnification to officers and members of the Board of Directors, (xi) repurchases of Indebtedness through open market purchases and Dutch auctions (in the case of Loans, to the extent permitted hereunder), (xii) activities incidental to the consummation of the Transactions and (xiii) activities incidental to the businesses or activities described in clauses (i) to (xiii) of this paragraph.

SECTION 6.04     Investments, Loans, Advances, Guarantees and Acquisitions.

The Borrower will not, and will not permit any Restricted Subsidiary to, make or hold any Investment, except:

(a)     Permitted Investments at the time such Permitted Investment is made and purchases of assets in the ordinary course of business consistent with past practice;

(b)        loans or advances to officers, members of the Board of Directors and employees of Holdings, the Borrower and the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be contributed to the Borrower in cash as common equity or Qualified Equity Interests) and (iii) for purposes not described in the foregoing clauses (i) and (ii), in an aggregate principal amount outstanding at any time not to exceed $15,000,000;

(c)        Investments by the Borrower in any Restricted Subsidiary and Investments by any Restricted Subsidiary in the Borrower or any other Restricted Subsidiary;

(d)        Investments (other than guarantees of Indebtedness) consisting of extensions of trade credit and guarantees in the ordinary course of business;

(e)        Investments (i) existing or contemplated on the Effective Date and set forth on Schedule 6.04 and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Effective Date by Holdings, the Borrower or any Restricted Subsidiary in Holdings, the Borrower or any Restricted Subsidiary and any modification, renewal or extension thereof; provided that the amount of the original Investment is not increased except by the terms of such Investment to the extent as set forth on Schedule 6.04 or as otherwise permitted by this Section 6.04;

(f)        Investments in Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(g)        promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05;

(h)        Permitted Acquisitions and Investments in any Restricted Subsidiary necessary to consummate Permitted Acquisitions;

(i)        the Transactions;

(j)        Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(k)        Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)        loans and advances to Holdings or any direct or indirect parent of the Borrower (x) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings or such direct or indirect parent of the Borrower in accordance with Section 6.07(a) (other than Section 6.07(a)(xvii)(2)) and (y) to the extent the proceeds thereof are contributed or loaned or advanced to the Borrower or a Restricted Subsidiary;

(m)        additional Investments and other acquisitions; provided that at the time any such Investment or other acquisition is made, the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (m), together with the aggregate amount of all consideration

172

paid in connection with all other Investments and acquisitions made in reliance on this clause (m) (including the aggregate principal amount of all Indebtedness assumed in connection with any such other Investment or acquisition previously made under this clause (m)), shall not exceed the sum of the greater of (i)(A) $70,000,000 and (B) 50.0% of Consolidated EBITDA for the most recently ended Test Period after giving Pro Forma Effect to the making of such Investment or other acquisition, plus (ii) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment, plus (iii) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment; plus (iv) unused amounts available to make Investments pursuant to Section 6.04(bb) (it being understood that the usage for such amounts for Investments under this clause (m) shall reduce the amount available for Investments under such Section 6.04(bb)) plus (v) unused amounts available to make Restricted Payments pursuant to Section 6.07(a)(xvi) (it being understood that the usage for such amounts for Investments under this clause (m) shall reduce the amount available for Restricted Payments under such Section 6.07(a)(xvi)) plus (vi) unused amounts available to make prepayments, redemptions, repurchases, defeasances and other payments of Junior Financing pursuant to Section 6.07(b)(iv) (it being understood that the usage of such amounts for Investments under this clause (m) shall reduce the amounts available for prepayments, redemptions, repurchases, defeasances and other payments in respect of Junior Financing under such Section 6.07(b)(iv)); provided, to the extent such Investment or other acquisition is made in reliance on clause (ii) above, no Specified Event of Default shall have occurred and be continuing or would result therefrom (provided, that in the case of an Investment or other acquisition incurred to finance a Limited Condition Transaction, if the Borrower had made an LCT Election, such condition shall be that no Specified Event of Default shall have occurred and be continuing at the LCT Test Date) (this clause (m), the "General Investment Basket");

(n)        advances of payroll payments, including wages, commissions, bonuses and other variable compensation to employees in the ordinary course of business;

(o)        Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests (excluding Qualified Equity Interests the proceeds of which will be applied as Cure Amounts) of Holdings, the Borrower or any direct or indirect parent of the Borrower;

(p)        Investments of a Restricted Subsidiary acquired after the Effective Date or of a Person merged, amalgamated or consolidated with any Subsidiary in accordance with this Section 6.04 and Section 6.03 after the Effective Date or that otherwise becomes a Restricted Subsidiary (provided that if such Investment is made under Section 6.04(h), existing Investments in subsidiaries of such Restricted Subsidiary or Person shall comply with the requirements of Section 6.04(h)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(q)        receivables owing to the Borrower or any Restricted Subsidiary, if created or acquired in the ordinary course of business;

(r)        Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(s)        any Permitted Reorganization and any Investments in connection therewith;

(t)        additional Investments so long as at the time of any such Investment and after giving effect thereto, on a Pro Forma Basis, (x) the Total Net Leverage Ratio is no greater than 4.75 to 1.00 or (y) the Cash Interest Coverage Ratio is at least 2.00 to 1.00;

173

(u)    Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(u)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.07, respectively;

(v)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of Holdings or the Borrower;

(w)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(x)    any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(y)    Investments made by an Unrestricted Subsidiary (other than Investments made with the proceeds of Investments made in reliance on Section 6.04(bb)) prior to the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary pursuant to the definition of "Unrestricted Subsidiary";

(z)    Investments in or relating to a Securitization Subsidiary or a Restricted Subsidiary that, in the good faith determination of the Borrower are necessary or advisable to effect any Qualified Securitization Facility or any repurchase obligation in connection therewith, including, without limitation, Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Securitization Facilities or any related Indebtedness;

(aa)    Investments in the ordinary course of business in connection with Settlements;

(bb)    (i) Investments in any Unrestricted Subsidiaries, joint ventures and Persons which do not become Loan Parties as a result of such Investment in an amount not to exceed the greater of (A) $35,000,000 and (B) 25.0% of Consolidated EBITDA for the Test Period then last ended at the time of making such Investment; provided that if any Investment pursuant to this clause (bb) is made in any Person that is an Unrestricted Subsidiary at the date of the making of such Investment and such Person becomes a Restricted Subsidiary after such date, such Investment will thereafter be deemed to have been made pursuant to Section 6.01(c) to the extent permitted thereunder and will cease to have been made pursuant to this clause (bb) for so long as such Person continues to be a Restricted Subsidiary;

(cc)    Investments in any Person engaged in a business similar to the business activities of the Borrower and its Subsidiaries on the Effective Date or business activities which are extensions thereof or otherwise incidental, corollary, synergistic, reasonably related or ancillary to any of the foregoing in an amount not to exceed the greater of (A) $45,500,000 and (B) 32.5% of Consolidated EBITDA for the Test Period then last ended at the time of making such Investment;

(dd)    asset purchases (including purchases of inventory, supplies and materials) and the granting of non-exclusive licenses or contribution of intellectual property pursuant to joint marketing arrangements with other Persons, in each case in the ordinary course of business;

(ee)    Investments by any Restricted Subsidiary that is not a Loan Party in a Person that is not a Loan Party, and will not become a Loan Party upon the making of such Investment, to the extent such

174

Investments are funded with amounts attributable to the cash flow of the Restricted Subsidiary that is not a Loan Party;

(ff)    Investments in connection with Intercompany License Agreements;

(gg)    Investments consisting of cash earnest money deposits in connection with a Permitted Acquisition or other Investment permitted hereunder;

(hh)    Investments solely to the extent such Investments reflect an increase in the value of Investments otherwise permitted under this Section 6.04;

(ii)    (a) performance bonds or guarantees and contingent obligations incurred in the ordinary course of business or consistent with industry practice, and (b) the creation of liens on the assets of the Borrower or any Restricted Subsidiary in compliance with Section 6.02 (other than by reference to this Section 6.04(ii)(b));

(jj)    Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with industry practice; and

(kk)    Term Loans repurchased by the Borrower or a Restricted Subsidiary pursuant to and in accordance with Section 2.11(a)(ii) or Section 9.04 so long as such loans are immediately cancelled.

For the avoidance of doubt, if an Investment would be permitted under any provision of this Section 6.04 (other than Section 6.04(h)) and as a Permitted Acquisition, such Investment need not satisfy the requirements otherwise applicable to a Permitted Acquisition unless such Investments are consummated in reliance on Section 6.04(h). In addition, to the extent an Investment is permitted to be made by the Borrower or a Restricted Subsidiary directly in any Restricted Subsidiary or any other Person who is not a Loan Party (each such person, a "Target Person") under any provision of this Section 6.04, such Investment may be made by advance, contribution or distribution directly or indirectly to a direct or indirect parent of Borrower and further advanced or contributed substantially simultaneously by such direct or indirect parent of Borrower to a Loan Party or other Restricted Subsidiary for purposes of ultimately making the relevant Investment in the Target Person without constituting an Investment for purposed of Section 6.04 (it being understood that such Investment must satisfy the requirements of, and shall count toward any thresholds or baskets in, the applicable clause under Section 6.04 as if made by the applicable Restricted Subsidiary directly to the Target Person).

Notwithstanding the foregoing, no Loan Party shall be permitted to make any new Investment in any Unrestricted Subsidiary in the form of Material IP or FCC Licenses other than in connection with transactions that have a bona fide business purpose (as determined by the Borrower in good faith) and otherwise permitted pursuant to baskets and exceptions set forth in this Section 6.04.

SECTION 6.05    Asset Sales.

The Borrower will not, and will not permit any Restricted Subsidiary to, (i) sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it or (ii) permit any Restricted Subsidiary to issue any additional Equity Interest in such Restricted Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to Holdings, the Borrower or any Restricted Subsidiary in compliance with Section 6.04(c)) (each, a "Disposition" and the term "Dispose" as a verb has the corresponding meaning), except:

175

(a)        Dispositions of obsolete, damaged, used, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable or commercially desirable to maintain, in the conduct of the business of Holdings and any Restricted Subsidiary (including by ceasing to enforce, allowing the lapse, abandonment or invalidation of or discontinuing the use or maintenance of or putting into the public domain any Intellectual Property that is, in the reasonable judgment of the Borrower or the Restricted Subsidiaries, no longer used or useful, or economically practicable or commercially desirable to maintain, or in respect of which the Borrower or any Restricted Subsidiary determines in its reasonable business judgment that such action or inaction is desirable);

(b)        Dispositions of inventory and other assets (including Settlement Assets) in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property (or a functional equivalent of such property) or (ii) an amount equal to Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property (or a functional equivalent of such property);

(d)        Dispositions of property to the Borrower or any Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then either (i) the transferee must be a Loan Party, (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with Section 6.04 or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for fair market value (as determined in good faith by the Borrower) and any promissory note or other non-cash consideration received in respect thereof is a permitted investment in a Restricted Subsidiary that is not a Loan Party in accordance with Section 6.04;

(e)        Dispositions permitted by Section 6.03, Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)        Dispositions of property acquired by the Borrower or any of the Restricted Subsidiaries after the Effective Date pursuant to sale-leaseback transactions;

(g)        Dispositions of Permitted Investments;

(h)        Dispositions or forgiveness of accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties);

(i)        leases, subleases, service agreements, product sales, transfers, licenses or sublicenses (including transfers, licenses and sublicenses of Intellectual Property), in each case that do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(j)        transfers of property subject to Casualty Events;

(k)        Dispositions of property (including the sale or issuance of Equity Interests of a Restricted Subsidiary) for fair market value (as determined by a Responsible Officer of the Borrower in good faith) not otherwise permitted under this Section 6.05; provided that with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of $5,000,000, the Borrower or such Restricted Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Permitted Investments; provided, however, that solely for the purposes of this clause (k), (A) any liabilities (as shown on the most recent balance sheet of the Borrower or such Restricted Subsidiary or in the footnotes thereto)

176

of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Loan Document Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, shall be deemed to be cash, (B) any securities, notes or other obligations or assets received by the Borrower or such Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Permitted Investments (to the extent of the cash or Permitted Investments received) within one hundred and eighty (180) days following the closing of the applicable Disposition, shall be deemed to be cash, (C) Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Disposition (other than intercompany debt owed to the Borrower or its Restricted Subsidiaries), to the extent that the Borrower and all of the Restricted Subsidiaries (to the extent previously liable thereunder) are released from any guarantee of payment of the principal amount of such Indebtedness in  connection with such Disposition, shall be deemed to be cash, (D) any Designated Non-Cash Consideration received by the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate fair market value (as determined by a Responsible Officer of the Borrower in good faith), taken together with all other Designated Non-Cash Consideration received pursuant to this clause (k) that is at that time outstanding, not in excess of the greater of (A) $35,000,000 and (B) 25.0% of Consolidated EBITDA for the Test Period then last ended at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value (as determined by a Responsible Officer of the Borrower in good faith) of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash, (E) consideration received in connection with an asset swap shall be deemed "cash" and (F) at the time of the execution of a binding agreement in respect of such Disposition, no Specified Event of Default shall have occurred and be continuing;

(l)      Dispositions of Investments in joint ventures or non-wholly owned Subsidiaries to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(m)      Dispositions of any assets not constituting Collateral hereunder, provided that the aggregate fair market value (as determined in good faith by the Borrower) of all such Dispositions, in the aggregate, shall be not in excess of the greater of (A) $7,500,000 and (B) 7.5% of Consolidated EBITDA at the time of such Disposition;

(n)      Dispositions of any assets (including Equity Interests) (A) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and the Restricted Subsidiaries or (B) made to obtain the approval of any applicable regulatory authority in connection with any acquisition or investment (including antitrust authorities, the FCC or FAA);

(o)      (i) any Disposition of accounts receivable, Securitization Assets, any participations thereof, or related assets in connection with any Qualified Securitization Facility or (ii) the sale or discount of inventory, accounts receivable or notes receivable in the ordinary course of business or the conversion of accounts receivable to notes receivable;

(p)      transfers of condemned real property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of real property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(q)      Dispositions constituting any part of a Permitted Reorganization;

177

(r)     Dispositions of Unrestricted Subsidiaries (other than Unrestricted Subsidiaries the primary assets of which are Permitted Investments received from the Borrower or a Restricted Subsidiary) or assets acquired from Unrestricted Subsidiaries;

(s)     any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater fair market value of usefulness to the business of the Borrower and its Restricted Subsidiaries, taken as a whole, as determined in good faith by the Borrower; provided that the aggregate fair market value (as determined in good faith by the Borrower) of all assets constituting Collateral that are exchanged for other assets not constituting Collateral pursuant to this clause (s) shall not exceed the greater of (x) $14,000,000 and (y) 10.0% of Consolidated EBITDA at the time of such swap of assets;

(t)     other Dispositions in an aggregate amount not be in excess of the greater of (A) $50,000,000 and (B) 36.0% of Consolidated EBITDA at the time of such Disposition;

(u)     samples, including time-limited evaluation software, provided to customers or prospective customers;

(v)     de minimis amounts of equipment or other assets provided to employees;

(w)     the unwinding of any Cash Management Obligations or Swap Agreement pursuant to its terms;

(x)     sales, transfers, leases or other dispositions to the Borrower or a Restricted Subsidiary pursuant to Intercompany License Agreements;

(y)     the Borrower and any Restricted Subsidiary may (i) terminate or otherwise collapse its cost sharing agreements with the Borrower or any Restricted Subsidiary and settle any crossing payments in connection therewith, (ii) convert any intercompany Indebtedness to Equity Interests, (iii) transfer any intercompany Indebtedness to the Borrower or any Restricted Subsidiary, (iv) settle, discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by the Borrower or any Restricted Subsidiary, (v) settle, discount, write off, forgive or cancel any Indebtedness owing by any present or former consultants, directors, officers or employees, the Borrower or any Restricted Subsidiary or any of their successors or assigns or (vi) surrender or waive contractual rights and settle or waive contractual or litigation claims;

(z)     Dispositions set forth on Schedule 6.05; and

(aa)     the sale, lease, assignment, license, sublease or discount of inventory, equipment, accounts receivable, notes receivable or other current assets in the ordinary course of business or consistent with industry practice or the conversion of accounts receivable to notes receivable or other dispositions of accounts receivable in connection with the collection thereof.

SECTION 6.06     [Reserved].

SECTION 6.07     Restricted Payments; Certain Payments of Indebtedness.

(a)     The Borrower will not, and will not permit any Restricted Subsidiary to, declare or make any Restricted Payment, except:

178

(i) the Borrower and each Restricted Subsidiary may make Restricted Payments to the Borrower or any Restricted Subsidiary, provided that in the case of any such Restricted Payment by a Restricted Subsidiary that is not a Wholly Owned Subsidiary, such Restricted Payment is made to the Borrower, any Restricted Subsidiary and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests;

(ii) the Borrower and each Restricted Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person;

(iii) Restricted Payments made to consummate the Transactions and Restricted Payments constituting any part of a Permitted Reorganization;

(iv) repurchases of Equity Interests in any Holdings Parent, Holdings, the Borrower or any Restricted Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price or withholding taxes payable in connection with the exercise of such options or warrants or other incentive interests;

(v) Restricted Payments to Holdings or any Holdings Parent, which Holdings or such Holdings Parent may use to redeem, acquire, retire, repurchase or settle its Equity Interests (or any options, warrants, restricted stock or stock appreciation rights or similar securities issued with respect to any such Equity Interests) or Indebtedness or to service Indebtedness incurred by Holdings or any Holdings Parent to finance the redemption, acquisition, retirement, repurchase or settlement of such Equity Interest or Indebtedness, held directly or indirectly by current or former officers, managers, consultants, members of the Board of Directors, employees or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of Holdings or any Holdings Parent, the Borrower and the Restricted Subsidiaries, upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement in an aggregate amount after the Effective Date together with the aggregate amount of loans and advances to Holdings or any Holdings Parent made pursuant to Section 6.04(l) in lieu of Restricted Payments permitted by this clause (v) not to exceed $20,000,000 in any calendar year with unused amounts in any calendar year being carried over to the next two succeeding calendar years (without giving effect to the following proviso); provided that such amount in any calendar year may be increased by (1) an amount not to exceed the cash proceeds of key man life insurance policies received by the Borrower, Holdings (or by any Holdings Parent and contributed to the Borrower) or the Restricted Subsidiaries after the Effective Date, or (2) the amount of any bona fide cash bonuses otherwise payable to members of the Board of Directors, consultants, officers, employees, managers or independent contractors of Holdings or any Holdings Parent, the Borrower or any Restricted Subsidiary that are foregone in return for the receipt of Equity Interests, the fair market value of which is equal to or less than the amount of such cash bonuses, which, if not used in any year, may be carried forward to any subsequent fiscal year; provided further that cancellation of Indebtedness owing to Holdings, the Borrower or any Restricted Subsidiary from members of the Board of Directors, consultants, officers, employees, managers or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of Holdings or any Holdings Parent, the Borrower or any Restricted Subsidiary in connection with a repurchase of Equity Interests of Holdings or any direct or indirect parent of the Borrower or the Borrower will not be deemed to constitute a Restricted Payment for purposes of

179

this Section 6.07 or any other provisions of this Agreement.

Case: 23-1058     Document: 28     Page: 327     Filed: 03/07/2023

(vi)       other Restricted Payments made by the Borrower; provided that, on the date of declaration of such Restricted Payments, (x) no Specified Event of Default shall have occurred and be continuing or would result therefrom and (y) on a Pro Forma Basis, the Total Net Leverage Ratio is equal to or less than 4.50 to 1.00;

(vii)      the Borrower may make Restricted Payments in cash to Holdings or any Holdings Parent:

(A)       as distributions by the Borrower or any Restricted Subsidiary to Holdings or any Holdings Parent in amounts required for Holdings or any Holdings Parent to pay, with respect to any taxable period in which the Borrower and/or any of the Restricted Subsidiaries is a member of a consolidated, combined, unitary or similar tax group (a "Tax Group") of which Holdings or such Holdings Parent is the common parent, non-U.S. taxes that are attributable to the taxable income, revenue, receipts, gross receipts, gross profits, capital or margin of the Borrower and/or its Subsidiaries; provided that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount of such taxes that the Borrower and its Subsidiaries would have been required to pay if they were a stand-alone Tax Group with the Borrower as the corporate common parent of such stand-alone Tax Group (collectively, "Tax Distributions");

(B)       the proceeds of which shall be used by Holdings or a direct or indirect parent of the Borrower to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings or such direct or indirect parent of the Borrower to pay) (1) its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses payable to third parties) that are reasonable and customary and incurred in the ordinary course of business, (2) any reasonable and customary indemnification claims made by members of the Board of Directors or officers, employees, directors, managers, consultants or independent contractors of Holdings or any direct or indirect parent of the Borrower attributable to the ownership or operations of the Borrower and the Restricted Subsidiaries, (3) fees and expenses (x) due and payable by Holdings, the Borrower and the Restricted Subsidiaries and (y) otherwise permitted to be paid by Holdings, the Borrower and any Restricted Subsidiaries under this Agreement, (4) [reserved], (5) to satisfy indemnity and other obligations under acquisition or other agreements and (6) amounts that would otherwise be permitted to be paid pursuant to Section 5.15;

(C)       the proceeds of which shall be used by Holdings or a direct or indirect parent of the Borrower to pay franchise and similar Taxes, and other fees and expenses, required to maintain its corporate or other legal existence;

(D)       to finance any Investment made by Holdings or a direct or indirect parent of the Borrower that, if made by the Borrower, would be permitted to be made pursuant to Section 6.04; provided that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (B) Holdings or such direct or indirect parent of the Borrower shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests but not including any loans or advances made pursuant to Section 6.04(b)) to be contributed to the Borrower or its Restricted Subsidiaries or (2) the Person formed or acquired to merge into or

180

amalgamate or consolidate with the Borrower or any of the Restricted Subsidiaries to the extent such merger, amalgamation or consolidation is permitted in Section 6.03) in order to consummate such Investment, in each case in accordance with the requirements of Sections 5.11 and 5.12;

(E)     the proceeds of which shall be used to pay (or to make Restricted Payments to allow Holdings or a direct or indirect parent of the Borrower to pay) (1) fees and expenses related to any actual or proposed equity or debt offering not prohibited by this Agreement and (2) advisory, refinancing, transaction and exit fees and expenses attributable to the business of the Borrower and the Restricted Subsidiaries;

(F)     the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings or any direct or indirect parent of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries; and

(G)     the proceeds of which shall be used to make payments permitted by clause (b)(iv) and (b)(v) of Section 6.07;

(viii)     in addition to the foregoing Restricted Payments, the Borrower may make additional Restricted Payments, in an aggregate amount not to exceed the sum of (A) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Restricted Payment, plus (B) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Restricted Payment, provided that any amounts included in the definition of "Available Amount" may only be used for Restricted Payments so long as no Specified Event of Default shall have occurred and be continuing at the time of declaration of such Restricted Payment;

(ix)     redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests; provided, that such new Equity Interests contain terms and provisions at least as advantageous to the Lenders in all respects material to their interests as those contained in the Equity Interests redeemed thereby;

(x)     payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;

(xi)     payments to Holdings or any Holdings Parent to permit it to (a) pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(xii)     payments made or expected to be made by Holdings, any Holdings Parent, the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager

181

Appx10314

or consultant (or their respective controlled Affiliates or permitted transferees) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar taxes;

   (xiii) the distribution, by dividend or otherwise, of shares of Equity Interests of, or Indebtedness owed to Holdings, any Holdings Parent, the Borrower or any Restricted Subsidiary by, Unrestricted Subsidiaries (other than Unrestricted Subsidiaries, the primary assets of which are Permitted Investments) received as Permitted Investments from the Borrower or a Restricted Subsidiary;

   (xiv) the declaration and payment of a Restricted Payment to Holdings on account of Holdings' common stock (or the payment by the Borrower to Holdings or any Holdings Parent) to fund redemptions or share repurchases of such company's common stock or a payment of dividends on such company's common stock, in any fiscal year of the Borrower in an amount not to exceed the sum of (x) 7.0% per annum of the net cash proceeds of a public offering of common stock received by or contributed to the Borrower or any Subsidiary Loan Party and (y) 7.0% of the Market Capitalization of Holdings or such Holdings Parent;

   (xv) any distributions or payments of Securitization Fees, sales or contributions and other transfers of Securitization Assets and proceeds thereof and purchases of Securitization Assets, in each case in connection with a Qualified Securitization Facility;

   (xvi) Restricted Payments in an amount not to exceed the sum of (I) the greater of (A) $55,000,000 and (B) 40% of Consolidated EBITDA for the Test Period then last ended at the time of making such Restricted Payment plus (II) unused amounts available to make prepayments, redemptions, repurchases, defeasances and other payments of Junior Financing pursuant to Section 6.07(b)(iv)(A) (it being understood that the usage of such amounts for Restricted Payments under this clause (xvi) shall reduce the amounts available for prepayments, redemptions, repurchases, defeasances and other payments in respect of Junior Financing under such Section 6.07(b)(iv)(A)) plus (III) unused amounts available to make Investments pursuant to Section 6.04(bb) (it being understood that the usage for such amounts for Restricted Payments under this clause (xvi) shall reduce the amount available for Investments under such Section 6.04(bb));

   (xvii) to the extent constituting Restricted Payments, the Borrower and the Restricted Subsidiaries may consummate (1) transactions permitted pursuant to Section 6.03 and (2) make Investments permitted under Section 6.04;

   (xviii) any Restricted Subsidiary may make a Restricted Payment in connection with the acquisition of additional Equity Interests in such Restricted Subsidiary from minority shareholders to the extent such acquisition would have been permitted (and to the extent so permitted shall constitute such Investment) by the parent company of such Restricted Subsidiary pursuant to Section 6.04; and

   (xix) Restricted Payments to Holdings to effectuate repayment of the Existing Convertible Notes.

  (b) The Borrower will not, and will not permit any Restricted Subsidiary to, make any voluntary prepayment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing constituting Material Indebtedness (other than to the extent of any Retained Declined Proceeds applied in compliance with Section 2.11(e)), including any

182

sinking fund or similar deposit on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Junior Financing, except:

Case: 23-1058     Document: 28     Page: 330     Filed: 03/07/2023

(i)        payment of regularly scheduled interest and principal payments, mandatory offers to repay, repurchase or redeem, mandatory prepayments of principal premium and interest, and payment of fees, expenses and indemnification obligations, with respect to such Junior Financing, other than payments in respect of any Junior Financing prohibited by the subordination provisions thereof;

(ii)       refinancings, supplements, substitutions, extensions, restructurings, exchanges or renewals of Indebtedness to the extent permitted by Section 6.01 and fees and expenses in connection therewith;

(iii)      the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of the Borrower, Holdings or any Holdings Parent, and any payment that is intended to prevent any Junior Financing from being treated as an "applicable high yield discount obligation" within the meaning of Section 163(i)(1) of the Code;

(iv)      prepayments, redemptions, repurchases, defeasances and other payments in respect of Junior Financing prior to their scheduled maturity in an aggregate amount, not to exceed the sum of (A) an amount at the time of making any such prepayment, redemption, repurchase, defeasance or other payment and together with any other prepayments, redemptions, repurchases, defeasances and other payments made utilizing this subclause (A) not to exceed the sum of (I) the greater of (1) $55,000,000 and (2) 40% of Consolidated EBITDA on a Pro Forma Basis for the most recently ended Test Period after giving Pro Forma Effect to the making of such prepayment, redemption, purchase, defeasance or other payment plus (II) unused amounts available to make Restricted Payments pursuant to Section 6.07(a)(xvi) (it being understood that the usage of such amounts for prepayments, redemptions, repurchases, defeasances and other payments in respect of Junior Financing under this clause (b)(iv) shall reduce the amounts available for Restricted Payments under such Section 6.07(a)(xvi)), plus (B) the Available Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment plus (C) the Available Equity Amount that is Not Otherwise Applied as in effect immediately prior to the time of making of such Investment plus (D) unused amounts available to make Investments pursuant to Section 6.04(bb) (it being understood that the usage for such amounts for prepayments, redemptions, repurchases, defeasances and other payments in respect of Junior Financings Payments under this clause (iv) shall reduce the amount available for Investments under such Section 6.04(bb));

(v)       payments made in connection with the Transactions;

(vi)      prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financing prior to their scheduled maturity; provided that after giving effect to such prepayment, redemption, repurchase, defeasance or other payment, (x) on a Pro Forma Basis, the Total Net Leverage Ratio is less than or equal to 4.75 to 1.00 and (y) no Event of Default shall have occurred and be continuing or would result therefrom; and

(vii)     prepayment of Junior Financing owed to the Borrower or any Restricted Subsidiary or the prepayment of Permitted Refinancing of such Indebtedness with the proceeds of any other Junior Financing.

(c)　　　　Any basket available for Restricted Payments pursuant to Section 6.07(a) may instead be used to either (i) make a payment or other distribution on or in respect of principal of or interest on any Junior Financing, or any payment or other distribution on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Junior Financing, pursuant to Section 6.07(b) (other than Section 6.07(b)(iv)(A)(II) except as provided for therein), and such payment or other distribution shall not be prohibited by Section 6.07(b) or (ii) make a Restricted Investment and such Restricted Investment shall not be prohibited by Section 6.04. For the avoidance of doubt, any such payment, other distribution or Restricted Investment shall reduce the amount available under such basket set forth in Section 6.07(a). Any basket available to make a payment or other distribution of or in respect of principal of or interest on any Junior Financing, or any payment or other distribution on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Junior Financing, pursuant to Section 6.07(b) may instead be used to make a Restricted Investment and such Restricted Investment shall not be prohibited by Section 6.04. For the avoidance of doubt, any Restricted Investment shall reduce the amount available under such basket set forth in Section 6.07(b).

SECTION 6.08　　　FCC License Holder Covenant.

No FCC License Holder may (i) engage in any material business activities other than in connection with incidental to, or in support of, the acquisition and use of such licenses or its roles as licensee and/or licensor of the FCC Licenses (the "Permitted Activities") or (ii) incur Indebtedness owed to any party other than Holdings or another Loan Party (other than Indebtedness owed to the FCC and incurred in connection with, incidental to, or in support of the Permitted Activities) or issue Equity Interests, other than in favor of or to Holdings or a Loan Party, in the case of (i) and (ii) other than as required by applicable law, rule or regulation; provided that any FCC License Holder may guarantee any Indebtedness (including any Secured Obligations) of Holdings or its Subsidiaries permitted to be incurred hereunder.

SECTION 6.09　　　Restrictive Agreements.

The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Secured Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a)　　　　restrictions and conditions imposed by (1) Requirements of Law, (2) any Loan Document, (3) any documentation governing Incremental Equivalent Debt, (4) any documentation governing Permitted Unsecured Refinancing Debt, Permitted First Priority Refinancing Debt or Permitted Junior Priority Refinancing Debt, (5) any documentation governing Indebtedness of a Restricted Subsidiary that is not a Loan Party incurred pursuant to Section 6.01 and that do not apply to any Loan Party, (6) any documentation governing Indebtedness incurred pursuant to Section 6.01(a)(v) (but only to the extent applicable to the assets financed by such Indebtedness (and replacements, additions, accessions and improvements to or proceeds of such assets and other assets financed by the same lender)), (vi), (vii), (viii), (x), (xi), (xii), (xiii), (xiv), (xv), (xvi), (xviii), (xxv), (xxvi), (xxix), (xxx), or (xxxiv), and (7) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses (1) through (6) above;

(b)　　　　customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

184

(c)    restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)    customary provisions in leases, licenses, sublicenses and other contracts (including licenses and sublicenses of Intellectual Property) restricting the assignment, license, sublicense, transfer or security interest thereof or assets subject thereto;

(e)    restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)    any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any Restricted Subsidiary (other than such Person that has become a Restricted Subsidiary);

(g)    restrictions or conditions in any Indebtedness permitted pursuant to Section 6.01 that is incurred or assumed by Restricted Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents or are market terms at the time of issuance and are imposed solely on such Restricted Subsidiary and its Subsidiaries;

(h)    restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)    restrictions set forth on Schedule 6.09 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)    customary provisions in shareholders agreements, joint venture agreements, organization constitutive documents or similar binding agreements relating to any joint venture or non-wholly-owned Restricted Subsidiary and other similar agreements applicable to joint ventures and non-wholly-owned Restricted Subsidiaries and applicable solely to such joint venture or non-wholly-owned Restricted Subsidiary and the Equity Interests issued thereby, in each case, permitted by Section 6.04;

(k)    customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto;

(l)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest of Holdings, the Borrower or any Restricted Subsidiary; and

(m)    customary net worth provisions contained in real property leases or other contracts entered into by Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of Holdings, the Borrower and its Subsidiaries to meet their ongoing obligations;

(n)    [reserved];

(o)    restrictions on transfers of assets subject to Liens permitted by Section 6.02 (but, with respect to any such Lien, only to the extent that such transfer restrictions apply solely to the assets that are the subject of such Lien);

185

(p)       restrictions created in connection with any Qualified Securitization Facility;

(q)       any restrictions regarding licensing or sublicensing by the Borrower and its Restricted Subsidiaries of intellectual property in the ordinary course of business;

(r)       any restrictions that arise in connection with cash or other deposits permitted under Section 6.02 and Section 6.04;

(s)       comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Effective Date and permitted under Section 6.01 if the restrictions contained in any such agreement taken as a whole (a) are not materially less favorable to the Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by the Borrower) or (b) either (I) the Borrower determines at the time of entry into such agreement or instrument that such encumbrances or restrictions will not adversely affect, in any material respect, the Borrower's ability to make principal or interest payments required hereunder or (II) such encumbrances or restriction applies only during the continuance of a default relating to such agreement or instrument; and

(t)       any FCC License.

SECTION 6.10       <u>Amendment of Organizational Documents</u>.

The Borrower will not, and will not permit any Restricted Subsidiary to, amend or modify its Organizational Documents if the effect of such amendment or modification, when taken as a whole, is materially adverse to the rights and remedies of the Lenders or the Issuing Banks under the Loan Documents, taken as a whole.

SECTION 6.11       <u>Financial Performance Covenant</u>.

As of the end of each Test Period (commencing with the Test Period ending on the last day of the second full fiscal quarter ending after the Effective Date and for each Test Period occurring thereafter) and only in the event that the aggregate Outstanding Amount of Revolving Loans outstanding on the last day of such fiscal quarter (excluding for any Test Period (i) cash collateralized Letters of Credit and (ii) undrawn Letters of Credit) exceeds 35.0% of the aggregate amount of all Revolving Commitments in effect as of such date, the Borrower shall not permit the Senior Secured First Lien Net Leverage Ratio as of the end of the applicable Test Period of the Borrower to be greater than 7.50 to 1.00. To the extent required to be tested with respect to any Test Period pursuant to the preceding sentence, compliance with this Section 6.11 shall be tested on the date that the Financial Statements for the applicable Test Period are delivered (or, if earlier, required to be delivered) pursuant to Section 5.01(a) or (b), as applicable, and not prior to such date.

186

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01 Events of Default.

If any of the following events (any such event, an "Event of Default") shall occur:

(a) any Loan Party shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise; provided that any non-payment of principal or reimbursement obligation in respect of any LC Disbursement resulting from the Borrower's good faith payment of an incorrect invoice received from the Administrative Agent shall not constitute an Event of Default;

(b) any Loan Party shall fail to pay (i) any interest on any Loan when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days, or (ii) any fee or any other amount (other than an amount referred to in paragraph (a) or (b)(i) of this Section 7.01) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of ten (10) Business Days; provided that any non-payment of interest or other amounts resulting from the Borrower's good faith payment of an incorrect invoice received from the Administrative Agent shall not constitute an Event of Default;

(c) any representation or warranty made or deemed made on or after the Effective Date by or on behalf of Holdings, the Borrower or any of its Restricted Subsidiaries in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of 30 days after notice thereof from the Administrative Agent to the Borrower;

(d) (i) the Borrower or any of the Restricted Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02(a), 5.04 (with respect to the existence of the Borrower only) or in Article VI (other than the Financial Performance Covenant), or Holdings shall fail to observe or perform any covenant, condition or agreement contained in Section 6.03; or

(ii) the Borrower or any of the Restricted Subsidiaries shall fail to observe or perform the Financial Performance Covenant; provided that failure to observe or perform the Financial Performance Covenant shall not constitute an Event of Default with respect to the Term Loans unless and until the Required Revolving Lenders shall have terminated their Revolving Commitments and declared the Revolving Loans then outstanding to be due and payable and such declaration has not been rescinded; provided further that any Event of Default under Section 6.11 is subject to cure as provided in Section 7.02 and an Event of Default with respect to such Section shall not occur until the expiration of the fifteenth (15th) Business Day subsequent to the date on which the Compliance Certificate with respect to the applicable fiscal quarter (or the fiscal year ended on the last day of such fiscal quarter) are required to be delivered pursuant to Section 5.01(d);

(e) Holdings, the Borrower or any of the Restricted Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section 7.01), and such failure shall continue unremedied for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower;

187

(f) Holdings, the Borrower or any of the Restricted Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period and all required notices have been given); provided that this paragraph (f) shall not apply to any Indebtedness if the sole remedy of the holder thereof in the event of such non-payment is to elect to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares; provided that this paragraph (f) shall not apply to any such failure that (x) is remedied by Holdings, the Borrower or any applicable Restricted Subsidiary or (y) waived (including in the form of amendment) by the requisite holders of the applicable item of Material Indebtedness in either case, prior to acceleration of all the Loans pursuant to this Section 7.01;

(g) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired and all required notices have been given) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement), (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness (it being understood that paragraph (f) of this Section 7.01 will apply to any failure to make any payment required as a result of any such termination or similar event) or (iii) any Indebtedness if the sole remedy of the holder thereof following such event or condition is to elect to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares, provided that this paragraph (g) shall not apply to any such failure that (x) is remedied by Holdings, the Borrower or any applicable Restricted Subsidiary or (y) waived (including in the form of amendment) by the requisite holders of the applicable item of Material Indebtedness in either case, prior to acceleration of all the Loans pursuant to this Section 7.01; provided further that a default under any financial covenant in such Material Indebtedness shall not constitute an Event of Default unless and until the lenders or holders with respect to such Material Indebtedness have actually declared all such obligations to be immediately due and payable and terminate the commitments in accordance with the agreement governing such Material Indebtedness and such declaration has not been rescinded by the required lenders with respect to such Material Indebtedness on or before such date;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, examination, reorganization or other relief in respect of Holdings, the Borrower or any Material Subsidiary or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency, examinership, receivership or similar law, now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator, interim receiver, liquidator, receiver and manager, administrative receiver, administrator, insolvency practitioner or similar official for Holdings, the Borrower or any Material Subsidiary or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) Holdings, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, examinership, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, examinership, receivership or similar law, now or hereafter in effect (but excluding any such proceeding or petition (other than under the Bankruptcy Code) the sole purpose of which is to effect a transaction permitted under Section 6.03(a) that is not otherwise prohibited by the Loan Documents), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator,

188

conservator, interim receiver, interim examiner, liquidator, receiver and manager, administrative receiver, administrator, insolvency practitioner or similar official for Holdings, the Borrower or any Material Subsidiary or for a material part of its assets (but excluding any such application or consent (other than under the Bankruptcy Code) the sole purpose of which is to effect a transaction permitted under Section 6.03(a) that is not otherwise prohibited by the Loan Documents), (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)        one or more enforceable judgments for the payment of money in an aggregate amount in excess of $30,000,000 (to the extent not covered by insurance or another creditworthy (as reasonably determined by the Administrative Agent) indemnitor, and as to which such insurer or indemnitor has not denied coverage) shall be rendered against Holdings, the Borrower, any Material Subsidiary or any combination thereof and the same shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 consecutive days;

(k)        an ERISA Event occurs that has resulted or would reasonably be expected, individually or together with any other ERISA Event(s) in the aggregate to result in a Material Adverse Effect;

(l)        any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be (other than in an informational notice), a valid and perfected (if and to the extent required to be perfected under the Loan Documents) Lien on any material portion of the Collateral, with the priority required by the applicable Security Documents, except (i) as a result of the release of a Loan Party (including as a result of the designation of a Restricted Subsidiary as an Unrestricted Subsidiary) or the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of the Collateral Agent's failure to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (B) file Uniform Commercial Code amendment or continuation financing statements or (iii) as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (iv) as a result of acts or omissions of the Collateral Agent, the Administrative Agent or any Lender;

(m)        any material provision of any Loan Document or any Guarantee of the Loan Document Obligations shall for any reason be asserted by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)        any material portion of the Guarantees of the Loan Document Obligations pursuant to the Guarantee Agreement, taken as a whole, shall cease to be in full force and effect (in each case, other than the occurrence of the Termination Date or otherwise in accordance with the terms of the Loan Documents including as a result of transactions permitted hereunder); or

(o)        a Change in Control shall occur; then, and in every such event (other than an event with respect to Holdings, the Borrower described in paragraph (h) or (i) of this Section 7.01), and at any time thereafter during the continuance of such event, the Administrative Agent at the request of the Required Lenders (or in the case of an Event of Default under Section 7.02(d)(ii), unless the condition set forth in the first proviso to Section 7.01(d)(ii) has been satisfied, the Required Revolving Lenders with respect to the Revolving Commitments and/or the Revolving Loans) (provided that the following actions may not be taken (A) in the case of an Event of Default under Section 7.01(d)(ii), until the ability to exercise the Cure Right under Section 7.02 has expired (but may be taken as soon as the ability to exercise the Cure Right has expired and it has not been so exercised) and (B) in the case of an Event of Default under Section 7.01(d)(i), if the express conditions in the last proviso contained in Section 7.01(d)(i) have been satisfied) shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i)

189

terminate the Commitments and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and (iii) demand the Borrower deposit cash collateral with the Administrative Agent as contemplated by Section 2.05(j) in the aggregate LC Exposure Amount of all outstanding Letters of Credit and thereupon the principal of the Loans and the LC Exposure of all Letters of Credit so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to Holdings or the Borrower described in paragraph (h) or (i) of this Section 7.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Notwithstanding anything to the contrary set forth herein, neither the Administrative Agent nor any Lender shall take any remedial action that would constitute an assignment of any material FCC License issued to or otherwise held by any Loan Party or its Restricted Subsidiaries or transfer of control of any Loan Party, or its Restricted Subsidiaries in each case, in violation of any material aspect of any Communications Laws and, to the extent consent of the FCC is required, without the prior consent of the FCC.

Notwithstanding any other provisions herein or in any other Loan Document to the contrary, no dollar-denominated basket under Article VI shall be treated as having been breached if the relevant breach would not have occurred but for any fluctuation in exchange rates, and no action taken and reported to the Administrative Agent and the Lenders or otherwise publicly available shall provide the basis for any Event of Default more than two (2) years after the date on which such action was reported to the Administrative Agent and the Lenders; *provided* that such limitation shall not apply to the extent the Administrative Agent has commenced any remedial action or has provided notice to the Borrower that it reserved its rights relating to such Event of Default.

Notwithstanding anything herein to the contrary, any notice of Default, Event of Default, acceleration action or direction or requirement to undertake action relating to a Default or Event of Default provided to the Borrower by the Administrative Agent on behalf of one or more Lenders that have expressly requested that such notice be given to the Borrower must be accompanied by a written Net Short Representation from any such Lender (other than an Unrestricted Lender) delivered to the Borrower (with a copy to the Administrative Agent); <u>provided</u> that (A) in the absence of any such written Net Short Representation, each such Lender shall be deemed to have represented and warranted to the Borrowers and the Administrative Agent that it is not a Net Short Lender (it being understood and agreed that the Borrower and the Administrative Agent shall be entitled to rely conclusively on each such representation and deemed representation, and neither the Borrower nor the Administrative Agent shall have any duty to independently verify the accuracy of any such representation or deemed representation) and (B) no Net Short Representation shall be required to be delivered during the pendency of a Default or Event of Default caused by any bankruptcy, insolvency, examinership, receivership or other similar proceeding.

SECTION 7.02    Right to Cure.

190

(a)     Notwithstanding anything to the contrary contained in Section 7.01, in the event that the Borrower and its Restricted Subsidiaries fail to comply with the requirements of the Financial Performance Covenant as of the last day of any applicable fiscal quarter of the Borrower, at any time after the beginning of such fiscal quarter until the expiration of the fifteenth (15th) Business Day subsequent to the date on which the Compliance Certificate with respect to such fiscal quarter (or the fiscal year ended on the last day of such fiscal quarter) is required to be delivered pursuant to Section 5.01(d) (the "Cure Termination Date"), the Borrower shall have the right to issue Qualified Equity Interests for cash or otherwise receive cash contributions to the capital of the Borrower as cash common equity or other Qualified Equity Interests (collectively, the "Cure Right"), and upon the receipt by the Borrower of the Net Proceeds of such issuance (the "Cure Amount") pursuant to the exercise by the Borrower of such Cure Right the Financial Performance Covenant shall be recalculated giving effect to the following pro forma adjustment:

(i)     Consolidated EBITDA shall be increased with respect to such applicable fiscal quarter and any four fiscal quarter period that contains such fiscal quarter, solely for the purpose of measuring the Financial Performance Covenant and not for any other purpose under this Agreement, by an amount equal to the Cure Amount; and

(ii)     if, after giving effect to the foregoing pro forma adjustment (without giving effect to any repayment of any Indebtedness with any portion of the Cure Amount or any portion of the Cure Amount on the balance sheet of the Borrower and its Restricted Subsidiaries, in each case, with respect to such fiscal quarter only), the Borrower and its Restricted Subsidiaries shall then be in compliance with the requirements of the Financial Performance Covenant, the Borrower and its Restricted Subsidiaries shall be deemed to have satisfied the requirements of the Financial Performance Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default or event of default of the Financial Performance Covenant that had occurred shall be deemed cured for the purposes of this Agreement and the other Loan Documents;

provided that the Borrower shall have notified the Administrative Agent of the exercise of such Cure Right within five (5) Business Days of the issuance of the relevant Qualified Equity Interests for cash or the receipt of the cash contributions by the Borrower.

191

(b) Notwithstanding anything herein to the contrary, (i) in each four consecutive fiscal quarter period of the Borrower there shall be at least two (2) fiscal quarters in which the Cure Right is not exercised, (ii) during the term of this Agreement, the Cure Right shall not be exercised more than five (5) times, (iii) for purposes of this Section 7.02, the Cure Amount shall be no greater than the amount required for purposes of complying with the Financial Performance Covenant and any amounts in excess thereof shall not be deemed to be a Cure Amount, (iv) the Lenders shall not be obligated to extend credit in the form of Revolving Loans or issue new Letters of Credit until the Cure Amount has been received by the Borrower and (v) neither the Administrative Agent nor any Lender or Secured Party shall exercise any remedy (including acceleration) under the Loan Documents or applicable law on the basis of an Event of Default caused by the failure to comply with Section 6.11 until after the Borrower's ability to cure has lapsed and the Borrower has not exercised the Cure Right, and, if the Borrower shall have delivered to the Administrative Agent a notice of its intent to cure a breach or default under Section 7.01(d)(ii) prior to the Cure Termination Date, no Default or Event of Default under Section 7.01(d)(ii) shall then be deemed to be in existence and retroactively not to have occurred, provided, however, that if the Cure Amount is not received by the Borrower on or prior to the Cure Termination Date, such Event of Default shall be deemed to arise). Notwithstanding any other provision in this Agreement to the contrary, the Cure Amount received pursuant to any exercise of the Cure Right shall not be included in the calculation of Consolidated EBITDA for any other purposes hereunder. For the avoidance of doubt, no Cure Amounts shall be applied to reduce the Indebtedness of the Borrower and its Restricted Subsidiaries on a Pro Forma Basis for purposes of determining compliance with the Financial Performance Covenant for the fiscal quarter in which such Cure Right was made and there shall not have been a breach of any covenant under Article VI of this Agreement by reason of having no longer included such Cure Amount in any basket during the relevant period.

SECTION 7.03 Application of Proceeds. Subject to the terms of any applicable Intercreditor Agreement, the Collateral Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, as follows:

FIRST, to the payment of all costs and expenses incurred by the Collateral Agent in connection with such collection or sale or otherwise in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Collateral Agent hereunder or under any other Loan Document on behalf of any Loan Party and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document;

SECOND, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution);

THIRD, to any agent of any other junior secured debt, in accordance with any applicable Intercreditor Agreement; and

FOURTH, to the Loan Parties, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be

192

answerable in any way for the misapplication thereof. The Collateral Agent shall have no liability to any of the Secured Parties for actions taken in reliance on information supplied to it as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Secured Obligations. Notwithstanding the foregoing, Excluded Swap Obligations with respect to any Subsidiary Loan Party shall not be paid with amounts received from such Subsidiary Loan Party or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth above.

## ARTICLE VIII

## ADMINISTRATIVE AGENT

SECTION 8.01    Appointment and Authority.

(a)    Each of the Lenders and the Issuing Banks hereby irrevocably appoints Morgan Stanley Senior Funding, Inc. to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent and Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent and the Collateral Agent, the Lenders and the Issuing Banks, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "Collateral Agent" under the Loan Documents, and each of the Lenders and the Issuing Banks hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of such Lender and such Issuing Bank, and acknowledges that, to the extent required in any relevant jurisdiction, the Administrative Agent may enter into such security trust or equivalent deeds as the Administrative Agent may consider necessary, in each case for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent and Collateral Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent") as if set forth in full herein with respect thereto. It is understood and agreed that the use of the term "agent" herein or in any other Loan Document with reference to any of the agents is not intended to connote any fiduciary or other implied or (express) obligations arising under any agency doctrine of any applicable law. Instead such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties.

SECTION 8.02    Rights as a Lender.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate of the Borrower as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

193

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law;

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)     shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.02 and in the last paragraph of Section 7.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment; provided that no action taken or not taken at the direction of the Required Lenders (or such other number of percentage of Lenders as shall be expressly provided for herein or in the other Loan Documents) shall constitute gross negligence or willful misconduct; provided, further that the Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice conspicuously identified as a "notice of default" and describing such Default is given to the Administrative Agent by the Borrower, a Lender or the Issuing Bank; and

(e)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or
(vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 8.04     Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The

194

Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or any Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or such Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or such Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05    Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents (which may include such of the Administrative Agent's affiliates or branches as it deems appropriate) appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 8.06    Resignation of Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign upon thirty (30) days' notice to the Lenders, the Issuing Banks and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (such consent not to be unreasonably withheld or delayed) unless a Specified Event of Default has occurred and is continuing), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the Issuing Banks, appoint a successor Administrative Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Administrative Agent is replaced, the "Resignation Effective Date"); provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice.

If the Person serving as Administrative Agent is a Defaulting Lender, the Required Lenders and the Borrower may, to the extent permitted by applicable law, by notice in writing to such Person remove such Person as Administrative Agent and, with the consent of the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed and (ii) with respect to any outstanding payment

195

obligations) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 9.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Any resignation by Morgan Stanley Senior Funding, Inc. as Administrative Agent pursuant to this Section 8.06 shall also constitute its resignation as an Issuing Bank, in which case such resigning Issuing Bank (x) shall not be required to issue any further Letters of Credit hereunder and (y) shall maintain all of its rights as Issuing Bank with respect to any Letters of Credit issued by it, prior to the date of such resignation so long as such Letters of Credit or LC Exposure remain outstanding and not otherwise cash collateralized in accordance with the terms herein. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (ii) the retiring Issuing Bank shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

SECTION 8.07     <u>Non-Reliance on Administrative Agent and Other Lenders</u>.

Each Lender and each Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption, Incremental Facility Amendment or Refinancing Amendment pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

196

No Lender shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent and Collateral Agent on behalf of the Lenders in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent or Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent or Collateral Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent or Collateral Agent on behalf of the Lenders at such sale or other disposition. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

SECTION 8.08      No Other Duties, Etc.

Anything herein to the contrary notwithstanding, neither any Joint Lead Arrangers nor any person named on the cover page hereof as a Joint Lead Arranger shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender, or an Issuing Bank hereunder.

SECTION 8.09      Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or outstanding Letter of Credit shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letters of Credit outstandings and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Banks and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Banks and the Administrative Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each Issuing Bank to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or any Issuing Bank to authorize the Administrative Agent to vote in respect of the claim of any Lender or any Issuing Bank or in any such proceeding.

SECTION 8.10    <u>No Waiver; Cumulative Remedies; Enforcement</u>.

No failure by any Lender, any Issuing Bank or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Article VII for the benefit of all the Lenders and the Issuing Banks; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) the Issuing Banks from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Bank, as the case may be) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided further</u> that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.18, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

198

SECTION 8.11    Return of Certain Payments.

(a)    Each Lender and each Issuing Bank (and each Participant of any of the foregoing, by its acceptance of a Participation) hereby acknowledges and agrees that if the Administrative Agent notifies such Lender or Issuing Bank that the Administrative Agent has determined in its sole discretion that any funds (or any portion thereof) received by such Lender or Issuing Bank (any of the foregoing, but in any event excluding the Loan Parties and their Affiliates, a "<u>Recipient</u>") from the Administrative Agent (or any of its Affiliates) were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Recipient (whether or not known to such Recipient) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Payment</u>") and demands the return of such Payment, such Recipient shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment as to which such a demand was made. A notice of the Administrative Agent to any Recipient under this Section shall be conclusive, absent manifest error.

(b)    Without limitation of clause (a) above, each Recipient further acknowledges and agrees that if such Recipient receives a Payment from the Administrative Agent (or any of its Affiliates) (x) that is in an amount, or on a date different from the amount and/or date specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "<u>Payment Notice</u>"), (y) that was not preceded or accompanied by a Payment Notice, or (z) that such Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, it understands and agrees at the time of receipt of such Payment that an error has been made (and that it is deemed to have knowledge of such error) with respect to such Payment. Each Recipient agrees that, in each such case, it shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made.

(c)    Any Payment required to be returned by a Recipient under this Section shall be made in Same Day Funds in the currency so received, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Overnight Rate/Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. Each Recipient hereby agrees that it shall not assert and, to the fullest extent permitted by applicable law, permitted by applicable law, hereby waives, any right to retain such Payment, and any claim, counterclaim, defense or right of set-off or recoupment or similar right to any demand by the Administrative Agent for the return of any Payment received, including without limitation any defense based on "discharge for value" or any similar doctrine.

(d)    The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party except, in each case, to the extent such erroneous Payment is, and with respect to the amount of such erroneous Payment that is, comprised of funds of the Borrower or any other Loan Party.

199

ARTICLE IX

MISCELLANEOUS

SECTION 9.01     Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission (including e-mail), as follows:

(i)     if to Holdings, the Borrower, the Administrative Agent or Morgan Stanley Senior Funding, Inc. as an Issuing Bank, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)     if to any other Lender or Issuing Bank, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain Material Non-Public Information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     Electronic Communications. Notices and other communications to the Lenders and the Issuing Banks hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or any Issuing Bank pursuant to Article II if such Lender or such Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received when sent to the proper e-mail address as specified on Schedule 9.01 (as updated from time to time in accordance with Section 9.01(d)), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received when an e-mail is sent to the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

200

(c)     <u>The Platform</u>. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Borrower, any Lender, any Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender, any Issuing Bank or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc. Each of Holdings, the Borrower, the Administrative Agent and any Issuing Bank may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent and the Issuing Banks. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Administrative Agent, Issuing Bank and Lenders. The Administrative Agent and the Issuing Banks and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

201

SECTION 9.02     Waivers; Amendments

(a)     No failure or delay by the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Issuing Banks and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or the issuance, amendment, renewal or extension of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b)     Except as provided in Section 2.20 with respect to any Incremental Facility Amendment, Section 2.21 with respect to any Refinancing Amendment or Section 2.24 with respect to any Permitted Amendment, neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders (with a written copy thereof being provided to the Administrative Agent unless such waiver, amendment or modification affects the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, in which case consent of the Administrative Agent shall be required) or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that the consent of the Required Lenders shall not be required with respect to the amendments set forth below; provided further that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan or LC Disbursement or reduce the reimbursement obligations of the Borrower for the LC Exposure at such time (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby (it being understood that any change to the definition of Total Net Leverage Ratio, Senior Secured Net Leverage Ratio, Senior Secured First Lien Net Leverage Ratio or Cash Interest Coverage Ratio or in the component definitions thereof shall not constitute a reduction of interest or fees), provided that only the consent of the Required Lenders shall be necessary to waive or otherwise modify any obligation of the Borrower to pay default interest pursuant to Section 2.13(c), (iii) postpone the maturity of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any maturity date), or the date of any scheduled amortization payment of the principal amount of any Term Loan under Section 2.10 or the applicable Refinancing Amendment, or the reimbursement date with respect to any LC Disbursement, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby, (iv) change Section 2.18(b), Section 2.18(c) or Section 7.03 in a manner that would alter the pro rata sharing of payments or other amounts required thereby

202

without the consent of the Supermajority Lenders (provided, that any such changes required in connection with any Refinancing Amendment, Incremental Facility Amendment or other transaction expressly permitted hereunder shall only require the approval (to the extent any approval is required) of the Required Lenders), (v) change any of the provisions of this Section 9.02(b) without the written consent of such Lender directly and adversely affected thereby, (vi) change the percentage set forth in the definition of "Required Lenders", "Required Revolving Lenders", "Supermajority Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be), (vii) release all or substantially all the value of the Guarantees under the Guarantee Agreement (except as expressly provided in the Loan Documents) without the written consent of each Lender (other than a Defaulting Lender) or (viii) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender (other than a Defaulting Lender), except as expressly provided in the Loan Documents; provided, further, that in connection with an amendment that addresses solely a re-pricing transaction in which any Class of Term Loans or Revolving Commitments (and the Revolving Loans in respect hereof) is refinanced with a replacement Class of term loans or revolving commitments (and the revolving loans in respect hereof) bearing (or is modified in such a manner such that the resulting term loans or revolving commitments (and the revolving loans in respect hereof) bear a lower Effective Yield, only the consent of the Lenders holding Term Loans or Revolving Commitments (and the Revolving Loans in respect hereof) subject to such permitted re-pricing transaction that will continue as a Lender in respect of the re-priced tranche of Term Loans or Revolving Commitments (and the Revolving Loans in respect hereof) or modified Term Loans or Revolving Commitments and the Revolving Loans in respect hereof shall be required); provided further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or any Issuing Bank without the prior written consent of the Administrative Agent, or such Issuing Bank, as the case may be, (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any mistake, ambiguity, omission, defect, obvious error or incorrect cross-reference, or to effect administrative changes of a technical, conforming or immaterial nature or to correct any inconsistency without further action or consent of any other party if the same is not objected to in writing by the Required Lenders to the Administrative Agent within five (5) Business Days following receipt of notice thereof, (C) technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent (and no other Person) to the extent necessary to (i) to integrate any Incremental Facility or Credit Agreement Refinancing Indebtedness, (ii) to integrate and terms or conditions from any Incremental Facility Amendment that are more restrictive than this Agreement in accordance with Section 2.20(d), (iii) to increase the interest rates (including any interest rate margins or interest rate floors), fees and other amounts payable to any Class or Classes of Lenders hereunder to the extent required by Section 2.20(b)(i), (iv) increase, expand and/or extend the call protection provisions and any "most favored nation" provisions benefiting any Class or Classes of Lenders hereunder and/or (v) modify any other provision hereunder or under any other Loan Document in a manner more favorable to the then-existing Lenders or Class or Classes of Lenders, in each case in connection with the issuance or incurrence of any Incremental Term Facility or other Indebtedness permitted hereunder, where the terms of any such Incremental Facility or other Indebtedness are more favorable to the lenders thereof than the corresponding terms applicable to other Loans or Commitments then existing hereunder, and it is intended that one or more then-existing Classes of Loans or Commitments under this Agreement share in the benefit of such more favorable terms in order to comply with the provisions hereof relating to the incurrence of such Incremental Facility or other Indebtedness (provided that the consent of the Lenders or the Required Lenders, as the case may be, shall not be required to make any such changes necessary to be made in connection with any borrowing of Incremental Loans, any borrowing of Credit Agreement Refinancing Indebtedness and otherwise to effect the provisions of Section 2.20 or 2.21) and (D) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders

203

holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders stating that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time, which includes amendments to covenants or other provisions of this Agreement that would benefit Lenders of other Classes of Loans. Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) guarantees, Security Documents and related documents in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement and the other Loan Documents, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects, (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents or (iv) to integrate any Incremental Facility or Credit Agreement Refinancing Indebtedness in a manner consistent with this Agreement and the other Loan Documents. Notwithstanding the foregoing, no Lender or Issuing Bank consent is required to effect any amendment, modification or supplement to any Intercreditor Agreement or subordination agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral, including any Incremental Term Loan or Incremental Revolving Loan, any Other Term Loan, Other Revolving Loan or Other Revolving Commitments, for the purpose of adding the holders of such Indebtedness (or their senior representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, to give effect hereto or otherwise carry out the purposes thereof, in each case as contemplated by the terms of such Intercreditor Agreement permitted under this Agreement (including any changes thereto as contemplated by Section 9.14(b)) or subordination agreement or arrangement permitted under this Agreement, as applicable.

(c)    In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (I) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable (and, if a Revolving Commitment is being assigned and each Issuing Bank), which consent shall not unreasonably be withheld, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)(i)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b) or (II) terminate the Commitment of such Non-Consenting Lender and repay all Loan Document Obligations of the Borrower owing to such Non-Consenting Lender relating to the Loans held

by such Non-Consenting Lender as of such termination date (including in the case of a Repricing Transaction, any "prepayment premium" pursuant to Section 2.11 that would otherwise be owed in connection therewith); *provided* that such termination shall be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

(d)        Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Revolving Commitments, Term Loans and Revolving Exposure of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of a Class), all affected Lenders (or all affected Lenders of a Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(e)        Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender (other than an Affiliated Debt Fund) hereby agrees that, for purposes of any plan of reorganization, such Affiliated Lender will be deemed to have voted in the same proportion as non-Affiliated Lenders voting on such matter; provided that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion in connection with any plan of reorganization to the extent (a) any such plan of reorganization proposes to treat any Secured Obligations held by such Affiliated Lender in a manner that is less favorable in any material respect to such Affiliated Lender than the proposed treatment of similar Secured Obligations held by Lenders that are not Affiliates of the Borrower, (b) that would deprive such Affiliated Lender of its pro rata share of any payments to which it is entitled or (c) if such plan of reorganization does not require the consent of each Lender or each affected Lender.

(f)        Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, only the consent of the Required Revolving Lenders shall be necessary to (A) amend or otherwise modify Section 6.11 or Section 7.02 (or, in each case, solely for the purposes of determining compliance with the Financial Performance Covenant, any defined terms used therein), (B) waive or consent to any Default or Event of Default resulting from a breach of the Financial Performance Covenant, (C) alter the rights or remedies of the Required Revolving Lenders arising pursuant to Article VII as a result of a breach of Section 6.11, (D) amend, modify or waive conditions to any extensions of credit under the Revolving Facility or (E) add or modify representations, covenants or other terms or conditions solely for the benefit of the Revolving Facility.

SECTION 9.03        Expenses; Indemnity; Damage Waiver.

(a)        The Borrower shall pay, if the Effective Date occurs and the Transactions have been consummated, (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent, the Joint Lead Arrangers, each Issuing Bank and their respective Affiliates (without duplication), (but limited, (A) in the case of legal fees and expenses, to the reasonable, documented and out-of-pocket fees, disbursements and other charges of one counsel to the Administrative Agent, the Issuing Bank, and the Joint Lead Arrangers, taken as a whole, plus, if reasonably necessary, one local counsel to the Administrative Agent, the Issuing Banks, and the Joint Lead Arrangers, taken as a whole, in any relevant material jurisdiction, in each case excluding allocated costs of in-house counsel (and in the case of an actual or reasonably perceived potential conflict of interest, one additional counsel and local counsel to the affected Lenders, taken as a whole), and (B) in the case of other consultants and advisors, limited to the fees and expenses of such persons approved by the Borrower, acting reasonably), in each case for the

205

Administrative Agent, in connection with the syndication of the credit facilities provided for herein, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof), (ii) all reasonable and documented and invoiced out-of-pocket costs and expenses incurred by each Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable and documented and invoiced out-of-pocket expenses (but not third party costs or expenses such as legal fees or the fees of other advisors) incurred by the Administrative Agent, each Issuing Bank or any Lender and the fees, charges and disbursements of counsel to the Administrative Agent, the Issuing Banks and the Lenders, taken as a whole, in any relevant material jurisdiction (and in the case of an actual or reasonably perceived potential conflict of interest, one additional counsel to the affected Lenders, taken as a whole) and in the case of other consultants and advisers, limited to the fees and expenses of such persons approved by the Borrower, acting reasonably) (but limited, (A) in the case of legal fees and expenses, to the fees, disbursements and other charges of one counsel to the Administrative Agent, the Issuing Banks, and the Lenders, taken as a whole, and, if reasonably necessary, one local counsel to the Administrative Agent, the Issuing Banks, and the Lenders, taken as a whole, in each relevant material jurisdiction (and in the case of an actual or reasonably perceived potential conflict of interest, one additional counsel to the affected Lenders, taken as a whole) and (B) in the case of other consultants and advisers, limited to the fees and expenses of such persons approved by the Borrower, acting reasonably) in connection with the enforcement or protection of any rights or remedies in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws or during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit).

(b)        Without duplication of the expense reimbursement obligations pursuant to clause (a) above, the Borrower shall indemnify the Administrative Agent, each Issuing Bank, each Lender, the Joint Lead Arrangers and each Related Party (other than Excluded Affiliates to the extent acting in their capacities as such) of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable, documented and out-of-pocket expenses (but limited, in the case of legal expenses, to the reasonable and documented and invoiced out-of-pocket fees and expenses of one counsel for all Indemnitees and to the extent reasonably determined by the Administrative Agent to be necessary, one local counsel in each relevant material jurisdiction (and, in the case of a conflict of interest, where the Indemnitee affected by such conflict notifies Holdings of the existence of such conflict and thereafter retains its own counsel, one additional counsel to the affected Indemnitees, taken as a whole) for all Indemnitees (which may include a single special counsel acting in multiple jurisdictions but excluding allocated costs of in-house counsel)), incurred by or asserted against any Indemnitee by any third party or by the Borrower, Holdings or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, the syndication of the credit facilities provided for herein, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Mortgaged Property or any other real property currently or formerly owned or operated by Holdings, the Borrower or any Subsidiary, or any other Environmental Liability related in any way to Holdings, the Borrower or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, Holdings or any Subsidiary or their Affiliates and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (w) resulted from the gross negligence, bad faith or willful

206

misconduct of such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) resulted from a material breach of the Loan Documents by such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment), (y) arise from disputes between or among Indemnitees (other than disputes involving claims against the Administrative Agent, the Collateral Agent or the Joint Lead Arrangers or any Issuing Bank, in each case, in their respective capacities) that do not involve an act or omission by Holdings, the Borrower or any Restricted Subsidiary or (z) resulted from any settlement effected without the Borrower's prior written consent; provided, that to the extent any amounts paid to an Indemnitee in respect of this Section 9.03, such Indemnitee, by its acceptance of the benefits hereof, agrees to refund and return any and all amounts paid by the Borrower to it if, pursuant to the operation of the foregoing clauses (w) through (z), such Indemnitee was not entitled to receipt of such amount.

(c)     To the extent that the Borrower fails to promptly pay any amount required to be paid by it to the Administrative Agent, any Lender or any Issuing Bank under paragraph (a) or (b) of this Section 9.03, each Lender severally agrees to pay to the Administrative Agent, such Lender or such Issuing Bank, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of any such actual and direct losses (other than lost profits), claims, damages, liabilities and related reasonable and documented out-of-pocket expenses; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, such Lender or such Issuing Bank in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate Revolving Exposures, outstanding Term Loans and unused Commitments at such time. The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02(a) (which shall apply *mutatis mutandis* to the Lenders' obligations under this paragraph (c)).

(d)     To the extent permitted by applicable law, none of Holdings, the Borrower, any Agent, any Lender, any other party hereto or any Agent Party shall assert, and each hereby waives, any claim against any other such Person on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, arising out of, as a result of, or in any way related to, this Agreement or any agreement or instrument contemplated hereby or referred to herein, the transactions contemplated hereby or thereby, or any act or omission or event occurring in connection therewith and each such Person further agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided that the foregoing shall in no event limit the Borrower's indemnification obligations under clause (b) above.

(e)     In case any proceeding is instituted involving any Indemnitee for which indemnification is to be sought hereunder by such Indemnitee, then such Indemnitee will promptly notify the Borrower of the commencement of any proceeding; provided, however, that the failure to do so will not relieve the Borrower from any liability that it may have to such Indemnitee hereunder, except to the extent that the Borrower is materially prejudiced by such failure. Notwithstanding the above, following such notification, the Borrower may elect in writing to assume the defense of such proceeding, and, upon such election, the Borrower will not be liable for any legal costs subsequently incurred by such Indemnitee (other than reasonable costs of investigation and providing evidence) in connection therewith, unless (i) the Borrower has failed to provide counsel reasonably satisfactory to such Indemnitee in a timely manner, (ii) counsel provided by the Borrower reasonably determines its representation of such Indemnitee would present it with a conflict of interest or (iii) the Indemnitee reasonably determines that there are actual conflicts of interest between the Borrower and the Indemnitee, including situations in which there may be legal defenses available to the Indemnitee which are different from or in addition to those available to the Borrower.

207

(f)     Notwithstanding anything to the contrary in this Agreement, to the extent permitted by applicable law, neither Holdings nor the Borrower shall assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; except to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties.

(g)     All amounts due under this Section 9.03 shall be payable not later than thirty (30) days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (other than to a Successor Borrower pursuant to a transaction permitted by Section 6.03(a)(iv)(I)(B)) without the prior written consent of each Lender, each Issuing Bank and the acknowledgement of the Administrative Agent (and any attempted assignment or transfer by the Borrower without such consent (other than to a Successor Borrower pursuant to a transaction permitted by Section 6.03(a)(iv)(I)(B)) shall be null and void), (ii) no assignment shall be made to any Defaulting Lender or any of its Affiliates, or any Persons who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii) and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraphs (b)(ii) and (f) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of (A) the Borrower; provided that no consent of the Borrower shall be required for an assignment (x) by a Term Lender to any Lender, an Affiliate of any Lender or an Approved Fund, (y) if a Specified Event of Default has occurred and is continuing or (z) by a Revolving Lender to another Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; provided further that no assignee contemplated by the immediately preceding proviso shall be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable assignor would have been entitled to receive with respect to the assignment made to such assignee, unless the assignment to such assignee is made with the Borrower's prior written consent; provided further that the Borrower shall have the right to withhold its consent to any assignment if in order for such assignment to comply with applicable law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority, (B) in the case of the Revolving

208

Loans and Revolving Commitments, the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of a Revolving Loan to any Lender, an Affiliate of any Lender or an Approved Fund or, subject to Section 9.04(f) and (g), to an Affiliated Lender, Holdings, the Borrower or any of its Subsidiaries and (C) solely in the case of Revolving Loans and Revolving Commitments, each Issuing Bank (not to be unreasonably withheld or delayed); provided that, for the avoidance of doubt, no consent of any Issuing Bank shall be required for an assignment of all or any portion of a Loan or Commitment to any Lender under the Revolving Facility or an Affiliate or an Approved Fund of a Lender with the Revolving Facility. Notwithstanding anything in this Section 9.04 to the contrary, if the Borrower has not given the Administrative Agent written notice of its objection to an assignment of Term Loans within ten (10) Business Days after written notice of such assignment, the Borrower shall be deemed to have consented to such assignment.

        (ii)        Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall, in the case of Revolving Loans, not be less than $5,000,000 (and integral multiples thereof) or, in the case of a Term Loan, $1,000,000 (and integral multiples thereof), unless the Borrower and the Administrative Agent otherwise consent (in each case, such consent not to be unreasonably withheld or delayed); provided that no such consent of the Borrower shall be required if a Specified Event of Default has occurred and is continuing, (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together with a processing and recordation fee of $3,500; provided that such processing recordation fee shall not be payable in connection with an assignment pursuant to clause (f) or (g) below and the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that any such Assignment and Assumption shall include a representation by the assignee that the assignee is not a Disqualified Lender; provided further that assignments made pursuant to Section 2.19(b), 2.21(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, (D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax forms required by Section 2.17(f), (ii) all documentation and other information reasonably determined by the Administrative Agent to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (iii) an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain Material Non-Public Information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws and (E) unless the Borrower otherwise consents, no assignment of all or any portion of the Revolving Commitment of a Lender that is also an Issuing Bank may be made unless (1) the assignee shall be or become an Issuing Bank, as applicable, and assume a ratable portion of the rights and obligations of such assignor in its capacity as Issuing Bank, or (2) the assignor agrees, in its discretion, to retain all of its rights with respect to and obligations to make or issue Letters of Credit hereunder in which case the Applicable

Fronting Exposure of such assignor may exceed such assignor's Fronting Exposure Cap for purposes of Section 2.05(b) by an amount not to exceed the difference between the assignor's Fronting Exposure Cap prior to such assignment and the assignor's Fronting Exposure Cap following such assignment.

        (iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04 to the extent otherwise permitted thereby or otherwise shall be void.

        (iv)      The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is an Affiliated Lender, nor shall the Administrative Agent be obligated to monitor the aggregate amount of the Loans or Incremental Loans held by Affiliated Lenders. The entries in the Register shall be conclusive absent manifest error, and Holdings, the Borrower, the Administrative Agent, the Issuing Banks and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower, the Issuing Banks and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

        (v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire, any "know your customer documentation" reasonably requested by the Administrative Agent and any tax forms required by Section 2.17(f) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi) The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as an original executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)      (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Banks, sell participations to one or more banks or other Persons (other than to a Disqualified Lender (but only if the list of Disqualified Lenders is available to such Lender upon request) or other Person that is not an Eligible Assignee) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Holdings, the Borrower, the Administrative Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations thereof and Section 2.19, it being understood that any tax forms required by Section 2.17(f) shall be provided solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(ii)      Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of its Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other obligations under the Loan Documents) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any Loan or other obligation under the Loan Documents is in registered form for U.S. federal income tax purposes.

(iii)      A Participant (other than a Revolving Lender pursuant to Section 2.05(e)) shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(d)       Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest, <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)       In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans and participations in Letters of Credit previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(f)       Notwithstanding anything to the contrary herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement to an Affiliated Lender subject to the following limitations:

(i)        Affiliated Lenders (other than Affiliated Debt Funds) will not receive information provided solely to Lenders by the Administrative Agent or any Lender, will not be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receives notices of Borrowings, notices of prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II and will not be entitled to receive advice of counsel to the Administrative Agent or other Lenders;

(ii)       for purposes of any amendment, waiver or modification of any Loan Document (including such modifications pursuant to Section 9.02), or, subject to Section 9.02(e), in any plan of reorganization pursuant to the U.S. Bankruptcy Code, that in either case does not require the consent of each Lender, or that would not deprive such Affiliated Lender of its pro rata share of any payments to which it is entitled, Affiliated Lenders will be deemed to have voted in the same proportion as the Lenders that are not Affiliated Lenders voting on such matter; and each Affiliated Lender hereby acknowledges, agrees and consents that if, for any reason, its vote to accept or reject any plan pursuant to the Bankruptcy Code is not deemed to have been so voted, then such vote will be (x) deemed not to be in good faith and (y) "designated" pursuant to Section 1126(e) of the Bankruptcy Code such that the vote is not counted in determining whether the applicable class has accepted or rejected such plan in accordance with Section 1126(c) of the Bankruptcy Code; <u>provided</u> that Affiliated Debt Funds will not be subject to such voting limitations and will be entitled to vote as any other Lender; <u>provided</u> that Affiliated Debt Funds may not account for more than 49.9% of the "Required Lenders" or "Supermajority Lenders" in any Required Lender vote or Supermajority Lender vote;

(iii) Affiliated Lenders may not purchase Revolving Loans, including pursuant to this Section 9.04;

(iv) the aggregate principal amount of Initial Term Loans (including Incremental Term Loans or Other Term Loans that are pari passu with the Initial Term Loans) purchased by assignment pursuant to this Section 9.04 and held at any one time by Affiliated Lenders (other than Affiliated Debt Funds) may not exceed 25.0% of the aggregate principal amount of all such Term Loans outstanding at the time of such purchase, after giving effect to any substantially simultaneous cancellations thereof;

(v) Affiliated Lenders shall clearly identify themselves as an Affiliated Lender in the loan assignment documentation. In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any lender is an Affiliated Lender or Affiliated Debt Fund nor shall the Administrative Agent be obligated to monitor the number of Affiliated Lenders or Affiliated Debt Funds or the aggregate amount of Term Loans or Incremental Term Loans held by Affiliated Lenders or Affiliated Debt Funds;

(vi) Affiliated Lenders (other than Affiliated Debt Funds) will not be permitted to vote on matters requiring a Required Lender vote, and the Term Loans held by Affiliated Lenders (other than Affiliated Debt Funds) shall be disregarded in determining (x) other Lenders' commitment percentages or (y) matters submitted to Lenders for consideration that do not require the consent of each Lender or each affected Lender; provided that the commitments of any Affiliated Lender shall not be increased, the Interest Payment Dates and the dates of any scheduled amortization payments (including at maturity) owed to any Affiliated Lender hereunder will not be extended and the amounts owing to any Affiliated Lender hereunder will not be reduced without the consent of such Affiliated Lender; and

(vii) each Lender making such assignment to such Affiliated Lender (A) shall render customer "big boy" disclaimer letters and (B) acknowledges and agrees that in connection with such assignment, (1) such Affiliated Lender then may have, and later may come into possession of Material Non-Public Information (it being understood that no representation regarding the absence of any Material Non-Public Information shall be required), (2) such Lender has independently and, without reliance on such Affiliated Lender, Holdings, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to enter into such assignment notwithstanding such Lender's lack of knowledge of the Material Non-Public Information and (3) none of Holdings, its Subsidiaries, the Administrative Agent, any Affiliated Lender or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by Requirements of Law, any claims such Lender may have against Holdings, its Subsidiaries, the Administrative Agent, such Affiliated Lender and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Material Non-Public Information. Each Lender entering into such an assignment further acknowledges that the Material Non-Public Information may not be available to the Administrative Agent or the other Lenders.

(g) Any Lender may, at any time, assign all or a portion of its Term Loans (but not Revolving Loans) to Holdings or any of its Subsidiaries, through (x) Dutch auctions or other offers to purchase open to all Lenders on a pro rata basis in accordance with procedures of the type described in Section 2.11(a)(ii) or other customary procedures acceptable to the Administrative Agent and/or (y) open market purchases on a non-pro rata basis, provided that (i) the Borrower shall not make any Borrowing of Revolving Loans to fund such assignment, (ii) any Term Loans that are so assigned will be automatically and irrevocably cancelled and the aggregate principal amount of the tranches and installments of the

213

relevant Term Loans then outstanding shall be reduced by an amount equal to the principal amount of such Term Loans and (iii) each Lender making such assignment to Holdings or any of its Subsidiaries (A) shall render customary "big boy" disclaimer letters and (B) acknowledges and agrees that in connection with such assignment, (1) Holdings or its Subsidiaries then may have, and later may come into possession of Material Non-Public Information (it being understood that no representation regarding the absence of any Material Non-Public Information shall be required), (2) such Lender has independently and, without reliance on Holdings, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to enter into such assignment notwithstanding such Lender's lack of knowledge of the Material Non-Public Information and (3) none of Holdings, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by Requirements of Law, any claims such Lender may have against Holdings, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Material Non-Public Information. Each Lender entering into such an assignment further acknowledges that the Material Non-Public Information may not be available to the Administrative Agent or the other Lenders.

(h)        Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Borrower; <u>provided</u> that, upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is on the list of Disqualified Lenders, the Administrative Agent shall be permitted to disclose to such Lender the list of Disqualified Lenders; <u>provided further</u> that inclusion on the list of Disqualified Lenders shall not apply retroactively to disqualify any persons that have previously acquired an assignment or participation in the Loan if such person was not included on the list of Disqualified Lenders at the time of such assignment or participation and so long as such Lender or Participant continues to hold or participate in such Loans. Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender was a Disqualified Lender at the time of the assignment of any Loans or Commitments to such Lender, following written notice from the Borrower to such Lender and the Administrative Agent and otherwise in accordance with Section 2.19(b), as applicable: (1) such Lender shall promptly assign all Loans and Commitments held by such Lender to an Eligible Assignee (and the signature of such Disqualified Lender shall not be required on any such assignment); <u>provided</u> that (A) the Administrative Agent shall not have any obligation to the Borrower, such Lender or any other Person to find such a replacement Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find such a replacement Lender or accept or consent to any such assignment to itself or any other Person subject to the Borrower's consent in accordance with Section 9.04(b)(i) and (C) the assignment of such Loans and/or Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of any Class), all affected Lenders (or all affected Lenders of any Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.02); <u>provided</u> that (x) the Commitment of any Disqualified Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to Lenders by the Administrative Agent or any Lender or will be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices or prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II. The Administrative Agent shall not be responsible for or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders or Net Short Lenders. Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to

214

whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or a Net Short Lender or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Lender or Net Short Lender. To the extent that any assignment or participation is purported to be made to any Person that was (at the time of such participation) a Net Short Lender on a pro forma basis for such participation, such transaction shall be subject to the applicable provisions of Section 9.23 (and the Borrower shall be entitled to seek specific performance in any applicable court of law or equity to enforce this sentence).

(i)    Notwithstanding the foregoing, any Affiliated Lender shall be permitted, at its option, to contribute any Term Loans so assigned to such Affiliated Lender pursuant to this Section 9.04 to Holdings or any of its Subsidiaries for purposes of cancellation, which contribution may be made (including, with the Borrower's consent, to the Borrower, whether through Holdings or any Intermediate Parent or otherwise), in exchange for Qualified Equity Interests of Holdings, any Intermediate Parent or the Borrower or Indebtedness of the Borrower to the extent such Indebtedness is permitted to be incurred (including, if applicable, as a Permitted Refinancing) pursuant to Section 6.01 at such time.

SECTION 9.05    <u>Survival</u>.

All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Termination Date. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, in the event that, in connection with the refinancing or repayment in full of the credit facilities provided for herein, an Issuing Bank shall have provided to the Administrative Agent a written consent to the release of the Revolving Lenders from their obligations hereunder with respect to any Letter of Credit issued by such Issuing Bank (whether as a result of the obligations of the Borrower (and any other account party) in respect of such Letter of Credit having been collateralized in full by a deposit of cash with such Issuing Bank or being supported by a letter of credit that names such Issuing Bank as the beneficiary thereunder, or otherwise), then from and after such time such Letter of Credit shall cease to be a "Letter of Credit" outstanding hereunder for all purposes of this Agreement and the other Loan Documents, and the Revolving Lenders shall be deemed to have no participations in such Letter of Credit, and no obligations with respect thereto, under Section 2.05(e) or (f).

SECTION 9.06    <u>Counterparts; Integration; Effectiveness</u>.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts

215

hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of an original executed counterpart of this Agreement. Notwithstanding anything to the contrary, the words "execution," "signed," "signature" and words of like import in this Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as an original executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07　　<u>Severability</u>.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent or the Issuing Banks, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

216

If a Specified Event of Default shall have occurred and be continuing, each Lender and each Issuing Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency, but not withholding or payroll accounts, employee benefits accounts, de minimis accounts or other accounts used exclusively for taxes or fiduciary or trust purposes) at any time held and other obligations (in whatever currency) at any time owing by such Lender or such Issuing Bank to or for the credit or the account of the Borrower (excluding, for the avoidance of doubt, any Settlement Assets except to effect Settlement Payments such Lender is obligated to make to a third party in respect of such Settlement Assets or as otherwise agreed in writing between the Borrower and such Lender) against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender or Issuing Bank, irrespective of whether or not such Lender or Issuing Bank shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender or Issuing Bank different from the branch or office holding such deposit or obligated on such Indebtedness; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender and applicable Issuing Bank shall notify the Borrower and the Administrative Agent of such setoff and application; <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender and each Issuing Bank under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or such Issuing Bank may have. Notwithstanding the foregoing, no amount set off from any Loan Party (other than the Borrower) shall be applied to any Excluded Swap Obligation of such Loan Party (other than the Borrower).

SECTION 9.09      <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)      This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

(b)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court except to the extent required by any Security Document to be brought in another jurisdiction pursuant to the terms of such Security Document. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against Holdings or the Borrower or their respective properties in the courts of any jurisdiction.

217

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.01. NOTHING IN ANY LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

SECTION 9.10    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11    Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12    Confidentiality.

(a)    Each of the Administrative Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates (other than Excluded Affiliates) and its and their respective directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors and any numbering, administration or settlement service providers on a "need-to-know" basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and will be instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent, any Issuing Bank or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent, such Issuing Bank or the relevant Lender, as applicable), (ii) to the extent requested by any regulatory authority or self-regulatory authority, required by applicable law or by any subpoena or similar legal process or in connection with the exercise of remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder; provided that (x) solely to the extent permitted by law and other than in connection with routine audits and reviews by regulatory and self-regulatory authorities, each Lender and the Administrative Agent shall promptly notify the Borrower of any such requested or required disclosure in connection with any legal or regulatory proceeding and (y) in the case of clause (ii) only, each Lender and the Administrative Agent shall use commercially reasonable efforts to ensure that

218

such Information is kept confidential in connection with the exercise of such remedies, (iii) to any other party to this Agreement, (iv) subject to an agreement containing confidentiality undertakings substantially similar to those in this Section 9.12 (but other than to a Disqualified Lender or Net Short Lender), to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any actual or prospective counterparty (or its advisors) to any Swap Agreement or derivative transaction relating to any Loan Party or its Subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (v) if required by any rating agency; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vi) to service providers providing administrative and ministerial services solely in connection with the syndication and administration of the Loan Documents and the facilities (e.g., identities of parties, maturity dates, interest rates, etc.) on a confidential basis, (vii) with the written consent of the Borrower, (viii) for purposes of establishing a "due diligence" defense or to the extent necessary to enforce our rights and remedies hereunder or (ix) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.12 or (y) becomes available to the Administrative Agent, any Issuing Bank, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary, which source is not known (after due inquiry) by the recipient of such information to be subject to a confidentiality obligation. For the purposes hereof, "Information" means all information received from or on behalf of Holdings or the Borrower relating to Holdings, the Borrower, any other Subsidiary or their business other than any such information that is available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by Holdings, the Borrower or any Subsidiary. Notwithstanding the foregoing, no such information shall be disclosed to a Disqualified Lender or Net Short Lender that constitutes a Disqualified Lender or Net Short Lender, as applicable, at the time of such disclosure without the Borrower's prior written consent.

(b)       EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN SECTION 9.12(a)) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)       ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14    Release of Liens and Guarantees.

(a)      A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, (1) upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Restricted Subsidiary (including pursuant to a permitted merger or amalgamation with a Subsidiary that is not a Loan Party or a designation as an Unrestricted Subsidiary) or becomes an Excluded Subsidiary or (2) upon the request of the Borrower, in connection with a transaction permitted under this Agreement, as a result of which such Subsidiary Loan Party ceases to be a Wholly Owned Subsidiary; provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise. Upon any sale or other transfer by any Loan Party (other than to any other Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral or upon any Collateral becoming an Excluded Asset, the security interests in such Collateral created by the Security Documents shall be automatically released. Upon the release of Holdings or any Subsidiary Loan Party from its Guarantee in compliance with this Agreement, the security interest in any Collateral owned by Holdings or such Subsidiary created by the Security Documents shall be automatically released. Upon the designation of a Restricted Subsidiary as an Unrestricted Subsidiary in compliance with this Agreement, the security interest created by the Security Documents in the Equity Interests of such new Unrestricted Subsidiary shall automatically be released. To the extent the release of any Lien in any Collateral is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 9.02), the security interest in such Collateral shall be automatically released. To the extent the release of any security interest in any Collateral is required to effect any sale or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Loan Documents, the security interest in such Collateral shall be automatically released. In addition, liens shall be released and guarantees released in accordance with the terms of the Security Documents and the Guarantee. Upon the Termination Date all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. Any such release shall not in any manner discharge, affect, or impair the Secured Obligations (other than those being discharged or released) or any Liens (other than those being discharged or released) of the Loan Parties in respect of all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent comprised of Excluded Assets or otherwise released in accordance with the provisions of the Loan Documents. In connection with any termination or release pursuant to this Section 9.14, without the further consent of any Lender, Issuing Bank or other Secured Party, the Administrative Agent or the Collateral Agent, as the case may be, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence or to file or register in any office such termination or release so long as the Borrower or applicable Loan Party shall have provided the Administrative Agent or the Collateral Agent, as the case may be, such certifications or documents as the Administrative Agent or the Collateral Agent, as the case may be, shall reasonably request in order to demonstrate compliance with this Agreement. The Administrative Agent or the Collateral Agent, as the case may be, will, at the Borrower's

220

expense, execute and deliver to the applicable Loan Party or to file or register in any office such documents as such Loan Party may reasonably request to subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(ii) (but only pursuant to clauses (d), (j) and (k) of the definition of "Permitted Encumbrances"), (iv), (v), (xi), (xii), (xv), (xxii), (xxiii), (xxviii) (to the extent the relevant Lien is of the type to which the Lien of the Collateral Agent is otherwise required or permitted to be subordinated pursuant to any other exceptions to Section 6.02 that are expressly included in this sentence), (xxix) or (xxx)).

(b)     Each of the Lenders and the Issuing Banks irrevocably authorizes the Administrative Agent or the Collateral Agent, as the case may be, to (i) provide any release or evidence of release, termination or subordination contemplated by this Section 9.14 (and upon request by the Administrative Agent or the Collateral Agent, as the case may be, at any time, the Required Lenders will confirm in writing the Administrative Agent's authority or the Collateral Agent's authority, as the case may be, to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.14), (ii) enter into subordination or intercreditor agreements with respect to Indebtedness to the extent the Administrative Agent or Collateral Agent is otherwise contemplated herein as being a party to such intercreditor or subordination agreement, in each case to the extent such agreements, at the time they are first entered into, are substantially consistent with the terms set forth on Exhibit E-1, E-2 or E-3 annexed hereto, together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders not less than five Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof, in each case in form and substance reasonably satisfactory to the Administrative Agent and/or Collateral Agent (it being understood that junior Liens are not required to be pari passu with other junior Liens, and that Indebtedness secured by junior Liens may be secured by Liens that are pari passu with, or junior in priority to, other Liens that are junior to the Liens securing the Loan Document Obligations); and (iii) enter into and sign for and on behalf of the Lenders as Secured Parties the Security Documents for the benefit of the Lenders and the other Secured Parties.

SECTION 9.15     No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks and the Lenders on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings, any of their respective Affiliates or any other Person, (B) none of the Administrative Agent, the Joint Lead Arrangers, the Issuing

221

Banks and the Lenders has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents and (C) each of the Borrower and Holdings agrees that it will not claim that the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks or the Lenders (or their respective affiliates) has rendered advisory services in connection with the services provided pursuant to the Loan Documents, or owe a fiduciary or similar duty to the Borrower, Holdings or any of their respective affiliates with respect to the transactions contemplated hereby; and (iii) the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Administrative Agent, the Joint Lead Arrangers, the Issuing Banks and the Lenders has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.

SECTION 9.16      Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

SECTION 9.17      Judgment Currency.

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower or any other Loan Party in respect of any such sum due from it to the Secured Parties hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under Requirements of Law).

222

Each Secured Party hereby agrees that the Administrative Agent and/or Collateral Agent may enter into any intercreditor agreement and/or subordination agreement pursuant to, or contemplated by, the terms of this Agreement (including with respect to Indebtedness permitted pursuant to Section 6.01, any applicable Liens on Collateral permitted pursuant to Section 6.02 and, in each case, together with the defined terms referenced therein) on its behalf and agrees to be bound by the terms thereof and, in each case, consents and agrees to the appointment of Morgan Stanley Senior Funding, Inc. (or its affiliated designee, representative, agent or successor) on its behalf as collateral agent, respectively, thereunder. Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any applicable Intercreditor Agreement (if entered into) and (b) hereby authorizes and instructs the Administrative Agent and Collateral Agent to enter into any Intercreditor Agreement (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, such agreements (subject, if applicable, to the last sentence of Section 9.02(b)), and to subject the Liens on the Collateral securing the Secured Obligations to the provisions thereof).

SECTION 9.19    <u>Cashless Settlement</u>.

Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

SECTION 9.20    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

223

SECTION 9.21    Certain ERISA Matters

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and any Joint Lead Arranger and any of their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise ) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, and the conditions for exemptive relief thereunder are and will continue to be satisfied in connection therewith,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, and (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14. and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender, or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, and any Joint Lead Arranger or any of their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the Administrative Agent, any Joint Lead Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

224

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**," and each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 9.23 <u>Disqualified Lenders and Net Short Positions</u>. Notwithstanding anything to the contrary herein or in any Loan Document, no Net Short Lender shall have the right to approve or disapprove any amendment, waiver or consent pursuant to Section 9.02 or under any Loan Document. In connection with any determination as to whether the requisite Lenders (including whether the Required Lenders or Required Revolving Lenders) have provided any amendment, waiver or consent pursuant to Section 9.02 or under any other Loan Document:

(a)     Net Short Lenders shall not be considered, and

(b)     Net Short Lenders shall be deemed to have consented to any such amendment, waiver or consent with respect to its interest as a Lender in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Net Short Lenders.

Each Lender that is not an Unrestricted Lender that delivers a written consent to any amendment, waiver or consent pursuant to Section 9.02 or under any other Loan Document shall concurrently deliver (or in the absence of any written Net Short Representation will be deemed to have delivered, concurrently with providing such consent) to the Borrower (with a copy to the Administrative Agent) a Net Short Representation.

*[Remainder of Page Intentionally Left Blank.]*

225

**List of Subsidiaries of Gogo Inc.**

| Name of Subsidiary | Jurisdiction of Organization | Ownership Percentage |
|---|---|---|
| AC BidCo LLC | Delaware | 100% |
| Gogo Business Aviation LLC | Delaware | 100% |
| Gogo Connectivity Ltd. | Canada | 100% |
| Gogo Finance Co. Inc. | Delaware | 100% |
| Gogo Intermediate Holdings LLC | Delaware | 100% |

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-264687 on Form S-3 and Registration Statement Nos. 333-189594, 333-212072, 333-219777, 333-225716, and 333-238295 on Form S-8 of our reports dated February 28, 2023, relating to the financial statements of Gogo Inc. and the effectiveness of Gogo Inc.'s internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended December 31, 2022.

/s/ Deloitte & Touche LLP

Chicago, Illinois
February 28, 2023

**Gogo Inc.**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO RULE 13a-14(a) OF THE EXCHANGE ACT, AS AMENDED,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

**I, Oakleigh Thorne, certify that:**

1.  I have reviewed this Annual Report on Form 10-K of Gogo Inc.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   February 28, 2023

/s/ Oakleigh Thorne
_____
Oakleigh Thorne
Chief Executive Officer and Chairman of the Board
(Principal Executive Officer)

Exhibit 31.2

**Gogo Inc.**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO RULE 13a-14(a) OF THE EXCHANGE ACT, AS AMENDED,**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

**I, Barry Rowan, certify that:**

1. I have reviewed this Annual Report on Form 10-K of Gogo Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 28, 2023

/s/ Barry Rowan
Barry Rowan
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32.1**

**Gogo Inc.**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002**

I, Oakleigh Thorne, President and Chief Executive Officer of Gogo Inc. (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

(1) the Annual Report on Form 10-K of the Company for the year ended December 31, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods presented therein.

Date:    February 28, 2023

/s/ Oakleigh Thorne
Oakleigh Thorne
Chief Executive Officer and Chairman of the Board
(Principal Executive Officer)

Exhibit 32.2

**Gogo Inc.**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002**

I, Barry Rowan, Executive Vice President and Chief Financial Officer of Gogo Inc. (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

   (1)   the Annual Report on Form 10-K of the Company for the year ended December 31, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

   (2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods presented therein.

Date:    February 28, 2023

/s/ Barry Rowan
_____
Barry Rowan
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

# EXHIBIT B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): February 28, 2023

# GOGO INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-35975** | **27-1650905** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **105 Edgeview Dr., Suite 300** | |
|---|---|
| **Broomfield, CO** | **80021** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
**303-301-3271**

**Not Applicable**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common stock, par value $0.0001 per share | GOGO | NASDAQ Global Select Market |
| Preferred Stock Purchase Rights | GOGO | NASDAQ Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02. RESULTS OF OPERATIONS AND FINANCIAL CONDITION.**

On February 28, 2023, Gogo Inc. issued a press release announcing its results of operations for the fourth quarter ended December 31, 2022. A copy of the press release is attached hereto as Exhibit 99.1.

**Item 9.01. FINANCIAL STATEMENTS AND EXHIBITS.**

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated February 28, 2023. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

      Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GOGO INC.


**By:**  /s/ Barry Rowan
       Barry Rowan
       Executive Vice President and
       Chief Financial Officer

Date: February 28, 2023

---

**Investor Relations Contact:**
Will Davis
+1 917-519-6994
wdavis@gogoair.com

**Media Relations Contact:**
Dave Mellin
+1 303-301-3606
pr@gogoair.com

**Gogo Announces Record Fourth Quarter and 2022 Results, Provides 2023 Guidance and Updates Long Term Targets**

*Record Fourth Quarter Revenue of $108.2 million, up 17% Year-over-Year; Net Income from Continuing Operations of $27.7 million; and Record Adjusted EBITDA[1] of $46.2 million, up 17% Year-over-Year*

*Record Full Year Revenue of $404.1 million, up 20% Year-over-Year; Net Income from Continuing Operations of $92.1 million; and Adjusted EBITDA of $173.8 million*

**BROOMFIELD, CO - February 28, 2023** – Gogo Inc. (NASDAQ: GOGO) ("Gogo" or the "Company"), the world's largest provider of broadband connectivity services for the business aviation market, today announced its financial results for the quarter and full-year ended December 31, 2022.

**Q4 2022 Highlights**

- Record total revenue of $108.2 million increased 17% compared to Q4 2021, fueled by strong growth in both service and equipment revenue.

  o Record service revenue of $77.3 million increased 12% compared to Q4 2021 and 3% compared to Q3 2022.

  o Record equipment revenue of $30.8 million increased 34% compared to Q4 2021 and 2% compared to Q3 2022.

- AVANCE equipment units shipped totaled a record 390, an increase of 36% compared to Q4 2021 and a slight increase compared to the previous quarterly record set in Q3 2022.

- Total ATG aircraft online ("AOL") reached 6,935 an increase of 8% compared to Q4 2021 and 2% compared to Q3 2022.

  o Total AVANCE units online grew to 3,279, an increase of 31% compared to Q4 2021 and 6% compared to Q3 2022. AVANCE units comprised more than 47% of total AOL as of December 31, 2022, up from 39% as of December 31, 2021.

- Average Monthly Revenue per ATG aircraft online ("ARPU") of $3,370 increased 2% compared to Q4 2021 and decreased slightly compared to Q3 2022.

- Net income from continuing operations decreased to $27.7 million from $209.1 million in Q4 2021. Q4 2022 net income from continuing operations is net of a $3.0 million income tax provision compared to an income tax benefit of $187.7 million in Q4 2021.

  o Diluted earnings per share from continuing operations was $0.21 compared to $1.57 in Q4 2021, driven primarily by the income tax benefit in Q4 2021.

- Record Adjusted EBITDA[1] of $46.2 million, which includes approximately $1 million of expenses related to Global Broadband, increased 17% compared to Q4 2021 and 6% compared to Q3 2022.

- Cash provided by operating activities from continuing operations of $31.5 million in Q4 2022 increased from $30.3 million in the prior year period.

  o Free Cash Flow[1] was $25.0 million in Q4 2022 compared to $25.7 million in the prior year period and increased from $8.5 million in Q3 2022.

1

o   Cash, cash equivalents and short-term investments totaled $175.3 million as of December 31, 2022 compared to $152.2 million as of September 30, 2022. Cash and cash equivalents reflect the Company's September repurchase of 1.5 million shares of common stock for $18.4 million in a private transaction.

**Full Year 2022 Highlights**

- Record total revenue of $404.1 million increased 20% compared to 2021.

  o   Record service revenue of $296.3 million increased 14% compared to 2021.

  o   Record equipment revenue of $107.7 million increased 42% compared to 2021.

- Record ARPU of $3,349 increased 3% compared to 2021.

- Net income from continuing operations decreased to $92.1 million compared to $156.6 million in 2021.  The prior year included a $187.2 million tax benefit.

- Adjusted EBITDA[1] of  $173.8 million increased 15% compared to 2021.

- Cash provided by operating activities from continuing operations increased to $103.4 million compared to $66.7 million in 2021.

- Free Cash Flow[1] increased to $57.8 million compared to $49.4 million in 2021.

"Our equipment revenue surged, which bodes well for future service revenue, as Gogo met extraordinary demand for inflight connectivity and delivered a 50% increase in equipment shipments despite global supply chain constraints in 2022," said Oakleigh Thorne, Chairman and CEO. "We're also on track to commercially launch our 5G service in Q4 this year, and our LEO-based Global Broadband product in the second half of 2024."

"Our strong financial results underpin our confidence in our financial targets," said Barry Rowan, Executive Vice President and CFO.  "We have extended our long-term revenue growth target of 17% from 2022 through 2027 and reiterate our target for over $200 million in Free Cash Flow beginning in 2025."

**2023 Financial Guidance and Long-Term Financial Targets**

The Company is providing the following guidance for 2023:

- Total revenue in the range of $440 million to $455 million.

- Adjusted EBITDA[1] of $150 million to $160 million, reflecting operating expenses of approximately $30 million for strategic and operational initiatives including Gogo 5G and Global Broadband.

- Free Cash Flow[1] of $80 million to $90 million. Free Cash Flow includes capital expenditures of approximately $30 million to $40 million, of which $20 million is tied to Gogo 5G.

The Company provides the following long-term financial targets:

- Revenue growth at a compound annual growth rate of approximately 17% from 2022 through 2027, with Global Broadband contributing to revenue beginning in 2025.

- Annual Adjusted EBITDA Margin[1] in the mid-40% range by 2027.

- Free Cash Flow[1] of more than $200 million beginning in 2025 and growing thereafter, consistent with the prior target.

The Company's 2023 financial guidance and long-term targets include Gogo 5G and Global Broadband but do not reflect the impact of the Federal Communications Commission's Secure and Trusted Communications Networks Reimbursement Program (the "FCC Program"), as the Company awaits further information regarding whether Congress will appropriate additional funds.

2

## Conference Call

The Company will host its fourth quarter conference call on February 28, 2023 at 8:30 a.m. ET. A live webcast of the conference call, as well as a replay, will be available online on the Investor Relations section of the Company's investor website at http://ir.gogoair.com.

Participants can also join the call by dialing +1 844-543-0451 (within the United States and Canada).  Please click on the below link to retrieve your unique conference ID to use to access the earnings call:

https://register.vevent.com/register/BI289cacc58c4d42f7a3edc43627bc60a0

## Non-GAAP Financial Measures

We report certain non-GAAP financial measurements, including Adjusted EBITDA and Free Cash Flow, in the supplemental tables below, and we refer to Adjusted EBITDA Margin in our discussion of long-term baseline targets above. Management uses Adjusted EBITDA, Adjusted EBITDA Margin and Free Cash Flow for business planning purposes, including managing our business against internally projected results of operations and measuring our performance and liquidity. These supplemental performance measures also provide another basis for comparing period-to-period results by excluding potential differences caused by non-operational and unusual or non-recurring items. These supplemental performance measurements may vary from and may not be comparable to similarly titled measures used by other companies. Adjusted EBITDA, Adjusted EBITDA Margin and Free Cash Flow are not recognized measurements under accounting principles generally accepted in the United States, or GAAP; when analyzing our performance with Adjusted EBITDA or Adjusted EBITDA Margin or liquidity with Free Cash Flow, as applicable, investors should (i) evaluate each adjustment in our reconciliation to the corresponding GAAP measure, and the explanatory footnotes regarding those adjustments, (ii) use Adjusted EBITDA and Adjusted EBITDA Margin in addition to, and not as an alternative to, net income (loss) attributable to common stock as a measure of operating results, and (iii) use Free Cash Flow in addition to, and not as an alternative to, consolidated net cash provided by (used in) operating activities when evaluating our liquidity. No reconciliation of the forecasted amounts of Adjusted EBITDA for fiscal 2023, Adjusted EBITDA Margin for fiscal 2027 and Free Cash Flow for fiscal 2025 is included in this release because we are unable to quantify certain amounts that would be required to be included in the corresponding GAAP measure without unreasonable efforts and we believe such reconciliation would imply a degree of precision that would be confusing or misleading to investors.

## Cautionary Note Regarding Forward-Looking Statements

*Certain disclosures in this press release and related comments by our management include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, without limitation, statements regarding our business outlook, industry, business strategy, plans, goals and expectations concerning our market position, international expansion, future technologies, future operations, margins, profitability, future efficiencies, capital expenditures, liquidity and capital resources and other financial and operating information. When used in this discussion, the words "anticipate," "assume," "believe," "budget," "continue," "could," "estimate," "expect," "forecast," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "future" and the negative of these or similar terms and phrases are intended to identify forward-looking statements in this press release. Forward-looking statements are based on our current expectations regarding future events, results or outcomes. These expectations may or may not be realized. Although we believe the expectations reflected in the forward-looking statements are reasonable, we can give you no assurance these expectations will prove to have been correct. Some of these expectations may be based upon assumptions, data or judgments that prove to be incorrect. Actual events, results and outcomes may differ materially from our expectations due to a variety of known and unknown risks, uncertainties and other factors. Although it is not possible to identify all of these risks and factors, they include, among others, the following: our ability to continue to generate revenue from the provision of our connectivity services; our reliance on our key OEMs and dealers for equipment sales; the impact of competition; our reliance on third parties for equipment*

3

*components and services; the impact of global supply chain and logistics issues and increasing inflation; our ability to expand our business outside of the United States; our ability to recruit, train and retain highly skilled employees; the impact of pandemics or other outbreaks of contagious diseases, including the COVID-19 pandemic, and the measures implemented to combat them; the impact of adverse economic conditions; our ability to fully utilize portions of our deferred tax assets; the impact of increased attention to climate change, ESG matters and conservation measures; our ability to evaluate or pursue strategic opportunities; our ability to develop and deploy Gogo 5G, Global Broadband or other next generation technologies; our ability to maintain our rights to use our licensed 3Mhz of ATG spectrum in the United States and obtain rights to additional spectrum if needed; the impact of service interruptions or delays, technology failures, equipment damage or system disruptions or failures; the impact of assertions by third parties of infringement, misappropriation or other violations; our ability to innovate and provide products and services; our ability to protect our intellectual property rights; the impact of our use of open-source software; the impact of equipment failure or material defects or errors in our software; our ability to comply with applicable foreign ownership limitations; the impact of government regulation of the internet and conflict minerals; our possession and use of personal information; risks associated with participation in the FCC Program, should we decide to participate; our ability to comply with anti-bribery, anti-corruption and anti-money laundering laws; the extent of expenses, liabilities or business disruptions resulting from litigation; the impact of global climate change and legal, regulatory or market responses to it; the impact of our substantial indebtedness; limitations and restrictions in the agreements governing our current and future indebtedness and our ability to service our indebtedness; fluctuations in our operating results; and other events beyond our control that may result in unexpected adverse operating results.*

*Additional information concerning these and other factors can be found under the caption "Risk Factors" in our annual report on Form 10-K for the year ended December 31, 2022 as filed with the Securities and Exchange Commission on February 28, 2023.*

*Any one of these factors or a combination of these factors could materially affect our financial condition or future results of operations and could influence whether any forward-looking statements contained in this report ultimately prove to be accurate. Our forward-looking statements are not guarantees of future performance, and you should not place undue reliance on them. All forward-looking statements speak only as of the date made and we undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.*

4

**About Gogo**

Gogo is the world's largest provider of broadband connectivity services for the business aviation market. We offer a customizable suite of smart cabin systems for highly integrated connectivity, inflight entertainment and voice solutions. Gogo's products and services are installed on thousands of business aircraft of all sizes and mission types from turboprops to the largest global jets, and are utilized by the largest fractional ownership operators, charter operators, corporate flight departments and individuals.

As of December 31, 2022, Gogo reported 3,279 business aircraft flying with Gogo's AVANCE L5 or L3 system installed, 6,935 aircraft flying with its ATG systems onboard, and 4,475 aircraft with narrowband satellite connectivity installed. Connect with us at business.gogoair.com.

5

**Gogo Inc. and Subsidiaries**
**Unaudited Consolidated Statements of Operations**
*(in thousands, except per share amounts)*

| | For the Three Months Ended December 31, | | For the Years Ended December 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Service revenue | $ 77,346 | $ 69,257 | $ 296,329 | $ 259,583 |
| Equipment revenue | 30,817 | 23,043 | 107,738 | 76,133 |
| **Total revenue** | 108,163 | 92,300 | 404,067 | 335,716 |
| **Operating expenses:** | | | | |
| Cost of service revenue (exclusive of items shown below) | 16,744 | 13,846 | 64,427 | 56,103 |
| Cost of equipment revenue (exclusive of items shown below) | 21,063 | 14,510 | 71,473 | 46,092 |
| Engineering, design and development | 8,241 | 6,882 | 29,587 | 24,874 |
| Sales and marketing | 6,932 | 6,892 | 25,471 | 20,985 |
| General and administrative | 13,914 | 14,185 | 58,203 | 51,554 |
| Depreciation and amortization | 2,574 | 3,658 | 12,580 | 15,482 |
| **Total operating expenses** | 69,468 | 59,973 | 261,741 | 215,090 |
| **Operating income** | 38,695 | 32,327 | 142,326 | 120,626 |
| **Other (income) expense:** | | | | |
| Interest income | (1,455) | (46) | (2,386) | (191) |
| Interest expense | 9,430 | 10,895 | 38,872 | 67,472 |
| Loss on extinguishment of debt and settlement of convertible notes | — | — | — | 83,961 |
| Other expense, net | 11 | 14 | 123 | 25 |
| **Total other expense** | 7,986 | 10,863 | 36,609 | 151,267 |
| **Income (loss) from continuing operations before income taxes** | 30,709 | 21,464 | 105,717 | (30,641) |
| Income tax provision (benefit) | 3,039 | (187,673) | 13,658 | (187,230) |
| **Net income from continuing operations** | 27,670 | 209,137 | 92,059 | 156,589 |
| **Net income (loss) from discontinued operations, net of tax** | — | 9,572 | — | (3,854) |
| **Net income** | $ 27,670 | $ 218,709 | $ 92,059 | $ 152,735 |
| | | | | |
| **Net income (loss) attributable to common stock per share—basic:** | | | | |
| Continuing operations | $ 0.22 | $ 1.89 | $ 0.75 | $ 1.50 |
| Discontinued operations | — | 0.09 | — | (0.04) |
| **Net income attributable to common stock per share—basic** | $ 0.22 | $ 1.98 | $ 0.75 | $ 1.46 |
| | | | | |
| **Net income attributable to common stock per share—diluted:** | | | | |
| Continuing operations | $ 0.21 | $ 1.57 | $ 0.71 | $ 1.28 |
| Discontinued operations | — | 0.03 | — | — |
| **Net income attributable to common stock per share—diluted** | $ 0.21 | $ 1.60 | $ 0.71 | $ 1.28 |
| | | | | |
| **Weighted average number of shares** | | | | |
| Basic | 128,447 | 109,907 | 123,268 | 103,400 |
| Diluted | 133,053 | 134,027 | 133,923 | 127,205 |

6

**Gogo Inc. and Subsidiaries**
**Unaudited Consolidated Balance Sheets**
*(in thousands)*

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Assets** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 150,550 | $ 145,913 |
| Short-term investments | 24,796 | — |
| Total cash, cash-equivalents and short-term investments | 175,346 | 145,913 |
| Accounts receivable, net of allowances of $1,778 and $894, respectively | 54,210 | 37,730 |
| Inventories | 49,493 | 33,976 |
| Prepaid expenses and other current assets | 45,100 | 32,295 |
| **Total current assets** | 324,149 | 249,914 |
| **Non-current assets:** | | |
| Property and equipment, net | 104,595 | 63,672 |
| Intangible assets, net | 49,509 | 49,554 |
| Operating lease right-of-use assets | 75,261 | 70,989 |
| Other non-current assets, net of allowances of $501 and $455, respectively | 43,355 | 28,425 |
| Deferred income taxes | 162,657 | 185,133 |
| **Total non-current assets** | 435,377 | 397,773 |
| **Total assets** | $ 759,526 | $ 647,687 |
| **Liabilities and stockholders' deficit** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 13,646 | $ 17,203 |
| Accrued liabilities | 60,056 | 59,868 |
| Deferred revenue | 3,418 | 1,825 |
| Current portion of long-term debt | 7,250 | 109,620 |
| **Total current liabilities** | 84,370 | 188,516 |
| **Non-current liabilities:** | | |
| Long-term debt | 690,173 | 694,760 |
| Non-current operating lease liabilities | 79,241 | 77,329 |
| Other non-current liabilities | 7,611 | 7,236 |
| **Total non-current liabilities** | 777,025 | 779,325 |
| **Total liabilities** | 861,395 | 967,841 |
| **Stockholders' deficit** | | |
| Common stock | 14 | 11 |
| Additional paid-in capital | 1,385,933 | 1,258,477 |
| Accumulated other comprehensive income | 30,128 | 1,789 |
| Treasury stock, at cost | (158,375) | (128,803) |
| Accumulated deficit | (1,359,569) | (1,451,628) |
| **Total stockholders' deficit** | (101,869) | (320,154) |
| **Total liabilities and stockholders' deficit** | $ 759,526 | $ 647,687 |

7

**Gogo Inc. and Subsidiaries**
**Unaudited Consolidated Statements of Cash Flows**
*(in thousands)*

| | For the Years Ended December 31, | |
|---|---|---|
| | **2022** | **2021** |
| **Operating activities from continuing operations:** | | |
| Net income | $ 92,059 | $ 156,580 |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization | 12,580 | 15,482 |
| Loss on asset disposals, abandonments and write-downs | 1,577 | 141 |
| Provision for expected credit losses | 1,047 | 284 |
| Deferred income taxes | 13,170 | (187,320) |
| Stock-based compensation expense | 19,065 | 13,345 |
| Amortization of deferred financing costs and interest rate caps | 3,215 | 4,661 |
| Accretion of debt discount | 456 | 419 |
| Loss on extinguishment of debt and settlement of convertible notes | — | 83,961 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (17,482) | 1,925 |
| Inventories | (15,517) | (5,862) |
| Prepaid expenses and other current assets | 8,351 | (20,844) |
| Contract assets | (2,164) | (5,638) |
| Accounts payable | (2,540) | 3,806 |
| Accrued liabilities | (12,031) | 14,099 |
| Deferred revenue | 1,589 | (1,282) |
| Accrued interest | 3,647 | (8,604) |
| Other non-current assets and liabilities | (3,617) | 1,535 |
| **Net cash provided by operating activities from continuing operations** | 103,405 | 66,697 |
| **Investing activities from continuing operations:** | | |
| Proceeds from sale of property and equipment | — | 1,000 |
| Purchases of property and equipment | (43,914) | (4,264) |
| Acquisition of intangible assets—capitalized software | (6,000) | (4,396) |
| Proceeds from (purchase of) interest rate caps | 4,292 | (8,629) |
| Purchases of short-term investments | (24,796) | — |
| **Net cash used in investing activities from continuing operations** | (70,418) | (16,289) |
| **Financing activities from continuing operations:** | | |
| Redemption of senior secured notes | — | (1,023,146) |
| Proceeds from term loan, net of discount | — | 721,375 |
| Payment of debt issuance costs | — | (21,103) |
| Repurchases of common stock | (18,375) | — |
| Payments on term loan | (7,250) | (3,625) |
| Payments on finance leases | (184) | (145) |
| Stock-based compensation activity | (2,579) | (4,393) |
| **Net cash used in financing activities from continuing operations** | (28,388) | (331,037) |
| **Cash flows from discontinued operations:** | | |
| Net cash used in operating activities | — | (1,211) |
| Net cash used in investing activities | — | (7,802) |
| Net cash used in financing activities | — | — |
| **Net cash used in discontinued operations** | — | (9,013) |
| Effect of foreign exchange rate changes on cash | 13 | 40 |
| **Increase (decrease) in cash, cash equivalents and restricted cash** | 4,612 | (289,602) |
| Cash, cash equivalents and restricted cash at beginning of period | 146,268 | 435,870 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 150,880 | $ 146,268 |
| Cash, cash equivalents and restricted cash at end of period | $ 150,880 | $ 146,268 |
| Less: current restricted cash | | 25 |
| Less: non-current restricted cash | 330 | 330 |
| **Cash and cash equivalents at end of period** | $ 150,550 | $ 145,913 |
| **Supplemental Cash Flow Information:** | | |
| Cash paid for interest | $ 41,209 | $ 71,114 |
| Cash paid for taxes | 377 | 376 |
| **Non-cash investing activities:** | | |
| Purchases of property and equipment in current liabilities | $ 10,688 | $ 6,126 |

8

**Gogo Inc. and Subsidiaries**
**Supplemental Information – Key Operating Metrics**

| | For the Three Months Ended December 31, | | | | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2022 | | 2021 |
| Aircraft online (at period end) | | | | | | | | |
| ATG | | | 6,935 | | 6,400 | | 6,935 | | 6,400 |
| Satellite | | | 4,475 | | 4,567 | | 4,475 | | 4,567 |
| Average monthly connectivity service revenue per aircraft online | | | | | | | | |
| ATG | $ | | 3,370 | $ | 3,301 | $ | 3,349 | $ | 3,238 |
| Satellite | | | 284 | | 254 | | 268 | | 250 |
| Units sold | | | | | | | | |
| ATG | | | 390 | | 286 | | 1,334 | | 869 |
| Satellite | | | 62 | | 36 | | 206 | | 205 |
| Average equipment revenue per unit sold (in thousands) | | | | | | | | |
| ATG | $ | | 67 | $ | 69 | $ | 68 | $ | 71 |
| Satellite | | | 44 | | 63 | | 49 | | 54 |

- *ATG aircraft online.* We define ATG aircraft online as the total number of business aircraft for which we provide ATG services as of the last day of each period presented. This number excludes aircraft receiving ATG service as part of the ATG Network Sharing Agreement with Intelsat.

- *Satellite aircraft online.* We define satellite aircraft online as the total number of business aircraft for which we provide narrowband satellite services as of the last day of each period presented.

- *Average monthly connectivity service revenue per ATG aircraft online.* We define average monthly connectivity service revenue per ATG aircraft online as the aggregate ATG connectivity service revenue for the period divided by the number of months in the period, divided by the number of ATG aircraft online during the period (expressed as an average of the month end figures for each month in such period). Revenue share earned from the ATG Network Sharing Agreement with Intelsat is excluded from this calculation.

- *Average monthly connectivity service revenue per satellite aircraft online.* We define average monthly connectivity service revenue per satellite aircraft online as the aggregate narrowband satellite connectivity service revenue for the period divided by the number of months in the period, divided by the number of narrowband satellite aircraft online during the period (expressed as an average of the month end figures for each month in such period).

- *Units sold.* We define units sold as the number of ATG or narrowband satellite units for which we recognized revenue during the period.

- *Average equipment revenue per ATG unit sold.* We define average equipment revenue per ATG unit sold as the aggregate equipment revenue from all ATG units sold during the period, divided by the number of ATG units sold.

- *Average equipment revenue per satellite unit sold.* We define average equipment revenue per satellite unit sold as the aggregate equipment revenue earned from all narrowband satellite units sold during the period, divided by the number of narrowband satellite units sold.

**Gogo Inc. and Subsidiaries**
**Supplemental Information – Revenue and Cost of Revenue**
*(in thousands, unaudited)*

| | For the Three Months Ended December 31, | | | | % Change | For the Years Ended December 31, | | | | % Change |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | 2022 over 2021 | | 2022 | | 2021 | 2022 over 2021 |
| Service revenue | $ | 77,346 | $ | 69,257 | 11.7 % | $ | 296,329 | $ | 259,583 | 14.2 % |
| Equipment revenue | | 30,817 | | 23,043 | 33.7 % | | 107,738 | | 76,133 | 41.5 % |
| Total revenue | $ | 108,163 | $ | 92,300 | 17.2 % | $ | 404,067 | $ | 335,716 | 20.4 % |

| | For the Three Months Ended December 31, | | | | % Change | For the Years Ended December 31, | | % Change |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | 2022 over 2021 | 2022 | 2021 | 2022 over 2021 |
| Cost of service revenue [(1)] | $ | 16,744 | $ | 13,846 | 20.9 % | $ 64,427 | $ 56,103 | 14.8 % |
| Cost of equipment revenue [(1)] | $ | 21,063 | $ | 14,510 | 45.2 % | $ 71,473 | $ 46,092 | 55.1 % |

[(1)] Excludes depreciation and amortization expense.

9

**Gogo Inc. and Subsidiaries**
**Reconciliation of GAAP to Non-GAAP Measures**
*(in thousands, unaudited)*

| | For the Three Months Ended December 31, | | For the Years Ended December 31, | | For the Three Months Ended September 30, |
|---|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 | 2022 |
| **Adjusted EBITDA:** | | | | | |
| Net income attributable to common stock (GAAP) | $ 27,670 | $ 218,709 | $ 92,059 | $ 152,735 | $ 20,176 |
| Interest expense | 9,430 | 10,895 | 38,872 | 67,472 | 8,781 |
| Interest income | (1,455) | (46) | (2,386) | (191) | (690) |
| Income tax provision (benefit) | 3,039 | (187,673) | 13,658 | (187,230) | 7,980 |
| Depreciation and amortization | 2,574 | 3,658 | 12,580 | 15,482 | 2,716 |
| EBITDA | 41,258 | 45,543 | 154,783 | 48,268 | 38,963 |
| Stock-based compensation expense | 4,964 | 3,201 | 19,065 | 13,345 | 4,690 |
| (Income) loss from discontinued operations | — | (9,572) | — | 3,854 | — |
| Loss on extinguishment of debt and settlement of convertible notes | — | — | — | 83,961 | — |
| Separation costs related to CA sale | — | 380 | — | 1,550 | — |
| Adjusted EBITDA | $ 46,222 | $ 39,552 | $ 173,848 | $ 150,978 | $ 43,653 |
| **Free Cash Flow:** | | | | | |
| Net cash provided by operating activities (GAAP) | $ 31,466 | $ 30,342 | $ 103,405 | $ 66,697 | $ 27,699 |
| Consolidated capital expenditures | (9,982) | (4,656) | (49,914) | (8,660) | (19,982) |
| Proceeds from (purchase of) interest rate caps | 3,489 | — | 4,292 | (8,629) | 803 |
| Free cash flow | $ 24,973 | $ 25,686 | $ 57,783 | $ 49,408 | $ 8,520 |

(1)   See Unaudited Consolidated Statements of Cash Flows

**Gogo Inc. and Subsidiaries**

**Reconciliation of Estimated Full-Year GAAP Net Cash**

**Provided by Operating Activities to Non-GAAP Measures**

*(in millions, unaudited)*

| | FY 2023 Range | |
|---|---|---|
| | Low | High |
| **Free Cash Flow:** | | |
| Net cash provided by operating activities (GAAP) | $ 85 | $ 105 |
| Consolidated capital expenditures | (30) | (40) |
| Proceeds from interest rate caps | 25 | 25 |
| Free cash flow | $ 80 | $ 90 |

*Definition of Non-GAAP Measures*

EBITDA represents net income attributable to common stock before interest expense, interest income, income taxes and depreciation and amortization expense.

Adjusted EBITDA represents EBITDA adjusted for (i) stock-based compensation expense included in the results of continuing operations, (ii) the results of discontinued operations, including stock-based compensation expense, (iii) loss on extinguishment of debt and settlement of convertible notes and (iv) separation costs related to the sale of CA. Our management believes that the use of Adjusted EBITDA eliminates items that management believes have less bearing on our operating performance, thereby highlighting trends in our core business which may not otherwise be apparent. It also provides an assessment of controllable expenses, which are indicators management uses to determine whether current spending decisions need to be adjusted in order to meet financial goals and achieve optimal financial performance.

10

We believe that the exclusion of stock-based compensation expense from Adjusted EBITDA is appropriate given the significant variation in expense that can result from using the Black-Scholes model to determine the fair value of such compensation. The fair value of our stock options is determined using the Black-Scholes model and varies based on fluctuations in the assumptions used in this model, including inputs that are not necessarily directly related to the performance of our business, such as the expected volatility, the risk-free interest rate and the expected life of the options. Therefore, we believe that the exclusion of this cost provides a clearer view of the operating performance of our business. Further, stock option grants made at a certain price and point in time do not necessarily reflect how our business is performing at any particular time. While we believe that investors should have information about any dilutive effect of outstanding options and the cost of that compensation, we also believe that stockholders should have the ability to consider our performance using a non-GAAP financial measure that excludes these costs and that management uses to evaluate our business.

We believe it is useful for an understanding of our operating performance to exclude the results of our discontinued operations from Adjusted EBITDA because they are not part of our ongoing operations.

We believe it is useful for an understanding of our operating performance to exclude the loss on extinguishment of debt and settlement of convertible notes from Adjusted EBITDA because this activity is not related to our operating performance.

We believe it is useful for an understanding of our operating performance to exclude separation costs related to the sale of CA from Adjusted EBITDA for the three and twelve months ended December 31, 2021 because of the non-recurring nature of this activity.

We also present Adjusted EBITDA as a supplemental performance measure because we believe that this measure provides investors, securities analysts and other users of our consolidated financial statements with important supplemental information with which to evaluate our performance and to enable them to assess our performance on the same basis as management.

Adjusted EBITDA Margin represents Adjusted EBITDA divided by total revenue. We present Adjusted EBITDA Margin as a supplemental performance measure because we believe that it provides meaningful information regarding our operating efficiency.

Free Cash Flow represents net cash provided by operating activities, plus the proceeds from our interest rate caps, less purchases of property and equipment and the acquisition of intangible assets and cash paid to purchase our interest rate caps. We believe that Free Cash Flow provides meaningful information regarding our liquidity.

To conform to current year presentation, we included the cash paid for our interest rate caps in Free Cash Flow for the twelve-month period ended December 31, 2021. We believe it is useful for an understanding of our liquidity to include the cash flows associated with interest rate caps to facilitate a more consistent comparison of net cash paid for interest and the interest rate changes for which we are hedged.

11

# EXHIBIT C

Transcripts



# Gogo Inc. (GOGO) Q4 2022 Earnings Call Transcript

Feb. 28, 2023 3:23 PM ET | **Gogo Inc. (GOGO)**



**SA Transcripts**
134.79K Followers

## Q4: 2023-02-28 Earnings Summary

▶ **Play Call**    **Press Release**

EPS of $0.21 beats by $0.06 | Revenue of $108.16M (17.19% Y/Y) beats by $1.01M

Gogo Inc. (NASDAQ:GOGO) Q4 2022 Results Conference Call February 28, 2023 8:30 AM ET

**Company Participants**

Will Davis - Vice President of Investor Relations

Oakleigh Thorne - Chairman and CEO

Barry Rowan - Executive Vice President and CFO

Jessi Betjemann - Senior Vice President, Finance, Chief Accounting Officer and Treasurer

**Conference Call Participants**

Ric Prentiss - Raymond James

Scott Searle - ROTH Capital Markets

Lance Vitanza - Cowen

Louie DiPalma - William Blair

Thank you for standing by. And welcome to the Gogo's Fourth Quarter 2022 Earnings Conference Call. At this time, all participants are in listen-only mode. After the speakers' presentation, there will be a question-and-answer session [Operator Instructions]. As a reminder, today's call is being recorded.

I would now like to turn the conference over to your host, Mr. Will Davis, Vice President of Investor Relations. Please go ahead.

**Will Davis**

Thank you, Valorie, and good morning, everyone. Welcome to Gogo's fourth quarter 2022 earnings conference call. Joining me today to talk about our results are Oakleigh Thorne, Chairman and CEO; Barry Rowan, Executive Vice President and CFO; and Jessi Betjemann, who will assume the role of Gogo's CFO on March 11, 2023. Before we get started, I would like to take this opportunity to remind you that during the course of this call, we may make forward-looking statements regarding future events and the future performance of the company. And we caution you to consider the risk factors that could cause actual results to differ materially from those in the forward-looking statements on the conference call. Those risk factors are described in our earnings release filed this morning and are more fully detailed under risk factors in our annual report on Form 10-K and 10-Q and other documents we have filed with the SEC. In addition, please note that the date of this conference call is February 28, 2023. Any forward-looking statements that we make today are based on assumptions as of this date. We undertake no obligation to update these statements as a result of more information or future events. During the call, we'll present both GAAP and non-GAAP financial measures. We've included a reconciliation and explanation of adjustments and other considerations of our non-GAAP measures to the most comparable GAAP measures in our fourth quarter earnings release. This call is being broadcast on the Internet and available on the Investor Relations Web site at ir.gogoair.com. The earnings press release is also available on the Web site. After management comments, we'll host a Q&A session with the financial community only.

It is now my great pleasure to turn the call over to Oakleigh.

**Oakleigh Thorne**

Thanks Will. And good morning, everyone. Thanks for joining us. Our 2022 fourth
quarter capped off a great year for Gogo. We exceeded our growth expectations and
positioned ourselves for continued long term growth and value creation. Our industry is
seeing seismic shifts in demand coming out of COVID. Thanks to our talented Gogo
team and strong operating infrastructure, Gogo stood atop the avionics electronics
industry in its ability to scale and meet that demand. We expect those demand drivers
to continue and we'll continue investing in improving our products and services to meet
that demand and maintain our leading position in the business aviation in flight
connectivity industry. As I mentioned, 2022 was a very busy year. Together the Gogo
team achieved a lot and released the 1.5 million flight milestone on our AVANCE
platform since launch in 2017, cementing its position as the most successful broadband
product launch ever in business aviation. We completed the multiyear simplification of
our capital structure and reduced our net leverage ratio to below our target of 4 times in
connection with the conversion of our final outstanding notes. With net leverage of
roughly 3.1 times at the year end and with ample cash on the balance sheet, we're well
positioned to execute on strategic initiatives that will ensure our long term
competitiveness. We adeptly managed supply chain in a year of strong demand and
weak supply. And many dealers tell us we were the only avionics company able to meet
their demand last year. We shipped more than 1,300 total ATG units, an all time record,
up more than 50% from 2021 and more than 20% above our additional guidance, all of
which we believe will drive a record increase in aircraft online in 2023.

We completed the 150 tower bill for our 5G network and we're on track for a fourth

quarter launch. As I'll discuss later, customers are excited and hungry to upgrade to this next level of service and we're actively selling, shipping and installing 5G equipment. We aim partnerships with OneWeb and Hughes to deliver the world's first low Earth orbit global broadband product size to fit on all BA aircraft. This initiative will take us from serving single digit megabits per second today to delivering hundreds of megabits per second for the high performance segment of the BA market over the next few years. We did that by aiming to build a much smaller antenna than competitive LEO and GEO satellite providers. As we aim to be the disruptor of the disruptee in the rapidly evolving satellite IFC space. And finally, not to be overlooked, we continued our strong track record of financial performance. We raised our fiscal 2022 financial guidance every quarter and ultimately delivered record performance at the high end or above those raised expectations. While we're happy with our progress, it's far more important to focus on our future. And the 2023 financial guidance and long term targets that Jessi will cover demonstrate our confidence in our business and in our value creation opportunity. So I'll focus the rest of my remarks on two areas. First, with some key highlights and market drivers of Gogo's strong fourth quarter results and second, update on our strategic thinking and progress against our strategic initiatives.

So let's start with our Q4 performance. At the end of the year on a high note, we delivered record fourth quarter revenue of $108.2 million, up nearly 17% over prior year fueled by record service revenue and record equipment revenue. We added 158 new service revenue producing AVANCE units and ended the year with 47% of our fleet on AVANCE. Adding additional AVANCE units online is central to our growth strategy. First, it drives incurring high margin service revenue. And second, it extends customer lifetimes by offering upgrades to new technologies like 5G and GBB that are easier and cheaper to execute than moving to competitor's solutions. As I've mentioned, we shipped a record 390 AVANCE units in the quarter and we anticipate those will help drive record activations in 2023. On the bottom line, Gogo delivered record fourth quarter adjusted EBITDA of $46.2 million, up 17% year-over-year, driven predominantly by growth in service and equipment revenue. We're really pleased that we can deliver this kind of bottom line performance even as we invest in strategic initiatives like 5G and GBB. We believe the strong demand we're seeing is result of a structural change in BA passenger demand, evidenced by Gogo flight counts being up 31% for the quarter when compared to pre-COVID Q4 2019. That change is driven by a number of factors, including a large cohort of buyers that tried private aviation during COVID and plan to keep funding private aviation, a shift in passenger demographics for Gens X, Y and Z through demand connectivity when traveling and a digital transformation on all passengers lived their lives whether that's their social lives and work lives, and the ways to drive demand for more high bandwidth applications.

The impact that digital transformation is evident in Gogo data consumption. Consumption per passenger hour grew 17% year-over-year in the fourth quarter, and was up 50% from 2019 for full year. One recent trend of note is the return of corporate flight department activity with [part 91 owners], which represents 59% of Gogo and [Indiscernible] flying 23% more flights in 2022 than in pre-COVID 2019 and nearly 46% more data per hour than they did in 2019. As a result of all this activity, we saw significant demand pull across our distribution channels. And both our dealer and OEM partners have told us they could have installed more aircraft with Gogo if it were not for sortages in labor and/or parts from their other suppliers. We saw a big surge in shipments in Q3 to Q4 and especially in December, as partners placed large orders to beat in January 1st price increase. As we look at our inventory in the field, we see shipments to channel inventory levels that are consistent with prior years. And when we look specifically at where the largest stockpiles are they're at our largest OEMs and dealers who choose to move those inventories fairly quickly. As we look ahead, we expect to return to more normal pre-COVID order patterns. Our lead times are down to three months and we build enough buffer stock that we can easily handle drop in orders. And from a supply perspective we've got clear line of sight to meet almost all component demand for 2023, and our current backlog is sitting at more than 50% of our equipment budget. That said, we had a very strong December, which has led to January and February being a little lighter than planned. However, March owners are back on track and we expect to return to normal high volumes for the rest of the year.

Now let me turn to our current strategic thinking and an update on our major strategic initiatives. As the supply chain environment has stabilized in recent months, we've now turned our attention to better understanding why 70% of North American and 95% of the rest of world aircraft have no broadband connectivity. As examples, for some it's the cost of installs; for others, its quality and current solutions; for others, it's there is no broadband solution that fits on their aircraft. There are many other inhibitors as well. But taking a systematic approach to tackling those inhibitors to accelerate our growth with the following three pronged strategy. First, expanding our service addressable market by bundling our products in different configurations to appeal to all segments of the BA market based on variables like size of aircraft, whether they fly in North America or the rest of the world, whether they want to pay more for high performance or less for a more value oriented product, and whether they fly corporate missions, private missions or some others. Given our choice of networks LEO or ATG and our various AVANCE equipment form factors.

From a performance oriented L5 to the value oriented SCS, we believe we can bundle different combinations of equipment, service and networks to fit the needs of every segment of the global market. Second, we want to continue to extend the service revenue life of Gogo equipment installed on an aircraft by continuing to drive AVANCE penetration by enhancing the performance of our ATG network to serve the North American midsize and light jet value oriented segments of the market and by providing an easy upgrade paths to new technologies for advanced customers that are cheaper than replacing our equipment with competitive products. And third, we want to provide equivalent for better network performance and superior customer service to each segment of the BA market at a lower total cost of ownership than our competition. Beyond our major 5G and GBB initiatives, we've launched a series of smaller operating initiatives to address many of the inhibitors I've described a moment ago, such as accelerating install times, further improving our award winning customer service and developing product, pricing and packaging to appeal to each segment of the BA market. These operating initiatives will add modestly to expense in 2023 and 24, but will help accelerate top line growth and a step function change in free cash flow in 2025 and beyond. We believe our focus on these areas will build an even more competitive Gogo, better positioned to capture large portion of the global business aircraft market and creating more value for customers and for our shareholders.

Now, let me turn to updates on our two major strategic initiatives, 5G and GBB, initiatives that will take us from delivering single digit megabits per second today to 10s and then 100s of megabits per second over the next few years. I'll start with 5G. As I mentioned earlier, we're now on track to commercially launch Gogo 5G in the fourth quarter of this year. In December, the chip passed critical design review, a collaborative effort in which intense scrutiny was applied and transparency exhibited across all parties working on this chip, including Samsung, GTT, Airspan and ourselves. The chip is now deep into fabrication and it's allotted to be delivered on time to hit our Q4 target. Once live, our 5G network is expected to deliver speeds roughly 5 to 10 times faster than Gogo's current ATG networks, with peak speeds up to 30 times faster. Enabling multiple streaming sessions and video conference applications be opened at the same time on the same aircraft and all at a lower cost than competing LEO or GEO satellite solutions. In the meantime, customers who want Gogo 5G service can install the AVANCE L5 today with full 5G provisions and operate on Gogo's 4G network until X3, the box with a chip [Indiscernible] is available. For those who pre-provisioned, once the X3 is ready it can be installed quickly and 5G service can begin immediately saving downtime and expense. Today, we've delivered 24 pre-provision chipsets to customers, we have 105 end customers that have signed up for pre-provisioning promotions, and we have 92 orders from dealers. Some of the dealer orders may be duplicative of customer orders. But regardless, that is a big jump from the 60 orders we had on our Q3 call. We also have commits from four OEMs and they're in discussions with several other OEMs about orders. And we have certifications in process for 19 aircraft models, representing more than 7,000 aircraft in the US fleet. And we expect further certification announcements and incremental momentum with our partners in the coming months.

Now I'll turn to GBB. First, a reminder of why LEO. LEO satellites are particularly well suited to business aviation because of their low altitude, which enables an equivalent length budget of less power than the GEO satellites, thereby enabling smaller contaminants, which can fit better into the small spaces available for antenna installation from most BA aircraft. Over the next few years, we expect LEO satellite technology will allow us to launch service plans that deliver 100s of megabits per second to meet demand from the high performance and heavy intercontinental jet segments of the BA market. Our goals for the global broadband offerings are to;one, expand our total addressable market to include the 14,000 business aircraft registered outside of North America; two, add a satellite feature for the hundreds of US super mid and heavy jets to fly global missions, but have Gogo advanced ATG installed for use over North America; and third, drive enhanced stickiness in our core North American medium sized smaller aircraft segment by offering an EV upgrade path to a LEO product if their need to pass with ATG alone can deliver. GBB will enable streaming directly from your favorite video services, multiple simultaneous video conferencing sessions, VPN access, and all the other connectivity enabled solutions you use today the same service levels you expect in your office or living room today. We continue to make great progress alongside our partners.

OneWeb, who will supply the LEO network, will complete launch of its 588 satellite global constellation in April and should have the network deployed and aero ready in 2024. And assuming their pending merger with Eutelsat closes, should have access to funding for their gen 2 network, which will further improve our GBB performance. On the antenna side, we just completed preliminary design review with our partner Hughes and have been able to move our schedule to the left by two months, and now aim to launch commercially in the second half of 2024. Our GBB product has received a very enthusiastic response from our OEMs, dealer partners and fleet managers. As we've gotten more clarity on competitive plans, it's clear that we're building -- what we're building is disruptive and highly differentiated on two key factors. First, our small form factor antenna is designed to work on all size aircraft while our -- LEO competitor has delivered a large antenna that will work best in the already very competitive heavy business jet segments of the market. The second, Gogo is focused on value. We believe our pricing will be more competitive than others in the space. Importantly, we're well positioned to leverage our existing international customer support footprint to support GBB outside the US, with 20 plus dealers already in place and 900 narrowband customers in 90 countries today.

Let me wrap up my strategic initiative update by saying that we see ATG 5G and GBB as complementary elements of our product portfolio, with 5G targeted to serve value oriented segments of the North American market where 86% of all flights take place, and GBB targeted to serve all segments outside North America in the high performance super mid and heavy jet segments inside North America. I should add that our advanced multi-bearer capability will allow us to serve the super high premium segment of North American aircraft with LEO and ATG connectivity at the same time, significantly enhancing capacity and providing redundancy for those owners who want them. Despite investments in these two very large strategic initiatives and the smaller operational investments I described earlier, we're guiding to substantial growth and free cash flow this year. And as these investments roll off, we expect step function growth in free cash flow beginning in 2025. To wrap up, our accomplishments throughout 2022 have reshaped Gogo. We're not just an ATG company. We're driving the next era of IFC technology with the launch of 5G and development of broadband LEO satellite. And the continued penetration of our AVANCE platform positions as well to extend customer lifetimes and drive free cash flow to invest in further strengthening our business and to return capital to shareholders. In short, we're more resilient, more in demand, more innovative and more poised for value creation than ever, and our team is energized and excited to deliver on the opportunity ahead in 2023.

Finally, in a moment, I'll turn the call over to Barry for his last earnings call's as Gogo's CFO. But first I want to thank him for his immense contributions to our company. Barry has been an invaluable leader during a period of unprecedented change, challenge and growth. He led us to numerous refinancing without which we would not have survived. He was essential to the sale of our commercial aviation business and he has been a trusted adviser on operational and strategic matters to me since the day I arrived in 2018. So I want to give him my personal thanks, as well as the thanks from the entire Gogo community. We wish Barry all the best in his well earned retirement. So while we'll miss Barry, it was very fortunate to have a highly qualified successor in Jessi Betjemann, who was running FP&A at Gogo for the last six and a half years, and who I credit with making sure we always hit our numbers. Jessi is also on the line today and will walk through our 2023 guidance and long term targets, as well as be available for questions at the end of our prepared remarks. There is no doubt our finance organization is set up for continued success in Jessi's capable hands. And now I'll turn it over to Barry for the notes.

**Barry Rowan**

Thanks Oakleigh, including your very kind words, really appreciate that. Good morning, everyone. We are very pleased with Gogo's performance in 2022 as we set new records both operationally and financially. Our performance demonstrates two foundational elements to Gogo investment thesis. First, we have proven our ability to deliver strong financial performance, even as we've undertaken significant strategic investments, including Gogo 5G and our Gogo broadband product. Looking ahead, we will continue these investments in 2023 and 2024 as we advance our technology and execute other operational initiatives to maintain our leadership position in the growing and underpenetrated business aviation in-flight connectivity market. We expect our free cash flow to accelerate substantially beginning in 2025 as we get these major projects behind us. Secondly, our ability to achieve these results is a testament to the strength of our underlying business model and financial position. In 2022, we met unprecedented demand for our equipment in the face of significant worldwide supply chain challenges. As these units are activated these aircraft online produce recurring high margin service revenue that is sticky and is the engine of our strong cash flow. And further, our strong balance sheet provides the flexibility to invest in our business for the long term while delivering for customers and shareholders today. The 2023 financial guidance and long term targets we announced this morning underscore our confidence in the business and our strategy. Before we discuss these in more detail, I'll walk you through our fourth quarter results.

For the fourth quarter, our record total revenue of $108.2 million grew 17% year-over-year. Our top line was driven by record service revenue of $77.3 million, up 12% year-over-year and 3% sequentially. As we have said, increasing AOL and particularly the penetration of our AVANCE products is the centerpiece of our strategy in both the North American market and globally, as we also further our GDP initiatives. In the fourth quarter, total ATG AOL increased to 6,935 units, up 8% versus the prior year and 2% versus the prior quarter. AVANCE units online grew to 3,279, up 31% year-over-year and AVANCE now comprises 47% of our total fleet. Our dealers are as busy as ever and the proportion of shipments channel inventory levels in 2022 was in line with trends for 2019 through 2021. As Oak mentioned, we expect our exceptional equipment shipment performance in 2022 to drive strong activations and service revenue growth throughout 2023. Total ATG ARPUs were 2% year-over-year to $3,370, driven by growth in revenue -- recurring revenue from subscription plans. We expect higher price data plans and the launch of Goho 5G followed by GBB to further expand to healthy growth over time. We expect the primary growth drive of service revenue to be from additional aircraft online.

Turning to the equipment side. Gogo delivered $3.8 million in equivalent revenue in the fourth quarter, a 34% increase year-over-year as we saw continuing very strong demand for our AVANCE L3 and L5 products. We shipped a record 390 AVANCE units in the quarter and 1,334 for the year, a remarkable 50% year-over-year growth in AVANCE units shipped. Gogo delivery service margin was 78% in the fourth quarter. This was a 2 percentage point decrease year-over-year due to the planned higher network costs associated with the deployment of the Gogo 5G network and an 1 percentage point increase sequentially due to lower maintenance and logistics costs. Our service margins were within our target range of 75% to 80% for '22, and we continue to expect service margins in the 75 plus percent range over a five year time horizon. As expected, equipment margins were down in the fourth quarter to [32%], 5% lower than the prior year period and 4% lower sequentially, driven by our strategic initiative to drive AVANCE penetration. This quarter also included higher excess and obsolete inventory reserves, which we regularly [refer] to as a matter of course and is related to our planned product upgrades and technology roadmap.

Now moving on to operating expenses. Fourth quarter combined engineering, design and development, sales and marketing and general and administrative expenses increased 4% year-over-year to $29.1 million, reflecting development expenses for GBB. On a sequential basis, these operating expenses were 2% lower in the fourth quarter, primarily due to lower legal fees. We anticipated that 2022 would be an investment here for Gogo. It was but not to the extent we originally planned due to pushing out of Google 5G expenses related to the chip delay. Looking ahead, we expect that 2023 and 2024 will continue to be investment years as we complete our 5G program and ramp spending for GBB. We expect to see the benefit of these investments through sustained strong top line growth and an inflection point and free cash flow growth in 2025 and beyond as we have consistently stated. I'll now describe the spending profiles of our Gogo 5G and GBB initiatives starting with Gogo 5G. As Oak mentioned, Gogo's 5G chip is now in fabrication and we're on track and on budget for commercial launch in the fourth quarter of 2023. It's worth noting that we have remained on track with the cost expectations we set back in 2019. The Gogo 5G external development and deployment costs would be approximately $100 million. As we detailed in our third quarter call, we pushed some of the Gogo 5G spending previously expected in 2022 into 2023 due to the delay in the 5G chipset availability.

In the fourth quarter of 2022, we spent $6 million for Gogo 5G, primarily in CapEx, [because] we impacted the timing shift for 5G spending from 2022 to 2023 is reflected in our 2023 financial guidance. It's particularly evident in our adjusted EBITDA expectations, which reflects both delayed 5G sales and higher 5G spending in this fiscal year. Now onto our GBB initiative. In the fourth quarter, we recorded approximately $1 million in operating expenses related to GBB. We continue to expect external development costs for GBB to be less than $50 million over three years. However, we have updated our expectations on the timing of those costs. GBB spending was approximately $4 million in 2022 and we now expect to over [ramp] to $14 million in 2023, with most of the remaining spending to occur in 2024. This is a slight pull forward from our prior view of the timing of our GBB investment. Additionally, we now anticipate that approximately 95% of GBB external development costs will be in OpEx. This spending profile is reflected in our 2023 adjusted EBITDA and free cash flow guidance.

I'll now touch on our record profitability. Gogo's record adjusted EBITDA increased 17% year-over-year to $46.2 million, primarily driven by record service and equipment revenue. We delivered net income of $27.7 million in the fourth quarter, translating to $0.22 in basic earnings per share and $0.21 in diluted earnings per share. As a reminder, our financial statements reflect non-cash income tax expense as we continue to generate positive pre-tax income. Based on our substantial NOL position, we do not expect to pay meaningful cash taxes for an extended period, but we may pay a modest amount by the end of our planning horizon. We continue to expect to see additional reversals for portions of our remaining valuation allowance against deferred tax assets within the next 12 months. In the fourth quarter, we generated $25 million in free cash flow, down slightly from $25.7 million from the prior year period due to increased CapEx associated with Gogo 5G and increased net working capital.

Now I'll turn to the discussion of our balance sheet. Gogo maintained its strong liquidity position as we ended the quarter with $175.3 million in cash and short term investments, and our $100 million revolver remains undrawn. As of the end of fourth quarter, we have $714 million in outstanding debt on our Term Loan B. Our strong balance sheet provides the foundation for Gogo's significant financial and strategic flexibility. In a moment, I'm going to turn the call over to Jessi to provide Gogo's forward-looking perspective, including our capital allocation strategy, as well as our 2023 outlook and long term targets. But first, I'll provide a quick recap of our 2022 full year results. Increasing demand from customers with connectivity and Gogo's robust business model both contributed to another year of great performance. We generated total revenue of $404.1 million, up 20% from 2021 and at the high end of our guidance range, which we increased during the year. We delivered service revenue of $296.3 million, up 14% from 2021 to service gross profit also growing 14%, which is a significant contributor to the free cash flow. Equipment revenue was $107.7 million, up a remarkable 42% from 2021. We reached adjusted EBITDA of $173.8 million for the full year, up 15% from 2021 and significantly above our guidance range, which we also increased throughout the year. Net income from continuing operations was $92.1 million for the year. The decrease versus prior net income from continued operations of $156.6 million was primarily driven by the $187.2 million income tax benefit recorded last year as a result of the partial release of our deferred tax valuation allowance. We also delivered record free cash flow of $57.8 million for 2022 even as we invested approximately $40 million in Gogo 5G CapEx. Overall, 2022 was an outstanding year for Gogo. We're proud of the results we achieved, thanks to the very hard work from our entire team. Thank you all for your relentless commitment to customer focus and innovation.

Now, I'd like to pass the mix to Jessi.

**Jessi Betjemann**

Thank you, Barry. It is a pleasure and a privilege to join you all this morning. While I've been behind the numbers for several years and have engaged with many of you on the line previously, I'm looking forward to getting to know you better as I move into my new role. I'm going to provide a brief update on our capital allocation strategy and then provide some context to the 2023 guidance and long term targets we announced this morning. We are pursuing a balanced capital allocation strategy intended to further our strategic goals and enhance shareholder value. We are focused on four priorities; first, maintaining adequate liquidity; second, investing in strategic opportunities to drive competitive positioning and financial value, including 5G and GBB; third, maintaining an appropriate level of leverage; and finally, returning capital to shareholders as appropriate in the future. Given the rise in interest rates and the current volatility of the financial markets, you can see that we are taking a more conservative approach to our balance sheet. A higher cash reserve provide us with the optionality to evaluate potential new strategic investments and preserve strategic and financial flexibility. In addition, we have previously stated our goal of maintaining a target net leverage ratio below 4 times. We ended 2022 with a net leverage ratio of 3.1 times. Looking forward, we are planning to maintain net leverage in the range of 2.5 to 3.5 times. Our strategic considerations also include the potential to pay down debt in the future. We will continue to evaluate returning capital to shareholders in conjunction with our ongoing assessment of financially attractive strategic investments in the context of the fluid macroeconomic environment.

Now, I'll turn to the guidance and long term targets we announced this morning, starting with some additional color on our 2023 projections. As a reminder, our guidance and long term targets do not reflect the impact of the Federal Communications Commission-Secure and Trusted Communications Networks Reimbursement Program. As we await further information regarding whether Congress will appropriate additional funds for eligible expenditures under this program. We expect 2023 revenue to be in the range of $440 million to $455 million. We anticipate that 2023 will be a strong year for aircraft online growth as the record equipment units we shipped in 2022 are activated, translating into solid service revenue growth. However, this growth is partially offset by lower 5G equipment sales relative to our previous expectations due to the Gogo 5G chipset delay. We anticipate 2023 adjusted EBITDA in the range of $150 million to $160 million. As Barry mentioned earlier, 2023 will be another important investment year for Gogo, particularly as we increase our investment in GBB and complete the launch of Gogo 5G. Our adjusted EBITDA expectation was approximately $30 million of [exclusive] targeted OpEx investments to drive future growth, broken down into three areas; first, $9 million in expected 5G spending, which reflects the shift of $6 million from 2022 to 2023 related to the chip delay; second, an increase in GDP spending to $14 million from our prior expectations of $10 million dollars; and finally, as Oak outlined in his remarks, increased investment in additional operational initiatives focused on penetrating the 70% of the business aviation in-flight connectivity market that remains untapped and maintaining our long term competitiveness.

We expect 2023 free cash flow of $80 million to $90 million, which at the midpoint is nearly 50% growth over 2022, even after reflecting the increased investments I just walked through. We forecast 2023 cash interest to be approximately $38 million net of the benefit of our interest rate caps and CapEx in the range of $30 million to $40 million, which includes approximately $20 million of spend for Gogo 5G. Looking further into the future. Our 2024 free cash flow or the [ramped] external spending for our GBB project, which as we mentioned, we expect to be below $50 million in aggregate. Now turning to our long term targets. We recently updated our baseline long term model, which now reflects the launch of Gogo 5G in late 2023, launching our GBB product to penetrate new global markets and investment in initiative to continue to improve our competitive positioning. Our long term targets are as follows. We expect revenue growth at a compound annual growth rate of approximately 17% from 2022 through 2027, with global broadband contributing to revenue beginning in 2025. This updated view maintains our 17% CAGR target for an additional year in spite of dropping 2022 during which revenue grew 20% as the first year. We expect annual adjusted EBITDA margin to be in the mid 40% range by 2027. This is slightly lower than prior expectations, driven by lower equipment margins to fund our strategic initiative of driving advanced penetration. It also includes investments in engineering, design and development to fund continued innovation and market competitiveness in the out years.

Importantly, we still expect to achieve significant operating leverage, as we see the potential for operating expenses as a percentage of revenue to be reduced by as much as 15 points from 2023 to the end of our planning horizon. We continue to expect free cash flow of more than $200 million in 2025 and growing in 2026 and beyond. This expectation is based on similar capital structure assumptions and underpinning our previous long term targets. Importantly, we originally set this target in September of 2021 and have maintained it in spite of since committing to the GBB project and operating in a higher interest rate environment. In conclusion, Gogo's business continues to perform extremely well. Our outlook underscores the immense value creation potential for our customers and shareholders that we expect to unlock as we execute our strategy. Now, I'll turn the call back to Barry for some closing remarks. But before I do that, I just want to give Barry my heartfelt thanks for his guidance and partnership over the years, and especially in the last year to ensure a smooth transition.

**Barry Rowan**

Thanks so much, Jessi. Before we open up the call for questions, I would like to take this opportunity to express my appreciation to Oak for your truly exemplary leadership, to Jessi for stepping up as you have, to Will for your partnership with the street, and to the entire Gogo team for your incredible support. As you know, I'll be closing a chapter of my professional life in the coming weeks, which has spanned 40 years helping build or turnaround technology driven companies, including nearly six years at Gogo. I may be retiring from Gogo but I'm not retiring from life. I look forward to this next season, which I expect to include serving on boards, contributing to the floor and investing in the next generation of leaders. Gogo is in outstanding position to achieve its significant potential for value creation through enriching our customers' lives and continuing to contribute to society along the way. It's been an absolute privilege to be a part of Gogo's transformation in partnership with our highly innovative and energized team, you are truly the best. I'm also proud to pass the baton to Jessi who's more than demonstrated her confidence, leadership and outstanding business acumen during her years at Gogo, plus she's a wonderful human being. I look forward to cheering as she open the rest of the leadership team guide Gogo into the right bright that lies ahead.

Operator, this concludes our prepared remarks and we're now ready for our first question.

**Question-and-Answer Session**

**Operator**

[Operator Instructions] Our first question comes from the line of Ric Prentiss of Raymond James.

**Ric Prentiss**

First Barry, I think our time together spans almost 20 years from all the different places I've covered and you've been at. So it's been a true pleasure working with you as well. So congrats on the next phase of life. And Jessi, glad to be working with you in your new role as well. First question is, Oak you talked a little bit about competition and how you think you guys shape up versus others that might be out there now and in the future. How should we think about what the '23 guidance and the long term guidance assumes as far as competition from whether it's LEOs or air to ground or other GEO type people, what's kind of baked into that? And it sounds like you want to be available to be very competitive in pricing, but how do we think about how competition is factored into this guidance?

So I think, you all know Starlink is entered the market at the high end, I would say, they came in with a large antenna aimed at competing with GEO satellite providers, doing the heavy JAXA segment of the market. At a pretty -- I think a price that's competitive with GEO, but a lot higher than our pricing. I think that there's going to be huge changes in the competitive landscape over the next couple of years, by virtue of the LEO entry and of course, we hope to be a driver of that, disruptor not to disruptee. And I think that's going to have a pretty significant impact on GEO providers. So from our perspective, we see ourselves accelerating revenue growth with the launch of the GBB product now in '24, accelerating revenue growth for 5G starting in -- well, the revenue goes from GBB will be '25 on, revenue growth from 5G will be '24 on. And so we think we compete very effectively. In terms of competing with Starlink, their product is installed on some aircraft, we've talked to people flown that and we kind of understand what their speeds are. And frankly, our speeds of GBB will be very competitive with those speeds and they'll be increasing their speeds over time and we'll be increasing our speeds over time as one OneWeb launches Gen 2 and we progress that partnership.

So we think on a product quality sort of pure basis we're competitive. And then when you look at all the other things that come into bear in terms of what it takes to win in the business aviation market, we think we have a real advantage. First of all, customer service is hugely important in our business. It ranges from engineering support, to billing support, to everything, and people expect very high levels of, what we'll call, white glove service in our industry and we're very good at that. We can afford to spend a lot of money serving our market, because of our scale in the vertical market. We have by far the largest share in the market and we generate a lot of cash flow out of the market, which enables us to invest in all the different elements of sales, marketing, support, engineering, et cetera, that it takes to really understand and deeply sort of integrate ourselves into the BA market. So we feel the big advantage there. We have 30 years of building very deep relationships with all the OEMs. We have contracts with all the OEMs, which are hard to do. We have 120 dealers and very deep relationships there. And we have deep relationships with the big fleet operators and with thousands of owner operators. So I think we feel that we can be very, very competitive and we feel good. And we've factored all those factors that I've mentioned a moment ago into our plan.

**Ric Prentiss**

And specific to the initiatives, should we assume that most of the GBB spending goes into EDD, and that the operational initiatives also go into kind of the EDD line?

## Jessi Betjemann

So most of that spending, as we mentioned with GBB now 95% is going to be OpEx and that will be all in GBB -- all in EDD. And yes -- but the operational initiatives as well as predominantly in EDD.

## Ric Prentiss

And final question. Any update on the lawsuits, what's going on, on the patents and the court case, I know you said I think came in lower cost than you thought in the quarter maybe?

## Oakleigh Thorne

There's a lot to update there. So first of all, I just want to repeat, we do not infringe on these patents. So I want to be very clear about that. And I'm also not going to comment on our litigation strategy or the case itself as I don't want to taint our litigation. But let me go through where things stand. So SmartSky, originally filed a patent suit against us of our own four patents. They've just added -- they've just filed with the court requesting to add two new patents. Those two new patents are essentially additive to existing families of patents that were already part of the suit. So three of those patents, there are six patents and all right now I believe, and three of those patents expire in August of 2025 and the other three expire in 2034 and 2035. There are two prongs of the litigation right now. One is the original infringement complaint and the other is the request for a temporary injunction, and I'll just cover each of them. The infringement -- I mean -- the injunction application, the judge at the presiding judge over the Maine trial, decided against SmartSky on that and did not grant a temporary injunction. They've appealed that that's in the federal district court, and that court can either essentially remand the case back to the original judge, saying that there was no abuse of discretion, which would be the standard that they'd have to apply and then the original judge would have to deal with that and either change his mind or confirm his original denial.

If the district court did not find that there was an abuse of discretion then the ruling against SmartSky on the temporary injunction would stand. The original case, the presiding judge has now scheduled trial for April 25. And like I said before, I do not believe, we do not believe, we infringe. But I want to be clear that if the judge ultimately found in favor of SmartSky, the overwhelming remedy is that there would be some sort of licensing agreement, the SmartSky sort of try to referred in their recent release, there could be a permanent injunction against us to prevent us from selling our 5G product, that would be highly unusual. And I would also note that the patents that are expiring, of course, any decision by the court there would, A, be fairly limited in terms of what the fees might be, because those patents will not be around very long after the case since the trials April 25 and the patents expire in August of 25, and I think that's about it. Any follow-up on that Ric?

**Ric Prentiss**

No, I think that's clear. We'll just keep our eyes on it. Have a good time. Look forward to seeing Jessi and Barry down for one final swansong in Orlando next week. Everyone, stay well.

**Oakleigh Thorne**

Yes, we managed to keep Barry, we hung on to him for two weeks. So that he can attend your conference…

**Operator**

Our next question comes from the line of Scott Searle of ROTH.

**Scott Searle**

Barry, I'd like to add my congratulations, best of luck going forward in your new endeavors. And Jessi, congrats. I look forward to working with you going forward. Maybe to dive in on the guidance for this year, right, we've got some elevated OpEx as a result of 5G pushing out from '22 to '23 on top of that investment cycle for GBB going up this year. I was wondering if you could extrapolate that into '24, right? 5G should start to come down, but I think the GBB cycle continues to increase a little bit. How we should be thinking about that? And also in terms of the guidance this year. I wonder if you could clarify how you're thinking about equipment gross margins? I think you've talked about possibly being a little bit more aggressive, if need be, where gross margins could be under 30%. What do you guys kind of factoring in at the current time in that guidance?

### Jessi Betjemann

So for 2024, as we mentioned, '23 and 2024 are investment nearest for us. So we will have the remaining spend, it's going to be around the $30 million to $35 million for the remaining spending GBB in 2024 and that's predominantly OpEx. We will -- that's going to get offset as we see some of the 2022 shipments are coming online in '23 and will continue to be providing service revenue in 2024, but it still will be an investment year. With regards to the equipment margins, that's right. So as you noticed our long term targets for the adjusted EBITDA did come down slightly and part of that is reflecting the lower equipment margins to be able to grow our units online and support the advanced penetration strategy that we have. Also included as part of that is continued funding in ED&D, so that we can remain competitive in the outer years where we're being cautious in that and being able to keep that level of innovation going forward.

### Barry Rowan

And I might just add that on the average sales price, to remind people, we've often talked about going down market as well as that market. And part of this, I'll call our segmentation strategy here is also going down market and penetrating down market. And as you go down market, the markets are more price sensitive. And so we sort of factored in some increased promotions or some price reductions on what I'll call more value oriented advanced form factors down market.

### Scott Searle

And I apologize if I missed this on the call. But did you give a unit number that you're targeting in 2023? And then lastly, if I could, on the ARPA front, you've done pretty well on that front, I think, over the course of '22, it's going up. A lot of moving parts, moving down market, plus you've got more unlimited plans and your 5G coming in to the back of this year. Given the current backdrop, if I look at some of the BA data in North America, utilization is flat to maybe down a little bit, still under penetrated, right? So you're growing overall units and connected aircraft. But utilization is going down a little bit. I'm wondering, is that having any near term impact on ARPAs in terms of how you're seeing for utilization, or are customers moving towards higher end plants? And how do you expect 5G to impact that as we start to get into the back of this year and into 2024?

**Oakleigh Thorne**

By utilization I'm assuming you mean aircraft utilization, not network utilization, but our network utilization is way up. Aircraft utilization and frankly, I think on Gogo equipped aircraft is up slightly. But yes, the trend is sort of leveling off. And then [Indiscernible] that looks just like it's kind of a plateau the demand for lift, but that demand is still way over where it was in 2019. And that's the structural change in the industry that's driving IFC demand, because 70% of their planes don't have anything and the people selling those aircraft, there's more demand now for IFC, given all the changes I talked about in my script in terms of the demographics and the applications people are using, et cetera. In terms of the impact on us have a slight decrease in flight count, industrywide, really not much impact. And that's for that same reason, there's just so much of this market that's unpenetrated and there's demand in that large unpenetrated portion of the market. So we don't see any impact there. I would say it's -- ARPA is not a major driver of our growth, unit counts are the main driver. And like you said, Scott, 5G will push things up a bit, going down market, deals like we have with Cirrus and others will pull it down a little bit, then ultimately GBB will push it up a it. So all these things are going to play out and that's why we don't project very large ARPA growth through the planning cycle.

**Operator**

Our next question comes from the line of Lance Vitanza of Cowen.

**Lance Vitanza**

Thanks very much for the information thus far. Barry, congratulations, it's been a pleasure working with you. And Jessi, I look forward to working with you as well. I wanted to sort of focus on the long term targets. The revenue and free cash flow targets, since you've introduced these longer term targets have been consistent, fairly consistent, thankfully, but EBITDA margin target seems to be bouncing around a bit. And I think first it was 45% in 2025 and then I think it was approaching 50% by 2026, and now it's down to 45% by 2027, I think. So just wondering if you can comment just at a high level on what's going on there and should we expect this target in particular, could remain volatile? And then I have a follow-up as well.

## Barry Rowan

I don't really view bouncing between 45% and 50% as being extremely volatile -- approaching 50, I should point out, as Jessi says. So yes, we did guide that, so 48, that was approaching 50. Maybe we're just below 47, it's 45% range. So we think those are all very healthy EBITDA margins to begin with. Second of all, I think there are two things over the course of the LTM that are impacting that. First is what I just mentioned around the average sales price on equipment. We have been introducing smaller form factors that go down market and those be priced at lower prices and they will be competitive because we want to [indiscernible] penetration down there with AVANCE platform. So that's a bit of a drag on equipment margin in the out years ago, so brought things down. And then frankly, we -- it's very hard to predict exactly what's going to happen in the competitive environment. We talked about it. Obviously, Starlink entered at the high end of the market, we don't see a lot of progress there, but they have entered. And the way we thought about that is we may need to invest more in engineering in the out years. So we've beefed up our ED&D spend even though we don't have main projects for some of that spend right now, but this was kind of a placeholder to manage expectations. So that's the other [product].

## Jessi Betjemann

And just to add to that though, we want to make sure that you understand that we are planning to have significant operating leverage, because of operating expenses as a percentage of revenue. We're expecting that to decline approximately 15 points from 2023. And also, we really want to focus on the absolute EBITDA generation and not just on the margin. As you noted and we've been pointing out, we've been very consistent on anchoring around more than $200 million in free cash flow, a target that we set over two years ago. So when you look at that -- and then also over the latter years of our planning period, the free cash flow conversion is approaching almost 90%.

And that actually ties into my follow-up, which is just trying to get a better sense for what might be happening below the EBITDA line. Given that there has been a little bit of a reset on the EBITDA margin and yet the free cash flow has been holding in firm. So is that -- I mean, I can't imagine that it's interest expense, but perhaps you're seeing some advantage, some better performance in terms of cash taxes, CapEx or working capital?

**Jessi Betjemann**

Yes, as we've noted with our net operating loss balance that we have, we don't expect to pay meaningful cash taxes until the end of our planning period, but also with regards to our CapEx. So after this year, we're really going to see a decline in that CapEx and that's why you're going to have that high turnover to free cash flow in 2025 really have that step function and then going forward.

**Barry Rowan**

And we also have one project hitting OpEx right now within than CapEx.

**Operator**

Our next question comes from the line of [Lenin Park] of [Indiscernible].

**Unidentified Analyst**

I just wanted to follow-up on the long term revenue guidance. I was just wondering if you could disaggregate that between service and equipment for us, and to better understand how those two elements are playing into it? And then I just had a couple of follow-ups on the back of that.

**Barry Rowan**

In terms of revenue mix, are those service revenue. The equipment as a means to service revenue, that percentage in out years I don't have the figures…

**Jessi Betjemann**

We haven't provided that. It's mainly being driven -- you're going to have that stronger growth in service revenue…

**Unidentified Analyst**

So service revenue will be about 17%?

Yes, it's going to probably be more.

**Unidentified Analyst**

And then when -- I was just wondering if you could just on the penetration rate that you guys see. Can you maybe unpack that in terms of what is the penetration rate at the sort of the large cabin aircraft, and how does that change as you get down into the small jets? And what do you think the realistic targets are for those different aircraft sizes over time? And then Jessi, just one last one for you, on the $30 million in strategic and operational spend this year. Can you just clarify, if we look at that bucket as a whole, what was it in '22? And then as we look at '24, what did it look like in 24? I know you talked about the GBB spend for '24. But just the other elements as well as if we could just get an apples-to-apples on that $30 million bucket?

**Barry Rowan**

So I'll start with the segments and then Jessi can mention the financial question. About half the heavy jets in the US market have in flight connectivity, today about half the medium sized jets down in the mid 20s on the light jet and it's very small on the turboprops. So we see frankly plenty of room to grow in all those jet sized segments, if you will. And globally, it's even more dramatic. I think 95% roughly in the market doesn't have connectivity today. There are a couple of thousand heavy jets on which, I don't know, either 900 I think have connectivity roughly. The rest of the market, frankly doesn't even have an IFC product that's available to them in terms of broadband IFC. So medium size jet run down overseas have nothing in this space in open territory.

**Unidentified Analyst**

And large jets are what in the US? Large jets, did you say penetration rate for this?

**Barry Rowan**

Yes, I did. I said heavy jets about 50%.

**Jessi Betjemann**

And then as far as the $30 million spending, [Lenin] the -- for 5G, we spent about $2 million in OpEx this year and GBB $4 million. So the 5G as mentioned is going to increase -- will be $9 million and GBB is around $14 million this year. And then for next year, the GBB is going to be the bunch of the spend, around $30 million, $35 million to which kind of the aggregate of $50 million in total. And then in terms of the other operational initiatives, it's probably going to be somewhere in the range of $5 million to $10 million next year.

**Operator**

Our next question comes from the line of Louie DiPalma of William Blair.

**Louie DiPalma**

Barry and Jessi, I am sure both of you will do great on the next phases of your respective careers. Starting off, global broadband is obviously critical for Gogo's future. Oak, what caused you to expedite your planned launch timing for the GBB service? So typically, projects in the satellite industry are delayed often by several years but for GBB, you pushed it forward. So what's behind that?

**Oakleigh Thorne**

Well, we have good partner who's got really mature development processes and manufacturing processes, and I think we've been very organized as well. And frankly, OneWeb has really pitched in and it's been a great working relationship. So we started with a late '24 early '25 kind of target. We do have some incentives built into our contracts to accelerate that. And Hugh's responded to that and come up with ways to get the intended done sooner. And we will continue to work on other ways that might speed it up further. Time is of the essence for us in this and we really want to get to market as fast as possible.

**Louie DiPalma**

And one on the financial side, either for the new CFO or the old CFO, but in terms of the 2025 free cash flow target. What does that assume for maintenance CapEx and interest expense?

**Jessi Betjemann**

In 2025, I think by that point in time, our CapEx is going to be sort of in that maintenance range. So it's around $20 million for maintenance CapEx. And that interest expense, obviously, it depends upon the forward rates and what happens with regards to that. But it should be -- depending upon where we are with the interest expense somewhere in the range of $30 million to $45 million in interest expense depending upon what happens with the rates, probably $40 million to $45 million.

**Operator**

And that is our time for questions today. I'd like to turn the call back over to Will Davis for any closing remarks.

**Will Davis**

Thank you, Valerie. And thank you everyone for joining the call. This concludes our fourth quarter earnings conference call. Thanks very much. You may disconnect.

**Operator**

Thank you. Ladies and gentlemen, this concludes today's conference. Thank you all for participating. You may now disconnect. Have a great day.

- Read more current GOGO analysis and news

- View all earnings call transcripts

# EXHIBIT D

# Introduction

[00 :01 :51 ] **Compound248**  : I am Compound248  , and this is our next installment  in our Business   Breakdown  miniseries  focused  on digital infrastructure  where we are breaking  down a handful of companies   that are key players  in the digital  infrastructure  asset  class .

# Gogo's History and Place  in Digital Infrastructure Today

[00 :02 :54 ] **Compound248**  : Our hope  with this miniseries  is to give  you an understanding   of how the businesses    that underpin our modern  lives  with an almost  magical  ubiquitous  connected   existence   work . How is it, for example  , that Netflix  based  in Seattle  is able to deliver  a perfect  streaming  video  to your phone  in the back seat  of a New York City taxi cab ? Or as the case  may be, to your seat  20,000  ft in the sky ? Digital infrastructure  powers  that experience  . And in this episode  , we will talk about  a company  that delivers  that airborne experience  , Gogo . Known for its eponymous   in-flight WiFi service  , Gogo is frequently  misunderstood  , having undergone  a transformation  to focus  purely on the business   or private aviation industry . It sells  equipment  that gets  installed  on a private aviation  airplane . And then , in infrastructure  -like fashion , monetizes   that equipment  with high margin  service  revenue  for decades  . We're fortunate  to be joined by Oak Thorne  who has led Gogo for 20 years  into the success   it is today.

[00 :04 :02 ] **Compound248**  : We're really pleased  to have with us today, Oak Thorne . I think the Gogo  people  think of when  they think of your service  is not the Gogo that you are today. So when I get on Delta Airlines  and use  Gogo , that's a business   you no longer  own . So today, we'll actually  have an opportunity  to learn about a new business  , so to speak , for most people . And so  with that, Oak, I'd love if you could  tell us a little bit about  Gogo's history  and yours , and how those  two intersect  ?

[00 :04 :33 ] **Oak:** The irony of what  you just said  is that we actually  started  in business   aviation  and moved  into commercial  aviation  around  2008 , and then  exited  about  2020 . We're back  to being a healthy  business   aviation  in-flight connectivity  company . We invested  in Gogo  in 1996 , actually . And the original  business   plan was to use , at that time , analog  cellular  technology  , point antennas   at the sky and sort  of have a cell network  in the sky to serve business   aircraft . We actually  got that business   to being profitable , but the problem  was that the analog  backhaul  that we relied on for that network  really started  disappearing   in '99 , or 2000 , or so . We didn't have the money  at the time  to invest in building  a digital network  . We'd just finished  building  an analog  network  . So we dipsy -doodled  very quickly  to satellite  actually , to narrowband   satellite  .

And we moved  our customers    to Iridium . Iridium  was just coming  out of bankruptcy  , and got a good  deal  with them  to sell their service . And we manufactured   equipment  to access  the Iridium  network  and provide  WiFi from that in the aircraft . It was actually  narrowband  , so it was more  phone  calls  rather  than WiFi, I should  say . We got that business   profitable  and in about  2003 or so , we started  eyeing  going  back  into ATG and raising  the money  to build  that digital network  . And also , going  after commercial   airlines . So we did. We started  building  our digital ATG network  in about  2003  or so .

[00 :06 :04 ] **Compound248**  : And when you say ATG, you're saying  air to ground . So this is a network  where  you're putting an antenna  on the belly  of the airplane  as opposed  to the back  of the airplane . And it's catching  signal  from cell phone  towers on the ground , correct ?

[00 :06 :17 ] **Oak:** It's catching  signal  from antennas   we put on cell phone  towers  that aim up in the air, not parallel  to the ground . So that  rolled  out late 2008 , actually  rolled  out on Delta Airlines  originally . Shortly  thereafter  , American  Airlines . The problem  with that was that if we got any kind of high take rate , we didn't have the capacity  to support  that with our frequency  . We bought  spectrum  , unlike the first product , the analog  product  in 2006 , managed  to get the FCC to auction  4 MHz of spectrum  for air to ground  use . That's something   you could  never  do today because  the spectrum  would  be so expensive  . They'd never

Appx10409

® 2023 Colossus, LLC. All rights reserved.

repurpose it for air to ground, use the Qualcomm broad licensed spectrum in the U.S. So that was a great investment on our part. We managed to get that spectrum for $31 million, which is a real song when you think about what spectrum costs today. And we built our ATG network based on that.

And so we have clean spectrum, which is really nice and it forms a really strong foundation. Anything we roll out in that, it's very reliable across the whole country. There's nobody to interfere in that range. We got that done, rolled out on Delta. But the usage was so high on these commercial airplanes that 4 MHz of spectrum just wasn't enough to support them. So we really had to take the commercial airline division into the satellite world. And we partnered with geo satellite providers to stitch together a network globally of beams that we bought. And we actually bought, paid for full time, and managed in terms of a global network. And ultimately, that didn't end up to be a very profitable business, especially the business outside the U.S. So we finally exited that in 2020.

**[00:08:03 | Compound248 : What is your story? How did you personally come into Gogo? And what's your background before taking over the leadership reigns here?**

[00:08:12 | **Oak:** Well, this is my third rodeo as a CEO of a public company. My first one was a company called Commerce Clearing House, which my family had owned for a long time. It was an old print publisher of loose leaf, legal reporters on taxes, and securities law, and the like. They had a couple of other businesses too. They all kind of ran into the same problem in the late '80s, which was that they really hadn't digitized. So the company got in fair amount of trouble, started shrinking, and somehow I got picked to lead it at that time.

[00:08:43 | **Compound248 : Congratulations .**

[00:08:44 | **Oak:** Yeah. We managed to get it into a digital world. We converted all the print into electronic formats, delivered it on CD-ROM, and then online, and now on the internet. We converted a tax service bureau business into a tax software business, a whole bunch of big changes. And we ended up selling that in the mid-'90s to Wolters Kluwer for about three times what it was worth when I took over a couple years before. And then we formed a family office and put about 80% of our assets in a diversified portfolio, but we wanted to take 20% and invest in companies ourselves in order to drive a higher than market return on the portfolio. And one of those was a company called eCollege, which was a very early startup in the e-learning space in the late '90s. I managed to get public at the end of the dot com bubble in December of '99 and raised $55 million. I think by the end of January, it was down to $36 million, and shrinking fast. So somebody had to come in, and so I could start Monday again. So. That ended up being a great journey. And we sold that for about 5X about six years later. We focused on kind of a SaaS model supporting really big, large online institutions, really niche focus. And that worked out well. We sold that to Pearson. So this is my third one, probably my last.

# The Size and Scope of Gogo's Market

**[00:10:01 | Compound248 : If I am framing it back to you, today when we say business aviation, we're really talking about private travel and the higher end of private travel, not typically your 4-seat, single engine prop plane, the recreational flyer, but this is for professional planes that can go cross-country within the U.S. And to date, your business in business aviation NDA has been purely U.S, is that a fair scoping ?**

[00:10:31 | **Oak:** Just to give it the big picture context, there's about 220,000 aircraft in what the FAA labels general aviation, that is non-scheduled flying. It's not vertical, it's not military, it's not government . Of those 220,000, 24,000 are considered business aircraft. And that is that they're primarily used for business purposes, or they're charter, or fractional, or whatever.

[00:10:56 | **Compound248 : In the U.S.?**

[00:10:57 | **Oak:** In the U.S., right. And our network, the ETG network I was describing a moment ago, is solely in the United States and Southern Canada, pretty much as far up as people generally fly in Canada. And we have the unified spectrum in the 850 MHz range between the U.S. and Canada for ATG use. Luckily that works out well. And so, yes, we're North

© 2023 Colossus, LLC. All rights reserved.

American bound . Of the 220,000 , like I said , about 24,000 are business aircraft . And think of those as everything from very large gulfstreams that fly globally all the way down to turboprops that probably seat six to eight people , your big King Airs and planes like that .

**[00 :11 :37 ] Compound248 : Of those 24,000 today , how many do you estimate are currently outfitted with some sort of in-flight WiFi service ?**

[00 :11 :47 ] **Oak:** About 30 % .

**[00 :11 :48 ] Compound248 : To me , that seems surprisingly low but I'm guessing it's because the average plane is more than 10 years old and in-flight WiFi has only become a must -have service sometime in the last 10 years .**

[00 :12 :01 ] **Oak:** I think that's a good assumption . The average age of an aircraft in the fleet is more like 20 years , so nobody was ordering WiFi on an aircraft 20 years ago . That's part of it . The second is that it's still more complicated than it should be to install on an airplane in the aftermarket . So typically , people don't install the systems until it goes in for a large maintenance event for other things , and then they can install us while they're in the shop already . And that occurs about every five to six years . So you don't get many shots at these aircraft , and you really don't want to miss one .

**[00 :12 :33 ] Compound248 : That kind of implies , call it , 8,000 or 9,000 planes in the U.S. have one of these services on it . And when I say one of these services , help scope what the competitive landscape looks like today . And then we can talk about maybe how many planes you guys have .**

[00 :12 :49 ] **Oak:** Today , we really have one type of competitor and that's geo satellite providers . And geo satellites are 22,000 miles above the Earth . That means that they need a lot of power and pretty big antennas on the plane to reach that . So their equipment is quite heavy and it's quite bulky . So it really only fits on large jets . They're expensive to install . The equipment's very expensive . And they are very expensive in terms of the service plans . That's our competition . And in that heavy jet market , it's about just a shy of 4,000 jets in the U.S. We've got about 1,800 of those , maybe a little more . And our competitors , combined , have about a 100 less than we do .

We also coexist in a lot of those planes . A lot of them have ATG and geo satellite . And when they get outside the U.S. , they flip on the geo satellite service . And when they're over the U.S. , they use us . And the reason for that is that the geo satellite service is more expensive . So if you're chewing up megabytes when you get into the overage cost , it's going to cost you a lot more than we do . And we have much lower latency because we're not going 22,000 miles up and back . We're just going a couple of hundred miles to the tower . So typically , the system seems more responsive than geo satellite products . That's the competitive layout . And when you estimate about 8,000 planes , we're getting close to 7,000 . I think we had , in the last call , 6,600 , something like that , and growing . That's the rough breakdown .

**[00 :14 :15 ] Compound248 : So 6,600 planes out of 8,000 , and some portion of that 1,400 are going to be global planes where they really need some sort of geo service in order to be able to catch internet around the world . But it sounds like in the rest of it , you basically have dominant market share . Now , it kind of begs the question of non -US as well as the other 200,000 smaller planes that historically have not been addressable . Is any of that coming into your space ? How is your business changing ? I think you had some news this weekend even that might be worth touching on right here .**

[00 :14 :58 ] **Oak:** Well , we always wanted to liven up this podcast with something fresh , so you're going to be the first interview on this particular issue . We announced a global product at the EBACE convention in Geneva , which was the big international business aviation air show . We've partnered with OneWeb and Hughes to deliver a fuselage -mounted , very small antenna to access the OneWeb LEO satellite constellation , which is about two thirds launched now . And they're continuing to launch . This is something that'll take us a few years to roll out , but it'll give us an opportunity to go after the 14,000 aircraft that are considered business aviation outside the United States . So it's a nice expansion to our TAM . If you think of it , U.S. TAM's about 24,000 . And then we'll add 14,000 to that for a total of 38,000 . So , exciting news . We think it's a great product . And I'm sure later on , we'll talk about how it fits with our existing product line , but it's going to be pretty easy to install if you already have us in the U.S. and it's going to be pretty easy to install it even if you don't have Gogo on your plane already .

Appx10411

® 2023 Colossus, LLC. All rights reserved.

have your advanced platform, you have global broadband, which we just touched on. And there's one in the middle that's also being launched, which is a new 5G. Maybe you could help scope what those are and why different customers might choose different services.

[00 :16 :21 ] **Oak:** Our classic product, it's just over half of our install bases still on our old product lines. And we had a number of varieties of these over the years, but we call them classics. They run on our 3G and 4G networks. They get typically 1 Mbit/s kind of speed, so quite slow relative to what people experience in their homes today. They do have the benefit of very low latency however, because they're still very close to the towers. They can perform pretty well in terms of interactivity. The big shift four years ago as we launched this thing called AVANCE, and AVANCE also runs on our 3G and 4G networks. Today, it comes in two flavors, our L3 for smaller aircraft and our L5 for larger aircraft. I'll just point out though, they're made of the same parts, common componentry across them, which also plays into our strategy long -term.

That platform's extremely flexible. And one of the flexibility vectors of that is multi -bearer capability, so it can take in more than one network. So today it might be using our 4G network. Tomorrow, it might use our 5G and our 4G network or our 5G network and our GBB LEO satellite network, and aggregate that capacity to deliver greater capacity to the user. So if you're getting 50 Mbit/s on your LEO antenna, and you're getting 25 Mbit/s on your ATG antenna, now you can get 75 combined, in North America anyhow. That multi -bearer capability is a great feature of it. And again, it has very low latency. But the even benefit then is when you think about 5G, and now we're rolling out our 5G network which will get more like 25 Mbit/s.

[00 :18 :00 ] **Compound248** : And that launches in the last part of this year?

[00 :18 :03 ] **Oak:** Yeah, in the second half of this year, peaks of up to 75 or 80 Mbit/s. That 5G network will run on unlicensed spectrum, but it will be aggregated with our 4G network so that you always have the benefit of the 4 MHZ of licensed spectrum. So you'll never going to lose coverage, very good speeds most of the time. That's the new product coming out relatively soon. And then, of course, we talked about global broadband. While that expands our TAM, it'll also give us a lot more capacity, a lot more capacity in North America for the large jets here that fly globally for instance. They no longer will need to use a geo product. They can use our AVANCE L5, like they have today. They can add an ESA antenna on top of the plane, which is very easy. You mount it on top and you run two wires into the plane, one for data, one for power. And all of a sudden you've got ATG plus Leo. You've got a really powerful system over North America, and you've got good global coverage as well. That'll, I think, give us a nice lift in units in the U.S. on that side. Also, we look at it as a belt and suspenders and kind of defensive in protecting our core market of medium size jets down to light jets. Those guys, if 25 Mbit/s isn't enough, they can very easily add GBB and the ESA antenna, and augment that capacity. And it'll be greater than they can get from anybody else. That's really exciting too.

# Breaking Down the Unit Economics and Business Model

[00 :19 :23 ] **Compound248** : Maybe this is a chance to touch on the economic business model. My understanding is, if I want to buy one of your services, buy my airplane so to speak, and then I need to install on it these antennas, which I'm going to pay for... And we can touch on that in a second ... but that's a one time spend for me. You guys have some sort of gross margin associated with that. And then basically forever, I'm paying a monthly fee based on consumption. It's effectively a giant broadband internet service. So this is a podcast about digital infrastructure. And when I think of digital infrastructure, I think of build it once, monetize it for decades. Is that economic profile, does that apply to Gogo? Where would you say yes? Where would you say no?

[00 :20 :12 ] **Oak:** Well, I think it definitely applies in a couple of different ways. First of all, we don't have long -term contracts with our customers, but we have long -term relationships with aircraft. So when our equipment's put on an aircraft, it's on there ... Right now, I think the average is close to 20 years, and that's almost since the beginning of the company. So like almost nobody's ever taken it off. And that's because the switching costs are high and you really need to want to make a change. Now, look, we're lowering switching costs in the future with AVANCE in terms of adding capability, but not switching.

© 2023 Colossus, LLC. All rights reserved.

[00:20:41] **Compound248**: Just to put a bullet on that, you're making it easy for people to upgrade within your system so that the switching costs that go from L3 or from L5 to 5G is not very high. But if a competitor showed up, I presume the switching costs would be actually quite substantial.

[00:21:00] **Oak:** They would be. First of all, they'd have to rip us out to make room for the competitor, which isn't the hard part. The hard part is you're installing a whole new system with its own box units that have to go in and have special places to go and new wiring, new WiFi access points in the plane, new antennas on the outside. So you're talking about hundreds of thousands of dollars in terms of doing that. And in terms of these upgrades where you're looking at something much less than half that cost, you're really not going to want to leave us in order to do that. It just isn't going to be economic.

[00:21:28] **Compound248**: So that hundreds of thousands of dollars, just before we leave sort of how the equipment itself works, if it costs me $200,000 to install one of your better systems onto my plane, perhaps half of that is antenna cost and then half of that is labor and install that goes not to Gogo, but to a third party?

[00:21:49] **Oak:** Yeah, probably less than half of that is Gogo because we sell at a discount to MSRP, to the dealers' install. And obviously, we can't charge OEMs more than we do dealers. And we'll talk about distribution channels later, I'm sure. But we get less than the list price, if you will. There's labor involved, and parts, and things. And that's where the dealers make a good living. So I would say typically, you said a couple hundred thousand, it's probably like 300,000 the first time you put somebody in, if it's a ATG system. For satellite, it's 400,000 to 700,000.

[00:22:22] **Compound248**: For satellite, for geosynchronous satellites, not LEO necessarily?

[00:22:26] **Oak:** There is no LEO option today, but -

[00:22:28] **Compound248**: Yes, but I'm imagining what it might cost in the future.

[00:22:32] **Oak:** So back to the other question you had, which was digital infrastructure attributes of us. Obviously, we have this equipment towers, and backhaul, and base stations in our core data center and all that stuff that looks like digital infrastructure. But I think the other big feature is, we have these long equipment on an aircraft lifetimes. That aircraft may switch owners three times in 20 years. It probably does. On average, they switch every seven years. But the equipment stays. So when one guy sells it, he turns it off. But the next guy, when they get it, they turn it back on. That I think is a lot like digital infrastructure. The advantage we have of course, is we have negative acquisition costs. Most digital infrastructure companies have an investment to make when they get a customer. It's a tower company, they have to build the tower for that first customer. Thereafter, every new customer or tenant is very, very profitable because you've already paid for the tower. We kind of resemble that as well in that think of the country, 250 some odd towers, as a tower. We're already making a lot of money on that. But every time we add an aircraft, we don't have to add any investment. We've already made that investment.

[00:23:42] **Compound248**: Your existing network could handle how much more traffic?

[00:23:45] **Oak:** We count it in terms of number of planes because it's actually the core that we need to expand, not so much the radio access network. So we can handle about three times as many as we have today. And that's projecting out including 25% a year growth in consumption. We have maintenance CapEx of about $15 to $20 million a year projected going out. And we spent a little bit less than that, frankly, historically, but that's what we think it'll be. And some of that will be actually helping us expand that 3X to be about 5X.

[00:24:15] **Compound248**: So that 15 to 20 million of maintenance CapEx, that's undergirding how much service revenue in 2021, so we have a sense for how capital-intensive that revenue piece is?

[00:24:27] **Oak:** Our service revenue for 21 was about 260 million. But I will warn, a small portion of that is from our old narrowband Iridium and SwiftBroadband products. But the bulk of it is from ATG.

[00:24:39] **Compound248**: So you mentioned you have almost 6,600 ATG systems currently installed as of Q1, but you also are expecting 1,300 new orders this year. So if I do that rough math, it's about 20% growth on your current installed base.

© 2023 Colossus, LLC. All rights reserved.

think about the growth in unit volume going forward?

[00:25:12] **Oak:** Well, we did net 600 plus last year ATG systems. And I think we'll do a little bit better than last year this year. But you have to remember, you got to back out a couple things. Some are upgrades and some people turn off equipment before it goes on the market and so we don't see it for a while and it comes back later. Another factor is that there's about a four to five month lag right now from the time we ship until the system is installed and activated. So we'll ship 1,300 this year, but they're not all going to be installed. There's some puts and takes, and so right now I'd say it's sort of 600-ish a year. Then maybe next year might be higher because, obviously, we're going to have a big tailwind going into next year of equipment that we shipped this year.

[00:25:56] **Compound248**: So a very meaningful upfront investment by your customer. And then I view that clearly as the razor. Customer comes in, they're buying the razor. And then you're selling them a monthly razor blade for, hopefully, two decades. What does that cost structure margin look like on the razor blade, on that recurring service revenue?

[00:26:20] **Oak:** That's about 75 percent-ish margin for us. And a lot of those costs are backhaul expenses, staff associated with customer service, tower rent, things like that. Some of that's fixed, so it does scale up with volume.

[00:26:37] **Compound248**: By implication, very high free cash flow margins on a recurring revenue basis. And then you're spending money right now building out your 5G network. Maybe you could just talk for a moment about where you are with that. And then once we do that, I'd really like to discuss how the technology works and get a little bit wonky about that, but let's round out the 5G network first.

[00:27:00] **Oak:** So we've said we're going to spend about a hundred million dollars in external spend on 5G. We've spent roughly a third of that. About a third of that is OPEX, two thirds of that's CapEx. And by the end of this year, we'll have spent about 90% of that. That'll be a little bit of some invoicing in whatever that carries over into next year, but the system will be done in the second half. We're on budget and we're on time, so we're pleased with that.

[00:27:26] **Compound248**: I presume the 5G network will officially light up and launch sometime in the second half. And then the way these ramped, it requires somebody buying that system and installing it. So you have a long runway with your existing L3 and L5, and then this will be a piece of incremental growth that attaches on to that going forward. Help me just scope what the momentum of the business growth looks like as we go out year over year.

[00:27:54] **Oak:** Well, today, I like to compare it to the L5 launch because they appeal to the same markets, if you will. So L5 launched five years ago. It's about 25% of our install base today. And we project a similar, but maybe not quite as fast a ramp up on the 5G product. That's the kind of growth we expect. We think it's going to grow for a very long time. We think ATG will be relevant to a large part of the market, especially the light jets, turboprops and mid-size jets for a very long time. It's easy to install. It's cheap, low latency, and we think it's going to be around for quite a while.

# The Technology Powering Gogo's Network

[00:28:30] **Compound248**: Let's just take a moment and touch on how the ATG network actually works. You have this constellation of antennas across the U.S. that are mounted on towers. I'm picturing them pointed up at the sky and generating like a cone shape network. At some point, a plane is passing through that cone. Maybe help me understand what actually happens on the bottom of the airplane.

[00:28:55] **Oak:** So there's two antennas on the bottom of the airplane.

[00:28:58] **Compound248**: A send and a receive?

[00:28:59] **Oak:** Yeah, exactly, in the traditional product. And the country is being divided into a set of cones, and those cones

© 2023 Colossus, LLC. All rights reserved.

intersect . They intersect there to cone , to cone and they kind of get passed off in tower to tower as they go . The difference with 5G is it doesn't have cones at all . It's all based on beamforming . So the antennas in 5G, they're pointing a beam at that plane and they're actually tracking the plane through the sky .

[00 :29 :29 ] **Compound248** : Instead of me generically flying through a general field that's generated by your 4G system , the 5G actually finds my airplane in the sky and points signal directly at it?

[00 :29 :42 ] **Oak:** That's right , and that's 5G standard .

[00 :29 :44 ] **Compound248** : And that's called beamforming technology . And I presume it requires a whole different antenna set up underneath my airplane , or do you integrate those ? What does that look like on the bottom of the plane ?

[00 :29 :55 ] **Oak:** They're new antennas . But if you have AVANCEL5 on the 4G network , the new antennas are basically the same exact size as the old ones . And they screw in , there's a little adapter plate you have to use , but basically screws into the same exact holes on the aircraft as the old one . So it's not a very difficult switch out to go from the 4G network antennas to the 5G network .

[00 :30 :16 ] **Compound248** : And then to your point, your in-plane AVANCE system , you don't have to do anything to that other than a software upgrade , correct ?

[00 :30 :25 ] **Oak:** For some period of time , you've got to add a small bearer box to that , but we will eliminate that relatively soon . And so you'll be able to just do a box swap inside the airplane of the same exact size box as what the AVANCEL5 was . So it's very easy to swap them out and add those two antennas , and you'll be all set to go .

[00 :30 :45 ] **Compound248** : If I am now imagining as a customer , what portion of your business comes through this aftermarket upgrade or install versus at the OEM line fit when it's manufactured ? And how should we think about that going forward ?

[00 :31 :02 ] **Oak:** Well, historically , it's been about half and half . But when there's flex in the market , it's the aftermarket they can flex . The OEMs can't flex as much .

[00 :31 :12 ] **Compound248** : Meaning they can only make so many planes and that doesn't flex up dramatically ?

[00 :31 :17 ] **Oak:** Yeah , they can flex up , but it takes longer . So they're all flexing up now , because they've got bill-to-book ratios that are ... Or, book -to -bill I should say ... around two . But generally , those have been around one . Now they're flexing up ... They're being cautious because they're a little worried that if there's an economic downturn , all of a sudden the pace of new orders could slow a lot . So they are being cautious , but everybody's been ramping up their projections for the OEMs pretty steadily all this year . The expectation is that they're going to be delivering quite a few more airplanes the next couple years , but it takes them a while to get there . Whereas , in the aftermarket , they can flex very easily . They can rent more hangar space . They can very quickly handle more planes . For us , of course , the main thing even for the planes they have is attaching IFC to that order , which is what we're seeing now . So right now we're over 60 %-

[00 :32 :08 ] **Compound248** : IFC means -

[00 :32 :09 ] **Oak:** In-flight connectivity . So right now I would say north of 60 % of our new installs are in the aftermarket and under 40 % are in the OEM channel .

[00 :32 :19 ] **Compound248** : If I'm thinking about this correctly , if I wanted to build a competing service , I can't, practically speaking , build a licensed spectrum service . There is no licensed spectrum for sale .

[00 :32 :33 ] **Oak:** Correct .

[00 :32 :33 ] **Compound248** : So I have to build an unlicensed spectrum service , which would be a 5G competitor , so to speak . I believe there is somebody in market who's attempting to ... maybe we can begin to talk a little bit about competition ,

© 2023 Colossus, LLC. All rights reserved.

and I think that'll give us some windows into other parts of your business as well. You have this 5G competitor who, in theory, is coming to market right now, SmartSky. What's the status there? What would somebody have to do to knock you off a plane as a competitor?

[00:33:03] **Oak:** First of all, they're not a 5G competitor. They're a 4G network. They started in 2014 building this and they still haven't really delivered the networks. Their biggest problem is they don't really have a product yet.

[00:33:14] **Compound248** : Eight years later?

[00:33:15] **Oak:** That's issue number one. Number two, they only rely on unlicensed spectrum. And this is where that licensed spectrum is a great competitive advantage for us. The problem with unlicensed spectrum is, that 2.4 range of spectrum is what we all use for WiFi, and Bluetooth, and garage door openers, and all kinds of stuff. The purpose of that spectrum is to have a lot of narrow range or small range RF products for people that you would never want to have the FCC have to license every one of those products. That's the purpose of that spectrum. And so when you get over densely populated areas and you get a lot of this usage rather interfering with each other, it actually builds up and it gets up into the sky pretty far. And it will basically overwhelm your signal from your aircraft to the tower. There's a lot of parts of the United States, especially on the coast where there's a tremendous amount of interference. That's going to be a real challenge for them. And it's a real advantage for us.

They have a lot of other challenges as well. They've not really thought through how they design their equipment very well, so it's quite hard to install. They have very large antennas. They've got a 30-inch antenna and a 15-inch antenna on the aircraft for their flagship product and that is just way too big for most of the market, way too big and way too heavy. They didn't really get the joke in this business, which is you've got an antenna on the ground and you've got antenna in the air. You have choices to make about where to put how much size in terms of power. We made the decision, we're going to have really big antennas on the ground. And if you look at our 5G antennas, they look like sails on a sailboat, they're so big. But really small antennas in the air. So we have two 13-inch antennas as opposed to a 30-inch and a 15-inch, and substantial weight advantage, and all that. And for most of the market, that's a game changer.

[00:35:05] **Compound248** : I presume that also means a power advantage for how much power you use on the plane.

[00:35:09] **Oak:** We're using less power on the plane and more on the ground to reach the plane. There's an inverse relationship between the size of the antenna and how much power you're going to be able to get. So if you have enough power in one, you can reduce the power in the other, and vice versa.

[00:35:24] **Compound248** : So they're attempting right now to launch a 4G competitor that would be competing with your, call it your L5. And at the same time, you'll be launching a 5G add-on. What is the speed differential that one of your 5G customers might expect versus your own L5 service and the theoretical SmartSky service?

[00:35:48] **Oak:** We do self-reporting of our customers. We, at BCG, go figure out what our customers think they get. They think they get 2 to 8 Mbit/s with our L3 and L5 products. Our average for the 5G, what we've done is test city routes. So we took the top 12 city routs in the U.S.

[00:36:05] **Compound248** : It'd be like New York to Miami, or something like that?

[00:36:07] **Oak:** That's, I think, number one. And our customers we think get about 25 Mbit/s on average, peaks of 75 to 80 with 5G. Now SmartSky, right before the NBAA conference, they were in a magazine article, AIN magazine which is an industry standard, claiming they were going to get 8 Mbit/s on average. And that's what people, who flew their planes in Las Vegas sort of tried it on a test bed, thought they were getting about that. But then when we said, "Okay, well, we're getting 25. Now they're going to get 15." I can't really tell you what they're going to get. The first thing we got to do is have a network to run it on, and they don't. And I think they made some pretty bad design choices in the equipment. And I don't think it's all working yet.

[00:36:49] **Compound248** : As a would be customer, is there a price gap between your product and their product?

© 2023 Colossus, LLC. All rights reserved.

[00 :36 :59 ] **Compound248 :** So effectively , not a huge price gap. Their network's not truly up and running yet and I guess , somewhat unproven . How should a customer think about the impact of having a dealer network and the ability to have maintenance , and service , and that sort of thing . Does it come into play? And then I'd love to touch a little bit more on the geosync competitors and LEO competitor .

[00 :37 :22 ] **Oak:** We have an incredibly strong dealer network . We've got 120 dealers . And we've got STCs , which are probably more important , but the dealers develop the engineering design .

[00 :37 :32 ] **Compound248 :** And then STC is a certificate that the FAA provides the dealer that allows them to install your equipment on your customer's plane ?

[00 :37 :42 ] **Oak:** An STC covers a particular model plane in a particular system and how it should be installed . And that installation plan , if you will, is approved by the FAA. They take about a year to get . And in our business , the dealers do them and then they sell them to other dealers . So you might have one dealer who does STCs on 30 aircraft with your system , and then other dealers will actually pay that dealer to use their STC, so they don't have to go through the design work . That's important and it's a barrier to entry . You've got to get STC done , all these planes . Dealers only do it if they think you're going to sell a lot of equipment and they're going to get paid a lot by other dealers for installing that equipment .

# Competing Providers and Technologies

[00 :38 :21 ] **Compound248 :** You also compete with geo satellite providers . Earlier in the conversation , you alluded to the fact that those are more expensive alternatives , although they give you global coverage . But help me understand as a potential customer , what I might pay to get a geo satellite service and how that quality compares to your ATG network .

[00 :38 :43 ] **Oak:** There are two geo satellite competitors today , Inmarsat and Viasat , and they're going to merge or at least in the process of merging . And I think that merger will probably occur . They're a bit different . Inmarsat is a classic old geo mobility satellite company . They cut their teeth in maritime and supplying satellite to ships . And then they got into aviation decades ago . They're very experienced . They have the only pseudo global system today . They have three satellites . Well, they've been adding a bit to it, but they got three main satellites . They don't cover the poles . They only reach so far north because you can't see around the Earth from the equator where those geos are . They quite cover everything , but they have a lot of coverage . That coverage is kind of thin , but because they have really a monopoly on that , their equipment is quite expensive . It's quite heavy . It's got a lot of components to it. It's not that easy to install . And their service is very expensive .

Then you have Viasat who has a number of different satellite products . But their real main product now is their own KA satellite network . And today they have coverage over North America , a lot of South America and the north Atlantic with ViaSat - 2. So they're sort of regional . They don't really have a global KA product right now . They bought another satellite over Europe , so they get some KA coverage there , but that's not terribly strong compared to what they have in the U.S. And they'll be launching ViaSat -3, just been I think delayed again , but sometime the end of this year or into next year . And that'll give them sort of a third of the Earth coverage . So they don't really have a global product , but they've got pretty high bandwidth in the products they do have . We had BCG to also go ask those customers what they think they're getting , and they think they're getting typically 2 to 17 Mbit/s with Inmarsat kind of down at the bottom of that , and the old Viasat KU product at the bottom of that . And then Viasat's newer Ka-band products towards the high end of that range .

[00 :40 :43 ] **Compound248 :** So your 5G product will be extremely competitive with those speeds domestically . That kind of brings us back a little bit to where we were started . So if I was going to describe a geo satellite to somebody , there's a reason we shoot it 22,000 miles out into the sky. We're basically trying to sync up its speed with the spin of the Earth. And it stays in a synchronized location above the Earth and it shoots down a huge cone that covers every part of the Earth it can see from that point. That's very different than what our friend Elon Musk is trying to do at Starlink, where he's launching

® 2023 Colossus, LLC. All rights reserved.

[00:41:55] **Oak:** You've got it right. They're lower, so they need less power to reach the Earth. And it's easier to close the link budget between a terminal on the ground and the satellite. So you don't need all the power that you need for the geo satellites, because you're not going 22,000 miles. You're going, in Elon's case, 350 miles. And in OneWeb's case, 750 or 800 miles. You also get much better latency because it's a much shorter trip. You have much less path loss in the packets as they go out. They go into space like that, you lose a lot of them. And that means you're going back and forth to actually fulfill the signal, and to keep the budget going, and to get everything to your computer that you need to see in order to see whatever it is you're receiving. So there's much less path loss. So it's just much more efficient from a link perspective. Generally, you have to add a lot of different types of orbits. Actually, you have some that look like orange slices that go over the poles. Then you've got some at planes and various angles that cross the equator at different angles, if you will. But that can give you complete global coverage. And so that's the other big advantage, you get polar coverage.

[00:42:58] **Compound248 :** I presume LEOs effectively have been enabled by the SpaceX type of technology where the cost of launch has fallen dramatically. Is that fair?

[00:43:10] **Oak:** That's a big part of it. There's just a whole lot of technological developments around antennas and other things that enabled it. There's a whole different way of thinking that every geo satellite is its own work of art,

[00:43:21] **Compound248 :** Right, it's a billion dollar project.

[00:43:24] **Oak:** Takes forever and they're made one at a time on a big hangar type space. The whole idea of actually having mass production of satellites was really pioneered by OneWeb and Airbus manufactured the OneWeb constellation. They have a factory that turns out, I think it's two a day or something like that. And of course, Elon's competing with that. And he's maybe turning out more than that. It's kind of a race to the finish line on that. There's some big differences between different approaches to LEO that are probably worth noting. Elon's approach is going to be, "I'm going to be really close to Earth because then I'm going to have the lowest latency. And I'll have the easiest time closing link budget and having more capacity." So he's like 350 miles up. Now, a couple drawbacks to that. Number one, they fall out of the sky a lot more often because they're actually not high enough to really sustain an orbit without using a fair amount of energy. He's got very high maintenance costs. He's going to have to replace a lot more satellites. You also need a lot more satellites because the closer you are to Earth, the less view each satellite has of the Earth. So you need more satellites to actually cover the Earth. So I think his final phase one is something like 11,000 satellites. That's expensive to manufacture. Now, he's got his own rockets, which makes it cheaper for him to launch. There's a lot of ways that they're getting efficiencies there, but they've got very high maintenance costs.

And then the last issue that he has is, he can't always see land from the satellite. So he has to put in Inter-Satellite Links so that over the Pacific ocean, for instance, where I can't see land and I can't reach a ground station to get my signal to the internet, he has to pass that signal from one satellite to another. Those were called Inter-Satellite Links. He didn't initially have those on his satellites. And the reason was, they're sort of a learning organization. We're going to throw this stuff up and see how it goes and keep learning and developing. So they took that approach. They've been launching satellites with Inter-Satellite Links now for a while. I think probably 600 or so of their 200 somewhat satellites have those links, but they're expensive. Inter-Satellite Links is really complex laser technology that literally points lasers between satellites up in its face, blasts the data back and forth. He's got a very expensive network with a very unique design. OneWeb and Telesat who are the two other players right now, OneWeb being the only one that's really launching at this point, but Telesat's on the drawing board. They're higher up and so they can see more of the Earth. OneWeb can reach the Earth from any satellite, so it has more ground stations than Elon's got, but does not have the expensive Inter-Satellite Links. So they have, I think, the advantage of probably being lower cost. They're going to complete in the not too distant future. They got set back by the Ukrainian war because they were launching from Kazakhstan, but I think they've relocated all their launches now to the United States. And

© 2023 Colossus, LLC. All rights reserved.

**[00 :46 :20 ] Compound248 : We're talking about LEO and Starlink as if it's fait accompli that it will be a competitor , but we actually don't know that as of yet whether Starlink plans to launch a true business aviation service . But maybe you could talk about the service they have launched , and some of the reasons we might expect them to become competitor .**

[00:46:41 ] **Oak:** Well, they've always said they were going to come into aviation , but aviation's a lot bigger than business aviation . The aviation market includes all the military government aircraft globally , which is a large count , relatively pricing sensitive market . Commercial aircraft , which is about 20,000 aircrafts globally . And also , this is the density of users on commercial aircraft , pretty good customer in terms of the amount of data they're going to use . So I think that's an interesting customer for them . And then they're dabbling in business aviation , especially at the high end .

**[00 :47 :13 ] Compound248 : Where it's effectively a commercial plane that's been repurposed for business aviation use ?**

[00:47:20 ] **Oak:** Or almost the same size . Like Elon's got a prototype antenna on his gulfstream 650 . They don't fly in commercial at all , but they're a regional jet size almost . We went through this big strategic planning process after we sold the commercial aviation division late 2020 . And as we look at the risks out there to the business of Starlink probably are the highest risk that we saw . And so much of our strategy is formulated around digging our moat deeper and having more barriers to entry than normal in order to make sure that they either decide not to enter our space or that we're very competitive with them when they do . We projected then that they would come in via regional jets and that's what they're doing . And the reason for that is without the Inter -Satellite Links , they really can't serve airlines that go over the ocean .

Today , that kind of puts the commercial airlines on the main line planes outside of their TAM . Regional jets , however , only fly over North America . So they've come in there with the first deal they announced was JSX , a funny little airline that flies from FBOs like private aviation terminals , but flies a scheduled flight , and you buy a seat on an aircraft . And they're Embraer 135s and 145s , which are small regional jets . They seat 35 passengers . And that was their launch customer . I know they've also been talking to a lot of the commercial airlines , and I actually expected them to announce with one of the major airlines as a launch customer on their regional jets , but we haven't heard anything to that effect .

**[00 :48 :55 ] Compound248 : So now if we bring it back to Gogo , it sounds like 5G and your global broadband product both are opportunities for growth over time , but also they sort of close the door behind you as a defensive mechanism to keep off competition . Is that a fair way of framing it?**

[00:49:16 ] **Oak:** GBB's offensive and defensive , no question . The defensive piece is that we can add the ESA antenna that we're desigring and building with Hughes .

**[00 :49 :25 ] Compound248 : ESA means electronically steerable antenna , so that it can capture those beams , so to speak .**

[00:49:30 ] **Oak:** Exactly . Well, it points beams at satellites . And the advantage of that is the way it does it is from a flat panel with the antenna elements in that panel . And they move the beam by running electrical currents through those elements in different patterns . And it has no moving parts , so it should be very durable . And it can switch the beams very quickly . It's all just chips . With these satellites , especially Starlink which is going to have thousands of satellites , you have to switch beams every couple of seconds . You can do that with those . OneWeb doesn't have as many satellites , so will be switching every couple minutes . Mechanical antennas have a hard time keeping up with that , and that's all of our competitors ' antennas are mechanical . The idea is that they actually wear out pretty quickly if they have to turn all the time . So on the defensive side , we can add these ESA antennas to install AVANCE aircraft and augment the capacity that aircraft is receiving and aggregate it with ATG.

So like I said earlier , let's say you've got 5G on the plane and it's getting 25 Mbit/s. And then our LEO product can add another 50 Mbit/s, all of a sudden you've actually got 75 Mbit/s. Now , I'm making those numbers up , but the argument goes that ATG plus LEO is going to be greater than LEO alone . And I think based on what we're seeing , what Starlink's able to deliver, et cetera , and sort of projecting that out , we think from a capacity perspective that will really protect our North American market well . First of all, you have a cheaper , easier upgrade to a LEO. And second that LEO's actually aggregating capacity with ATG to

© 2023 Colossus, LLC. All rights reserved.

have more capacity than even the offshore oceans than any other part of the world. And we can go into the large jets that fly globally today and have our system onboard with a geo product. And we can go after that geo product and replace with our LEO product.

# Exploring Gogo's Growth Runway and Major Threats

[00:51:25] **Compound248** : I'd love to start putting these pieces together. The way it sounds like is, there's 24,000 addressable U.S. planes, of which 8,000 have a system. And you're on... I'm just using round numbers ... call it 7,000 of those 8,000. That, call it a third of the market having a system on it today. It's very hard for me to imagine in 10 years that just about every plane doesn't have it. So when a new plane is built today for U.S. business aviation delivery, what portion of those end up having an in-flight WiFi solution ?

[00:52:03] **Oak:** Let me break down how the deliveries work first, because I think that's helpful. About 70% of those aircraft are destined for the U.S., 70%-75%.

[00:52:12] **Compound248** : Of new build business aviation planes .

[00:52:15] **Oak:** That varies over time. But over the last couple of years, it swayed a little more to the U.S. because people couldn't even fly most places overseas due to COVID. That's the first break. Of those that are going overseas, the heavies will all have a geo satellite system. Of those going overseas that aren't heavys, none of them will have any kind of broadband satellite product because they don't have a system they can fly, no network they can fly. And then now those that are delivered in the U.S., about 60% have us on it of the 70, 70-75, roughly about 60% have us on them .

[00:52:49] **Compound248** : That's just 60 out of the 70, not 60 %?

[00:52:51] **Oak:** Yeah, yeah .

And then I would guess roughly maybe another 20%, or heavys, would have geo satellites on them, geo satellite capability. So just to make that graphic, Gulfstream probably puts geo satellite product in almost every jet it delivers .

[00:53:08] **Compound248** : Because they're large ?

[00:53:09] **Oak:** Because they're big, large jets that go overseas . When a Gulfstream gets us, it's usually done after it's come off the line. And a lot of people will add us after it's come off the line, usually after it started flying. And so we don't count that as a line fit install . We get a pretty good chunk of Gulfstreams where they add us, but it's not line fit there . So just to give you a little bit of color, they're all different . All the different OAM are different . It's complicated . At Textron, that's our sweet spot . Those kinds of jets, we come out on almost every plane that's staying in the U.S.

[00:53:40] **Compound248** : I guess , I'm imagining you have this service where you're spending $20 million a year to maintain your network . And yet, every year, the overall penetration of this market is basically going , to grow, and grow, and grow. It sounds like you have enough network capacity effectively to be able to scale to the whole u.S. business aviation opportunity set over the next 10 years . And so I'm picturing this sort of 70% contribution , maybe even higher, 70% contribution margin on all that incremental service revenue . What eats that up? Why do you not become just a cash flow generative machine starting in two or three years ?

[00:54:27] **Oak:** We do. I think that's the answer . $125 million in free cash flow next year, that does not include our GBB investment however . That was based on our baseline plan before we announced GBB. We thought , with that baseline , we'd get to about 200 million in free cash flow in 2025 . We've de-levered , so our interest payments are down . That's helping our free cash flow a lot . And there's sort of a virtuous circle , which is the more we can invest in improving the service and products , and the more we improve the service and products , the happier the customers are . And the more sign up, put in equipment , then by service plans generating more cash .

© 2023 Colossus, LLC. All rights reserved.

**[00:55:02] Compound248 : You have this dominant market share domestically. Sounds like huge incremental market share and virtually every new plane that's coming out is going to have some type of service on this. And so you just get attached and dragged along with that. And now you have this premium opportunity in the U.S. to add LEO on top. You have 14,000 planes outside the U.S. that are now becoming addressable. How long would you imagine this growth runway can last for? At what point do you think we're in a mature market where we're kind of fully penetrated ?**

[00:55:37] Oak: I'd say 10 to 15 years. And I base that on a couple things. I believe NBAA, which is the National Business Aviation Association projects that a 100 % of business aircraft will have in-flight connectivity in 10 years time. I believe it's GAMA, which was the General Aviation Manufacturers Association. I believe their target is 15 years. I can't predict the future with specificity, but those are a lot of people that know what's going on. And so I think that's kind of the timeframe.

**[00:56:07] Compound248 : So that's a 15 year growth runway for unit growth. And then after that, who knows ? It's beyond our ability to contemplate. But it sounds like we have effectively a very low churn, high margin product that looks something more and more like an annuity at that point. I'd Love to talk about threats for a moment. How would you frame the risk of regulatory ? You have this license spectrum. Is there any risk that you lose the license to the spectrum ? Is there risk to your antenna designs ?**

[00:56:41] Oak: We paid for the spectrum. And as long as we use it, we can renew it. Absent huge changes in our legal structure, I think that's relatively protected.

**[00:56:51] Compound248 : And what about the actual designs and getting approved onto planes ? That process, I don't know exactly how that works.**

[00:56:58] Oak: There are industry standards you have to comply with and then there are also regulatory hurdles you have to go through. There are a couple of steps on each of those to get a product approved and launched. I mean, we manage that today. We have really knowledgeable people that know what they're doing, and you design your products in such a way that you know they're going to get approved. You don't want to take that risk of investing a lot of money and then having something that's not going to get approved. So there's a risk there, but I think that's something that we live with every day, and we manage every day, and we build it into our design, in how we design products.

**[00:57:34] Compound248 : Your would be competitor SmartSky that haven't been able to beat you in the sky, so to speak. So it sounds like they're trying to beat you in the courtroom. They've sued you over, it sounds like, the antenna design and some of the ways that you're planning to use unlicensed spectrum. To the extent you can comment on that, I'd love to have your perspective on it.**

[00:57:52] Oak: We spend a great deal of time with patent council and our own engineers going through all of their patents. We've always said we did not violate any valid patent of theirs. And that sort of implies that we think some of them are invalid. These four patents that they've sued us over though, we don't have to rely on validity. We know we do not infringe on those paths. So we are feeling that we should prevail. You never know what happens in court, but we should prevail. The way the case will go is this, they petition for a temporary injunction to bar us from launching our 5G product. That will get heard relatively soon, that part of the case. In June or July, we think there will be a hearing. And we're still waiting to have a judge assigned actually in Delaware to set a date, but to win on that injunction is quite a challenge for a plaintiff. And they have to, a, show that they are likely to prevail in the ultimate case. And then it has 70, 80 % chance that they will prevail. I think that's probably pretty challenging here.

And then the other is that there will be a reparable harm done to them that can't be quantified unless we are halted. I think there are arguments against that too, and that tell us how many planes you lost, and then we can multiply, got your service revenue would've been, it's probably pretty good way to estimate that you have a real challenge I think there. And then if they either win or lose on that, then the case will actually go forward on whether we infringe on the patents and whether there should be any damages awarded to them as a result of that. And that will probably take several years and be a very long case, very complex. Even if we were to lose that ... If you look at how these cases generally go, they award some kind of royalty to them or whatever for the value of whatever component of theirs, the service is represented in our product or whatever. And

© 2023 Colossus, LLC. All rights reserved.

they usually end up picking a percentage of regular what would happen, but we think it's important that people understand where this could all go in the end, even if everything went wrong.

[00:59:51] **Compound248** : Totally. It becomes a probabilistic game. I guess, also on the things that can go wrong, I heard you earlier talking about the book-to-bill ratio of the OEMs, and that they worry there is some customer economic sensitivity. I mean, I'm picturing the second home market, which is famously cyclical. You cut back on buying your vacation home. How do you see that in the private aviation market? What is the cyclicality? What has it been like in the past when we've had downturns, how many customers have turned off their service? Help me understand that.

[01:00:25] **Oak:** There's really two we can look at. One is COVID and the other is that '08, '09 recession . COVID, about 20% of our customer suspended service briefly. And we had about a 4% decline in service revenue. The revenue's pretty sticky, even in a very, very difficult situation where there was no place to fly too.

[01:00:46] **Compound248** : In part, that was a special recession where people just could not travel.

[01:00:50] **Oak:** And so they didn't want to pay for connectivity while their plane was sitting on the ground. '09, '10, '11 actually was a good era for us. Now, that's not a 100% a great comparison either because we were a relatively new product in ATG at that time . But we grew very well through those years. Our service revenue grew very quickly in that timeframe . When we look forward , we say, "Okay, there may be fewer planes sold and there may be new planes , OEM deliveries . And generally what happens is people try to sell planes secondhand that they already have . That could all happen , but there's 70% of the market that doesn't have anything . And the demographic of the flyer is shifting a younger . 67% of our customers now are gen X, Y, and Z, as opposed to baby boomers . Those are all people that expect internet on their planes . So if they're buying a secondhand aircraft that doesn't have internet , they're going to put it in. So that actually could be kind of good for us .

The main barometer in terms of drivers , it's the number of high net worth individuals . So you have to look at how many people have lost how much money in terms of net worth . Generally , the Wheels Up and Flex jets of the world say, if you have more than 30 million in net worth , you can fly private . There's a huge number of people worth more than $30 million who fly, who don't have any WiFi yet . So there's just so much addressable market that while we may see a slow down in deliveries and a few other things , and the orders may slow down a little bit, I think the overall trend is going to do pretty well even through a pretty big recession .

[01:02:19] **Compound248** : I guess , the overall trend just to me is a digital infrastructure trend is people want to consume more data faster in more places , and the sky is now one of those places .

[01:02:33] **Oak:** Absolutely .

[01:02:34] **Compound248** : As you mentioned Flexjet , could you just quickly touch on what is your customer concentration ? I imagine it's pretty fragmented . a lot of single or small fleet owners , but there's some big players out there too.

[01:02:46] **Oak:** I like to describe our channels and customers in the following way, there's 10 OEMs, there's hundreds of dealers , and there's thousands of customers . Our top 10 customers , which includes Flexjet obviously , and NetJets , and Wheels Up, they account for about 20% of revenue . But then it falls off a cliff right at about 20%. And the other 80% is literally 4,000 customers . And there's none on there that are even 1%. It's a very fragmented market and customer base , which I think is always good in a business . Too much . Concentration is very risky, I think .

[01:03:18] **Compound248** : So barring a competitive shift , and it sounds like you guys are investing to get out in front of those , seems like you're on this sort of 10-year glide , 15-year glide path towards more and more penetration , more and more data consumption , meaning more and more megabits that you get to sell hopefully at very high incremental margins . You own a really big chunk of the business . GTCR, well regarded private equity firm, owns a similarly large chunk of the business . Between you, them , and any other person you guys have 40 plus percent . What do you think the long-term goal is? And how do we think about minority shareholders here ?

[01:03:57] **Oak:** I can't speak for GTCR, but I can speak for us . We're very happy owning this company . I've sold two companies in the past and if somebody comes along with the right price, I'd mostly be open to an exit if the value represented , but we

© 2023 Colossus, LLC. All rights reserved.

thought the prospects of the business were ... So that's always an option. I see long-term strong growth, high margins. The business mix will change a little bit as we add the satellite component. But remember, we're not paying for fixed beams in that business, so variable pricing. It's a managed service model and our margins won't be quite as high as they are on ATG, but they're going to be pretty good.

**[01:04:32] Compound248 : But you also won't have to build your own network, so it's a variable cost business. Is that a fair way of thinking about it?**

[01:04:39] **Oak:** Yeah, there's no cap backs other than what we invest in developing and building the equipment we sell for the aircraft themselves.

**[01:04:46] Compound248 : So that's a resale business model that is a variable cost structure in the sense you're paying by the drink, so to speak, by the mega bit. And then you are marking it up somewhat.**

[01:04:57] **Oak:** Right.

**[01:04:58] Compound248 : It sounds like a recurring revenue, long-term growth, low capital intensity business model. To me, that is what I think of when I think of digital infrastructure, obviously powered by those trends that we were talking about. So this has been, from my perspective, a really fabulous conversation. I'd love just to get to ask one more question before we say goodbye, you mentioned you've sold, and run, and built it sounds like three different businesses now. You haven't sold this one yet, but you've run three different businesses. Could you help us generalize what are two key lessons that you think you could extrapolate and bring to other businesses? Think of this as advice that you would give to someone who's attempting to build and lead a company?**

[01:05:44] **Oak:** I think about this often just in terms of what's the biggest lesson learned for me and that is it's all about the team and it's all about the culture of that team. We have a really transparent and cross-functional culture. In other words, transparency is rewarded, expressing your point of view is rewarded even if others disagree with it. And making sure that you're well coordinated across the various functions of the company, that everybody that's going to be involved in something ... When we look at a product launch plan, it even includes how we're going to bill for it. You got to include everything along that value chain of delivery from inception to delivery, to the customer. And in a complex business like ours, that requires complete transparency, because it's really complicated. It's really complicated. And if people aren't talking to each other very openly and expressing all the little issues and everything else, your project plans are going to run afoul. So to me that's important.

And interestingly, when you come into turnarounds, there's always a lot of different personalities. And sometimes the smartest guy in the room is the worst team member. And so sometimes you got to let the smartest guy go in order to move the team forward. And so that's lesson one. I guess, lesson two would be, I came into this, I didn't know anything about satellites. I didn't know anything about telecommunications. I didn't know anything about airplanes. The only reason I got hired is I could start on Monday. But I ask a lot of questions. And so I'll say, "You know what? Don't ever be scared to ask questions, no matter how dumb you think the question is." I always start with the team, I say, "This is going to be a really stupid question." And of course, they say, "Not really." And then I ask it and they say, "Yeah, it is a pretty stupid question. But anyhow, here's the answer." And I think that facilitates a lot of good questions and understanding on my part to help me lead the team. Those would be the two.

**[01:07:29] Compound248 : Well, hopefully I asked a few stupid questions in here and other people get the benefit of that. We really are grateful for you spending your time with us today. I hope that people leave this understanding a lot more about Gogo and a little bit more about how you fit into this ecosystem. Thank you again, Oak.**

[01:07:47] **Oak:** Appreciate it. Thank you.

© 2023 Colossus, LLC. All rights reserved.

# EXHIBIT E



**COLOSSUS**

Search our transcripts by guest or keyword

**Business Breakdowns**

**Oakleigh Thorne - Gogo: Internet for Private Jets**

Oak Thorne is the President and CEO of Gogo. We cover the size of the market for in-flight connectivity, the technology powering Gogo's offering, and how Starlink differs.

Professional Investors   Public Equity   Technology

1X   00:00:00   01:07:58

Released June 22nd, 2022

BLOCKS   **TRANSCRIPT**   SHOW NOTES

**»**   Transcript Search

Search by guest or keyword...

## Introduction

[00:01:51] **Compound248:** I am Compound248, and this is our next installment in our Business Breakdown miniseries focused on digital infrastructure where we are breaking down a handful of companies that are key players in the digital infrastructure asset class.

## Gogo's History and Place in Digital Infrastructure Today

[00:02:54] **Compound248:** Our hope with this miniseries is to give you an understanding of how the businesses that underpin our modern lives with an almost magical ubiquitous connected existence work. How is it, for example, that Netflix based in Seattle is able to deliver a perfect streaming video to your phone in the back seat of a New York City taxi cab? Or as the case may be, to your seat 20,000 ft in the sky? Digital infrastructure powers that experience. And in this episode, we will talk about a company that delivers that airborne experience, Gogo. Known for its eponymous in-flight WiFi service, Gogo is frequently misunderstood, having undergone a transformation to focus purely on the business or private aviation industry. It sells equipment that gets installed on a private aviation airplane. And then, in infrastructure-like fashion, monetizes that equipment with high margin service revenue for decades. We're fortunate to be joined by Oak Thorne who has led Gogo for 20 years into the success it is today.

[00:04:02] **Compound248:** We're really pleased to have with us today, Oak Thorne. I think the Gogo people think of when they think of your service is not the Gogo that you are today. So when I get on Delta Airlines and use Gogo, that's a business you no longer own. So today, we'll actually have an opportunity to learn about a new business, so to speak, for most people. And so with that, Oak, I'd love if you could tell us a little bit about Gogo's history and yours, and how those two intersect?

[00:04:33] **Oak:** The irony of what you just said is that we actually started in business aviation and moved into commercial aviation around 2008, and then exited about 2020. We're back to being a healthy business aviation in-flight connectivity company. We invested in Gogo in 1996, actually. And the original business plan was to use, at that time, analog cellular technology, point antennas at the sky and sort of have a cell network in the sky to serve business aircraft. We actually got that business to being profitable, but the problem was that the analog backhaul that we relied on for that network really started disappearing in '99, or 2000, or so. We didn't have the money at the time to invest in building a digital network. We'd just finished building an analog network. So we dipsy-doodled very quickly to satellite actually, to



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

Appx10424

being a healthy business aviation in-flight connectivity company. We invested in Gogo in 1996, eventually got into that business probably 1997 at that time. We got the technology, point antennas at the sky and sort of have a cell network in the sky to serve business aircraft. We actually got that business to being profitable, but the problem was that the analog backhaul that we relied on for that network really started disappearing in '99, or 2000, or so. We didn't have the money at the time to invest in building a digital network. We'd just finished building an analog network. So we dipsy-doodled very quickly to satellite actually, to narrowband satellite.

And we moved our customers to Iridium. Iridium was just coming out of bankruptcy, and got a good deal with them to sell their service. And we manufactured equipment to access the Iridium network and provide WiFi from that in the aircraft. It was actually narrowband, so it was more phone calls rather than WiFi, I should say. We got that business profitable and in about 2003 or so, we started eyeing going back into ATG and raising the money to build that digital network. And also, going after commercial airlines. So we did. We started building our digital ATG network in about 2003 or so.

**[00:06:04]** Compound248: And when you say ATG, you're saying air to ground. So this is a network where you're putting an antenna on the belly of the airplane as opposed to the back of the airplane. And it's catching signal from cell phone towers on the ground, correct?

[00:06:17] Oak: It's catching signal from antennas we put on cell phone towers that aim up in the air, not parallel to the ground. So that rolled out late 2008, actually rolled out on Delta Airlines originally. Shortly thereafter, American Airlines. The problem with that was that if we got any kind of high take rate, we didn't have the capacity to support that with our frequency. We bought spectrum, unlike the first product, the analog product in 2006, managed to get the FCC to auction 4 MHz of spectrum for air to ground use. That's something you could never do today because the spectrum would be so expensive. They'd never repurpose it for air to ground. I think it'll be the only air to ground license spectrum that is ever sold off in the U.S. So that was a great investment on our part. We managed to get that spectrum for $31 million, which is a real song when you think about what spectrum costs today. And we built our ATG network based on that.

And so we have clean spectrum, which is really nice and it forms a really strong foundation. Anything we roll out in that, it's very reliable across the whole country. There's nobody to interfere in that range. We got that done, rolled out on Delta. But the usage was so high on these commercial airplanes that 4 MHz of spectrum just wasn't enough to support them. So we really had to take the commercial airline division into the satellite world. And we partnered with geo satellite providers to stitch together a network globally of beams that we bought. And we actually bought, paid for full time, and managed in terms of a global network. And ultimately, that didn't end up to be a very profitable business, especially the business outside the U.S. So we finally exited that in 2020.

**[00:08:03]** Compound248: What is your story? How did you personally come into Gogo? And what's your background before taking over the leadership reigns here?

[00:08:12] Oak: Well, this is my third rodeo as a CEO of a public company. My first one was a company called Commerce Clearing House, which my family had owned for a long time. It was an old print publisher of loose leaf, legal reporters on taxes, and securities law, and the like. They had a couple of other businesses too. They all kind of ran into the same problem in the late '80s, which was that they really hadn't digitized. So the company got in fair amount of trouble, started shrinking, and somehow I got picked to lead it at that time.

**[00:08:43]** Compound248: Congratulations.

[00:08:44] Oak: Yeah. We managed to get it into a digital world. We converted all the print into electronic formats, delivered it on CD-ROM, and then online, and now on the internet. We converted a tax service bureau business into a tax software business, a whole bunch of big changes. And we ended up selling that in the mid-'90s to Wolters Kluwer for about three times what it was worth when I took over a couple years before. And then we formed a family office and put about 80% of our assets in a diversified portfolio, but we wanted to take 20% and invest in companies ourselves in order to drive a higher than market return on the portfolio. And one of those was a company called eCollege, which was a very early startup in the e-learning space in the late '90s. I managed to get public at the end of the dot com bubble in December of '99 and raised $55 million. I think by the end of January, it was down to $36 million, and shrinking fast. So somebody had to come in, and so I could start Monday again.



what it was worth when I took over a couple years before. And then we formed a family office and put together assets in a large-sized portfolio. And we would do private deals and invest in companies ourselves in order to drive a higher than market return on the portfolio. And one of those was a company called eCollege, which was a very early startup in the e-learning space in the late '90s. I managed to get public at the end of the dot com bubble in December of '99 and raised $55 million. I think by the end of January, it was down to $36 million, and shrinking fast. So somebody had to come in, and so I could start Monday again. So. That ended up being a great journey. And we sold that for about 5X about six years later. We focused on kind of a SaaS model supporting really big, large online institutions, really niche focus. And that worked out well. We sold that to Pearson. So this is my third one, probably my last.

## The Size and Scope of Gogo's Market

[00:10:01] Compound248: If I am framing it back to you, today when we say business aviation, we're really talking about private travel and the higher end of private travel, not typically your 4-seat, single engine prop plane, the recreational flyer, but this is for professional planes that can go cross-country within the U.S. And to date, your business in business aviation NDA has been purely U.S, is that a fair scoping?

[00:10:31] Oak: Just to give it the big picture context, there's about 220,000 aircraft in what the FAA labels general aviation, that is non-scheduled flying. It's not vertical, it's not military, it's not government. Of those 220,000, 24,000 are considered business aircraft. And that is that they're primarily used for business purposes, or they're charter, or fractional, or whatever.

[00:10:56] Compound248: In the U.S.?

[00:10:57] Oak: In the U.S., right. And our network, the ETG network I was describing a moment ago, is solely in the United States and Southern Canada, pretty much as far up as people generally fly in Canada. And we have the unified spectrum in the 950 MHz range between the U.S. and Canada for ATG use, so that's why that works out well. And so, yes, we're North American bound. Of the 220,000, like I said, about 24,000 are business aircraft. And think of those as everything from very large gulfstreams that fly globally all the way down to turboprops that probably seat six to eight people, your big King Airs and planes like that.

[00:11:37] Compound248: Of those 24,000 today, how many do you estimate are currently outfitted with some sort of in-flight WiFi service?

[00:11:47] Oak: About 30%.

[00:11:48] Compound248: To me, that seems surprisingly low but I'm guessing it's because the average plane is more than 10 years old and in-flight WiFi has only become a must-have service sometime in the last 10 years.

[00:12:01] Oak: I think that's a good assumption. The average age of an aircraft in the fleet is more like 20 years, so nobody was ordering WiFi on an aircraft 20 years ago. That's part of it. The second is that it's still more complicated than it should be to install on an airplane in the aftermarket. So typically, people don't install the systems until it goes in for a large maintenance event for other things, and then they can install us while they're in the shop already. And that occurs about every five to six years. So you don't get many shots at these aircraft, and you really don't want to miss one.

[00:12:33] Compound248: That kind of implies, call it, 8,000 or 9,000 planes in the U.S. have one of these services on it. And when I say one of these services, help scope what the competitive landscape looks like today. And then we can talk about maybe how many planes you guys have.

[00:12:49] Oak: Today, we really have one type of competitor and that's geo satellite providers. And geo satellites are 22,000 miles above the Earth. That means that they need a lot of power and pretty big antennas on the plane to reach that. So their equipment is quite heavy and it's quite bulky. So it really only fits on large jets. They're expensive to install. The equipment's very expensive. And they are very expensive in terms of the service plans. That's our competition. And in that heavy jet market, it's about just a shy of 4,000 jets in the U.S. We've got about 1,800 of those, maybe a little more. And our competitors, combined, have about a 100 less than we do.



Today, we really have one type of competitor and that's geo satellite providers. And geo satellite, 22,000 miles above the Earth. That means that you need a lot of power and pretty big antennas on the plane to reach that. So their equipment is quite heavy and it's quite bulky. So it really only fits on large jets. They're expensive to install. The equipment's very expensive. And they are very expensive in terms of the service plans. That's our competition. And in that heavy jet market, it's about just a shy of 4,000 jets in the U.S. We've got about 1,800 of those, maybe a little more. And our competitors, combined, have about a 100 less than we do.

We also coexist in a lot of those planes. A lot of them have ATG and geo satellite. And when they get outside the U.S., they flip on the geo satellite service. And when they're over the U.S., they use us. And the reason for that is that the geo satellite service is more expensive. So if you're chewing up megabytes when you get into the overage cost, it's going to cost you a lot more than we do. And we have much lower latency because we're not going 22,000 miles up and back. We're just going a couple of hundred miles to the tower. So typically, the system seems more responsive than geo satellite products. That's the competitive layout. And when you estimate about 8,000 planes, we're getting close to 7,000. I think we had, in the last call, 6,600, something like that, and growing. That's the rough breakdown.

**[00:14:15] Compound248:** **So 6,600 planes out of 8,000, and some portion of that 1,400 are going to be global planes where they really need some sort of geo service in order to be able to catch internet around the world. But it sounds like in the rest of it, you basically have dominant market share. Now, it kind of begs the question of non-US as well as the other 200,000 smaller planes that historically have not been addressable. Is any of that coming into your space? How is your business changing? I think you had some news this weekend even that might be worth touching on right here.**

[00:14:58] **Oak:** Well, we always wanted to liven up this podcast with something fresh, so you're going to be the first interview on this particular issue. We announced a global product at the EBACE convention in Geneva, which was the big international business aviation air show. We've partnered with OneWeb and Hughes to deliver a fuselage-mounted, very small antenna to access the OneWeb LEO satellite constellation, which is about two thirds launched now. And they're continuing to launch. This is something that'll take us a few years to roll out, but it'll give us an opportunity to go after the 14,000 aircraft that are considered business aviation outside the United States. So it's a nice expansion to our TAM. If you think of it, U.S. TAM's about 24,000. And then we'll add 14,000 to that for a total of 38,000. So, exciting news. We think it's a great product. And I'm sure later on, we'll talk about how it fits with our existing product line, but it's going to be pretty easy to install if you already have us in the U.S. and it's going to be pretty easy to install it even if you don't have Gogo on your plane already.

**[00:16:01] Compound248:** **Maybe this is an opportunity to talk about what your different product offerings are today. So you have your advanced platform, you have global broadband, which we just touched on. And there's one in the middle that's also being launched, which is a new 5G. Maybe you could help scope what those are and why different customers might choose different services.**

[00:16:21] **Oak:** Our classic product, it's just over half of our install bases still on our old product lines. And we had a number of varieties of these over the years, but we call them classics. They run on our 3G and 4G networks. They get typically 1 Mbit/s kind of speed, so quite slow relative to what people experience in their homes today. They do have the benefit of very low latency however, because they're still very close to the towers. They can perform pretty well in terms of interactivity. The big shift four years ago as we launched this thing called AVANCE, and AVANCE also runs on our 3G and 4G networks. Today, it comes in two flavors, our L3 for smaller aircraft and our L5 for larger aircraft. I'll just point out though, they're made of the same parts, common componentry across them, which also plays into our strategy long-term.

That platform's extremely flexible. And one of the flexibility vectors of that is multi-bearer capability, so it can take in more than one network. So today it might be using our 4G network. Tomorrow, it might use our 5G and our 4G network or our 5G network and our GBB LEO satellite network, and aggregate that capacity to deliver greater capacity to the user. So if you're getting 50 Mbit/s on your LEO antenna, and you're getting 25 Mbit/s on your ATG antenna, now you can get 75 combined, in North America anyhow. That multi-bearer capability is a great feature of it. And again, it has very low latency. But the even benefit then is when you think about 5G, and now we're rolling out our 5G network which will get more like 25 Mbit/s.



Tomorrow it might use our 5G and our 4G network or our 5G network and our GBB LEO satellite network, and aggregate that capacity to deliver greater capacity to the user. So if you're getting 50 Mbit/s on your LEO antenna, and you're getting 25 Mbit/s on your ATG antenna, now you can get 75 combined, in North America anyhow. That multi-bearer capability is a great feature of it. And again, it has very low latency. But the even benefit then is when you think about 5G, and now we're rolling out our 5G network which will get more like 25 Mbit/s.

[00:18:00] Compound248: And that launches in the last part of this year?

[00:18:03] Oak: Yeah, in the second half of this year, peaks of up to 75 or 80 Mbit/s. That 5G network will run on unlicensed spectrum, but it will be aggregated with our 4G network so that you always have the benefit of the 4 MHZ of licensed spectrum. So you'll never going to lose coverage, very good speeds most of the time. That's the new product coming out relatively soon. And then, of course, we talked about global broadband. While that expands our TAM, it'll also give us a lot more capacity, a lot more capacity in North America for the large jets here that fly globally for instance. They no longer will need to use a geo product. They can use our AVANCE L5, like they have today. They can add an ESA antenna on top of the plane, which is very easy. You mount it on top and you run two wires into the plane, one for data, one for power. And all of a sudden you've got ATG plus Leo. You've got a really powerful system over North America, and you've got good global coverage as well. That'll, I think, give us a nice lift in units in the U.S. on that side. Also, we look at it as a belt and suspenders and kind of defensive in protecting our core market of medium size jets down to light jets. Those guys, if 25 Mbit/s isn't enough, they can very easily add GBB and the ESA antenna, and augment that capacity. And it'll be greater than they can get from anybody else. That's really exciting too.

## Breaking Down the Unit Economics and Business Model

[00:19:23] Compound248: Maybe this is a chance to touch on the economic business model. My understanding is, if I want to buy one of your services, buy my airplane so to speak, and then I need to install on it these antennas, which I'm going to pay for... And we can touch on that in a second... but that's a one time spend for me. You guys have some sort of gross margin associated with that. And then basically forever, I'm paying a monthly fee based on consumption. It's effectively a giant broadband internet service. So this is a podcast about digital infrastructure. And when I think of digital infrastructure, I think of build it once, monetize it for decades. Is that economic profile, does that apply to Gogo? Where would you say yes? Where would you say no?

[00:20:12] Oak: Well, I think it definitely applies in a couple of different ways. First of all, we don't have long-term contracts with our customers, but we have long-term relationships with aircraft. So when our equipment's put on an aircraft, it's on there... Right now, I think the average is close to 20 years, and that's almost since the beginning of the company. So like almost nobody's ever taken it off. And that's because the switching costs are high and you really need to want to make a change. Now, look, we're lowering switching costs in the future with AVANCE in terms of adding capability, but not switching.

[00:20:41] Compound248: Just to put a bullet on that, you're making it easy for people to upgrade within your system so that the switching costs that go from L3 or from L5 to 5G is not very high. But if a competitor showed up, I presume the switching costs would be actually quite substantial.

[00:21:00] Oak: They would be. First of all, they'd have to rip us out to make room for the competitor, which isn't the hard part. The hard part is you're installing a whole new system with its own box units that have to go in and have special places to go and new wiring, new WiFi access points in the plane, new antennas on the outside. So you're talking about hundreds of thousands of dollars in terms of doing that. And in terms of these upgrades where you're looking at something much less than half that cost, you're really not going to want to leave us in order to do that. It just isn't going to be economic.

[00:21:28] Compound248: So that hundreds of thousands of dollars, just before we leave sort of how the equipment itself works, if it costs me $200,000 to install one of your better systems onto my plane, perhaps half of that is antenna cost and then half of that is labor and install that goes not to Gogo, but to a third party?

[00:21:49] Oak: Yeah, probably less than half of that is Gogo because we sell at a discount to



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

want to leave us in order to do that. It just isn't going to be economic.

**[00:21:28]** Compound248: So that hundreds of thousands of dollars, just before we leave sort of how the equipment itself works, if it costs me $200,000 to install one of your better systems onto my plane, perhaps half of that is antenna cost and then half of that is labor and install that goes not to Gogo, but to a third party?

[00:21:49] Oak: Yeah, probably less than half of that is Gogo because we sell at a discount to MSRP, to the dealers' install. And obviously, we can't charge OEMs more than we do dealers. And we'll talk about distribution channels later, I'm sure. But we get less than the list price, if you will. There's labor involved, and parts, and things. And that's where the dealers make a good living. So I would say typically, you said a couple hundred thousand, it's probably like 300,000 the first time you put somebody in, if it's a ATG system. For satellite, it's 400,000 to 700,000.

**[00:22:22]** Compound248: For satellite, for geosynchronous satellites, not LEO necessarily?

[00:22:26] Oak: There is no LEO option today, but-

**[00:22:28]** Compound248: Yes, but I'm imagining what it might cost in the future.

[00:22:32] Oak: So back to the other question you had, which was digital infrastructure attributes of us. Obviously, we have this equipment towers, and backhaul, and base stations in our core data center and all that stuff that looks like digital infrastructure. But I think the other big feature is, we have these long equipment on an aircraft lifetimes. That aircraft may switch owners three times in 20 years. It probably does. On average, they switch every seven years. But the equipment stays. So when one guy sells it, he turns it off. But the next guy, when they get it, they turn it back on. That I think is a lot like digital infrastructure. The advantage we have, of course, is we have negative acquisition costs. Most digital infrastructure companies have an investment to make when they get a customer. It's a tower company, they have to build the tower for that first customer. Thereafter, every new customer or tenant is very, very profitable because you've already paid for the tower. We kind of resemble that as well in that think of the country, 250 some odd towers, as a tower. We're already making a lot of money on that. But every time we add an aircraft, we don't have to add any investment. We've already made that investment.

**[00:23:42]** Compound248: Your existing network could handle how much more traffic?

[00:23:45] Oak: We count it in terms of number of planes because it's actually the core that we need to expand, not so much the radio access network. So we can handle about three times as many as we have today. And that's projecting out including 25% a year growth in consumption. We have maintenance CapEx of about $15 to $20 million a year projected going out. And we spent a little bit less than that, frankly, historically, but that's what we think it'll be. And some of that will be actually helping us expand that 3X to be about 5X.

**[00:24:15]** Compound248: So that 15 to 20 million of maintenance CapEx, that's undergirding how much service revenue in 2021, so we have a sense for how capital-intensive that revenue piece is?

[00:24:27] Oak: Our service revenue for 21 was about 260 million. But I will warn, a small portion of that is from our old narrowband Iridium and SwiftBroadband products. But the bulk of it is from ATG.

**[00:24:39]** Compound248: So you mentioned you have almost 6,600 ATG systems currently installed as of Q1, but you also are expecting 1,300 new orders this year. So if I do that rough math, it's about 20% growth on your current installed base. Some of that, obviously, will be replacing legacy systems. Some of it won't be immediately installed. So, how should we think about the growth in unit volume going forward?

[00:25:12] Oak: Well, we did net 600 plus last year ATG systems. And I think we'll do a little bit better than last year this year. But you have to remember, you got to back out a couple things. Some are upgrades and some people turn off equipment before it goes on the market and so we don't see it for a while and it comes back later. Another factor is that there's about a four to five month lag right now from the time we ship until the system is installed and activated. So we'll ship 1,300 this year, but they're not all going to be installed. There's some puts and takes, and so right now I'd say it's sort of 600-ish a year. Then maybe next year might be higher because, obviously, we're going to have a big tailwind going into next year of equipment that



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

Appx10429

better than last year this year. But you have to remember, you got to back out a couple things. Some are equipment, some people lagged, equipment backlog, you know whatever, and so we don't see it for a while and it comes back later. Another factor is that there's about a four to five month lag right now from the time we ship until the system is installed and activated. So we'll ship 1,300 this year, but they're not all going to be installed. There's some puts and takes, and so right now I'd say it's sort of 600 ish a year. Then maybe next year might be higher because, obviously, we're going to have a big tailwind going into next year of equipment that we shipped this year.

**[00:25:56] Compound248:** So a very meaningful upfront investment by your customer. And then I view that clearly as the razor. Customer comes in, they're buying the razor. And then you're selling them a monthly razor blade for, hopefully, two decades. What does that cost structure margin look like on the razor blade, on that recurring service revenue?

**[00:26:20] Oak:** That's about 75 percent-ish margin for us. And a lot of those costs are backhaul expenses, staff associated with customer service, tower rent, things like that. Some of that's fixed, so it does scale up with volume.

**[00:26:37] Compound248:** By implication, very high free cash flow margins on a recurring revenue basis. And then you're spending money right now building out your 5G network. Maybe you could just talk for a moment about where you are with that. And then once we do that, I'd really like to discuss how the technology works and get a little bit wonky about that, but let's round out the 5G network first.

**[00:27:00] Oak:** So we've said we're going to spend about a hundred million dollars in external spend on 5G. We've spent roughly a third of that. About a third of that is OPEX, two thirds of that's CapEx. And by the end of this year, we'll have spent about 90% of that. That'll be a little bit of some invoicing in whatever that carries over into next year, but the system will be done in the second half. We're on budget and we're on time, so we're pleased with that.

**[00:27:26] Compound248:** I presume the 5G network will officially light up and launch sometime in the second half. And then the way these ramped, it requires somebody buying that system and installing it. So you have a long runway with your existing L3 and L5, and then this will be a piece of incremental growth that attaches on to that going forward. Help me just scope what the momentum of the business growth looks like as we go out year over year.

**[00:27:54] Oak:** Well, today, I like to compare it to the L5 launch because they appeal to the same markets, if you will. So L5 launched five years ago. It's about 25% of our install base today. And we project a similar, but maybe not quite as fast a ramp up on the 5G product. That's the kind of growth we expect. We think it's going to grow for a very long time. We think ATG will be relevant to a large part of the market, especially the light jets, turboprops and mid-size jets for a very long time. It's easy to install. It's cheap, low latency, and we think it's going to be around for quite a while.

## The Technology Powering Gogo's Network

**[00:28:30] Compound248:** Let's just take a moment and touch on how the ATG network actually works. You have this constellation of antennas across the U.S. that are mounted on towers. I'm picturing them pointed up at the sky and generating like a cone shape network. At some point, a plane is passing through that cone. Maybe help me understand what actually happens on the bottom of the airplane.

**[00:28:55] Oak:** So there's two antennas on the bottom of the airplane.

**[00:28:58] Compound248:** A send and a receive?

**[00:28:59] Oak:** Yeah, exactly, in the traditional product. And the country is being divided into a set of cones, and those cones intersect. They intersect at about 3,000 ft, which is why that's our service altitude. They pass through cone, to cone, to cone and they kind of get passed off in tower to tower as they go. The difference with 5G is it actually doesn't have cones at all. It's all based on beamforming. So the antennas in 5G, they're pointing a beam at that plane and they're actually tracking the plane through the sky.

**[00:29:29] Compound248:** Instead of me generically flying through a general field that's



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

**[00:28:59] Oak:** Yeah, exactly, in the traditional product. And the country is being divided into a set of cells... you might some interest... They intersect at the 40,000 ... and that's our service altitude. They pass through cone, to cone, to cone and they kind of get passed off in tower to tower as they go. The difference with 5G is it actually doesn't have cones at all. It's all based on beamforming. So the antennas in 5G, they're pointing a beam at that plane and they're actually tracking the plane through the sky.

**[00:29:29] Compound248:** Instead of me generically flying through a general field that's generated by your 4G system, the 5G actually finds my airplane in the sky and points signal directly at it?

**[00:29:42] Oak:** That's right, and that's 5G standard.

**[00:29:44] Compound248:** And that's called beamforming technology. And I presume it requires a whole different antenna set up underneath my airplane, or do you integrate those? What does that look like on the bottom of the plane?

**[00:29:55] Oak:** They're new antennas. But if you have AVANCE L5 on the 4G network, the new antennas are basically the same exact size as the old ones. And they screw in, there's a little adapter plate you have to use, but basically screws into the same exact holes on the aircraft as the old one. So it's not a very difficult switch out to go from the 4G network antennas to the 5G network.

**[00:30:16] Compound248:** And then to your point, your in-plane AVANCE system, you don't have to do anything to that other than a software upgrade, correct?

**[00:30:25] Oak:** For some period of time, you've got to add a small bearer box to that, but we will eliminate that relatively soon. And so you'll be able to just do a box swap inside the airplane of the same exact size box as what the AVANCE L5 was. So it's very easy to swap them out and add those two antennas, and you'll be all set to go.

**[00:30:45] Compound248:** If I am now imagining as a customer, what portion of your business comes through this aftermarket upgrade or install versus at the OEM line fit when it's manufactured? And how should we think about that going forward?

**[00:31:02] Oak:** Well, historically, it's been about half and half. But when there's flex in the market, it's the aftermarket they can flex. The OEMs can't flex as much.

**[00:31:12] Compound248:** Meaning they can only make so many planes and that doesn't flex up dramatically?

**[00:31:17] Oak:** Yeah, they can flex up, but it takes longer. So they're all flexing up now, because they've got bill-to-book ratios that are... Or, book-to-bill I should say... around two. But generally, those have been around one. Now they're flexing up... They're being cautious because they're a little worried that if there's an economic downturn, all of a sudden the pace of new orders could slow a lot. So they are being cautious, but everybody's been ramping up their projections for the OEMs pretty steadily all this year. The expectation is that they're going to be delivering quite a few more airplanes the next couple years, but it takes them a while to get there. Whereas, in the aftermarket, they can flex very easily. They can rent more hangar space. They can very quickly handle more planes. For us, of course, the main thing even for the planes they have is attaching IFC to that order, which is what we're seeing now. So right now we're over 60%-

**[00:32:08] Compound248:** IFC means-

**[00:32:09] Oak:** In-flight connectivity. So right now I would say north of 60% of our new installs are in the aftermarket and under 40% are in the OEM channel.

**[00:32:19] Compound248:** If I'm thinking about this correctly, if I wanted to build a competing service, I can't, practically speaking, build a licensed spectrum service. There is no licensed spectrum for sale.

**[00:32:33] Oak:** Correct.

**[00:32:33] Compound248:** So I have to build an unlicensed spectrum service, which would be a 5G competitor, so to speak. I believe there is somebody in market who's attempting to do that. Maybe we can begin to talk a little bit about competition, and I think that'll give us some windows into other parts of your business as well. You have this 5G competitor who, in theory, is coming to market right now, SmartSky. What's the status there? What would



**[00:32:33]** **Compound248:** So I have to build an unlicensed spectrum service, which would be a 5G competitor, so to speak. I believe there is somebody in market who's attempting to do that. Maybe we can begin to talk a little bit about competition, and I think that'll give us some windows into other parts of your business as well. You have this 5G competitor who, in theory, is coming to market right now, SmartSky. What's the status there? What would somebody have to do to knock you off a plane as a competitor?

[00:33:09] **Oak:** First of all, they're not a 5G competitor. They're a 4G network. They started in 2014 building this and they still haven't really delivered the networks. Their biggest problem is they don't really have a product yet.

**[00:33:14]** **Compound248:** Eight years later?

[00:33:15] **Oak:** That's issue number one. Number two, they only rely on unlicensed spectrum. And this is where that licensed spectrum is a great competitive advantage for us. The problem with unlicensed spectrum is, that 2.4 range of spectrum is what we all use for WiFi, and Bluetooth, and garage door openers, and all kinds of stuff. The purpose of that spectrum is to have a lot of narrow range or small range RF products for people that you would never want to have the FCC have to license every one of those products. That's the purpose of that spectrum. And so when you get over densely populated areas and you get a lot of this usage rather interfering with each other, it actually builds up and it gets up into the sky pretty far. And it will basically overwhelm your signal from your aircraft to the tower. There's a lot of parts of the United States, especially on the coast where there's a tremendous amount of interference. That's going to be a real challenge for them. And it's a real advantage for us.

They have a lot of other challenges as well. They've not really thought through how they design their equipment very well, so it's quite hard to install. They have very large antennas. They've got a 30-inch antenna and a 15-inch antenna on the aircraft for their flagship product and that is just way too big for most of the market, way too big and way too heavy. They didn't really get the joke in this business, which is you've got an antenna on the ground and you've got antenna in the air. You have choices to make about where to put how much size in terms of power. We made the decision, we're going to have really big antennas on the ground. And if you look at our 5G antennas, they look like sails on a sailboat, they're so big. But really small antennas in the air. So we have two 13-inch antennas as opposed to a 30-inch and a 15-inch, and substantial weight advantage, and all that. And for most of the market, that's a game changer.

**[00:35:05]** **Compound248:** I presume that also means a power advantage for how much power you use on the plane.

[00:35:09] **Oak:** We're using less power on the plane and more on the ground to reach the plane. There's an inverse relationship between the size of the antenna and how much power you're going to be able to get. So if you have enough power in one, you can reduce the power in the other, and vice versa.

**[00:35:24]** **Compound248:** So they're attempting right now to launch a 4G competitor that would be competing with your, call it your L5. And at the same time, you'll be launching a 5G add-on. What is the speed differential that one of your 5G customers might expect versus your own L5 service and the theoretical SmartSky service?

[00:35:48] **Oak:** We do self-reporting of our customers. We, at BCG, go figure out what our customers think they get. They think they get 2 to 8 Mbit/s with our L3 and L5 products. Our average for the 5G, what we've done is test city routes. So we took the top 12 city routs in the U.S.

**[00:36:05]** **Compound248:** It'd be like New York to Miami, or something like that?

[00:36:07] **Oak:** That's, I think, number one. And our customers we think get about 25 Mbit/s on average, peaks of 75 to 80 with 5G. Now SmartSky, right before the NBAA conference, they were in a magazine article. AIN magazine which is an industry standard, claiming they were going to get 8 Mbit/s on average. And that's what people, who flew their planes in Las Vegas sort of tried it on a test bed, thought they were getting about that. But then when we said, 'Okay, well, we're getting 25. Now they're going to get 15.' I can't really tell you what they're going to get. The first thing we got to do is have a network to run it on, and they don't. And I think they made some pretty bad design choices in the equipment. And I don't think it's all



on average, peaks of 75 to 80 with 5G. Now SmartSky, right before the NBAA conference, they were in a big marketing campaign, an industrial announcement, saying they were going to get 8 Mbit/s on average. And that's what people, who flew their planes in Las Vegas sort of tried it on a test bed, thought they were getting about that. But then when we said, "Okay, well, we're getting 25. Now they're going to get 15." I can't really tell you what they're going to get. The first thing we got to do is have a network to run it on, and they don't. And I think they made some pretty bad design choices in the equipment. And I don't think it's all working yet.

**[00:36:49] Compound248:** As a would be customer, is there a price gap between your product and their product?

[00:36:55] **Oak:** Well, they've published pricing and it's just a little bit less than ours.

**[00:36:59] Compound248:** So effectively, not a huge price gap. Their network's not truly up and running yet and I guess, somewhat unproven. How should a customer think about the impact of having a dealer network and the ability to have maintenance, and service, and that sort of thing. Does it come into play? And then I'd love to touch a little bit more on the geosync competitors and LEO competitor.

[00:37:22] **Oak:** We have an incredibly strong dealer network. We've got 120 dealers. And we've got STCs, which are probably more important, but the dealers develop the engineering design.

**[00:37:32] Compound248:** And then STC is a certificate that the FAA provides the dealer that allows them to install your equipment on your customer's plane?

[00:37:42] **Oak:** An STC covers a particular model plane in a particular system and how it should be installed. And that installation plan, if you will, is approved by the FAA. They take about a year to get. And in our business, the dealers do them and then they sell them to other dealers. So you might have one dealer who does STCs on 30 aircraft with your system, and then other dealers will actually pay that dealer to use their STC, so they don't have to go through the design work. That's important and it's a barrier to entry. You've got to get STC done, all these planes. Dealers only do it if they think you're going to sell a lot of equipment and they're going to get paid a lot by other dealers for installing that equipment.

## Competing Providers and Technologies

**[00:38:21] Compound248:** You also compete with geo satellite providers. Earlier in the conversation, you alluded to the fact that those are more expensive alternatives, although they give you global coverage. But help me understand as a potential customer, what I might pay to get a geo satellite service and how that quality compares to your ATG network.

[00:38:43] **Oak:** There are two geo satellite competitors today, Inmarsat and Viasat, and they're going to merge or at least in the process of merging. And I think that merger will probably occur. They're a bit different. Inmarsat is a classic old geo mobility satellite company. They cut their teeth in maritime and supplying satellite to ships. And then they got into aviation decades ago. They're very experienced. They have the only pseudo global system today. They have three satellites. Well, they've been adding a bit to it, but they got three main satellites. They don't cover the poles. They only reach so far north because you can't see around the Earth from the equator where those geos are. They quite cover everything, but they have a lot of coverage. That coverage is kind of thin, but because they have really a monopoly on that, their equipment is quite expensive. It's quite heavy. It's got a lot of components to it. It's not that easy to install. And their service is very expensive.

Then you have Viasat who has a number of different satellite products. But their real main product now is their own KA satellite network. And today they have coverage over North America, a lot of South America and the north Atlantic with ViaSat-2. So they're sort of regional. They don't really have a global KA product right now. They bought another satellite over Europe, so they get some KA coverage there, but that's not terribly strong compared to what they have in the U.S. And they'll be launching ViaSat-3, just been I think delayed again, but sometime the end of this year or into next year. And that'll give them sort of a third of the Earth coverage. So they don't really have a global product, but they've got pretty high bandwidth in the products they do have. We had BCG to also go and ask those customers what they think they're getting, and they think they're getting typically 2 to 17 Mbit/s with Inmarsat kind of down at the bottom of that, and the old Viasat KU product at the bottom of that. And then



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

regional. They don't really have a global KA product right now. They bought another satellite over Europe. They have KA over the Atlantic, it'll cover the Americas, and the US. It's geared to what they have in the U.S. And they'll be launching ViaSat-3, just been I think delayed again, but sometime the end of this year or into next year. And that'll give them sort of a third of the Earth coverage. So they don't really have a global product, but they've got pretty high bandwidth in the products they do have. We had BCG to also go and ask those customers what they think they're getting, and they think they're getting typically 2 to 17 Mbit/s with Inmarsat kind of down at the bottom of that, and the old Viasat KU product at the bottom of that. And then Viasat's newer Ka-band products towards the high end of that range.

**[00:40:43] Compound248: So your 5G product will be extremely competitive with those speeds domestically. That kind of brings us back a little bit to where we were started. So if I was going to describe a geo satellite to somebody, there's a reason we shoot it 22,000 miles out into the sky. We're basically trying to sync up its speed with the spin of the Earth. And it stays in a synchronized location above the Earth and it shoots down a huge cone that covers every part of the Earth it can see from that point. That's very different than what our friend Elon Musk is trying to do at Starlink, where he's launching something called LEO satellites, low Earth orbit, and those are not synchronized to the world. They actually spin around the world. So the satellite itself is orbiting the Earth, its asynchronous to us here on the ground. But the theory is, they have more smaller satellites. Each covers a smaller cone, but it's closer. And therefore, each satellite can be a little bit faster, have more capacity. Am I kind of framing it out? And how does that come into your space and the global broadband product?**

[00:41:55] Oak: You've got it right. They're lower, so they need less power to reach the Earth. And it's easier to close the link budget between a terminal on the ground and the satellite. So you don't need all the power that you need for the geo satellites, because you're not going 22,000 miles. You're going, in Elon's case, 350 miles. And in OneWeb's case, 750 or 800 miles. You also get much better latency because it's a much shorter trip. You have much less path loss in the packets as they go out. They go into space like that, you lose a lot of them. And that means you're going back and forth to actually fulfill the signal, and to keep the budget going, and to get everything to your computer that you need to see in order to see whatever it is you're receiving. So there's much less path loss. So it's just much more efficient from a link perspective. Generally, you have to add a lot of different types of orbits. Actually, you have some that look like orange slices that go over the poles. Then you've got some at planes and various angles that cross the equator at different angles, if you will. But that can give you complete global coverage. And so that's the other big advantage, you get polar coverage.

**[00:42:58] Compound248: I presume LEOs effectively have been enabled by the SpaceX type of technology where the cost of launch has fallen dramatically. Is that fair?**

[00:43:10] Oak: That's a big part of it. There's just a whole lot of technological developments around antennas and other things that enabled it. There's a whole different way of thinking that every geo satellite is its own work of art,

**[00:43:21] Compound248: Right, it's a billion dollar project.**

[00:43:24] Oak: Takes forever and they're made one at a time on a big hangar type space. The whole idea of actually having mass production of satellites was really pioneered by OneWeb and Airbus manufactured the OneWeb constellation. They have a factory that turns out, I think it's two a day or something like that. And of course, Elon's competing with that. And he's maybe turning out more than that. It's kind of a race to the finish line on that. There's some big differences between different approaches to LEO that are probably worth noting. Elon's approach is going to be, "I'm going to be really close to Earth because then I'm going to have the lowest latency. And I'll have the easiest time closing link budget and having more capacity." So he's like 350 miles up. Now, a couple drawbacks to that. Number one, they fall out of the sky a lot more often because they're actually not high enough to really sustain an orbit without using a fair amount of energy. He's got very high maintenance costs. He's going to have to replace a lot more satellites. You also need a lot more satellites because the closer you are to Earth, the less view each satellite has of the Earth. So you need more satellites to actually cover the Earth. So I think his final phase one is something like 11,000 satellites. That's expensive to manufacture. Now, he's got his own rockets, which makes it cheaper for him to launch. There's a lot of ways that they're getting efficiencies there, but they've got very high maintenance costs.

And then the last issue that he has is, he can't always see land from the satellite. So he has to put in Inter-Satellite Links so that over the Pacific ocean, for instance, where I can't see land



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

you are to Earth, the less view each satellite has of the Earth. So you need more satellites to actually view the Earth. So I think he finally has 3,300 to 3,700 is supposed to be 3,300 to 3,700 satellites. That's expensive to manufacture. Now, he's got his own rockets, which makes it cheaper for him to launch. There's a lot of ways that they're getting efficiencies there, but they've got very high maintenance costs.

And then the last issue that he has is, he can't always see land from the satellite. So he has to put in Inter-Satellite Links so that over the Pacific ocean, for instance, where I can't see land and I can't reach a ground station to get my signal to the internet, he has to pass that signal from one satellite to another. Those were called Inter-Satellite Links. He didn't initially have those on his satellites. And the reason was, they're sort of a learning organization. We're going to throw this stuff up and see how it goes and keep learning and developing. So they took that approach. They've been launching satellites with Inter-Satellite Links now for a while. I think probably 600 or so of their 200 somewhat satellites have those links, but they're expensive. Inter- Satellite Links is really complex laser technology that literally points lasers between satellites up in its face, blasts the data back and forth. He's got a very expensive network with a very unique design. OneWeb and Telesat who are the two other players right now, OneWeb being the only one that's really launching at this point, but Telesat's on the drawing board. They're higher up and so they can see more of the Earth. OneWeb can reach the Earth from any satellite, so it has more ground stations than Elon's got, but does not have the expensive Inter-Satellite Links. So they have, I think, the advantage of probably being lower cost. They're going to complete in the not too distant future. They got set back by the Ukrainian war because they were launching from Kazakhstan, but I think they've relocated all their launches now to the United States. And they'll start launching again pretty soon. They're just different approaches.

**[00:46:20] Compound248:** We're talking about LEO and Starlink as if it's fait accompli that it will be a competitor, but we actually don't know that as of yet whether Starlink plans to launch a true business aviation service. But maybe you could talk about the service they have launched, and some of the reasons we might expect them to become competitor.

[00:46:41] Oak: Well, they've always said they were going to come into aviation, but aviation's a lot bigger than business aviation. The aviation market includes all the military government aircraft globally, which is a large count, relatively pricing sensitive market. Commercial aircraft, which is about 20,000 aircrafts globally. And also, this is the density of users on commercial aircraft, pretty good customer in terms of the amount of data they're going to use. So I think that's an interesting customer for them. And then they're dabbling in business aviation, especially at the high end.

**[00:47:13] Compound248:** Where it's effectively a commercial plane that's been repurposed for business aviation use?

[00:47:20] Oak: Or almost the same size. Like Elons got a prototype antenna on his gulfstream 650. They don't fly in commercial at all, but they're a regional jet size almost. We went through this big strategic planning process after we sold the commercial aviation division late 2020. And as we look at the risks out there to the business of Starlink probably are the highest risk that we saw. And so much of our strategy is formulated around digging our moat deeper and having more barriers to entry than normal in order to make sure that they either decide not to enter our space or that we're very competitive with them when they do. We projected then that they would come in via regional jets and that's what they're doing. And the reason for that is without the Inter-Satellite Links, they really can't serve airlines that go over the ocean.

Today, that kind of puts the commercial airlines on the main line planes outside of their TAM. Regional jets, however, only fly over North America. So they've come in there with the first deal they announced was JSX, a funny little airline that flies from FBOs like private aviation terminals, but flies a scheduled flight, and you buy a seat on an aircraft. And they're Embraer 135s and 145s, which are small regional jets. They seat 35 passengers. And that was their launch customer. I know they've also been talking to a lot of the commercial airlines, and I actually expected them to announce with one of the major airlines as a launch customer on their regional jets, but we haven't heard anything to that effect.

**[00:48:55] Compound248:** So now if we bring it back to Gogo, it sounds like 5G and your global broadband product both are opportunities for growth over time, but also they sort of close the door behind you as a defensive mechanism to keep off competition. Is that a fair way of framing it?

[00:49:16] Oak: GBB's offensive and defensive, no question. The defensive piece is that we can



**[00:48:55] Compound248:** So now if we bring it back to Gogo, it sounds like 5G and your global broadband product both are opportunities for growth over time, but also they sort of close the door behind you as a defensive mechanism to keep off competition. Is that a fair way of framing it?

[00:49:16] **Oak:** GBB's offensive and defensive, no question. The defensive piece is that we can add the ESA antenna that we're designing and building with Hughes.

**[00:49:25] Compound248:** ESA means electronically steerable antenna, so that it can capture those beams, so to speak.

[00:49:30] **Oak:** Exactly. Well, it points beams at satellites. And the advantage of that is the way it does it is from a flat panel with the antenna elements in that panel. And they move the beam by running electrical currents through those elements in different patterns. And it has no moving parts, so it should be very durable. And it can switch the beams very quickly. It's all just chips. With these satellites, especially Starlink which is going to have thousands of satellites, you have to switch beams every couple of seconds. You can do that with those. OneWeb doesn't have as many satellites, so will be switching every couple minutes. Mechanical antennas have a hard time keeping up with that, and that's all of our competitors' antennas are mechanical. The idea is that they actually wear out pretty quickly if they have to turn all the time. So on the defensive side, we can add these ESA antennas to install AVANCE aircraft and augment the capacity that aircraft is receiving and aggregate it with ATG.

So like I said earlier, let's say you've got 5G on the plane and it's getting 25 Mbit/s. And then our LEO product can add another 50 Mbit/s, all of a sudden you've actually got 75 Mbit/s. Now, I'm making those numbers up, but the argument goes that ATG plus LEO is going to be greater than LEO alone. And I think based on what we're seeing, what Starlink's able to deliver, et cetera, and sort of projecting that out, we think from a capacity perspective that will really protect our North American market well. First of all, you have a cheaper, easier upgrade to a LEO. And second that LEO's actually aggregating capacity with ATG to have more capacity than competitors. The offense is that we can go after the other 14,000 aircraft in rest of the world. And we can go into the large jets that fly globally today and have our system onboard with a geo product. And we can go after that geo product and replace with our LEO product.

## Exploring Gogo's Growth Runway and Major Threats

**[00:51:25] Compound248:** I'd love to start putting these pieces together. The way it sounds like is, there's 24,000 addressable U.S. planes, of which 8,000 have a system. And you're on... I'm just using round numbers... call it 7,000 of those 8,000. That, call it a third of the market having a system on it today. It's very hard for me to imagine in 10 years that just about every plane doesn't have it. So when a new plane is built today for U.S. business aviation delivery, what portion of those end up having an in-flight WiFi solution?

[00:52:03] **Oak:** Let me break down how the deliveries work first, because I think that's helpful. About 70% of those aircraft are destined for the U.S., 70%-75%.

**[00:52:12] Compound248:** Of new build business aviation planes.

[00:52:15] **Oak:** That varies over time. But over the last couple of years, it swayed a little more to the U.S. because people couldn't even fly most places overseas due to COVID. That's the first break. Of those that are going overseas, the heavies will all have a geo satellite system. Of those going overseas that aren't heavys, none of them will have any kind of broadband satellite product because they don't have a system they can fly, no network they can fly. And then now those that are delivered in the U.S., about 60% have us on it of the 70, 70-75, roughly about 60% have us on them.

**[00:52:49] Compound248:** That's just 60 out of the 70, not 60%?

[00:52:51] **Oak:** Yeah, yeah.

And then I would guess roughly maybe another 20%, or heavys, would have geo satellites on them, geo satellite capability. So just to make that graphic, Gulfstream probably puts geo satellite product in almost every jet it delivers.



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

Appx10436

**[00:52:48] Oak:** ...that it's just geared toward, not dedicated.

**[00:52:51] Oak:** Yeah, yeah.

And then I would guess roughly maybe another 20%, or heavys, would have geo satellites on them, geo satellite capability. So just to make that graphic, Gulfstream probably puts geo satellite product in almost every jet it delivers.

**[00:53:08] Compound248:** Because they're large?

**[00:53:09] Oak:** Because they're big, large jets that go overseas. When a Gulfstream gets us, it's usually done after it's come off the line. And a lot of people will add us after it's come off the line, usually after it started flying. And so we don't count that as a line fit install. We get a pretty good chunk of Gulfstreams where they add us, but it's not line fit there. So just to give you a little bit of color, they're all different. All the different OAM are different. It's complicated. At Textron, that's our sweet spot. Those kinds of jets, we come out on almost every plane that's staying in the U.S.

**[00:53:40] Compound248:** I guess, I'm imagining you have this service where you're spending $20 million a year to maintain your network. And yet, every year, the overall penetration of this market is basically going, to grow, and grow, and grow. It sounds like you have enough network capacity effectively to be able to scale to the whole U.S. business aviation opportunity set over the next 10 years. And so I'm picturing this sort of 70% contribution, maybe even higher, 70% contribution margin on all that incremental service revenue. What eats that up? Why do you not become just a cash flow generative machine starting in two or three years?

**[00:54:27] Oak:** We do. I think that's the answer. $125 million in free cash flow next year, that does not include our GBB investment however. That was based on our baseline plan before we announced GBB. We thought, with that baseline, we'd get to about 200 million in free cash flow in 2025. We've de-levered, so our interest payments are down. That's helping our free cash flow a lot. And there's sort of a virtuous circle, which is the more we can invest in improving the service and products, and the more we improve the service and products, the happier the customers are. And the more sign up, put in equipment, then by service plans generating more cash.

**[00:55:02] Compound248:** You have this dominant market share domestically. Sounds like huge incremental market share and virtually every new plane that's coming out is going to have some type of service on this. And so you just get attached and dragged along with that. And now you have this premium opportunity in the U.S. to add LEO on top. You have 14,000 planes outside the U.S. that are now becoming addressable. How long would you imagine this growth runway can last for? At what point do you think we're in a mature market where we're kind of fully penetrated?

**[00:55:37] Oak:** I'd say 10 to 15 years. And I base that on a couple things. I believe NBAA, which is the National Business Aviation Association projects that a 100%' of business aircraft will have in-flight connectivity in 10 years time. I believe it's GAMA, which was the General Aviation Manufacturers Association. I believe their target is 15 years. I can't predict the future with specificity, but those are a lot of people that know what's going on. And so I think that's kind of the timeframe.

**[00:56:07] Compound248:** So that's a 15 year growth runway for unit growth. And then after that, who knows? It's beyond our ability to contemplate. But it sounds like we have effectively a very low churn, high margin product that looks something more and more like an annuity at that point. I'd Love to talk about threats for a moment. How would you frame the risk of regulatory? You have this license spectrum. Is there any risk that you lose the license to the spectrum? Is there risk to your antenna designs?

**[00:56:41] Oak:** We paid for the spectrum. And as long as we use it, we can renew it. Absent huge changes in our legal structure, I think that's relatively protected.

**[00:56:51] Compound248:** And what about the actual designs and getting approved onto planes? That process, I don't know exactly how that works.

**[00:56:58] Oak:** There are industry standards you have to comply with and then there are also regulatory hurdles you have to go through. There are a couple of steps on each of those to get a product approved and launched. I mean, we manage that today. We have really



Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

huge changes in our legal structure, I think that relatively protected.

**[00:56:51] Compound248:** And what about the actual designs and getting approved onto planes? That process, I don't know exactly how that works.

[00:56:58] Oak: There are industry standards you have to comply with and then there are also regulatory hurdles you have to go through. There are a couple of steps on each of those to get a product approved and launched. I mean, we manage that today. We have really knowledgeable people that know what they're doing, and you design your products in such a way that you know they're going to get approved. You don't want to take that risk of investing a lot of money and then having something that's not going to get approved. So there's a risk there, but I think that's something that we live with every day, and we manage every day, and we build it into our design, in how we design products.

**[00:57:34] Compound248:** Your would be competitor SmartSky that haven't been able to beat you in the sky, so to speak. So it sounds like they're trying to beat you in the courtroom. They've sued you over, it sounds like, the antenna design and some of the ways that you're planning to use unlicensed spectrum. To the extent you can comment on that, I'd love to have your perspective on it.

[00:57:52] Oak: We spend a great deal of time with patent council and our own engineers going through all of their patents. We've always said we did not violate any valid patent of theirs. And that sort of implies that we think some of them are invalid. These four patents that they've sued us over though, we don't have to rely on validity. We know we do not infringe on those paths. So we are feeling that we should prevail. You never know what happens in court, but we should prevail. The way the case will go is this, they petition for a temporary injunction to bar us from launching our 5G product. That will get heard relatively soon, that part of the case. In June or July, we think there will be a hearing. And we're still waiting to have a judge assigned actually in Delaware to set a date, but to win on that injunction is quite a challenge for a plaintiff. And they have to, a, show that they are likely to prevail in the ultimate case. And then it has 70, 80% chance that they will prevail. I think that's probably pretty challenging here.

And then the other is that there will be a reparable harm done to them that can't be quantified unless we are halted. I think there are arguments against that too, and that tell us how many planes you lost, and then we can multiply, got your service revenue would've been, it's probably pretty good way to estimate that you have a real challenge I think there. And then if they either win or lose on that, then the case will actually go forward on whether we infringe on the patents and whether there should be any damages awarded to them as a result of that. And that will probably take several years and be a very long case, very complex. Even if we were to lose that... If you look at how these cases generally go, they award some kind of royalty to them or whatever for the value of whatever component of theirs, the service is represented in our product or whatever. And that they usually end up being a couple of percentages, or points of revenue, or whatever. We don't think that would happen, but we think it's important that people understand where this could all go in the end, even if everything went wrong.

**[00:59:51] Compound248:** Totally. It becomes a probabilistic game. I guess, also on the things that can go wrong, I heard you earlier talking about the book-to-bill ratio of the OEMs, and that they worry there is some customer economic sensitivity. I mean, I'm picturing the second home market, which is famously cyclical. You cut back on buying your vacation home. How do you see that in the private aviation market? What is the cyclicality? What has it been like in the past when we've had downturns, how many customers have turned off their service? Help me understand that.

[01:00:25] Oak: There's really two we can look at. One is COVID and the other is that '08, '09 recession. COVID, about 20% of our customer suspended service briefly. And we had about a 4% decline in service revenue. The revenue's pretty sticky, even in a very, very difficult situation where there was no place to fly too.

**[01:00:46] Compound248:** In part, that was a special recession where people just could not travel.

[01:00:50] Oak: And so they didn't want to pay for connectivity while their plane was sitting on the ground. '09, '10, '11 actually was a good era for us. Now, that's not a 100% a great comparison either because we were a relatively new product in ATG at that time. But we grew very well through those years. Our service revenue grew very quickly in that timeframe. When we look forward, we say, "Okay, there may be fewer planes sold and there may be new planes,



[01:00:49] Compound248: In part, that was a special recession where people just could not travel.

[01:00:50] Oak: And so they didn't want to pay for connectivity while their plane was sitting on the ground. '09, '10, '11 actually was a good era for us. Now, that's not a 100% a great comparison either because we were a relatively new product in ATG at that time. But we grew very well through those years. Our service revenue grew very quickly in that timeframe. When we look forward, we say, "Okay, there may be fewer planes sold and there may be new planes, OEM deliveries. And generally what happens is people try to sell planes secondhand that they already have. That could all happen, but there's 70% of the market that doesn't have anything. And the demographic of the flyer is shifting a younger. 67% of our customers now are gen X, Y, and Z, as opposed to baby boomers. Those are all people that expect internet on their planes. So if they're buying a secondhand aircraft that doesn't have internet, they're going to put it in. So that actually could be kind of good for us.

The main barometer in terms of drivers, it's the number of high net worth individuals. So you have to look at how many people have lost how much money in terms of net worth. Generally, the Wheels Up and Flex jets of the world say, if you have more than 30 million in net worth, you can fly private. There's a huge number of people worth more than $30 million who fly, who don't have any WiFi yet. So there's just so much addressable market that while we may see a slow down in deliveries and a few other things, and the orders may slow down a little bit, I think the overall trend is going to do pretty well even through a pretty big recession.

[01:02:19] Compound248: I guess, the overall trend just to me is a digital infrastructure trend is people want to consume more data faster in more places, and the sky is now one of those places.

[01:02:33] Oak: Absolutely.

[01:02:34] Compound248: As you mentioned Flexjet, could you just quickly touch on what is your customer concentration? I imagine it's pretty fragmented, a lot of single or small fleet owners, but there's some big players out there too.

[01:02:46] Oak: I like to describe our channels and customers in the following way, there's 10 OEMs, there's hundreds of dealers, and there's thousands of customers. Our top 10 customers, which includes Flexjet obviously, and NetJets, and Wheels Up, they account for about 20% of revenue. But then it falls off a cliff right at about 20%. And the other 80% is literally 4,000 customers. And there's none on there that are even 1%. It's a very fragmented market and customer base, which I think is always good in a business. Too much. Concentration is very risky, I think.

[01:03:18] Compound248: So barring a competitive shift, and it sounds like you guys are investing to get out in front of those, seems like you're on this sort of 10-year glide, 15-year glide path towards more and more penetration, more and more data consumption, meaning more and more megabits that you get to sell hopefully at very high incremental margins. You own a really big chunk of the business. GTCR, well regarded private equity firm, owns a similarly large chunk of the business. Between you, them, and any other person you guys have 40 plus percent. What do you think the long-term goal is? And how do we think about minority shareholders here?

[01:03:57] Oak: I can't speak for GTCR, but I can speak for us. We're very happy owning this company. I've sold two companies in the past and if somebody comes along with the right price, we'd certainly be open to an exit if the value represented, but we thought the prospects of the business were... So that's always an option. I see long-term strong growth, high margins. The business mix will change a little bit as we add the satellite component. But remember, we're not paying for fixed beams in that business, so variable pricing. It's a managed service model and our margins won't be quite as high as they are on ATG, but they're going to be pretty good.

[01:04:32] Compound248: But you also won't have to build your own network, so it's a variable cost business. Is that a fair way of thinking about it?

[01:04:39] Oak: Yeah, there's no cap backs other than what we invest in developing and building the equipment we sell for the aircraft themselves.

[01:04:46] Compound248: So that's a resale business model that is a variable cost structure in the sense you're paying by the drink, so to speak, by the mega bit. And then you are



**[01:04:35] Compound248:** But you also said that there is build your own network, so it's a
variable cost business. Is that a fair way of thinking about it?

**[01:04:39] Oak:** Yeah, there's no cap backs other than what we invest in developing and
building the equipment we sell for the aircraft themselves.

**[01:04:46] Compound248:** So that's a resale business model that is a variable cost structure
in the sense you're paying by the drink, so to speak, by the mega bit. And then you are
marking it up somewhat.

**[01:04:57] Oak:** Right.

**[01:04:58] Compound248:** It sounds like a recurring revenue, long-term growth, low capital
intensity business model. To me, that is what I think of when I think of digital infrastructure,
obviously powered by those trends that we were talking about. So this has been, from my
perspective, a really fabulous conversation. I'd love just to get to ask one more question
before we say goodbye, you mentioned you've sold, and run, and built it sounds like three
different businesses now. You haven't sold this one yet, but you've run three different
businesses. Could you help us generalize what are two key lessons that you think you could
extrapolate and bring to other businesses? Think of this as advice that you would give to
someone who's attempting to build and lead a company?

**[01:05:44] Oak:** I think about this often just in terms of what's the biggest lesson learned for
me and that is it's all about the team and it's all about the culture of that team. We have a
really transparent and cross-functional culture. In other words, transparency is rewarded,
expressing your point of view is rewarded even if others disagree with it. And making sure that
you're well coordinated across the various functions of the company, that everybody that's
going to be involved in something... When we look at a product launch plan, it even includes
how we're going to bill for it. You got to include everything along that value chain of delivery
from inception to delivery, to the customer. And in a complex business like ours, that requires
complete transparency, because it's really complicated. It's really complicated. And if people
aren't talking to each other very openly and expressing all the little issues and everything else,
your project plans are going to run afoul. So to me that's important.

And interestingly, when you come into turnarounds, there's always a lot of different
personalities. And sometimes the smartest guy in the room is the worst team member. And so
sometimes you got to let the smartest guy go in order to move the team forward. And so that's
lesson one. I guess, lesson two would be, I came into this, I didn't know anything about
satellites. I didn't know anything about telecommunications. I didn't know anything about
airplanes. The only reason I got hired is I could start on Monday. But I ask a lot of questions.
And so I'll say, "You know what? Don't ever be scared to ask questions, no matter how dumb
you think the question is." I always start with the team, I say, "This is going to be a really stupid
question." And of course, they say, "Not really." And then I ask it and they say, "Yeah, it is a
pretty stupid question. But anyhow, here's the answer." And I think that facilitates a lot of good
questions and understanding on my part to help me lead the team. Those would be the two.

**[01:07:29] Compound248:** Well, hopefully I asked a few stupid questions in here and other
people get the benefit of that. We really are grateful for you spending your time with us
today. I hope that people leave this understanding a lot more about Gogo and a little bit more
about how you fit into this ecosystem. Thank you again, Oak.

**[01:07:47] Oak:** Appreciate it. Thank you.




COMPANY   LEGAL   SOCIAL

Careers   Disclaimer   LinkedIn

Shows   Privacy   Twitter
Policy

Sponsors

Newsletter   Terms and
Conditions

About Us

Sitemap

[01:04:44] **Compound248:** So that's a resale business model that is a variable cost structure in the sense you're paying by the drink, so to speak, by the mega bit. And then you are marking it up somewhat.

[01:04:57] **Oak:** Right.

[01:04:58] **Compound248:** It sounds like a recurring revenue, long-term growth, low capital intensity business model. To me, that is what I think of when I think of digital infrastructure, obviously powered by those trends that we were talking about. So this has been, from my perspective, a really fabulous conversation. I'd love just to get to ask one more question before we say goodbye, you mentioned you've sold, and run, and built it sounds like three different businesses now. You haven't sold this one yet, but you've run three different businesses. Could you help us generalize what are two key lessons that you think you could extrapolate and bring to other businesses? Think of this as advice that you would give to someone who's attempting to build and lead a company?

[01:05:44] **Oak:** I think about this often just in terms of what's the biggest lesson learned for me and that is it's all about the team and it's all about the culture of that team. We have a really transparent and cross-functional culture. In other words, transparency is rewarded, expressing your point of view is rewarded even if others disagree with it. And making sure that you're well coordinated across the various functions of the company, that everybody that's going to be involved in something... When we look at a product launch plan, it even includes how we're going to bill for it. You got to include everything along that value chain of delivery from inception to delivery, to the customer. And in a complex business like ours, that requires complete transparency, because it's really complicated. It's really complicated. And if people aren't talking to each other very openly and expressing all the little issues and everything else, your project plans are going to run afoul. So to me that's important.

And interestingly, when you come into turnarounds, there's always a lot of different personalities. And sometimes the smartest guy in the room is the worst team member. And so sometimes you got to let the smartest guy go in order to move the team forward. And so that's lesson one. I guess, lesson two would be, I came into this, I didn't know anything about satellites. I didn't know anything about telecommunications. I didn't know anything about airplanes. The only reason I got hired is I could start on Monday. But I ask a lot of questions. And so I'll say, "You know what? Don't ever be scared to ask questions, no matter how dumb you think the question is." I always start with the team, I say, "This is going to be a really stupid question." And of course, they say, "Not really." And then I ask it and they say, "Yeah, it is a pretty stupid question. But anyhow, here's the answer." And I think that facilitates a lot of good questions and understanding on my part to help me lead the team. Those would be the two.

[01:07:29] **Compound248:** Well, hopefully I asked a few stupid questions in here and other people get the benefit of that. We really are grateful for you spending your time with us today. I hope that people leave this understanding a lot more about Gogo and a little bit more about how you fit into this ecosystem. Thank you again, Oak.

[01:07:47] **Oak:** Appreciate it. Thank you.



**COMPANY**
Careers
Shows
Sponsors
Newsletter
About Us
Sitemap

**LEGAL**
Disclaimer
Privacy Policy
Terms and Conditions

**SOCIAL**
LinkedIn
Twitter

© 2023 Colossus, LLC. All rights reserved.

Document title: Gogo: Internet for Private Jets | Colossus®
Capture URL: https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript
Capture timestamp (UTC): Wed, 01 Mar 2023 21:07:06 GMT

Appx10441

| | |
|---|---|
| Document title: | Gogo: Internet for Private Jets \| Colossus® |
| Capture URL: | https://www.joincolossus.com/episodes/90983440/thorne-gogo-internet-for-private-jets?tab=transcript |
| Page loaded at (UTC): | Wed, 01 Mar 2023 21:06:07 GMT |
| Capture timestamp (UTC): | Wed, 01 Mar 2023 21:07:06 GMT |
| Capture tool: | 10.20.11 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.215 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 19 |
| Capture ID: | van39dujhFEr5jv6UFjLkP |
| User: | bf-jdipiazza |